UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RALPH BIRCH,<br><br>                    Plaintiff,<br><br>     v.<br><br>TOWN OF NEW MILFORD; ANDREW OCIF;<br>SCOTT O'MARA; JOHN MUCHERINO;<br>STEVEN JORDAN; JOSEPH QUARTIERO;<br>MICHAEL GRAHAM; BRIAN ACKER; and<br>HENRY LEE,<br><br>                    Defendants. | No. 20-1790<br><br>**COMPLAINT AND<br>JURY DEMAND** |

## PRELIMINARY STATEMENT

1.      Next to the definition of a "miscarriage of justice" in every law dictionary should be a picture of Ralph "Ricky" Birch and Shawn Henning.

2.      The wrongful convictions that deprived Ricky and Shawn of three decades of their lives were travesties in every respect.

3.      The case against Ricky had nearly all the hallmarks of wrongful convictions: Unreliable jailhouse snitches. Overstretched defense lawyers. Junk science. And, most of all, egregious and willful police misconduct.

4.      In December 1985, Ricky and Shawn were troubled and vulnerable teenagers, not sophisticated criminal masterminds.

5.      The idea that they could have committed an exceptionally gory murder while leaving no physical trace of themselves and picking up no physical trace of the victim is absurd. It has always been absurd.

6.      Police learned of the death of Everett Carr at his home in New Milford, Connecticut, in the early morning hours of December 2, 1985.

7.      When police arrived, they found one of the bloodiest crime scenes they had ever encountered.

8.      There was blood on the floor, blood on the walls almost all the way up to the ceiling, blood on the victim's clothes, blood scattered around the house on objects that the killers touched.

9.      None of it was Ricky Birch or Shawn Henning's blood.

10.     The killers left bloody footprints at the scene. According to the State, the footprints must have been left during the struggle, and could not have been left by someone who came upon the scene afterwards, because other blood spattered on top of the footprints.

11.     The footprints were not Ricky Birch's or Shawn Henning's. They were too small.

12.     The crime scene was rich with fingerprints. The police lifted at least 40 latent fingerprints from the scene and compared them against 50 known individuals.

13.     None of the fingerprints belonged to Ricky Birch or Shawn Henning. To this day, one of the fingerprints has never been matched to its source.

14.     Hairs were recovered from the crime scene.

15.     None of the hairs belonged to Ricky Birch or Shawn Henning.

16.     And, as one would expect, the bloody struggle left substantial amounts of DNA at the crime scene.

17.     None of the DNA was Ricky Birch or Shawn Henning's DNA.

18.     The DNA of a still-unknown person was found mixed with the blood and DNA of the victim on his clothing, on a piece of the murder weapon, in a bloody footprint on the floor, and in a smear of blood found on a box in the victim's dresser.

19.     No physical trace of the victim has ever been found on the person of Ricky Birch or Shawn Henning or on any items that were ever in their possession.

20.     At the time of Carr's death, Ricky was just 18 years old. Shawn was 17.

21.     Ricky was homeless, sleeping in a stolen car, and carrying around the few possessions he owned on his back. He was poor, dirty, and barely surviving. He didn't even have a real winter coat.

22.     The police thoroughly searched Ricky and Shawn's bodies, their clothing, their property, the car Ricky slept in, and the area where the car was found. None of Carr's blood, hair, or DNA was ever found in any of those places.

23.     While the police quickly became suspicious of Ricky and Shawn, they knew they had virtually no evidence to charge Ricky or Shawn with the crime.

24.     The police had no eyewitnesses putting Ricky or Shawn at the scene. No physical evidence. No explanation of how a couple of homeless teenage drifters left no trace at one of the bloodiest crime scenes in recent memory.

25.     In the words of the commanding officers who supervised the investigation, the police did not have "sufficient probable cause" to arrest or charge Ricky or Shawn.

26.     But, as the case remained unsolved, the pressure mounted. The police needed someone to take the fall for the murder of Everett Carr. They chose Ricky Birch and Shawn Henning.

27.     The police falsely claimed that Ricky had incriminated himself in a police interview—even though the incriminating remark was nowhere to be found in the police reports and went entirely unmentioned for more than a year.

28.     The police fed details of the crime to jailhouse informants to get them to falsely claim that Ricky had confessed his participation in the crime to them.

29.     The police suppressed evidence inconsistent with their half-baked theory of the case.

30.     And a famed criminalist falsely claimed, in an effort to explain away the lack of physical evidence, that a towel at the scene had tested positive for blood.

31.     These misdeeds stole almost half of Ricky Birch's adult life from him.

32.     Remarkably, Ricky is not angry. He is not bitter. He has already begun to move forward and build a successful new life for himself.

33.     He does, however, demand justice—the justice he has been denied since a cold night in the winter of 1985, and the justice he deserves.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiff's claims arise under the laws of the United States, namely 42 U.S.C. § 1983, and allege the deprivation of rights guaranteed by the Constitution of the United States.

35.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

36.     Venue lies in this Court under 28 U.S.C. 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District of Connecticut.

**JURY DEMAND**

37.     Plaintiff demands trial by jury.

**PARTIES**

38.     Plaintiff Ralph "Ricky" Birch is a 53-year-old man. He is a citizen of the United States and resides in New Milford, Connecticut.

39.     Defendant Town of New Milford is a municipal corporation organized under the laws of the State of Connecticut, with its principal place of business at 10 Main Street, New Milford, Connecticut.

40.     Defendant Andrew Ocif was at all relevant times a Detective in the Connecticut State Police, acting under color of state law. He is sued in his individual capacity.

41.     Defendant Scott O'Mara was at all relevant times a Detective in the Connecticut State Police, acting under color of state law. He is sued in his individual capacity.

42.     Defendant John Mucherino was at all relevant times a Sergeant in the Connecticut State Police, acting under color of state law. He is sued in his individual capacity.

43.     Defendant Steven Jordan was at all relevant times a Police Officer in the New Milford Police Department, acting under color of state law. He is sued in his individual capacity.

44.     Defendant Joseph Quartiero was at all relevant times a Detective in the Connecticut State Police acting under color of state law. He is sued in his individual capacity.

45.     Defendant Michael Graham was at all relevant times a Detective in the Connecticut State Police, acting under color of state law. He is sued in his individual capacity.

46.     Defendant Brian Acker was at all relevant times a Sergeant in the Connecticut State Police, acting under color of state law. Acker was the highest-ranking police official assigned to the Everett Carr murder investigation and, upon information and belief, retained supervisory authority over the investigation as a whole. He is sued in his individual capacity.

47.     Defendant Henry Lee was at all relevant times the Chief Criminalist and Director of the Connecticut State Police Forensic Laboratory, acting under color of state law. He is sued in his individual capacity.

## FACTS

### I.  The Peculiar Murder of Everett "Charlie" Carr

#### A. *Blood Everywhere*

48.     On the night of December 1-2, 1985, at least two people murdered 65-year-old Everett "Charlie" Carr at the home of his daughter Evelyn Kominiak, a.k.a. Diana Columbo, at 74 Aspetuck Avenue in New Milford, Connecticut.

49.     Carr was stabbed approximately 27 times, including a deep five-inch gash across his neck. His jugular vein was severed. He sustained approximately seven instances of blunt force trauma to the head.

50.     The murder weapon has never been recovered. A metal collar that connected the blade of the murder weapon to the handle was found underneath under Carr's body.

51.     Blood was pooled around Carr's body and splattered and smeared on the walls of the Columbo home's front hallway, reaching or nearly reaching the ceiling.

52.     The blood trail showed that, after the assault on Carr, the assailants did not immediately leave the house.

53.     Rather, they rummaged through a few other areas of the house, including, most notably, the dresser in Carr's bedroom. One of the assailants dripped Carr's blood onto the clothes in a drawer of that dresser and smeared blood on a White Owl cigar box in the drawer.

54.     Neither Ricky Birch nor Shawn Henning was involved in Carr's death in any way.

55.     Neither Ricky Birch nor Shawn Henning has ever been inside the home at 74 Aspetuck Avenue.

56.     Ricky Birch and Shawn Henning are, and always have been, entirely innocent of this crime. Carr's true killers remain unknown and have never been brought to justice.

### B. Diana Columbo's Suspicious Behavior

57.     Diana Columbo called for emergency assistance for her father at approximately 4:50 am on the morning of December 2, 1985.

58.     During that call, she said to the dispatcher, "Oh my God, he's got a knife in his hand."

59.     When emergency medical personnel arrived at 74 Aspetuck Avenue, they entered the house through the kitchen.

60.     When one of the EMTs tried to push through a swinging door from the kitchen to the dining room to go speak with Columbo, she found that the door was barricaded.

61.     But Columbo had just walked through the door, unobstructed, moments earlier.

62.     After entering the dining room, Columbo pushed furniture against the door to prevent the police from opening it.

63.     During a conversation with an EMT at the crime scene, Columbo blurted out, "Why did he do this?"

64.     While still at the scene, Columbo later returned to the dining room to retrieve her fur coat; an EMT noted this fact in his report because he found it strange.

65.     Ms. Columbo provided widely divergent and irreconcilable stories of how and when she discovered her father's body.

66.     When she spoke with police at the scene, Columbo told them that she had been home all night and heard her father "coughing" but did not check on him. This was a lie. Columbo had in fact been at the home of a boyfriend for much of the night.

67.     The next day, Columbo acknowledged that she had lied and told police she had been at the boyfriend's house. This time, she told police she had left her boyfriend's house and arrived home at 2:30 or 3:00 a.m.

68.     In a sworn statement to police on December 3, Columbo changed her story again, this time claiming that she returned home at 4:30 a.m. on the morning of December 2. When she found her father, she "thought he had hemorrhaged and pas[sed] out." She knelt by him and "told him I was going to help him up."

69.     Ms. Columbo claimed she "felt his hand and wrist and told him to move his hand to get his blood circulating." When he did not do so, she became concerned.

70.     These absurd statements boggle the mind. When Columbo purportedly came home, the lights were on, the floor and walls of her hallway were covered in blood, and her father was lying on the ground with a five-inch gash in his throat and dozens of stab wounds in his torso.

71.     That Columbo could have confused this grotesque scene for a "hemorrhage" from which she could help her father *get up by moving his hand* is inconceivable.

72.     Although there was blood splattered all over the hallway and walls, Columbo also told police that it did not appear there had been a struggle in the house.

73.     The time at which Columbo claimed she came home from the boyfriend's house varied, but was in all events no later than 4:30 a.m.

74.     Columbo did not call for emergency medical assistance until 4:50 a.m.

75.     Columbo's delay of at least 20 minutes in seeking help is equally inexplicable and incriminating.

76.     The gravity of the situation was readily apparent—as was the possibility that the assailants might still be in the house, unless of course Columbo knew who they were.

77.     Screaming, running away, or immediately calling the police are all predictable, innocent responses to discovering one's father gruesomely murdered in one's home. Hanging around for at least 20 minutes, lying to the police, claiming it was a "hemorrhage," and barricading emergency personnel from a room of the house are not.

78.     What's more, immediately after calling for medical assistance on the night of the murder, Columbo called Richard Burkhart, her employer and lover.

79.     Columbo was a senior manager of Burkart's radiological equipment company, Burkhart-Roentgen. She was also his paramour for many years while Burkhart was married to someone else.

80.     In 1983, Columbo was convicted of two felonies in New York in connection with a scheme to defraud customers of Burkhart-Roentgen.

81.     Columbo's father, the victim, also worked part-time in the shipping department at Burkhart-Roentgen.

82.     Burkhart claimed that his car would not start upon receiving Columbo's call, so he called an employee to drive him to Columbo's house at 74 Aspetuck Avenue.

83.     The purportedly broken car was back in working order the following day.

84.     Burkhart also called one of his sons at 5:00 a.m. and asked him to come from Port Chester, New York to Columbo's house in New Milford to "help clean up the blood."

85.     Burkhart told police that Columbo told him that she had been home during the night and heard a thud downstairs, which she later discovered was her father.

86.     Burkhart and Columbo both falsely told police that Burkhart and the victim had a close, friendly relationship.

87.     In fact, as numerous witnesses told police, Burkhart and Everett Carr loathed each other.

88.     Police notes not disclosed to the defense before trial describe Carr's feelings toward Burkhart as follows: "[F]ather said I hate that SOB before I leave I'm going to punch that bastard."

89.     On the afternoon after the murder, another Burkhart-Roentgen employee visited Burkhart's farm and noticed unexplained scratches on Burkhart's face and neck.

### C. An Inside Job?

90.     From the moment he became involved in the investigation, the lead investigator, Connecticut State Police ("CSP") Detective Andrew Ocif, believed that the killing of Everett Carr was a "burglary gone bad."

91.     However, in addition to the suspicious behavior of the victim's daughter and her intimates, there were any number of reasons to doubt—from the very beginning of the investigation—that this was true.

92.     First, the exceptional savagery of the crime itself. The number and severity of the wounds were more consistent with an attack committed in a fit of rage out of personal animosity than a burglary committed by someone seeking to avoid detection.

93.     Second, the theft, or lack thereof. Some items were reported missing from the home, including a VCR, a few pieces of jewelry with little value, and some rolls of quarters.

94.     But the house was full of televisions, stereos, candlesticks, and antiques that were not touched. The victim had $67 in cash, a watch, and a gold wedding ring on his person, none of which was taken.

95.     In addition, as the police knew but failed to disclose to Mr. Birch's defense, investigators seized $1,000 in cash from the crime scene, further undermining the burglary-gone-wrong theory.

96.     The assailants thoroughly searched Carr's dresser, as if looking for something in particular.

97.     The only room in the house that the attackers did not disturb in any way was Diana Columbo's bedroom.

98.     The only thing of any real value taken from the house—the VCR—had been a gift from Richard Burkhart to Diana Columbo.

99.     Third, the dogs. Diana Columbo had four dogs in the house that were known by neighbors to bark very loudly at any stranger and to act aggressively toward perceived threats.

100.    The dogs did not bark on the night of the murder. Neighbors familiar with the sound of Columbo's dogs said they did not hear them that night, suggesting that whoever killed Carr was not an unknown intruder.

101.    The dogs were familiar with Burkhart, as he had bred them and given them to Columbo.

102.    None of the dogs was harmed in the incident in any way.

103.    Fourth, the guns. Carr was known to own multiple firearms, including one he regularly kept in the glove compartment of his Pontiac, which he generally kept unlocked.

104.    No firearms were found at the crime scene. The glove compartment of Carr's Pontiac was found open. No gun was inside.

105.    Carr's missing guns raise the possibility that his assailants were familiar with him and took measures to deprive him of known means of self-defense before attacking him.

106.    Fifth, the rock through the window. Video of the crime scene showed that a window in Carr's living room was broken, with a stone lying on the floor.

107.    It is apparent that someone threw the stone through the window as some kind of message or warning, which is not generally what burglars do.

108.    Sixth, the timing. Carr and his wife Evelyn had lived with their daughter Diana Columbo in New Milford for several years. They were scheduled to move into a new apartment in New Jersey on December 3, 1985.

109.    On the night of the murder, December 1-2, 1985, Mrs. Carr was already in New Jersey making preparations for the move.

110.    If someone wanted to kill Carr before he left New Milford and while his wife was not there, the night of December 1-2, 1985 was an opportune time to do so.

## II.  Defendants' Investigation Yields "Not Enough Probable Cause"

### A. *The Usual Suspects*

111.    Because the crime occurred in New Milford, the New Milford Police Department (NMPD) responded to the crime scene and initially took charge of the investigation.

112.    New Milford had a population of less than 25,000 at the time and a small police department.

113.    The Western District Major Crime Squad of the Connecticut State Police (CSP) soon began providing assistance.

114.    Throughout the investigation, the CSP and NMPD jointly investigated the homicide.

115.    Some investigative tasks were performed exclusively by NMPD personnel; some exclusively by CSP personnel; and some by both CSP and NMPD personnel.

116.    In practice, the lead investigator on the case was CSP Detective Andrew Ocif.

117.    On the morning of December 2, 1985, just hours after police responded to the scene of the Carr homicide, NMPD Police Officer Steve Jordan was in contact with a local informant, Peter Barrett. Jordan asked Barrett who was committing burglaries and stealing VCRs.

118.    Barrett revealed the names of several people who were committing small-time burglaries in the area, all of whom were drug users.

119.    Barrett also revealed the identities of two "fences" who were receiving stolen property for resale in return for money or drugs. One of the fences was a man named Douglas Stanley, who lived in Danbury and sold cocaine out of his apartment.

120.    Police began investigating the people whom Barrett mentioned, including Stanley, for whose apartment they got a search warrant.

121.    Most of the early persons of interest in the investigation were people with addiction issues, transients, and low-level offenders known to local police.

122.    In the two to three days following the murder, police canvassed Carr's neighborhood to see whether neighbors heard anything unusual on the night of the murder.

123.    Most reported hearing and seeing nothing of interest. But at least one neighbor said that she heard a car with a loud exhaust drive up the street at approximately 12:20 to 12:30 a.m., and then turn around and depart the area approximately 15 to 20 minutes later.

### B. Ricky, Shawn, Tina, and the Stolen Buick

124.    Among the people mentioned by the informant as someone who used recreational drugs and committed small-time burglaries in New Milford in December 1985 was Ricky Birch.

125.     Ricky was born in New Milford. He never knew his biological father.

126.     When he was eight years old, Ricky's mother married the man who became his adoptive father.

127.     Ricky used marijuana for the first time when he was seven years old. He became a heavy marijuana user when he was 14 years old.

128.     When Ricky was 13, the family moved from New Milford to an isolated location in rural New Hampshire. Ricky was ostracized and had difficulty fitting in, contributing to growing behavioral issues in school.

129.     Ricky completed school through eighth grade before being expelled. He spent a year in a juvenile detention facility when he was 15.

130.     Ricky's father, with whom he was close, was diagnosed with lung cancer when Ricky was a teenager. Finding it very difficult to watch his father's condition deteriorate, Ricky left the family home at age 16 and eventually made his way back to New Milford.

131.     Ricky's father died in December 1984, when Ricky was 17.

132.     In December 1985, Ricky was homeless. He generally slept in a park, at a friend's house, or in a car if he had access to one. He carried around a few extra items of clothing in a backpack.

133.     In December 1985, Ricky was also regularly using cocaine. On a few occasions, he broke into houses he knew to be empty at the time and stole electronics and other household items. He then sold those items, including to Douglas Stanley, to pay for drugs.

134.    On November 29, 1985, Ricky Birch, Shawn Henning, and Tina Yablonski, a childhood friend of Ricky's who was now Shawn's girlfriend, stole an old Buick from the lot of an auto body shop in Brookfield, Connecticut.

135.    They stole the car so that Ricky would have somewhere to sleep.

136.    They drove the Buick to New Hampshire to visit Ricky's mother.

137.    While they were in New Hampshire, the Buick got stuck in a stream in bad weather. In the process of pulling it out, its muffler ripped off. As a result, the Buick was very loud.

138.    On the night of December 1, 1985, upon returning from New Hampshire, Ricky, Shawn, and Tina drove to Douglas Stanley's apartment in Danbury, where they hung out and got high.

139.    They left in the early morning hours of December 2 and dropped Tina at her home in New Milford. They then returned to Shawn Henning's father's house, where Ricky slept on the floor of Shawn's room.

140.    Ricky, Shawn, and Tina returned to Douglas Stanley's apartment on December 3. Barrett, the informant, was there, as were other local burglars whose names Barrett had given to police, including a man named Keith Breen.

141.    Stanley, Barrett and Breen told the group that an old man in New Milford had been killed when he interrupted a burglary and had his throat slashed with a knife. Stanley told everyone assembled at his apartment to expect to be questioned by the police.

142.    Ricky, Shawn, and Tina decided that, if questioned by the police, they would say they had hitchhiked from New Hampshire to Danbury, and then from

Danbury to New Milford, on the night of December 1-2. Their purpose in doing so was to conceal that they had stolen the Buick.

143.    The police questioned Shawn Henning on December 4. He told the police that he, Ricky, and Tina had left Douglas Stanley's around 12:30 am on the night of December 1-2 and hitchhiked back to New Milford. Shawn denied any knowledge of or involvement in the Carr homicide.

144.    On December 5, Ricky voluntarily walked into NMPD headquarters to speak with police after hearing from an acquaintance that the police had identified Ricky as an informant.

145.    When Ricky showed up, police questioned him about his whereabouts on the night of December 1-2. He said that he, Shawn, and Tina had left Douglas Stanley's between 12:30 am and 2:00 am on the night of December 1-2 and hitchhiked back to New Milford. Ricky denied any knowledge of or involvement in the Carr homicide.

146.    The police had learned through investigation that the Buick had been stolen from the auto body shop but did not know who had taken it. When police asked Ricky about the Buick, he admitted stealing it. He also acknowledged having committed four recent residential burglaries in the area.

147.    Ricky offered to take the police to the Buick. It was not where Ricky had last left it, but while Ricky was in the patrol car with the NMPD, they coincidentally passed Shawn walking on the street.

148.    Ricky told Shawn that he had told the police everything about the Buick and that Shawn should do the same. Shawn then took the police to the Buick, which he had left in the woods near the reservoir.

149.    On December 5, police separately interrogated Ricky and Shawn a second time. This time, they were in custody.

150.    Each man continued to deny any knowledge of or involvement in the Carr homicide. Each truthfully maintained that they had left Douglas Stanley's apartment in Danbury in the early morning hours of December 2, dropped off Tina at her house, and returned to Shawn's father's house, where they slept.

151.    The police seized the clothes that Shawn and Ricky were wearing when they were arrested.

152.    After recovering the Buick, the police thoroughly searched it. It was predictably filthy—full of trash, clothes, dust, and dirt. It had clearly not been cleaned any time in recent memory. The police knew from multiple witnesses that Ricky and Shawn had slept multiple nights in the Buick.

153.    The police painstakingly inventoried every single object in the Buick—more than a hundred items altogether.

154.    The items included matchbooks, pieces of paper, forks, tissues, an empty soda cup, soap, clothing, a Motley Crue poster, gasoline cans, marijuana, a single penny, and an empty mayonnaise jar "partially filled with Hawaiian Punch-type liquid."

155.    The car also contained items connected to burglaries that Shawn and Ricky had committed both before and after December 1-2, making clear that there had been no attempt to clean out the car or hide or destroy evidence in anticipation of a police search.

156.    None of the items found in the Buick had any connection to 74 Aspetuck Avenue or to the Carr homicide.

157.    On December 9, police again conducted custodial interrogations of Shawn and Ricky, who were detained pending trial on charges relating to the stolen Buick. The December 9 interrogation of Ricky would later become a pivotal moment in the case against him.

158.    The police exerted significant pressure on the teenage suspects during those interrogations. They threatened them with the death penalty, shoved graphic photos of Carr's slit throat in their faces, and encouraged each man to turn on the other.

159.    Neither did so. Both truthfully maintained that they had nothing to do with the murder of Everett Carr.

160.    During Ricky's December 9 interrogation, CSP Detective Scott O'Mara held a graphic photo of Carr's dead body a few inches from Ricky's face. O'Mara yelled, in sum and substance, "Look what you did to someone's grandfather. How can you live with yourself?"

161.    Ricky responded, in sum and substance, "If you don't get that photo out of my face, I'm going to punch you in yours." At that point, the police ended the interrogation.

162.    The officers completed a written report of the interview within hours after it concluded. The report did not indicate that Ricky had said anything incriminating.

163.    Also on December 9, the police executed search warrants for the Henning residence, the Yablonski residence, and the bodies of Ricky, Shawn, and Tina.

164.    The police took clothes from Shawn and Tina's houses. They took lint from Shawn's father's dryer. They took samples of Ricky, Shawn, and Tina's fingerprints, blood, hair, and pubic hair.

165.    None of Carr's blood was found in or near the stolen Buick, or on Ricky, Shawn, or Tina's persons or property.

166.    There were small blood spots on some clothes belonging to Ricky and Shawn, but the blood was Shawn's. He had cut his finger while removing a license plate from the Buick.

167.    As the State Lab reported to the police in January 1986, none of the latent fingerprints lifted from the Carr crime scene belonged to Ricky, Shawn, or Tina.

168.    As the State Lab reported to the police in February 1986, none of the blood found at the Carr crime scene belonged to Ricky, Shawn, or Tina.

169.    None of the hair found at the Carr crime scene belonged to Ricky, Shawn, or Tina.

170.    The footprints at the Carr crime scene did not match the footwear seized from Ricky and Shawn.

171.    In short, within two months of their initial contact with Ricky Birch, the police knew that no physical evidence whatsoever connected him (or Shawn Henning or Tina Yablonski) to the Carr homicide.

### C. *The Investigation Flails*

172.    The police continued to investigate persons of interest other than Ricky Birch and Shawn Henning. The investigation flailed from one abortive lead to another.

173.    In December 1985 and January 1986, the police canvassed current and former employees of Burkhart-Roentgen. They learned of a break-in at Burkhart-Roentgen around Christmas of 1985 and obtained a warrant for the footwear of an employee suspected in that break-in. His shoes did not match the footprints from the Carr homicide scene.

174.    In early 1986, the police investigated Peter Barrett, the informant with whom the NMPD had been in touch within hours of the homicide, and Keith Breen, a drug user and burglar who was known to local law enforcement and also frequented Douglas Stanley's Danbury apartment.

175.    Breen had a documented history of violence and was a suspect in the unsolved 1984 murder of his sister-in-law in Danbury.

176.    Police repeatedly interviewed Barrett and his associates and Breen and his wife. The Breens repeatedly claimed that Barrett was responsible for the homicide. Barrett said that the Breens were angry with him for informing on them.

177.    In March 1986, the police learned that Douglas Stanley had bought a stolen Panasonic VCR from Ricky Birch and then resold it. The VCR taken from the Columbo house at 74 Aspetuck Avenue was also a Panasonic.

178.    Police tracked down the VCR that Ricky had sold to Douglas Stanley. To their evident disappointment, however, it had no connection to the Carr homicide. It came from a different house in a different town.

179.    Making no progress, the police started taking increasingly desperate shots in the dark in the summer of 1986.

180.    They learned that two men had been committing burglaries in the New Milford area with Tina Yablonski. In June 1986, the CSP requested that those men's fingerprints be compared to the latent fingerprints lifted from Diana Columbo's home. They did not match.

181.    They learned that a man in Waterbury who had a loud car had been arrested for a series of burglaries of homes whose occupants were asleep. In July 1986,

the CSP requested that the man's fingerprints be compared to the latent prints from the crime scene. They did not match.

182.    Between January and October of 1986, the police searched the road between 74 Aspetuck Avenue and the reservoir. They had dogs sniff the woods for blood. They had divers search the reservoir. They went back to 74 Aspetuck Avenue to dust for more fingerprints.

183.    They found nothing.

184.    Even as they pursued tangential leads, the police scarcely investigated Diana Columbo and Richard Burkhart.

185.    In May 1986, a CSP trooper who was not involved in the Carr investigation received a phone call at home from an anonymous caller who said that Richard Burkhart was responsible for the Carr homicide.

186.    On June 9, 1986, Ocif asked Burkhart to take a polygraph test about his whereabouts on the night of Everett Carr's death. Burkhart became enraged, yelled "No fucking way," kicked over a wastebasket, and told Ocif to "get the hell out of here and never come back."

187.    Ocif left and never came back. He made no attempt to speak with Burkhart again.

188.    Police knew that both Burkhart and Columbo had repeatedly lied about the relationship between Burkhart and Everett Carr. Burkhart and Columbo claimed the two men were friendly when they actually hated each other. Police do not appear to have ever confronted either Burkhart or Columbo about these lies.

189.    Despite having been informed that Burkhart owed Carr money, police do not appear to have investigated the financial relationship between the two men.

190.    Police also appear to have been unaware that Columbo was using illicit drugs heavily at the time of Carr's death.

191.    Police do not appear to have investigated the fact that Columbo's primary car, a white Volkswagen Beetle, was not parked at her home on the night of the murder.

### D. With Pressure Mounting, the Police Admit They Cannot Solve the Crime

192.    Everett Carr was a senior citizen killed in especially brutal fashion in what the police claimed was a home invasion robbery. The case attracted significant public attention in western Connecticut. The police were under significant pressure to solve it.

193.    Some of that pressure came from the victim's family. On May 11, 1986, Carr's widow Evelyn wrote to CSP Sergeant Brian Acker to express her displeasure that no one had been arrested yet.

194.    Evelyn, who by then lived in New Jersey, asked the police to tell her if they were still "at first base." She wrote: "I still have many friends in New Milford, and I feel obliged to let them know by advising these friends and doing so through the public media, i.e., press conferences, TV, interviews, etc."

195.    She copied the Governor of Connecticut on the letter.

196.    On October 9, 1986, CSP Lieutenant James Hiltz, the Commander of the Western District Major Crime Squad, encouraged the State's Attorney's Office to seek authorization from the Governor to issue a monetary reward.

197.    Lt. Hiltz wrote to the State's Attorney: "[A]ll conventional investigative leads and processes have been exhausted. All known associates, friends, possible witnesses and/or suspects have been interviewed. Evidence has been collected and

forensically examined and analyzed. Simply stated, there is **not enough Probable Cause for an arrest or prosecution**."

198.   Lt. Hiltz's representations were true. On information and belief, he would not have made such representations to the State's Attorney without familiarizing himself with the investigation or without consulting the lead detective, Ocif.

199.   The Governor authorized a $20,000 reward on October 23, 1986. CSP investigators working on the case learned of the award on October 28, 1986, when the State's Attorney informed them of it.

200.   Ocif personally learned of the reward—and of Lt. Hiltz's representation that no probable cause existed—no later than March 5, 1987, when Ocif attached Lt. Hiltz's letter to a memo that Ocif wrote and signed.

201.   On information and belief, Ocif never questioned, challenged, or disputed Lt. Hiltz's representation that no probable cause existed. To the contrary, Ocif agreed with it.

202.   The reward did not bear any fruit. The finger-pointing began.

203.   On February 17, 1987, State's Attorney Pastore wrote to Henry Lee at the State Lab: "The commanding officer of the Western District Major Crime Squad . . . has requested that this office intervene with your office to expediate [*sic*] the complete analysis of blood stains to clothing submitted to you in [the Carr case]. I expressed reservations to the officers in as much as their frustrations are within their own agency however [*sic*] I did want to advise you of their request."

204.   In other words, Lt. Hiltz, the commanding officer of the Western District Major Crime Squad, blamed the State Lab for not having solved the Carr case. But the

State's Attorney told Lt. Hiltz that the real blame lay "within their own agency"—that is, with the CSP investigators working the case.

205.    On February 26, 1987, Lee responded. He wrote: "We started the examination of the evidence right away. I treated this case as the top priority case. Five examiners and myself worked on this case day and night for four weeks, including several weekends . . . . We have done everything within our available resources on this case. However, forensic science has its limitations. The bloodstain found on [Shawn Henning]'s jacket didn't match the victim's blood type."

206.    Lee noted that he had reached out to several other laboratories for assistance with the Carr homicide but "they inform me that there is really not much that they can do to help us with this case."

207.    In conclusion, Lee wrote: "If a case cannot be solved, it is not the fault of any particular individual."

208.    On March 5, 1987, Major John M. Watson, the commander of the entire CSP Western District and the supervisor of Lt. Hiltz, wrote a letter to Evelyn Carr, who was continuing to press for an arrest.

209.    Watson wrote: "I do understand your frustrations regarding this tragic occurrence in your life. Suspects have been identified but sufficient ***probable cause does not exist at this time to proceed against them***."

210.    Major Watson's representation was true. On information and belief, Watson would not have made such a representation (particularly not to the victim's widow) without familiarizing himself with the details of the investigation or without consulting the lead detective, Ocif.

211.   On information and belief, Ocif never questioned, challenged, or disputed Major Watson's representation that no probable cause existed. To the contrary, Ocif agreed with it.

212.   In short, as of March 1987, the investigation was at a dead end. No one agreed who was responsible for the lack of progress. The State's Attorney blamed the CSP. The CSP blamed the State Lab. The State Lab blamed the limits of science.

213.   But everyone agreed on the problem: There was no probable cause for an arrest. It looked like the Carr case might never be solved.

### III.  Defendants Create the Evidence They Were Lacking and Suppress Evidence That Contradicts Their Fabricated Narrative

214.   Knowing that they lacked any basis for an arrest, and facing increasing pressure, Defendants set out to "solve" the Carr homicide by manufacturing the evidence they were missing. Their targets were Ricky Birch and Shawn Henning.

215.   Defendants targeted Ricky and Shawn because they uncritically accepted the facile narrative that the Carr homicide was a "burglary gone bad" without considering the evidence.

216.   Defendants targeted Ricky and Shawn because they were out of other ideas.

217.   Above all else, Defendants targeted Ricky and Shawn because they were easy targets—young and poor, troubled and adrift.

#### A.  The Bathroom Fabrication

218.   On April 3, 1987—just weeks after CSP commanding officers repeatedly represented that no probable cause existed for an arrest and the State's Attorney blamed the CSP investigators on the case for the lack of progress—those CSP investigators

retrospectively altered Ricky Birch's words to create an incriminating statement that Ricky never made.

219.    As discussed above, CSP Sergeant John Mucherino and Detective Scott O'Mara had conducted a custodial interrogation of Ricky on December 9, 1985.

220.    Among the aggressive tactics Mucherino and O'Mara used in that interrogation was to shove graphic photos of Everett Carr's dead body in Ricky's face and ask Ricky how he could live with himself after killing someone's grandfather. The interrogation terminated when Ricky said he would "punch" O'Mara if O'Mara did not get the photo out of his face.

221.    Throughout the December 9 interrogation, Ricky maintained his innocence.

222.    On April 3, 1987, O'Mara wrote a memo indicating that he and Mucherino had "reviewed" their December 9, 1985, interrogation with Ricky. Sixteen months later, O'Mara and Mucherino both now "remembered" that Ricky had said, "That's the bathroom there" while looking at a photo of Carr's body lying in a pool of blood in the hallway.

223.    According to O'Mara and Mucherino, the photo did not show any portion of the bathroom. Therefore, according to O'Mara and Mucherino, Ricky's statement revealed knowledge of the house's layout that Ricky could only have gained from being inside the house.

224.    This alleged inculpatory statement about the bathroom was an utter fabrication.

225.    It is nowhere to be found in O'Mara's contemporaneous report of the December 9, 1985 interrogation.

226.   O'Mara's April 3, 1987 fabricated report states that Mucherino "previously had a conversation with . . . Ocif" in which Mucherino told Ocif about the statement.

227.   No contemporaneous record of that purported conversation between Mucherino and Ocif exists either. It never occurred.

228.   Ricky never said "That's the bathroom there," in words or substance, during his December 9, 1985 interrogation.

229.   Nor did Ricky make any other such statement during the December 9 interrogation demonstrating that he had non-public information about the layout of the house at 74 Aspetuck Avenue. He had no such knowledge, having never been inside the house.

230.   O'Mara, Mucherino, and Ocif made the whole thing up.

231.   O'Mara and Mucherino fabricated other details about the interrogation as well, including that Ricky's entire body convulsed and he nearly fell on the floor when shown a photo of Carr's dead body.

### B. *The Perugini Fabrication*

232.   To bolster their implausible "burglary-gone-wrong" theory and create corroboration for the preposterous self-inculpatory statement they attributed to Ricky, Defendants continued to fabricate evidence they thought would fill in the holes in their case.

233.   For instance, although jailhouse informants are notoriously unreliable—even when law enforcement acts in good faith to obtain evidence from them—Ocif spent much of 1986 and 1987 traveling around interviewing inmates who had spent time in jail or prison with Ricky Birch and Shawn Henning.

234.   Most of these inmates told Ocif that neither man had said anything about committing any crimes.

235.   Then, on December 7, 1987, Ocif met Robert Perugini.

236.   Perugini had been incarcerated with Ricky at the Manson Youth Institute while they were teenagers.

237.   In December 1987, Perugini was preoccupied with the possibility that he could be transferred to a prison in Somers, which was apparently known as a place where young inmates would be sexually assaulted after being transferred from the Manson Youth Institute.

238.   Perugini had been convicted of a gang rape and therefore understood himself to be a potential target of sexual violence in prison. He told associates repeatedly that he was desperate not to be transferred to Somers, and would lie to avoid it.

239.   Ocif told Perugini that he would help him in exchange for information that could be used to convict Ricky Birch.

240.   Ocif and Perugini fabricated a conversation in which Ricky supposedly confessed to Perugini that he had participated in the Carr murder as part of a botched burglary.

241.   No such conversation ever happened.

242.   Perugini later wrote a letter to an associate stating that he had arranged a "deal" to lie in exchange for a reduced sentence.

243.   Perugini also bragged several years later that he had gotten out of jail because he lied as part of a deal he made with the state.

244.    Perugini told at least four people over the course of many years that he had lied about Ricky's supposed involvement in the Carr murder in order to avoid going to Somers or to help himself get out of jail.

### C. *The Cocchia Fabrication*

245.    Perhaps concerned that the implausible claims of one known liar and criminal would not be enough, Defendants sought to bolster the invented case against Ricky by fabricating a statement from another informant, Todd Cocchia.

246.    Cocchia had met and become friendly with Ricky in 1986 and 1987, while they were incarcerated together.

247.    After being released in 1988, Ricky and Cocchia hung out together in New Milford. They then decided to travel to Virginia together.

248.    Cocchia came to the attention of the authorities when he was arrested in Virginia in June 1988.

249.    After being arrested, Cocchia told local police in Virginia that he had information concerning a homicide in which Ricky Birch was involved.

250.    Cocchia had violated his probation in Connecticut before leaving for Virginia. Cocchia refused to provide *any* information about Ricky's supposed involvement in a homicide until he was assured that he would receive consideration for doing so.

251.    In July 1988, Ocif and NMPD Detective David Shortt traveled to Norfolk, Virginia to speak with Cocchia.

252.    The point of having Shortt travel with Ocif was for Shortt to observe, participate in, and listen to the interview with Cocchia. Shortt did in fact participate in the interview.

253.    At the beginning of the interview, Ocif told Cocchia, in sum and substance, that the prosecutors in Connecticut could ensure that he did not serve time in Connecticut if he provided helpful information.

254.    Cocchia then claimed that Ricky Birch had spontaneously confessed his participation in a murder while the two were on the bus to Virginia together.

255.    It quickly became obvious to Ocif and Shortt that Cocchia's claim was bunk. Cocchia claimed that Ricky had confessed to killing a man during the daytime by himself. Of course, Everett Carr was killed at night by multiple assailants.

256.    Ocif and Shortt should have simply ignored Cocchia's transparently unreliable and self-serving claim, which they knew to be false.

257.    Ocif even commented during the interview that half of what Cocchia was saying was inaccurate.

258.    Instead, Ocif, with Shortt's acquiescence, decided to turn it into something he could use to pin the Carr homicide on Ricky Birch. As Ocif put it, "half a loaf of bread is better than none."

259.    During the interview, Ocif falsely told Cocchia, in sum and substance, that the police had ample evidence against Ricky Birch and that others had previously told police what Cocchia was now telling them.

260.    Ocif fixed Cocchia's numerous inaccurate statements about how the Carr murder occurred.

261.    Ocif provided Cocchia with additional details about the crime that Cocchia did not know, including that the homicide occurred at night, that the murder weapon was a knife, that the knife had come from the kitchen, that there was more than one assailant, and that the victim was old.

262.   Perhaps most astonishingly, Ocif *gave Cocchia the police file* on the Carr homicide so that Cocchia could familiarize himself with the materials it contained.

263.   Ocif later testified that, because Cocchia "didn't have one hundred percent [of the] details" about the Carr homicide, "we had to provide a little more information about what happened."

264.   Ocif took these actions for the purpose of fabricating a statement by Cocchia that he could use against Ricky Birch—a statement that could only exist if Ocif invented it.

265.   At no point did Shortt, who was present and paying attention throughout the interview, intervene to stop the fabrication from occurring.

### D. The Suppressed Exculpatory Evidence

266.   Even with this fabricated evidence—the "bathroom" statement and the secondary confessions attributed to Perugini and Cocchia—Defendants still had a problem. They had manufactured a case based on a bungled burglary, but their own evidence showed that Everett Carr was almost certainly not killed by burglars in a random home invasion.

267.   To cover up these discrepancies, Defendants withheld material exculpatory evidence from the State's Attorney's Office, preventing that evidence from being disclosed to Ricky and his defense counsel.

268.   The Litchfield County State's Attorney's Office had an open file policy in place at the time, under which it made all nonprivileged investigative materials in its possession, including police records, available for inspection by defense counsel.

269.   The suppressed evidence tended to suggest that Ricky and Shawn could not have committed the murder of Everett Carr—and that the murder was not a "burglary gone wrong" at all.

270.   First, the police withheld the fact that they had recovered $1,000 in cash from the crime scene.

271.   CSP Detective Michael Graham, who helped to process the crime scene at 74 Aspetuck Avenue, found eight $100 bills and four $50 bills at the scene shortly after the homicide. He seized the bills as evidence and filled out an inventory form documenting the seizure.

272.   On December 4, 1985, the NMPD gave the $1,000 in cash back to Diana Columbo, who claimed it as her "lost property." NMPD Detective Steve Jordan filled out a form documenting the return of the $1,000 to Columbo.

273.   CSP Detective Joseph Quartiero documented the recovery of the $1,000 in cash in his handwritten notes from the investigation.

274.   Graham, Jordan, and Quartiero did not disclose any of these documents— or the fact that $1,000 had been recovered from the scene—to the State's Attorney's Office at any time before the start of Ricky's trial.

275.   The recovery of $1,000 in large bills from the crime scene--or nearly $2,400 in today's dollars—lends further support to the theory that the murder of Everett Carr did not occur during a robbery at all, as the fabricated statements of Perugini and Cocchia claimed.

276.   Second, the police suppressed a recording of a pre-polygraph interview with Tina Yablonski in which she confirmed that Ricky and Shawn could not have been in New Milford at the time the State accused them of being there.

277. The time at which Ricky, Shawn, and Tina left Douglas Stanley's apartment in Danbury on the night of December 1-2, 1985, was an important detail in the investigation.

278. If Ricky, Shawn, and Tina left Danbury after approximately midnight, Ricky and Shawn could not have been driving the loud car that a neighbor heard on Aspetuck Avenue around 12:20 a.m. It would have taken too long to drive back from Danbury, drop off Tina at home, and get to Aspetuck Avenue.

279. An early morning departure from Danbury would therefore mean that Ricky and Shawn did not commit the crime. (Of course, an earlier departure would not mean that they *did* commit the crime, just that it would have been logistically possible for them to have done so.)

280. Ricky and Shawn consistently and truthfully maintained that they had left Douglas Stanley's apartment sometime in the early morning hours of December 2.

281. In a written statement on December 6, Tina told police that she arrived home in New Milford around 1:00 a.m.

282. On December 8, Tina told police that they left Danbury around 12:50 am.

283. In June 1986, Tina changed her story. The CSP obtained a letter from a county prosecutor in New Hampshire that promised Tina immunity against prosecution for any role she might have played in a burglary in Charleston, New Hampshire.

284. After Ocif showed her the immunity letter, Tina claimed that she, Ricky, and Shawn had left Douglas Stanley's apartment in Danbury shortly after 11:15 p.m., and certainly before midnight.

285.   Unbeknownst to Ricky and his defense lawyer, however, Tina had previously given police *yet another* consistent, exculpatory statement about the time of departure from Danbury.

286.   On March 4, 1986, Tina was administered a polygraph exam by CSP Sergeant Michael Beal and Trooper Joseph Palombizio.

287.   In the interview preceding the polygraph, which was audio recorded, Tina told police that she, Ricky, and Shawn had left Danbury at around 12:25 a.m.—much too late for Shawn and Ricky to have driven the loud car that was heard near Carr's home on the night of the murder.

288.   Beal sent a report on the results of the polygraph examination itself to CSP Sergeant Brian Acker, one of the investigators on the case.

289.   On information and belief, Beal also conveyed either the recording of the pre-polygraph interview or its sum and substance to Acker and/or other investigators on the case.

290.   Neither Beal, Palombizio, Acker, nor any other police officer disclosed the recording of the March 4, 1986 interview to the State's Attorney's Office.

291.   Neither Beal, Palombizio, Acker, nor any other police officer disclosed the substance of Tina Yablonski's March 4, 1986 statement about the timing of her departure from Danbury to the State's Attorney's Office.

292.   Police also suppressed the immunity letter that provided the motivation for Tina to change her story.

293.   Third, the police suppressed comprehensive video footage of the crime scene at 74 Aspetuck Avenue.

294.    The footage showed, among other things, that a rock had been thrown through the living room window of the house and that Diana Columbo's bedroom was the only room in the house that was untouched during the purported robbery.

295.    This information, which was not otherwise disclosed to Ricky or his defense counsel, further strengthened the inference that this homicide was not a "burglary gone bad" at all.

296.    Fourth, the police suppressed handwritten notes maintained by Detective Quartiero during the investigation of the Carr murder. These notes were never disclosed to Ricky or his defense counsel at the time he was accused of and tried for the murder.

297.    Quartiero's notes contained a trove of exculpatory information.

298.    The notes documented that police found $1,000 in cash at the crime scene, as well as a long list of jewelry with a total value of approximately $10,000, undermining the State's trial theory that the murder occurred during a burglary.

299.    The notes documented that Diana Columbo told investigators there were no signs of a struggle at the crime scene, an absurd assertion that would have prompted reasonable defense counsel to explore her possible role in the crime and cast doubt on the thoroughness and rigor of the police investigation, which failed to meaningfully probe Columbo's reasons for making such a specious claim.

300.    The notes also documented that a Burkhart-Roentgen employee had heard Mr. Carr say of Richard Burkhart, "I hate that SOB. Before I leave I'm going to punch that bastard." The suppression of the notes deprived defense counsel of the opportunity to use this statement as further support for an alternative theory that the murder resulted from personal animosity involving Columbo, Burkhart and Carr.

301.    The suppression of this material evidence, which was favorable to Ricky's

defense, deprived him of his right to a fair trial.

### E. The Towel Fabrication

302.    Even with the falsified new "evidence" and the hidden exculpatory

evidence, the emerging case against Ricky still had a glaring flaw: How did homeless

teenagers who slept in a stolen car walk out of one the goriest crime scenes in recent

memory without a trace of the victim's blood anywhere on either of them?

303.    To help solve that problem for the government, Dr. Henry Lee, the

Director of the Connecticut State Police forensic laboratory, fabricated still more

evidence.

304.    When police processed the crime scene, they photographed a bathroom

upstairs in which two towels were hanging next to the sink. One of the towels appeared

to have a red-colored stain of some kind on it.

305.    On a date and time not presently known, Lee told the prosecutor on the

case that he had tested the bathroom towels and that one of the towels had tested

positive for blood.

306.    These statements were false, and Lee knew they were false.

307.    Lee had never tested the towels. Having never tested them, he never got a

positive result for blood on one of them. Lee knew as much when he told the prosecutor

he had.

308.    Lee's fabrication about the towel was integral to Ricky's false conviction.

As the Supreme Court of Connecticut later explained in overturning the conviction, "the

prosecutor's greatest challenge at trial was to explain how it was possible for two

teenagers to have stabbed the victim twenty-seven times in the confines of a narrow

hallway, severed his jugular vein, struck him over the head several times, tracked blood all over the house, and yet somehow managed not to leave any trace evidence in their getaway vehicle—which, as we previously discussed, did not show any signs of having been cleaned when the police recovered it a few days later—or elsewhere." *Birch v. Commissioner of Corr.*, 334 Conn. 37, 68 (2019).

309.   Lee's fabrication supplied an explanation. As a result, Ricky was convicted of a crime he did not commit.

310.   This was not the first or the only time that Lee forwarded false information to prosecutors that was later used to convict an innocent person.

311.   According to published media reports, Lee "has allegedly hidden evidence or given incorrect testimony in at least three other cases, potentially sending the wrong men to prison"[1]—just as he did to Ricky Birch.

312.   For instance, in one case in 1988, Lee testified that a brown substance found on a knife belonging to murder suspect was blood. Although Lee testified that it could not be determined whether the blood was human in origin, in fact laboratory testing conducted prior to the trial had already shown that the substance was definitively *not* human blood.

313.   In another case, Lee testified that blood spatter found on a murder defendant's pants matched his slain wife's blood type. In fact, it now appears that the victim's blood type was never found on the pants.

---

[1]      Natalie O'Neill, "How Many Murder Cases Did Celeb Forensic Scientist Henry Lee Botch?," *The Daily Beast* (June 26, 2019), https://www.thedailybeast.com/henry-lee-how-many-murder-cases-did-the-celebrity-forensic-scientist-botch.

314.    Only by fabricating evidence supporting their incredible "burglary-gone-wrong" theory and suppressing evidence that undermined it were Defendants able to secure Ricky Birch's conviction.

### IV. The Flimsy Case Against Ricky Birch and Its Eventual Collapse

315.    Ricky was arrested for the murder of Everett Carr on January 28, 1989 by Ocif and Shortt.

316.    He was charged with felony murder and burglary. He pleaded not guilty.

317.    The case proceeded to trial just four months after the arrest.[2]

### A. An Unjust Conviction

318.    The State had no eyewitnesses placing Ricky at the scene of the crime. It had no forensic evidence connecting Ricky to the crime. In fact, all of the forensic evidence indicated that he was not involved in the crime.

319.    The State's extremely weak trial case against Ricky had five basic parts:

320.    **First**, the car. Ricky and Shawn were concededly driving the loud Buick with the missing muffler on the night of December 1-2, 1985. Two neighbors testified that they heard some unspecified loud car near the Carr residence between 12:10 and 12:30 am on the night of the murder. They did not see the car or hear its doors open or close.

321.    One of these neighbors claimed to have heard the noise of the car toward the end of watching *The Tonight Show* with Johnny Carson, which aired from 11:30 p.m. to 12:30 a.m. However, subsequent investigation showed that *The Tonight Show*

---

[2]     Shawn Henning was tried separately and convicted before Ricky's trial began.

did not air on the evening of December 1, 1985, and that the neighbor therefore must have recalled hearing a loud noise on a different night, not the night of the murder.

322.    Another neighbor who testified that he had both seen and heard the loud car on the night in question testified upon being shown a photograph of the Buick that it was not the car he observed.

323.    **Second**, Ricky, Shawn, and Tina's statements about their whereabouts on the night in question. The State made much of the fact that Ricky, Shawn, and Tina initially misled the police about their whereabouts on the night of December 1-2, 1985. But those misleading statements were immediately corrected and were meant to conceal that they had stolen the Buick. The police knew all of that within 72 hours of the murder.

324.    The State also focused on inconsistent statements about the timing of their activities that night. According to Tina Yablonski's testimony, which was inconsistent with her undisclosed prior statement to police, she, Ricky, and Shawn left Danbury shortly after 11:00 p.m. on the night of the murder.

325.    According to the State, this testimony not only showed that it was logistically possible for Ricky to have committed the crime, but also suggested consciousness of guilt—that Ricky lied to police about the timing of his departure from Danbury to conceal that he committed the murder. But Defendants' suppression of Tina's pre-polygraph interview deprived the defense of a crucial area of cross-examination.

326.    **Third**, the falsified December 9 interrogation. Police witnesses falsely testified that, during the December 9 interrogation, Ricky said, in sum and substance, "Is that the bathroom there?" or "That is the bathroom there." They also falsely testified

that Ricky violently convulsed and "literally almost fell out of his chair" when shown the photograph of Carr's bloody corpse.

327.   **Fourth**, the fabricated jailhouse informant testimony. Todd Cocchia and Robert Perugini both testified about Ricky's purported "confessions." Cocchia testified that Ricky told him that he grabbed a knife from the kitchen and stabbed a man during a burglary. Perugini testified that Ricky told him that he killed an old man with a knife while robbing a house in New Milford with Shawn Henning. Without any way of knowing about the suppressed evidence that $1,000 in cash had been left undisturbed at the crime scene, the defense was impeded from demonstrating that the robbery-gone-wrong theory was incredible.

328.   **Fifth**, the junk science, which served not to inculpate Ricky but to explain away the utter lack of forensic evidence against him. Lee testified that the blood spatter on the walls was "uninterrupted," meaning that no person or object was between the victim's body and the wall when the spatter occurred. According to Lee, this meant that it was possible for the attackers to have committed the crime without getting significant amounts of blood on them.[3]

329.   Lee also falsely testified that a "smear of blood" had been found on the towel in the upstairs bathroom in the Columbo residence. Lee testified that a photograph of the towel "depicts the portion of the bathroom—bathroom, two towels. This towel had a reddish smear, very light smear. Subsequently, that smear was identified to be blood."

---

[3]   This testimony was, of course, nonsense. The possibility that the attackers could stab Carr 27 times in a dynamic struggle in close quarters without getting bloody themselves was virtually nil.

330.    In attempting to convince the jury of Ricky's guilt in his closing argument, the prosecutor relied heavily on the evidence fabricated by Defendants.

331.    This is how the prosecutor summarized the case: "What we have, ladies and gentlemen, is that the evidence establishes unequivocally that the defendant was in possession of this noisy car, they are in the area of the crime. We also have, ladies and gentlemen, is [*sic*] the defendant's own words putting him inside that house. He tells Cocchia, he tells Perugini, he implies it to O'Mara and Mucherino and he shows his consciousness of guilt by concocting with Tina Yablonski and Shawn Henning a false story to cover his movements, and the times of his movements, as well as the method of his movements on the night of December 1 and the early morning of December 2."

332.    All of that evidence—except that Ricky was driving around in the noisy stolen Buick and initially lied about it—was either fabricated by the police or contradicted by other exculpatory material suppressed by the police.

333.    The prosecutor discussed the December 9 interrogation at length in summation. He offered an extended defense of the fact that Mucherino and O'Mara did not memorialize the fabricated statement about the bathroom. He characterized it as a "mistake" by "guys who are overworked, running a number of cases," not "necessarily a lie."

334.    The prosecutor also twice reminded the jury of Lee's fabricated assertion that there was blood on the towel in the upstairs bathroom. He stated: "Lee also testified that he found blood on the towel by the bathroom sink upstairs." In a rebuttal to the defense's anticipated argument that "there is no forensics putting Mr. Birch in the house," the prosecutor again noted, in reference to the towel: "There was testimony that there was blood by the bathroom sink upstairs."

335.     The jury deliberated over the course of three days. While deliberating, it asked for a readback of testimony concerning the December 9 interrogation by O'Mara and Mucherino.

336.     The jury eventually found Ricky guilty of felony murder and burglary. He was sentenced to 55 years in prison.

**B.** ***New, Definitive Evidence Proves That Ricky and Shawn Are Innocent***

337.     After Ricky and Shawn spent decades in prison for a crime they did not commit, a thorough post-conviction investigation proved their innocence.

338.     Extensive DNA testing conducted between 2008 and 2015 compared items seized from the crime scene to the belongings of Ricky, Shawn, and Tina. The DNA results show that Carr's DNA was not found on any of Ricky or Shawn's clothing or other belongings.

339.     Numerous items from the crime scene were tested and found to bear DNA. Testing excluded Shawn, Ricky, and Tina as contributors of that DNA.

340.     Four items—a blood smear on the White Owl cigar box from Carr's dresser, blood from a floorboard where the perpetrator left a footprint next to Carr's body, the waistband of Carr's bloody underwear, and the knife collar found under Carr's body—were each shown to contain a mixture of Carr's DNA and that of another person. That person is not Tina, Shawn, or Ricky, and has never been identified.

341.     It is overwhelmingly likely that the second DNA profile found on these four items belongs to Everett Carr's real killer.

342.     A latent fingerprint recovered from the crime scene has never been matched to any known individual. It may also belong to the real killer.

343.    Post-conviction forensic analysis also established that two shoe impressions found at the crime scene—which the State conceded belonged to the perpetrators—did not match the shoes that Ricky and Shawn wore at the time.

344.    William Bodziak, a former FBI footwear impression analyst also concluded that at least one of the sets of footprints left by Carr's murderers was far too small to match either Shawn's feet or Ricky's feet.

345.    Todd Cocchia also recanted his fabricated statements implicating Ricky in the murder, and admitted that he lied when he claimed that Ricky had confessed to him. He explained that he was overborne by Ocif's insistence on Ricky's guilt and his desire to return to the streets in order to feed his addiction.

346.    Cocchia's mother also confirmed that, shortly after Ricky's conviction, Cocchia confessed to her that he lied in order to avoid incarceration. She further testified that he was a dishonest person at that time who would say anything to feed his addiction.

347.    Robert Perugini told investigators from the Connecticut Innocence Project that he had hoped that by speaking to Ocif he could help his own case, but that "it was a bad idea" in the end to provide a statement. He also said he was under a lot of pressure from law enforcement to testify against Ricky.

348.    When called to testify at Ricky's post-conviction habeas trial in 2015, Perugini invoked his privilege against self-incrimination and refused to answer questions.

349.    The post-conviction reinvestigation also uncovered evidence from John Andrews, who was Diana Columbo's boyfriend at the time of Ricky's trial in 1989.

350.    Andrews has since testified that Columbo once charged at him with a knife during an argument and threatened to kill him like she had killed her father.

351.    Shortly after receiving these threats from Diana Columbo, Andrews was brutally assaulted and nearly murdered while playing cards at the Aspetuck Avenue house. He believed that Columbo had orchestrated the attack.

352.    While packing his belongings to leave Columbo's home, Andrews discovered the blade of a knife with its handle missing hidden away in the basement. The knife used to murder Carr almost certainly snapped in half, as demonstrated by the knife collar found under his body.

353.    In short, the entirety of the State's extremely flimsy case against Shawn and Ricky has been soundly discredited.

### C.  Ricky Is Finally Exonerated and the Charges Dismissed

354.    After lengthy post-conviction proceedings in State court, Ricky's conviction was finally overturned by the Supreme Court of Connecticut on June 14, 2019.

355.    The Supreme Court ruled that Lee's false testimony about finding blood on the bathroom towel, and the prosecution's failure to correct it, violated Ricky's right to a fair trial. It ordered that he be granted a new trial.

356.    After the State concluded that there was insufficient evidence to permit a retrial, the Connecticut Superior Court dismissed all of the charges against Ricky on July 10, 2020, finally ending his three-decade ordeal.

357.    In explaining the State's decision not to retry the case, the State's Attorney represented to the court that there were "significant obstacles to the State's ability to prove the case[] beyond a reasonable doubt," including "the lack of forensic evidence

establishing a link between [Ricky] and the crime scene" and the recantation of Todd Cocchia, whom the State characterized as a "material witness[]."

## V.  Thirty Years Lost

358.    As a result of Defendants' misconduct, Ricky Birch spent more than 30 years incarcerated for a murder of which he was completely innocent.

359.    Ricky suffered severe emotional pain and suffering as a result of being punished for a crime he did not commit. He continues to suffer mental anguish and distress to this day.

360.    While in prison, Ricky was exposed to horrific violence and trauma that will haunt him for the rest of his life. He witnessed grisly violence between inmates and vicious assaults on inmates by staff. Friends attempted and committed suicide. He lived through riots and brawls, saw his cell and belongings set on fire, and had his possessions stolen.

361.    In one incident, Ricky narrowly escaped an attempted stabbing by another inmate who was in the midst of a mental health crisis. A week later, Ricky watched in horror when that same inmate smeared himself with feces and attacked another prisoner with two improvised blades, stabbing the man dozens of times while guards looked on.

362.    In another incident, an inmate impaled Shawn Henning with an improvised blade—plunging the weapon so deeply into Shawn's chest that it exited out of his back—while Ricky was standing next to him. Ricky, who had tried unsuccessfully to intercede to stop the attack, watched the gruesome stabbing from inches away as his friend was nearly killed.

363.    In or around 2000, Ricky was one of almost 500 Connecticut prisoners who were transferred to the notorious Wallens Ridge State Prison in Virginia as part of an attempt to ease prison overcrowding in Connecticut.[4] When he arrived at Wallens Ridge, he was strip-searched in a group with approximately 20 other prisoners, handcuffed, shackled, and led across the prison grounds on a leash with a Taser pressed against his neck. The officer charged with orienting him to his new environment repeatedly warned that guards were armed and would not hesitate to "fire upon" inmates.

364.    During his time at Wallens Ridge, Ricky routinely witnessed and endured horrific violence. Guards frequently fired plastic ammunition from shotguns to quell perceived disturbances among inmates. In one incident, Ricky watched in horror as guards carried a fellow inmate on a stretcher as he appeared to be suffering a seizure. After his convulsions caused the inmate to involuntarily kick an officer, the guards transporting him began tasing the inmate repeatedly until he died in front of Ricky's eyes.

365.    Ricky's time at Wallens Ridge was dehumanizing and traumatic. He was forced to bathe in completely open showers with no privacy whatsoever, including from female guards who frequently observed him nude.

366.    Although his experience at Wallens Ridge and other prisons was traumatizing and deeply scarring, Ricky feared seeking mental health treatment while in prison because accessing such care could disqualify prisoners from eligibility for certain

---

[4]    *See* Edward Fitzpatrick, "State Inmates Call Virginia's Wallens Ridge 'Hell,'" *The Hartford Courant* (June 19, 2000), https://www.courant.com/news/connecticut/hc-xpm-2000-06-19-0006190028-story.html ("The routine use of shotguns containing rubber pellets is just one of the issues that have made Wallens Ridge a lightning rod for criticism.").

programs and jobs. As a result, Ricky never obtained any meaningful mental health treatment while incarcerated.

367.    As a result of the trauma he experienced in prison, Ricky continued to suffer from anxiety and mental anguish after his release. He was fearful of being approached from behind, even in church. By force of habit, he continued engaging in behaviors he had learned in prison to ensure his safety, such as maintaining a line of sight to the nearest exit from any enclosed space at all times and examining the hands of anyone he met to see if they might be secreting a weapon.

368.    Ricky's physical health also suffered during his time in prison. For instance, although the Connecticut Department of Corrections apparently learned from a blood test in or around 1992 that Ricky had hepatitis C, he was never informed of this diagnosis or offered treatment until 2007. By the time Ricky discovered learned of his illness 15 years later, he had already sustained significant liver damage. He was forced to undergo approximately a year of grueling treatment, which caused debilitating side effects and thyroid damage that lingers to this day.

369.    Ricky was also denied adequate dental care while in prison. Officials refused for years to provide inmates with dental floss, and Ricky was not permitted to see a dentist for approximately 20 years while incarcerated. He suffered frequent pain and bleeding and developed gum disease as a result.

370.    Ricky's wrongful incarceration also denied him the opportunity to pursue normal relationships with, and enjoy the companionship of, his family and friends.

371.    For example, throughout his life, Ricky has been very close with his mother, who was in her mid-50s when Ricky was convicted. She is now in her late 80s and in ailing health. Ricky's unjust incarceration deprived him of the opportunity to care

for and support his mother as she aged, including during multiple heart surgeries that she underwent while he was in prison.

372.    Ricky was also deprived of the opportunity to maintain close relationships with his siblings and their children. Ricky's sister, with whom he was particularly close, died while he was incarcerated. He was robbed of the opportunity to say goodbye and spend time with her in her final days. One of Ricky's brothers also died while he was in prison. His relationships with his two surviving brothers were strained by the long-term separation caused by his incarceration. As a result, Ricky's relationships with his siblings, nieces and nephews has been permanently damaged.

373.    Ricky was denied years of gainful employment and income as a result of his incarceration. His earning power and ability to support himself have been permanently hampered as a result of losing years of productive work experience.

374.    Ricky has been publicly shamed, disgraced and humiliated because of the ordeal of being falsely accused and convicted of a gruesome murder. Nothing can undo the reputational damage he has sustained.

375.    Ricky's wrongful conviction and incarceration violated his fundamental constitutional rights and shattered his faith in the American justice system.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Fabrication of Evidence in Violation of the Right to a Fair Trial
(Against Defendants Ocif, O'Mara, Mucherino, Acker, and Lee)

376.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

377.    At all relevant times, Ocif, O'Mara, Mucherino, Acker, and Lee acted under color of law in investigating Plaintiff for the murder of Everett Carr.

378.    Defendants fabricated evidence against Plaintiff, and/or failed to intervene to prevent the fabrication of evidence against Plaintiff despite having knowledge of the fabrication and a reasonable opportunity to intervene.

379.    The fabricated evidence includes but is not limited to the invented self-inculpatory "bathroom" statement, the false secondary confessions attributed to Perugini and Cocchia, and the fabricated positive test for blood on the bathroom towel.

380.    This evidence was likely to, and ultimately did, influence the jury's verdict finding Plaintiff guilty.

381.    Defendants forwarded this fabricated evidence to prosecutors, who presented it to the jury that convicted Plaintiff.

382.    Plaintiff was wrongfully convicted and incarcerated as a result.

383.    Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards Plaintiff.

384.    Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

## SECOND CAUSE OF ACTION
42 U.S.C. § 1983 – Malicious Prosecution in Violation of the Fourth Amendment
(Against Defendants Ocif, Acker, Mucherino and O'Mara)

385.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

386.   Defendants Ocif, Acker, Mucherino and O'Mara initiated criminal proceedings against Plaintiff by generating evidence against him and providing it to prosecutors.

387.   The proceedings terminated in Plaintiff's favor when all charges against him were dismissed.

388.   There was no probable cause for the criminal proceedings against Plaintiff, which were based almost entirely on fabricated and patently unreliable evidence.

389.   As demonstrated by their gross deviations from acceptable police procedures, suppression of exculpatory material, and intentional fabrication of evidence, Defendants Ocif, Acker, Mucherino and O'Mara acted with malice in pursuing criminal proceedings against Plaintiff.

390.   Plaintiff was wrongfully convicted and incarcerated as a result.

391.   Defendants Ocif, Acker, Mucherino and O'Mara acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards Plaintiff.

392.   Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

**THIRD CAUSE OF ACTION**

42 U.S.C. § 1983 – Suppression of Material Favorable Evidence / *Brady v. Maryland*
(Against Defendants Graham, Jordan, Quartiero, Ocif, and Acker)

393.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

394.    Defendants Graham, Jordan, Quartiero, and Acker acted under color of state law in investigating Plaintiff for murder.

395.    In the course of the investigation, these Defendants uncovered and/or learned of evidence favorable to Plaintiff, including (a) that $1,000 in cash was left undisturbed at the victim's residence, undermining the theory that the crime was a robbery gone wrong; (b) that Tina Yablonski told police during a March 4, 1986 pre-polygraph interview that she, Ricky, and Shawn had departed Danbury at 12:25 a.m. on the night of the murder and therefore could not have been present when the victim's neighbors heard a loud car in the area; (c) the crime scene video showing, among other things, a rock through the living room window and Diana Columbo's bedroom undisturbed; (d) that Todd Cocchia was given an opportunity to review Ocif's file to fill in missing information in his story while giving a statement to police; (e) that, before changing her story, Yablonski was offered immunity from prosecution for any role she might have played in a New Hampshire burglary; and (f) Defendant Quartiero's handwritten notes, which documented a slew of information that Ricky's defense could have used to undermine the case against him.

396.    This evidence was material and would likely have led to an outcome more favorable to Plaintiff in the criminal proceedings against him.

397.    Defendants suppressed this evidence by not disclosing it to prosecutors, thereby preventing it from reaching Plaintiff or his defense counsel, and/or failed to intervene to prevent the suppression of this evidence despite having knowledge of the suppression and a reasonable opportunity to intervene.

398.    Plaintiff was wrongfully convicted and incarcerated as a result.

399.    Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards Plaintiff.

400.    Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

### FOURTH CAUSE OF ACTION
Negligence
(Against Defendants Ocif, O'Mara, Mucherino,
Jordan, Quartiero, Graham, Acker, and Lee)

401.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

402.    Defendants Ocif, O'Mara, Mucherino, Jordan, Quartiero, Graham, Acker, and Lee owed Plaintiff a duty to exercise reasonable care in their investigation of crimes, to reasonably pursue and disclose exculpatory evidence, and to refrain from fabricating evidence and pursuing criminal prosecutions without sufficient basis.

403.    Defendants Ocif, O'Mara, Mucherino, Jordan, Quartiero, Graham, Acker, and Lee breached these duties by their conduct set forth above.

404.   The negligent acts and omissions of Defendants Ocif, O'Mara, Mucherino, Jordan, Quartiero, Graham, Acker, and Lee proximately caused the damages hereinbefore alleged.

## FIFTH CAUSE OF ACTION
Negligent Infliction of Emotional Distress
(Against Defendants Ocif, O'Mara, Mucherino,
Jordan, Quartiero, Graham, Acker, and Lee)

405.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

406.   Defendants Ocif, O'Mara, Mucherino, Jordan, Quartiero, Graham, Acker, and Lee knew or should have known that their negligent conduct in investigating Plaintiff and pursuing the criminal prosecution of Plaintiff, as set forth above, carried an unreasonable risk of causing emotional distress and that such distress might result in illness or bodily harm.

407.   Plaintiff suffered severe and extreme emotional distress which was reasonable and foreseeable in light of the conduct of Defendants Ocif, O'Mara, Mucherino, Jordan, Quartiero, Graham, Acker, and Lee.

408.   Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

## SIXTH CAUSE OF ACTION
Indemnification – Conn. Gen. Stat. § 7-465
(Against Defendant Town of New Milford)

409.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

410.     Jordan was a police officer acting in the performance of his duties within the scope of his employment with Defendant Town of New Milford and under color of law.

411.     As set forth above, Jordan infringed Plaintiff's civil rights and caused him physical damages to his person and property while performing his duties and acting within the scope of his employment.

412.     As a direct and proximate result of his conduct, Plaintiff suffered the damages hereinbefore alleged.

413.     Within six months after the foregoing causes of action accrued, pursuant to Conn. Gen. Stat. § 7-465, Plaintiff filed with the clerk of the Town of New Milford written notice of his intention to commence this action and of the time when and the place where the damages were incurred or sustained.

414.     Pursuant to the First, Third, Fourth, and/or Fifth Causes of Action, Defendant Town of New Milford is liable for Plaintiff's damages under Conn. Gen. Stat. § 7-465.

## SEVENTH CAUSE OF ACTION
Direct Action – Conn. Gen. Stat. § 52-557n
(Against Defendant Town of New Milford)

415.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

416.     Shortt and Jordan were police officers acting in the performance of their duties within the scope of their employment with Defendant Town of New Milford and under color of law.

417.     Shortt and Jordan owed Plaintiff a duty to exercise reasonable care in their investigation of crimes, to reasonable pursue and disclose exculpatory evidence, to

refrain from fabricating evidence, and/or to intervene to prevent other law enforcement officers from engaging in such misconduct.

418.    Shortt and Jordan breached these duties by their conduct set forth above.

419.    Even to the extent that Shortt and Jordan were performing discretionary functions, they disregarded the risk of imminent harm to Plaintiff, an identifiable person.

420.    In addition or in the alternative, the actions of Shortt and Jordan involved malice, malicious intent to vex or trouble, and/or intent to injure.

421.    As a direct and proximate result of their conduct, Plaintiff suffered the damages hereinbefore alleged.

422.    Defendant Town of New Milford is liable for those damages under Conn. Gen. Stat. § 52-557n.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

1.    Compensatory damages in an amount to be determined;

2.    Punitive damages in an amount to be determined;

3.    Pre-judgment interest as allowed by law;

4.    An order awarding Plaintiff reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

5.    Such other further relief as the Court may deem just and proper.

Dated: December 2, 2020

KIRSCHBAUM LAW GROUP, LLC

By: /s/ Damon A. R. Kirschbaum
      Damon A.R. Kirschbaum
      Andrew P. O'Shea*
433 South Main Street, Suite 101
West Hartford, CT 06110
(860) 522-7000

KAUFMAN LIEB LEBOWITZ & FRICK LLP

      David A. Lebowitz±
      Douglas E. Lieb±
10 East 40th Street, Suite 3307
New York, New York 10016
(212) 660-2332

* Application for admission pending
± Application for *pro hac vice* admission
forthcoming

*Attorneys for Plaintiff Ralph Birch*