**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

SHAWN HENNING,
  *Plaintiff*,

  v.

TOWN OF NEW MILFORD et al.,
  *Defendants.*

No. 3:20-cv-1790 (VAB)
[*rel.* No. 3:20-cv-1792 (VAB)]

**RULING AND ORDER ON MOTION TO DISMISS**

Shawn Henning ("Plaintiff") has sued the Town of New Milford and Steven Jordan

("Town Defendants") and Andrew Ocif, Scott O'Mara, H. Patrick McCafferty, Joseph Quartiero,

Michael Graham, Brian Acker, and Henry Lee ("State Defendants") (collectively, "Defendants"),

under 42 U.S.C. § 1983 and state common law for Defendants' alleged fabrication and

suppression of material exculpatory evidence, which allegedly resulted in Mr. Henning's

wrongful conviction for felony murder and subsequent incarceration for thirty years. *See* Compl.,

No. 3:20-CV-1792, ECF No. 1 (Dec. 2, 2020) ("Compl.").

The State and Town Defendants have separately moved to partially dismiss the suit for

failure to state a claim upon which relief can be granted.[1]

For the following reasons, the State Defendants' motion to dismiss Mr. Henning's § 1983

suppression of material favorable evidence (Count Three) and intentional infliction of emotional

distress (Count Eight) claims is **DENIED**.

---

[1] The State Defendants also moved to dismiss Count Six and Count Seven of the Complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Mot. to Dismiss Shawn Henning's Compl., ECF No. 35 (Feb. 15, 2021). On March 22, 2021, Mr. Henning voluntarily dismissed without prejudice these claims against the State Defendants. Joint Notice of Partial Voluntary Dismissal of State-Law Causes of Action Against State Defs. Only, ECF No. 42 (Mar. 22, 2021); Order, ECF No. 43 (Mar. 25, 2021) (dismissing Count Six and Count Seven as to the State Defendants).

1

The Town Defendants' motion to dismiss is **GRANTED** as to Mr. Henning's § 1983 civil rights conspiracy (Count Four) and failure to intervene (Count Five) claims and **DENIED** as to his § 1983 suppression of material favorable evidence claim (Count Three); common law negligence (Count Six), negligent infliction of emotional distress (Count Seven), and intentional infliction of emotional distress (Count Eight) claims; and statutory indemnification (Count Nine) and municipal liability (Count Ten) claims.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

On December 2, 1985, Everett "Charlie" Carr died, allegedly after being stabbed twenty-seven times, at the home of his daughter, Evelyn Kominiak, also known as Diana Columbo, in New Milford, Connecticut. Compl. ¶¶ 44–45.

The New Milford Police Department ("NMPD") responded to the crime scene and initially took charge of the investigation. *Id.* ¶ 104. The Western District Major Crime Squad of the Connecticut State Police ("CSP") also provided assistance. *Id.* ¶ 106.

Allegedly, the lead investigator on the case was CSP Detective Andrew Ocif, who believed that the murder of Mr. Carr was a "burglary gone bad." *Id.* ¶¶ 85, 109.

On December 2, 1985, NMPD Police Officer Steven Jordan allegedly asked a local informant who had been committing burglaries and stealing video cassette recorders ("VCRs"). *Id.* ¶ 110. The informant allegedly revealed the names of several people who were committing small-time burglaries in the area, all of whom were drug users. *Id.* ¶ 111. The informant also revealed the identities of two "fences" who were receiving stolen property in return for money or drugs. *Id.* ¶ 112. Allegedly, one of the fences was a man named Douglas Stanley, who lived in Danbury and sold cocaine from his apartment. *Id.*

According to the informant, Mr. Birch and Mr. Henning were "[a]mong the people . . . who used recreational drugs and committed small-time burglaries in New Milford[.]" *Id.* ¶ 117. In December 1985, Mr. Henning was seventeen years old and homeless. *Id.* ¶¶ 120, 122. He "regularly use[d] cocaine" and on a few occasions, allegedly "broke into houses he knew to be empty at the time and stole electronics and other household items." *Id.* ¶ 123. Mr. Henning then sold those items to Douglas Stanley to pay for drugs. *Id.*

On November 29, 1985, Mr. Birch, Mr. Henning, and Tina Yablonski allegedly stole an old Buick from the lot of an auto body shop in Brookfield, Connecticut and drove the Buick to New Hampshire to visit Mr. Birch's mother. *Id.* ¶¶ 124–125.

On the evening of December 1, 1985, Mr. Birch, Mr. Henning, and Ms. Yablonski allegedly returned from New Hampshire and drove to Mr. Stanley's apartment in Danbury, Connecticut. *Id.* ¶ 127. Mr. Birch, Mr. Henning, and Ms. Yablonski allegedly left Mr. Stanley's apartment in the early morning hours of December 2, 1985 and drove Ms. Yablonski to her home in New Milford. *Id.* ¶ 128. Mr. Birch and Mr. Henning allegedly then returned to Mr. Henning's father's house. *Id.*

On December 4, 1985, Mr. Henning was questioned by the police. *Id.* ¶ 132. Mr. Henning told the police that he, Mr. Birch, and Ms. Yablonski had left Mr. Stanley's apartment on the night of December 1-2, 1985 around 12:30 a.m. and hitchhiked back to New Milford. *Id.* ¶ 132. On December 5, 1985, Mr. Birch also allegedly voluntarily disclosed to the police that he, Mr. Henning, and Ms. Yablonski had left Mr. Stanley's home between 12:30 a.m. and 2:00 a.m. on the night of December 1-2, 1985 and hitchhiked back to New Milford. *Id.* ¶ 134. Both Mr. Henning and Mr. Birch denied any knowledge of or involvement in the Carr homicide. *Id.* ¶¶ 132, 134.

During his December 4, 1985 interview with the police, Mr. Birch allegedly admitted to stealing the Buick and having committed four recent residential burglaries in the area. *Id.* ¶ 135. After Mr. Birch admitted to stealing the Buick, Mr. Henning took the police to the stolen car. *Id.* ¶ 137. The police allegedly "thoroughly searched" the car and did not find any items that had a connection to the Carr homicide. *Id.* ¶¶ 141–144.

On December 9, 1985, the police conducted separate custodial interrogations of Mr. Henning and Mr. Birch, who were detained pending trial on charges relating to the stolen Buick. *Id.* ¶ 145. During the interrogations, the police allegedly exerted "significant pressure" on Mr. Birch and Mr. Henning, including by "threaten[ing] them with the death penalty, shov[ing] graphic photos of Carr's slit throat in their faces, and encourag[ing] each man to turn on the other." *Id.* ¶ 146. Mr. Henning and Mr. Birch allegedly both "maintained that they had nothing to do with the murder of Everett Carr." *Id.* ¶ 147.

The same day, the police allegedly executed search warrants for the Henning residence, the Yablonski residence, and the persons of Mr. Birch, Mr. Henning, and Ms. Yablonski. *Id.* ¶ 153. Allegedly, none of Mr. Carr's blood was found in or near the stolen Buick or on Mr. Birch, Mr. Henning, or Ms. Yablonski's person or property. *Id.* ¶ 155. In January and February 1986, the State Lab also allegedly reported to the police that none of the blood or latent fingerprints lifted from the Carr crime scene belonged to Mr. Birch, Mr. Henning, or Ms. Yablonski. *Id.* ¶¶ 157–158. The hair and footprints found at the Carr crime scene also allegedly did not belong to or match the footwear seized from Mr. Birch or Mr. Henning. *Id.* ¶¶ 159–160.

The police continued to pursue leads in the investigation. *Id.* ¶¶ 162–173. On October 9, 1986, CSP Lieutenant James Hiltz, the Commander of the Western District Major Crime Squad, allegedly encouraged the State's Attorney's Office to seek authorization from the governor to

issue a monetary award. *Id.* ¶ 178. Allegedly, Mr. Hiltz wrote to the State's Attorney that "all conventional investigative leads and processes have been exhausted" and "there is not enough Probable Cause for an arrest or prosecution." *Id.* ¶ 179 (emphasis omitted).

Mr. Henning alleges that Defendants fabricated evidence on which the State later relied during his trial. *Id.* ¶¶ 214–238.

Specifically, Mr. Henning alleges that following his December 4, 1985 interrogation at the New Milford police station, Mr. O'Mara "created a report of the interrogation[] falsely claiming that [Mr. Henning] had, during that interrogation, acknowledged that he knew the victim [Mr. Carr] had tattoos." *Id.* ¶ 214. The State allegedly relied on Mr. O'Mara's report during Mr. Henning's trial "to argue that [Mr. Henning's] supposed knowledge of the tattoos came from his being at the crime scene." *Id.* ¶ 215. Mr. Henning alleges that this statement in the report was fabricated. *Id.* ¶ 216.

In addition, Mr. Henning alleges that Detective Patrick McCafferty "created a false report" of Mr. McCafferty's December 9, 1985 interrogation of Mr. Henning, in which Mr. McCafferty stated that Mr. Henning "admitted that he 'may have turned around in the victim's [Mr. Carr's] driveway.'" *Id.* ¶¶ 218–219. Mr. Henning alleges that he had in fact stated during the interrogation that he "had turned around in the driveway" during "a burglary that he, [Mr. Birch,] and [Ms. Yablonski] had committed in Brookfield," not New Milford. *Id.* ¶ 218. The State allegedly relied on Mr. McCafferty's report "to argue that [Mr. Henning] admitted [to] being in the driveway at the [Carr] crime scene." *Id.* ¶ 220.

Mr. Henning further alleges that Detective Andrew Ocif interviewed Mr. Henning's grandmother, Mildred Henning, in August 1987 and "falsely represented . . . that he had a 'mountain of evidence' that [Mr. Henning] had been at the [Carr] crime scene." *Id.* ¶ 224. Mr.

Ocif allegedly also "falsely represented to [Mrs. Henning] that she would 'help' [Mr. Henning] if she said that Mr. Henning had told her that he had been at the murder scene but did not kill Mr. Carr." *Id.* ¶ 225. Mrs. Henning allegedly then "gave an account of an emotional call with Mr. Henning from jail in December 1985 about him committing burglaries, a man being killed, and a dog being killed, and that Mr. Henning said he did not kill anyone." *Id.* Mr. Henning alleges that he had in fact called Mrs. Henning from the Litchfield Correctional Center infirmary, where he was being held on pending burglary charges, in December 1985 and "accurately told [her] that he had no involvement with the [Carr] crime." *Id.* ¶¶ 221–222. The State allegedly "denies that recordings exist of the calls." *Id.* ¶ 223.

Mr. Henning alleges that Mr. Ocif also "prepared a fake warrant for Mr. Henning's arrest for the Carr homicide" and "sought to use . . . the fake arrest warrant and [a] surprise call [between Mr. Henning and] Mrs. Henning [from the Litchfield state police barracks] to prompt [Mr. Henning] to make a self-incriminating statement [to Mrs. Henning]." *Id.* ¶¶ 228–229. During his phone call with Mrs. Henning, Mr. Henning allegedly "again denied any involvement in the Car homicide." *Id.* ¶ 230. Mr. Ocif allegedly did not record this telephone conversation. *Id.* ¶ 231.

Mr. Henning alleges that in December 1988, Mr. Ocif "falsely represented to [Timothy] Saathoff," a childhood friend of Mr. Henning's, "that he had substantial evidence that Mr. Henning was at the scene of the homicide, and falsely represented to Mr. Saathoff that he would 'help' Mr. Henning if he said that Mr. Henning told him he was at the murder scene but did not kill the man himself." *Id.* ¶¶ 233–235. Mr. Saathoff allegedly then "falsely stated that Mr. Henning had told him that he was at the scene of the murder, but had not participated in the

murder himself," *id.* ¶ 236, which he later recanted, *id.* ¶ 237. The State allegedly relied on Mrs. Henning's and Mr. Saathoff's statements at Mr. Henning's trial. *Id.* ¶ 238.

Mr. Henning further alleges that Defendants "withheld material exculpatory evidence from the State's Attorney's Office, [which] prevent[ed] that evidence from being disclosed to [Mr. Birch], [Mr. Henning,] and their defense counsel" before his trial. *Id.* ¶ 240.

As relevant to the claims at issue here, this evidence allegedly includes $1,000 in cash that Connecticut State Police Detective Michael Graham found at the Carr crime scene shortly after the homicide. *Id.* ¶¶ 243–244. Mr. Henning alleges that Mr. Graham, Detective Steven Jordan of the New Milford Police Department, and Connecticut State Police Detective Joseph Quartiero each documented the recovery or return of the $1,000 to Mr. Carr's daughter, Ms. Columbo, but did not disclose these documents or the fact that the $1,000 had been recovered to the State's Attorney's Office before the start of Mr. Henning's trial. *Id.* ¶¶ 244–247. In Mr. Henning's view, "[t]he recovery of $1,000 in large bills from the crime scene . . . lends further support to the theory that the murder of Everett Carr did not occur during a robbery[.]" *Id.* ¶ 248.

In addition, Mr. Henning alleges that Defendants failed to disclose to the State's Attorney's Office "a recording of a pre-polygraph interview with Tina Yablonski in which she confirmed that [Mr. Birch] and [Mr. Henning] could not have been in New Milford at the time the State accused them of being there." *Id.* ¶ 249. After conducting the polygraph examination on March 4, 1986, a Connecticut State Police Sergeant allegedly sent the results of the polygraph examination and "either the recording of the pre-polygraph interview, or at least its sum and substance" to CSP Sergeant Brian Acker and/or other investigators on the case. *Id.* ¶¶ 261–262. Mr. Henning alleges that neither Mr. Acker "nor any other police officer disclosed the recording of the March 4, 1986 interview to the State's Attorney's Office." *Id.* ¶ 263.

7

Mr. Henning alleges that the police also suppressed an immunity from prosecution letter that the Connecticut State Police provided to Ms. Yablonski which allegedly "promised [Ms. Yablonski] immunity against prosecution for any role she might have played in a burglary in Charleston, New Hampshire." *Id.* ¶ 256. According to Mr. Henning, the immunity letter "provided the motivation for [Ms. Yablonski] to change her story" regarding the timing of Mr. Birch, Mr. Henning, and Ms. Yablonski's departure to New Milford on the night of December 1, 1985. *Id.* ¶ 265.

Mr. Henning alleges that "the police suppressed comprehensive video footage of the [Carr] crime scene[,]" which allegedly "showed, among other things, that Diana Columbo's bedroom was the only room in the house that was untouched during the purported burglary." *Id.* ¶¶ 266–267. According to Mr. Henning, "[t]his information, which was not otherwise disclosed to [Mr. Birch], [Mr. Henning] or their defense counsel, further strengthened the inference that this homicide was not a 'burglary gone bad[.]'" *Id.* ¶ 268.

Mr. Henning alleges that the police further "suppressed handwritten notes maintained by Detective Quartiero during the investigation of the Carr murder, . . . [which] were never disclosed to [Mr. Birch], [Mr. Henning] or their defense counsel at the time he was accused of and tried for the murder." *Id.* ¶ 269. These notes allegedly included "exculpatory information," including documentation that Ms. Columbo had "told investigators that there were no signs of a struggle at the crime scene," *id.* ¶¶ 270, 272, as well as documentation of a statement made by Richard Burkhart and overheard by an employee of Mr. Burkhart's company that was critical of Mr. Carr, *id.* ¶ 273. The suppression of this statement allegedly "deprived defense counsel of the opportunity to use [the] statement as further support for an alternative theory that the murder resulted from personal animosity involving [Ms.] Columbo, [Mr.] Burkhart and [Mr.] Carr." *Id.*

In addition, Mr. Henning alleges that Dr. Henry Lee, the Director of the Connecticut State Police forensic laboratory, fabricated evidence relating to two towels that were found at the Carr crime scene. *Id.* ¶ 275. Mr. Lee allegedly "told the prosecutor on the case that he had tested the bathroom towels and that one of the towels had tested positive for blood." *Id.* ¶ 277. Mr. Henning alleges that Mr. Lee "never tested the towels," "never got a positive result for blood on one of them," and "knew as much when he told the prosecutor he had." *Id.* ¶ 279 (emphasis omitted).

On November 18, 1988, Mr. Henning was arrested for the murder of Mr. Carr. *Id.* ¶ 287. Mr. Henning was charged with felony murder and burglary. *Id.* ¶ 288. He pleaded not guilty, and the case proceeded to trial. *Id.* ¶ 289. A jury found Mr. Henning guilty of felony murder, and he was sentenced to fifty years in prison. *Id.* ¶ 307.

Following Mr. Henning's conviction, "DNA testing conducted between 2008 and 2015 compared items seized from the crime scene to the belongings of [Mr. Birch], [Mr. Henning], and [Ms. Yablonski]." *Id.* ¶ 309. The DNA results allegedly "show[ed] that Carr's DNA was not found on any of [Mr. Birch's] or [Mr. Henning's] clothing or other belongings." *Id.* In addition, "[n]umerous items from the crime scene were [allegedly] tested and found to bear DNA." *Id.* ¶ 310. The testing allegedly "excluded [Mr. Henning], [Mr. Birch], and [Ms. Yablonski] as contributors of that DNA." *Id.*

On June 14, 2019, the Supreme Court of Connecticut overturned Mr. Henning's conviction. *Id.* ¶ 322. The Supreme Court ruled that Dr. Lee's "false testimony about finding blood on the bathroom towel, and the prosecution's failure to correct it, violated [Mr. Henning's] right to a fair trial" and ordered that Mr. Henning be granted a new trial. *Id.* ¶ 323.

The State concluded that there was insufficient evidence to permit a retrial. *Id.* ¶ 324. On

9

July 10, 2020, the Connecticut Superior Court dismissed all of the charges against Mr. Henning.

*Id.*

Mr. Henning was incarcerated for approximately thirty years. *Id.* ¶ 326. He alleges that

Defendants' conduct caused him to suffer

> physical injuries (including being stabbed in the chest with a shiv by another inmate); pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of educational opportunity; loss of professional opportunity; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression[.]

*Id.* ¶ 329.

### B. Procedural History

On December 2, 2020, Mr. Henning filed his Complaint. Compl.

On February 4, 2021, the Court granted Mr. Henning's joint motion to consolidate this

case with *Birch v. Town of New Milford et al.*, No. 3:20-cv-1790-VAB. Order, ECF No. 27 (Feb.

4, 2021).

On February 15, 2021, the Town of New Milford and Mr. Jordan (together, "Town

Defendants") filed a motion to dismiss Counts Three, Four, Five, Six, Seven, Eight, Nine, and

Ten of Mr. Henning's Complaint with supporting materials. Defs. Mot. to Dismiss Pl. Henning's

Compl., ECF No. 33 (Feb. 15, 2021) ("Town Mot."); Mem. of Law in Supp. of Defs. Mot. to

Dismiss Pl. Henning's Compl., ECF No. 33-1 (Feb. 15, 2021) ("Town Mem.").

The same day, Brian Acker, Michael Graham, Andrew Ocif, Scott O'Mara, H. Patrick

McCafferty, Joseph Quartiero, and Henry Lee (collectively, "State Defendants") filed a motion

to dismiss Counts Three, Six, Seven, and Eight of Mr. Henning's Complaint with supporting materials. State Defs.' Mot. to Dismiss Pl. Shawn Henning's Compl., ECF No. 35 (Feb. 15, 2021) ("State Mot."); Mem. of Law in Supp. of State Defs.' Mot. to Dismiss Pl. Shawn Henning's Compl., ECF No. 35-1 (Feb. 15, 2021) ("State Mem.").

On March 22, 2021, Mr. Henning filed a joint memorandum with Mr. Birch in opposition to the State Defendants' motion to dismiss. Pls.' Joint Mem. in Opp'n to State Defs.' Partial Mot. to Dismiss, ECF No. 40 (March 22, 2021) ("Opp'n to State"). Mr. Henning and Mr. Birch also filed a joint opposition to the Town Defendants' motion to dismiss. Pls.' Joint Mem. in Opp'n to Town Defs.' Mot. to Dismiss, ECF No. 41 (Mar. 22, 2021) ("Opp'n to Town").

The same day, Mr. Henning voluntarily dismissed without prejudice Counts Six and Seven of the Complaint against the State Defendants. Joint Notice of Partial Voluntary Dismissal of State-Law Causes of Action Against State Defs. Only, ECF No. 42 (Mar. 22, 2021). Mr. Henning did not dismiss any cause of action against the Town Defendants. *Id.* The Court issued an Order dismissing Counts Six and Seven of Mr. Henning's Complaint against the State Defendants on March 25, 2021. Order, ECF No. 43 (Mar. 25, 2021).

On April 5, 2021, the State Defendants filed a consolidated reply to Mr. Henning's opposition to their motion to dismiss. Reply Mem. in Supp. of Mot. to Dismiss, ECF No. 46 (Apr. 5, 2021) ("State Reply").

On April 9, 2021, the Town Defendants filed a consolidated reply to Mr. Henning's opposition to their motion to dismiss. Reply to Pls.' Joint Mem. of Law in Opp'n to the Town Defs' Mot. to Dismiss, ECF. No. 49 (Apr. 9, 2021) ("Town Reply").

On April 12, 2021, Mr. Henning and Mr. Birch moved to strike the Town Defendants' reply as untimely. Mot. to Strike Reply Mem., ECF No. 50 (Apr. 12, 2021). On April 13, 2021,

11

the Town Defendants filed a motion for leave to file a reply to Mr. Henning's opposition to their motion to dismiss out of time *nunc pro tunc*. Mot. for Leave to File Reply to Pls.' Joint Mem. of Law in Opp'n to the Town Defs.' Mot. to Dismiss Out of Time Nunc Pro Tunc, ECF No. 51 (Apr. 13, 2021).

On April 14, 2021, the Court issued an order denying the motion to strike and granting the Town Defendants' motion for leave to file *nunc pro tunc*. Order, ECF No. 52 (Apr. 14, 2021).

## II.   STANDARD OF REVIEW

To survive a motion to dismiss under 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation

of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

## III.   DISCUSSION

### A.  The "Shotgun Pleading" Issue

Rule 8(a)(2) requires that a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 10(b) provides that claims or defenses must be stated "in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). Some courts outside this Circuit have found that a "shotgun pleading" violates Rule 8(a)(2) or Rule 10(b), or both. *See, e.g.*, *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021) (holding that "[s]hotgun pleadings are flatly forbidden by the spirit, if not the letter, of [Rules 8(a)(2) and 10(b)] because they are calculated to confuse the enemy, and the court, so that theories for relief not provided by law and which can prejudice an opponent's case . . . can be masked" (internal quotation marks and alterations omitted)).

The Town Defendants argue that the Complaint is an impermissible "shotgun pleading" under Federal Rules of Civil Procedure 8(a) and 10(b). Town Mem. at 5–8.

They argue that "[b]y incorporating all of the 329 paragraphs of factual allegations, which deal in a large part with State defendants which are irrelevant to a claim against the town, the plaintiff has confused the issues and wastes the resources of the defendants by forcing them to ferret out which of those 329 paragraphs apply and which do not." *Id.* at 6. They further

14

contend that the Complaint is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action[,]" and "asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* at 6–7 (citing *Barmapov*, 986 F.3d at 1325).

The Court disagrees.

The Town Defendants rely on a single case outside this Circuit, *Barmapov v. Amuial*, for the proposition that a complaint may be dismissed on the grounds that it is an improper "shotgun pleading." *See* Town Mem. at 5–8. Even assuming the Second Circuit has recognized that a complaint may be dismissed on this basis, the Complaint does not "confuse" the Court so that "theories of relief not provided by law" are "masked." *Barmapov*, 986 F.3d at 1324.

Although the factual allegations relate to several Defendants and causes of action, the Complaint's "organizational scheme is adequate to provide to [Defendants] notice of the legal claims against [them] and the factual grounds upon which those claims rest." *McCarter & English, LLP v. Jarrow Formulas, Inc.*, No. 3:19-cv-01124 (MPS), 2020 WL 5074303, at *4 (D. Conn. Aug. 27, 2020).

The allegations are generally organized chronologically, beginning with Mr. Carr's murder and proceeding to Defendants' investigation, the alleged fabrication and suppression of evidence, and Mr. Henning's trial and post-conviction proceedings. The Complaint's allegations then are followed by ten counts that identify the Defendants against which each cause of action is brought. While Mr. Henning repeats and realleges the general allegations in each count, he also includes allegations specific to each cause of action. *See, e.g.*, Compl. ¶¶ 332–333 (alleging in Count One that the fabricated evidence includes "the invented self-inculpatory 'turning in the

driveway' and knowledge of the victim's 'tattoos' statements, the false secondary confessions attributed to Mrs. Henning and Mr. Saathoff, and the fabricated positive test for blood on the bathroom towel").

Accordingly, the Town Defendants' motion to dismiss the Complaint as an improper shotgun pleading will be denied.

### B. Count Three: Suppression of Material Favorable Evidence/*Brady*

In Count Three, Mr. Henning alleges that Defendants violated his constitutional right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963), when they allegedly failed to disclose "material favorable evidence" that "would likely have led to an outcome more favorable to [Mr. Henning] in the criminal proceedings against him." Compl. ¶ 350 (emphasis omitted). The Town Defendants argue that this claim is collaterally estopped by Mr. Henning's prior state habeas proceedings. Both the Town and State Defendants further argue that this claim is barred by qualified immunity. In addition, the Town Defendants contend that even if they are not entitled to qualified immunity, Mr. Henning has failed to plausibly allege a *Brady* claim.

The Court addresses each of these arguments in turn.

### 1. Collateral Estoppel

"Collateral estoppel bars a party from raising an issue of law or fact in a second suit that the party had a full and fair opportunity to litigate . . . in [a] prior proceeding and where the decision of the issue was necessary to support a valid and final judgment on the merits in the first action." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998) (internal citations and quotations omitted). "The doctrines of *res judicata* and collateral estoppel protect 'litigants from the burden of relitigating an identical issue with the same party or his privy and [to promote] judicial economy by preventing needless litigation.'" *Id.* at 644 (quoting *Parklane*

*Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)). "[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). "[T]he law in this state is clear," however, "that a *reversed* judgment does not have preclusive effect." *Shirley P. v. Norman P.*, 329 Conn. 648, 661 (2018) (emphasis in original).

The Town Defendants argue that Mr. Henning's *Brady* claim is collaterally estopped by the Connecticut Superior Court's decision in his state habeas proceedings, which held that the failure to disclose the recovery of the $1,000 from the crime scene was not material because the disclosure of this fact would not have undermined the trial's outcome. Town Mem. at 10 (citing *Birch v. Warden State Prison*, No. TTDCV01817907S, 2016 WL 4007686, at *3 (Conn. Super. Ct. June 21, 2016)). That decision, however, was reversed on appeal by the Connecticut Supreme Court, *Henning v. Comm'r of Corr.*, 334 Conn. 1 (2019), and thus does not have preclusive effect, *Shirley P.*, 329 Conn. at 661 ("a reversed judgment does not have preclusive effect"); *State v. Brundage*, 320 Conn. 740, 753–54 (2016) ("Because the defendant's judgments of conviction . . . have been vacated, those judgments have no preclusive effect").

Accordingly, the doctrine of collateral estoppel does not bar Mr. Henning's *Brady* claim.

### 2.  Qualified Immunity

"Qualified immunity shields government officials from claims for money damages unless a plaintiff adduces facts showing that '(1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct.'" *Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "For law to be clearly established, it is not necessary to identify a case directly on point. But precedent must have spoken with sufficient clarity to have placed the constitutional question at

17

issue beyond debate." *Id.* "Specifically, the law must be so clearly established with respect to the '*particular* conduct' and the 'specific context' at issue that 'every reasonable officer would have understood that his conduct was unlawful.'" *Id.* at 68–69 (emphasis in original) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). "Even in the absence of binding precedent, a right is clearly established if the contours of the right are sufficiently clear that the unlawfulness is apparent." *Horn v. Stephenson*, --- F.4th ---, 2021 WL 3776318, at *3 (2d Cir. Aug. 26, 2021) (internal alterations and quotation marks omitted). "'[I]f decisions from this or other circuits clearly foreshadow a particular ruling on the issue,' [the court] may treat the law as clearly established." *Id.* (citing *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014)).

In addition, qualified immunity protects state actors when it was objectively reasonable for the state actor to believe that his conduct did not violate a clearly established right. *Manganiello v. City of New York.*, 612 .3d 149, 165 (2d Cir. 2010). "If a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). Qualified immunity does not apply if, on an objective basis, it is obvious that no reasonably competent officer would have taken the actions of the alleged violation. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Brosseau v. Haugen*, 542 U.S. 194, 198 (2004)).

"While qualified immunity may be 'successfully asserted' on a motion to dismiss the complaint, the defense 'faces a formidable hurdle' at the pleading stage." *Horn*, 2021 WL 3776318, at *4 (citing *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004)). For qualified immunity to bar suit at the motion to dismiss stage, "[n]ot only must the facts supporting the

18

defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna*, 386 F.3d at 436 (internal quotation marks and citations omitted). In considering qualified immunity on a motion to dismiss, the court draws all reasonable inferences in favor of the plaintiff both from the facts alleged in the complaint that support the plaintiff's claim and those that would defeat the qualified immunity defense. *Hyman v. Abrams*, 630 F. App'x 40, 42 (2d Cir. 2015).

The State Defendants argue that Mr. Henning's claims are barred by qualified immunity because "[r]egardless of whether [Mr. Henning] presently states a constitutional violation," he "has failed to set forth sufficient factual allegations to demonstrate that defendants Graham, Quartiero, Ocif and Acker violated any of [Mr. Henning's] constitutional rights that were clearly established at the time of the conduct." State Mem. at 6–7. The State Defendants assert that Mr. Henning "can point to no controlling precedent between 1985 and 1989 that clearly establishes a constitutional *Brady* right against law enforcement officers, let alone a damages action under § 1983 for any breach of such a duty." *Id.* at 8.

Citing *Walker v. New Yok*, 974 F.2d 293 (2d Cir. 1992), the State Defendants contend that the Second Circuit "did not extend *Brady* obligations to law enforcement officers until 1992, approximately three years after the completion of [Mr. Henning's] criminal trial." *Id.* at 9. They argue that in 1985 through 1989, moreover, it was not "clear that a law enforcement officer could be liable for damages under § 1983 for an alleged *Brady* violation." *Id.* Thus, law enforcement officers during this time period "could not reasonably have expected to be individually accountable in a money damages action for their failure to disclose to prosecutors exculpatory evidence in their possession." *Id.* at 10.

19

The Town Defendants join and adopt these arguments. Town Reply at 2–3. The Town Defendants further argue that they are entitled to qualified immunity because "an objectively reasonable officer in Officer Jordan's position would not have believed that the [$1,000] cash document in the context of this case would have been material exculpatory evidence and that if he did not personally provide the document to the State's Attorney he would violate Mr. Henning's constitutional rights." Town Mem. at 21.

Mr. Henning responds that Second Circuit case law before 1989 "[c]learly [e]stablished" that "the suppression of evidence possessed by a police officer who served as an 'arm of the prosecutor'—but not possessed by the prosecutor herself—violated a defendant's constitutional rights under *Brady*." Opp'n to State at 10 (citing *United States v. Morrell*, 524 F.2d 550, 555 (2d Cir. 1975) and subsequent cases). He argues that "[t]hese 'arm of the prosecution' cases made clear beyond debate to police officers in the Second Circuit that a criminal defendant had a constitutional right to receive material exculpatory evidence possessed by core police investigators, even if not possessed by prosecutors themselves." *Id.* at 11. In Mr. Henning's view, "[i]t follows [from these cases] . . . that such [core police] investigators may not deliberately suppress any such [material exculpatory] evidence or information that they possess." *Id.*

In addition, Mr. Henning maintains that it is "immaterial" that the Second Circuit's "arm of the prosecution" cases are not civil damages lawsuits. *Id.* at 12. He argues that "[d]ecisions in criminal cases and habeas cases," including those cited by Mr. Henning, "can put defendants on notice of the unlawfulness of their conduct no less than civil damages cases can." *Id.*

With regard to the Town Defendants' additional qualified immunity arguments, Mr. Henning responds that these arguments are "legally irrelevant" to the doctrine of qualified

20

immunity; are "contrary to [Mr. Henning's] allegations" that Mr. Jordan was an investigating officer on the Carr case; and "ignore[] [Mr. Henning's] . . . allegations" that Mr. Jordan had "independent knowledge" of the $1,000 and did not disclose this information to the State's Attorney's Office. Opp'n to Town at 19–21.

The State Defendants reply that "[Mr. Henning] point[s] to no Second Circuit case prior to *Walker* that recognizes a money damages claim against police officers for purported *Brady* violations." *Id.* at 3. Therefore, the State Defendants argue, "[Mr. Henning's] purported *Brady* claim precedes clearly established case law recognizing such a claim by several years, and as a result, is barred by qualified immunity." *Id.* at 8.

The Court disagrees.

In 1963, *Brady v. Maryland* "established the affirmative duty of the prosecution to turn over exculpatory evidence to the defense." *Horn*, 2021 WL 3776318, at *4. The Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

*Brady* "specifically addressed the disclosure obligation of the prosecution." *Horn*, 2021 WL 3776318, at *4. In 1992, the Second Circuit, applying the teachings of *Brady*, recognized that the government's disclosure obligation extends to the police, holding that "the police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors." *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992).

*Walker* "clearly established" the "duty of police to share with the prosecutor any *Brady* evidence that is favorable to the accused." *Horn*, 2021 WL 3776318, at *4. The parties do not dispute that the Second Circuit issued its decision in *Walker* after the alleged misconduct in this

21

case. *Walker*, however, is not the first instance in which the Second Circuit has addressed the disclosure obligations of the prosecution and police.

In 1975, this Circuit held in *United States v. Morrell*, 524 F.2d 550, 555 (2d Cir. 1975), that a federal law enforcement agent who supervised a government informant and "was intimately involved in the prosecution" acted as an "arm of the prosecutor" and was therefore subject to the requirements in *Brady*. *Morrell* involved the alleged suppression of a "confidential file" relating to a government informant who served as the principal government witness in the defendants' case. *Id.* at 551, 554. The court reasoned that although the prosecution did not appear to be aware of the confidential file before the defendants' trial and therefore "[could not] be charged with the failure to produce information, . . . it seems fair to view [the federal law enforcement agent]," who "not only supervised [the informant] and participated actively in the investigation, but also was present at counsel's table throughout all or most of the trial," as an "arm of the prosecutor" for purposes of *Brady*. *Id.* at 555.

Following *Morrell*, the Second Circuit has recognized that members of the police can act as an "arm of the prosecution," triggering the *Brady* disclosure requirement. *Pina v. Henderson*, 752 F.2d 47, 49 (2d Cir. 1985) (upholding as not clearly erroneous district court's finding that a patrolman who testified at the defendant's trial and was the investigating officer on the case qualified as an arm of the prosecution); *Wedra v. Thomas*, 671 F.2d 713, 717 n.1 (2d Cir. 1982) ("the knowledge of a police officer may be attributable to the prosecutor if the officer acted as an arm of the prosecution").

As these decisions suggest, *Morrell* held that law enforcement officers can cause a *Brady* violation by withholding material exculpatory evidence from the defense. This Court, however, also looks to other circuits interpreting *Brady* to determine if the obligations of the police were

22

clearly established before Mr. Henning's trial began in 1989. *Horn*, 2021 WL 3776318, at \*4 ("'[I]f decisions from this or other circuits clearly foreshadow a particular ruling on the issue,' we may treat the law as clearly established." (quoting *Terebesi*, 764 F.3d at 230)); *Mara*, 921 F.3d at 68 ("For law to be clearly established, it is not necessary to identify a case directly on point.").

Before 1989, at least three other circuits concluded that the police violate *Brady* by failing to disclose material exculpatory evidence to the prosecution. *See Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) ("[A] police officer cannot avail himself of a qualified immunity defense if he procures false identification by unlawful means or deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles."); *United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978) ("Since the investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutor, [are] guilty of nondisclosure."); *Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir. 1964) ("The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused"). As the Ninth Circuit has explained, *Butler* "made unmistakably clear that police officers and prosecutors alike share an obligation to disclose 'pertinent material evidence favorable to the defense.'" *Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1220 (9th Cir. 2015) (citation omitted); *McMillian v. Johnson*, 88 F.3d 1554, 1569 (11th Cir. 1996) ("[C]learly established law in 1987 and 1988 prohibited the police from concealing exculpatory or impeachment evidence."). Even where courts have not squarely held that *Brady* obligations extend to the police, they have recognized that "police files withheld from the state's attorney and therefore unavailable as a source of exculpatory information" to the prosecution and to

23

defense counsel "cannot be tolerated." *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988).

That the police have a duty to disclose material exculpatory evidence under *Brady* was "clearly foreshadow[ed]" by these decisions. *Horn*, 2021 WL 3776318, at *3 (quotation marks omitted). Thus, pre-existing law in the Second Circuit, when considered in the context of contemperaneous decisions in other circuits, clearly established that withholding *Brady* material from the prosecution violates the defendant's due process rights. *Weber v. Dell*, 804 F.2d 796, 803 (2d Cir. 1986) (holding that "although we have not directly ruled on the precise issue presented in this case," the law was clearly established where "[a]t least eleven circuit court decisions, three of them antedating the search in this case, hold similar policies unconstitutional").

The State Defendants argue that regardless of whether a law enforcement officer could be viewed as an "arm of the prosecutor," *Walker* first recognized that law enforcement officers could be held liable in a civil action for the failure to disclose exculpatory evidence. State Reply at 1–2. Relying on the Second Circuit's decision in *Crawford v. Cuomo*, 721 Fed. Appx. 57 (2d Cir. 2018), the State Defendants assert that before 1989, law enforcement officers could not reasonably have expected to be individually accountable in a "money damages action" for their failure to disclose exculpatory evidence to the prosecution. State Mem. at 10; State Reply at 2–7.

The Second Circuit's reasoning in *Crawford*, however, is distinct from the allegations in this case. In *Crawford*, the Second Circuit held that two state officials were entitled to qualified immunity for sexual abuse conduct alleged to have occurred in 2011. The court reasoned that its prior decision from 1997 did not "clearly establish[]" that the officials' alleged conduct violated the Eighth Amendment because in that case, the court had concluded that "similar . . . allegations

24

[to those alleged in *Crawford*]. . . were insufficient to state a claim." *Crawford*, 721 Fed. Appx. at 59. Thus, "[a] reasonable officer could . . . have believed that the sexual abuse [alleged in *Crawford*,] even if it might violate state criminal law or subject him to tort liability[,] did not violate the Eighth Amendment." *Id.*

By contrast, *Morrell* holds that a law enforcement officer can cause a *Brady* violation by failing to disclose exculpatory evidence to the prosecution. The court in *Crawford*, moreover, noted that out-of-state authorities were "sharply divided" on the extent to which "abuse comparable [to the officials'] was cruel and unusual," and therefore did not "clearly foreshadow" that the officers' alleged conduct violated a constitutional right. *Id.* at 60. Before 1989, out-of-state circuits were not similarly divided on the extent to which *Brady's* disclosure requirements apply to the police.

Having determined that the clearly established law obligated Defendants to disclose material exculpatory evidence to the prosecution, the Court next addresses whether a reasonable officer in their position "would not have believed that the [$1,000] cash document in the context of this case would have been material exculpatory evidence and that if he did not personally provide the document to the State's Attorney he would violate Mr. Henning's constitutional rights." Town Mem. at 21.

In considering qualified immunity on a motion to dismiss, this Court draws all reasonable inferences in favor of the plaintiff based on both the facts alleged in the complaint and those that would defeat a qualified immunity defense. *Hyman*, 630 F. App'x at 42. Taking Mr. Henning's allegations in the Complaint as true, the Court cannot now conclude that Mr. Jordan could not have reasonably believed that the $1,000 in cash that was discovered at Ms. Columbo's home

25

would have been material exculpatory evidence, or that Mr. Jordan was not among the officers "responsible for providing the investigative file to the State's Attorney[.]" Town Mem. at 15.

Accordingly, Defendants are not entitled to qualified immunity with respect to Mr. Henning's *Brady* claim, at least at this stage of the proceedings given the allegations here.

### 3. *Brady* Claim

To establish a *Brady* violation, "[the accused] must show that: (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the [accused]; and (3) the failure to disclose this evidence resulted in prejudice." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (quoting *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001)). As to the first element, the Second Circuit has "suggested, though without so concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional." *Bellamy v. City of New York*, 914 F.3d 727, 751 n.23 (2d Cir. 2019). With respect to the second element, "[e]vidence that is not disclosed is suppressed for *Brady* purposes even when it is 'known only to the police investigators and not to the prosecutor.'" *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 161 (2d Cir. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)). Evidence is "material" if "there is a 'reasonable probability' that disclosure would have changed the outcome of the case, or where the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Kirk Tang Yuk*, 885 F.3d at 86 (quoting *Kyles*, 514 U.S. at 434–35).

The Town Defendants argue that Mr. Henning has "failed to adequately allege [Mr.] Jordan's personal involvement [in the recovery and disclosure of the $1,000]," Town Mem. at 15; "that [Mr.] Jordan knew or should have known that the form he filled out was not part of the investigative file provided to the State's Attorney," *id.* at 16; and "why [Mr.] Jordan would have

26

believed that the receipt was relevant [or] material exculpatory evidence," *id.* at 17. The Town

Defendants further suggest that Mr. Henning's criminal defense counsel "would have had access

to information that the $1,000 was found during a search of the crime scene in numerous ways[,]

including[] the crime scene report, the inventory form, detective notes, or testimony of

detectives[.]" *Id.* at 17.

Mr. Henning contends that the Complaint "allege[s] ample facts in support of each

element" of a *Brady* claim, Opp'n to Town at 9, including that Mr. Jordan "suppressed evidence

that $1,000 in cash was found at the crime scene," *id.* at 10 (emphasis omitted), and that "the

suppressed evidence was materially favorable" to Mr. Henning, *id.* at 14 (emphasis omitted). In

Mr. Henning's view, "the Town Defendants' attempt to blame their own *Brady* violations on

[Mr. Henning's] criminal defense counsel's supposed failure to exercise due diligence . . . fails

because the concept of due diligence plays no role in the *Brady* analysis." *Id.* at 12 (internal

quotation marks and citation omitted).

In reply, the Town Defendants contend that Mr. Henning has not sufficiently alleged a

*Brady* violation because it "requires an intentional act." Town Reply at 1 (emphasis omitted).

The Court disagrees.

"In this Circuit personal involvement of defendants in alleged constitutional deprivations

is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield*, 950 F.2d

880, 886 (2d Cir. 1991) (quoting *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert.*

*denied*, 434 U.S. 1087 (1978)). "A defendant may be personally involved in a constitutional

deprivation within the meaning of [§ 1983] in several ways," including by "directly

participat[ing] in the infraction." *Id.* (quoting *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.

1986) (citations omitted)). Mr. Henning alleges that the lead investigator on the case, Andrew

Ocif, believed Mr. Carr's murder was a "burglary gone bad," Compl. ¶ 85; that Mr. Jordan knew $1,000 had been found at the Carr crime scene and completed a form documenting the recovery and return of the money to Ms. Columbo shortly after the murder, *id.* ¶¶ 245–246; and that Mr. Jordan did not disclose this document or the fact that $1,000 had been recovered from the scene to the State's Attorney's Office at any time before the start of Mr. Henning's trial, *id.* ¶ 247. These allegations are sufficient to plead Mr. Jordan's "direct[] participat[ion]" in the withholding of allegedly exculpatory evidence from the prosecution. *Moffitt*, 950 F.2d at 886.

The Town Defendants' suggestion that Mr. Jordan did not "prepare[] the arrest warrant application," Town Mem. at 15, has no bearing on Mr. Henning's *Brady* claim, which relates to the alleged failure to disclose material exculpatory evidence, not malicious prosecution or false arrest. Furthermore, the Court cannot at this stage of the proceedings consider the Town Defendants' claim that Mr. Jordan was not responsible for providing the investigative file containing documentation of the $1,000 to the prosecution, or that this information "was part of a public record available for disclosure" to Mr. Henning's criminal defense attorney. *Id.* at 16. These arguments raise questions of fact that are inappropriate for resolution on a motion to dismiss. *York*, 286 F.3d at 125 ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

For the same reason, the Court declines to dismiss Mr. Henning's claim on the basis that he has not sufficiently alleged intent to suppress. But "the issue of [Defendants'] intent is a question of fact that cannot be resolved on a motion to dismiss." *Equal Emp. Opp. Comm'n v. Day & Zimmerman NPS, Inc.*, No. 15-cv-01416 (VAB), 2016 WL 1449543, at *5 (D. Conn. Apr. 12, 2016); *Redcross v. Rensselaer Cnty.*, 511 F. Supp. 364, 372 (N.D.N.Y. 1981) (extent to

which "investigators acted in good faith" is "a question of fact that will survive a motion to dismiss" § 1983 claim). Thus, "regardless of whether [Mr. Henning] needs to plead that [Defendants] acted intentionally," *Fraser v. City of New York*, No. 20-cv-04926 (CM), 2021 WL 1338795, at *5 (S.D.N.Y. Apr. 9, 2021), his allegations satisfy the first element of a *Brady* claim.

As to the third element, Mr. Henning plausibly has alleged that the recovery of the $1,000 was material to his criminal case. "Suppressed information is exculpatory and thus 'favorable' to the defense for *Brady* purposes when it directly contradicts the motive theory testified to by prosecution witnesses." *Mendez v. Artuz*, 303 F.3d 411, 414 (2d Cir. 2002) (citation omitted); *United States v. Djibo*, 15 CR 00088 (RJD), 2019 WL 1517086, at *7 (E.D.N.Y. Apr. 8, 2019) ("Where suppressed evidence is inculpatory as well as exculpatory, and 'its exculpatory character harmonize[s] with the theory of the defense case,' a *Brady* violation has occurred" (emphasis omitted) (quoting *United States v. Mahaffy*, 693 F.3d 113, 130 (2d Cir. 2012)).

The Complaint alleges that Defendants premised their investigation on the theory that Mr. Carr's murder was a "burglary gone bad," Compl. ¶ 86, a theory the prosecution allegedly later relied upon at Mr. Henning's trial, *id.* ¶ 299. The alleged recovery of $1,000 in cash from the crime scene arguably undermines this theory by suggesting that a burglary did not precipitate Mr. Carr's murder. Opp'n to Town at 16 ("The presence of $1,000 in cash left behind at the crime scene was . . . entirely at odds with the government's theory of the case at trial, *i.e.* that the perpetrators lingered after the killing while continuing to search for valuables to steal[.]" (internal quotation marks omitted)).

Under the facts alleged, "there is a 'reasonable probability' that disclosure [of this information] would have changed the outcome of the case" or "put the whole case in such as different light as to undermine confidence in the verdict." *Kirk Tang Yuk*, 885 F.3d at 86

(internal quotation marks omitted) (citing *Kyles*, 514 U.S. at 434–35); *United States v. Gonzalez*, 110 F.3d 936, 944 (2d Cir. 1997) (where "defendants' theory was that only [the police officer had] fired a weapon . . . [alleged *Brady*] evidence suggesting *no* shots were fired plainly would have undermined, rather than supported, that theory" (emphasis in original)).

Accordingly, Mr. Henning has plausibly alleged a *Brady* violation, and Defendants' motion to dismiss Mr. Henning's *Brady* claim will be denied.

### C.  Count Four: Civil Rights Conspiracy

To state a claim for conspiracy under § 1983, a plaintiff must allege facts showing (1) "an agreement between two or more state actors;" (2) "to act in concert to inflict an unconstitutional injury;" and (3) "an overt act done in furtherance of that goal[,] causing damages." *Brown v. Semple*, No. 3:16-cv-01144 (SRU), 2017 WL 4246776, at *10 (D. Conn. Sept. 25, 2017) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)). A claim of conspiracy to violate civil rights requires more than general allegations. "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002).

The Town Defendants argue that Mr. Henning "fails to allege any of the required elements of [the] civil rights conspiracy claim," including that "[Mr.] Jordan reached an agreement with the other defendants to commit any of the alleged unconstitutional acts" or that "any one of the other named defendants knew he [had] created the cash receipt[.]" Town Mem. at 23.

30

Mr. Henning argues that the Complaint sufficiently pleads that Mr. Jordan and State Defendants Mr. Graham and Mr. Quartiero "all documented, in some form, the recovery of $1,000 from the crime scene;" "knew that the police were promoting the theory that the homicide resulted from a burglary-gone-wrong"; and "[failed to] disclose[] to the State[']s Attorney's Office their documentation or the fact that $1,000 had been recovered (or that [Mr.] Jordan had returned the money to Diana Columbo)." Opp'n to Town at 36–37. In Mr. Henning's view, "[t]he fact that three different police officers all suppressed this important information strongly supports a plausible inference that they did so by agreement." *Id.*

The Court disagrees.

To plausibly allege a conspiracy to deprive constitutional rights, a plaintiff "must allege specific facts that show that the defendants shared a unity of purpose or a common design to injure the plaintiff, not mere conclusory allegations." *Brown v. Seniuk*, No. 01 CV 1248 SJ, 2002 WL 32096576, at *4 (E.D.N.Y. Mar. 25, 2002) (citing *Polur v. Raffe*, 912 F.2d 52, 56 (2d Cir. 1990), *cert denied*, 490 U.S. 386 (1991)). Mr. Henning's § 1983 conspiracy allegations fall short of this standard. Although the Complaint alleges that Mr. Jordan, Mr. Graham, and Mr. Quartiero "agreed among themselves and with other individuals to act in concert" to deprive Mr. Henning of his constitutional rights, Compl. ¶ 355, Mr. Henning does not plead specific facts from which to plausibly infer the existence of an agreement among Mr. Jordan, Mr. Graham, and Mr. Quartiero to withhold the recovery of the $1,000 from the State's Attorney's Office. Mr. Henning does not plead that Mr. Jordan communicated with Mr. Graham or Mr. Quartiero regarding the recovery or documentation of the $1,000 or that he was aware that they did not disclose this information to the State's Attorney's Office.

31

The Complaint also does not allege when Mr. Graham and Mr. Quartiero each documented this information. *See id.* ¶¶ 244, 246. In the absence of more detailed allegations regarding, for example, communications among the Defendants concerning the recovery or disclosure of the $1,000 or the timing of the alleged misconduct, Mr. Henning has not sufficiently alleged a civil conspiracy to violate his *Brady* rights. *See Thompson v. Kline*, 504 F. Supp. 3d 200, 211 (W.D.N.Y. Dec. 3, 2020) (allegations that defendants "spoke with each other a total of one time . . . does not amount to an 'agreement' to inflict a constitutional injury for purposes of a conspiracy"); *Sullivan v. Stein*, 487 F. Supp. 2d 52, 83 (D. Conn. 2007) (dismissing § 1983 civil conspiracy claim on the grounds that plaintiffs "do not provide any evidence of an agreement [] to act in concert" (internal quotation marks omitted)); *Brown*, 2002 WL 32096576, *4 (dismissing § 1983 civil conspiracy claim where plaintiff failed to allege "specific facts that show an agreement among the alleged co-conspirators").

Accordingly, the Town Defendants' motion to dismiss Mr. Henning's § 1983 civil conspiracy claim will be granted.

### D.  Count Five: Failure to Intervene

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "Liability may attach only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008), *aff'd sub*

*nom. Jean-Laurent v. Wilkerson*, 461 F. App'x 18 (2d Cir. 2012) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988)).

The Town Defendants move to dismiss Count Five, arguing that the Complaint "is devoid of any reference to [Mr.] Jord[a]n's observation or knowledge of any other defendant's action that would amount to a constitutional violation." Town Mem. at 24.

The Court agrees.

Mr. Henning argues that Mr. Jordan "readily could have, and reasonably should have, realized that a failure to disclose recovery of the $1,000 violated the Plaintiffs' constitutional rights[,] . . . [b]ut . . . neither intervened nor took any steps to prevent the constitutional violation perpetrated by [Mr.] Graham and [Mr.] Quartiero, indeed participating in the suppression of evidence himself." Opp'n to Town at 39. The Complaint does not, however, allege that Mr. Jordan "observe[d] or ha[d] reason to know" that Mr. Graham and Mr. Quartiero had documented the recovery of the $1,000 or that they had failed to provide this information to the State's Attorney's Office. *Anderson*, 17 F.3d at 557; *see* Compl. ¶¶ 244, 246, 247.

"[I]t [is] objectively reasonable for [a state actor] not to intervene for the simple reason that he never witnessed any constitutional violations." *Disorbo v. Hoy*, 74 F. App'x 101, 104 (2d Cir. 2003). While the question of whether an officer had a "realistic opportunity" to intervene is normally a question for the jury, *Terebesi*, 764 F.3d at 244, a failure to intervene claim cannot be sustained where a reasonable person in the officer's position would not know that the victim's constitutional rights were being violated. Because the Complaint does not include allegations from which to reasonably infer that Mr. Jordan witnessed or was aware of Mr. Graham and Mr. Quartiero's failure to disclose the recovery of the $1,000 to the State, Mr. Henning has not stated a claim for failure to intervene.

33

Accordingly, the Town Defendants' motion to dismiss Mr. Henning's § 1983 failure to intervene claim will be granted.

### E. Count Six and Count Seven: Negligence and Negligent Infliction of Emotional Distress ("NIED")

In Count Six, Mr. Henning alleges that the Town Defendants' "negligent acts and omissions" breached their duty to exercise reasonable care "in their investigation of crimes, to reasonably pursue and disclose exculpatory evidence, and to refrain from fabricating evidence and pursuing criminal prosecutions without sufficient basis." Compl. ¶ 363. In Count Seven, Mr. Henning alleges that he "suffered severe and extreme emotional distress, anxiety, and physical and mental harm which were reasonable and foreseeable in light of the conduct of" the Town Defendants. *Id.* ¶ 368.

The Town Defendants move to dismiss both counts, arguing that (1) Mr. Henning has not plausibly alleged the elements of a negligence or negligent infliction of emotional distress claim; (2) Mr. Henning's negligence claims are barred by Connecticut's statute of limitations; and (3) the Town Defendants are entitled to governmental immunity on these claims.

#### 1. Negligence

Under Connecticut law, "[t]he essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *McDermott v. State*, 316 Conn. 601, 609 (2015) (citing *LePage v. Horne*, 262 Conn. 116, 123 (2002)). Within the duty, "there are two distinct considerations." *LePage*, 262 Conn. at 123 (internal quotation marks omitted). "First it is necessary to determine the existence of a duty, and [second], if one is found, it is necessary to evaluate the scope of that duty." *Id.* And, "[t]he issue of whether a duty exists is a question of law." *Id.*

The Town Defendants move to dismiss Count Six, arguing that Connecticut law does not recognize an independent action for "negligent investigation of a crime by police officers." Town Mem. at 26.

Mr. Henning argues that "[n]egligent conduct by police in the course of investigating a crime, making an arrest, and/or initiating a prosecution can . . . be the subject of common-law tort liability under Connecticut law." Opp'n to Town at 21.

In reply, the Town Defendants contend that "[t]o the extent the complaint fails to identify what Mr. Jordan did that was negligent, it fails to adequately . . . state a cause of action for negligence." Town Reply at 8.

The Court disagrees.

Connecticut law permits claims of negligence against police officers, including, for example, for negligent arrest, enforcement of police regulations, and use of force. *Bussolari v. City of Hartford*, No. 3:14-CV-00149 (JAM), 2016 WL 4272419, at *3 (D. Conn. Aug. 12, 2016); *see, e.g.*, *Mikita v. Barre*, No. 990430564, 2001 WL 651171 (Conn. Super. Ct. May 22, 2001) (negligent arrest); *Anderson v. City of New London*, No. 541273, 1999 WL 162791, at *3 (Conn. Super. Ct. Mar. 4, 1999) (negligent false imprisonment and false arrest); *see also Marsh v. Town of East Hartford*, No. 3:16-cv-928 (SRU), 2017 WL 3038305, at *7 (D. Conn. July 18, 2017) ("Connecticut law permits negligence claims against police officers alleged to have used excessive force."); *Velez v. City of New London*, 903 F. Supp. 286, 291 (D. Conn. Oct. 31, 1995) (denying motion to dismiss negligence claims against chiefs of police for alleged "fail[ure] or refus[al] to take actions, including enforcement of police regulations and adequate training, supervision, and discipline of officers").

And Mr. Henning alleges that Defendants "owed [Mr. Henning] a duty to exercise

reasonable care" not only in their investigation of the crime, but "to reasonably pursue and disclose exculpatory evidence, and to refrain from fabricating evidence and pursuing criminal prosecutions without sufficient basis." Compl. ¶ 363. These allegations are sufficient to state a claim for negligent conduct, including Mr. Jordan's alleged failure to disclose exculpatory evidence. *See Nealy v. State*, No. 9501283988, 1997 WL 600159, at *2 (Conn. Super. Ct. Sept. 18, 1997) (rejecting argument that plaintiffs had improperly advanced a claim of "negligent investigation" because the complaint specifically "alleg[ed] that the plaintiff's losses and injuries were caused by the 'negligence or carelessness' of the two state troopers in certain stated respects").

Accordingly, Mr. Henning has adequately alleged a neglience claim.

### 2.  Negligent Infliction of Emotional Distress

For a successful negligent infliction of emotional distress claim, a plaintiff must prove that "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003). In such cases, the "fear or distress experienced by the plaintiffs [must] be reasonable in light of the conduct of defendants." *Id.* at 447 (citing *Barrett v. Danbury Hosp.*, 232 Conn. 242, 261–262 (1995)). When that fear is reasonable, "the defendants should have realized that their conduct created an unreasonable risk of causing distress, and they, therefore, properly would be liable." *Id.* At the same time, fear that was "unreasonable in light of defendants' conduct" would not allow defendants to recognize "that their conduct would cause distress, and therefore, they would not be liable." *Id.*

The Town Defendants argue that Mr. Henning has failed to plausibly allege negligent infliction of emotional distress because he has not plead facts "show[ing] that [Mr.] Jordan knew or should have known that the receipt for cash . . . was a key to [Mr. Henning's] defense, and [that] without it [Mr. Henning] would not know about the money being found [at the Carr crime scene]." Town Mem. at 32.

The Court disagrees.

As discussed above, the Complaint alleges that Mr. Jordan knew that $1,000 in cash had been found at the Carr crime scene and documented the recovery and return of the money to Ms. Columbo. Compl. ¶ 245. Mr. Henning further alleges that Mr. Jordan did not disclose this information to the prosecution before the start of Mr. Henning's trial, which relied in part on the theory that Mr. Carr was murdered during a "burglary gone wrong." *Id.* ¶ 247. Under these facts, Mr. Henning has plausibly alleged that Mr. Jordan knew or should have known that the failure to disclose this information would create an unreasonable risk of causing Mr. Henning unreasonable emotional distress. Mr. Henning has alleged in detail the emotional distress resulting from his conviction. *Id.* ¶ 329.

Accordingly, Mr. Henning has stated a claim for negligent infliction of emotional distress.

### 3. Statute of Limitations

The Town Defendants argue that Mr. Henning's negligence claims are time-barred under Connecticut General Statutes § 52-584 and § 52-577. Town Mem. at 24–26. Although the statute of limitations is an affirmative defense that usually may not be raised in a pre-answer motion, if "the running of the statute is apparent from the face of the complaint, the defense may properly

37

be raised under Rule 12(b)(6)." *Galea v. Law Offs. of Cary Alan Cliff*, No. 3:19-cv-225 (SRU),

2021 WL 1090783, at \*7 (D. Conn. Mar. 22, 2021) (internal quotation marks omitted).

Connecticut General Statutes § 52-584 provides, in relevant part:

> No action to recover damages for injury to the person, or to real or personal property, caused by negligence . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of . . . .

Conn. Gen. Stat. § 52-584. Section 52-584's two-year limitations period is a "statute of

limitation." *Carrano v. Town of Monroe*, No. 3-98-cv-1835 (JCH), 2000 WL 565500, \*3 (D.

Conn. Mar. 24, 2000). "The second requirement of the statute is that a plaintiff may not bring an

action 'more than three years from the date of the act or omission complained of.'" *Id.* (citing

Conn. Gen. Stat. § 52-584). This requirement "is a period of repose because it specifies the time

beyond which an action is absolutely barred by Section 52-584." *Id.* Under the three-year period

of repose, the "statutory clock . . . begins running when the negligent conduct of the defendant

occurs. . . . Consequently, an action may be time barred even if no injury is sustained during the

three years following a defendant's act or omission." *Nardi v. AA Elec. Sec. Eng'g*, 32 Conn.

App. 205, 210–11 (1993) (citations omitted).

Connecticut General Statutes § 52-577 is a statute of repose and provides that "[n]o

action founded upon a tort shall be brought but within three years from the date of the act or

omission complained of." Conn. Gen. Stat. § 52-577.

The Town Defendants argue that "[i]n as much as the plaintiff complains that the

Defendants may have conducted a negligent investigation, the statute of limitations has run"

because Mr. Jordan allegedly "failed to provide [the receipt for $1,000] to the State's Attorney

38

[before] [Mr. Henning's] trial in January 1989." Town Mem. at 25. In addition, Mr. Henning argued at his habeas proceeding in 2015 that the $1,000 in cash found at the Carr crime scene was exculpatory evidence. *Id.* Therefore, the Town Defendants contend that Mr. Henning became aware of the alleged negligent conduct at the latest in 2015. *Id.*

Mr. Henning responds that his negligence claims are timely because the claims did not accrue until his conviction was overturned. Opp'n to Town at 28. He invokes the principle that "a statute of limitations begins to run . . . when the plaintiff first successfully could have maintained an action." *Id.* (quoting *Rosenfield v. I. David Marder & Assocs.*, 110 Conn. App. 679, 686 (2008)). In Mr. Henning's view, if he had sued for negligence on the grounds "that Defendants' improper investigation led to [his] wrongful conviction[] for which [he is] innocent" before the Connecticut Supreme Court had granted him habeas relief, his negligence claims would have been "barred by the fact of [his] conviction." *Id.* Thus, Mr. Henning maintains that he "could not have sued the Town Defendants for negligence until [he] obtained relief from [his] criminal conviction[]." *Id.* at 28.

In addition, Mr. Henning argues that his negligence claims were tolled by the Town Defendants' continuing course of conduct, specifically Mr. Jordan's alleged "failure to disclose *Brady* material," which he contends constituted an "ongoing breach" of his legal duties. *Id.* at 30–32.

The Town Defendants reply that the statute of repose for state tort actions is "strict" and therefore may bar a party's cause of action even before the action begins to accrue. Town Reply at 4 (citing *Daily v. New Britain Mach. C.*, 200 Conn. 562, 582 (1986)).

The Court disagrees.

As a threshold matter, the Court addresses which statutory provision governs the limitations period for Mr. Henning's negligence claims. The Town Defendants argue that in addition to § 52-584, Mr. Henning's negligence claims are barred by Connecticut's statute of repose in § 52-577. The three-year limitation in § 52-577, however, "is applicable to all actions founded upon a tort which do not fall within those causes of action carved out of § 52-577 and enumerated in § 52-584 or another section." *Colleens v. New Canaan Water Co.*, 155 Conn. 477, 491 (1967).

Section 52-584 expressly applies to "action[s] to recover damages for injury to the person, or to real or personal property, caused by negligence . . . ." Conn. Gen. Stat. § 52-584. Thus, Mr. Henning's negligence and negligent infliction of emotional distress claims are governed by the two-year limitations period in § 52-584. *Gibson v. Metropolis of CT LLC*, No. 19-cv-00544 (KAD), 2020 WL 956981, at *10 (D. Conn. Feb. 27, 2020) (applying § 52-584 to common law negligence claim); *Carrano v. Town of Monroe*, No. 3-98-cv-1835 (JCH), 2000 WL 565500, *3 (D. Conn. Mar. 24, 2000) ("The applicable statute of limitations for . . . the negligence claim . . . is § 52-584.").

The parties do not dispute that Defendants' alleged misconduct occurred before Mr. Henning's trial began in January 1989. Mr. Henning's negligence claims therefore would be barred absent tolling of the statute of limitations.

"According to Connecticut state decisional law, if a prior action prevents enforcement of a remedy sought in a later action, the pendency of the prior action can toll the statute of limitations for a later filed action." *Garcia v. United States*, No. 07-cv-322 (WWE), 2008 WL 4298319, at *2 (D. Conn. Sept. 16, 2008) (citing *Fontanella v. Marucci*, 89 Conn. App. 690, 699 (2005) (statute of limitations tolled in legal malpractice action by pendency of the underlying

case)); *Lee v. Harlow, Adams & Friedman, P.C.*, 116 Conn. App. 289, 302 (2009) ("It would be counterintuitive for our law to have mandated that the malpractice case move forward, with the plaintiffs having to prove that but for the attorney's negligence, the plaintiffs would have been successful in the underlying case, even before that underlying case had been lost and the plaintiffs legally injured because of the attorney's action or omission."). "When a statute of limitations is tolled, it does not run and the time during which the statute is tolled is considered, in effect, as not having occurred." *Fontanella*, 89 Conn. App.at 699 (quoting A. Levy, Solving Statute of Limitations Problems § 5.14 (1987)). Therefore, "if a statute in a particular case is tolled, it is as if the statute commenced on a later date." *Id.*

Under Connecticut law, "[i]f success in a tort action would necessarily imply the invalidity of a conviction, the action is to be dismissed unless the underlying conviction is invalidated." *Taylor v. Wallace*, 184 Conn. App. 43, 51 (2018). In *Taylor*, the Connecticut Appellate Court held that a legal malpractice claim was not ripe because the underlying conviction on which the claim was based had not been vacated. *Id.* In analyzing this question, the court adopted the U.S. Supreme Court's reasoning in *Heck v. Humphrey*, 512 U.S. 477 (1994). There, the Supreme Court held that "when a state prisoner seeks damages in a § 1983 suit, the court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of the conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Heck*, 512 U.S. at 486–87.

Applying this principle to common law tort actions, the court in *Taylor* reasoned that "[t]he rationale in *Heck* is similar to other limitations in our tort law. . . . A tort case is not ripe for adjudication if resolution of an unresolved underlying case is necessary for reliable

41

adjudication." *Taylor*, 184 Conn. App. at 349; *Cooke v. Williams*, No. CV185041290, 2018 WL 4865688, *2 (Conn. Super. Ct. Sept. 17, 2018) ("Until an underlying conviction has been invalidated . . . a plaintiff's claim for legal malpractice against his criminal trial or habeas lawyer is not ripe for adjudication"), *aff'd in part, rev'd in part on other grounds*, 206 Conn. App. 151 (2021); *see also Turner v. Boyle*, 116 F. Supp. 3d 58, 91 (D. Conn. 2015) (state law claim for malicious prosecution accrues only after the underlying action terminates in the plaintiff's favor).

The principle articulated in *Taylor* and *Cooke* applies to the facts alleged here. Mr. Henning's negligence claims are premised on his allegation that the Town Defendants' alleged fabrication of and failure to disclose material exculpatory evidence led to his wrongful conviction and emotional distress. *See* Compl. ¶ 365 ("The negligent acts and omissions of [Mr. Jordan] proximately caused the damages hereinbefore alleged."). Thus, his negligence claims did not accrue until his criminal conviction was overturned by the Supreme Court of Connecticut in June 2019. *Id.* ¶ 322. Because Mr. Henning's criminal conviction "prevent[ed] enforcement of the remedy sought in the [current] action," the "pendency of the prior action . . . tolled the statute of limitations" in his civil case. *Fontanella*, 89 Conn. App.at 700.

Accordingly, Mr. Henning's negligence claims are not time-barred by the statute of limitations in § 52-584.

### 4. Governmental Immunity

Under Connecticut law, municipal employees generally are personally liable for state law torts arising from "the misperformance of ministerial acts," but enjoy "qualified immunity" in the performance of discretionary governmental acts. *Mulligan v. Rioux*, 229 Conn. 716, 727–28 (1994). "Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature." *Id.* (quoting *Gauvin v. New Haven*, 187 Conn. 180, 184

(1982)). "In contrast, '[m]inisterial' refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion." *Id.* (quoting *Wright v. Brown*, 167 Conn. 464, 471 (1975) (internal quotation marks and alterations omitted)).

There are three exceptions to this discretionary act immunity: (1) when the alleged conduct involves malice, wantonness, or intent to injure; (2) when a statute provides for a cause of action against a municipality or municipal official for failure to enforce certain laws; and (3) when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm. *Doe v. Petersen*, 279 Conn. 607, 615–16 (Conn. 2006).

With respect to the third exception, the "identifiable person-imminent harm exception has three requirements: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." *Haynes v. City of Middletown*, 314 Conn. 303, 311 (2014).

The Town Defendants argue that the "provision of police services" and "investigation into a criminal complaint" are "matter[s] of discretion" and therefore "governmental act[s]" protected by "discretionary act immunity." Town Mem. at 28–29. They contend that Mr. Jordan's alleged actions do not fall within the exception to governmental immunity for circumstances where the failure to act would likely subject an identifiable person to imminent harm. *Id.* at 30–31. In the Town Defendants' view, "[it was not] apparent to [Mr.] Jordan that his failure to ensure the State's Attorney had the form he prepared when he returned [the $1,000 to Mr. Carr's daughter] years before would subject [Mr. Henning] to harm." *Id.* at 31. The Town Defendants also assert that Connecticut law does not provide an exception to governmental immunity for the negligent infliction of emotional distress. *Id*.

Mr. Henning argues that the determination as to whether Mr. Jordan's alleged actions were discretionary is a question of fact. Opp'n to Town at 23–24. He contends that the exception to governmental immunity for identifiable victims applies to Mr. Jordan's alleged actions because "[r]egardless of whether the harm to . . . Mr. Henning . . . was imminent in December 1985, when [Mr.] Jordan first learned of the existence of the $1,000 and returned it to Ms. Columbo, it was . . . imminent by late 1988 and early 1989, when [Mr. Henning was] arrested, charged with, and tried for the murder of Everett Carr." *Id.* at 26–27. In addition, Mr. Henning argues that the imminent harm exception applies both to claims of negligence and negligent infliction of emotional distress. *Id.* at 28 (citing *Roguz v. Walsh*, No. 09-1052 (TLM), 2012 WL 6049580, at *9 (D. Conn. Dec. 5, 2012)).

In reply, the Town Defendants reiterate that the imminent harm exception to governmental immunity "requires physical harm, not emotional [harm]." Town Reply at 6.  The Town Defendants do not directly respond to Mr. Henning's governmental immunity arguments as they relate to his negligence claim, but contend that Mr. Henning "fails to identify what Mr. Jordan did that was negligent" and thus has not "adequately alleg[ed] a state cause of action for negligence." *Id.* at 8.

The Court disagrees.

Connecticut courts "consistently have held that to demonstrate the existence of a ministerial duty on the part of a municipality and its agents, a plaintiff ordinarily must point to some statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, by its clear language, compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion." *Doe v. Town of Madison*, No. SC 20508, 2021 WL 3281024, at *12 (Conn. July 30, 2021) (emphasis omitted). "[A]lthough the ultimate determination of

whether governmental immunity applies is typically a question of law for the court, there may well be disputed factual issues material to the applicability of the defense, the resolution of which are properly left to the trier of fact." *Ventura v. Town of East Haven*, 330 Conn. 613, 637 (2019); *Mulligan*, 229 Conn. 716, 735–36 and n.22 (1994) (disputed factual issues material to applicability of police officers' qualified immunity defense presented factual questions for jury).

At this stage of the case, it is not clear whether Mr. Jordan's alleged inaction—the failure to disclose the recovery of the $1,000 to the State's Attorney's Office—was discretionary or if the reporting of such information is a ministerial act "performed in a prescribed manner without the exercise of judgment." *Evon v. Andrews*, 211 Conn. 501, 506–07 (1989) (emphasis omitted). Thus, the extent to which "the acts complained of . . . were governmental or ministerial is a factual question which depends upon the nature of the act complained of." *Gauvin*, 187 Conn. at 186.

Even assuming the Town Defendants' alleged actions were discretionary in nature, however, these actions would fall within the exception to discretionary act immunity for circumstances where an officer's failure to act would likely subject an identifiable person to imminent harm. The Town Defendants do not dispute that Mr. Henning was an "identifiable victim," but contend that he has failed to satisfy the imminent harm prong of the exception. Town Mem. at 30–31. A harm is imminent if the risk of harm to the plaintiff is so likely that the defendant has a "clear and unequivocal duty to act immediately to prevent the harm." *Haynes*, 314 Conn. at 323. This inquiry focuses not on the "*duration* of the alleged dangerous condition, but on the *magnitude of risk* that the condition created." *Id.* at 322 (emphasis in original). "[W]hether harm in any particular case was imminent necessarily is a fact bound question." *Brooks v. Powers*, 328 Conn. 256, 275 (2018).

Mr. Henning has sufficiently alleged that at least by the time of his arrest, it was apparent to Mr. Jordan that the failure to disclose the recovery of the $1,000 to the prosecution was so likely to subject Mr. Henning to harm that Mr. Jordan had a clear and unequivocal duty to disclose this information before the trial. *Doe v. Torrington Bd. of Educ.*, No. 3:15-cv-00452 (MPS), 2017 WL 33927304, at *8 (D. Conn. Aug. 7, 2017) (denying motion to dismiss where, "although the harassment of Doe allegedly occurred over a period of two years and in different locations, the magnitude of the risk associated with repeated beatings was sufficient to create an imminent harm"). And the Connecticut Supreme Court has not foreclosed the possibility that the injury alleged here, at least at this stage of the proceeding, would constitute imminent harm. *See Pines v. Bailey*, No. 3:10-cv-866 (MRK), 2012 WL 2958213, at *6 (D. Conn. July 19, 2012) (recognizing that "the Connecticut Supreme Court has explicitly entertained an identifiable person-imminent harm claim involving what it called a 'nonphysical risk of harm'"), *rev'd in part on other grounds*, 563 Fed. Appx. 814 (2d Cir. 2014); *Doe v. Petersen*, 279 Conn. 607, 619–20 (2006) (finding the defendant was entitled to government immunity, not because the harm was nonphysical, but because the harm, "terror and long term psychological injury," was not apparent to the officer, who had no knowledge of the alleged assault).

Accordingly, the Town Defendants' motion to dismiss Mr. Henning's negligence and negligent infliction of emotional distress claims will be denied.

### F.  Count Eight: Intentional or Reckless Infliction of Emotional Distress ("IIED")

Under Connecticut law, four elements must be established to prevail on a claim for intentional infliction of emotional distress: "(1) that the actor intended to inflict emotional

46

distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000) (internal quotation marks omitted). Conduct is "extreme and outrageous" when it "exceeds all bounds usually tolerated by decent society." *Reyes v. City of Bridgeport*, 152 Conn. App. 528, 543 n.13 (2014).

"The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." Restatement (Second) of Torts § 46 cmt. e (1965). "Whether an actor's conduct is 'extreme and outrageous' is an issue for the Court in the first instance and a factual question for the jury '[o]nly where reasonable minds disagree' as to whether 'the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency[.]'" *Rogers v. Apicella*, 606 F. Supp. 2d 272, 293 (D. Conn. 2009) (quoting *Appleton*, 254 Conn. at 211).

The State Defendants argue that Mr. Henning "states, in conclusory terms, that the defendants' 'conduct was extreme and outrageous,'" but "does not . . . identify what actions defendants Ocif, O'Mara, McCafferty, Quartiero, Graham, Acker, and Lee allegedly took to cause him 'extreme emotional distress.'" State Mem. at 16. The State Defendants suggest that an intentional infliction of emotional distress claim must be dismissed where the underlying conduct falls within the ambit of the plaintiff's § 1983 and state law claims. *Id.* at 15–16.

With respect to Mr. Jordan, the Town Defendants argue that Mr. Henning's intentional infliction of emotional distress claim is barred by Connecticut's statute of repose, Connecticut

47

General Statutes § 52-577. Town Mem. at 33–34. They further contend that the Complaint fails to plausibly allege that Mr. Jordan engaged in "outrageous behavior" by allegedly failing to disclose the cash receipt. *Id.* at 34–35.

In response, Mr. Henning maintains that under Connecticut law, "[p]olice conduct that results in a malicious prosecution or other violations of an individual's constitutional protections is a recognized basis for an IIED action." Opp'n to State at 21; *see* Opp'n to Town at 39–40. He contends that § 1983 and emotional distress claims arising from the same set of facts can co-exist, arguing, "Connecticut courts consistently uphold claims for emotional distress that are asserted in the complaint as claims based on malicious prosecution, false arrest, excessive force and other federal civil rights violations." *Id.* at 24.

The Court agrees.

In contrast to the factual allegations in the cases cited by Defendants, Mr. Henning alleges specific facts regarding Defendants' conduct that far exceed a mere "description of emotional harms." State Mem. at 15. In his Complaint, Mr. Henning alleges that Mr. Ocif made material false representations to Mr. Henning's grandmother and childhood friend to elicit evidence, Compl. ¶¶ 224–238; Mr. O'Mara fabricated a report of his interrogation of Mr. Henning, which included evidence the State relied upon at trial, *id.* ¶¶ 214–216; Mr. McCafferty "created a false report" which the State relied upon at trial, *id.* ¶¶ 218–220; Mr. Graham, Mr. Quartiero, and Mr. Jordan failed to disclose the recovery of $1,000 from the Carr crime scene that may have enabled Mr. Henning to undermine the State's theory of a "burglary gone wrong," *id.* ¶¶ 244–248; Mr. Acker and/or other officers failed to disclose a potentially exculpatory recording of Ms. Yablonski's pre-polygraph interview to the State's Attorney's Office, *id.* ¶¶

48

263–264; and Mr. Lee fabricated evidence relating to two towels found at the Carr crime scene, *id.* ¶¶ 277–281.

These allegations are legally sufficient to support Mr. Henning's claim of intentional infliction of emotional distress. *Castro v. Narcisse*, No. 3:12-cv-01535, 2013 WL 5423689, at *10 (D. Conn. Sept. 26, 2013) (denying motion to dismiss intentional infliction of emotional distress claim where the plaintiff alleged that she "lost her money, lost her good name and endured criminal prosecution" as a result of defendants' false arrest).

Taking the allegations as true, as this Court must on a motion to dismiss, a reasonable juror could conclude that the alleged fabrication of and failure to disclose potentially exculpatory evidence by an official government authority, if proved, "constitutes extreme and outrageous conduct." *DeRafelo v. Littlejohn*, No. 3:10-CV-207 CSH, 2012 WL 2459396, at *6 (D. Conn. June 27, 2012) (finding that "[a] reasonable juror could . . . infer, from the record, that the Officers deliberately included false information in their police report"); *Hyde v. Pysz*, No. CV054003674, 2006 WL 894926, at *4 (Conn. Super. Ct. Mar. 21, 2006) (concluding, on a motion to strike, that "[t]he crucial fact differentiating this case from the cases cited by the parties . . . is that . . . [t]he acts at issue were done by officers of the law whose sworn duty it is to protect and respect the rights of all citizens, innocent or guilty, by impartially enforcing the law." (internal quotation marks omitted)); *Balogh v. City of Shelton*, No. CV990067521S, 2002 WL 523225, at *7 (Conn. Super. Ct. Mar. 18, 2002) (denying summary judgment where the plaintiff alleged that the defendants "arrest[ed] the plaintiff without probable cause and without an adequate investigation, us[ed] excessive force in arresting the plaintiff, and erroneously represent[ed] in the police report that the plaintiff was intoxicated and had made certain inculpatory statements").

49

While Mr. Henning's intentional infliction of emotional distress claim arises from the same set of facts as his § 1983 claims, this is not a basis to dismiss his emotional distress claim under Connecticut law. *See, e.g.*, *Belton v. Wydra*, No. 3:17-cv-2006 (KAD), 2019 WL 2162718, at *18 (D. Conn. May 17, 2019) (exercising supplemental jurisdiction over intentional infliction of emotional distress claim where the IIED, unreasonable search and seizure, excessive force, and malicious prosecution claims "arise[] from the same set of facts"); *Castro*, 2013 WL 5423689, at *3 to *7, *9 to *10 (denying motion to dismiss false arrest, malicious prosecution, and intentional infliction of emotional distress claims).

Accordingly, Defendants' motion to dismiss Mr. Henning's intentional infliction of emotional distress claim will be denied.[2]

### G.  Count Nine: Indemnification, Conn. Gen. Stat. § 7-465

"Connecticut General Statute § 7-465 allows a plaintiff to seek indemnity from a municipality based upon the actions of a municipal employee within the scope of his municipal employment," *Jones v. City of Hartford*, 285 F. Supp. 2d 174, 190 (D. Conn. 2003), so long as "the injury 'was not the result of any wilful [*sic*] or wanton act,'" *Carey v. Maloney*, 480 F. Supp. 2d 548, 567 (D. Conn. 2007) (quoting Conn. Gen. Stat. § 7-465). Mr. Henning argues that the Town of New Milford is liable under § 7-465(a) to indemnify its municipal employees for their alleged misconduct under Counts Three, Four, Five, Six, Seven, and Eight. Compl. ¶ 380. The Court has determined that Mr. Jordan may be liable to Mr. Henning on four of these counts.

Accordingly, the Town Defendants' motion will be denied as to this claim.

---

[2] Mr. Henning's intentional infliction of emotional distress claim is not time-barred for the same reasons as above. Because Mr. Henning's IIED claim is premised on his underlying conviction, his claim did not accrue until that conviction was overturned in 2019. *See Fontanella*, 89 Conn. App. at 697–99 (statute of limitations under Connecticut General Statutes § 52-577 was tolled where plaintiffs were precluded from bringing a malpractice claim until resolution of the underlying action).

### H. Count Ten: Direct Action, Conn. Gen. Stat § 52-557n

Connecticut General Statutes § 52-557n imposes liability on a municipality for the negligence of municipal employees. Conn. Gen. Stat. § 52-557n. As relevant here, the statute provides that "[e]xcept as otherwise provided by law, a political subdivision of the state shall be liable to damages for person or property caused by . . . [t]he negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . . ." *Id.* § 52-557n(a)(1)(A).

The Town Defendants argue that Mr. Henning's claim against the Town of New Milford is barred by the statute of limitations in Connecticut General Statutes § 52-584. Town Mem. at 37–38.[3]

The Court disagrees.

"Like the [negligent infliction of emotional distress] claim, a negligence claim under [§ 52-557n] is governed by a two year statute of limitations." *Thompson v. Rovella*, No. 3:15-cv-01742-VLB, 2017 WL 601399, at *6 (D. Conn. Feb. 14, 2017); *see, e.g.*, *Tagliaferi v. Town of Hamden*, No. 3:10-cv-1759 (JGM), 2014 WL 129223, at *11 (D. Conn. Jan. 14, 2014) (applying the two-year limitations period under § 52-584 to § 52-557n claim). Section 52-584 therefore applies to Mr. Henning's § 52-557n claim. For the same reasons as above, Mr. Henning's negligence claims did not accrue until his criminal conviction was overturned in June 2019.

Accordingly, Defendants' motion to dismiss Mr. Henning's statutory claim against the Town of New Milford will be denied.

---

[3] The Town Defendants refer to Mr. Henning's statutory claim against the Town of New Milford as the "Seventh Cause of Action" rather than Count Ten. *See* Town Mem. at 37. The Court construes the Town Defendants' argument relating to Connecticut General Statutes § 52-557n as applying to Count Ten of Mr. Henning's Complaint.

## IV.    CONCLUSION

For the foregoing reasons, the State Defendants' motion to dismiss Counts Three and Eight is **DENIED**.

The Town Defendants' motion to dismiss is **GRANTED** as to Counts Four and Five and **DENIED** as to Counts Three, Six, Seven, Eight, Nine, and Ten.

SO ORDERED at Bridgeport, Connecticut, this 24th day of September, 2021.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE