molding, the various door jambs, blood was spilled, the man was stabbed.

Nevertheless, the burglary continued after the bloodletting, because we find blood in the dresser and because we find bloody footprints with contents spilled on them.

Doctor Lee also testified that he found blood on the towel by the bathroom sink upstairs. He also testified that the rug upstairs, he found blood enhanced with chemicals, the chevron print similar to that which appears in the hallway on State's Exhibit Seven, and that which appears in the northwest bedroom of State's Exhibit Seven.

Diana Columbo further testified that jewelry was missing, a VCR was missing, and the photograph of that was admitted as well. She also testified that the bathroom was not in the same condition when she returned as when she left. She testified that the slippers were there and the towel were there, neither of which were there before she left that night.

The State did introduce testimony through Doctor Shaw with respect to Mr. Carr's injuries. I don't think there is any serious dispute here that Mr. Carr died of a homicidal attack. But what Shaw did testify to you is that the gentleman suffered

There is a stipulation in evidence about hairs. The only hairs that they found were the decedent's. There are a number of fingerprints that were found in the house, half of which are unreadable. The other half which are covered by the stipulation.

I want you to look at the stipulation with respect to the fingerprints, ladies and gentlemen, which is number four, Court's Exhibit Number Four, and see whose name isn't on that. Evelyn Carr. She lived in the house. Her prints were never found. Fingerprinting simply is not the infallible science that appears to be on Quincy, Matlock and Perry Mason.

Finkle testified that only on twenty-five percent of homicides will you find fingerprints. Doctor Lee said he scoured that hallway, no readable prints in blood, there were no readable prints at all in that house. Prints don't put him in the house, they don't take him out either.

There was also testimony that spatter patterns were uninterrupted. There was testimony that there was blood by the bathroom sink upstairs. There was testimony that these gentlemen -- the defendant had access to clothing and footwear in that brown drawer.

I submit to you, ladies and gentlemen, they, one, weren't covered with blood, and two, had the opportunity between twelve o'clock and half past two in the morning to change their clothes or dispose of their clothes. Had a ready supply in the car. Also in that car there was testimony that they had access to gloves. It was wintertime. And it certainly would rebut any fingerprints.

Both Doctor Lee and Doctor Finkle testified that it is not at all unusual not to find prints. I suspect also that in some points in the defendant's argument, they will pick up Defendant's Exhibit Number Two and wave it around and say, that is your reasonable doubt. This print 1021, which was allegedly -- which was found on the dresser in the northwest bedroom.

It doesn't amount to a hill of beans. His own witness couldn't tell you how long it was there, he couldn't even say conclusively that it was not impressed between December 2 and December 10 when he did his testing. And he didn't know if everybody who had ever been in that house over the preceding months been subjected to elimination prints. That print doesn't put the defendant in the house, and that print doesn't take him out.

I only have a couple of more minutes. I just