

Neutral

As of: November 7, 2022 8:23 PM Z

# *Henning v. Comm'r of Corr.*

Supreme Court of Connecticut

October 11, 2018, Argued; June 14, 2019[*], Decided

SC 20137

**Reporter**
334 Conn. 1 *; 219 A.3d 334 **; 2019 Conn. LEXIS 161 ***; 2019 WL 2494763

SHAWN HENNING v. COMMISSIONER OF CORRECTION

**Prior History:** [***1] Petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, Sferrazza, J.; judgment denying the petition, from which the petitioner, on the granting of certification, appealed.

*State v. Henning, 220 Conn. 417, 599 A.2d 1065, 1991 Conn. LEXIS 483 (Nov. 19, 1991)*

**Disposition:** Reversed; judgment directed.

## Core Terms

blood, murder, incorrect, towel, burglary, killed, bathroom, forensic evidence, bloody, tested, night of the murder, interviewed, assailants, forensic, new trial, immaterial, photograph, neighbors, crime scene, clothing, stabbed, arrest, smear, loud, dog, beyond a reasonable doubt, false testimony, habeas petition, blood spatter, fair trial

## Case Summary

### Overview
HOLDINGS: [1]-An inmate was entitled to habeas corpus relief from his murder conviction due to the state's failure to alert him that the testimony of the then-director of the state police forensic laboratory, that a substance on a towel found in the victim's home had tested positive for blood when no such test had been conducted and a subsequent test of the substance proved negative for blood, was false because the state was required to establish beyond a reasonable doubt that the prosecutor's failure to correct the testimony was immaterial, the director should have known that the bathroom towel had not been tested for blood, the incorrect testimony was imputed to the prosecutor irrespective of good faith, and the state failed to meet its burden of establishing that the prosecutor's failure to correct the testimony concerning the bathroom towel was harmless beyond a reasonable doubt.

### Outcome
Judgment reversed and remanded.

## LexisNexis® Headnotes

Criminal Law & Procedure > ... > Discovery & Inspection > Brady Materials > Brady Claims

Criminal Law & Procedure > ... > Review > Specific Claims > Prosecutorial Misconduct

Criminal Law & Procedure > Habeas Corpus > Review > Burdens of Proof

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Use of False Testimony

*HN1*[ ] **Brady Materials, Brady Claims**

---

[*] June 14, 2019, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Under Brady and its progeny, it makes no difference whether testimony was intentionally false or merely mistaken. In either situation, if the state knew or should have known that the testimony was incorrect, the petitioner is entitled to a new trial unless the respondent can demonstrate that the incorrect testimony was harmless beyond a reasonable doubt.

Criminal Law & Procedure > ... > Discovery & Inspection > Brady Materials > Appellate Review

Criminal Law & Procedure > ... > Discovery & Inspection > Brady Materials > Brady Claims

HN2[ ]  Brady Materials, Appellate Review

The rules governing evaluation of a prosecutor's failure to correct false or misleading testimony are derived from those first set forth by the United States Supreme Court in Brady v. Maryland, in which the Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecutor. The United States Supreme Court also has recognized that the jury's estimate of the truthfulness and reliability of a witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. Accordingly, the Brady rule applies not just to exculpatory evidence, but also to impeachment evidence which, broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.

Criminal Law & Procedure > ... > Discovery & Inspection > Brady Materials > Appellate Review

Criminal Law & Procedure > ... > Discovery & Inspection > Brady Materials > Brady Claims

HN3[ ]  Brady Materials, Appellate Review

Not every failure by the state to disclose favorable evidence rises to the level of a Brady violation. Indeed, a prosecutor's failure to disclose favorable evidence will constitute a violation of Brady only if the evidence is found to be material. The evidence will be deemed material only if there would be a reasonable probability of a different result if the evidence had been disclosed. A reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Use of False Testimony

HN4[ ]  Prosecutorial Misconduct, Use of False Testimony

When a prosecutor obtains a conviction with evidence that he or she knows or should know to be false, the materiality standard is significantly more favorable to the defendant. A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. This standard applies whether the state solicited the false testimony or allowed it to go uncorrected and is not substantively different from the test that permits the state to avoid having a conviction set aside, notwithstanding a violation of constitutional magnitude, upon a showing that the violation was harmless beyond a reasonable doubt.

Criminal Law & Procedure > ... > Discovery & Inspection > Brady Materials > Appellate Review

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Use of False Testimony

Criminal Law & Procedure > ... > Discovery & Inspection > Brady Materials > Brady Claims

HN5[ ]  Brady Materials, Appellate Review

The stringent materiality test applies when a prosecutor elicits testimony that he/she knows or should know to be false, regardless of the lack of intent to lie on the part of the witness. This standard is appropriate not just because such cases involve prosecutorial misconduct, but more importantly because they involve corruption of the truth-seeking function of the trial process. In light of this effect, and because the state's use of false testimony is fundamentally unfair, prejudice sufficient to satisfy the materiality standard is readily shown such that reversal is virtually automatic unless the state's case is so overwhelming that there is no reasonable likelihood that

the false testimony could have affected the judgment of the jury. The court's determination of whether false testimony was material under Brady and its progeny requires a careful review of that testimony and its probable effect on the jury, weighed against the strength of the state's case and the extent to which the petitioner was otherwise able to impeach the witness. Because the court's role in examining the state's case against the petitioner is to evaluate the strength of that evidence and not its sufficiency, the court does not consider the evidence in the light most favorable to the state. Rather, the court is required to undertake an objective review of the nature and strength of the state's case.

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Use of False Testimony

*HN6*[] **Prosecutorial Misconduct, Use of False Testimony**

The strict materiality standard applies whenever the state fails to correct testimony that it knew or should have known to be false. References to perjured testimony must be taken to include testimony that the prosecutor knew or should have known to be false or misleading even if the witness may not have such an awareness. The prosecutor's actions in failing to disclose false or misleading testimony corrupts the trial process and denies the defendant his constitutional right to a fair trial just as surely as if the state's case included perjured testimony.

Criminal Law & Procedure > ... > Discovery & Inspection > Brady Materials > Brady Claims

*HN7*[] **Brady Materials, Brady Claims**

The prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation whether, that is, a failure to disclose is in good faith or bad faith the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

Criminal Law & Procedure > ... > Discovery & Inspection > Brady Materials > Appellate Review

*HN8*[] **Brady Materials, Appellate Review**

In the Brady context, a murder prosecution predicated primarily on a defendant's alleged or actual admissions, and in which there are no eyewitnesses and no forensic or other physical evidence connecting the defendant to the crime, is not a strong case and is therefore one in which prejudice sufficient to satisfy the materiality standard is readily shown.

Criminal Law & Procedure > ... > Discovery & Inspection > Brady Materials > Brady Claims

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Use of False Testimony

*HN9*[] **Brady Materials, Brady Claims**

When a conviction depends entirely on the testimony of certain witnesses, information affecting their credibility is material in the constitutional sense since if they are not believed a reasonable doubt of guilt would be created.

**Counsel:** W. James Cousins, with whom was Craig A. Raabe, for the appellant (petitioner).

Michael J. Proto, assistant state's attorney, with whom were Jo Ann Sulik, supervisory assistant state's attorney, and, on the brief, David S. Shepack, state's attorney, for the appellee (respondent).

**Judges:** Robinson, C. J., and Palmer, McDonald, D'Auria, Mullins, Kahn and Ecker, Js. PALMER, J. In this opinion the other justices concurred.

**Opinion by:** PALMER

## Opinion

 [**336]   [*3]  PALMER, J. The petitioner, Shawn Henning, and Ralph Birch were convicted of felony murder in connection with the vicious 1985 slaying of sixty-five year old Everett Carr in Carr's New Milford residence during what the police believed at the time to

be a burglary gone wrong.¹ After this court affirmed his conviction; see *State v. Henning, 220 Conn. 417, 431, 599 A.2d 1065 (1991)*; the petitioner filed two habeas petitions, the first of which was dismissed with prejudice by the habeas court, *White, J.*, on the basis of the petitioner's purported refusal to appear at his **[***2]** habeas trial. The second habeas petition, which is the subject of this appeal, alleges, among other things, that the state deprived the petitioner of his due process right to a fair trial in violation of *Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)*, and its progeny, which require the state to correct any testimony by a state's witness when the state knew or should have known that that testimony was materially false or misleading. More specifically, the petitioner claims that his right to **[**337]** due process was violated by virtue of the state's failure to correct the trial testimony of the then director **[*4]** of the state police forensic laboratory, Henry C. Lee, that a red substance on a towel found in the victim's home had tested positive for blood when, in fact, no such test had been conducted, and, further, a test of the substance conducted in connection with the present case proved negative for blood. The habeas court, *Sferrazza, J.*,² rejected all of the petitioner's claims, including his claim concerning Lee's testimony about the towel, and this appeal followed. We agree with the petitioner that, contrary to the determination of the habeas court, he is entitled to a new trial due to the state's failure to alert the trial court and the **[***3]** petitioner that Lee's testimony was incorrect,³ and, therefore, we reverse the judgment of the habeas court.⁴

**[**338]** **[*5]** The record reveals the following relevant facts and procedural history. On November 29, 1985, the then seventeen year old petitioner, together with his eighteen year old friend, Birch, and eighteen year old girlfriend, Tina Yablonski, stole a 1973 brown Buick Regal from an automobile repair shop in the town of Brookfield. Later that evening, the three teenagers drove

---

¹ The petitioner and Birch were tried and convicted separately.

² Unless otherwise noted, all references hereinafter to the habeas court are to *Sferrazza, J.*, and all references to the habeas petition are to the petition in the present case.

³ As we discuss more fully hereinafter, the respondent, the Commissioner of Correction, concedes that the testimony of Lee at issue in this case was false or misleading—terms commonly used in cases, like the present one, involving due process claims stemming from the state's improper use of testimony in a criminal trial—in the sense that it was factually wrong or incorrect. In its memorandum of decision, however, the habeas court found that Lee's testimony was mistaken rather than intentionally false or untruthful—a conclusion that the petitioner has not challenged—and we have no reason to question that determination. Nevertheless, for the reasons set forth hereinafter, we conclude that, in the circumstances presented, the petitioner is entitled to a new trial because, *HN1*[↑] under *Brady* and its progeny, it makes no difference whether Lee's testimony was intentionally false or merely mistaken. In either situation, if, as we conclude, the state knew or should have known that the testimony was incorrect, the petitioner is entitled to a new trial unless the respondent can demonstrate that the incorrect testimony was harmless beyond a reasonable doubt, a burden the respondent cannot meet. Finally, although Lee's testimony was false or misleading insofar as it was contrary to the facts, we characterize his testimony as incorrect rather than false or misleading because the latter terms might be understood as connoting a dishonest or untruthful intent, an implication that would be incompatible with the habeas court's determination.

⁴ The petitioner also filed a petition for a new trial; see *General Statutes § 52-270 (a)*; on the basis of newly discovered evidence. Prior to trial, the habeas court consolidated that petition with the present habeas petition and with the closely related habeas and new trial petitions of Birch. The habeas court rejected all of the claims in the four petitions, and the petitioner and Birch separately appealed to the Appellate Court from the judgments denying their habeas and new trial petitions. We thereafter transferred all four appeals to this court pursuant to *General Statutes § 51-199 (c)* and *Practice Book § 65-2*. In a separate opinion also issued today, we have dismissed as moot the petitioner's appeal from the habeas court's denial of his petition for a new trial because of our determination that the petitioner must be afforded a new trial due to the state's failure to correct Lee's incorrect testimony. See *Henning v. State, 331 Conn. 33, 34, 218 A.3d 1042, 2019 Conn. LEXIS 160 (2019)*. We also have reversed the judgment of the habeas court denying Birch's habeas petition; see *Birch v. Commissioner of Correction, 331 Conn. 37, 40, 219 A.3d 353, 2019 Conn. LEXIS 158 (2019)*; see also *Birch v. State, 331 Conn.37, 40, 219 A.3d 353 (2019)* (dismissing as moot Birch's appeal from denial of petition for new trial); a decision that, like our decision in the present case, is predicated on the state's use of Lee's incorrect testimony.

We note, finally, that, at various points throughout this opinion, we briefly discuss a number of the other claims raised by the petitioner in his habeas petition and in his petition for a new trial. We do not decide the merits of any of those claims, however, in light of our conclusion that the petitioner is entitled to a new trial as a result of Lee's incorrect testimony. To the extent that we discuss them, we do so only to place the present claim in the broader context of the several significant issues that the petitioner also raises as a basis for his entitlement to a new trial.

the vehicle to New Hampshire to visit Birch's mother. While there, the vehicle's muffler was damaged and subsequently removed, causing the vehicle to make a loud noise when it was operated. When the trio returned to Connecticut on December 1, 1985, they went directly to the Danbury residence of Douglas Stanley, a local drug dealer, where they freebased cocaine. In addition to selling the teenagers drugs, Stanley also acted as a "fence"[5] for property they periodically stole from local businesses and homes. After leaving the Stanley residence, the petitioner and Birch dropped Yablonski off at her parents' **[*6]** home in the town of New Milford, arriving there **[***4]** at approximately 11:55 p.m.

At that time, the victim was living at the home of his daughter, Diana Columbo, in New Milford, approximately two miles from the Yablonski residence. Sometime between 9 and 9:30 p.m. on December 1, 1985, Columbo left the house to visit a friend. When she returned home the next morning, reportedly between 4 and 4:30 a.m., she found the victim's lifeless body in a narrow hallway adjacent to the kitchen, which led to the victim's first floor bedroom. The victim, clad only in an undershirt and underwear, was lying in a pool of blood. Blood spatter and smears covered the walls around him, almost to the ceiling. An autopsy later revealed that the victim had sustained approximately twenty-seven stab wounds, a severed jugular vein, and blunt force trauma to the head. Investigators theorized that the victim had confronted his assailants in the hallway and fought for his life. The associate medical examiner could not determine the exact time of death, only that the victim died within twenty-four hours of his body being examined by the medical examiner and two and one-half to three hours of his last meal.

The assailants left two distinct sets of bloody foot-prints near **[***5]** the victim's body and in other locations throughout the house. Beneath the victim's body, the police found what they believed to be a piece of the murder weapon—a small metal collar that separates a knife blade from the handle. The police also discovered blood on a dresser drawer in the victim's bedroom. Inside the drawer were a pair of bloody socks and a blood stained cigar box, indicating that the assailants had rummaged through the house after the murder. A videocassette recorder, jewelry, several rolls of quarters, and some clothing were reported missing.

The evidence established that, sometime between 12:10 and 12:30 a.m. on the night of the murder, two **[*7]** of the victim's neighbors heard a loud vehicle being operated near the victim's residence. One of the neighbors, Alice Kennel, heard the vehicle stop at the lot beside her house for approximately twenty minutes and then drive away. The other neighbor, Brian Church, reported hearing a vehicle with "a very loud muffler sound" at around the same time. According to Church, the vehicle stopped for about thirty minutes and then drove away. Neither Kennel nor Church saw the vehicle or heard its doors open or shut. Nor could either witness **[***6]** place the vehicle or its occupants at the victim's **[**339]** house.[6]

Because the police suspected that the victim had interrupted a burglary, they began their investigation by compiling a list of known burglars in the area. Almost immediately, they became aware of the names of the petitioner, Birch, and Yablonski, as well as Stanley, whom they were told purchased stolen goods from the teenagers. The police interviewed the petitioner on December 4, 1985. By then, he, Birch, and Yablonski had heard about the victim's murder from Stanley, whom the police had already interviewed.

According to Yablonski, who testified for the state, she, the petitioner, and Birch discussed the murder with a group of people at Stanley's residence on December 2, 1985. From this discussion, they learned that a man had been killed after surprising a burglar and that the **[*8]** man's dog also had been killed.[7] Yablonski testified that, prior to speaking to the police, she, the petitioner, and Birch decided they should "get [their] stories straight" to prevent the police from finding out about the stolen Buick and the burglaries that the teens had committed close in time to the murder. To that end,

---

[5] A fence is a person who receives and sells stolen goods.

[6] A third neighbor, Gary Smith, also reported hearing a vehicle with a loud muffler on the night of the murder. Unlike Kennel and Church, Smith observed the vehicle as it drove past his house. Although Smith did not testify at the petitioner's criminal trial, he did so at Birch's criminal trial, at which he described the vehicle's taillights as being "fairly wide set" and "round in appearance." When Smith was shown a photograph of the stolen Buick, he testified that its taillights were not those of the vehicle he had observed on the night of the murder. In his habeas petition, the petitioner alleged that his trial counsel, Carl D. Eisenmann, rendered ineffective assistance by failing to call Smith as a witness to rebut the state's theory that the loud vehicle that was heard in the vicinity of the victim's home was the stolen Buick.

[7] It is undisputed that no dog was killed or otherwise harmed in the commission of the victim's murder.

the trio agreed to tell the police **[\*\*\*7]** that they had hitchhiked to and from New Hampshire, and then hitchhiked home from Stanley's residence on the night of the murder, leaving the city of Danbury at approximately 12:30 or 1 a.m. and arriving in New Milford several hours later. According to Yablonski, however, they did not leave Danbury at 12:30 a.m. but, rather, at around 11:20 p.m. Yablonski further testified that, while discussing the victim's murder, the petitioner had said to her and Birch, "[w]hat if we get caught? What if they suspect us?" At the time, Yablonski had assumed that the petitioner was referring to the burglaries and the stolen Buick.

When interviewed by the police on December 4, 1985, the petitioner informed the officers that he was aware that a man had been stabbed during a burglary. According to the testimony of one of the officers, when the petitioner was shown a photograph of the victim, he indicated that he previously may have seen the man around town and asked whether he was the man with all the tattoos, even though no tattoos were visible in the photograph.[8] The following day, Birch confessed to the theft of the Buick, and the petitioner took the police to where he had hidden it in a wooded area **[\*\*\*8]** near a reservoir in New Milford. The petitioner and Birch also confessed to using the car in connection with the commission of several burglaries, for which they were placed under arrest.

 **[\*9]** When the police recovered the Buick, it was evident that it had not been cleaned. According to several police reports **[\*\*340]** and photographic exhibits, the vehicle was covered in dirt and filled with sand, sneakers, toiletries, food, blankets, pillows, various items of clothing, and what the police believed to be stolen electronics. Despite a thorough examination of the vehicle and the surrounding area, which involved draining two reservoirs and the use of specially trained dogs, no evidence was found linking the petitioner or Birch to the murder. A search of the victim's neighborhood, including the surrounding roadways and fields adjacent to those roadways, also produced no incriminating evidence.

On December 6, 1985, the police conducted a second interview of the petitioner. During this interview, which was recorded, the officers falsely claimed that Birch had implicated the petitioner in the murder. Specifically, they told the petitioner that Birch had placed the entire blame for the murder on him and that **[\*\*\*9]** Birch would "walk out of this thing" a free man while the petitioner would be "left . . . holding the bag." They advised the petitioner that, if he would just "tell . . . the truth about what happened, the whole truth, like . . . Birch did, then it's gonna weigh heavily in [his] favor." The officers also informed the petitioner that the police had recovered a wealth of forensic evidence from the crime scene, that that evidence was being tested, and that it was just a matter of time before it would confirm his presence in the victim's home. Finally, the officers informed the petitioner that, on the night of the murder, the victim's neighbors had heard a loud vehicle that sounded just like the vehicle the petitioner and Birch were driving that evening. The petitioner vehemently denied any involvement in the crime and implored the officers to test the crime scene evidence, his clothing, and everything else that they had seized from him because he was certain it would **[\*10]** prove his innocence. When the petitioner was told that the tests would take two weeks, the petitioner expressed impatience that he would have to wait so long to clear his name.

According to the transcript of the December 6, **[\*\*\*10]** 1985 interview, the officers asked the petitioner what he knew about the murder. The petitioner responded that he knew only what people had told him and what everyone else knew. Specifically, the petitioner stated that, when he first heard about the murder, he was told "that some old man from New Milford had gotten knocked out in the middle of a burglary; then I heard from someone else right after that . . . [that the victim] came in, saw who it was, and that was the reason for the, the knife or whatever they used on him. . . . [P]eople [told] me he got internal wounds in the gut, and then the story switched around and someone said he got his jugular vein ripped out of his neck or something . . . ." When asked who he had gotten this information from, the petitioner responded, "that's what the Danbury police told [Stanley] when they brought him down for questioning." When the petitioner finished speaking, the officers tried unsuccessfully to elicit a confession from him by informing him that he had revealed details about the murder that only the killer would know. Specifically, one of the officers stated, "you got this information about the old guy being knocked out that ties into some **[\*\*\*11]** evidence that we've got, that's never been in the paper. . . . [O]nly people who [know] something about [the murder would] say something like that." The petitioner was later asked, "how [do] you know all these things that we don't know? . . . You do too; you know more about that crime scene than [we] know." The petitioner explained, "[t]hat's just what . . . I heard, man, there was

---

[8] The victim did have tattoos. At his criminal trial, however, the petitioner denied indicating to the police that he had ever seen the victim prior to being shown his photograph.

fucking six other people there when . . . [Stanley] told me that. Every other [person] . . . **[\*\*341]** heard the same . . . thing. If it wasn't for this stupid **[\*11]** fucking piece of junk [car] that we . . . [stole] to get a ride home that night, none of this shit would [be] happening."

On December 9, 1985, the police conducted a third interview of the petitioner at the Litchfield Correctional Center. According to the testimony of one of the officers who was present there, when the petitioner was told that the police knew from the victim's neighbors where the petitioner and Birch had parked on the night of the murder, and where they had turned their car around, the petitioner's "right leg began to shake violently," and he stated that, although he, Birch, and Yablonski may have turned around in the victim's driveway, he was **[\*\*\*12]** never in the victim's house and did not kill the victim.

During the course of the investigation, the police discovered that the petitioner had called his grandmother, Mildred Henning (Mildred) and his close childhood friend, Timothy Saathoff, from jail shortly after his arrest in 1985. In 1987 or 1988, Andrew Ocif, a detective with the Connecticut state police, interviewed Mildred and Saathoff about their recollection of those telephone calls. After speaking with Ocif, both Mildred and Saathoff agreed to provide statements indicating that the petitioner had told them that he was involved in various burglaries, that there was a burglary during which a man was killed, and that he did not kill him. Despite Mildred's and Saathoff's statements, the petitioner and Birch were not charged with the victim's murder until November, 1988. At the petitioner's criminal trial, Mildred testified that the petitioner had told her shortly after his arrest, during an emotional telephone call from jail, that he had been involved in a burglary during which a man and a dog were killed but that he was not the killer. Saathoff also testified that the petitioner had told him that he and another individual were **[\*\*\*13]** involved **[\*12]** in a burglary and that a man had been killed but that he did not commit the murder.[9]

Because there was no forensic evidence connecting the petitioner to the crime, the state's case against him relied primarily on the testimony of Mildred and Saathoff, the testimony of the victim's neighbors, who had heard a loud vehicle on the night of the murder, the fact that the petitioner was driving such a vehicle that evening, and the testimony of Yablonski, whom the state relied on to establish consciousness of guilt predicated on the theory that the petitioner had lied to the police about the time of his return to New Milford to conceal his involvement in the murder. The state also called Lee, the criminalist and forensic scientist, to explain how it was possible for the petitioner and Birch to have stabbed the victim so many times without getting any blood on their clothing and without transferring any blood to the Buick. Lee testified that, although there clearly had been a violent struggle between the victim and his assailants, all of the blood spatter in the hallway was "uninterrupted," meaning that no individual or object was between the victim and the walls or floor to interrupt **[\*\*\*14]** the blood spatter. According to Lee, this would explain why the assailants might not have been covered in the victim's blood. When asked, **[\*\*342]** however, whether, "based [on his] examination of the [crime] scene and the spatter patterns that appear on the floor and walls, [he] ha[d] an opinion as to whether or not the perpetrators would have had blood on their persons," Lee answered, "[m]y opinion is maybe."

**[\*13]** During his testimony, Lee relied on certain crime scene photographs. One of the photographs showed two towels hanging beside a sink in the upstairs bathroom. Although the state now concedes that the towels had not been tested for the presence of blood, Lee testified at trial that they had been so tested. Lee testified specifically that "there are some reddish color stain[s] [on one of the towels]. Those stains tested [positive] for the presence of blood . . . ." Later, in reference to the same photograph, Lee reiterated that one of the two towels had a "reddish color smear. That smear, I did a few tests, [which] show that it [tested] positive consistent with blood." At no time did the assistant state's attorney (prosecutor) correct Lee's incorrect testimony, apparently because he was unaware **[\*\*\*15]** that it was untrue. Nor did the petitioner's trial counsel, Carl D. Eisenmann, attempt to correct it, presumably because he, too, did not know that it was incorrect.

At the close of the state's case, the petitioner moved for a judgment of acquittal, which the trial court denied. Thereafter, the petitioner's trial counsel presented a

---

[9] Saathoff recanted his testimony several years later, stating that the petitioner had never confessed to any involvement in the burglary and the victim's murder. Saathoff stated that the only reason he testified that the petitioner did so confess was because Ocif had told him that it would help the petitioner. At the petitioner's habeas trial, Ocif did not deny telling both Mildred and Saathoff that the police had strong evidence placing the petitioner at the crime scene and that it would actually help the petitioner if they would say that he had told them that he was there but that he did not kill the victim.

defense comprised of just two witnesses, Columbo, the victim's daughter, and the petitioner. In an effort to establish time of death, the petitioner's counsel asked Columbo whether she knew when her father had last eaten prior to being murdered. Columbo testified that she did not know. He also asked her whether she had ever told anyone that the victim was holding an object in his hand when she discovered his body. Columbo denied having said any such thing, and counsel asked no further questions.[10]

 [*14]  In his trial testimony, the petitioner denied killing the victim or ever being in the victim's home. The petitioner stated that, after he, Birch, and Yablonski left the Stanley residence on December 1, 1985, they "smoked" cocaine before dropping Yablonski off at her parents' home in New Milford, and then he and Birch drove around siphoning gas for the Buick, after [***16] which they went to his father's house. According to the petitioner's father, the petitioner and Birch arrived at his house sometime between 2:15 and 4:20 a.m. The petitioner further testified that, although he had called Mildred and Saathoff after his arrest in 1985, at no time did he tell them that he was at the victim's home on the night of the murder; according to the petitioner, he told them only that the police were accusing him of being there and that he feared they were trying to frame him. The petitioner testified that he told both Mildred and Saathoff "that the police . . . believed . . . [that he had] been at the [victim's] residence because of things that [he] had said to the police when [he] was asked about [the] case, about the murder. When I was asked about the murder, I had known things that other people had not known, that the newspapers had not known yet, and . . . [that is what] I . . . told [them], that [the] man had been beaten [**343] to death, stabbed to death, and his dog was killed. . . . That's what I [had] heard."

In his closing argument, the prosecutor, relying on Lee's reconstruction of the crime, argued "that the evidence shows that . . . there may have been two [***17] individuals involved in that fight, with [the victim] holding one while the other stabbed him about the back and arms." The prosecutor also argued to the jury that the bloody footwear impressions, blood stained bathroom towel, and "bloodied items . . . found in the dresser . . . in the northwest bedroom" indicated that "the burglary continued after the bloodletting."

 [*15]  The prosecutor also explained to the jury that, although there was no forensic evidence connecting the petitioner and Birch to the crime, that was only because, as Lee had explained, all of the blood spatter was uninterrupted, meaning that the assailants would not have been covered in it. Another reason why there was no forensic evidence, the prosecutor asserted, was because the perpetrators had cleaned up before leaving the scene. "Remember also the bloody towel in the upstairs bathroom," the prosecutor stated. "It gave them an opportunity to wash or have some access to that sink." Finally, the prosecutor reminded the jury about the petitioner's admissions to his grandmother and Saathoff, the noisy vehicle that was heard near the victim's home on the night of the murder, the fact that the petitioner and Birch were driving [***18] a noisy vehicle that evening, and the petitioner's consciousness of guilt as evidenced by the fact that he lied to the police about the time he left Danbury on the night of the murder. The prosecutor also reminded the jury that, according to the officers who first interviewed him, the petitioner had asked whether the victim was the man with many tattoos even though there were no tattoos visible in the photograph. Finally, the prosecutor maintained that the explanation that the petitioner purportedly gave to the officers as to why he knew about the tattoos—namely, because he previously had seen the victim around town— should not be believed.

In his closing argument, the petitioner's counsel emphasized the lack of forensic evidence, arguing that it simply made no sense that the petitioner and Birch could have committed such a violent and bloody crime without getting a drop of blood on their shoes or clothing, or without transferring any trace evidence to the Buick. With respect to the testimony of Mildred and Saathoff, the petitioner's counsel maintained that those witnesses were simply mistaken about what the  [*16] petitioner had told them so many years ago. The petitioner's counsel argued [***19] that, if the petitioner actually had been present when the victim was murdered, he would not have told his grandmother that a dog was killed during the commission of the crime because he would have known that no such thing had occurred. The fact that he did, counsel stated, supported the petitioner's contention that he had told his grandmother and Saathoff that he had

---

[10] As we explain more fully hereinafter; see footnote 11 of this opinion; the petitioner alleged in his habeas petition that his trial counsel was ineffective by failing to raise a third-party culpability defense against Columbo on the basis of numerous lies that she had told the police in the early hours of the investigation, and other suspicious behavior that she exhibited at that time, including, on the night of the murder, screaming to the emergency services dispatcher, "Oh God, he's got a knife in his hand."

been arrested on burglary charges and that, as a result, the police suspected him of committing another burglary during which a man had been killed, but that he had nothing to do with that crime.

The jury thereafter found the petitioner guilty of felony murder, and the trial court rendered judgment sentencing the petitioner to a term of imprisonment of fifty years. This court later affirmed the trial court's judgment in *State v. Henning, supra, 220 Conn. 431*. In 2001, while serving his Connecticut sentence in a Virginia prison, the petitioner filed a petition for a writ of habeas corpus, alleging ineffective assistance of trial counsel. As we previously indicated, the habeas [**344] court dismissed that petition with prejudice on the basis of the petitioner's purported refusal to appear at the habeas trial. In 2012, the petitioner filed a second habeas petition in [***20] which he alleged, inter alia, that his trial counsel had rendered ineffective assistance in myriad ways, including but not limited to his failure to consult and present the testimony of a forensic footwear impression expert, failure to consult and present the testimony of a crime scene reconstructionist, failure to consult and present the testimony of a forensic pathologist, failure to investigate and present a third-party culpability defense implicating the victim's daughter,[11] and failure to investigate, cross-examine, impeach, [*17] or otherwise challenge the testimony of the state's witnesses, including Mildred, Saathoff and Ocif.[12] The

---

[11] More specifically, at the habeas trial, the petitioner sought to demonstrate that the crime scene had been staged to resemble a burglary and that his trial counsel had rendered ineffective assistance in failing to raise a third-party culpability defense against Columbo and Richard Burkhart, Columbo's lover and employer at the time of the murder, and for whom the victim also had worked and who allegedly owed the victim money. In support of this contention, the petitioner adduced evidence that, when Columbo was initially interviewed by the police on the night of the murder, she claimed to have been home all evening and to have heard the victim coughing, although she did not check on him. She then told the police that she actually had gone out that evening and returned home between 2:30 and 3 a.m. Later, she told the police that she had lied in her earlier statements to prevent Burkhart from finding out that she had been with another man that evening. Columbo also told the police that she had left the house at around 9:30 p.m. and returned sometime between 4 and 4:30 a.m. Police records indicate, however, that Columbo did not call for help until 4:50 a.m., and that, when she did, according to the emergency dispatcher, she screamed, "Oh God, he's got a knife in his hand." There was also evidence that Columbo exhibited highly unusual behavior immediately after the murder. For example, one of the first responders, Anita Bagot, testified that Columbo barricaded herself in the dining room shortly after the police arrived and, later, asked Bagot, "[w]hy would he do it . . . [w]hy would he do it," clearly suggesting that she knew the identity of the assailant. The petitioner also presented evidence at the habeas trial that there was animus between Burkhart and the victim, despite Burkhart's statement to the police that he and the victim "had an excellent relationship" and that he "loved" the victim. One witness who had worked for Burkhart, Cynthia M. Russo-Donaghy, testified that Burkhart had a scratch on his face on the morning after the murder and that the victim had told her that Burkhart was a "son of a bitch" and that he "hate[d]" him. The petitioner also established that the state police received an anonymous telephone call on May 22, 1986, from an unknown male who said that Burkhart had murdered the victim.

We note, finally, that the petitioner, in support of his petition for a new trial, presented the deposition testimony of John Andrews, who stated that, after the murder, he and Columbo became romantically involved and, for a time, lived together. Andrews stated that, during an argument one night, Columbo charged at him with a knife and told him that "she would kill [him] like she killed her father." According to Andrews, late at night sometime thereafter, while he was in the kitchen and Columbo was upstairs, he was attacked and severely injured by an unknown assailant who beat him over the head and repeatedly stabbed him. Andrews further explained that, during the assault, he heard a male voice telling him to "leave and don't come back." Following this incident, Andrews decided to move out and, while packing his belongings, found a six to seven inch knife blade without a handle protruding from a basement wall. Andrews never told anyone about Columbo's threat or his discovery of the knife blade until years later, when he was contacted by the Connecticut Innocence Project. In its memorandum of decision, the habeas court observed that "Andrews [had] no obvious reason to fabricate [his] recollections."

[12] In particular, the petitioner alleged that his trial counsel had rendered ineffective assistance by failing to interview Mildred, Saathoff and Ocif prior to trial, and by failing to impeach their testimony at trial. The petitioner argued that, if trial counsel had interviewed Mildred and Saathoff, he would have learned that Ocif had goaded them into providing false testimony in the misguided belief that they were helping the petitioner. The petitioner further claimed that, if trial counsel had interviewed Ocif, he would have discovered that Ocif had failed to adequately investigate any other suspects or their possible motives for the crime or even to familiarize himself with the investigative file because Ocif was convinced of the petitioner's guilt founded on the theory that the victim was killed during the course of a burglary. In support of this contention, the petitioner elicited testimony from Ocif that he did not assist in the crime scene investigation and had seen only a single photograph of the crime scene. Ocif also did not know at the time of his investigation that Columbo had lied to the police about her

petitioner [**345] further claimed that his first habeas counsel, [*18] Michael Merati, rendered ineffective assistance of counsel by failing to adequately investigate and present his ineffective assistance of trial counsel claims and by allowing the petitioner's first habeas petition to be dismissed with prejudice on the basis of his purported failure to appear at the first habeas trial. The petitioner also claimed actual innocence on the basis of, among other things, numerous DNA tests conducted over the last decade by the Connecticut Forensic Science Laboratory, which [***21] had excluded the petitioner, Birch, and Yablonski as the source of DNA recovered from the crime scene, and revealed the DNA of an unknown female on four key pieces of evidence with which the assailants were known or thought to have come into contact.[13] Finally, the petitioner alleged that the state had violated his right to a fair trial by adducing Lee's [*19] incorrect testimony that there was blood on the bathroom towel, testimony that had permitted the prosecutor to argue that the reason investigators failed to find forensic evidence on the petitioner's clothing or in the Buick was because the petitioner had cleaned himself up before leaving the victim's home.

A consolidated trial on the petitioner's second habeas petition, his petition for a new trial, and the closely related habeas and new trial petitions of Birch; see footnote 4 of this opinion; was conducted over a period of several weeks in November and December, 2015, during which the petitioner and Birch called a number of expert and lay witnesses whose testimony cast serious doubt on the state's theory of the case.[14] In [**346] support of the petitioner's claim that the prosecutor's failure to correct Lee's incorrect testimony entitled the [***22] petitioner to a new trial, he argued that, under a line of cases following the United States Supreme Court's seminal opinion in *Brady v. Maryland, supra, 373 U.S. 83*, including *United States v. Bagley, 473 U.S. 667, 679, 105 S. Ct. 3375, 87 L. Ed. 2d 481 and n.9 (1985)* (opinion [*20] announcing judgment) (conviction obtained with state's knowing use of perjured testimony must be set aside unless state can establish testimony was harmless beyond reasonable doubt), *State v. Ouellette, 295 Conn. 173, 186, 989 A.2d 1048 (2010)* (prosecutor who knows that testimony of witness is false or substantially misleading must correct that testimony regardless of lack of intent to lie on part of witness), and *State v. Cohane, 193 Conn. 474, 498, 479 A.2d 763* (prosecutor has responsibility to correct false testimony when prosecutor knew or should have known that testimony was false), cert. denied, *469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984)*, the respondent, the Commissioner of Correction, was required to establish that Lee's concededly incorrect testimony was immaterial beyond a reasonable doubt, a standard that, the petitioner further claimed, the respondent could not meet.

Following the trial, the habeas court issued a memorandum of decision in which it denied or dismissed

---

whereabouts on the night of the murder, that she had barricaded herself in the dining room after the police arrived, and that, when she called for emergency assistance, indicated to the dispatcher that there was a man in her home holding a knife. Ocif also was unaware of the animus between the victim and Burkhart, and the fact that the police had received an anonymous call identifying Burkhart as the killer.

[13] In this regard, Christine Mary Roy, a forensic science examiner with the state's Division of Scientific Services, testified at the petitioner's habeas trial that, in addition to the victim's DNA, the DNA profile of an unknown female was found on the bloody cigar box, the inside of the front waistband of the victim's underwear, the metal ring that was found under the victim that was thought to be part of the murder weapon, and a floor board that the police had removed, which contained two sets of bloody footprints. Lucinda Lopes-Phelan, another forensic science examiner with the Division of Scientific Services, testified that she had tested the victim's underwear on the theory that one of the assailants may have grabbed him there during the struggle that led to the victim's murder.

[14] For example, in support of his claim that trial counsel was ineffective for failing to consult a forensic footwear impression expert, the petitioner presented the testimony of William Bodziak, a former agent with the Federal Bureau of Investigation (FBI) and a prominent footwear impression expert. Bodziak testified that, using techniques available at the time of the petitioner's criminal trial, he was able to determine that one of the two sets of bloody footprints from the crime scene could not possibly have been left by either the petitioner or Birch because it was made by a size 9 or smaller shoe, perhaps even as small as a size 7 and 1/2, and the petitioner and Birch wore shoes sized 11 and 1/2 and 10 and 1/2 to 11, respectively. According to Bodziak, the size difference between the bloody footprints and the petitioner's and Birch's shoes at the time of the murder was "enormous . . . ." With respect to Bodziak's expertise, the habeas court made the following findings: "Obviously, expert footwear analysts were available at the time of the petitioner's [criminal] trial in 1989. From 1973 to 1997 . . . . Bodziak was a special agent for the FBI who specialized [in], among other [things] . . . footwear imprint analysis. He testified at the [petitioner's] habeas trial, and he is a well trained, extensively experienced, and highly qualified expert in this field of criminology. He has testified in nearly every state and federal trial court in the United States, including at the trials of [Orenthal James] Simpson and [Timothy McVeigh] the Oklahoma City bomber."

all of the **[\*\*347]** petitioner's claims.[15] With respect to the petitioner's **[\*21]** claim that the state had deprived him of a fair trial by failing to correct Lee's concededly incorrect testimony,[16] the court concluded, **[\*\*\*23]** contrary to the contention of the petitioner, that the respondent was not required to demonstrate the immateriality, that is, the harmlessness, of that testimony beyond a reasonable doubt. The habeas court concluded, rather, that that heavy burden applies only when the state fails to correct *perjured* testimony, and it appeared clear to the habeas court that, in the absence of any contrary evidence, "Lee mistakenly, but honestly, **[\*22]** believed he tested [the bathroom towel] rather than contrived a false story about having done so." In other words, as the habeas court explained, although Lee had testified incorrectly, he was "not lying under oath." The habeas court then concluded that the applicable standard was "the classic test" for determining whether the petitioner was entitled to a new trial as a consequence of the state's *Brady* violation, a standard that, as the habeas court further explained, is satisfied "only if [the petitioner can demonstrate that] there would be a reasonable probability of a different result if the [correct] evidence had been disclosed. . . . A reasonable probability . . . is one [that] undermines confidence in the outcome of the trial . . . ." (Citations omitted; **[\*\*\*24]** internal quotation marks omitted.)

Applying this standard, which is considerably less favorable to the petitioner than the standard that the petitioner himself had advanced, the habeas court concluded that Lee's incorrect testimony was immaterial because the state's case against the petitioner did not in any way rely on forensic evidence. Specifically, the court explained: "Because no forensic nexus was produced, the state's case against [the petitioner] hinged on the credibility of . . . [numerous] lay witnesses rather than on . . . Lee's [testimony]. The impact of the victim's neighbors' testimony about being disturbed by a very loud vehicle and the false time line fabricated by Birch and [the petitioner] was far more incriminating and [was] in no way

---

[15] We note that one of the claims that the habeas court rejected was the claim that the petitioner's first habeas counsel had rendered ineffective assistance by allowing the petitioner's first habeas petition to be dismissed with prejudice. In light of that conclusion, the habeas court declined to consider the merits of several of the petitioner's claims because they had been raised in the first petition, and, by virtue of the dismissal of that petition with prejudice, they could not be litigated in any subsequent habeas petition. In rejecting this claim of ineffective assistance by first habeas counsel, the habeas court discredited the petitioner's testimony that his first habeas counsel had told him that he need not appear for the scheduled habeas trial because he was withdrawing the petition without prejudice, which would have allowed the petitioner to refile it at a later date if and when additional evidence became available. In doing so, the habeas court observed that when the first habeas court asked first habeas counsel whether "it is true that your client refused to come here," he replied, "[y]es." The court then stated that it could discern "no possible motivation for [first habeas counsel] to mischaracterize the petitioner's position about refusing to appear and participate in his own case with respect to [his] allegation of ineffective assistance [against his trial counsel]. . . . The petitioner neither appealed [from] the dismissal nor asserted any misrepresentation or misunderstanding as to the dismissal with prejudice for the eight years between the dismissal and the filing of the present habeas action." It is undisputed, however, that the petitioner, acting pro se, filed a timely petition for certification to appeal from the judgment dismissing his first habeas petition and a motion for the appointment of new habeas counsel, which the first habeas court denied. After the dismissal of his first habeas petition, the petitioner also sent the court a letter he had received from first habeas counsel advising him that he need not appear. On appeal to this court, the petitioner contends that the habeas court incorrectly determined that first habeas counsel did not render ineffective assistance by allowing his first habeas petition to be dismissed with prejudice or by representing to the first habeas court that his claims against trial counsel lacked merit. As we explained, because we conclude that the petitioner is entitled to a new trial due to the prosecutor's failure to correct Lee's incorrect testimony that there was blood on the bathroom towel, we do not reach the merits of this or any of the petitioner's other claims. We take this opportunity to reiterate, however, that a habeas petition may not be dismissed with prejudice in the absence of a knowing, voluntary, and intelligent waiver by the petitioner of the claims contained therein. See, e.g., *Nelson v. Commissioner of Correction, 326 Conn. 772, 785-86, 167 A.3d 952 (2017)* ("a habeas court may accept the withdrawal of a habeas petition 'with prejudice,' allowing the petitioner to waive any future habeas rights, as long as the withdrawal is knowing, voluntary, and intelligent"); *Fine v. Commissioner of Correction, 147 Conn. App. 136, 145, 81 A.3d 1209 (2013)* ("in light of the magnitude of the right at issue . . . we will not merely presume a waiver of [the petitioner's habeas petition with prejudice] on the basis of a silent record, but will give effect to a waiver only after ensuring that it has been clearly expressed on the record, and that it is knowing, intelligent, and voluntary").

[16] In regard to that testimony, the habeas court found in relevant part: "As to . . . Lee's testimony, he erroneously testified that he tested a reddish substance on a towel seized from an upstairs bathroom, which test indicated a positive result for blood. That stain was never tested by . . . Lee or anyone at the crime laboratory before the petitioner's criminal trial. In conjunction with the present habeas action, the towel was tested, and the reddish smear proved negative for blood." The respondent has never contested the results of that test.

diminished by . . . Lee's error as to whether a reddish smear on a **[\*\*348]** towel . . . was or was not tested for blood." The court further reasoned that Lee's incorrect testimony also was immaterial because the prosecutor could have explained the absence of any forensic evidence simply by arguing that the petitioner and Birch had disposed of their bloody clothing and shoes sometime after leaving the victim's home and prior to their arrest.

 **[\*23]** On **[\*\*\*25]** appeal, the petitioner claims that the legal standard for materiality that the habeas court applied, that is, that the petitioner was required to demonstrate that the testimony at issue undermines confidence in the verdict, was incorrect, and that the proper standard required the respondent to establish beyond a reasonable doubt that the testimony was immaterial. The petitioner further contends that, upon application of the proper standard, it is apparent that Lee's incorrect testimony was material and, therefore, that the prosecutor's failure to correct that testimony dictated that the petitioner be awarded a new trial because the state's case was weak and Lee's testimony offered jurors an explanation as to why no incriminating blood evidence was found despite the victim's massive blood loss and the fact that the victim was killed at such close range. The respondent, for his part, maintains that (1) the habeas court properly applied the less stringent materiality standard of *Brady*, (2) Lee's incorrect testimony was not adduced for the purpose of providing an explanation for why no blood evidence was found linking the petitioner to the victim's murder, and the prosecutor did not rely **[\*\*\*26]** on that testimony to that end, (3) the state's case was so strong that there is no reasonable probability that the jury verdict would have been any different without it, and (4) even if we were to apply the demanding materiality standard pursuant to which the respondent must establish beyond a reasonable doubt that Lee's incorrect testimony had no bearing on the verdict, the state's evidence was so strong that that more exacting standard has been met. We disagree with each of the respondent's contentions.

We commence our consideration of the petitioner's claim with a brief review of the principles that guide our analysis. *HN2*[⬆] "The rules governing our evaluation of a prosecutor's failure to correct false or misleading testimony are derived from those first set forth by the **[\*24]** United States Supreme Court in *Brady v. Maryland, [supra, 373 U.S. 86-87]* . . . [in which] the court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process [when] the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the [prosecutor]. . . . The United States Supreme Court also has recognized that [t]he jury's estimate of the truthfulness and reliability **[\*\*\*27]** of a . . . witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. *Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)*. Accordingly, the *Brady* rule applies not just to exculpatory evidence, but also to impeachment evidence . . . which, broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness. . . . *United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004)*. . . .

*HN3*[⬆] "Not every failure by the state to disclose favorable evidence rises to the level of a *Brady* violation. Indeed, a prosecutor's failure to disclose favorable evidence will constitute a violation of *Brady* only if the evidence is found to be material. . . . In a classic *Brady* case, involving the state's inadvertent failure to disclose **[\*\*349]** favorable evidence, the evidence will be deemed material only if there would be a reasonable probability of a different result if the evidence had been disclosed. . . . A reasonable probability of a different result is . . . shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. *Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)*.

*HN4*[⬆] "When, however, a prosecutor obtains a conviction with evidence **[\*\*\*28]** that he or she knows or should know to be false, the materiality standard is significantly more **[\*25]** favorable to the defendant. [A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)* . . . . This standard . . . applies whether the state solicited the false testimony or allowed it to go uncorrected . . . and is not substantively different from the test that permits the state to avoid having a conviction set aside, notwithstanding a violation of constitutional magnitude, upon a showing that the violation was harmless beyond a reasonable doubt." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Adams v. Commissioner of Correction, 309 Conn. 359, 369-72, 71 A.3d 512 (2013)*.

Furthermore, it is well established that *HN5*[⬆] this stringent materiality test applies when a prosecutor elicits

testimony that he or she knows or should know to be false, "[r]*egardless of the lack of intent to lie on the part of the witness* . . . ." (Emphasis added; internal quotation marks omitted.) *Greene v. Commissioner of Correction, 330 Conn. 1, 15, 190 A.3d 851 (2018)*, cert. denied sub nom. *Greene v. Semple,* U.S. , 139 S. Ct. 1219, 203 L. Ed. 2d 238 (2019); accord *State v. Satchwell, 244 Conn. 547, 561, 710 A.2d 1348 (1998)*; see also *State v. Cohane, supra, 193 Conn. 498* ("[t]he responsibility of the state's attorney to conduct the prosecution **[\*\*\*29]** in accordance with constitutional fair trial standards . . . cannot be defined or limited by the precise contours of the perjury statute"). "This strict standard of materiality is appropriate in such cases not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process. . . . In light of this corrupting effect, and because the state's use of false testimony is fundamentally unfair, prejudice **[\*26]** sufficient to satisfy the materiality standard is readily shown . . . such that reversal is *virtually automatic . . . unless the state's case is so overwhelming* that there is no reasonable likelihood that the false testimony could have affected the judgment of the jury." (Citations omitted; emphasis added; internal quotation marks omitted.) *Adams v. Commissioner of Correction, supra, 309 Conn. 372-73*. "In accordance with these principles, our determination of whether . . . false testimony was material under *Brady* and its progeny requires a careful review of that testimony and its probable effect on the jury, weighed against the strength of the state's case and the extent to which the petitioner . . . [was] otherwise able to impeach [the witness]." *Id., 373*. Finally, **[\*\*\*30]** "because our role in examining the state's case against the petitioner is to evaluate the strength of that evidence and not its sufficiency, we do not consider the evidence in the light most favorable to the state. See *Lapointe v. Commissioner of Correction, 316 Conn. 225, 342 n.88, 112 A.3d 1 (2015)* . . . . Rather, we are required to undertake an objective review of the nature and strength of the state's case." **[\*\*350]** (Citation omitted.) *Skakel v. Commissioner of Correction, 329 Conn. 1, 39, 188 A.3d 1 (2018)*, cert. denied, ___U.S.___ , 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019).

In light of the foregoing principles, it is readily apparent that the habeas court incorrectly concluded that the respondent was not required to establish beyond a reasonable doubt that the prosecutor's failure to correct Lee's incorrect testimony was immaterial. Contrary to the respondent's assertion, controlling case law makes it abundantly clear that that HN6[⬆] strict materiality standard applies whenever the state fails to correct testimony that it knew or, as in the present case, should have known to be false. As we explained in *State v. Cohane, supra, 193 Conn. 474*, a case directly on point, "[t]he references in *Agurs* to perjured testimony must be **[\*27]** taken to include testimony [that the prosecutor knew or should have known] to be false or misleading *even if the witness may not have such an awareness*. . . . [T]he [prosecutor's] actions in failing to disclose **[\*\*\*31]** [false or misleading testimony] corrupt[s] the trial process and denie[s] the defendant his constitutional right to a fair trial just as surely as if the state's case included perjured testimony."[17] (Emphasis added; footnotes omitted.) *Id., 498-99*; see also *Mesarosh v. United States, 352 U.S. 1, 9, 77 S. Ct. 1, 1 L. Ed. 2d 1 (1956)* ("The question of whether [the witness'] untruthfulness . . . constituted perjury or was caused by a psychiatric condition can make no material difference . . . . Whichever explanation might be found to be correct in this regard, [the witness'] credibility has been wholly discredited . . . . The dignity of the . . . [g]overnment will not permit the conviction of any person on tainted testimony.").

Furthermore, it is inarguable that Lee, as the representative of the state police forensic laboratory, should have known that the bathroom towel had not been tested for blood. He, like any such witness, had an affirmative obligation to review any relevant test reports before testifying so as to reasonably ensure that his testimony would accurately reflect the findings of those tests. To conclude otherwise would permit the state to gain a conviction on the basis of false or misleading testimony even though the error readily could have been **[\*\*\*32]** avoided if the witness merely had exercised due diligence; such a result is clearly incompatible with the principles enunciated in *Brady* and its progeny. Lee's incorrect testimony also must be imputed to the prosecutor who, irrespective of whether he elicited that testimony in good faith, is deemed to be aware of any **[\*28]** and all material evidence in the possession of any investigating agency, including, of course, the state police forensic laboratory. See, e.g., *Kyles v. Whitley, supra, 514 U.S. 437-38* HN7[⬆] ("[T]he . . . prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case,

---

[17] For reasons unknown to us, the respondent, in his brief, does not even cite to *Cohane*, let alone did he seek to distinguish that case or have this court overrule it. The habeas court similarly ignored *Cohane*.

including the police. But whether the prosecutor succeeds or fails in meeting this obligation [whether, that is, a failure to disclose is in good faith or bad faith] . . . the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." [Citation omitted.]). Notably, the respondent does not claim otherwise. Thus, the only question remaining is whether the respondent has met his burden of establishing that the prosecutor's **[\*\*351]** failure to correct Lee's testimony concerning the bathroom towel was harmless beyond a reasonable **[\*\*\*33]** doubt. We agree with the petitioner that he has not.

As we previously indicated, the respondent maintains that Lee's incorrect testimony was immaterial because the prosecutor did not offer that testimony to persuade the jury "that the towel smear explained the absence of physical evidence," only to establish "that a burglary occurred, and that it occurred . . . 'after the bloodletting.'" The respondent also argues that the state's case against the petitioner was so overwhelming that the petitioner would have been convicted regardless of Lee's incorrect testimony.

First, we disagree that that incorrect testimony was offered solely for the purpose of establishing the existence and timeline of the burglary. As we explained, during his closing argument, the prosecutor expressly urged the jury to "[r]emember . . . the bloody towel in the upstairs bathroom. *It gave them an opportunity to wash . . . .*" (Emphasis added.) This argument by the prosecutor leaves no doubt that the testimony concerning the bathroom towel was elicited for the purpose **[\*29]** of explaining why no evidence of blood connecting the petitioner to the murder was found. Although the prosecutor also argued to the jury that it reasonably **[\*\*\*34]** could find, in accordance with other testimony from Lee, that the petitioner never came in contact with any of the victim's blood despite the extremely bloody crime scene, the prosecutor further stated to the jury that the blood on the bathroom towel supported the conclusion that the petitioner had washed off any of the victim's blood with which he had come in contact. The importance of this latter argument cannot fairly be minimized in light of how profusely the victim bled as a result of the twenty-seven stabs wounds he suffered at the hands of his assailants. That argument, moreover, was intended to address Lee's testimony, offered in response to the question of whether "the perpetrators would have had blood on their persons" as a result of their attack on the victim, acknowledging that "maybe" they did. In fact, it is apparent that the perpetrators did get at least some of the victim's blood on them because they left several sets of bloody footprints in the house, and blood was discovered on a dresser drawer in the victim's bedroom and on socks and a cigar box that were found in that drawer, all of which indicate that the perpetrators, with blood on their shoes and hands, made **[\*\*\*35]** their way through the victim's house following the deadly assault on the victim.

Nor do we agree with the respondent that the state's case against the petitioner was so strong as to take this case out of the purview of cases in which, as a result of the state's use of testimony that it knew or should have known was false, reversal is "virtually automatic . . . ." (Internal quotation marks omitted.) *Adams v. Commissioner of Correction, supra, 309 Conn. 372*. Although sufficient to sustain a conviction, the state's evidence was hardly overwhelming. The strongest evidence by far was the testimony of Mildred, the petitioner's grandmother, and Saathoff, both of whom provided **[\*30]** nearly identical statements to the police two or three years after the victim's murder. As we discussed previously, both Mildred and Saathoff testified that the petitioner had called them from jail after his arrest in 1985 and told them that he had been involved in a burglary during which a man had been killed but that he was not the killer. The strength of this evidence was considerably diluted, however, by virtue of Mildred's repeated statement that the petitioner also told her that a dog had been killed during the commission of the victim's murder. Surely, jurors must have **[\*\*352] [\*\*\*36]** wondered why, if the petitioner actually was present when the victim was murdered, he informed his grandmother, Mildred, that a man *and* a dog were killed. We note, moreover, that, beyond the petitioner's purported barebones admission that the murder occurred and that he was present when it occurred, neither Mildred nor Saathoff claimed to have learned from the petitioner any more specific information about the crime or the petitioner's role in it.

In addition to the testimony of Mildred and Saathoff, the only other evidence that the state presented was the testimony of the victim's two neighbors who had heard a car with a loud engine shortly after midnight on the night of the murder, Yablonski's testimony that the petitioner and Birch had lied to the police that they were in Danbury at that time, and the fact that the petitioner had asked whether the victim was the man with all the tattoos when the police showed him a photograph of the victim. This additional evidence may have cast suspicion on the petitioner and was sufficient to support the jury's guilty verdict when considered together with the testimony of

Mildred and Saathoff, but the state's case against the petitioner was certainly **[\*\*\*37]** not so overwhelming that we can be satisfied beyond a reasonable doubt that Lee's incorrect testimony was harmless. As this court previously has recognized *HN8*[⬆] in the *Brady* context, a murder prosecution predicated **[\*31]** primarily on a defendant's alleged or actual admissions, and in which there are no eyewitnesses and no forensic or other physical evidence connecting the defendant to the crime, is not a strong case; see *Skakel v. Commissioner of Correction, supra, 329 Conn. 85-86*; *Lapointe v. Commissioner of Correction, supra, 316 Conn. 323-25*; and is therefore one in which "prejudice sufficient to satisfy the materiality standard is readily shown . . . ." (Citations omitted; internal quotation marks omitted.) *Adams v. Commissioner of Correction, supra, 309 Conn. 372*.

The respondent asserts, nonetheless, that there is no reasonable possibility that the petitioner was prejudiced by Lee's incorrect testimony because there is little chance that the jury credited the state's theory that the assailants washed up before leaving. Specifically, the respondent argues that, "if the prosecution [had] sought to portray the towel smear as a portal through which blood drenched killers passed only to emerge on the other side completely clean, it would have failed miserably. In the absence of any other evidence that the killers cleaned up at the scene . . . it is simply not reasonable **[\*\*\*38]** to believe that all of that blood reduced to a single towel smear. The more obvious conclusion is that the jury found that, consistent with . . . Lee's spatter testimony, the perpetrators were not drenched in blood . . . ." That conclusion is far from obvious and by no means compelled from the facts. Indeed, we cannot say with any confidence that the jury found either theory more plausible than the other as a basis for explaining the total absence of forensic evidence. The more probable scenario, rather, is that the jury, like the state, relied on *both* theories. That is, the jury very reasonably could have found, on the basis of the blood spatter testimony, that the killers may have had less blood on them than the evidence otherwise would seem to indicate, and, on the basis of the towel testimony, whatever blood they did have on them, they simply washed off.

**[\*32]** Finally, because Lee's testimony provided the sole evidentiary basis for both of the state's theories regarding the dearth of forensic evidence, the prosecutor's failure to correct Lee's testimony about the bathroom **[\*\*353]** towel was material for the additional reason that it deprived the petitioner of the opportunity to impeach Lee's blood **[\*\*\*39]** spatter testimony. See, e.g., *Merrill v. Warden, 177 Conn. 427, 431, 418 A.2d 74 (1979)* ("The fact that [the witness] was a key witness made his credibility crucial to the state's case. In assessing his credibility the jury [was] entitled to know that he was testifying under false colors. Such knowledge could have affected the result."); *State v. Grasso, 172 Conn. 298, 302, 374 A.2d 239 (1977) HN9*[⬆] ("[w]hen a conviction depends entirely [on] the testimony of certain witnesses . . . information affecting their credibility is material in the constitutional sense since if they are not believed a reasonable doubt of guilt would be created"). To be sure, the prosecutor's greatest challenge at trial was to explain how it was possible for two teenagers to have stabbed the victim twenty-seven times in the confines of a narrow hallway, severed his jugular vein, struck him over the head several times, tracked blood all over the house, and yet somehow managed not to leave any trace evidence in their getaway vehicle—which, as we previously discussed, did not show any signs of having been cleaned when the police recovered it a few days later—or elsewhere. To answer this question, the state proffered two theories, one of which the respondent now concedes was predicated on Lee's incorrect testimony. If the jury **[\*\*\*40]** had known that Lee's testimony about finding blood on the bathroom towel was incorrect, that knowledge might well have caused it to question the reliability of his other testimony. If that had occurred, the state's entire case against the petitioner could very well have collapsed.[18]

**[\*33]** In light of the foregoing, we conclude that the state's failure to correct Lee's testimony that there was blood on the bathroom towel deprived the petitioner of a fair trial. Accordingly, the judgment of the habeas court must be reversed insofar as it was predicated on that

---

[18] We note that the habeas court, in reaching a different conclusion, reasoned that the incorrect testimony was immaterial because the prosecutor could have explained the absence of forensic evidence without by arguing that the petitioner had disposed of the evidence before his December 6, 1985 arrest on burglary charges. As the petitioner observes, however, the prosecutor did not make this argument at trial, and the respondent does not make it on appeal. This is undoubtedly so because the trace evidence likely to have been left by the perpetrators in the present case is not the kind of evidence that could be readily identified, collected and disposed of by the perpetrators. Moreover, testimony adduced by the state indicated that the petitioner made no attempt to clean the Buick allegedly used in connection with the crime, and no evidence was found in or near that vehicle, which was subjected to a thorough examination by the investigating authorities.

court's determination that the petitioner is not entitled to a new trial because Lee's incorrect testimony was immaterial.

The judgment is reversed and the case is remanded with direction to render judgment granting the habeas petition and ordering a new trial.

In this opinion the other justices concurred.

---

**End of Document**

Robin Schwartz