UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RALPH BIRCH                    :        CIVIL NO. 3:20-CV-01790 (VAB)

    v.                         :

TOWN OF NEW MILFORD, ET AL.    :        NOVEMBER 7, 2022

**STATE POLICE DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

    Pursuant to Fed.R.Civ.P. 56, the State Police Defendants, Andrew Ocif, Scott O'Mara, John Mucherino, Joseph Quartiero, H. Patrick McCafferty[1] and Brian Acker, move for summary judgment. As shown below, the plaintiffs cannot prove their wildly speculative and unsupported claims of evidence fabrication, malicious prosecution and suppression of exculpatory or otherwise favorable evidence, and these defendants are entitled to judgment as a matter of law on nearly all of the claims advanced in the plaintiffs' respective complaints.

**II.     THE STATE DEFENDANTS' UNDISPUTED FACTS**

    This action arises from the convictions of plaintiffs Shawn Henning and Ralph Birch for the 1985 murder of Everett Carr.  Those convictions were vacated by the Connecticut Supreme Court in 2019 on a ground wholly unrelated to any of the actions of these State Police Defendants.  No court has found their actions to be improper, and virtually all of the claims against them have been rejected by juries in the underlying criminal proceedings and by courts hearing collateral challenges to the convictions.   The

---

[1] As noted in Document 68, Mr. McCafferty died on September 11, 2021, and a representative of his estate has been substituted as a party pursuant to Fed. R. Civ. P. 25(a)(1)(Doc. 99).  For ease of reference, Mr. McCafferty is referred to by his name rather than that of the representative of his estate.

combined record of the criminal investigation, probable cause hearings, criminal trials, habeas proceedings and discovery in these civil cases is voluminous and often repetitive. The State Police defendants respectfully refer this Court to their Local Rule 56(a)1 Statement of Material Facts Not in Dispute (hereinafter referred to as "Rule 56(a)1 Statement") and the supporting exhibits filed along with this Memorandum of Law and incorporated by reference herein. [2]

III.  **ARGUMENT**

**A.  Standard Of Review**

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any fact and that the party is entitled to judgment as a matter of law." A principle purpose of a summary judgment motion under Rule 56 is to isolate and dispose of factually unsupported claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The party seeking summary judgment always has the initial responsibility of informing the Court of the basis for its motion by identifying the portions of the pleadings, affidavits, or other documentary evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Id*. at 323-24. The moving party may satisfy this burden by demonstrating the absence of evidence supporting the nonmoving party's case. *See Pepsi Co., Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). The court construes the facts in the light most favorable to the nonmoving party's case. *See*

---

[2] Additional general background not included in the 56(a)1 statement comes from published decisions that arose from the criminal prosecution. *See, e.g.*, *Birch v. Comm'r of Corr.*, 334 Conn. 37 (2019); *Henning v. Comm'r of Corr,* 334 Conn. 1 (2019).

*Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162, (2d Cir. 2006), *cert. denied*, 549 U.S. 953 (2006).

When the moving party meets its burden and demonstrates the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to affirmatively set forth facts showing that there is indeed a genuine issue for trial.  Fed. R. Civ. P. 56(a).  To defeat a motion for summary judgment, the non-moving party may not merely rely upon unsupported allegations made in their complaint, nor rely on "mere speculation or conjecture" to overcome a motion for summary judgment.  *Knight v. Fire Insurance Company*, 804 F.2d 9, 12 (2d Cir. 1986), cert. denied, 480 U.S. 932 (1987).  The evidence must be presented in a manner consistent with its admissibility at trial.  *See First National Bank Co. of Clinton, Ill. v. Insurance Co. of North America*, 606 F.2d 760 (7th Cir. 1979) (in ruling on summary judgment motion, the court properly relied upon documents and exhibits identified by affidavit).  Unsworn statements of the parties, letters addressed to the litigants from third persons, and hearsay which does not fall under one or more exceptions listed in rules 803-805 of the Federal Rules of Evidence, may not be properly considered.  *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970); *Beyene v. Coleman Security Service, Inc.,* 854 F.2d 1179 (9th Cir. 1988*); Edward B. Marks Music Corp. v. Stansy Music Corp.,* 1 F.R.D. 720 (S.D.N.Y. 1941). Rather, the nonmoving party must, by affidavit or otherwise, set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  If the nonmoving party does not respond, the court may accept as true the moving party's factual statements.  D. Conn. L. R. Civ. P. 56(a)1.

"[T]he mere existence of a factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there

is no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party". *Id*. A "material fact" is one whose resolution will affect the ultimate determination of the case. *Id*. A party opposing a motion for summary judgment must point to "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. The party opposing summary judgment must also produce evidence to show the existence of every element essential to the case which it bears the burden of proving at trial. *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.,* 812 F.2d 141, 144 (3d Cir. 1987). Likewise, mere conclusory allegations and denials in legal memoranda are not evidence and cannot, by themselves, create a genuine issue of material fact where none would otherwise exist. *Id*.

**B. Defendant Acker is Entitled to Summary Judgment On Plaintiff Birch's Fabrication of Evidence Claim**

When the Plaintiffs (Henning in 1988 and Birch in 1989) were arrested, some of the more inculpatory pieces of evidence against them included: (1) the Plaintiffs' possession of the noisy stolen car; (2) the Plaintiffs' efforts to conceal their whereabouts at the time of the murder ("consciousness of guilt"); (3) Birch's statements about the victim's bathroom; (4) Henning's statement about the victim's tattoos; (5) Henning's statement about turning around in the victim's driveway; (6) Birch's admissions to Cocchia and Perugini; and (7) Henning's admissions to Ms. Henning and Saathoff. *56(a)1 Statement,* ¶¶ 10, 15-30, 32-33.

Not surprisingly, Plaintiffs target as fabricated, all of the confession evidence that was relied on at trial by the state. Birch claims he never identified the location of the

bathroom in the victim's home – that O'Mara, Mucherino and Ocif made this up from whole cloth[3]. As proof of his claim, Plaintiff Birch points to the nearly one-and-a-half years between O'Mara's 1985 and 1987 police reports detailing Birch's alleged statements to O'Mara and Mucherino. Henning similarly claims he never said anything about recognizing the victim's tattoos or turning around in the victim's driveway – contending that this is pure fabrication by O'Mara. In support of these claims, Henning relies on his own trial testimony. Henning also claims that defendant McCafferty misquoted him by reporting that Henning admitted turning his car around in the driveway of the murder scene on the night of the crime. Both Plaintiffs allege that the four secondary confessions from Cocchia, Perugini, Ms. Henning and Saathoff were the product of improper police interviews. In the case of Perugini and Cocchia, Plaintiff Birch complains that the two jailhouse informants gave untrue statements in return for consideration from the state. He also suggests that Ocif used improper leading questions during the interviews and that Cocchia was specifically coached and permitted to see the police file during his interview. In the case of Ms. Henning and Saathoff, Plaintiff Henning attacks those statements as the product of coercion by Ocif. Henning alleges that during the interviews, Ocif manipulated his grandmother and Saathoff by giving them incorrect information about the investigation and playing on their sympathies for Henning. As evidence of the four allegedly improper interviews, the Plaintiffs rely in large part on recantation

---

[3] Unfortunately, there are no audio recordings of the plaintiffs' conversations with these officers, and therefore the plaintiffs' denials, standing alone, create disputed issues of material fact as to these so-called fabrication claims arising from statements made by them to McCafferty, O'Mara and Mucherino. These defendants categorically deny that they fabricated any evidence but cannot, consistent with Rule 56, move for summary judgment on these claims at this time.

information that was obtained in 2008 and 2009 during an investigation by the Connecticut Innocence Project.

The use of fabricated evidence to prosecute an arrestee violates due process under the fifth and fourteen amendments of the United States Constitution. *Small v. Collins*, 10 F.4th 117, 132 (2nd Cir. 2021); *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) (finding that everyone possesses the "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity."); *see also Harasz v. Katz*, 239 F. Supp. 3d 461, 491 (D. Conn. 2017).   To succeed on a fabrication of evidence claim, a plaintiff must allege and establish that an "(1) investigating official (2) fabricate[d] information (3) that [wa]s likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039,* 838 F.3d 265, 279 (2d Cir. 2016).   Fabricated evidence is more than testimony that is disputed or turns out to be incorrect. *McDonough v. Smith*, 2022 U.S. Dist. LEXIS 143055 75-76, 2022 WL 3279348 (NDNY 2022), *citing Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014).   Because "[n]o arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee" probable cause is not a defense to a fabrication of evidence claim. *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).

## 1. Acker Did Not Fail to Intervene in Violation of Plaintiff Birch's Right to a Fair Trial

A review of the pleadings, depositions, interrogatories, and affidavits demonstrate that there are no genuine disputes as to any material facts involving Defendant Acker and that he is, therefore, entitled to judgment as a matter of law on Plaintiff Birch's fabrication

of evidence claim.  Fed. R. Civ. Pro. 56(a).  It is well settled that "the personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.  *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (internal quotation marks omitted)."  (Internal quotation marks omitted.)  *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016).

Although the Plaintiffs accurately note that Acker was a supervising Sergeant at times on the Carr murder investigation "a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority."  *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *accord Amory v. Katz*, 2016 U.S. Dist. LEXIS 175342 *9 (D. Conn. 2016).  "[T]here is no special rule for supervisory liability and a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Thus, to avoid summary judgment, a plaintiff must establish the defendant violated the constitution by his or her own conduct, not by reason of the defendant's supervision of others who committed the violation and cannot rely on a separate test of liability specific to supervisors.  *Id.* The factors necessary to plead and establish a Section 1983 violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary.  *Id.* (quoting *Ashcroft v. Iqbal*, [556 U.S. 662, 676 (2009)])."  (Internal quotation marks omitted.)

In his answers to Defendants' interrogatories, Plaintiff Birch fleshes out his claims against Acker and accuses Acker more specifically of "failing to intervene" or "taking no corrective action" to stop the fabrication of evidence by others.  *Plaintiff Birch's Response to State Defendants' First Set of Interrogatories & Requests for Production*, pp. 12, 16-17

(March 2022).  Specifically, Plaintiff alleges that Acker reviewed police reports drafted by his fellow officers and/or listened to the recordings of interviews which direct review should have put him on notice that his fellow officers had fabricated evidence in violation of Plaintiff's rights and, thereby, Acker himself, is liable under § 1983 for failing to intervene in those unconstitutional violations.  The evidence does not support the Plaintiff's claims.

### 2.  Legal principles applicable to failure to intervene claims

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *accord Ricciuti* 124 F.3d at 130.  Failure to satisfy that duty can expose the observer to liability along with the actors.  Liability for failing to intervene attaches on the theory that the officer, by failing to intervene, becomes a "tacit collaborator" in the illegality.  *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016).  To succeed on a claim of failure to intervene, a plaintiff must show, among other things, that the accused officer was able to "observe[ ] the constitutional violation and ha[d] sufficient time to act to prevent it."  *Id.*, citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988).

### 3.  Acker did not observe the alleged fabrication of the "bathroom statement"

There is no genuine issue of material fact as to Defendant Acker's failure to intervene in the alleged fabrication of the "bathroom statement" by Defendants O'Mara, Mucherino and Ocif because there is no evidence to show that Acker knew, or should have known, that the "bathroom statement" was (allegedly) fabricated in the first place. *Apostol v. City of New York*, 607 Fed. Appx. 105, 107 (2d Cir. 2015) (quoting *Major*

*League Baseball Props., Inc. v. Salvino*, Inc., 542 F.3d 290, 310 (2d Cir. 2008) ("A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory, or based on speculation." (internal citations omitted)).  The 1987 report indicates that both O'Mara and Mucherino became aware in 1987, following a conversation between Mucherino and Ocif, that a statement made by the Plaintiff in 1985 had not been included in the 1985 report.  To rectify that error, a supplemental police report was generated.  Acker was shown the 1987 report and signed off as the reviewing supervisor.  *56(a)1 Statement*, ¶ 17.  Acker, as a police officer himself, and understanding that police sometimes make mistakes, could reasonably have concluded when reviewing the 1987 supplemental report that this explanation for its generation was legitimate and did not constitute fabrication of evidence by his fellow officers.[4]  *Seldon v. Goodman*, 487 F. Supp. 30 (SDNY 1980) (recognizing that Constitution does not guarantee infallible police).  This is particularly true because a comparison of the two reports reveals that the original 1985 report also mentioned the victim's bathroom.  The 1985 report reads:

> [Birch] studied the photo [of the victim's body] for approx.. 30 seconds, and then replied; "I didn't kill anybody".  He continued to look at the photo, **and then asked if the victim was laying in the bathroom**.  Sgt. Mucherino and I attempted to further the questioning about the specifics of the scene, and Birch denied any knowledge by repeatedly stating: "I didn't kill anybody.

(Emphasis added.) *56(a)1 Statement* ¶ 10.  The 1987 supplemental report notes:

> Sgt. Mucherino previously had a conversation with Det. Andrew Ocif and had advised him that he specifically recalled Birch saying, **"That's the bathroom there"** when Birch was shown a polaroid photograph of the victim's body lying in the hallway between the bedroom and the bathroom of the house.

---

[4] Acker was not the reviewing Sergeant who signed the original 1985 police report; he only signed the 1987 report.  *56(a)(1) Statement* ¶¶ 10, 15.

(Emphasis added.) *56(a)1 Statement* ¶ 15.  Whether the 1987 report was factual or not, does not create a material issue of fact with respect to Acker's liability.  The question is whether Acker knew, or could have known, that the 1987 report was (allegedly) fabricated.

As Acker was not present for the 1985 interview with Birch or the 1987 conversation with O'Mara, Mucherino and Ocif, his knowledge of Birch's statements was limited to the reports of his fellow officers who were present and any other credible evidence that he may have reviewed during the investigation.  At no time did Defendants O'Mara, Mucherino, or Ocif indicate that the events memorialized in the 1985 and 1987 reports respectively, did not happen as indicated.  At no time was any other evidence uncovered prior to trial indicating that the statement in the 1987 report was fabricated.  It was, thereby, objectively reasonable for Acker, who had no first-hand knowledge of what Birch had to say about the murder, to conclude that the 1987 report, which was similar to the 1985 report, was honestly generated by his fellow investigating officers.  See *Demosthene v. City of New York*, 2018 U.S. Dist. LEXIS 122909 *24-25 (EDNY 2018) (granting summary judgment on fabrication of evidence claim where, even assuming photo array was fabricated, plaintiff failed to present facts that would show accused officers knew of manipulation of alleged photo array by other officers or were grossly negligent in supervising or relying on detective's work); *cf  United States v. Ventresca*, 380 U.S. 102, 111 (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."  *Benbow v. City of New York*, 2022 U.S. Dist. LEXIS 157815, *22-26 (EDNY 2022) (explaining "fellow officer rule" provides that even if arresting officer lacks personal

knowledge sufficient to establish probable cause, arrest is lawful if officer acts upon direction of or result of communication with superior or fellow officer or another police department provided that police as whole in possession of information sufficient to constitute probable cause to arrest); *Micalizzi v. Ciamarra*, 206 F. Supp. 2d 564, 577 (SDNY 2002) (entitled to act in reliance on fellow-officer's radio report).  Any conclusion to the contrary, would be based on unsupported allegations, speculation and conjecture that Acker had evidence of fabrication.

It is also worth noting that despite the inculpatory nature of the evidence, the police did not treat the 1987 information as a missing smoking gun and then close the case upon its "discovery."  On the contrary, the warrant for Plaintiff Birch's arrest was not signed until January 23, 1989 – more than a year-and-a-half after the 1987 report was issued.  *56(a)1 Statement* ¶ 33.  The 1987 report was simply one more piece of an ongoing investigation. This is not the sort of scenario that might lead an officer to conclude that a fellow officer, mired in an investigation that wasn't moving forward, decided to take the drastic step of fabricating evidence just to close the case.  And just as important, there is nothing in the record evidence to suggest that Acker acquiesced in, or otherwise condoned the alleged fabrication by others, because there is no evidence in the record that he had any knowledge of fabrication in the first place. He cannot, therefore, be held responsible for failure to intervene in the alleged fabrication of the "bathroom statement."  Any claim to the contrary is pure speculation on the part of Birch.  *See e.g.,  O'Neill v.Krzeminski*, 839 F.2d  at 11.

#### 4.   Acker did not observe alleged fabrication of written statements by Ocif

Plaintiff Birch further alleges in his Response to Defendants' Interrogatories that a review of the Cocchia and Perugini interviews, and the facts surrounding Ocif's securing of them, were sufficient to put Acker on notice that he had an obligation to take corrective action because the interviews were conducted and designed to produce fabricated statements and did, in fact, produce fabricated statements.  Again, the Plaintiff is wrong. The evidence about which he complains is not evidence of fabrication, consequently, Acker's failure to act on the evidence cannot support a claim for failure to intervene in such misconduct.

In support of his claim against Acker, Birch points to several factors which he argues were indicative of the fact that the Cocchia and Perugini statements had obviously been fabricated by Ocif.   The Plaintiff attacks Ocif for affirmatively seeking out the witnesses rather than, presumably, waiting for the witnesses to come to him.  He asserts that jailhouse informants are notoriously unreliable.  He points out that both men had healthy motives to lie.  He complains that Ocif offered to help both in exchange for information about him.  And, the Plaintiff notes that some of the information provided was known by Ocif to be wrong.  Finally, he points to the fact that both men recanted their statements some thirty-years later.   None of this "evidence" however, supports the Plaintiff's cause of action.

First, it was reasonable for Ocif to seek to interview individuals who lived with and/or associated with and/or were incarcerated with the Plaintiff around the time of the murder to determine the Plaintiff's whereabouts, activities and possible admissions. Acker's uncontradicted testimony supports this fact: "Ocif was a good investigator.  He

took steps, okay, to interview anyone that could potentially have information with respect to this incident.  As far as going to corrections, you know, you – [Y]ou don't learn anything by talking to the local church, you learn things from talking to people in the same circles, if you're involved in crimes.  You talk to criminals to find out about crime…." *56(a)1 Statement* ¶ 85.  Ocif's good detective work was also basic common sense.

Additionally, Cocchia's and Perugini's status as jailhouse informants with motives to cooperate was a fact that that both men had credibility problems, not proof that Ocif fabricated their statements.  When a prospective witness presents with a credibility problem, "reasonable officers corroborate their testimony before relying on it." *Thorp v. Duve*, 2022 U.S. App. LEXIS 3201 * 9, 2022 WL 332804.  That is what happened here. In December of 1987, when Acker sat in on Ocif's second interview of Perugini, Acker already was familiar with the fact that the Plaintiff had a history of committing burglaries in New Milford.  When Perguini disclosed during the interview that Birch had confessed to him to committing numerous burglaries in the New Milford area, that information was consistent with information already uncovered during the investigation through the Plaintiff himself.  *56(a)1 statement* ¶ 7.  Likewise, when Cocchia disclosed that Birch confessed to him that he (Birch) had committed a lot of burglaries with a guy and a girl, that information was consistent with the information police already had about Birch, Henning and Yablonski, directly from Birch, Henning and Yablonski.  *56(a)1 Statement* ¶¶ 7, 8, 9.  Notably, the statements of both Perugini and Cocchia, also corroborated an earlier statement provided to police by Stanley Bryson.  On May 5, 1986, Bryson told New Milford Officers Engle and Golden that while he was incarcerated with Henning and Birch in December of 1985, Henning disclosed to Bryson that he (Henning) and Birch broke

into the Carr home and Birch stabbed and killed the victim.  Bryson then provided Ocif with a sworn statement to that effect on May 6, 1988.  *56(a)1 Statement* ¶¶ 11, 12, 13, 14.

Offering to assist individuals with their own pending charges, in exchange for testimony against another, is also not evidence of illegal coercion.  This is simply a fact that goes to the witness' credibility and the weight of the testimony at a future trial.  *Elleby v. Coveny*, 2018 U.S. Dist. LEXIS 196080 *23-24 (SDNY 2018) (use of inducements to secure witness testimony not coercion; goes to weight and credibility of testimony).  However, even if Perugini's and Cocchia's statements were "coerced" by promises of favorable outcomes, "[c]oerced testimony is not necessarily fabricated.  A reluctant witness or co-conspirator whose testimony an officer must pry out through aggressive interrogation techniques may be telling the truth despite the measures used. Fabricated testimony, meanwhile, is invariably false because it is made up by the officer, who knows he is making it up."  (Citation omitted).  *Coleman v. City of Peoria*, 925 F.3d 336, 346 (7th Cir. 2019); *see also Lopez v. City of New York*, 105 F.Supp.3d 242, 248 (EDNY 2015) ("When false testimony is knowingly elicited by an investigating official, that act can be viewed as the creation of false evidence...; coercion of a true statement is not.").  Here of course, there is no suggestion that Perugini or Cocchia was subjected to aggressive interrogation techniques such as the use of threats or actual physical violence.  The presence of Perugini's attorney during his second interview with police also undermines any claim that he was coerced into speaking with police or providing a written statement. Because no reasonable jury, on this evidentiary record, could find that Defendant Acker violated the Plaintiff Birch's fair trial rights by failing to intervene in the alleged fabrication

of evidence by his fellow officers, Acker is entitled to summary judgment on this cause of action.[5]

### 5.  Defendant Acker is shielded by qualified immunity

Finally, Defendant Acker is entitled to qualified immunity because it was objectively reasonable for him "[to] believe[s] that his … conduct complie[d] with the law." *Pearson v. Callahan*, 555 U.S. 223, 244, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009); *see also Manganiello v. Cit of New York*, 612 F.3d 149, 165 (2d Cir. 2010).   Acker did not personally fabricate evidence, and the Plaintiff doesn't suggest that he did – only that Acker failed to prevent others from doing so.  *See e.g., Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015) (qualified immunity not available for fabrication of evidence claim where jury could find based on evidence that accused intentionally fabricated evidence). Additionally, no fellow officer reported fabrication in connection with Birch's statements, Perugini's statements or Cocchia's statements.  Nor did any other witness step forward to allege anything to that effect.  Because Acker did not possess any information that would suggest the constitutional rights of the Plaintiff had been violated by anyone, he reasonably relied upon the information his fellow officers shared with him.  Although Perugini and Cocchia retracted their statements several decades later, they did not do so prior to, or even during, the trial when Defendant Acker could have considered the new

---

[5] At his deposition on December 6, 2021, Defendant Acker testified that he had no current recollection of ever listening to the Cocchia interview recording or reviewing the transcript of the interview.  And, because he was not present for the interview and did not sign the transcript of the interview, it is possible he never reviewed the material in the first place.  *56(a)1 Statement* ¶ 22.  Defendant Acker is not, however, contesting this point for purposes of this summary judgment motion (resolving all ambiguities in favor of nonmovant).  He acknowledges that he reviewed a police report written by Ocif about the July 12th interview.  *Id.* ¶ 23.  He also testified at his deposition that in his role as the Supervising Sergeant on the investigation he "generally" either listened to recordings of interviews or read their transcripts. *Id.*, at 132;  Nevertheless, he does not concede that he did, *in fact*, ever hear the recording or read the transcript.

information, investigated further, or otherwise taken action. *Disorbo v. Hoy*, 74 Fed. Appx. 101, 104 (2d Cir. 2003) ("objectively reasonable for [state actor] not to intervene for the simple reason that he never witnessed any constitutional violations").  It is also interesting to note that in 2020, Perugini was again interviewed by the Division of Criminal Justice and stood by his original statements from the late 1980's – he recanted his recantation. In short, there is nothing in the record evidence that would support a finding by a jury, that Acker's conduct was unreasonable in light of the facts that were before him in the 1980's. He is, therefore, entitled to the benefit of qualified immunity. *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010) (qualified immunity standard "is forgiving and protects all but the plainly incompetent or those who knowingly violate the law" (internal quotation marks and citation omitted).

### C. The State Police Defendants Are Entitled To Summary Judgment On The Plaintiffs' Malicious Prosecution Claims

Birch and Henning each allege in count two of their respective complaints that they were victims of malicious prosecution by multiple Defendants.  Both Plaintiffs accuse State Defendants Ocif, Acker and O'Mara of this violation.  Plaintiff Birch additionally accuses Mucherino, and Plaintiff Henning additionally accuses Defendant McCafferty. The State Defendants, however, are entitled to judgment as a matter of law on the basis of qualified immunity because there was, at a minimum, arguable probable cause to charge both Plaintiffs with burglary and felony murder and, thereafter, maintain the prosecutions.

### 1. Legal principles applicable to malicious prosecution claims

"Malicious prosecution claims essentially allege[ ] a violation of the plaintiff's right under the Fourth Amendment to be free from unreasonable seizure, the 'touchstone' of

which is 'reasonableness.'   The 'essence' of such a claim is the alleged groundless prosecution…."   (Internal citations and quotation marks omitted.)  *Smalls v. Collins*, 10 F.4th 117 (2d Cir. 2021).  The elements of a malicious prosecution claim under § 1983, "are substantially the same the same as [a] claim[ ] for . . . malicious prosecution under state law."  (Internal quotation marks omitted.) *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003), *citing Conway v. Vill. of Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984) (holding that 42 U.S.C. § 1988 requires the use of state law rules to determine the elements of malicious prosecution).

"To state a claim for malicious prosecution under Connecticut law, a plaintiff must prove four elements: '"(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice.'" *Spak v. Phillips*, 857 F.3d 458, 461 n.1 (2d Cir. 2017) (quoting *Brooks v. Sweeney*, [299 Conn. 196, 210-11 (2010)])."  *Belton v. Wydra*, 2021 U.S. Dist. LEXIS 50694 *25-26, 2021 WL 1056770 (D. Conn. 2021).  Because the absence of probable cause is an essential element of a malicious prosecution claim, the existence of probable cause is a complete defense.  *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013).

The Second Circuit has described probable cause in the context of a § 1983 malicious prosecution claim as having "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff is guilty."  *Boyd v. City of New*, 336 F.3d 72, 76 (2d Cir. 2003).  Similarly, Connecticut defines probable cause to prosecute as "the knowledge of facts sufficient to justify a reasonable person in the belief that he [or she]

has reasonable grounds for prosecuting an action." *Brooks v. Sweeney*, 299 Conn. at 211.  Although similar to the standard for probable cause to arrest, which is defined as reasonable cause to believe that the person to be arrested has committed or is committing a crime, probable cause to prosecute presents a slightly higher standard. *Stansbury v. Wertman*, 721 F.3d at 95; *see also Richardson v. McMahon*, 2022 U.S. Dist. LEXIS 34189 at *32.  "The determination of probable cause [to prosecute] … must be evaluated in light of the facts known or believed at the time the prosecution is initiated, rather than at the time of the arrest."  (Internal quotation marks omitted.) *Richardson*, at 32.  In other words, "[o]nce probable cause to arrest has been established, claims of malicious prosecution survive only if, between the arrest and the initiation of the prosecution, the groundless nature of the charges is made apparent by the discovery of some intervening fact." *Richardson*, at 33-34.

However, "[e]ven if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was "arguable probable cause" to arrest. Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d [864, 870 (2d Cir. 1991)]; *see also Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (stating that "in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity.") (citations omitted); *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000). Thus, the analytically distinct test for qualified immunity is more favorable to the officers than the

18

one for probable cause; "arguable probable cause" will suffice to confer qualified immunity for the arrest." *Escalera v. Lunn*, 361 F.3d 737 (2d Cir. 2004).  Similarly, because the existence of probable cause is an absolute defense to a malicious prosecution claim, officers involved in the prosecution of the accused will be entitled to qualified immunity from suit for damages if they can establish that there was arguable probable cause to charge and maintain the prosecution.  *Creese v. City of New York*, 815 Fed. Appx. 586, 590 (2d Cir. 2020) ("In the context of a malicious prosecution claim, arguable probable cause exists where, accounting for any new information learned subsequent to an arrest, it was not manifestly unreasonable for [the defendant officer] to charge [the plaintiff] with the crime in question." (Internal quotation marks and citation omitted)); *see also Richardson v. McMahon*, 2022 U.S. Dist. LEXIS 34189 *32, 2022 WL 595935 (D. Conn. 2022), *citing Conroy v. Caron*, 275 F. Supp. 3d 328, 349 (D.Conn. 2017).

### 2.  The State Defendants Are Entitled to Qualified Immunity Because The Plaintiffs' Arrests Are Supported By Arguable Probable Cause

The parties agree that prosecutions were initiated against the Plaintiffs and those prosecutions terminated in the Plaintiffs' favor some thirty years later when the convictions were vacated and then dismissed.  The Defendants reject, however, the contentions of the Plaintiffs that their prosecutions were initiated without probable cause and with malice.  Each Plaintiff was arrested on the basis of a signed warrant which was reviewed for probable cause by a neutral judicial authority.  *56(a)1 Statement*  ¶¶ 30, 33.[6] Where, as is the case here, an individual is arrested by warrant signed by a neutral judicial authority, there is a presumption of probable cause to arrest. *Stonick v. DelVecchio*, 438

---

[6] Each Plaintiff also exercised his right to a hearing in probable cause following his arrest.  At the close of each hearing, probable cause was found to proceed.  *56(a)(1 Statement* ¶¶ 31, 34.

F. Supp. 3d 154, 162 (D. Conn. 2020), *citing Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017).  Of course, a plaintiff can overcome that presumption.  To do so the plaintiff must demonstrate that misstatements and, or omissions were made in the affidavit procuring the warrant which were necessary to the judicial authority's finding of probable cause. *Escalera v. Lunn*, 361 F.3d at 743, *citing Franks v. Delaware*, 438 U.S. 154, 156 (1978).

This determination under the "corrected affidavits doctrine" tests whether the hypothetical contents of a "corrected" application would still provide an objective finding of probable cause.  In making that determination, all of the information known to law enforcement at the time the affidavit was submitted is considered as part of the *hypothetically* corrected affidavit.  *Ganek v. Leibowitz*, 874 F.3d at 82; *Loria v. Gorman*, 306 F.3d 1271, 1289 (2d Cir. 2002); *Smith v. Edwards*, 175 F.3d 99, 105 (2d Cir. 1999); *see also Franks*, 438 U.S. at 171-72.  If after engaging in the corrective process "there remains an objective basis to support arguable probable cause, remaining factual disputes are not material to the issue of qualified immunity and summary judgment should be granted to the defendant on the basis of qualified immunity."  *Escalera v. Lunn*, 361 F.3d at 744.  If, however, probable cause is ultimately found lacking after the correction, the misstatements or omissions at issue were necessary to the finding of probable cause. *Ganek*, at 82.  This is, of course, what Plaintiffs Birch and Henning allege in their complaints before this court.  And, they conclude that because there was no probable cause once the mis-statements and omissions are accounted for, they were maliciously prosecuted.  The Plaintiffs are wrong.

While the State Defendants maintain that there was both probable cause to arrest and probable cause to prosecute (as no additional evidence of guilt or innocence was

uncovered following the arrest of the Plaintiffs), even if probable cause to arrest is ultimately found not to have existed, the officers are still be entitled to qualified immunity from a suit for damages because there was "*arguable* probable cause" to arrest. Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d at 743.   Under either prong of the qualified immunity test, Defendants are entitled to protection.

### a. The alleged misstatements

Putting aside the confession evidence attributed to the Plaintiffs themselves, at the time the Plaintiffs were arrested and charged with felony murder and burglary, the police were in possession of five, highly inculpatory statements from Stanley Bryson, Robert Perugini[7], Todd Cocchia, Mildred Henning and Timothy Saathoff.  *56(a)1 Statement* ¶¶ 13, 18, 20, 21, 22, 25, 29, 32.[8]  That evidence, coupled with the Plaintiffs' possession of

---

[7] Perugini made two oral statements prior to the arrest of the Plaintiffs.  He then provided a signed sworn statement in May of 1989, after both had been arrested.  The signed statement was consistent with the information shared in his earlier interviews.  *56(a)1 Statement* ¶ 35.

[8] Although Bryson did pass away prior to the signing of the two arrest warrants, officers may establish probable cause with witness statements and other evidence, including hearsay, that would not be admissible at trial. *Cf Franks v. Delaware*, 438 U.S. 154, 164-65 (1978) ("When the *Fourth Amendment* demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing". This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true. It is established law, that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter. If an informant's tip is the source of information, the affidavit must recite "some of the underlying circumstances from which the informant concluded" that relevant evidence might be discovered, and "some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be

a vehicle believed to have been outside of the Carr home at the time of the murder, the consciousness of guilt evidence (Plaintiffs lied about their whereabouts on the night of the murder), and the Plaintiffs' admitted history of burglarizing local homes and stealing small electronics to trade for drugs,[9] was sufficient to support probable cause to believe that the Plaintiffs burglarized Everett Carr's home and that one of the them killed him during the course of the burglary.   While the Plaintiffs argue that four of the five witness statements cannot be included in this Court's corrected affidavit analysis (Perugini, Cocchia, M. Henning, Saathoff), thereby undermining the probable cause determination, their reliance on the 2008 and 2009 recantation evidence in support of that claim is misplaced.  The recantation evidence was unknown to anyone in 1988 and 1989 when the Plaintiffs were arrested and prosecuted.[10]   Therefore, that evidence is not properly considered under the corrected affidavits doctrine.  *Ganek v. Leibowitz*, 874 F.3d at 81. Any backward-looking probable cause analysis, under the corrected affidavits doctrine can only take into consideration evidence that was known to exist in 1988 and 1989. *Escalera v. Lunn*, 361 F.3d at 744 ("In performing this correcting process, we examine all of the information the officers possessed when they applied for the arrest warrant.").  The Defendants submit that, as a matter of law, absent the recantation evidence there is no basis for excluding the four witness statements from consideration.

---

disclosed, . . . was 'credible' or his information 'reliable.'"  (Internal citations and brackets omitted; emphasis in original.))

[9] *56(a)(1) Statement*  ¶¶ 7, 8

[10]  In February of 2020, Perugini spoke with investigators for the State of Connecticut's Division of Criminal Justice and reaffirmed that his 1987 and 1989 statements and testimony were true. Saathoff also provided a signed sworn statement in February 2020, reaffirming his 1989 testimony.

As addressed above, there was nothing objectively improper about the Perugini and Cocchia interviews.   Any credibility problems associated with the circumstances under which the statements were taken, was fodder for cross examination at trial and an issue of credibility for the jury.  *Cf Clack v. Torre*, 2014 U.S. Dist. LEXIS 34578 * 28 (D. Conn. 2014) ("A police officer may rely upon the statements of victims and witnesses to determine the existence of probable cause for the arrest, regardless of the ultimate accurateness or truthfulness of the statements.").  There is no legal basis for disqualifying the statements of Ms. Henning and Saathoff either.  While Plaintiff Henning accuses Ocif of misconduct in securing the statements of his grandmother and Saathoff, he fails to address the fact that Ms. Henning was interviewed at home in Illinois by local police, with Ocif present, and Saathoff was initially interviewed exclusively by Illinois police.  His attacks on how this inculpatory evidence was secured in Connecticut by the State Defendants, is therefore, unfounded.

On September 16, 1988, Ms. Henning spoke with Ocif *and* Illinois Detective Karl Seidel at the Herscher, Illinois police department.  At that time Ms. Henning was clear that in December of 1985, her grandson made incriminating statements to her about participating in a burglary during which someone was killed.  She explained that, although the Plaintiff tried to convince her on multiple occasions thereafter that she had misunderstood him – she had not.  *56(a)1 Statement* ¶¶ 24, 25.  Seidel took the sworn statement which was also witnessed by Ocif and then notarized by a local Illinois notary, Lisa Pombert.  *Id*. ¶ 26.  Pombert's role in witnessing Ms. Henning's statement is particularly noteworthy because after she witnessed Ms. Henning's statement, Pombert reached out to Herscher Illinois Police Chief Bruce Larson and notified him that her

brother, Timothy Saathoff, had similarly confided in her that his old friend (Henning) had confessed to him that he (Henning) had been involved in a murder in Connecticut but that he had not committed it. *56(a)1 Statement* ¶ 27. Chief Larson then reached out to Saathoff to learn more. On October 12, 1988, Larson interviewed Saathoff and took a sworn statement from him. *Id.* ¶¶ 28, 29. Ocif was not present during that interview. The statement was then mailed to Connecticut for further use in the investigation. Given the circumstances under which both statements were secured by Connecticut investigators – through the neutral assistance of the Illinois police – there is no basis for suggesting that either statement be excluded from a backward-looking probable cause analysis based on misconduct by the State Defendants.

That said, even if this Court were to conclude that one or more of the statements was sufficiently tainted to warrant its exclusion from the probable cause consideration, the inclusion of even one of the four statements, coupled with the additional inculpatory evidence known to police, would have been sufficient to lead a reasonable officer to conclude that probable cause existed to arrest the Plaintiffs in connection with the crimes that occurred at the Carr residence. As mentioned above, the police were in possession of persuasive consciousness of guilt evidence – that the Plaintiffs lied about their whereabouts at the time of the murder. Although the Plaintiffs disagree about the proper interpretation of the consciousness of guilt evidence – they claim they lied to cover up a car theft and not to hide their involvement in the murder – the police were not required to credit their explanation for the lies in the face of a credible alternate explanation.[11] *Butler*

---

[11] At the Plaintiff Birch's probable cause hearing, Yablonski testified that on the day after the murder, she and the Plaintiffs agreed to "make sure our stories were straight" because they were doing burglaries and didn't want to "go to jail for burglaries" or otherwise be suspected of the murder. *56(a)(1) Statement* ¶ 34 (pp. 121-22).

*v. Sampognaro*, 2019 U.S. Dist. LEXIS 132777  *7 (D. Conn. 2019) ("the Second Circuit has made clear, "[p]robable cause does not necessarily disappear simply because an innocent explanation may be consistent with facts that an officer views as suspicious," and officers are "not required to accept [a suspect's] account on faith" but are "entitled to weigh [the suspect's] explanation ... against the facts on the other side of the ledger," quoting *Figueroa v. Mazza*, 825 F.3d at 102).  The Plaintiff also made early statements to police about the manner in which Everett Carr was murdered.  *56(a)1 Statement* ¶ 34 (pp. 82-83.) ("… he told us that the subject had veins sticking out of his neck … and he said that these fellows told him that a 68 year old man got all cut up or slashed up in New Milford").  Although he claimed to have learned those details from other individuals, again, the police were not required to credit that explanation.  The police also had compelling modus operandi evidence.  Both Plaintiffs, in addition to Tina Yablonski, admitted to committing multiple local burglaries during which they stole almost exclusively small electronics to trade for drugs.  *56(a)1 Statement* ¶¶ 7, 8, 9.  That was consistent with the circumstances surrounding the burglary of the Carr residence which occurred in the same town, in the same time frame, and where little was stolen outside of a VCR, some jewelry and petty cash.  *Jones v. Meehan*, 2018 U.S. Dist. LEXIS 7395 *27, 2018 WL 459662 (SDNY 2018) ("In the context of an arrest for burglary, courts have found probable cause based on factors such as a *modus operandi* linking the crimes to the defendant, descriptions of the suspect matching the defendant's characteristics, and the defendant's possession of property stolen during the offense." (emphasis in original)).  The Plaintiffs' possession of a noisy vehicle that generated a sound much like that heard by multiple neighbors on the night of the murder is yet another highly inculpatory fact, particularly

given that both Plaintiffs placed themselves with Yablonski at her home on the night of the murder, which was quite near the Carr residence.  These factors, coupled with even some of the secondary confession evidence, would have been more than sufficient to lead reasonable officers to believe that probable cause existed to arrest the Plaintiffs.

### b.  The alleged omissions

Plaintiff Birch further asserts, however, that he was prosecuted without probable cause "[a]s demonstrated by … suppression of exculpatory material."  *Birch Amended Complaint*, at ¶ 51.[12]  Although he cites no evidence in support of this claim in his complaint, Defendants interpret the evidence to be the same as that cited in Plaintiff's third cause of action for suppression of evidence.  This claim is without merit.

"In seeking an arrest warrant, a "[p]olice officer[ ] may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause…. A failure to make further inquiry when a reasonable person would have done so may evidence a lack of probable cause." *Korthas v. City of Auburn*, 2006 U.S. Dist. LEXIS 38745, *15 (N.D.N.Y June 9, 2006)." *Martel v. Town of S. Windsor*, 562 F. Supp. 2d 353, 358 (D. Conn. 2008), *aff'd* 345 Fed. Appx. 663 (2d Cir. 2009).  Here, the evidence that the Plaintiff presumably claims undermines the existence of probable cause is: (1) the discovery of cash at the Carr residence; (2) a statement by Yablonski that she and the Plaintiffs were not near the Carr house at the time of the murder; (3) a video of the crime scene; (4) that Ocif showed Cocchia his police file while interviewing him; (5) that Yablonski was offered a deal on charges in New Hampshire; and (6) Defendant Quartiero's field notes.  The Plaintiff is wrong.  Had any or all of this information been

---

[12] Plaintiff Henning does not raise a similar claim in support of his malicious prosecution claim.

included in his arrest warrant and / or introduced at his probable cause hearing, it would not have voided probable cause.

First, the discovery of $1,000.00 in cash at the Carr residence was not exculpatory on the issue of whether a burglary had occurred. Multiple items of value were missing from the home as testified to at the Plaintiff's probable cause hearing, by the victim's daughter Diana Columbo. *56(a)1 Statement* ¶ 34 (pp. 9-10). Multiple rooms in the home were also discovered in disarray. *Id*. (pp. 26, 30-31, 36) (*Testimony of Detective Bates*). The fact that not every item of value was stolen from the home was also not a fact that logically would have impeached anyone's testimony. Moreover, felony murder occurs when a murder is committed in the course of the commission or a burglary, or the *attempted* commission of a burglary. It was not necessary, therefore, for the prosecution to prove that every item of value in the home was stolen in order to prove its case. Thus, noting in the warrant affidavit that some valuables were not stolen while others were, would not have impacted the probable cause determination in the least.

Including additional information about Yablonski's conflicting statements was also unlikely to undermine probable cause. Like the Plaintiffs, Yablonski told police multiple stories about where she had been at the time of the murder. Birch ultimately conceded, though, in response to being confronted with information provided by witness Effie Coats, that the time frame that the three had originally disclosed was wrong. Confronted with this information, the Plaintiff, like Yablonski, then agreed that the three likely left Douglas Stanleys home around 11:00-11:15 p.m. and at 12:30 a.m. In so acknowledging, the Plaintiff undermined his own alibi defense predicated on the 12:30 timeframe. *56(a)1 Statement* ¶ 34 (pp. 92-93). Had police included Yablonski's statement about leaving the

Stanley home around 12:30 a.m. it might have undermined her credibility initially but was not likely to move the needle at the end of the day when Birch admitted to police that he, Henning and Yablonski left the Stanley home around 11:00 p.m. and Yablonski similarly testified to that fact at the Plaintiff's probable cause hearing. *Id.*, (p. 119).

The Plaintiff's reliance on the crime scene video is particularly illogical. Footage showing that one room in the Carr home was not disturbed would not have undermined probable cause. The police had a bloody crime scene and a dead body. Jewelry, money, and a VCR were missing from the home. The police had confession evidence from five witnesses, and consciousness of guilt evidence from Birch and Henning. Additionally, both men were in possession of a car that was believed to have been at the crime scene at the time of the murder. It simply strains credulity to believe that this mountain of inculpatory evidence would have been overcome by a notation in the warrant affidavit that the police were in possession of a video that showed a rock through a window and an undisturbed bedroom at the Carr residence.

Another "omission" that would not have impacted the probable cause determination was the "information" about witness Cocchia reviewing Defendant Ocif's police file during Cocchia's interview. As discussed above, that "information" was not available in 1989 when the warrant for the Plaintiff's arrest was drafted and secured. Rather, this "evidence" was first uncovered decades after the Plaintiffs were convicted when Cocchia recanted to investigators with the CT Innocence Project. What police did have were statements from Cocchia implicating the Plaintiff and his matching testimony that was presented at the Plaintiff's probable cause hearing.[13] *56(a)1 Statement* ¶¶ 21,

---

[13] Cocchia also testified at that time about the plea deal he had secured in exchange for his testimony. *Id.,* at 143-44.

22 32, 34(pp. 134).  Because this "Cocchia read the file" story was unknown to anyone in 1989, it cannot be considered now under the corrected affidavits doctrine.

Including information in the Birch warrant affidavit that Yablonski was offered a deal to resolve her New Hampshire charges also would not have voided probable cause to believe that Birch had committed the crimes at the Carr residence.  While it may have heightened concerns about Yablonski's credibility in a vacuum, it would not have undercut probable cause to support the arrest of the Plaintiff.  As an initial matter, Yablonski made several statements against her penal interest within Connecticut sufficient to raise questions about her credibility, so this wasn't a situation where police presented a witness against the accused who appeared to have a squeaky-clean record with no credibility issues.   But, more importantly, the vast majority of what Yablonski reported was consistent with what the Plaintiffs themselves disclosed.  Yablonski confirmed that the three had committed multiple burglaries.  She confirmed the theft of the "noisy" car – in fact she explained how it came to be noisy.   Her statements were consistent with information the police obtained through interviews of other witnesses like Effie Coates and Douglas Stanley.  She even corroborated statements by the Plaintiffs with respect to their interpretation of the consciousness of guilt evidence and how they allegedly learned about Carr's murder from other individuals.  In short, Yablonski's statements so aligned with the information police had from other sources, that including this one fact in the warrant that may have suggested a motive to cooperate, would not have voided the probable cause determination made from the warrant affidavit or, subsequently, at the Plaintiff's probable cause hearing.

Finally, the failure of the police to reference in the warrant affidavit that Defendant Quartiero remained in possession of his field notes, is not the sort of information that would have undermined probable cause.  Police use field notes to assist them in remembering information they learn during their investigations so that they can draft comprehensive police reports.  Once the police reports are drafted, the reports serve as the official record of the investigation.  If an officer fails to transfer exculpatory or impeachment information from his or her field notes to the official report, that may amount to a *Brady* violation.  But such a violation needs to be pled and proven.  Merely complaining that an officer has not turned over field notes, is not proof of anything. Although Plaintiff alleges that Quartiero's notes contain "a slew of information that [Plaintiff's] defense could have used to undermine the case against him," he fails to cite to a single passage in the notes that support his case.  A review of the notes themselves, more importantly, though, proves this claim to be without merit.  *56(a)1 Statement* ¶¶ 81, 82, 83.

The corrected affidavit analysis review in this case leads to only one conclusion – that there remains an objective basis for concluding that a reasonable officer could have believed that probable cause to arrest existed when the warrants were secured and prosecutions maintained.  Although the convictions were ultimately overturned three decades later and the charges dismissed, that is not dispositive on the question of probable cause.  *Clack v. Torre*, 2014 U.S. Dist. LEXIS 34578 at *29 ("Even if Plaintiff did not commit the crimes for which he was arrested, that does not mean that Defendants lacked probable cause at the time he was arrested.").  In 1988 and 1989, police were in possession of such facts and circumstances that would, at a minimum, sustain an

objectively reasonable officer's belief that probable cause existed.  This is particularly so where two warrants were signed and, thereafter, both Plaintiffs were held over for prosecution after hearings in probable cause.  Nothing the Plaintiffs have alleged, and no evidence that has been uncovered until now, void those earlier findings.  Because there was, at a minimum, arguable probable cause to arrest and maintain the prosecution, all of the State Defendants are entitled to the protections of qualified immunity and summary judgment should enter in their favor on the malicious prosecution counts.

### D.  State Defendants Graham, Quartiero, Ocif, and Acker Did Not Commit any *Brady* violations

The plaintiffs' third claim against the State Police defendants accuses these four officers of suppressing several pieces of evidence favorable to their defense.  As shown below, none of these accusations constitute actionable *Brady* money damages claims.

The Second Circuit has instructed that a true *Brady* claim has three components: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Poventud v. City of N.Y.*, 750 F.3d 121, 133 (2d Cir. 2014) (internal citation omitted). In order to prove prejudice, the plaintiff must establish that the evidence was material; in other words, the plaintiff must demonstrate that the "evidentiary suppression undermines confidence in the outcome of the trial." *Fappiano*, 640 F. App'x at 118 (quoting *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001)).  "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *Ambrose v. City of New York*, 623 F.Supp.2d 454, 467 (S.D.N.Y. 2009) (quoting *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001)). However,

"materiality does not depend on factual innocence, but rather what would have been proven absent the violation." *Poventud*, 750 F.3d at 134.

First and foremost, the named individual State defendants, Graham, Quartiero, Ocif and Acker, can only be liable if they did not turn over *Brady* material to the prosecutors. *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) ("[T]he police satisfy their obligations under *Brady* when they turn exculpatory evidence over to prosecutors," as "[i]t is appropriate that the prosecutors, who possess the requisite legal acumen, be charged with the task of determining which evidence constitutes *Brady* material that must be disclosed to the defense."); *Blake v. Race*, 487 F.Supp.2d 187, 216 (E.D.N.Y. 2007) ("[T]o the extent Blake attempts to argue that the police had some disclosure obligation beyond providing Brady material to prosecutors, *Walker* precludes such an argument.") Since it is the prosecutor's duty to disclose *Brady* material to the defense, police officers cannot be liable for a *Brady* violation where the prosecutor is aware of the allegedly-withheld *Brady* material. *See, e.g., Johnson v. Scheidler*, No. 05-CV-74465, 2007 U.S. Dist. LEXIS 27815, 2007 WL 1119876, at *10 (E.D. Mich. Apr. 16, 2007) (*Brady* due process claim could not be maintained against police officer who omitted information from his police report, since the prosecutor was made aware of the omitted information prior to trial). Indeed, as already discussed, a police officer is only liable for *Brady* violations under §1983 when he "intentionally suppress[es] exculpatory evidence," from the prosecutor, which is known only to the police. *See, e.g.*, *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016); *Valentin v. City of Rochester*, No. I l-CV-6238, 2018 U.S. Dist. LEXIS 182601,

2018 WL 5281799, at *13 (W.D.N.Y. Oct. 24, 2018) ("[F]or purposes of §1983 a police officer cannot be said to have 'suppressed' *Brady* material that is not in his sole possession, and which is readily available to the prosecutor.")

As is more fully discussed below, it is undisputed that the alleged *Brady* material was disclosed to the trial prosecutor and that Plaintiffs' defense attorneys were aware of this evidence prior to trial through the State's open file policy. As such, the plaintiffs cannot maintain a *Brady* claim against the State defendants and judgment must enter in the State defendants' favor.

### 1. The plaintiffs' *Brady* claims fail as a matter of law because the evidence they allege was suppressed by the State defendants was known and made available to their defense attorneys

"'Evidence is not "suppressed" if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.'" *United States v. Zackson,* 6 F.3d 911, 918 (2d Cir. 1993) (quotation omitted); *accord, e.g., Davis v. United States,* Nos. 98–CV–0541E(F), 92–CR–157E, 1999 WL 1067575, at *10 (W.D.N.Y. Nov.17, 1999) (rejecting *Brady* claim because the information was not "suppressed" since "during the examination of the co-defendant at trial, the petitioner's attorney elicited a response that clearly indicated a plea agreement had been entered into with the prosecution"); *Ulrich v. Berbary*, 445 F. Supp. 2d 267, 283 (W.D.N.Y. 2006) ("[T]rial counsel had all of the 'essential facts' necessary for him to take advantage of this allegedly exculpatory material as it came out both on direct and cross-examination.").

Here, State defendants Graham, Quartiero, Ocif and Acker did not suppress any evidence. Indeed, even the trial prosecutor had no reason to believe that the State defendants suppressed any evidence in the plaintiffs' criminal trials. *56(a)1 Statement, ¶*

33

53. The plaintiffs have the burden to show that the government failed to disclose evidence that was favorable to him. *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) ("In order to establish a *Brady* violation, a defendant must show, inter alia, (1) that the government failed to disclose favorable evidence, and (2) that the evidence it 'suppressed' was material) (emphasis added)); *Harris v. United States*, 9 F.Supp.2d 246, 275 (S.D.N.Y. 1998). The plaintiffs have not met that burden. For purposes of this argument, the State defendants separately address each piece of "evidence" the plaintiffs allege was suppressed, thus illustrating how the undisputed record evidence does not support the plaintiffs' claims.

### a. $1,000 in cash

The plaintiffs claim that the fact that cash was located by an unidentified person at an unknown area of the property  is somehow exculpatory because it runs contrary to the prosecution theory of a burglary gone bad ("as the police knew but failed to disclose … investigators seized $1,000 in cash from the crime scene, further undermining the burglary-gone wrong theory." (Doc. 54, p. 12, ¶99)). Contrary to the plaintiffs' assertions, however, the record evidence undisputedly establishes that the State defendants did not suppress this information. Indeed, this is not the first time that the plaintiffs have tried to argue that the $1,000 in cash is somehow representative of malfeasance on behalf of the State.

On November 3, 2015, plaintiff Henning's trial attorney, Carl Eisenmann, testified at the plaintiffs' consolidated habeas corpus trials. *56(a)1 Statement,* ¶55. One of the many claims brought forth in the plaintiffs' amended petitions for writ of habeas corpus was that the prosecutor failed to disclose to defense counsel the seizure of $1,000 in cash

from the crime scene. *56(a)1 Statement,* ¶¶58-59. Attorney Eisenmann was questioned

on direct examination regarding the $1,000 in cash:

> **Q:** Attorney Eisenmann, I put in front of you Exhibits 50 and 51 from this
> trial which are two documents relating to the seizure and return of a
> thousand dollars in relation to this crime. Do you recall, sir, whether
> you've ever seen those documents before?
> **A:** I can't, that's too blurry.
> **Q:** So look at the second one, Exhibit 51. Any recollection before today
> of seeing that document?
> **A:** Yes, but I don't – I don't know when.

*56(a)1 Statement,* ¶58

Plaintiff Birch's trial counsel, Alfred Mencuccini was also asked about whether he

recalled seeing any materials related to the thousand dolllars:

> **Q**: Do you recall seeing any materials related to the seizure of a
> thousand dollars in cash at the crime scene?
> **A**: I do not remember that. No, I don't. I was shown a – or – I don't know
> whether you provided me or the State provided me with a copy of – of a
> receipt for a thousand dollars or something. I do not remember seeing
> that at the time – at any time.

*56(a)1 Statement,* ¶59

While Attorney Mencuccini did not have a present recollection regarding the

thousand dollars, that is not proof that information related to it was suppressed by the

State defendants and therefore not in the State's file. In fact, when pressed further about

this issue, and shown copies of the Inventory of Seized Property report and Possessed

Property Receipt form, Attorney Mencuccini offered the following:

> **Q:** And you have no memory of seeing those while preparing for the
> defense of Mr. Birch?
> **A:** I don't have any present recollection and  I don't remember – and
> truthfully I don't remember -- these documents.

*56(a)1 Statement,* ¶59

### b.  Tina Yablonski pre-polygraph interview

Similarly, the plaintiffs cannot maintain their claim that the State defendants suppressed evidence "that Tina Yablonski told police during a March 4, 1986 pre-polygraph interview that she, Ricky and Shawn departed Danbury at 12:25 a.m. on the night of the murder and therefore could not have been present when the victim's neighbors heard a loud car in the area." (Henning Complaint, p. 48, ¶349(b); Birch Amended Complaint, Doc. 54, p. 52, ¶399(b)) Just as they do in the instant action, the plaintiffs also alleged in their habeas petition the suppression of this information. *56(a)1 Statement,* ¶¶67-71. Attorney Mencuccini testified on direct examination regarding Tina Yablonski and her testimony. Specifically, he was shown a statement from Tina Yablonski:

> **Q:** I'm showing you Petitioner's Exhibit 52 for identification. If you could take a moment to just glance at it quickly and just look up when you're done.
> **A:** Do you want me to read the whole thing?
> **Q:** No just to – just to briefly scan through it and see if you by any chance recognize it.
> **A**: I have seen this. I don't specifically remember all its contents.

*56(a)1 Statement,* ¶67.

Plaintiff Birch's habeas counsel then moved to offer this document to show that Attorney Mencuccini "had access to this information." *56(a)1 Statement,* ¶67. The Court allowed the document to be introduced as a full exhibit to show what "he had available to him and could have considered and should have considered or not." (*Id*.) Following its admission as a full exhibit, counsel for the petitioner continued his direct examination of Attorney Mencuccini as to Tina Yablonski, generally.

**Q:** Do you remember any statements or police reports relating to prior statements by – or recordings related to prior statements by Tina Yablonski that conflicted with the statement you just read?
**A:** Not specifically at this time, but I know that there were inconsistencies, yes.

*56(a)1 Statement,* ¶68.

Attorney Mencuccini was then asked whether he used Ms. Yablonski's December 6, 1985 statement to the New Milford Police Department; he could not recall. (HTT, p. 39) Attorney Mencuccini eventually testified that he recognized Tina's statement.

**Q:** How did you recognize it?
**A:** It's familiar. I know I read. I know I was – that I had it or I had a – I had dictated it to my file.

*56(a)1 Statement,* ¶67.

Based on Mencuccini's testimony, the Court permitted the introduction of that document, over objection, as a full exhibit for the "purpose of showing what [Mencuccini] had available." *56(a)1 Statement,* ¶67.

### c. Crime scene video

In line with the *Brady* claim they pursued in their habeas actions, the plaintiffs allege the State defendants did not disclose to the prosecutor "the crime scene video showing, among other things, a rock through the living room window and Diana Columbo's bedroom undisturbed." (Doc. 54, p. 52, ¶399(c)).   It is impossible to explain how or why the plaintiffs would make such an allegation, given the undisputed testimony that was elicited from plaintiffs' trial attorneys during their habeas trials. In no uncertain terms, both Attorney Mencuccini and Attorney Eisenmann testified that they knew of the existence of the crime scene video. *56(a)1 Statement,* ¶73. Specifically, Attorney

Eisenmann recalled that the State gave him access to this item, though he did not make a copy of it.

> **Q:** Do you recall, Attorney Eisenmann, whether during the pre-trial discovery phase the State gave you access to a crime scene video?"
> **A:** I believe so, yes.
> **Q:** Did you make a copy of it?
> **A:** No.
> **Q:** Where did you see it?
> **A:** It was either in the State's Attorney's Office or someplace in the courthouse.

*56(a)1 Statement,* ¶74.

Plaintiff Birch's criminal trial counsel also testified that the crime scene video was in the State's file, and thus had not been withheld by the State defendants from the prosecutor. "[T]here's a note in the file and I know I wrote a note to myself to see the video. I just don't remember if I did or I did not." *56(a)1 Statement,* ¶75. He confirmed that he was aware of the video "because its in my notes."  *Id*.

### d.  Todd Cocchia statement[14]

In his Complaint, plaintiff Birch alleges that an additional piece of evidence was supposedly withheld from prosecutors: "that Todd Cocchia was given an opportunity to review Ocif's file to fill in the missing information in his story while giving a statement to the police." (Birch Complaint, Doc. 54, p. 52, ¶399(d)) The validity of this claim is undercut however, because there is absolutely no evidence to support plaintiff's theory that State defendant Ocif permitted Todd Cocchia to review his file to allegedly "fill in missing information." (*Id*.) Indeed, the plaintiff has not presented or elicited, over the course of the lengthy discovery period in these consolidated cases, any evidence to support his

---

[14] This allegation is only made by Plaintiff Birch. (Doc. 54, p. 52, ¶399(d)).

conclusory allegation that "Ocif gave Cocchia the police file on the Carr homicide so that Cocchia could familiarize himself with the materials it contained." (*Id*. at 32, ¶266)

Moreover, the undisputed record evidence from plaintiff Birch's 2015 habeas trial further eradicates plaintiff's baseless claim. On direct examination, Attorney Mencuccini testified that he  cross examined Todd Cocchia. *56(a)1 Statement,* ¶77. Furthermore, and as more fully discussed below, assuming for purposes of argument that the incredible is somehow credible here – i.e. that State defendant Ocif *actually* permitted Cocchia to review his file to fill in the gaps in his story – and this information was not disclosed to the prosecution, Mencuccini cross-examined Cocchia at length, specifically as to the basis of his knowledge, his criminal record and as to any promises he may have been made or anything he expected as a result of his testimony. *56(a)1 Statement,* ¶78. Mencucini also confirmed that Cocchia's credibility was a "key point" in his cross-examination. (*Id*.)

### e.  Yablonski immunity

At the habeas trial, both defense attorneys were questioned about their knowledge of a document from New Hampshire that granted Tina Yablosnki immunity. Mencuccini had no independent recollection, but was shown his dictated notes from reviewing the state's file and testified he "may have seen a memo that was filed by the police investigating it to the file about some sort of immunity being extended to Tina…" *56(a)1 Statement,* ¶79. Eisenmann did not have any recollection of such a document, which is to be expected given the amount of time that had passed at that point (nearly thirty years after his representation of plaintiff Henning). *56(a)1 Statement,* ¶80. Nevertheless, because Attorney Mencucci had notes that confirmed the existence of the document as he was reviewing the State's file, the State defendants clearly did not suppress this

information. The prosecutor was in possession of this document, it was in his file, and it was made available for review and disclosure to defense counsel, even if Attorney Eisenmann has no recollection of the document. *See, e.g., United States v. Bermudez*, 526 F.2d 89, 100 (2d Cir. 1975) (state's investigative files were not suppressed since defense counsel, who represented one of the defendants in the state proceedings, could have discovered them "with the exercise of due diligence"), *cert. denied*, 425 U.S. 970 (1976).

### f. Quartiero's notes[15]

As to State defendant Quartiero, plaintiff Birch has resurrected his 2015 habeas claim that Quartiero suppressed his handwritten notes by failing to disclose them to the prosecutor. Just as this claim lacked merit seven years ago, it does still today. Defendant Quartiero testified during the plaintiff's 2015 habeas trial. On direct examination by plaintiff's habeas attorney, Quartiero explained that the purpose of keeping "field notes" was to, essentially, "reduce them to writing if [he] felt the information in [the] notes pertain to the case [he] was working on." *56(a)1 Statement,* ¶82. Ultimately, Quartiero testified that he would memorialize the information from his field notes into a police report, as the case may be and would turn over those police reports "to the State's Attorney's Office." *56(a)1 Statement,* ¶83. He would not turn over his notes, not because of any intentionally misleading or dishonest animus, but rather because "there's things in there that may not pertain to the investigation." *56(a)1 Statement,* ¶84. Although the plaintiff alleges that Quartiero's notes contain "a slew of information that [Plaintiff's] defense could have used to undermine the case against him," he fails to cite to a single passage in the notes that

---

[15] This allegation is only made by Plaintiff Birch. (Doc. 54, p. 52, ¶399(f)).

support his case.  A review of the notes themselves, more importantly, though, proves this claim to be without merit.  *56(a)1 Statement* ¶82.

There is no doubt that the State defendants timely disclosed information related to the above-referenced evidence to the prosecutor. Indeed, the plaintiffs pursued these very same claims in their 2015 habeas petitions and their trial attorneys testified about their knowledge of this allegedly suppressed evidence over seven years ago. Based upon the record evidence, it is clear that such evidence was not suppressed by the State defendants because plaintiffs' trial attorneys *knew or had reason to know* about this allegedly exculpatory information. Evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney "either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982), *cert. denied*, 459 U.S. 1174 (1983).

The State defendants did not withhold any exculpatory evidence and this fact necessitates a grant of summary judgment in their favor as to the plaintiffs' respective Third Causes of Action. (Henning Complaint, Doc. 1, p. 48, ¶¶347-353; Birch Amended Complaint, Doc. 54, p. 52, ¶¶397-404)

## 2. The evidence was not material, and the plaintiffs cannot establish prejudice

Ultimately, in order for the plaintiffs to establish that they were prejudiced as a result of any supposed *Brady* violation, they must show that the allegedly withheld or suppressed evidence was material. Prejudice requires a plaintiff to show "materiality." *Poventud*, 750 F.3d at 133. The "touchstone of materiality is a reasonable probability of a different result . . . . The question is not whether the defendant would more

likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* (quoting *Leka*, 257 F.3d at 104) (emphasis omitted). Said differently, "materiality does not depend on factual innocence, but rather what would have been proven absent the violation." *Id*. at 134. "For example, a § 1983 plaintiff proceeding on a *Brady* theory can succeed on his claim if, had the withheld information been disclosed prior to trial, 'he would have been acquitted based on reasonable doubt or convicted on a lesser charge.'" *Bellamy*, 914 F.3d at 751 (quoting *Poventud*, 750 F.3d at 134-35.)

Critically, even if there was a factual basis for concluding that the above referenced evidence was not disclosed, which the record evidence refutes, the Plaintiffs cannot succeed on their Brady claims because they cannot show that any of the allegedly suppressed "evidence" was "material", and that they consequently suffered prejudice from its alleged suppression. The Supreme Court has held that "the materiality standard for *Brady* claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Banks v. Dretke*, 540 U.S. 668, 698, (2004) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435, (1995)). Put another way, there must be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *U.S. v. Avellino*, 136 F.3d 249, 256 (2d Cir. 1998) (quoting *Kyles*, 514 U.S. at 433-34) (internal quotation marks omitted); *accord Banks*, 540 U.S. at 699.

The Second Circuit has stated that information coming within the scope of materiality includes "not only evidence that is exculpatory, *i.e.*, going to the heart of the

defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.*, having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *Leka v. Portuondo*, 257 F.3d 89, 99 (2d Cir. 2001) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir.1998)).

Here, the evidence that the plaintiffs allege was suppressed by the State defendants does not put the "whole case in such a different light as to undermine confidence in the verdict" and therefore cannot be considered "material" evidence.

First, Attorney Mencuccini was doubtful if the $1,000 in cash that was found after the murder of Everett Carr was material.  When asked about the impact of this information on plaintiff Birch's defense, he readily conceded:

> The fact that the thousand-dollars was there, sitting here today, I don't think I would have – would have made much of a difference one way or the other to me to be honest with you… I viewed it as a reasonable doubt case to begin with…. I thought there was a burglary aspect to it or could have been but the fact that something was not taken did not surprise me considering the degree of violence that took place in that house. And I don't know based on whatever, I think it was – what happened was shocking in that even though there may have been intentions to burglarize that place, it wouldn't surprise me that someone after this happened would just get the hell out of there.

*56(a)1 Statement,* ¶60.

There is no question that the State's theory of the case was that Everett Carr's murder occurred during a burglary. *56(a)1 Statement,* ¶61; the plaintiffs were both charged with felony murder, with the underlying felony being a burglary. *56(a)1 Statement,* ¶62. The plaintiffs' reliance on the fact that because items were left behind at the Carr residence that somehow negates whether a burglary occurred is flawed. *56(a)1 Statement,* ¶63.

 During his deposition, David Shepack, who was the trial prosecutor in the *State v. Shawn Henning* and *State v. Ralph Birch* trials explained as much:

> **Q:** So if the basis for the burglary was the missing VCR, and some rolls of quarters and a couple pieces of jewelry, would you agree with me that the presence of $1,000 in cash and $10,000 worth of jewelry in the house could be used to argue it wasn't a burglary?
>
> **A:** No. I don't know if it could be used to argue it wasn't a burglary. It could be used to argue that it wasn't an efficient burglary. If, in fact, coins, jewelry and a VCR were stolen, that's a burglary. The fact that they could have acquired more property doesn't make it any less of a burglary.

*56(a)1 Statement,* ¶¶64-65.

Similarly, as to Tina Yablonski's statement, Mencuccini also testified that he did not use this information to impeach Tina because he did not want to "open the door to show that Ralph and Shawn were involved in burglaries." *56(a)1 Statement,* ¶69. When undisclosed impeachment evidence is "possibly useful to the defense," but "not likely to have changed the verdict," the undisclosed impeachment evidence is "not material in the *Brady* sense." *United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 593, 181 L. Ed. 2d 435 (2011) and 132 S. Ct. 1637 (2012) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)) (internal quotation marks omitted). Impeachment evidence is not material for *Brady* purposes when it "merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Mack v. Conway*, No. 10-3414-pr, 476 Fed. Appx. 873, 2012 U.S. App. LEXIS 7452, 2012 WL 1232951, at *2 (2d Cir. Apr. 13, 2012) (quoting *United States v. Wong*, 78 F.3d 73, 79 (2d Cir .1996)) (internal quotations marks omitted); *see also Persico*, 645 F.3d at 111. Mencuccini further reasoned that, in his opinion, this information "would really hurt them at trial because that would help support the State's case that they were actually involved in a burglary" and "would open the door for prior

bad acts…" *56(a)1 Statement,* ¶70. Mencuccini explained that it was his defense theory that his client was not present during the Carr murder. *56(a)1 Statement,* ¶71.

As to the claim that State defendant Ocif "gave Cocchia the police file on the Carr homicide" to fill in his story, plaintiff Birch has failed to establish that such a story is material for purposes of *Brady*. Ignoring, for purposes of this argument, how implausible this claim is to begin with, the crucial question here is whether this information would have led to a different result in plaintiff Birch's trial. In *Cantone v. Superintendent N.Y. Corr. Facility at Green Haven,* 759 F.2d 207 (2d Cir. 1985), the Second Circuit examined a similar case. There, the police were in possession of impeachment information relating to a cooperating conspirator who was the key witness: namely, statements that the witness had threatened to kill various parties who were responsible for his arrest. *Id.* at 211. The Second Circuit held that the information was not material, because the defense had nevertheless brought the witness's credibility into question during both cross-examination and summation, such that the witness's prior criminal activities, plea agreement and sentence, enticement to cooperate, and history of dishonesty were all disclosed to the jury. *Id.* at 216. The court also gave weight to the fact that there were other testifying witnesses who corroborated the witness' testimony, and emphasized that the suppressed information was not the type to which the jury would accord great weight. *Id.* at 216-17.

Similarly, in *United States v. Wong,* 78 F.3d 73 (2d Cir. 1996), the defendant moved for a new trial on the basis of post-conviction disclosures that the government had not revealed information that would have exposed a witness's bias, interest, and dishonesty. *Id.* at 79. The Second Circuit again concluded that the suppressed

information did not warrant a new trial. It stated that impeachment evidence is material for *Brady* purposes if the impeached witness "supplied the only evidence linking the defendant(s) to the crime," or if "the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *Id.* (internal citations omitted).

On the other hand, "new impeachment evidence is *not* material, and thus a new trial is *not* required 'when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'" *Id.* (citing *United States v. Payne,* 63 F.3d 1200, 1210 (2d Cir. 1995)). Guided by the Second Circuit's teaching in these cases, this Court should likewise reject the plaintiff's allegation that the alleged Todd Cocchia evidence was material. Cocchia did not provide the only evidence against plaintiff Birch. His criminal history was disclosed to the jury. His credibility was attacked at trial. In light of these factors, it seems clear that the impeachment value of the suppressed information was minimal--cumulative at best. The same can be said about all of the evidence the plaintiffs allege was suppressed. Accordingly, even if this information were true and the State defendants actually suppressed it, this information was not material, and therefore any alleged suppression would not violate *Brady. See Busiello v. McGinnis*, 235 F. Supp. 2d 179, 190-191, 2002 U.S. Dist. LEXIS 24426, *28-3

Even if any of the evidence enumerated their Third Cause of Action could be considered favorable, the plaintiffs cannot establish that the verdicts in their respective criminal trials would have been different. Therefore, this information cannot be considered

"material" evidence, and for this additional, independently sufficient reason, the plaintiffs' Third Cause of Action fails on the merits.

### 3. The plaintiffs have failed to establish the State defendants acted in bad faith.

Furthermore, even assuming that the plaintiffs could show the State defendants actually "suppressed" or "withheld" *Brady* material from prosecutors – and the undisputed evidence establishes that they did not – the plaintiffs have not presented any evidence in support of their bald allegations that the State defendants "acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard" for plaintiffs' rights. Critically, "the Second Circuit has 'never held that anything less than an intentional *Brady* violation establishes a civil §1983 due process claim for damages." *Jeanty v. City of Utica*, 2021 U.S. Dist. LEXIS 7737, *45 (N.D.N.Y. Jan. 14, 2021).

Here, plaintiffs cannot satisfy the elevated intent requirement necessary for a *Brady*, damages claim against State defendants Graham, Quartiero, Ocif and Acker. There is no evidence that these defendants intentionally suppressed materials or that they acted in bad faith. Instead, the evidence demonstrates that State defendants Graham, Quartiero, Ocif and Acker provided material to the Litchfield State's Attorney's office, who in turn, through the open file policy, produced that information to defense counsel, as described above.

Even if all of the other arguments above on the merits of a civil *Brady* claim were somehow not enough, State defendants Graham, Quartiero, Ocif and Acker still prevail on the merits because there is no genuine dispute of fact that they did not have the requisite, culpable state of mind for such a claim. These State defendants did not act in

bad faith by intentionally suppressing material, exculpatory evidence,  which is what is required for civil liability under *Brady*.

The Court should grant this motion and enter judgment in the State defendants' favor.

### 4.  Additionally, judgment must enter in favor of the State defendants as they are entitled to qualified immunity

"Qualified immunity shields government officials from civil suits for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions . . . ."  *Distiso v. Cook,* 691 F.3d 226, 240 (2d Cir. 2012)(quotation omitted).  It balances the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment and distraction when they perform duties reasonably.  *Wood v. Moss*, 572 U.S. 744, 758 (2014).

The qualified immunity defense is a "forgiving" and "broad shield that protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017)(citation omitted); *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir.), *cert. denied sub nom. Kass v. City of New York, N.Y.*, 138 S. Ct. 487 (2017).  It applies regardless of whether the officials' error is "a mistake of law, mistake of fact, or a mistake based on mixed questions of law and fact."  *Doninger v. Niehoff*, 642 F.3d 334, 353 (2d Cir. 2011)(quotation and citation omitted).

The immunity specifically allows "breathing room to make reasonable but mistaken judgments about open legal questions" including nuanced constitutional issues. *Francis v. Fiacco*, 942 F.3d 126, 146 (2d Cir. 2019)(quotation omitted); *Mara*, 921 F.3d at 69. Existing precedent must have placed the constitutionality of the officer's conduct "beyond debate." *See, e.g.*, *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

"The Supreme Court has lately emphasized the breadth of qualified immunity protection." *Francis*, 942 F.3d at 145. "[T]he Supreme Court has 'repeatedly told courts not to define clearly established law at a high level of generality,' instead emphasizing that 'clearly established law must be "particularized" to the facts of the case.'" *Id.* at 146 (citations omitted).

Defining a constitutional right too broadly is the cardinal error of qualified immunity analysis, and the Supreme Court is vigilant in its enforcement of this bedrock tenet of qualified immunity jurisprudence. *See, e.g.*, *City of Tahlequah v. Bond*, No. 20-1668, 2021 U.S. LEXIS 5310, *4 (Supreme Court Oct. 18, 2021)("We have repeatedly told courts not to define clearly established law at too high a level of generality."). The purported clearly established right in question must be defined with specificity. *See, e.g.*, *City of Escondido, Cal. v. Emmons*, 139 S. Ct. at 503. This analysis requires a *high degree* of specificity. *Wesby*, 138 S. Ct. at 590 (emphasis added); *see also Farid v. Ellen*, 593 F.3d 233, 244 (2d Cir. 2010)("For a right to be clearly established, it must have been recognized in a particularized rather than a general sense.")(citation omitted).

"[T]he law must be . . . clearly established with respect to the '*particular* conduct' and the 'specific context' at issue . . . ." *Mara v. Rilling*, 921 F.3d 48, 68-69 (2d Cir.

2019)(emphasis in original)(quoting *Mullenix*, 136 S. Ct. at 308). The specificity requirement is a critical factor in qualified immunity jurisprudence in this Circuit. *See, e.g.*, *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011); *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012).

"Qualified immunity applies to defeat a federal claim unless a plaintiff [demonstrates] (1) that the official violated a statutory or constitutional right, . . . (2) that the right was 'clearly established' at the time of the challenged conduct," *Francis*, 942 F.3d at 145, and (3) even still qualified immunity also applies if official's conduct was objectively reasonable, such that a reasonable official would reasonably believe his conduct did not violate a clearly established right, *Taravella v. Town of Wolcott*, 599 F.3d 129, 134-36 (2d Cir. 2010).

The Court has "flexibility" for which order it assess qualified immunity arguments. *See generally Pearson v. Callahan*, 555 U.S. 223 (2009). In *Pearson*, the Supreme Court overruled the "rigid" two-step order structure from *Saucier v. Katz*, 533 U.S. 194 (2001) for how courts used to be forced to undertake qualified immunity analysis.

Even if plaintiffs could show 1) an actionable violation, of 2) a clearly established *Brady* right, that does not end the inquiry or deprive of qualified immunity. There is a third question in qualified immunity analysis: whether an official's conduct was objectively reasonable, *i.e.,* whether a reasonable official would reasonably believe his conduct did not violate a clearly established right. *Taravella*, 599 F.3d at 134-36. The Second Circuit has held that "this third question is indispensable." *See id.* at 135.

"Even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an

official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Taravella*, 599 F.3d at 134 (quoting *Hizazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007)).  Qualified immunity is properly awarded (including at summary judgment) under this analysis in instances where there is ambiguity in how the legal requirements or obligations apply to the official under the governing law.  *See Taravella*, 599 F.3d at 135 ("the district court has concluded--and we agree--that the Agreement is ambiguous as a matter of law. Dunn read the Agreement, sought legal advice, and reasonably concluded that Taravella could be terminated without a hearing."); *see also Security & Law Enforcement Employees, Dist. Council 82, etc. v. Carey*, 737 F.2d 187, 211 (1984)(awarding qualified immunity to officials who ordered unconstitutional searches because, "[t]hese officials operated in an area in which the law was not charted clearly.").That is "[q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *City of Tahlequah v. Bond*, 2021 U.S. LEXIS 5310, *4 (Supreme Court Oct. 18, 2021).  Here the State defendants did not knowingly violate the law, and they were not plainly incompetent.

It was reasonable for the State defendants to believe that the practices that they had followed time and again were in compliance with any *Brady* requirement.  In fact, the Second Circuit emphasized that its rulings for extending *Brady* obligations past prosecutors and attaching to police officials "makes good sense, we['ve] reasoned, because the police may lack 'the requisite legal acumen' to determine whether materials constitute *Brady* evidence, and therefore they should not be charged with 'mak[ing] separate, often difficult, and perhaps conflicting, disclosure decisions.'"  *Horn v. Stephenson*, 11 F.4th 163, 171 (2d Cir. 2021)(quoting *Walker,* 974 F.2d at 299).

Even if courts wish to redefine or clarify *Brady* obligations as a legal matter decades later *post hoc*, that neither deprives the State defendants of their qualified immunity nor renders their conduct unreasonable. Qualified immunity "is deliberately 'forgiving,' to give public officials 'breathing room to make reasonable but mistaken judgments' without fear of disabling liability." *Mara*, 921 F.3d at 69 (citation omitted). Even if the Court were to hold there was a technical violation of a *Brady* right, State defendants Graham, Quartiero, Ocif and Acker are still entitled to qualified immunity.

### E. Plaintiff Henning's §1983 Civil Rights Conspiracy claim fails as a matter of law.

In his Fourth Cause of Action, plaintiff Henning alleges the Defendants "Ocif, O'Mara, McCafferty, Acker, Jordan, Quartiero, Graham, Lee… agreed  among themselves and with other individuals to act in concert in order to deprive [him] of his clearly established Fourth, Fifth, Fourteenth Amendment rights…" (Henning Doc. 1, p. 49, ¶355)[16] Not only does plaintiff Henning fail to establish the existence of a conspiracy, generally, between these defendants, his claim fails as a matter of law because this Court previously granted the Town Defendants' motion to dismiss plaintiff Henning's § 1983 civil conspiracy claim.

To support a claim under § 1983 for conspiracy, plaintiff must show: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999). "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn*, 200 F.3d at 72 (quotation marks omitted). Because "[§] 1983 is only a grant of a right of action[,] the substantive

---

[16] Birch does not allege any such conspiracy in his complaint.

right giving rise to the action must come from another source.*" Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995). Therefore, a § 1983 conspiracy claim "will stand only insofar as the plaintiff can prove the sine qua non of a § 1983 action: the violation of a federal right." Singer, 63 F.3d at 119 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150(1970)).

To plausibly allege a conspiracy to deprive constitutional rights, a plaintiff "must allege specific facts that show that the defendants shared a unity of purpose or a common design to injure the plaintiff, not mere conclusory allegations." *Brown v. Seniuk*, No. 01 CV 1248 SJ, 2002 U.S. Dist. LEXIS 28732, 2002 WL 32096576, at *4 (E.D.N.Y. Mar. 25, 2002) (citing *Polur v. Raffe*, 912 F.2d 52, 56 (2d Cir. 1990), *cert denied*, 490 U.S. 386 (1991)). Plaintiff Henning has failed to meet this standard.

In his Complaint, plaintiff Henning asserts that the State defendants "agreed among themselves and with other individuals to act in concert" to violate his constitutional rights. (Henning Complaint, Doc. 1, p. 49, ¶.) Such a conclusory statement does not create a genuine issue of material fact, however. There is *absolutely nothing* that that supports this baseless claim, despite dozens of depositions and thousands of pages of documentary evidence that has been produced in these consolidated matters. Furthermore, as detailed above, plaintiff Henning has failed to establish that any of the State defendants fabricated evidence, suppressed or withheld exculpatory or material evidence or lacked the requisite probable cause to arrest him and plaintiff Birch.

As such, plaintiff Henning cannot maintain his claim that the defendants engaged in a civil conspiracy to violate his constitutional rights. *See Thompson v. Kline*, 504 F. Supp. 3d 200, 211 (W.D.N.Y. Dec. 3, 2020) (allegations that defendants "spoke with each other

a total of one time . . . does not amount to an 'agreement' to inflict a constitutional injury for purposes of a conspiracy"); *Sullivan v. Stein*, 487 F. Supp. 2d 52, 83 (D. Conn. 2007) (dismissing § 1983 civil conspiracy claim on the grounds that plaintiffs "do not provide any evidence of an agreement to act in concert" (internal quotation marks omitted)); *Brown*, 2002 U.S. Dist. LEXIS 28732, 2002 WL 32096576, *4 (dismissing § 1983 civil conspiracy claim where plaintiff failed to allege "specific facts that show an agreement among the alleged co-conspirators").

Moreover, the plaintiff alleges a conspiracy among the State defendants and Town defendant Jordan. However, this Court dismissed this claim as to Town Defendant Jordan in its Ruling and Order on Motion to Dismiss on September 24, 2021. (Doc. 71, p. 32) A civil rights conspiracy requires an agreement between two or more actors to inflict an unconstitutional injury. Thus, even if the plaintiff could somehow prove the elements of a conspiracy– which he cannot – this claim would still fail as a matter of law because of the intracorporate conspiracy doctrine. "[U]nder the intracorporate conspiracy doctrine, the 'officers, agents, and employees of a single corporate entity are legally incapable of conspiring together.'" *Murphy v. City of Stamford*, 634 F. App'x 804, 805 (2d Cir. 2015) (quoting Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008)) (barring the plaintiff's conspiracy claims under the intracorporate conspiracy doctrine because "the defendants were employees or agents of Stamford, the alleged conspiratorial activities pertained to and were motivated by the defendants' respective public duties, and all of the alleged discriminatory conduct pertains to a single act (the wrongful property assessment*)"); see also Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) (noting legal impossibility of

pleading conspiracy by exclusive reference to actions of employees of a single corporation).

Here, the remaining defendants are all former employees of the same agency – the Connecticut State Police – and are, at the very least, all former employees of the State of Connecticut, thus barring any co-conspirator claims. *See Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015) (explaining that under the intracorporate conspiracy doctrine, "employees or agents of a single corporate entity, acting within the scope of their employment, are legally incapable of conspiring together" (citing *Hill v. City of New York*, No. 03-CV-1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005))); *Varricchio v. County of Nassau*, 702 F. Supp. 2d 40, 62 (E.D.N.Y. 2010) ("The intracorporate conspiracy doctrine posits that the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other."); *Broich v. Inc. Vill. of Southampton*, 650 F. Supp. 2d 234, 246-48 (E.D.N.Y. 2009) (barring claims under doctrine where defendants were "all employees of a single municipal entity," in this case a village).

Accordingly, this Court should grant judgment in the State defendants favor as to plaintiff Henning's Fourth Cause of Action.

## F. The State defendants did not engage in any constitutional violations and, thus, plaintiff Henning cannot maintain his failure to intervene claim

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "Liability may attach only when (1) the officer had a realistic opportunity to

intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008), *aff'd sub nom. Jean-Laurent v. Wilkerson*, 461 F. App'x 18 (2d Cir. 2012) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988)).

However, "it [is] objectively reasonable for [a state actor] not to intervene for the simple reason that he never witnessed any constitutional violations." *Disorbo v. Hoy*, 74 F. App'x 101, 104 (2d Cir. 2003). While the question of whether an officer had a "realistic opportunity" to intervene is normally a question for the jury, *Terebesi*, 764 F.3d at 244, a failure to intervene claim cannot be sustained where a reasonable person in the officer's position would not know that the victim's constitutional rights were being violated. While plaintiff Henning's Complaint includes conclusory allegations against the State defendants, plaintiff has failed to establish that the State defendants violated his constitutional rights. Even so, the plaintiff cannot meet his burden to show that any of the defendants observed or had knowledge of any other defendants' actions that would amount to a constitutional violation.

Accordingly, judgement should enter for the State defendants as to plaintiff Henning's §1983 failure to intervene claim.

### G. Plaintiff Henning's state-law claim should be dismissed for lack of supplemental jurisdiction.

In his Complaint, plaintiff Henning also asserts a state law claim for intentional infliction of emotional distress (Henning Complaint, Doc. 1, p. 53). Plaintiff Henning alleges that State defendants Ocif, O'Mara, McCafferty, Quartiero, Graham, Acker and Lee "knew or should have known that their conduct would cause emotional distress and

that such distress might result in illness or bodily harm." (*Id.*) Because plaintiff Henning has failed to establish any plausible federal law claims, the Court should decline to exercise supplemental jurisdiction over his state law claim

"[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Lennon v. Miller*, 66 F.3d 416, 426 (2d Cir. 1995)(quoting, *inter alia*, *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)); *cf. Healy v. City of N.Y. Dep't of Sanitation*, 286 F. App'x 744, 746 (2d Cir. 2008)(Summary Order)("Given that plaintiff's only federal claim was dismissed at an early stage of the litigation . . . and that there is a paucity of state-court decisions construing § 12–113. . . we conclude that the district court exceeded the bounds of discretion in deciding [plaintiff's state-law] claim on its merits rather than declining to exercise supplemental jurisdiction")(internal citations omitted)

Because plaintiff Henning's federal claims fail as a matter of law, this Court should decline to exercise supplemental jurisdiction over his Connecticut state-law claim.

## IV.   **CONCLUSION**

For the foregoing reasons, the State defendants respectfully request that this motion be granted, and judgment be entered in their favor as a matter of law.

Respectfully Submitted,

STATE DEFENDANTS

WILLIAM TONG
ATTORNEY GENERAL

By: */s/ Terrence M. O'Neill*

Terrence M. O'Neill
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct10835
E-Mail: terrence.oneill@ct.gov
Tel.:  (860) 808-5450
Fax:  (860) 808-5591

BY: */s/ Lisamaria T. Proscino*

Lisamaria T. Proscino
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct30588
E-Mail: lisamaria.proscino@ct.gov
Tel.:  (860) 808-5450
Fax:  (860) 808-5591

By: */s/ Robin S. Schwartz*

Robin S. Schwartz
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct24891
E-Mail: robin.schwartz@ct.gov
Tel.:  (860) 808-5450
Fax:  (860) 808-5591

## **CERTIFICATION**

I hereby certify that on November 7, 2022, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing].  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing].  Parties may access this filing through the Court's system.

/s/ Lisamaria T. Proscino
Lisamaria T. Proscino
Assistant Attorney General