# TAB 1

```
NO.:  TSR-CV01-0817907-S          :  SUPERIOR COURT

RALPH BIRCH v. WARDEN             :  JUDICIAL DISTRICT
                                     OF TOLLAND
NO.:  TSR-CV12-4004924-S          :  AT ROCKVILLE, CONNECTICUT

SHAWN HENNING v. WARDEN           :  NOVEMBER 16, 2015

NO.:  TTD-CV15-6009683-S

SHAWN HENNING v. STATE OF CONNECTICUT

NO.:  TTD-CV15-6009781-S

RALPH BIRCH v. STATE OF CONNECTICUT
```

HABEAS

BEFORE THE HONORABLE SAMUEL J. SFERRAZZA, JUDGE

A P P E A R A N C E S :

    Representing the Petitioner/Plaintiff Shawn Henning:

        ATTORNEY W. JAMES COUSINS
        ATTORNEY CRAIG ARCHER RAABE
        ATTORNEY KRISTOPHER MOORE
        ROBINSON & COLE, LLP

    Representing the Petitioner/Plaintiff Ralph Birch:

        ATTORNEY ANDREW O'SHEA - Ordering Party
        ATTORNEY ILANA OFGANG
        KIRSCHBAUM LAW FIRM

    Representing the Respondent/Defendant:

        ATTORNEY MICHAEL PROTO
        ATTORNEY LISAMARIA TERESA PROSCINO
        ATTORNEY DAVID CARLUCCI
        ATTORNEY JO ANNE SULIK

                              Recorded By:
                              Pamela Clemens

                              Transcribed By:
                              Pamela Clemens
                              Court Recording Monitor
                              20 Park Street
                              Rockville, CT 06066

 1          THE COURT:  Good morning, everyone.

 2          ATTY. O'SHEA:  Good morning, Your Honor.

 3          THE COURT:  And I understand the plan is that

 4     this afternoon we are going to try to make the

 5     telephonic -- the video connection with a witness

 6     that we had started with previously.  Am I correct?

 7          ATTY. OFGANG:  Yes.  It's actually -- my

 8     understanding is that it's a new witness who we're

 9     trying to --

10          THE COURT:  Okay.

11          ATTY. OFGANG:  -- via video conference.

12          THE COURT:  All right.

13          ATTY. OFGANG:  So that would be for the

14     Birch -- Birch petition at -- at two p.m., we're

15     hoping the video conference.

16          THE COURT:  Okay.  Otherwise, we're ready to

17     begin with our in-person witness at this time, is

18     that right?

19          ATTY. OFGANG:  Yes, Your Honor, but just to

20     make a note --

21          THE COURT:  Sure.

22          ATTY. OFGANG:  -- there will be another

23     Wednesday video conference witness.

24          THE COURT:  Yup.

25          ATTY. OFGANG:  Just to clarify.

26          THE COURT:  Okay.  And I understand from the

27     clerk that there may be some technical difficulties

```
 1        which hopefully will be resolved by this afternoon.

 2             ATTY. O'SHEA:  Your Honor, there are a couple

 3        of preliminary matters --

 4             THE COURT:  Yes.

 5             ATTY. O'SHEA:  -- before we present any

 6        witnesses.  First, Exhibit Number 98.  I believe it

 7        was in for ID.  It was the criminal record of Tina

 8        Yoblonski.  Opposing counsel had requested a

 9        certified copy which I provided to the Court.  We're

10        just asking that that certified copy be accepted as

11        full.

12             THE COURT:  Any objection?

13             ATTY. PROTO:  There's no objection, Your Honor.

14             THE COURT:  We'll substitute that as the full

15        exhibit 98?

16             ATTY. O'SHEA:  Yes, Your Honor.

17             THE COURT:  98.  Okay.

18             ATTY. O'SHEA:  And Your Honor, I'd request at

19        this time a writ for -- a writ of habeas corpus for

20        Henry Messenger.  He -- given that Robert Perugini

21        had -- had invoked his Fifth Amendment rights, his

22        testimony is now -- would be relevant in our -- in

23        our opinion, so.

24             THE COURT:  Okay.  And for what date?

25             ATTY. O'SHEA:  Wednesday if possible, the 18th.

26             THE COURT:  Mr. Clerk, is that possible for

27        this Wednesday to get it done that soon?
```

```
1              THE CLERK:  I'll just email Safia.  She's the
2         one who takes care of that.  I'm sure that that can
3         be arranged.
4              THE COURT:  Okay.  If -- if it can't, then the
5         next --
6              ATTY. O'SHEA:  December 1st, I believe would be
7         the next date.
8              THE COURT:  -- the next date, whatever our next
9         date is after that, okay?
10             ATTY. O'SHEA:  Yes, Your Honor.  Yes.
11             THE CLERK:  I'll get information from you.
12             ATTY. O'SHEA:  Okay.  Thank you.  And finally,
13        Your Honor, we just recently learned that opposing
14        counsel intends to use expert testimony in this
15        case.  There's been no disclosure whatsoever as to
16        that.  There was a deadline set that had been
17        extended for opposing counsel specifically very
18        late, close to the start of this trial to
19        accommodate them.  They've had our disclosures for
20        months, and we're just asking, Your Honor that --
21        that -- just as a preliminary matter that there be a
22        ruling that this not be allowed.  I believe there --
23        there's case law on the issue that such a late
24        disclosure with no disclosure of an expert testimony
25        that that testimony should not be allowed.  The
26        only -- I would say though that I would not object
27        to an expert regarding the TrueAllele matter that
```

1    came up on Thursday with respect to the DNA from

2    Greg Hampikian; but otherwise, any other experts,

3    there's been more than enough notice for months and

4    we've received no indication.  Our experts would

5    likely have testified differently had we known that

6    there was going to be certain other things

7    potentially talked about that we don't even know

8    what might be talked about.

9        ATTY. COUSINS:  We'd join in that, Your Honor.

10        THE COURT:  Okay.  Yes?

11        ATTY. PROTO:  Your Honor, Dr. Henry Lee and

12    Kenneth Zercie were disclosed on our witness list,

13    and it is true we did not give a separate expert

14    witness disclosure for them.  They both testified as

15    experts at the underlying trial, and the only

16    difference in intent now is that they may indeed

17    testify in rebuttal to some of the things that the

18    experts for the Petitioners have testified to.

19        ATTY. COUSINS:  Your Honor, I'm sorry.  I think

20    that's quite unfair.  They have had our expert

21    disclosures since August.  Although Henry Lee and --

22    Dr. Henry Lee and Mr. Zercie may have some

23    expertise, they did not disclose them as experts.

24    It's quite unfair now for them to give some opinion.

25    We may have been in a position, had we known what

26    that opinion would be, to address that through our

27    experts and through our factual presentation of our

```
 1        witnesses.  If they want to put on Dr. Lee as a fact
 2        witness without expressing any opinions, that's
 3        fine.  We understand that.  The same with -- with --
 4        with Mr. Zercie.  But at this late date, to have had
 5        our expert disclosures, for us to have already
 6        completed our presentations, to say oh, by the way,
 7        we're going to give expert opinions, I think is
 8        in -- in direct contravention of the rules.  That's
 9        why we have expert disclosure rules, and -- and
10        quite unfair to the -- to the Petitioner, Your
11        Honor.
12             THE COURT:  Okay.
13             ATTY. O'SHEA:  If I may join in, Your Honor.
14        Also, as far as this being in rebuttal, the -- our
15        tesperts -- excuse me -- our experts testified
16        consistently with what our disclosures were, so it's
17        not the case that there's any new information that's
18        come up that's required suddenly --
19             THE COURT:  Well, what about the TrueAllele?
20             ATTY. O'SHEA:  True- -- Your Honor, with
21        respect to TrueAllele, as I said earlier, no -- no
22        objection to an expert to discuss those issues, but
23        we're -- we're speaking about experts on other
24        matters.
25             THE COURT:  Okay, but I don't think you can --
26             ATTY. O'SHEA:  Well, so --
27             THE COURT:  -- restrict -- what I'm saying is
```

1    what's good for the goose is good for the gander.

2         ATTY. O'SHEA:  Well, Your Honor, our position

3    with TrueAllele --

4         THE COURT:  You -- you offered that expert now

5    who's identified, but not about that topic; and

6    there was a report that was very recently provided

7    to all counsel.

8         ATTY. O'SHEA:  Your Honor, with respect to --

9    to TrueAllele, it -- it's still the same position of

10   us that that was included within the disclosure.

11   The -- the tool of TrueAllele is -- is simply a

12   utility that opposing counsel -- probabilistic

13   genotyping is a well-known tool that is used

14   throughout the DNA community, and so the fact that

15   this was particularly -- you know, one instance, one

16   application of that.  It happens to be one program

17   called TrueAllele, but there's many others that use

18   that idea.  And so it's -- it's not the case that

19   anything -- we already disclosed the ultimate

20   conclusion that this tool was used to -- to provide

21   in the same way that, for example, you know, a

22   footwear expert compares -- obtains heels and

23   compares them to -- to printouts.  The TrueAllele is

24   simply a tool that's utilized to obtain the ultimate

25   conclusion.  That conclusion was disclosed.

26        THE COURT:  That -- that may be true, but then

27   it also may be the difference between using a

1    magnifying glass and a microscope.  They -- they

2    work on the same optical principles, but -- you

3    know, one -- one produces quite different results

4    than the other.  So the part -- and I don't know if

5    that's the case here.  It may not be, but it was

6    enough to provoke a request for a Porter hearing and

7    expression of surprise, so it seems to me that you

8    might have to be a little more accommodating --

9         ATTY. O'SHEA:  Well --

10        THE COURT:  -- to a late disclosure.  And also,

11   my understanding is Dr. Lee and Mr. Zercie -- did

12   they both testify at the criminal trial?

13        ATTY. PROTO:  They did, Your Honor, and I'm not

14   going to ask them to make -- render opinions

15   different from what they testified to.  I'm just

16   going to ask them rebuttal questions with respect to

17   the procedures employed by these witnesses that --

18   that we've heard from.

19        THE COURT:  Okay, so that -- so that they're --

20   they're not giving a --

21        ATTY. PROTO:  A different opinion.

22        THE COURT:  New opinions for what they

23   testified at the criminal case --

24        ATTY. PROTO:  Not at all, Your Honor.

25        THE COURT:  -- but they may be indicating

26   that -- something that -- which -- which particular

27   experts did you -- did you have in mind?

```
 1              ATTY. PROTO:  You're testing my memory, Your
 2      Honor.
 3              THE COURT:  Mr. Hampikian --
 4              ATTY. PROTO:  I have to remember names.
 5              THE COURT:  Mr. Hampikian?
 6              ATTY. PROTO:  The footwear --
 7              THE COURT:  Mr. Hampikian?
 8              ATTY. PROTO:  Yes, the footwear -- well, the
 9      footwear expert and --
10              THE COURT:  Okay.
11              ATTY. PROTO:  -- the -- the crime scene expert,
12      whose name -- both names escape me, Your Honor.
13              THE COURT:  Mr. Turvey?
14              ATTY. PROTO:  Turvey, yes.
15              THE COURT:  Okay.
16              ATTY. COUSINS:  Your Honor, I would object to
17      that.  We disclosed Mr. Turvey.  We disclosed Mr.
18      Bodziak10:14:02 in August as to what their opinions
19      were going to be, and if -- if Dr. Lee's simply
20      going to restate his testimony that he provided at
21      the criminal trial, and the same with Mr. Zercie,
22      that I have a problem with.  That's a fact witness
23      and they can state facts.  If they're going to
24      express an opinion about the -- express a new
25      opinion, which is what it sounds like, about the --
26      the measures and -- and the expert opinion that was
27      rendered by Dr. Turvey and by Mr. Bodziak, I do
```

1    object to that.  If -- if I knew they were going to

2    do that, I may have addressed what they were going

3    to say in the presentations by Mr. Bodziak and Mr.

4    Turvey.  I -- I think that's unfair at this point to

5    disclose them as expert witnesses.

6        THE COURT:  When would you anticipate calling

7    them?

8        ATTY. PROTO:  It would be probably -- my

9    understanding is that the Petitioner is now going to

10   use December 1st largely for their witnesses, so it

11   would be either December 2nd or 3rd, Your Honor.

12       THE COURT:  Okay, and do you have written

13   reports -- new reports from either of these experts?

14       ATTY. PROTO:  Again, Your Honor, I don't as

15   yet.  There's -- their -- their opinion is not

16   changing.  It's just a question of the methodologies

17   and -- and whether or not they have a comment on --

18   on their methodologies as it relates to the

19   methodologies employed by these witnesses who -- who

20   recently testified.

21       ATTY. COUSINS:  Well, Your Honor, I would've

22   liked to have seen that.  If they're -- if they're

23   going to say that their methodologies are different

24   from the experts that -- that we put on, I think I

25   was entitled to see that before these experts --

26       THE COURT:  But how would they know that until

27   your testimony was presented?

```
 1           ATTY. COUSINS:  Because we disclosed our
 2      experts and the nature of what they were going to
 3      say back in August.
 4           THE COURT:  Well --
 5           ATTY. PROTO:  If I May, Your Honor --
 6           THE COURT:  -- not -- certainly not as to the
 7      TrueAllele.
 8           ATTY. PROTO:  Well, not as to that --
 9           ATTY. COUSINS:  I'm segregating out TrueAllele
10      for a moment, Your Honor.  I'm addressing only Dr.
11      Lee and Mr. Zercie.
12           THE COURT:  But what I'm saying is that was not
13      disclosed, so why shouldn't I give leeway for
14      something they don't dis- -- haven't disclosed?
15           ATTY. PROTO:  And frankly, Your Honor, if I may
16      add that the disclosures were --
17           ATTY. COUSINS:  (Indiscernible) I'm sorry.
18           ATTY. PROTO:  The disclosures were what they
19      were.  They were somewhat bare bones.  We didn't get
20      reports discussing methodologies or anything like
21      that, so we -- you know, this is all new testimony
22      that we've heard and --
23           THE COURT:  All right, then what I'm going to
24      do is I'm going require the Respondent to provide a
25      written report of expected testimony of Dr. Lee and
26      Mr. Zercie.  Anybody else?
27           ATTY. PROTO:  No, that would be it, Your Honor.
```

```
1              THE COURT:  And I --

2              ATTY. PROSCINO:  Well --

3              ATTY. PROTO:  And the TrueAllele issue as well.

4              THE COURT:  Okay.  Counsel wanted to talk to

5       you?

6              ATTY. PROSCINO:  If I may, Your Honor.  Thank

7       you.

8              ATTY. PROTO:  Excuse me, Your Honor.  Yeah,

9       with respect to that issue, Your Honor, Attorney

10      Sulik, you know, is handling that.  I can't really

11      speak intelligently, but I don't know who she's

12      going to call, if she's going to call, or what she's

13      going to do with respect to that, so I don't want to

14      speak out of turn with respect to the TrueAllele

15      issue.

16             THE COURT:  Well, there -- my understanding is

17      the TrueAllele issue, they're not versing objection

18      to that.

19             ATTY. O'SHEA:  Yes, Your Honor, we would still

20      like to have a disclosure ahead of time.  I'd like

21      to set a date now for that, but --

22             THE COURT:  Yes, that's what my intent is, that

23      with regard to the other opinions as to experts that

24      may be rendered, I would ask that the Respondent

25      provide that to the Petitioner's counsel by the day

26      before Thanksgiving, so that's a week from

27      Wednesday.
```

1          ATTY. PROTO:  Thank you, Your Honor.

2          THE COURT:  Okay?  And if there should be a

3     circumstance where counter experts need to be called

4     in surrebuttal, I'll consider that.

5          ATTY. O'SHEA:  Understood.

6          THE COURT:  Under our rules of practice as they

7     now exist, the concept is to favor the introduction

8     of evidence rather than to exclude it unless there's

9     real prejudice and damage that's going to be done to

10    the other party.  And so, I think this schedule that

11    we've designed should accommodate that.  Okay?

12         ATTY. PROTO:  Very good, Your Honor.  Thank

13    you.

14         ATTY. O'SHEA:  Thank you, Your Honor.

15         THE COURT:  Yes?

16         ATTY. O'SHEA:  May -- May I approach the clerk

17    briefly?

18         THE COURT:  Yes.

19         ATTY. O'SHEA:  Thank you.

20         ATTY. MOORE:  Your Honor, the Petitioner, Shawn

21    Henning, calls Attorney Christopher Cosgrove.

22         THE COURT:  Is he -- yes.  Attorney Cosgrove,

23    I'd ask you to step up here next to the witness box,

24    face the clerk.

25

26

27

1              C H R I S T O P H E R    C O S G R O V E, 63 West

2              Street, Litchfield, Connecticut, duly sworn by the

3              clerk, testified under oath as follows:

4         THE CLERK:  Thank you.

5         THE COURT:  You may be seated.  You may

6    inquire.

7    DIRECT EXAMINATION BY ATTY. MOORE:

8    Q    Good morning, Attorney Cosgrove.

9    A    Good morning.

10    Q    Where are you currently employed?

11    A    At the Litchfield Superior Court Public Defender's

12    Office.

13    Q    And how long have you been at the Litchfield Public

14    Defender's Office?

15    A    Since June of 1995.

16    Q    And who was your predecessor at the Public

17    Defender's Office in Litchfield?

18    A    That would be Attorney Carl Eisenmann.

19    Q    Attorney Carl Eisenmann testified at this habeas

20    trial that it was his practice when he finished a case to

21    place the file in the cabinet within the Public Defender's

22    Office.  What was your practice when you took over in 1995?

23    A    The same thing, generally.  When a case is disposed

24    of, the office -- Part A office retains the file for at

25    least five years before sending it to archives.

26    Q    And so from the time that you took over as Public

27    Defender in Litchfield, was there a policy in place to

```
 1  maintain the integrity of the files within the Public

 2  Defender's Office?

 3      A   Yes.  Again, they were stored in file cabinets in

 4  the office, and as I say, for at least five years before

 5  being sent to a storage facility.

 6      Q   For files being stored within the Public Defender's

 7  Office, is there anyone other than yourself or the office

 8  staff who would have access to these files?

 9      A   No.

10      Q   When you receive a request for a copy of the

11  defendant's -- of -- of a defendant's file, what has been

12  your general practice?

13      A   Well, it depends on who's making the request.  If

14  it's for a habeas or an appeal for example, we would provide

15  that the client had signed a release.  We would make a copy

16  of the file and send it to the attorney who's making the

17  request for the file.

18      Q   And is that something that the Public Defender's

19  Office would document?

20      A   Generally, yes.

21      Q   At -- at some point, did you become aware that your

22  office had in its possession the file for Shawn Henning?

23      A   Yes.

24      Q   And how did you come to become aware of this?

25      A   Attorney Deborah Del Prete-Sullivan, legal counsel

26  for our division, re- -- made -- made a request of me for

27  that particular file if it was still in the office, and I
```

```
 1   located it and sent it to her.
 2            ATTY. MOORE:  Your Honor, may I approach the
 3        clerk?
 4            THE COURT:  Yes.
 5            ATTY. MOORE:  I'm handing the witness what's
 6        been marked Exhibit 180 and 181 for identification.
 7   Q    Can you take a look at them?
 8            ATTY. MOORE:  And a copy for Your Honor.
 9            THE COURT:  Thank you.
10   Q    Attorney Cosgrove, do you recognize Exhibits 180 and
11   181?
12   A    I do.  These are both notes by me.  One is to the
13   file.  It's dated November 30th, '04, indicating that I
14   dropped this --
15            THE COURT:  Well, they're ID exhibits.
16            ATTY. MOORE:  Yes.
17   Q    So you -- you recognize --
18            ATTY. PROTO:  Your Honor, we have -- I'm sorry
19        to interrupt.  We have no objection to the admission
20        of these as full exhibits.
21            THE COURT:  Are you going to offer these?
22            ATTY. MOORE:  Yes.  Yes, Your Honor.
23            THE COURT:  Then they may be admitted as full
24        exhibits 180 and 181.  If I could have them so I
25        could have the clerk mark them.
26            ATTY. MOORE:  They've already been marked, Your
27        Honor.
```

1          THE COURT:  As -- as full.

2          ATTY. MOORE:  Oh.  Sorry, Your Honor.

3          THE COURT:  Thank you.  Yes?

4      Q    So, Exhibit 180.  Could you tell the Court what --

5   what Exhibit 180 is?

6      A    180 is a note that I wrote.  It's my handwriting,

7   and put in -- into a file for Shawn Henning indicating that

8   I had conveyed his entire file that I had in the office to

9   Attorney Sullivan at the Chief Public Defender's Office in

10  Hartford.

11     Q    And how about Exhibit 181?

12     A    181 appears to be a note that I just wrote to

13  Attorney Sullivan, at her office apparently, on that day,

14  November 30th of '04 because as my note to the file on

15  Exhibit 180 indicates, I gave this to her administrative

16  assistant.  I actually handed it to her administrative

17  assistant that day, so this was just a note to her saying

18  here's the file.

19     Q    And could you just read from Exhibit 181 what you

20  had written?

21     A    Again, it's dated 11/30/04.  Hi Deb.  This is Carl's

22  Shawn Henning file in toto.  I was in the area!  Signed,

23  Chris.

24     Q    So to the best of your knowledge, is the file that

25  you delivered to Attorney Deborah Del Prete-Sullivan's

26  office on November 30, 2004 the complete, original file for

27  State of Connecticut v. Shawn Henning.

```
 1      A    It's the complete package that I had in the office

 2  at that time.

 3      Q    Thank you.

 4           ATTY. MOORE:  May I have a moment, Your Honor?

 5           THE COURT:  Yes.

 6           ATTY. MOORE:  No further questions.

 7           THE COURT:  All right.  Cross-examination?

 8           ATTY. PROTO:  Just a couple -- couple quick

 9       questions.

10           THE COURT:  Well, let me just ask --

11           ATTY. PROTO:  Oh, I'm sorry.

12           THE COURT:   -- counsel for Attorney (sic)

13       Birch?

14           ATTY. OFGANG:  No questions, Your Honor.

15           THE COURT:  Okay.  Yes, go ahead.

16           ATTY. PROTO:  Okay.

17  CROSS-EXAMINATION BY ATTY. PROTO:

18      Q    Just a couple quick questions, Mr. Cosgrove.  On

19  180- -- you still have Exhibit 181 in front of you?

20      A    Yes.

21      Q    And I'm sorry, it's somewhat cryptic when you say I

22  was in the -- what -- what are you referring to when you say

23  I was in the area?  What does that mean?

24      A    Well, my office is about an hour away from Hartford,

25  the Chief Public Defender's Office.  I evidently had some

26  business in the area, but I -- I personally delivered

27  this --
```

1    Q    Oh.

2    A    -- as opposed to sending it through

3  interdepartmental or U.S. Mail.

4    Q    Okay, I'm sorry.  I missed that.  So you hand

5  delivered it --

6    A    Yes.

7    Q    -- that day.  Okay.  And you joined the office I

8  think you said in 1995.  Is that correct?

9    A    Yes.

10    Q    Okay.  So you were not in that office before that.

11    A    No.

12    Q    And would it -- is it fair to say the first time

13  that you physically came into possession of this file was in

14  2004 when it was requested?

15    A    I think that's fair to say, yes.

16    Q    Okay.  And you don't have any idea what the file

17  went through before 2004 then, is that correct?

18    A    I do not.

19    Q    Okay.  And when you say it's the entire file, I just

20  want to be clear.  You -- when you say it's the entire file,

21  you're not guaranteeing that it exists in its entirety as it

22  did when Mr. Eisenmann completed with it.  You're saying

23  it's the entire file that I happen to have here today in my

24  office.

25    A    That's correct.

26    Q    Okay.

27            ATTY. PROTO:  No further questions, Your Honor.

```
 1                THE COURT:  Any redirect?

 2                ATTY. MOORE:  Could I have a moment, Your

 3          Honor?

 4                THE COURT:  Yes.

 5                ATTY. MOORE:  No questions, Your Honor.

 6                THE COURT:  Any need to retain the witness?

 7                ATTY. MOORE:  No, Your Honor.

 8                THE COURT:  You're free to go.  You can give me

 9          the exhibits.

10                THE WITNESS:  Thank you, Your Honor.

11                ATTY. COUSINS:  The Petitioner, Shawn Henning,

12          calls Deborah Del Prete-Sullivan.

13                THE COURT:  All right, Counsel.  If you'd step

14          right up here next to the witness box and face the

15          clerk.

16                ATTY. DEL PRETE-SULLIVAN:  Good morning, Judge.

17                THE COURT:  Good morning.  Miss Del Prete-

18          Sullivan has argued habeas cases in front of me in

19          the past before her positions a long time ago.

20          Okay, we'll place her under oath.

21

22

23

24

25

26

27
```

```
 1              D E B O R A H   D E L   P R E T E - S U L L I V A N,

 2              30 Trinity Street, 4ᵗʰ Floor, Hartford, Connecticut,

 3                       duly sworn by the clerk, testified

 4                          under oath as follows:

 5              THE COURT:  Okay, you may be seated.  You may

 6         inquire.

 7    DIRECT EXAMINATION BY ATTY. COUSINS:

 8         Q    Good morning, Miss Sullivan.

 9         A    Good morning, Mr. Cousins.

10         Q    Are you employed?

11         A    Yes, I am.

12         Q    Where are you employed?

13         A    At the Chief Public Defender's Office in Hartford,

14    Connecticut.

15         Q    In what capacity?

16         A    I'm the legal counsel for the agency.

17         Q    And how long have you held that position?

18         A    Since 1994 -- November of 1994.

19         Q    And very briefly, what are your responsibilities in

20    that position?

21         A    In my role there, I am charged with representing and

22    working with the AG's office when it comes to malpractice

23    suits or representing individuals in the division for

24    grievances, representing the Division of Public Defender

25    Services Commission for Freedom of Information cases, and

26    working with the AG's office if it goes further than the

27    actual hearing, advising and representing employees in
```

1    regard to habeas corpus petitions, and the legislative

2    liaison to the governor's office and the House -- the

3    chamber of the House of Representatives.

4        Q    That sounds like it keeps you busy.

5        A    Yes.

6        Q    In -- in that capacity, are there times when you

7    have custody of files that were created by public defenders

8    for their clients?

9        A    Yes.

10        Q    And -- and what are the circumstances under which

11    you had come into custody of such a file?

12        A    If a public defender was the subject of a habeas

13    corpus petition, then I would in some instances become the

14    person who takes possession of the original file that had

15    been at the office.  There are also instances in malpractice

16    lawsuits where I may have possession of that original file

17    as well.

18        Q    And did you come into possession of Carl Eisenmann's

19    file for his client, Shawn Henning?

20            ATTY. PROTO:  Objection, Your Honor.  May --

21        May I voir dire the witness briefly?

22            THE COURT:  There's nothing being offered at

23        this point.

24            ATTY. COUSINS:  I'm not offering it --

25            THE COURT:  I'm not sure what --

26            ATTY. PROTO:  Well, here's my concern, Your

27        Honor.

1          THE COURT:  Yes.

2          ATTY. PROTO:  I believe Miss Del Prete-Sullivan

3      through these proceedings has represented Mr.

4      Eisenmann, and I'm concerned that we're getting into

5      a conflict area here.

6          THE COURT:  Okay.  Well, we'll see.  Why don't

7      you ask your question.  Don't answer the question.

8      We'll see.  Go ahead.  Pose your question.

9      Q   Miss Sullivan, in your capacity that you just

10  described at the Public Defender's Office, did you come into

11  possession of Carl Eisenmann's file that he created for his

12  client, Shawn Henning?

13      A   Yes.

14          ATTY. PROTO:  Well, Your Honor, I -- the

15      witness represents Mr. Eisenmann, so my concern is

16      that if there is not a waiver for her to testify,

17      I --

18          THE COURT:  You want to voir dire on whether

19      she does represent --

20          ATTY. PROTO:  I -- I would like to do that,

21      Your Honor.

22          THE COURT:  -- Mr. Eisenmann or another --

23          ATTY. PROTO:  I would like to do that.

24          THE COURT:  Go ahead.  I'll let you voir dire.

25  VOIR DIRE BY ATTY. PROTO:

26      Q   Miss Sullivan, is it -- should I call you Miss

27  Sullivan?  Is that --

```
 1      A   Attorney Sullivan.

 2      Q   Attorney Sullivan.  You were present at a deposition

 3  in September with Mr. Eisenmann --

 4      A   Yes.

 5      Q   -- is that correct?

 6      A   Yes.

 7      Q   And you remember I was there as well?

 8      A   Yes.

 9      Q   Okay.  Did you represent Mr. Eisenmann's interests

10  at that deposition?

11      A   Yes, I did.

12      Q   Okay.  And you were here present in the courtroom

13  when Mr. Eisenmann testified?

14      A   Yes, I was.

15      Q   Were you here to represent Mr. Eisenmann's interests

16  on that day?

17      A   Yes, I was.

18      Q   Has he signed a waiver for you to testify in this

19  matter?

20      A   He does not need to have me -- he does not need to

21  waive my testimony in regard to Mr. Henning's file because

22  Mr. Henning has signed a waiver.

23      Q   Okay.

24          ATTY. PROTO:  Your Honor, we would disagree.  I

25          mean, it's -- the Court -- it's at the Court's

26          discretion.  We disagree that a waiver is not -- I

27          mean, this is a matter in which Mr. Eisenmann has
```

1        claimed to have rendered ineffective assistance of

2        counsel.  It seems to me highly unusual that his

3        attorney is here testifying as to things that he may

4        or may not have done.

5             THE COURT:  Well, I -- I haven't heard a

6        question which impugns Attorney Eisenmann's

7        representation.  So far, we're just talking about a

8        file.

9             ATTY. COUSINS:  That's correct, Your Honor.

10            THE COURT:  The physical location of the file

11       and what happened to it, so I'm going to overrule

12       the objection.  Now, as to what I've heard so far,

13       if we get something else concerning advice to

14       Attorney Eisenmann, that's different.

15            ATTY. PROTO:  Thank you, Your Honor.

16            THE COURT:  Okay?

17  DIRECT CONTINUED BY ATTY. COUSINS:

18     Q   Attorney Sullivan, you came into possession of Carl

19  Eisenmann's file that he created during his representation

20  of Shawn Henning?

21     A   Yes.

22     Q   And -- and was that in November of 2004?

23     A   In -- in 2004.  I can't say for sure which month.

24     Q   You received it from Chris Cosgrove?

25     A   Yes, I did.

26     Q   And I believe his notes said it was the complete

27  file?

```
 1     A   Yes.

 2     Q   And -- and I think another note said it was in toto?

 3     A   Yes, it did.

 4     Q   Was that your understanding, that meant it was a

 5   complete file?

 6               ATTY. PROTO:  Objection, Your Honor.

 7               Irrelevant.

 8               THE COURT:  What her understanding is is

 9               irrelevant.

10     Q   Was it the original file?

11     A   Yes.

12     Q   And in 2007, did you send that to an outside third

13   party archive service?

14     A   Yes.

15     Q   That's a service that your office uses?

16     A   Yes.

17     Q   And in -- and in 2010, you retrieved it from that

18   same third party archive service?

19     A   I know I retrieved it from an archive service.  I'm

20   not sure if it was re- -- if it was archived from Jefferson

21   Archives or Iron Mountain, but it was in archive service.

22     Q   When that file was in your custody or the custody of

23   your office, did you have any policies to maintain the

24   integrity of the file?

25     A   Can you just tell me when you're talking about?

26     Q   At any time when the file was in your possession,

27   not -- not obviously during the period that it was in the
```

1  archive possession, but when it was in your possession which

2  was 2004 through 2007 and then you retrieved it again in

3  2010, so from 2004 to 2007 and from 2010 to the present, did

4  your office maintain any policies in order to protect the

5  integrity of the file?

6     A   In regard to 2004 to 2007, the policy would be that

7  the file would be locked up in my office, not outside in the

8  corridor, in my office of the Chief's office where there are

9  other files.  It would be locked up in my office.  From 2010

10 going forward, there was a time, and I wasn't able to locate

11 this date, but some -- at some point between 2010 and 2015

12 now where we are, the file had been sent back to Iron

13 Mountain Storage because we did retrieve the original this

14 year.  It had been in Iron Mountain for a number of years

15 between 2010 and today.

16    Q   If -- if habeas counsel wants access to the file,

17 are they given the original or given copies?  What's the --

18 what's the process there?

19    A   Petitioner's counsel is what you're asking -- habeas

20 petition- --

21    Q   Yes.

22    A   They would receive a copy.  They would not receive

23 the original.

24    Q   And if habeas counsel or petitioner's counsel sought

25 access to the file and a copy was made, was that documented?

26    A   Yes.

27    Q   I'm going to show you what's been marked

1    Petitioner's Exhibit for identification, number 182.  Is --

2              THE COURT:  Just remember you have to be near a

3         microphone.

4              ATTY. COUSINS:  Okay.

5    Q    Can you tell me what that is, please?

6    A    This is entitled an Acknowledgement of Receipt of

7    Copy of Attorney/Client File.  It is on my letterhead, and

8    it is from 2010 regarding State of Connecticut v. Shawn

9    Henning, and it is a receipt that was signed by Pete Palmer

10   on June 9, 2010 that he had received a copy of the

11   attorney/client trial file from my office.

12   Q    And it was a copy that was given to him?

13   A    Yes.

14   Q    And that's in keeping with the policy that you just

15   described that petitioners or a representative of a

16   petitioner receives a copy and not the original.

17   A    Absolutely.  We do not turn over the original file

18   to anyone.

19              ATTY. COUSINS:  I -- I offer those as a full

20         exhibit.

21              ATTY. PROTO:  Objection, Your Honor.  It should

22         come in through Mr. Palmer.  It should come in

23         through Mr. Palmer.  She can't authenticate this.

24         It's got his signature on it.

25              THE COURT:  But he's already testified.  Mr.

26         Palmer testified as to his procedures while

27         (indiscernible) -- a chain of custody.

```
 1              ATTY. PROTO:  I don't believe he testified to
 2         the -- to having authored this document, Your Honor.
 3              THE COURT:  But it -- she's testified that it
 4         was received and it was in their files.  Did you
 5         want to ask any other foundational questions with
 6         regard to that?
 7    Q    Attorney Sullivan, who authored this document?
 8    A    I authored the document.
 9    Q    And did you author that document in the regular
10    course of your business?
11    A    Yes, I did.
12    Q    And was the regular course of -- was the regular
13    course of business at your office to maintain that kind of
14    doc- -- or create that kind of documentation?
15    A    Any time a file is taken from my office, we require
16    this.
17    Q    And was that particular document created out of need
18    at the time of the transaction that it represents?
19    A    Yes.
20              ATTY. COUSINS:  I renew my offer.
21              ATTY. PROTO:  Withdraw the objection, Your
22         Honor.
23              THE COURT:  Okay.  Is this marked as an
24         exhibit?
25              ATTY. COUSINS:  Yes, it is.
26              THE COURT:  What is the number, please?
27              ATTY. COUSINS:  182.
```

```
1              THE COURT:  All right.  It may be admitted as
2         full Exhibit 182.  Will you be using it with the
3         witness again?
4              ATTY. COUSINS:  I will not, Your Honor.
5              THE COURT:  Okay.  You can keep it.
6    Q    Have you or anyone in your office permitted anyone
7  to remove anything from the original Shawn Henning file
8  since it's been in your custody?
9              ATTY. PROTO:  I'm just going to object as to
10        form, Your Honor, with respect to anyone from her
11        office.  I'm not sure that there's a foundation for
12        this witness to testify to that.
13             THE COURT:  The question I -- I thought was
14        aimed at whether -- to her knowledge, did she
15        authorize anyone to do it, not whether someone did
16        it surreptitiously.  Is that correct?  That's your
17        question?
18             ATTY. COUSINS:  Yes.  If you want, I can
19        rephrase the question along those lines.
20             THE COURT:  Sure.
21   Q    To your knowledge, did you -- did you or did you
22  authorize anyone to remove anything from the Shawn Henning
23  file while it was in your custody?
24   A    While the file was in my custody, I authorized Tammy
25  Parker to take the contents out and make a copy that was
26  given to counsel.
27   Q    And to your knowledge, did she remove anything after
```

1  copying it?

2      A    Remove totally?  No.  She did not remove anything.

3      Q    And so the original file remained intact after the

4  copying?

5      A    To my knowledge, yes.

6      Q    Do you have the original file with you?

7      A    I do.

8      Q    Is this it?

9      A    That's it.  I did receive one additional piece just

10  in the last month which were only transcripts -- original

11  transcripts from the probable cause hearing.

12      Q    Okay.  How do you know this is the original?

13      A    Well, it was sent from -- it was given to me by

14  Chris Cosgrove, first of all.  Its original notation on it,

15  they are not copies, original ink, various colors of pages,

16  various colors of ink that are written on those pages, and

17  notations in different colors of ink by, I believe, Mr.

18  Eisenmann.

19          ATTY. COUSINS:  I'd offer the file as a full

20      exhibit.

21          ATTY. PROTO:  I do object, Your Honor.  She

22      can't authenticate the file.  I mean, she says she

23      believes they're Mr. Eisenmann's markings, but

24      there's no foundation for that belief.

25          THE COURT:  Okay.  But it doesn't require the

26      witness to be -- provide conclusive testimony as to

27      the entire chain, simply the phase of it in which

1     she's involved.  And so for that purpose, I'll allow

2     it.  Is this being offered as a separate exhibit or

3     for comparative purposes?

4          ATTY. COUSINS:  Separate exhibit.

5          THE COURT:  Well, let me just ask the

6     Respondent.  We already have probably many of the

7     documents in there, or do we have all of the

8     documents in there as copies?

9          ATTY. COUSINS:  No.  No, Your Honor.

10          THE COURT:  Okay.

11          ATTY. COUSINS:  Not all of the copies are in --

12          ATTY. PROTO:  Well, again, Your Honor, I mean,

13     I object to the extent it's cumulative, and it seems

14     to me like it's -- you know, I'm not sure what we're

15     entering.  Are we entering just the jacket, are we

16     entering the -- the contents separately in each and

17     every document in the -- because in that case, Your

18     Honor, it would contain hearsay and -- and I'm not

19     sure what I'll be -- I'll be relevant.

20          THE COURT:  All right.  I'll admit it as full

21     Exhibit -- is this 183?

22          THE CLERK:  Correct, Your Honor.

23          THE COURT:  And the purpose is to attempt to

24     establish what was available in Attorney Eisenmann's

25     file.  Attorney Eisenmann has testified concerning

26     his procedures in taking notes and putting notes to

27     the file and what he would do.

1          ATTY. COUSINS:  Yes, Your Honor.

2          THE COURT:  So I think it's relevant for that

3      purpose.

4    Q   Attorney Sullivan --

5          THE COURT:  We -- we need to mark it.

6          ATTY. COUSINS:  Oh, yeah.

7          THE COURT:  If you could give it to the clerk.

8      Yes, you may proceed.

9    Q   Attorney Sullivan, about a year and a half ago, did

10   you and I sit down and compare the copy that I had of the

11   file with the file that you had?

12   A   Yes.

13   Q   And they were the same?

14   A   Yes.

15   Q   Attorney Sullivan, did you conduct a search of your

16   office to determine if there were any other files related to

17   Mr. Henning?

18   A   I did.

19   Q   And what was the result of that search?

20   A   The -- the result of it was that there were original

21   transcripts that we found in the -- Chris Cosgrove had found

22   from the 1989 probable cause hearing in the Shawn Henning

23   case, and no other documents were found besides what we have

24   here in the original file.

25   Q   Did you conduct a search for any documents or files

26   that may have been created by a public inves- -- a public

27   defender investigator -- or a private investigator for that

```
 1   matter, working on behalf of Mr. Eisenmann for Mr. Henning?

 2       A    Yes, I did.

 3       Q    And what was the result of that search?

 4       A    There were no documents under the investigator's

 5   name, Casey or any other individual as an investigator.

 6       Q    And why did you mention Casey?

 7       A    Only because that's been mentioned before in the

 8   deposition, as well as here at the hearing.

 9       Q    And did you examine the file to determine whether

10   there are any memoranda, reports or notes of any witness

11   interviews conducted by Mr. Eisenmann --

12            ATTY. PROTO:  Your Honor -- Oh, I'm sorry.

13       Q    -- or an investigator on Mr. Henning or Mr.

14   Eisenmann's behalf?

15            THE COURT:  Okay, don't answer.  Yes?

16            ATTY. PROTO:  Your Honor, I just want to renew

17        my original objection because it seems to me that

18        this testimony is going to the performance of Mr.

19        Eisenmann and this witness represents Mr. Eisenmann,

20        so I just want to, for the record, restate my

21        original objection as to a potential conflict.

22            THE COURT:  Well, don't we already have

23        testimony that -- that the Exhibit 183 is the

24        contents of his file?  We have the testimony from

25        Attorney Eisenmann, and isn't this then cumulative

26        asking this witness to say what this witness found

27        or observed?  It is what it is.  What's there is
```

```
1        there, and what's not there is not there.
2             ATTY. COUSINS:  May I consult briefly with --
3             THE COURT:  Yes.
4             ATTY. PROTO:  And if -- while they're doing
5        that, Your Honor, if I just may state for the
6        record, a potential problem that I see here is that
7        I feel as though I am foreclosed from asking the
8        witness about whether or not she has spoken to Mr.
9        Eisenmann to explain why things are or are not in
10       his file.
11            THE COURT:  Well, I haven't heard any testimony
12       that would make that a relevant cross-examination.
13       It would seem to be outside the scope at this point.
14            ATTY. PROTO:  Except that it looks to us, Your
15       Honor, as though where this is going is why things
16       are and are not in the file.
17            THE COURT:  I don't know if it's going in or
18       not.  We'll find out.
19            ATTY. COUSINS:  We can find out right now, Your
20       Honor.
21            THE COURT:  Okay.
22            ATTY. COUSINS:  No further questions.
23            THE COURT:  Okay.  Questions from counsel for
24       Attorney -- I mean for Mr. Birch?
25            ATTY. OFGANG:  No questions, Your Honor.
26            THE COURT:  Okay.  Cross-examination?
27  CROSS-EXAMINATION BY ATTY. PROTO:
```

1    Q   Attorney Sullivan, when you say that this is the

2   original file, this 183 -- Exhibit 183 is the original file,

3   are you guaranteeing to the Court that it is in the

4   condition and main- -- it retains the contents that it had

5   when Mr. Eisenmann initially turned it back to the Office of

6   the Public Defender in Litchfield?

7    A   No.

8    Q   Okay.  And are you -- and -- and you first came into

9   possession of this file, to the extent that it exists, in

10  2004.  Is that correct?

11   A   Yes.

12   Q   Okay.  And I think you testified that from 2004 to

13  2007 you sent it off to an ar- -- or it was in your

14  possession during those years?

15   A   Yes.

16   Q   Okay.  And where was it located during that time?

17   A   In my office -- in a locked drawer in my office.

18   Q   Okay.  And at no time during those three years did

19  you retrieve anything from it or for any reason open the

20  file?

21   A   When you say retrieve something from it, are you

22  saying remove something permanently?

23   Q   Permanently or temporarily.

24   A   No.  The file was there if Mr. Eisenmann came into

25  my office to review it, which I'm not testifying he did or

26  he didn't.  Of course, that would be up for review; but the

27  only time that there was anything that was removed from the

1    file during that time, out of the file, was when it was put

2    on a copy machine by my assistant.

3        Q    Okay.  And in 2007, you -- you shipped it out to an

4    archive, is that correct?

5        A    It went to archives.  That's correct.

6        Q    And where is that?

7        A    I'd have to review my notes to see if it was

8    Jefferson Archives.  I believe it was, or if it was Iron

9    Mountain.

10       Q    Okay.  And then it came back into your possession in

11   2010?

12       A    In 2010, yes.

13       Q    Okay.  And what prompted it to come back into your

14   possession?

15       A    I believe the habeas corpus -- one of the habeas

16   corpus petitions that was filed with the Court.

17       Q    Okay.  And so then it would come back into your

18   possession and you would copy the contents and ship it out

19   to the habeas attorney.  Is that -- is my understanding

20   correct?

21       A    At that time I did, and the reason is because Mr.

22   Eisenmann was no longer an employee, and files are not

23   permitted to be taken out of the offices by people who are

24   no longer employed.

25       Q    Okay.  And -- but -- and you said in 2010 it was a

26   habeas that prompted you to re- -- to retrieve the file back

27   from --

```
 1       A   Correct.

 2       Q   -- the archives.

 3       A   Yes.

 4       Q   Okay.  So it wouldn't be going to Mr. Eisenmann

 5   anyway.  It would be going to a new habeas attorney.

 6       A   A copy would go to the habeas attorney, and I

 7   believe at that time it was the Connecticut Innocence

 8   Project, which is part of our office, that the copy went to.

 9       Q   Okay.  So the copy went to the Innocence Project

10   within your office suite?

11       A   No.

12       Q   Okay.  In another office suite.

13       A   Yes.  I'm at 30 Trinity.  They're at the McCarter

14   and English suite that's there --

15       Q   Okay.  And --

16       A   -- at City Place.

17       Q   -- and you -- so therefore, you retained in your

18   office the file that came back from archives.

19       A   Are you still talking 2010?

20       Q   Yes.

21       A   2010, yes, and it stayed under lock and key.  It did

22   go back to archives at some point between 2010 when -- after

23   I turned over a copy to Mr. Palmer, and this year.

24       Q   Okay.  And at some point, did part or all of it go

25   to Mr. LeFebvre?

26       A   A copy went to that office, so I have Mr. Palmer

27   signing off on it.  I have not -- I have no notations of
```

```
1    giving anything to Mr. LeFebvre.
2        Q    Okay.  And you testified that the contents are --
3    are -- are you able to -- as you sit here today, are you
4    able to guarantee that the contents in that file today are
5    what they were when you got the file in 2004?
6        A    I could testify that nothing has changed from my
7    office, that we did not remove anything.
8        Q    Okay.  But are you able to guarantee that --
9        A    I can't guarantee since it was in archives.  I
10   cannot guarantee myself.
11       Q    Okay.
12                ATTY. PROTO:  One moment, Your Honor?
13                THE COURT:  Yes.
14       Q    Did you discuss with Mr. Eisenmann what may or may
15   not be in the file?
16       A    Yeah, I'm going to assert the privilege at this
17   point.
18                THE COURT:  Well, that -- I -- you need not
19            answer that question.  That's outside the scope and
20            it may violate the privilege which you raised.
21       Q    You testified that you did not know whether or not
22   Mr. Eisenmann came to your office to look at the file.  Is
23   that correct?
24       A    I can't testify as to whether he did or he didn't,
25   and I said I wasn't saying he did or he didn't.
26       Q    Okay.  When you say you can't testify as to whether
27   he did or he didn't, you just don't know?  Is that your
```

1  answer?

2     A    No, I'm not going to answer that question because

3  that's really beyond the -- that's actually privileged

4  information as to whether I met with him, what I discussed

5  with him, or where I met with him.

6           ATTY. PROTO:  Well, Your Honor, I don't see how

7        I can fully explore the points that are being made

8        by the Petitioner's counsel.

9           THE COURT:  What is the area of difficulty that

10       you perceive?

11          ATTY. PROTO:  Well, it -- it seems to me, Your

12       Honor, that this is all being offered for the

13       purpose of showing that what was in the file when

14       Mr. Eisenmann turned it over, or at least for a

15       period of time after Mr. Eisenmann turned the file

16       over, that what is -- the suggestion is that what is

17       in the file now is what was in the file then.

18          THE COURT:  Well, Attorney Eisenmann testified

19       in this case, and you can certainly recall him and

20       go directly to the source rather than asking

21       Counsel.

22          ATTY. PROTO:  No further questions, Your Honor.

23          THE COURT:  Any redirect?

24          ATTY. COUSINS:  Yes, Your Honor.

25  REDIRECT BY ATTY. COUSINS:

26     Q    Attorney Sullivan --

27          THE COURT:  Make sure -- you have to be --

```
1            because of the recording system is activated by your

2            voice.

3       Q   Attorney Sullivan, when Mr. Eisenmann testified in

4  this proceeding, you were present?

5       A   Yes, I was.

6       Q   And you accompanied him here?

7       A   Yes, I did.

8       Q   And you had a file with you?

9       A   Yes, I did.

10      Q   Was it his file?

11      A   Yes, it was.

12      Q   And you had the original file with you?

13      A   The same one that just went into evidence, yes.

14      Q   And was there a copy of that file in the courtroom

15 at the time, too?

16      A   Yes.

17      Q   That he used during his testimony?

18      A   Yes.

19      Q   It was an exact copy of the original file?

20      A   Well, actually I believe he brought the original

21 file up with him, not a copy.  He brought the original up

22 with him.

23      Q   Attorney Sullivan, when Mr. Eisenmann was

24 testifying, he was testifying from the exhibit which is now

25 Exhibit 183, the original file.  Is that correct?

26      A   Yes.

27      Q   Thank you.
```

```
 1              ATTY. COUSINS:  Nothing further.
 2              THE COURT:  Let me just ask Counsel for
 3         Attorney (sic) Birch.
 4              ATTY. OFGANG:  No questions, Your Honor.
 5              THE COURT:  Okay.  Go ahead.
 6  RECROSS BY ATTY. PROTO:
 7     Q   Attorney Sullivan, Mr. Eisenmann brought Exhibit 183
 8  to the stand with him because you gave it to him.  Is that
 9  correct?
10     A   That's correct.  I had it with me --
11     Q   But you brought it --
12     A   -- and I gave it to him.
13     Q   So you brought it from your office and gave it to
14  him, and he brought it up to the stand.
15     A   Correct.
16     Q   So the -- when he testified with the exhibit, it was
17  in the condition that it was in when you gave it to him,
18  correct?
19     A   It was in the condition it was when it came out of
20  my locked cabinet.  He had that with him that day.
21     Q   Okay.  And that was a couple weeks ago or a week ago
22  or so, correct?
23     A   A few weeks ago.
24     Q   And prior to that, had it been removed from the
25  cabinet for any -- any reason?
26     A   I really can't answer that question.  I'd have to
27  assert the privilege again as to whether or not it was
```

1  removed to meet with Mr. Eisenmann.  I can testify that I

2  did not remove that -- that file.  It had just come into our

3  custody.  The original file had just come into our custody

4  in the last couple of months.  Prior to that, it was in

5  archives with Iron Mountain.

6      Q   Okay.  I'm sorry then, maybe I misunderstood.  I

7  thought you said in 2010 it came back from archives.

8      A   It did, and then we sent it back to archives.  It

9  came back, we made a copy as the testimony has been; and

10 then once that had been completed, we sent the file back to

11 archives so it didn't sit in my office for five years.  It

12 went back to archives, and it only came back in the last

13 couple of months, in that --

14     Q   Okay.  Okay.  I'm not asking you whether you spoke

15 to Mr. Eisenmann or whether you removed it to discuss with

16 him.  I just want to know, after it came back to you from

17 archives the last time, in the past couple of months, it

18 went into your locked drawer?

19     A   Yes.

20     Q   And did it come out of that locked drawer for any

21 reason prior to the day that Mr. Eisenmann testified here?

22          THE COURT:  Excluding discussions with or given

23      to Attorney Eisenmann.

24          ATTY. PROTO:  For any reason.  No, not for any

25      particular reason.

26     Q   Did it ever come out of that -- did the door -- did

27 the -- did the cabinet ever open up to take that file out?

```
 1              THE COURT:  With regard to anybody except for a
 2         request involving Attorney Eisenmann.
 3              ATTY. PROTO:  Right.
 4    A    No.  It did not.
 5              ATTY. PROTO:  Nothing further, Your Honor.
 6              ATTY. COUSINS:  Nothing further, Your Honor.
 7              THE COURT:  Is the witness free to leave then?
 8              ATTY. COUSINS:  She is.
 9              THE COURT:  Okay.  You may leave.  Thank you.
10         Do you have the exhibit there?
11              ATTY. OFGANG:  Your Honor?
12              THE COURT:  Yes.
13              ATTY. OFGANG:  Petitioner Ralph Birch would
14         like to call Attorney John Davenport.  My co-counsel
15         is getting him.  He was out --
16              THE COURT:  Okay.
17              ATTY. OFGANG:  Your Honor, the Petitioner at
18         this time would like to call John Davenport.
19              THE COURT:  Okay.  Counsel, if you'd step right
20         up here next to the witness box and face the clerk.
21
22
23
24
25
26
27
```

1          J O H N   J.   D A V E N P O R T, 400 Grand Street,

2              Waterbury, Connecticut, duly sworn by the clerk,

3                  testified under oath as follows:

4              THE COURT:  You may be seated.  You may

5          inquire.

6  DIRECT BY ATTY. OFGANG:

7      Q   Good morning, Mr. Davenport.

8      A   Good morning.

9      Q   Can you tell me what your current employment is?

10     A   I work for the State of Connecticut.  I'm a

11  Supervisory Assistant State's Attorney at Waterbury GA4.

12     Q   And how long have you been in that position?

13     A   I've been in that position five years.

14     Q   And before taking that position, what was your

15  employment?

16     A   I was with the State as an Assistant State's

17  Attorney then Senior Assistant State's Attorney.

18     Q   And how long have you been working in the State's

19  Attorney's Office?

20     A   23 years.

21     Q   Prior to joining the State's Attorney's Office, what

22  was your employment?

23     A   I worked at the law firm of Moynahan, Ruskin,

24  Mascolo, Minella and Mariani.

25     Q   And where was that firm located?

26     A   In Waterbury, Connecticut.

27     Q   And how long did you work there?

```
 1      A    Approximately three years.

 2      Q    From when to when?

 3      A    1980- -- late '89 until late '92.

 4      Q    Do you have -- do you recall handling the direct

 5  appeal for the case State v. Ralph Birch?

 6      A    I worked on that appeal, yes.

 7      Q    Do you recall arguing it before the Supreme Court?

 8      A    I did.

 9      Q    Do you have any recollection of drafting the brief?

10      A    Not any direct recollection.  I -- I believe that I

11  was a signature on that.  I believe I contributed to the

12  brief.

13      Q    Did you retain any of the case files after you left

14  the Moynahan Law Firm?

15      A    I did not.

16      Q    Do you have any documents in your possession related

17  to the -- the Birch appeal?

18      A    I do not.

19      Q    Do you have any recollection of picking up the trial

20  attorney case file?

21      A    I do not.

22      Q    Do you have a recollection of meeting with Alfred

23  Mencuccini -- Attorney Alfred --

24      A    I have a general recollection of meeting with him,

25  but specifics, I couldn't tell you what they were.  I also

26  believe that he was involved in a second appeal that I

27  worked on, and I may be confusing the two, but I do remember
```

1    meeting with him at some point.

2        Q    Do you remember meeting with him more than once?

3        A    No.  I -- I -- I just don't remember.

4        Q    Okay.  And the second appeal you're referring to was

5    handled while you were at Moynahan Law Firm as well?

6        A    That's correct.

7        Q    Was the Ralph Birch appeal your first time appearing

8    before the Supreme Court?

9        A    It was.

10        Q    And would you have filed the brief without reviewing

11    the entire case file?

12        A    I can't imagine that I would have.

13        Q    It being your first case arguing before the Supreme

14    Court, do you imagine you would have been particularly

15    meticulous?

16            ATTY. PROTO:  Objection.  Speculation, Your

17        Honor.

18            THE COURT:  Do you claim it?

19            ATTY. OFGANG:  I can rephrase it, Your Honor.

20            THE COURT:  Okay.

21        Q    Without speculating, can you describe what your

22    general practice would've been?  Had you been arguing before

23    the Supreme Court for the first time, would you have been

24    particularly meticulous?

25        A    As a young associate, I can't imagine that I was not

26    meticulous in my preparation.

27        Q    Was it your general practice to make sure that you

1    had a trial file to review during brief writing?

2        A    I couldn't speak to a general practice having only

3    argued two appeals.  I believe I would not have gone forward

4    without some or all of the trial file.

5        Q    Do you have a recollection of going to the Appellate

6    Unit of the Chief Public Defender's Office to retrieve a

7    case file?

8        A    I do not.

9        Q    And as a general practice at the Moynahan Law Firm,

10   were you made aware of the importance of maintaining the

11   integrity of case files in -- at -- in the possession of the

12   law firm?

13       A    I think that was left to our own independent

14   judgment.  I don't remember being taught that there.

15       Q    But was it your practice to maintain the integrity

16   of case files?

17       A    I took care of all my files.  I handled a great

18   number of criminal files while I was at that law firm.

19       Q    And when you were assigned a case as an associate at

20   that law firm, would you review the case file?

21       A    Yes.

22       Q    And what were your assignments at the law firm?

23       A    I handled all criminal assign- -- criminal cases

24   that were brought into the firm to defend unless -- I had a

25   couple of other people that helped me, but primarily I was

26   responsible for representing all the criminal clients at the

27   firm.

1    Q    And was it ever your practice while at the Moynahan

2    Law Firm to permanently remove documents from case files in

3    your possession?

4    A    No.

5    Q    Do you have a recollection of ever permanently

6    removing a document from a case file on which you were

7    working?

8    A    No.

9    Q    Do you recall removing any materials at all

10    including perhaps investigative memoranda or trial attorney

11    work product or dictations from any file?

12    A    No.

13    Q    After your completion of an appeal, what would you

14    do with a client's case file?

15    A    The file would be just turned over to the

16    secretaries and they would do whatever they had to do.

17    Understand that Mr. Moynahan was the primary focus of the

18    material coming to the law firm.

19    Q    And you have no recollection of arranging for the

20    file to go back to --

21    A    No.

22            ATTY. OFGANG:  Your Honor, may I have a moment?

23            THE COURT:  Yes.

24            ATTY. OFGANG:  No further questions, Your

25        Honor.

26            THE COURT:  Counsel for Attorney (sic) Henning,

27        any questions?

```
 1              ATTY. COUSINS:  No questions.
 2              ATTY. PROTO:  Just some very brief questions,
 3       Your Honor.
 4              THE COURT:  Yes.
 5  CROSS-EXAMINATION BY ATTY. PROTO:
 6       Q   Good morning, Mr. Davenport.
 7       A   Good morning.
 8       Q   You -- when did you leave the Moynahan Law Firm
 9  again?
10       A   In August of 1992.
11       Q   Okay.  And you said you contributed.  I think if --
12  if I remember your words correctly, you contributed to the
13  brief in the Birch case.
14       A   Correct.
15       Q   So does that mean that there were other people who
16  worked on the brief as well?
17       A   I believe, as I recall, Mr. Moynahan and I both
18  signed the brief.
19       Q   Okay.  And you said that Mr. Moynahan was the
20  primary focus.  Can you just elaborate on what you meant by
21  that?
22       A   Sure.  My understanding and my recollection is that
23  the Chief Public Defender at the time had asked Mr. Moynahan
24  to take on this appeal pro bono, which Mr. Moynahan agreed
25  to do, and so at some point after that conversation I was
26  asked to work on the file.
27       Q   Okay.  And when was the last time that you actually
```

1  saw the file?

2     A   I have no idea.  It would certainly have been

3  sometime before I left the law firm in '92, but I have no

4  independent recollection of when the last time I saw the

5  file was.

6     Q   And -- and according to your testimony, you would've

7  just turned it over to -- or -- or somebody that you or Mr.

8  Moynahan would have turned it over to the secretary.

9     A   Yeah, to whoever was handling the -- the filing at

10 that time, yes, sir.

11    Q   And do you have any knowledge of what would happen

12 to it thereafter?

13    A   No, I don't.

14          ATTY. PROTO:  No further questions, Your Honor.

15          THE COURT:  Any redirect?  Counsel, any

16      redirect?

17          ATTY. OFGANG:  A moment to consult with co-

18      counsel?

19          THE COURT:  Yes.

20          ATTY. OFGANG:  No further questions, Your

21      Honor.

22          THE COURT:  Any need to retain the witness?

23          ATTY. OFGANG:  No, Your Honor.

24          THE COURT:  You're free to leave.  Thank you.

25          THE WITNESS:  Thank you, Your Honor.

26          ATTY. OFGANG:  Your Honor, at this time,

27      Petitioner Ralph Birch would like to call Attorney

1        Temmy Miller.

2            THE COURT:  Okay.  Counsel -- and I would

3    indicate that this witness also has handled habeas

4    cases in front of me.  Okay?  Go ahead.

```
1              T E M M Y   A N N   M I L L E R, 2275 Silas Deane
2              Highway, Rocky Hill, Connecticut, duly sworn by the
3                   clerk, testified under oath as follows:
4              THE COURT:  Okay.  You may be seated.  You may
5         inquire.
6    DIRECT EXAMINATION BY ATTY. OFGANG:
7         Q    Good morning, Attorney Miller.
8         A    Good morning.
9         Q    Can you tell me what your current employment status
10   is?
11        A    I'm employed with the Division of Public Defender
12   Services.
13        Q    And what's your title?
14        A    I'm the Resource Attorney for habeas corpus matters
15   for the Office of the Chief Public Defender.
16        Q    And how long have you been in that role?
17        A    Since approximately June of 2013.
18        Q    And prior to taking on that position, what was your
19   former employment?
20        A    I was the Chief of Habeas Corpus Services for the
21   Office of the Chief Public Defender.
22        Q    And when -- from when to when were you in that
23   employment?
24        A    I had that title from approximately 1999 or 2000
25   until 2013 -- yes, 2013.
26        Q    And prior to it -- so you supervised the Habeas Unit
27   from -- from '99 to 2013?
```

1    A    I supervised the Habeas Unit from 1991 through

2    December 1st of 1992, and again from mid April or mid May of

3    1996 continuously through 2005, and then again 2010 to 2013.

4    Q    And let's just -- I'm -- I'm going to just parse

5    out.  So you said from '92 to '93?

6    A    December 1, 1992.

7    Q    And during the time that you were not supervising,

8    were you otherwise employed within the Public Defender's

9    Office?

10    A    Yes.  I was employed with the Legal Services Unit of

11    the Office of the Chief Public Defender, except from 1994 to

12    '96 I was with the Public Defender's Office for the New

13    Haven JD.

14    Q    And going back to your time as Supervisor of the

15    Habeas Units, what were your job responsibilities?

16    A    I was responsible for supervising the personnel of

17    the Habeas Corpus Unit and ensuring compliance with the

18    rules of professional responsibility.  I was also generally

19    responsible for contact with Special Public Defenders in

20    that role, those being attorneys contracting with the

21    Division of Public Defender Services to handle cases that

22    were not being handled in house.

23    Q    And is it correct that Special Public Defenders are

24    also known as Assigned Counsel?

25    A    They are now known as Assigned Counsel.

26    Q    And just to clarify, in -- within your

27    responsibilities, were you responsible for ensuring that

1  personnel maintained case files in accordance with the rules

2  of professional ethics?

3      A   Yes, I was.

4      Q   Do you have any specific recollection of the Ralph

5  Birch case?

6      A   I have specific recollections of the transfer of the

7  case to the Connecticut Innocence Project.  I have a

8  specific recollection of a few other aspects of the case

9  such as the transfer of the case to a Special Public

10 Defender.

11     Q   Can you tell me what you recall about the transfer

12 of the case to the Connecticut Innocence Project -- what you

13 remember?

14     A   I remember a conversation with then Attorney Karen

15 Goodrow, now Judge Goodrow.  She was interested in handling

16 the case, and I do remember that she took over

17 responsibility for the case and materials that were

18 available within the Habeas Corpus Unit were physically

19 transferred to her.

20     Q   And do you have a sense of approximately when that

21 occurred?

22     A   I believe it was 2001 or perhaps -- I have a -- I

23 think it was between 2001 and the end of 2003.  I don't know

24 exactly when.

25     Q   And did you review any of the records on file at the

26 Habeas Unit related to the Birch case in preparation for --

27 for testimony today?

1    A    I reviewed some records concerning the -- when

2    the attorn- -- when the case came into the Habeas Corpus

3    Unit and what attorneys represented Mr. Birch.

4    Q    Do you have -- based on that review, do you have a

5    recollection of when the attor- -- when the file came into

6    the Habeas Unit -- around when?

7    A    It was a 1992 case, and I know it came into the

8    office in 1992.  I know what the records say as far as the

9    date.  I don't have a specific independent recollection of

10   the date.

11   Q    And so other than this general recollection about

12   the case, you don't have any specific recollection of the

13   case file transfers in the Birch case, other than what we

14   just discussed.

15   A    No, I have no other specific recollection.

16   Q    The general practice at the Habeas Unit related to

17   assignment of cases.  Could you -- could you speak to that a

18   little bit about how cases were assigned to the Habeas Unit?

19   A    Sure.  Cases were filed -- habeas corpus cases were

20   filed pro se with the Court in various jurisdictions

21   throughout the state, principally Rockville and New Haven

22   and Hartford.  Those were the locations the Habeas Corpus

23   Unit handled generally.  The Court after -- the -- the

24   petition, would refer the case to the Office of the Chief

25   Public Defender, the Habeas Corpus Unit; and at one point, I

26   believe it was prior to 1995, the Habeas Corpus Unit would

27   examine the case, and absent indications to the contrary the

1   office operated on the principle that individuals who had

2   been incarcerated did not have sufficient resources to hire

3   attorneys absent indications to the contrary, and the office

4   would file an appearance on behalf of -- let me specify --

5   from 1991 to 1992, the office would file an office

6   appearance, and this also applies to 1996 moving forward --

7   file an office appearance on behalf of the petitioner.  The

8   case would be examined to determine whether it would be

9   handled in house or would be referred to a Special Public

10  Defender for representation.  If it was being referred to a

11  Special Public Defender, a member of the office would ask a

12  specific attorney to -- a specific Special Public Defender

13  to handle the case, and that was done -- and I can't

14  remember exactly the -- whether this was the case in '96

15  going forward, as well as '91 and '92 or not.  The request

16  to the Special Public Defender would be made by a letter

17  once it was determined that a Special Public Defender was

18  necessary and there was reason to believe a particular

19  Special Public Defender was available for that case.  The

20  secretary in the office would send a letter to that

21  perspective Special Public Defender asking -- naming the

22  case and the attorney who had previously represented the

23  petitioner and asking if the perspective Special Public

24  Defender was aware of a potential conflict of interest or

25  whether that attorney would accept the case.  If the

26  Special -- if the perspective Special Public Defender was

27  willing to accept the case, that attorney filed an

1  appearance in lieu of the Habeas Corpus Unit and the file

2  was transferred to that attorney.

3      Q    And so there would be a transfer of the trial

4  attorney case file between the Habeas Unit to the SPD -- the

5  Special Public Defender.

6      A    There'd be a transfer of the Habeas Corpus Unit file

7  which might or might not include the trial attorney's file.

8      Q    But if -- if in -- if in a case it did include a

9  trial attorney file, the Habeas Unit would transfer that

10  file over to the Special Public Defender who was assigned.

11      A    Would transfer that file, either the original or a

12  copy.  I -- I can't now recall whether we routinely sent the

13  original file.  I believe that we did and retained a copy of

14  that file.  The reason for that was the original file was

15  the evidence of what the attorney had, perhaps didn't have,

16  or what the attorney did, and sometimes additional

17  information could be gleaned from the original as opposed to

18  a photocopy.  The indication that notes might've made --

19  be -- been made on a different date, that sort of thing.

20      Q    Were there ever circumstances where an in-house

21  Habeas Unit attorney would handle a case for a while and

22  then it would get assigned out?

23      A    Yes.

24          ATTY. PROTO:  I'm going to object, Your Honor,

25          relevance to this case in particular.

26          ATTY. OFGANG:  Your Honor, we're trying to

27          establish -- the witness has said she doesn't have a

```
 1              specific recollection of this case.  We're trying to
 2              establish general practices.
 3                   THE COURT:  I'll allow it.
 4      A    Yes, there were occasions where it was originally
 5    believed that the case would be handled throughout its
 6    entirety by one of the lawyers in the Habeas Corpus Unit,
 7    and then for one reason or another a Special Public Defender
 8    took over the case.
 9      Q    In those instances, would it happen that the
10    original file would be retained and a photocopy would go
11    out?  Would that be a possibility of the trial attorney
12    file?
13      A    It certainly -- yes, as I said, I believe that some
14    original files went out, but I do know there was a practice
15    at some point of sending copies of the file.
16      Q    And at all times during case file transfers, was the
17    personnel at the Habeas Unit aware of maintaining the
18    integrity of a trial case file, be it a copy of the original
19    or the original itself?
20                   ATTY. PROTO:  Objection, Your Honor.  I believe
21              the question is were other people aware of things,
22              and I would object to that.  It's hearsay.
23                   THE COURT:  Yes.
24      Q    And based on your institutional knowledge of the
25    Habeas Unit and in your capacity as supervisor, to your
26    knowledge, were personnel made aware of the importance of
27    maintaining the integrity of trial attorney case files as
```

1  they are transferred, be they original copies of the case

2  file or a photocopy?

3          ATTY. PROTO:  Still the same objection, Your

4      Honor.

5          THE COURT:  Well, I'll allow it.

6    A    Yes, I was aware of that information being

7  communicated to the staff of the Habeas Corpus Unit, both as

8  to internal files and files going out to Special Public

9  Defenders.

10   Q    And to your knowledge, was the Habeas Unit made

11  aware of the importance of preserving the underlying record

12  particularly in habeas cases?

13   A    Yes, I --

14          ATTY. PROTO:  Same objection, Your Honor.

15          THE COURT:  Overruled.  You may answer.

16   A    I particularly provided that information to the

17  staff because in habeas corpus cases, and to a certain -- in

18  habeas corpus cases, one is trying to represent the

19  petitioner.  One is trying to reconstruct what has happened

20  at a previous date, and so the integrity of the file was

21  very important both for the cases handled in house, and I

22  believed that it was very important to maintain the

23  integrity of materials going to Special Public Defenders so

24  that they logically were doing the same reconstruction.

25   Q    Was it a policy at any time during your tenure at

26  the Habeas Corpus Unit for personnel to permanently remove

27  documents from case files within the possession of the

1  office?

2     A   Absol- --

3           ATTY. PROTO:  Objection, Your Honor.  It's

4          irrelevant as to this case.  I'm not sure there's a

5          foundation been laid for that.

6           THE COURT:  Based on the foundational argument,

7          I will overrule the objection.  You may answer.

8     A   It was not the practice that individuals in the

9  Habeas Corpus Unit would permanently remove items from a

10  case file.

11     Q   Where would case files be stored at the office?

12     A   The files, whether they were ultimately going to go

13  out to a Special Public Defender or whether they were being

14  handled in house, were stored in filing cabinets in the

15  office.  If no member of the Habeas Corpus Unit was

16  physically in the office, the office itself was locked.

17     Q   Would it be customary for personnel to open files if

18  not necessary?

19     A   No.  Each attorney in the office was handling his or

20  her own habeas corpus cases.  Cases that were going to

21  Special Public Defenders remained in the cabinet.  Any

22  materials we received related to those, which were usually

23  received in boxes that had been sealed during the

24  transmission -- for the transmission, those boxes were

25  maintained in the Habeas Corpus Unit, and the practice was

26  those boxes weren't even opened.  The boxes were received,

27  generally as I say, sealed, were placed in the office, and

1  the Special Public Defender typically would come pick up

2  that box.

3      Q   Would it be exceedingly unusual for documents to be

4  permanently removed from a trial attorney's file that was in

5  the possession of the Habeas Unit?

6              ATTY. PROTO:  Objection, Your Honor.

7         Speculation.

8      Q   Without speculating --

9              THE COURT:  I think it's not speculating to a

10             future event.  It's a description of past custom and

11             practice?

12             ATTY. OFGANG:  Yes.

13             THE COURT:  I'll allow that.

14             ATTY. OFGANG:  Do you want me to --

15     A   It would have been beyond extraordinary for a

16 document to be permanently -- permanently removed from a

17 trial attorney's file.  The importance of maintaining the

18 trial attorney's file was well understood by all members of

19 the Unit.

20             ATTY. OFGANG:  Thank you.  Can I have a moment,

21        Your Honor?

22             THE COURT:  Yes.

23     Q   Can you describe what the normal practices would be

24 for obtaining a trial attorney case file once a case was

25 initiated at the Habeas Unit?

26     A   Certainly.  A member of the office would either

27 contact the petitioner by letter or personally visit the

```
 1   petitioner.  At that time, I believe virtually all
 2   petitioners received a personal visit from the paralegal in
 3   the office.  The petitioner would be asked to sign releases
 4   authorizing the trial attorney to transfer the file to the
 5   Unit, also releases to receive other types of information.
 6        Q   And then from there, how would the Habeas Unit
 7   affect the --
 8        A   The Habeas Unit would then write to trial counsel
 9   enclosing a copy of the release requesting the file.  In
10   some cases, the file was promptly delivered to the Habeas
11   Corpus Unit.  In other cases, the Habeas Corpus mem- -- a
12   member of the Habeas Corpus Unit would go to the trial
13   attorney's file to pick up the file and there were some
14   occasions where there was a delay in receiving the file
15   because the trial attorney did not initially respond to the
16   request.  In those cases, there was a follow up request and
17   in most cases that follow up request produced the file.
18   There were some occasions, rare, where the Unit filed a
19   motion that was styled as a motion for supervisory order.
20   That motion asked the Court to schedule a hearing at which
21   the trial attorney could appear and explain to the Court why
22   the file had not been forwarded to the Habeas Corpus Unit.
23             THE COURT:  Was that usually with private
24        counsel?
25             THE WITNESS:  Yes.  The Habeas Corpus Unit did
26        not handle cases involving public defenders at that
27        time -- public defenders as trial counsel.
```

```
 1                    ATTY. OFGANG:  One moment.

 2                    THE COURT:  Yes.

 3                    ATTY. OFGANG:  No further questions, Your

 4          Honor.

 5                    THE COURT:  Okay.  Counsel for Mr. Henning, any

 6          questions?

 7                    ATTY. COUSINS:  No questions.

 8                    THE COURT:  Respondent?

 9                    ATTY. PROTO:  Again, Your Honor, very briefly.

10                    THE COURT:  Yes.

11   CROSS-EXAMINATION BY ATTY. PROTO:

12     Q   Attorney Miller, correct me if I'm wrong.  Is my

13   understanding correct that your memory with res- -- specific

14   re- -- specifically with respect to Mr. Birch's case and his

15   file is limited to a transfer at the time that it went to

16   Attorney, now Judge Goodrow?

17     A   I wouldn't say that's the total.  That is the

18   primary memory I have.  I have memory of certain other

19   general -- certain other events that are not atypical, but I

20   do remember a few things.

21     Q   Okay.  At that time -- let's -- let's focus just on

22   that -- that transfer.  Is that something that you sort of

23   orchestrated administratively or did the file ever

24   physically come into your personal possession?

25     A   There was a file at the Habeas Corpus Unit that --

26   physically present at the Habeas Corpus Unit that was

27   transferred to then Attorney Goodrow.
```

1    Q    Okay.  But not through your hands.  Is that correct?

2    A    I have no specific recollection of whether I hand

3    delivered it or whether then Attorney Goodrow came to the

4    office to pick it up or whether it was transferred by some

5    other mechanism.

6    Q    Okay.  And is it -- am I correct to understand that

7    there was no inventory of the documents in the file done

8    prior to its transfer to Attorney Goodrow?

9    A    That's correct.

10   Q    Okay.  And when it came -- are you familiar with the

11   time when it came back to your office?

12   A    I am aware that it went to the Connecticut Innocence

13   Project, and I believe that it stayed with the Innocence

14   Project, but the Innocence Project and the Habeas Corpus

15   Unit merged after I became the Resource Attorney and was no

16   longer supervisor of the office -- the Habeas Corpus Unit.

17   Q    Was the -- did the actual file go to the Innocence

18   Project or did a copy of the file go to the Innocence

19   Project?

20   A    I have no specific recollection of whether it was a

21   copy or an original.

22   Q    Okay.  And from the time that the file was turned

23   over from Mr. Eisenmann to the Office of the Public

24   Defender --

25   A    Excuse me --

26           ATTY. OFGANG:   Objection.

27   A    I do not believe that Attorney Eisenmann turned over

1  the Birch file.  As I recall, Mr. Birch was represented by

2  Attorney Al Mencuccini.

3      Q   My apologies.  I -- I'm easily confused.  From the

4  time that the file was turned over by Mr. Mencuccini to the

5  office to the time that you transferred it to Attorney, now

6  Judge Goodrow, have you seen that file personally?

7              ATTY. OFGANG:  Objection, Your Honor.  Outside

8          the scope of direct.  She never testified that

9          Alfred Mencuccini deposited the file at the office.

10             THE COURT:  I'll allow the question if you

11         recollect if you physically saw it.

12     A   I don't have a specific recollection.

13     Q   Okay.  So are you able to say that at the time the

14  file was turned over to Judge Goodrow that it was in fact in

15  the same exact situation that it had been when Mr.

16  Mencuccini had it?

17     A   No.

18     Q   Okay.

19             ATTY. PROTO:  No further questions, Your Honor.

20             THE COURT:  Any redirect?

21             ATTY. OFGANG:  A moment, Your Honor.

22             THE COURT:  Okay.

23  REDIRECT BY ATTY. OFGANG:

24     Q   Again, was it the general practice of the Habeas

25  Unit not to tamper with a trial counsel file?

26             ATTY. PROTO:  Objection.  Beyond the scope of

27         cross.

```
1              THE COURT:  Well, I'm not sure.  In what way is
2          it beyond the scope of --
3              ATTY. PROTO:  Well, I -- I didn't ask anything
4          about general policies and tampering with files,
5          Your Honor.
6              THE COURT:  All right.  I'll sustain the
7          objection.  I think she's already testified as to
8          the practices.
9      Q   Would there be any reason for a Habeas Unit attorney
10  to permanently remove a document from a trial counsel file
11  that came into its possession?
12             ATTY. PROTO:  Same objection, and it's been
13         asked and answered.
14             THE COURT:  Well, that calls for speculation.
15         I'll sustain the objection.
16             ATTY. OFGANG:  One moment, Your Honor.
17             THE COURT:  Okay.
18             ATTY. OFGANG:  No further questions.
19             THE COURT:  Okay.  Counsel for Attorney (sic)
20         Henning, any questions?
21             ATTY. COUSINS:  No questions.
22             THE COURT:  Respondent?
23             ATTY. PROTO:  Nothing, Your Honor.
24             THE COURT:  Any need to retain the witness?
25             ATTY. COUSINS:  No.
26             THE COURT:  You're free to leave.  Thank you.
27             THE WITNESS:  Thank you.
```

```
 1              THE COURT:  Nice to see you again.

 2              THE WITNESS:  Good to see you, Judge.

 3              THE COURT:  This would be the time we normally

 4      take our morning break.  Is that good for the

 5      parties?  All right, then we'll take our morning

 6      break, about ten, fifteen minutes.

 7              ATTY. PROTO:  Thank you.

 8              ATTY. OFGANG:  Thank you, Your Honor.

 9                          (Recess)

10              THE COURT:  Good afternoon.  Yes?

11              ATTY. O'SHEA:  Good afternoon, Your Honor.  The

12      Petitioner calls Ralph Birch.

13              THE COURT:  Okay, sir.  We're going to have you

14      stand right over here next to the witness box and

15      face the clerk.

16

17

18

19

20

21

22

23

24

25

26

27
```

```
 1              R A L P H   J O S E P H   B I R C H, 137220, Osborn

 2              Correctional Institution, Somers, Connecticut,

 3                  duly sworn by the clerk, testified under

 4                              oath as follows:

 5              THE COURT:  Okay.  You may inquire.

 6              ATTY. O'SHEA:  Thank you, Your Honor.

 7   DIRECT EXAMINATION BY ATTY. O'SHEA:

 8       Q   Good afternoon, Mr. Birch.

 9       A   Hello.

10       Q   How old are you?

11       A   48.

12       Q   And do you have any siblings?

13       A   Yes.  I've got four half siblings and several step

14   siblings.

15       Q   And --

16              ATTY. CARLUCCI:  Judge, could I just interject?

17          Could you ask the witness to keep his voice up,

18          please?

19              THE COURT:  Yes.  Mr. Birch, you can move that

20          microphone closer to you if it's easier to get your

21          voice in there, okay?  And Attorney Carlucci, are

22          you going to be doing the examination -- cross-

23          examination?

24              ATTY. CARLUCCI:  Yes, Judge.

25              THE COURT:  Then do you want to take a seat

26          over here --

27              ATTY. CARLUCCI:  If -- if you would prefer,
```

```
1              Judge, sure.

2              THE COURT:  -- so we don't have the problems

3         that we encountered with other witnesses.

4    DIRECT CONTINUED BY ATTY. O'SHEA:

5    Q   And where do your parents live?

6    A   My father is -- well, my biological father and my

7    stepfather are both deceased, and my mother lives in New

8    Hampshire.

9    Q   And where did you grow up?

10   A   I grew up in New Milford until I was 13, and then I

11   moved to Charlestown, New Hampshire.  I lived there until I

12   was 17, then I went to Virginia briefly and then came back

13   to New Milford.

14   Q   And why did you go to New Hampshire?

15   A   Because my parents wanted to move up there.  They

16   moved up there, wanted to get away.  They didn't like the

17   hectic pace down here.  They wanted to go up and live up on

18   a mountain.

19   Q   And why did you -- withdrawn.  How old were you when

20   you left New Hampshire?

21   A   When I left New Hampshire?

22   Q   Yes.

23   A   17.

24   Q   And why did you leave New Hampshire?

25   A   I didn't like it up there.  I wanted to be more in

26   the city.  I wanted to be around people.  We -- we were two

27   miles away from our nearest neighbor up there.  It was like
```

1   very secluded.

2       Q    And when you moved to New Milford -- when you

3   returned back to New Milford, when was that?

4       A    What year?

5       Q    Yes.

6       A    1985, I believe.

7       Q    And how -- how old were you at that point?

8       A    17.  It was either the beginning of '85 or the end

9   of '84 I came back.

10      Q    And who did you live with when you went to New

11  Milford?

12      A    I lived with my grandmother for a little bit, and my

13  brother -- my half-brother a little bit.

14      Q    And -- and what's your half-brother's name?

15      A    John.  We call him Butch -- John.

16      Q    And what was his -- was he married?

17      A    Excuse me?

18      Q    Was he married at the time?

19      A    Yes, he was.

20      Q    What was his wife's name?

21      A    Pam.

22      Q    And did you end up leaving their apartment -- or

23  their house?

24      A    Yes, I left there.  I lived in a basement apartment

25  that I was supposed to be remodeling for somebody --

26      Q    And when was that?

27      A    -- I worked with.  Excuse me?

1    Q    When was it that you moved into that apartment?

2    A    Sometime summer of '85.

3    Q    I'm sorry, when was that?

4    A    Like summer of '85, maybe fall of '85.

5    Q    And what was the -- I think -- believe -- I believe

6    you mentioned this earlier, but what was the arrangement

7    for -- for rent there?

8    A    I was doing remodeling.  I was turning the basement

9    into an apartment building -- put building partitions in,

10   putting in a bathroom down there.  I was supposed to be

11   remodeling it into a -- a livable, basement apartment.

12   Q    And did you end up leaving that apartment?

13   A    Yes.

14   Q    And when was that?

15   A    Shortly before Thanksgiving of '85.

16   Q    And where did you live after that?

17   A    For a little while, I was home- -- I was homeless,

18   basically.

19   Q    So where did -- where did you sleep?

20   A    Sometimes I slept at the pavilion on Young's Field.

21   Sometimes I slept in a tent that I had.  Sometimes I slept

22   in a car that we stole.

23   Q    So turning to the car, is that the Buick that was at

24   issue in your criminal trial?

25   A    Yes.

26   Q    And when did you -- when did you take that vehicle?

27   A    Thanksgiving Day of '85.

1    Q    And at the time around this time period, how much

2    money did you have?

3    A    None.  No money.

4    Q    And how -- how many possessions did you have?

5    A    Nothing that wouldn't fit in a little bag or a

6    backpack that I carried.

7    Q    And did you -- did you own a coat at that time?

8    A    Yes.  I got a coat from my mother when I went to New

9    Hampshire.  I did -- before that, I had a leather jacket

10   that was all ripped up.

11   Q    And was that coat that you received your -- from

12   your mother, was that the one that -- that was taken by the

13   police from you on December 5th of 1985?

14   A    Yes, it is.  Yes, it is.

15   Q    When did you first meet Tina Yoblonski?

16   A    I knew her when I was a kid in like first grade or

17   second grade, and she was in the same class as I was in.

18   And then I never really had any contact with her growing up

19   until I was 13 after that, and then I met her again when I

20   came back.  She remembered me.  I didn't even really

21   remember her when I met her.  She remembered me from when we

22   were kids.

23   Q    And did you become friends with her in 1985?

24   A    Yes.

25   Q    And when did you first meet Shawn Henning?

26   A    I'm going to say either late September, early

27   October, somewhere in there of '85.

```
1       Q    And how did you meet him?

2       A    He was Tina Yoblonski's boyfriend.

3       Q    And until this trial started on November 2nd of this

4  year, when was the last time that you saw or -- or spoke

5  with -- had any contact with Shawn Henning?

6       A    1994.  We left Somers together.  He went to one

7  institution, I went to another, and then I seen him briefly

8  for like ten seconds when Karen Goodrow came to see both of

9  us.  I seen him briefly.  We passed in the hallway.

10      Q    And when approximately was that?

11      A    Say 2004 or some- -- '05 -- somewhere in there.

12      Q    And other than the one brief moment of contact, have

13  you spoken with him and exchanged letters or communicated in

14  any way since you went to different institutions in 1994?

15      A    No, we haven't.  That was -- Karen made it clear

16  that -- I'm sorry, Miss Goodrow made it clear that she

17  didn't want us to be in contact in any way.

18      Q    And do you know Steve McDonald?

19      A    Yes, I do.

20      Q    When's the last time you spoke with him?

21      A    I think '95, I think.

22      Q    And where was that?

23      A    At MacDougall Correctional.

24      Q    And other than at this trial when you saw him

25  testify, have you had any contact with him since that time

26  in 1995?

27      A    Other than the Innocence Project contacting him, no.
```

1   Me, personally, I didn't have any contact with him.

2       Q    You didn't write any letters to him --

3       A    No.

4       Q    -- or call him?

5       A    No.

6       Q    Turning to Todd Cocchia, when is the last time that

7   you had any contact with him?

8       A    When he wrote me a letter.  I didn't contact him.

9   He wrote me a letter in 2005, I guess around there.

10      Q    And prior to that, when was the last time you had

11  spoken to him or had any contact with him?

12      A    In like, I'm going to say '90- -- between '92 and

13  '94.  My wife called Todd on a three-way phone and I talked

14  to him trying to get him to tell the truth.

15      A    And how long was that conversation?

16           ATTY. CARLUCCI:  I'm sorry, what year was that?

17      A    Somewhere in '90- -- it had to be -- well, I met my

18  wife in '92.  We were divorced in 2000, and it was before I

19  went to MacDougall.  I went to MacDougall in '94, so it had

20  to be between '92 and '94.

21      Q    And how long was that conversation?

22      A    I'm not exactly sure.  Not very long.  He didn't

23  really want to talk to me.

24      Q    And when you were with Todd at Manson Youth

25  Institute and in Virginia, did you discuss the fact that you

26  were being investigated in respect to the Everett Carr

27  murder?

1    A    Yes, I did.

2    Q    And what did you tell him about that?

3    A    When we were at MYI together, it wasn't only Todd.

4  It was everybody who would ask how come I did -- was there

5  for so long.

6              ATTY. CARLUCCI:  Objection, Judge.  I think

7          that the question was just related to Mr. Cocchia

8          (inaudible)

9              THE COURT:  Yes.

10    Q    If you could just focus on your conversation with

11  Mr. Cocchia when you were -- what -- what did you tell him

12  about this investigation when you were at MYI and Virginia?

13    A    I told him that I was a suspect and that's how come

14  I was doing so much time was because I was a suspect, and

15  then when I was in Virginia I told him that when I got

16  arrested for my violation of probation I would end up having

17  to do every bit of my violation time because I was a suspect

18  in the murder.

19    Q    And did you provide him any information about

20  that -- that investigation into the murder?

21    A    No, I didn't.

22    Q    Did you ever talk --

23    A    I didn't have any information.

24    Q    Did you ever tell him that you were suspected of --

25  did you ever give him -- withdrawn.  Did you ever give him

26  any information about the details of the crime that you were

27  being investigated for?

```
 1      A    Only that they thought Shawn Henning and I killed

 2   some man during a burglary.

 3              ATTY. CARLUCCI:   I'm sorry, I didn't hear the

 4         last part.

 5      A    Only that they thought that Shawn Henning and I

 6   killed a man during a burglary.

 7      Q    Did you ever tell Todd Cocchia that you had ever

 8   killed anyone?

 9      A    No, I did not.

10      Q    Other than seeing Todd Cocchia testify at this

11   trial, have you had any contact with him since receiving

12   that letter in 2006?

13      A    No, I haven't.

14      Q    Turning to Robert Perugini.   When is the last time

15   that you had any contact with him?

16      A    In MYI.

17      Q    And when approximately was that?

18      A    I'm going to say '87.

19      Q    And did you talk to him about being investigated for

20   this murder?

21      A    Yes, I did.

22      Q    What did you tell him about that?

23      A    I told him the same thing that I told Todd, the same

24   thing that I told everybody - that I was a suspect in a

25   murder.   Shawn -- they suspected Shawn Henning and I of

26   killing somebody during a burglary.

27      Q    Did you ever tell Robert Perugini that you had ever
```

1  killed anyone?

2     A   No.

3     Q   Other than seeing Robert Perugini at this trial,

4  have you had any contact with him since 1987?

5     A   No, I haven't.

6     Q   Now, switching to Henry Messenger.  Do you know who

7  that is?

8     A   Yes, I do.

9     Q   When did you first meet him?

10     A   I'm going to say 1985 or '86 in Litchfield Jail.

11     Q   And what was your relationship there?

12     A   We were acquaintances.  I wasn't -- we weren't

13  really friends.  We were just acquaintances.

14     Q   When was the last time that you spoke with Henry

15  Messenger?

16     A   I think I seen him around -- I'm going to say -- I'm

17  not even certain.  It was sometime in 2008, maybe around

18  there.  He was in one unit at MacDougall and I was in

19  another, and I spoke to him through a fence.

20     Q   And prior to that, when was the last time you spoke

21  to him?

22     A   I don't think since '85 or six.  I don't think there

23  was another time, not that I remember.

24     Q   And other -- and other than those two times, have

25  you had any contact with him prior to this case?

26     A   No, I haven't.  We don't -- we don't really -- he --

27  he wasn't -- I think he considers me a friend more than I --

```
 1    I don't agree with a lot of his opinions on stuff, so I
 2    just --
 3              ATTY. CARLUCCI:  Objection, Judge.  This is
 4         beyond the scope --
 5    A    -- I haven't had contact with him.
 6              THE COURT:  Yes.
 7    Q    Okay.  Daniel Edwards.  Do you know him -- or do you
 8    know who he is?
 9    A    I know who he is.  I don't know him.
10    Q    Did you have any -- were you ever friends with him
11    at all?
12    A    No, I was not.
13    Q    Were -- but you were incarcerated with him at M --
14    MYI?
15    A    Yes.  I think the only time I ever had contact with
16    him was at MYI.
17    Q    Do you remember ever speaking to him while you were
18    there?
19    A    I think the only thing he ever said to me was when
20    he came and tried to collect money that I owed Bob Perugini.
21    Q    And since that time, have you had any contact with
22    him?
23    A    No, I haven't.
24    Q    And do you know someone named Tara Blum?
25    A    I know who she is.  I don't know her, though.
26    Q    And how do you know who she is?
27    A    Through your investigation -- through your
```

1  investigation reports you gave me.

2     Q   Have you ever met -- or do you know Diana Colombo?

3     A   No, I don't.

4     Q   Have you ever met or do you know Richard Burkhart?

5     A   No.

6     Q   Now, switching gears to your time with Al

7  Mencuccini, when did you first meet Attorney Mencuccini?

8     A   When he was appointed to represent me, I guess early

9  February of '89.

10     Q   And approximately how long was that before your

11  murder trial?

12     A   I started trial in May of '89.

13     Q   Was that jury selection at that point?

14     A   I -- that was first.  Jury selection was the first

15  thing we did, yeah.

16     Q   And what did you tell Attorney Mencuccini about your

17  involvement in the murder of Everett Carr?

18     A   I told him that I had nothing to do with it.

19     Q   What did you tell him about your -- your memory with

20  respect to what occurred in -- withdrawn.  What did you tell

21  him with respect to your memory as to the events on

22  December -- or on December 1st and 2nd of 1985?

23     A   I told him my memory of that wasn't very clear, and

24  if he could get me my statements that I gave to police that

25  would help me remember what happened.

26     Q   And -- and why did you think those statements would

27  help you remember?

1          ATTY. CARLUCCI:  Objection.

2          THE COURT:  Overruled.  You can answer.

3     A    Because I know I told them the truth the best that I

4   could remember when they questioned me a couple days after

5   the murder occurred.

6     Q    Would this be the -- withdrawn.  And -- so what

7   interviews were -- were you told the -- the police the --

8   the truth about what -- what you had done on the night of

9   the murder?

10    A    Can you re-ask that, please?

11    Q    I can.  So you -- you previously said that you asked

12  Attorney Mencuccini to get you reports related to your

13  interviews with the police because you told the police the

14  truth and you couldn't quite remember in 1989 what you

15  had -- what had happened.  You thought that would refresh

16  your recollection.

17    A    Correct.

18    Q    Which specific interviews were -- was it that you --

19  you were told -- you told the police the truth about what

20  had -- what you had done on the night of the murder?

21    A    Every one except the first time that they

22  interviewed me.  The first time they interviewed me, I told

23  a lie.

24    Q    And why was that?

25    A    I was trying to hide a stolen car that I had in my

26  possession.

27    Q    Is that the -- the same Buick we spoke about

1   earlier?

2       A   Yes, it was.

3       Q   Did you ever ask Attorney Mencoccini to review any

4   materials -- withdrawn.  You -- you stated that you did ask

5   Attorney Mencuccini to re- -- review your own statements.

6   Did you ask for any other materials?

7       A   I wanted to see what Shawn Henning and Tina

8   Yoblonski had said.

9       Q   What other materials did Mencuccini -- Attorney

10  Mencuccini ever provide you with?

11      A   At that time, nothing.  The first time he provided

12  me anything is when I -- when we had a suppression hearing

13  in the middle of trial.

14      Q   And what did he give you at that point?

15      A   Just the -- the first lie that I told the police,

16  the December 5th report.

17      Q   And did you ever ask Attorney Mencuccini to -- well,

18  withdrawn.  Did you -- did you learn that Robert Perugini

19  had said that you had told him that you were involved in the

20  murder?

21      A   Did I learn that he told you that?

22      Q   Did you -- did you learn that he had said that, yes.

23      A   Yes.

24      Q   And did you -- when did you -- what if anything did

25  you ask Attorney Mencuccini to do when you learned that

26  information?

27      A   I was told that Bob Perugini said that it occurred

1    while I was in the middle of a fight, and I told Al

2    Mencuccini that that would be impossible.  It would be

3    documented because of the way that the cottages were set up

4    at MYI.  The officers can see all of the wings.  And I asked

5    him to check into the log books and all that because they

6    would -- it would show that I was never in that fight that

7    Bob said I was in.

8        Q    And did Attorney Mencuccini ever ask you for names

9    of other people who -- who were at MYI at that time as well?

10       A    Not that I remember, no.

11       Q    And if he had asked you, would you have been able to

12   give him -- been able to tell him about any individuals

13   who -- who were there and would've known Robert Perugini?

14       A    Yes, at that time -- at that time I knew a lot of

15   the people that were there with me.  Today, I couldn't tell

16   you the names.  I could tell you the names of a couple, but

17   not many.

18       Q    And at that time, would you have known that Daniel

19   Edwards was there, Robert Perugini's co-defendant?

20       A    I would've known that was his co-defendant, yes.

21       Q    And -- and would you have known that Steve McDonald

22   was also friends with Robert Perugini?

23       A    Yes.

24       Q    Now, did Attorney Mencuccini ever speak to you about

25   obtaining the assistance of a footwear impression expert?

26       A    I don't know if he spoke to me about it.  I spoke to

27   him about it.

1    Q    And when was that?

2    A    During a meeting that we had in the lockup at

3    Litchfield Court.

4    Q    Do you remember approximately when -- when that was?

5    A    I think it was -- I think the date was March 28th of

6    '89, I think, because there's notes in his file about that

7    meeting.

8    Q    So -- but you did talk to him about obtaining a

9    footwear expert before the trial?

10   A    Yes.

11   Q    And what did you ask him to do?

12   A    I asked him to try to determine what the size of the

13   footprints were that were in the house.

14   Q    And -- and after that, did Attorney Mencuccini ever

15   speak to you about consulting with a footwear expert?

16   A    No, he didn't.

17   Q    And did he ever ask anyone to size your feet?

18   A    No, he didn't.

19   Q    And do you recall the police seizing some of your

20   work boots in this case?

21   A    Yes, I do.

22   Q    I'm going to show you Petitioner's Exhibit 28.   If

23   you could just take a look at those.

24   A    Mm hmm.

25   Q    Do you recognize those?

26   A    Yes.   Those are a pair of my work boots.

27   Q    And when did you acquire those boots?

```
 1      A    When did I acquire them?

 2      Q    Yes.

 3      A    It would've been sometime in '85.

 4      Q    And why did you -- well, withdrawn.

 5      A    Maybe '84.

 6      Q    Do you -- do you remember acquiring those shoes?

 7      A    Specifically?  No, I don't remember when I went to

 8   the store and bought them, no.

 9      Q    Do you remember why you would've bought work boots

10   like that?

11           ATTY. CARLUCCI:  Objection.

12           THE COURT:  What's the relevancy?  What's the

13        relevancy of why he had that kind of boots?

14           ATTY. O'SHEA:  I'll withdraw the question.

15           THE COURT:  Okay.

16      Q    I'm going to show you Petitioner's Exhibit 29.

17      A    Mm hmm.

18      Q    Do you recognize those?

19      A    Yes.  These are a pair of my work boots as well.

20      Q    And what did you -- do you recall purchasing those

21   boots?

22      A    Excuse me?

23      Q    Do you recall purchasing those boots?

24      A    No, I don't remember the day I bought them, no.

25      Q    And how do you know that those are your boots?

26      A    By the way they're worn out from the roof.  I used

27   to wear -- I -- I was a roofer by trade, and they're worn
```

1  out just like my boots wear out when I wear them from

2  sitting on them on the roof.

3      Q   And so you used those for when you were doing

4  roofing?

5      A   Yes.

6      Q   And do you recall anything about when you acquired

7  those boots?

8      A   No.

9      Q   Now, you mentioned earlier that the -- well,

10  withdrawn.  Did you have those boots with you at the

11  apartment you were living in that you said you were

12  remodeling part of it?

13      A   Yes, I did.

14      Q   Did you take them with you after you left that

15  apartment and were --

16      A   No, I did not.  I only took a small bag of stuff

17  with me.  The rest of my stuff I left there.

18      Q   And where did you -- where did you send that stuff

19  to including those boots?

20      A   My brother Butch went and picked it all up and

21  brought it to his house.

22      Q   And this is your brother whose wife was Pam Gaspar?

23      A   Yes.

24      Q   Now, on the weekend of December 1, 1985, what --

25  what shoe wear did you own at that time?

26      A   I -- what did I own?  I had a pair of Adidas

27  sneakers and a pair of work boots -- my father's work boots

1    which my mother gave me.

2    Q    And those sneakers, are those the -- the Adidas

3    sneakers that were seized from the trunk of the Buick later?

4    A    Yes, they are.

5    Q    And the work boots, are those the ones that were

6    seized by the police when you were arrested a couple days

7    later?

8    A    They're the ones I was wearing a couple days later,

9    yes.

10    Q    And did the police take those boots or inspect those

11    boots at all?

12    A    They inspected them right when they arrested me for

13    the car, but they didn't even want them because the soles

14    were smooth.

15            ATTY. CARLUCCI:    Objection (inaudible)

16            THE COURT:    Yes.

17    Q    Did Attorney Mencuccini ever speak to you about

18    obtaining the assistance of a forensic pathologist or crime

19    scene --

20    A    No, he didn't.

21    Q    Did he ever speak to you about investigating the

22    connection between Diana Colombo and Richard Burkhart to the

23    murder of Everett Carr?

24    A    No, he didn't.

25            ATTY. CARLUCCI:    Objection, Judge.    There's no

26            foundation --

27            THE COURT:    Overruled.

```
1      A    No, he didn't.

2                THE COURT:   You can answer the question.

3      A    No.

4      Q    Did you ever learn that Effie Coates was going to

5   testify that -- withdrawn.  Prior to your trial, did you

6   learn that Effie Coates was going to testify regarding her

7   belief as to the events of the nights of December 1, 1985?

8      A    I'm -- I'm not sure I understand the -- I don't know

9   if you're talking about did I -- did the police ever tell me

10  that or did --

11     Q    Did -- I'll -- I'll rephrase the question.  Did --

12  did you ever learn from anyone that Effie Coates was going

13  to be testifying at your criminal trial or -- or that she

14  had provided information to the police about your -- about

15  the events of December 1, 1985?

16     A    I did learn that she provided police an account of

17  the events, but I didn't know that she was going to testify

18  until she testified.

19     Q    And when did you learn that she had provided the --

20  an account?

21     A    December 9th of '85 during a police interview.

22     Q    And did you ever talk to Attorney Mencuccini about

23  that?

24     A    Yes, I did.

25     Q    What did you tell him about that?

26     A    I told him that what really occurred was not what

27  the police were saying occurred, that -- I'm -- I'm sorry,
```

1    I'm talking about another thing that happened during that

2    same interview.

3    Q   Well, I'll -- I'll rephrase the question.   What did

4    you tell Attorney Mencuccini with respect to the accuracy of

5    Effie Coates' statements to the police?

6    A   That we -- I didn't believe that we did leave at

7    that time.

8              ATTY. CARLUCCI:   I'm sorry.   I didn't hear the

9         end of that.

10             THE COURT:   Could you repeat --

11   A   That I didn't believe that we left at the time she

12   said that we left.

13   Q   And by left, you're speaking of leaving Douglas

14   Stanley's house who was --

15   A   Correct.

16   Q   -- Effie Coates' --

17   A   Correct.

18   Q   -- common law spouse?  Okay.  And now, I believe

19   Effie Coates had said that there was -- well, withdrawn.

20   What did you tell him had -- what did you tell Attorney

21   Mencuccini had actually happened that night?

22   A   I didn't know what happened that night.  I needed my

23   statements to refresh my recollection.  I couldn't say for

24   sure, but I told him that I thought that we left somewhere

25   between 11:30 and 12:30.  That's what I told him.

26   Q   And did you talk to him at all about the assertion

27   about -- by Effie Coates that there was an argument with

```
 1    Douglas Stanley that night?

 2              ATTY. CARLUCCI:  Objection.  Leading, Judge.

 3         There wasn't any testimony to that effect.

 4              THE COURT:  Could you repeat your question?

 5    Q    Did you talk to Attorney Mencuccini at all about

 6    Effie Coates having an argument with Douglas Stanley that

 7    night?

 8              THE COURT:  I'll -- I'll allow that.

 9    A    Yes, I did.

10    Q    And what did you say about that?

11    A    I told him that I believe that argument took place

12    the night of Thanksgiving, not December 2nd.

13    Q    Prior to your trial, did you -- were you ever --

14    withdrawn.  Prior to your trial, were you given -- were you

15    given any information that led you to believe that Tina

16    Yoblonski was going to testify as to the timeline regarding

17    the night of the murder?

18    A    Say that one more time, please?

19    Q    No problem.  It's a long question.  Do you recall

20    Tina Yoblonski testifying at your criminal trial?

21    A    Yes, I do.

22    Q    And did you know before that that she was going to

23    testify that you had left Douglas Stanley's house somewhere

24    around -- I believe it was around eleven o'clock?

25              ATTY. CARLUCCI:  Objection (inaudible)

26              THE COURT:  Overruled.

27    A    Yes, I did know she was going to testify to that.
```

1    Q    And what did you tell Attorney Mencuccini regarding

2    that?

3    A    I told him that I also didn't believe that was

4    accurate.

5    Q    And prior to your trial, did you ever hear anything

6    from anyone - the police, Attorney Mencuccini, or see any

7    documents relating to a thousand dollars being seized at the

8    crime scene?

9         ATTY. CARLUCCI:  Objection to the foundation,

10        relevance --

11        THE COURT:  Overruled.

12    A    Could you say that one more time, please?

13    Q    Prior to your trial, did you ever hear anything from

14    anyone including Attorney Mencuccini or a police officer or

15    read any documents indicating that a thousand dollars had

16    been seized at the crime scene?

17    A    No.

18    Q    Now, were you ever given an opportunity to testify

19    against Shawn Henning at his criminal trial?

20    A    Yes.

21    Q    And how did that occur?

22        ATTY. CARLUCCI:  Objection.  Relevance, Judge.

23        THE COURT:  What's the question again?

24        ATTY. O'SHEA:  The question was if he was given

25        an opportunity to testify against Shawn Henning at

26        Mr. Henning's criminal trial.

27        THE COURT:  Okay, then why -- what's the

1    relevance?

2         ATTY. O'SHEA:  The -- the relevance is going to

3    the actual innocence claim and -- and two

4    (indiscernible).  I'll -- I'll focus on one first.

5    This would be to the relationship with Attorney

6    Mencuccini and -- and Attorney Mencuccini --

7    Attorney Mencuccini's knowledge that Mr. Birch is

8    insisting on his innocence in this case regarding

9    the actions that Attorney Mencuccini should have

10   taken.

11        THE COURT:  All right.  I'll sustain the

12   objection.

13        ATTY. O'SHEA:  And the second offer is as to

14   the actual innocence claim.  This would be to the

15   consistent declarations of innocence over the

16   past -- over 30 years about.

17        THE COURT:  Again, that's not -- that's not

18   relevant on that.

19        ATTY. O'SHEA:  Understood.

20   Q    Do you recall when you first met Attorney Avery

21   Chapman?

22   A    Yes.

23   Q    And when was that?

24   A    The day we came for my habeas, December -- the

25   beginning of December of 1997.

26   Q    So you had -- had you ever had any meetings with

27   Attorney Chapman prior to that --

```
 1      A   No.

 2      Q   -- that date of the habeas trial?

 3      A   No, I hadn't.

 4      Q   When was Attorney Chap- -- when did you first have

 5   any contact with Attorney Chapman?

 6      A   I'm going to say probably summer of '97.

 7      Q   And how did that occur?  Excuse me.

 8      A   I had my wife call -- I wrote him several times and

 9   never got a response, so I had my wife call him through a

10   three-way phone call and spoke to him.

11      Q   And how long did that conversation last?

12      A   A few minutes.

13      Q   And now you mentioned you had written to Attorney

14   Chapman prior.  When did you -- when did you first write to

15   Attorney Chapman?

16      A   I don't have a date.  I don't know.

17      Q   Do you recall approximately how long before the

18   habeas trial occurred that you first learned that he was

19   your attorney on the matter?

20      A   It wasn't very long because I had another attorney

21   that represented me who filed the -- the document that lays

22   out all of the different claims -- amended petition.  She

23   filed them and Nancy Radoff filed an amended petition in

24   1987 sometime --

25      Q   Was it 19- --

26      A   -- and he was appointed after her.

27      Q   I believe you said 1987.
```

1    A   I'm sorry.  1997.

2    Q   Did you ever receive any letters from Attorney

3  Chapman?

4    A   Not that I remember.  I may have gotten one, but I

5  don't remember getting one.

6    Q   Now you said you spoke -- you were able to speak

7  with Attorney Chapman over the phone for a few minutes that

8  one time.  Were you ever able to speak to him over the phone

9  again after that?

10    A   No, each time we called after that it would always

11  go to an answering machine.  He would never pick up.

12    Q   And did you ever leave him messages?

13    A   Yes.

14    Q   Did you -- would your wife also leave him messages?

15    A   Yes, she would.

16    Q   Were any of those ever returned?

17    A   No.  No, they weren't.

18    Q   Now in your letters to Attorney Chapman, did you

19  discuss your case in those letters?

20    A   Not so much in the letters.  I wrote him a big

21  document -- thick document, and made him a copy of all of my

22  files and had it sent through my wife to him, what I thought

23  all of our issues were.

24    Q   And when approximately was that?

25    A   Shortly after he was appointed, probably in the

26  summer -- summer of 8- -- '97.

27    Q   Did you ever send him a -- any other legal

```
 1  materials?

 2      A   I sent him a petitioner's pro se brief that I wanted

 3  to send to the judge myself, but he wouldn't allow me to.

 4      Q   And -- and when was that?

 5      A   That was probably October or November of '97.

 6      Q   And -- and what claims -- you -- you described

 7  earlier that you had sent a large file describing the claims

 8  you -- you wanted raised at the habeas.  What claims were

 9  those that you told him that you wanted raised?

10                  ATTY. CARLUCCI:  Objection.

11                  THE COURT:  I'll allow it.

12      A   I wanted him to raise everything that was in the

13  amended petition that Nancy Radoff wrote.

14      Q   And turning now to your activities on the weekend --

15  or the time of Thanksgiving of 1985 and the following

16  weekend, how clear is your memory about that time period

17  right now?

18      A   Most of my memory right now comes from looking over

19  the documents of the case.  As far as an independent

20  recollection of remembering doing A, B, C, it's not very

21  clear.  It's 30 years ago.

22      Q   But did reviewing -- reviewing those documents at

23  all help refresh your recollection on those matters?

24      A   Yes.

25      Q   Now, how old were you on Thanksgiving of 1985?

26      A   18.

27      Q   And just in general, what was your behavior like as
```

1    an 18 year old at that time?

2            ATTY. CARLUCCI:  Objection.  Relevance, Judge.

3            THE COURT:  Sustained.

4    A    What was your attitude at that time regarding

5    contact with the police?

6            ATTY. CARLUCCI:  Objection.

7            THE COURT:  I'll allow it.

8    A    I didn't -- I wanted the least amount of contact

9    with the police as possible.  I -- I was a troublemaker.

10   Q    And -- so on November 28th, Thanksgiving of that

11   year, what did you do that night?

12   A    On Thanksgiving?

13   Q    On November 28th of 1985, yes, Thanksgiving of 1985.

14   What did you do that night?

15   A    After we got thrown out of Doug- -- by We I mean me,

16   Tina Yoblonski and Shawn Henning.  After we got thrown out

17   of Douglas Stanley's apartment, we stole a car.

18   Q    Well -- so who -- who were you at -- withdrawn.  You

19   said you were at Douglas Stanley's apartment.  Who were you

20   there with?

21   A    I was there with Tina, Shawn, Effie Coates, Doug

22   Stanley, and their two kids.

23   Q    And what happened to cause you to leave that

24   apartment exactly?

25   A    Effie and the kids came home and we were there, and

26   it was Thanksgiving Day, and she blew up at Doug talking

27   about all these crackers in her house and she wanted us out

```
 1   of there.
 2       Q   And approximately what time was that?
 3       A   I'm going to say ten to eleven.
 4       Q   And so what did you do next after you -- after you
 5   left the apartment?
 6       A   We started hitchhiking back to New Milford and we
 7   got a ride as far as Brookfield.
 8       Q   Why were you going to New Milford?
 9       A   'Cause that's where we were staying.  Tina lived
10   there, Shawn lived there.  I stayed at Shawn's house
11   sometimes, sometimes at the pavilion.
12       Q   And so what happened when you got to Brookfield?
13       A   We got to Brookfield, it was cold.  We stood out
14   there and tried to hitchhike for a little while.  When no
15   cars were coming because it was Thanksgiving, I guess,
16   because there was nobody really out on the road, we got in a
17   van that was parked right there to try to keep the wind off
18   of us because it was cold.
19       Q   And after you got into the van, what did you do
20   next?
21       A   Whenever a car would come I would jump out and stick
22   out my thumb hitchhiking, and they'd pass and then I'd get
23   back in the van.  We did that for a little while, and then
24   I -- I had an idea of going to find a -- a car with the keys
25   in it and see if we could keep warm -- start a car and keep
26   warm in the car.
27       Q   And did you end up conducting a search for a car
```

1  like that?

2      A   Yes, I did.

3      Q   And did you find one?

4      A   Yes, I found an old, beat up car in the back of an

5  auto body place, and we went there and -- and then I

6  decided -- I asked them if they wanted to steal it, and we

7  all agreed to steal it and go to New Milford.

8      Q   And what type of car was that?

9      A   It was an old Buick Regal, brown.

10     Q   And where -- so you said you took the car.  Where

11  did you take it and go?

12     A   Again, I --

13     Q   If you remember.

14     A   I know only from the police reports where we went.

15     Q   Well, let me ask you what -- what your recollection

16  is.  Do -- do you have any recollection of what you did with

17  the car?

18     A   I remember sleeping in the car at the reservoir, but

19  do I remember that we went there that night?  No, but I know

20  that we went there that night after reviewing the police

21  reports.

22     A   Okay.  But you do remember sleeping in the Buick

23  that night?

24     A   Yes.

25     Q   And were Shawn Henning and Tina Yoblonski with you

26  then, too?

27     A   Yes.  They were both with me.

1    Q   Now on the morning of November 29th when you woke up,

2   what happened?

3    A   The morning of the 29th we -- I had a great -- I had

4   the idea -- a great idea of going to New Hampshire to see my

5   mom.

6    Q   And what did you do after that?

7    A   We brought Tina to where she worked and she picked

8   up her check, and then we left and went to New Hampshire.

9    Q   And -- and why did you stop off to have her pick up

10  her check?

11   A   So that we would have money.

12   Q   And -- and where were you going in particular in New

13  Hampshire?

14   A   Charlestown, New Hampshire.

15   Q   And approximately when did you arrive there?

16   A   What time of night you mean?

17   Q   Yeah, or day -- what -- if you remember when you

18  arrived.

19   A   It was Friday -- late Friday.  I'm not sure what

20  time we got there.

21   Q   Was it dark out at the time?

22   A   Yes.  I believe it was already dark, yes.

23   Q   And did you stop and visit anyone on the way?

24   A   No, not that I remember.

25   Q   But did you -- if you -- if you woke up in the

26  morning -- approximately what time did you wake up on that

27  Friday morning?

 1      A    I don't know.

 2      Q    Okay.

 3      A    I don't know what time.  It would've been early

 4  'cause it was cold.

 5      Q    How long does it take to get from Connecticut

 6  approximately to Charlestown, New Hampshire?

 7      A    Three hours probably --

 8      Q    So --

 9      A    -- maybe a little more.

10      Q    -- if you didn't arrive until nighttime, why was

11  that?

12      A    We hung out in New Milford before we left.

13      Q    Oh.

14      A    We didn't leave right in the morning right from

15  there.

16      Q    Okay.

17      A    After Tina picked up her check, we hung out in New

18  Milford.  We -- I think we may have even went to Danbury.  I

19  don't know.  I'm not sure.

20      Q    Okay.  And where did you sleep on the night of the

21  29th?

22      A    At a motel in New Hampshire -- or in Vermont rather,

23  I'm sorry.  Right across the river from where my mom lives.

24      Q    And why was that?

25      A    Because my mom wasn't home.  We went to see my mom.

26  She wasn't there.  We found out later that she had actually

27  went to Connecticut, so while we were up there she was down

1    here.

2       Q    And the next morning, that Saturday morning,

3    November 30th, what did you do after you woke up?

4       A    We went to see a couple friends of mine in New

5    Hampshire, in Keene.

6       Q    And did there come a time where you had trouble with

7    the car?

8       A    Yes.  We got the car stuck on a back road in a -- a

9    little stream at the bottom of two hills, a back road.

10      Q    And approximately when was that?

11      A    Late Saturday -- late Saturday afternoon.

12      Q    And what did you do after the -- the car got stuck?

13      A    We tried for a long time to get it unstuck by

14   sticking brush under the tires and all kinds of stuff.  We

15   tried to get it unstuck.

16      Q    Were you successful?

17      A    No, not that day.

18      Q    So what did you do that night?

19      A    We slept in the car.

20      Q    And what happened the next morning of December 1st,

21   that Sunday morning?

22      A    When we woke up, there was a couple hunters looking

23   in the car, and we asked them to try to help us push the car

24   out; and they tried and they couldn't get it out, and then I

25   went and asked the woman that lived a couple miles away if

26   she would help us pull us out with a truck, and she did.

27      Q    And did anything happen to the car when it was

1    pulled out of the brook?

2        A    The muffler was ripped off of it.

3        Q    And what did you do next?

4        A    We went to my mother's house again because one of

5    the lights also got broke when that happened.  We went to my

6    mother's house, and I went and looked for lights on the

7    property -- headlights, 'cause we had several vehicles on

8    our property.  I took one to try to replace the headlight

9    for when we drove back.

10        Q    And what happened then?

11        A    Then we went down and I was on the side of the road,

12    I was putting the headlight in and my mother drove by.

13    She -- her and my nephew drove by in the car and seen us and

14    they stopped.

15        Q    And what did you do after speaking with your mom?

16        A    She asked us to come up to the house, said that --

17    she said we looked filthy.  We should come up to the house,

18    and when we got there she yelled at me 'cause I had wet

19    shoes on.

20        Q    And how -- why were they wet?

21        A    'Cause Saturday before we got stuck, one of the

22    things we were -- what we were doing out on the back roads

23    is we were skitching.  We were holding onto the back bumper

24    of the car and sliding on the snow behind the car.

25        Q    How much snow was -- was around at that time?

26        A    Several inches.

27        Q    And what did you do after speaking to your mom about

1  your wet shoes?

2     A    After her yelling at me, you mean?  Yeah, after she

3  yelled at me for my wet shoes, I went out on the mudroom

4  porch and got a pair of my father's boots and I put those

5  on.  Those were what I was wearing when I got arrested.

6     Q    And what did you guys do after that -- oh,

7  withdrawn.  So at this time, Tina Yoblonski and Shawn

8  Henning were still with you?

9     A    Yes, they were.

10    Q    And -- and what did you all do after that?

11    A    After that, my mom fixed us a meal.  We ate there,

12  and then we left to come back to Connecticut around four or

13  five o'clock, something like that.

14    Q    Was it dark yet at that time when you came back?

15    A    I believe it was getting dark or it just got dark,

16  yeah.

17    Q    And where in Connecticut did you go to?

18    A    Went right directly to Danbury to Douglas Stanley's

19  house.

20    Q    And so you said you arrived there, you know, around

21  four or five.  Do you -- do you recall seeing Effie Coates

22  at all that night?

23              ATTY. CARLUCCI:  Could you (inaudible) by the

24        date --

25              ATTY. O'SHEA:  Yes.

26              ATTY. CARLUCCI:  I'm sorry.

27              ATTY. O'SHEA:  No problem.

1    Q   On the night of December 1, 1985, that Sunday, when

2  you returned to Douglas Stanley's house, do you remember

3  seeing Effie Coates there at all?

4    A   Independ- -- no, I don't.  I think she may have been

5  in the bedroom.  I don't know.

6    Q   Okay.  And how long did you stay at Douglas

7  Stanley's house for?

8    A   We were there and then we left, and then we came

9  back.

10    Q   Well, what time did you leave Douglas Stanley's

11  house that first time?

12    A   The first time?

13    Q   Yes.

14    A   Probably around ten, I guess.

15    Q   And where did you go when you left his house?

16    A   We went and we ate at McDonald's, and then we did a

17  burglary in Danbury.

18    Q   And -- and what did -- and what did you take from

19  there?

20    A   A tv and a cable converter box.

21    Q   What did you do with those?

22    A   Traded them to Doug Stanley for cocaine.

23    Q   And so when did you return to Douglas Stanley's

24  house?

25    A   Eleven o'clock, probably.

26    Q   And how late did you stay at Douglas Stanley's house

27  after that?

```
1       A    Til after one in the morning.

2       Q    And why is it that you left?

3       A    Tina had to work the next day and she kept

4   complaining about her stomach hurting, and we finally left

5   around one, somewhere around there.

6       Q    And are you positive about the time when you left?

7   Do you have an independent recollection of that?

8       A    Positive?  No, but I know that it had to be after

9   twelve thirty, but I don't know for sure exactly what time

10  it was.

11      Q    And where did you go when you left Douglas Stanley's

12  house?

13      A    Went and dropped Tina off at her house and then went

14  to Shawn's house.  We may have stopped and siphoned gas

15  between Tina's and Shawn's.

16      Q    And -- and where is it that you would've taken gas

17  from?

18      A    Same places we always siphoned gas from, was the --

19  the slaughterhouse on Wellsville -- I mean Wells Road, the

20  auction barn up near Shawn's house on 109.  Next to --

21  there's a --

22      Q    So you don't remember which particular place.

23      A    No, I don't know exact- -- there's this group of

24  places that we siphoned from several times both with Tina's

25  car and the stolen car.

26      Q    How do you -- how do you know that you siphoned gas

27  that night?
```

```
 1      A   I don't know for pos- -- for sure, but that's what
 2  we would've done.  I mean, I -- am I one hundred percent
 3  certain we definitely went and siphoned gas and this is
 4  where we went?  No, I can't tell you that.
 5      Q   Okay.  You have no memory of exactly what happened?
 6      A   No.
 7      Q   Did you have a memory -- a clear memory of exactly
 8  what happened back in 1997 when you testified at your habeas
 9  trial?
10      A   No, I -- only from what I know from what I said in
11  the reports is where I get -- got most of my information.
12      Q   Okay.  But what you said in the reports was -- was
13  true.
14      A   What I said to the police was true, yes.
15      Q   And they -- and you -- when you read them, you --
16  you recognized that that was an accurate description of what
17  you had told them?
18      A   Yes.
19      Q   And in there, you had said that you went and
20  siphoned gas?  So back -- back in December of '1985, you
21  told the police that you were siphoning gas that night?
22      A   No, I told them that it was possible we were
23  siphoning gas.
24      Q   Oh.  So even back then, in December of 1985, did you
25  have a clear recollection of what your activities were on
26  the night of December 1, 1985?
27      A   Completely clear?  No, I didn't like -- I didn't
```

1  remember absolutely this was the time that I did this, then

2  we did this.  I couldn't chrono- -- chronologically lay it

3  out and say for certain these are our exact movements over

4  this ten day period that they were asking me about.

5      Q    But you had a best guess at that time?

6      A    Yeah, I had a fairly accurate memory of it then in

7  '85.

8      Q    And so what did you do after siphoning gas that

9  night -- on the night of December 1, 1985?

10     A    We would've went directly to Shawn's house.

11     Q    Do you -- do you recall riding back to Shawn's house

12  that night?

13     A    Actually, I do.

14     Q    You do?  Do you remember about what time that was?

15     A    Two o'clock in the morning, somewhere around there.

16     Q    And what did you do when you got there?

17     A    That's why I remember that night, 'cause we went in

18  and we ate baked beans -- raw baked beans out of a can.  We

19  were both hungry.  That's what we had before we went up and

20  went to sleep in his room.

21     Q    And what happened when you woke up the next morning?

22  This would be December 2, 1985.

23     A    We woke up when Laurie Brooks (phonetic) came up and

24  woke Shawn up.

25     Q    Who's Laurie Brooks?

26     A    She's a girl that used to live at the house with her

27  father.

1    Q    And do you remember approximately when she woke you

2    up?

3    A    The -- the police report said it was around eleven

4    o'clock.

5    Q    But do you -- do you remember what time it was?

6    A    No.

7    Q    Okay.  And -- and what did you do after you woke up?

8    A    After we woke up on the second.  See, that's

9    where -- I don't -- there's not a lot of that in the -- the

10   files to be able to --

11   Q    Well, let me --

12   A    -- remind me.  I don't --

13   Q    Let me stop you there.  Do you -- do you have an

14   independent recollection right now of what happened after

15   you -- have you -- withdrawn.  You said that you remember

16   waking up that morning?

17   A    Mm hmm. I remember when Laurie woke Shawn up.

18   Q    And do you -- do you have a memory yourself of what

19   you did after waking up that morning?

20   A    No.  Right away in the morning, no.

21            THE COURT:  Why don't we take our break now and

22        we'll resume at two o'clock.  Okay?

23                        (Recess)

24            THE COURT:  Good afternoon.  Okay, and I assume

25        we're resuming with Mr. Birch?

26            ATTY. O'SHEA:  Yes, Your Honor.

27            THE COURT:  Okay.  All right, you may resume

```
 1            direct examination.

 2                 ATTY. O'SHEA:  Thank you, Your Honor.

 3   DIRECT EXAMINATION BY ATTY. O'SHEA CONTINUES:

 4     Q   I just want to step back a moment, Mr. Birch.  You

 5   had mentioned that your mother had given you a pair of your

 6   father's boots.  Could you describe those boots?

 7     A   They were old work shoes that were worn smooth --

 8   the soles were worn smooth on them.

 9     Q   And in your presence, did any police officers ever

10   investigate those boots?

11     A   Yes, they observed them.  They looked at them and

12   they gave them back to me.

13     Q   When was that?

14     A   On December 5th.

15     Q   Now, I know you described these events, but I have a

16   couple of follow up questions.  Did you murder Everett Carr?

17     A   No.

18     Q   Have you ever been inside the house at 74 Aspetuck

19   Drive in New Milford --

20     A   No.

21     Q   -- or excuse me -- 74 Aspetuck Ave. in New Milford?

22   Have you ever told anyone that you murdered Everett Carr or

23   anyone else?

24     A   No.

25                 ATTY. O'SHEA:  I have no further questions.

26                 THE COURT:  All right.  Counsel for Mr.

27           Henning?
```

```
 1   DIRECT EXAMINATION BY ATTY. COUSINS:
 2       Q   Hello, Mr. Birch.
 3       A   Hello.
 4       Q   Do you have any information as to whether Shawn
 5   Henning murdered Everett Carr?
 6       A   Absolutely he didn't.
 7       Q   Did you -- you didn't testify against Mr. Henning,
 8   right?
 9       A   No, I didn't.
10       Q   Why not?
11           ATTY. CARLUCCI:  Objection.
12           THE COURT:  Yes.  He doesn't have to answer why
13       he didn't testify against him, okay?
14           ATTY. COUSINS:  I have nothing further.
15           THE COURT:  All right.  Cross examination?
16           ATTY. CARLUCCI:  May I have a moment?
17           THE COURT:  Yes.
18   CROSS-EXAMINATION BY ATTY. CARLUCCI:
19       Q   Good afternoon, sir.
20       A   Afternoon.
21       Q   Now, you testified to a number of things here today
22   before the recess and a few things afterwards, but in -- in
23   particular, I think you said that your memory of the time
24   period around -- surrounding the murder is a little bit
25   unclear?
26       A   My independent recollection, yes.
27       Q   Sure.  But you were -- when you testified, you were
```

1    specific about some things and not others, correct?

2       A    Correct.

3       Q    And -- and that's because of the information you got

4    from the police reports.

5       A    Some that I remember and some from police reports,

6    yes.

7       Q    And when was the last time you reviewed any of the

8    police reports?

9       A    This morning.

10      Q    I'm sorry?

11      A    This morning.

12      Q    Okay.

13      A    I've been reviewing them for 28 years -- 27 years.

14      Q    Well, that's what I was just going to -- you've had

15   a long time, about 30 years to think about what you would

16   say here today?

17      A    I've had 30 years to try to remember things, yes.

18      Q    And also what you would say here today, as well.

19      A    Yeah.

20      Q    Okay.  And just one other question.  Now, you --

21               ATTY. CARLUCCI:  Can I have a moment, Judge?

22               THE COURT:  Yes.

23      Q    Just a few pages back, and unfortunately, I was

24   having a little trouble hearing, but I believe Mr. O'Shea

25   asked you a question about Mr. McDonald and Mr. Perugini,

26   not speaking to them or something to that effect.  Is that

27   correct?

```
 1      A   Yes.  He asked me several questions about that.

 2      Q   Okay.  And what -- what was the time period that you

 3   were referring to there?

 4      A   Referring to what?

 5      Q   He asked you some questions, I believe, in terms of

 6   things that you had discussed with Mr. McDonald or Mr.

 7   Perugini, or they were at a place where you were and maybe

 8   some things were said.  Do you remember what the time period

 9   was that you were talking about?

10      A   Which one of the -- it's different for each one of

11   them, so I need to know who are you talking about?  You're

12   saying McDonald --

13      Q   Okay, we'll take them separately.

14      A   -- and Perugini.

15      Q   First, Mr. McDonald.

16      A   What do you want to know about him, when the last

17   time I talked to him was?

18      Q   When -- again, I -- I -- and I don't remember the

19   exact wording.  Mr. O'Shea asked you a question - did you

20   ask Mr. Mencuccini to do this in regard to Mr. McDonald, and

21   you said no.  What was that --

22              ATTY. O'SHEA:  Objection, Your Honor.  This is

23          mischaracterizing the --

24              ATTY. CARLUCCI:  Well, I don't remember the

25          exact wording, Judge.  I'm --

26              THE COURT:  I think he's trying to -- he -- he

27          said he was having trouble hearing, so -- go ahead.
```

1              You can answer it if you recall.

2      Q   And I'm going to try to narrow it down for you as

3  much as possible, and I -- and I think your response was he

4  didn't speak to him about that, and it was in regard to Mr.

5  McDonald.  Do you remember that question?

6      A   Not really.  I remember him asking me did I tell

7  Attorney Mencuccini to interview Mc- -- Mr. McDonald about

8  Perugini.  I think that's what he asked me.  I'm not even

9  positive.

10     Q   Possibly.  Okay, thank you.  And again, can you tell

11 me again, if you can recall, the specific time periods that

12 you had contact with Mr. McDonald and Mr. Perugini?

13             THE COURT:  But he wants to do one at a time.

14             ATTY. CARLUCCI:  Okay, one at a time.

15             THE COURT:  So just Mr. McDonald.

16             ATTY. CARLUCCI:  First, Mr. McDonald.

17     A   Mr. McDonald?  I knew him when I was in MYI with

18 him.

19     Q   Okay.

20     A   And then again -- I met him again in Somers -- I

21 mean, MacDougall rather, I'm sorry -- MacDougall in '95 I'm

22 gonna say.  It might've been '94.  I think it was '95.

23     Q   Okay.  And no other times?

24     A   Not that I spec- -- oh, he was in Somers, too.  He

25 was at Somers when I was up there in like '88 or nine.

26     Q   Okay.  Did you ever meet him in public anywhere?

27     A   No.

```
 1      Q   No.  Okay.  Same question for Mr. Perugini.

 2      A   The last time I seen Mr. Perugini was in MYI before

 3   I seen him here.

 4      Q   And again, never -- had never met him in public.

 5      A   No.

 6      Q   Okay.

 7              ATTY. CARLUCCI:  May I have a moment?

 8              THE COURT:  Yes.

 9              ATTY. CARLUCCI:  I don't have any further

10          questions, Judge.

11              THE COURT:  Any redirect based on cross-

12          examination?

13              ATTY. O'SHEA:  Briefly, Your Honor.

14   REDIRECT BY ATTY. O'SHEA:

15      Q   You were asked on cross-examination about the time

16   you had to prepare for testifying today.

17      A   Mm hmm.

18      Q   Is what you're telling here the truth today?

19      A   Absolutely.

20              ATTY. O'SHEA:  No further questions.

21              ATTY. COUSINS:  No questions, Your Honor.

22              ATTY. CARLUCCI:  Nothing further, Judge.  Thank

23          you.

24              THE COURT:  Okay, you may step down and resume

25          your seat.  Yes?

26              ATTY. RAABE:  Your Honor, Shawn Henning calls

27          Shawn Henning.
```

1          THE COURT:  All right, Mr. Henning.  If you'd

2     step right up here next to the witness box and face

3     the clerk.

1          S H A W N   H E N N I N G, 141169, Enfield,

2          Connecticut, duly sworn by the clerk, testified

3                    under oath as follows:

4          THE COURT:  Okay, you can put your hand down,

5     You may be seated.  You may inquire.

6          ATTY. RAABE:  Thank you, Judge.

7    DIRECT EXAMINATION BY ATTY. RAABE:

8     Q   Mr. Henning, to this day, do you know precisely

9    where 74 Aspetuck Avenue in New Milford is?

10    A   I do not.  I'm not from Connecticut.

11    Q   Did you know Mr. Everett Carr?

12    A   I do not know Everett Carr.

13    Q   How about Diana Colombo?

14    A   I do not know Diana Colombo.

15    Q   How about Richard Burkhart?

16    A   I do not know him either.

17    Q   I'm going to go through a couple names that Attorney

18    O'Shea asked Mr. Birch about.  Steve McDonald.  Do you know

19    Steve McDonald?

20    A   Yes, I do.

21    Q   Have you ever discussed the Everett Carr homicide

22    with Steve McDonald?

23    A   Never.

24    Q   How about Todd Cocchia?  Have you ever discussed the

25    Everett Carr homicide with Todd Cocchia?

26    A   I do not know Todd Cocchia.  He was in MYI with me,

27    but I never hung with him.  I never spoke with him.

```
 1      Q    Okay.  You ever discuss the Everett Carr homicide
 2   with Robert Perugini?
 3      A    Never.
 4      Q    Have you ever discussed the Carr homicide with
 5   Daniel Edwards?
 6      A    I do not know Daniel Edwards.
 7      Q    Have you ever discussed the Carr homicide with Tara
 8   Blum?
 9      A    I do not know Tara Blum.
10      Q    Do you know Henry Messenger?
11      A    Yes, I do.
12      Q    Can you tell the judge how you know Henry Messenger?
13      A    He was an inmate in Litchfield County Jail when --
14   when I had get -- first gotten arrested, excuse me, for the
15   stolen car and the burglaries.  That's how I know Henry
16   Messenger.
17      Q    Did you ever tell Mr. Messenger that you were
18   involved in the homicide of Everett Carr?
19      A    Never.
20      Q    Did you ever tell Mr. Messenger that Mr. Birch was
21   involved in the homicide of Everett Carr?
22      A    Never.
23      Q    Have you ever told anyone that you were involved in
24   the homicide of Everett Carr?
25      A    Never.
26      Q    So the Carr homicide occurred in early December of
27   1985.  How old were you then?
```

```
1    A    17 years old.  I just turned 17 in September of '85.

2    Q    Can you describe to the judge what your physical

3  appearance was on December 1st and December 2nd of 1985?

4    A    I was a skinny, white kid with long hair living in a

5  stolen car.

6    Q    How long was your hair?

7    A    Halfway down my back.

8    Q    What was your level of personal cleanliness at that

9  point?

10   A    We were living in a stolen car.  You know, we

11 were --

12   Q    Why were you living in a stolen car, sir?

13   A    Because me and my father did not see eye to eye and

14 I had no respect for him, so we argued and he kicked me out

15 of my house.

16   Q    At some point, were you living with your father in

17 New Milf- -- I'm sorry.  Where -- where did your father live

18 in this time period, 1985?

19   A    He lived on Route 109 in -- in New Milford on the

20 Washington Depot line.

21   Q    At some point, were you living with your dad?

22   A    Yes, when I came -- when my family sent me here from

23 Chicago, Illinois.

24   Q    Okay, so -- so just stick with your father's

25 residence.  Can you just describe to the Court what kind of

26 house that was?

27   A    It was a farm house duplex.  We lived on one side of
```

1  it, our neighbors lived on the right.  We lived on the right

2  side, they lived on the left side.

3      Q   And before December 1st -- withdrawn.  Before

4  Thanksgiving weekend of 1985, when was the last time that

5  you were living full time at your dad's house in New

6  Milford?

7      A   Restate the question, please.

8      Q   So up -- before Thanksgiving of 1985, before that

9  time period, when were you last living full time in your

10  dad's house in New Milford?

11             THE COURT:  I'm not sure I understand the

12         question.  Can you --

13             ATTY. RAABE:  At some -- let me break it down,

14         Your Honor.

15     A   Yeah, I'm not understanding.

16     Q   At some -- at some point, were you living in your

17  dad's house on a day-to-day basis?

18     A   Yes, when I came from New England Adolescent

19  Treatment Center, I moved in with my father to stay there,

20  yes.

21     Q   Do you recall when that was, sir?

22     A   That was 1985.  I don't -- what month, I'm --

23  September?  August maybe?  August of September, I believe.

24     Q   Okay.  And at some point prior to Thanksgiving of

25  1985, were you no longer living in your father's house on a

26  day-to-day basis?

27     A   Yes, when he basically said that he was going to

```
1    kick me out, and I -- we had an argument as to, you know, me

2    moving out of his house.

3         Q   And what's your best recollection today of when that

4    was?

5         A   November.

6         Q   Sometime before Thanksgiving?

7         A   Around then, yes.

8         Q   Okay.  And ultimately, you ended -- ended up living

9    in the stolen Buick Regal with Mr. Birch and Miss Yablonski?

10        A   Yes.  That's true.

11        Q   So you said -- just a few minutes ago, that you had

12   moved to your dad's house from Illinois.  Where were you

13   living in Illinois?

14        A   I was living with -- I was living with my aunt

15   during the week and I was living with my grandmother, and

16   then I moved to live with friends and we ended up getting in

17   a car accident which put me back with my grandmother and my

18   aunt in a -- in that living situation.

19        Q   What town in Illinois?

20        A   Herscher.

21        Q   And your grandmother's name is Mildred Henning?

22        A   Yes, sir.

23        Q   Okay, we'll come back to her in a bit.  What led you

24   to be living in Illinois?

25        A   My relationship with my alcoholic uncle got bad, and

26   things with my cousins weren't working out, so my aunt and

27   my grandmother decided that they couldn't take care of me.
```

1    My grand- -- my grandparents were too old to raise me.

2        Q    Okay, so that's -- that's what led you to go from

3    Illinois to Connecticut?

4        A    Yes, sir.  To live with my father, David, yes.

5        Q    At some point, did you live in California with your

6    mother?

7        A    Before Chicago, yes.

8        Q    Okay.  So tell the judge how you ended up going from

9    California to Chicago.

10       A    My mother put us on a Greyhound Bus.

11       Q    Who's we?

12       A    Me and my two young brothers.

13       Q    How old were they at the time?

14       A    11 and 9, maybe.

15       Q    How old were you at the time?

16       A    That was 1981, 13.

17       Q    And was your mother on the bus with you?

18       A    No.  She was not.

19       Q    When you got to Illinois, did your mother come out

20   to stay with you in Illinois?

21       A    No.

22       Q    When you left California to come to Illinois, did

23   your mom tell you what was happening?

24       A    No.

25       Q    You're just shipped off with your brothers?

26       A    Yes.

27       Q    In December of 1985, what size shoe did you wear?

```
 1        A    11½, 12.

 2        Q    I'm going to show you an entry on Exhibit 5, which

 3   is the evidence report from this case.

 4             ATTY. RAABE:  Your Honor, I don't know if you

 5        still have the copy.  It's the --

 6             THE COURT:  I'm sure I do.

 7        Q    Item 152 in Exhibit 5 is a pair of sneakers that

 8   were taken from you at the Litchfield County Jail on

 9   December 9, 1985.  You see that?

10        A    Yes, I do.

11        Q    Those were Pony sneakers?

12        A    Yes, sir, they were.  They were seized by me from

13   the police.

14        Q    Those are the only sneakers you were wearing at that

15   time?

16        A    Yes, sir.

17             THE COURT:  And this is Exhibit 26 in this

18        case, is that right?

19             ATTY. RAABE:  Correct, Your Honor.

20        Q    Mr. Henning, I put on the stand in front of you one

21   of the Pony sneakers that was Exhibit 26.  Was that your

22   sneaker that you were wearing on December 1$^{st}$, December 2$^{nd}$

23   of 1985?

24        A    Those were the sneakers that the police seized from

25   us, yes.

26        Q    Right.  So my question was were those the sneakers

27   that you were wearing as your footwear in or about December
```

1   1st and December 2, 1985?

2       A   Yes.

3       Q   Yes?

4       A   Yes.

5       Q   In this case, we have Exhibit 97 and 94.  These were

6   pictures from your underlying criminal trial, right?

7       A   I believe so.

8       Q   It showed bloody footprints at the Carr residence?

9       A   I believe so.

10      Q   And in your trial, they were referred to as the

11  Chevron pattern, right?

12      A   Yes.  I remember hearing that name, the Chevron

13  thing.

14      Q   Does that pattern match the sole of your shoe that

15  was Exhibit 26?

16      A   It does not.

17          ATTY. PROSCINO:  Objection, Your Honor.  He's

18          not qualified to give that answer.

19          THE COURT:  Either he's an expert or anyone

20          could do the comparison.  This testimony is

21          inadmissible for that reason.  Okay?

22          ATTY. RAABE:  (Indiscernible) Your Honor, I'll

23          withdraw it.  I just raised it for Your Honor to

24          examine.  And Your Honor, in that connection, at

25          this point I would offer Exhibit 160 which is a

26          police report.  I believe with our agreement with

27          the State, this would come in without objection.

```
1              THE COURT:  Is that correct?
2              ATTY. PROSCINO:  And that's correct, Your
3         Honor, just with respect to our limited agreement on
4         these police reports.
5              THE COURT:  Okay.  It's admitted as full
6         Exhibit 160.  Thank you.
7              ATTY. RAABE:  And just for expediency, Your
8         Honor, I would point you to on the first page item
9         number 152 which is the Pony sneakers that are
10        Exhibit 26, and then paragraph two on the second
11        page -- that those patterns don't match anything
12        from the crime scene.
13             THE COURT:  Okay.
14   Q    You're arrested for the Carr homicide in November of
15   1988, right?
16   A    Yes, sir.
17   Q    Where were you living then?
18   A    In Mystic, Connecticut.
19   Q    What were you doing?
20   A    I was working six days a week as a carpenter out on
21   Fishers Island and Block Island building homes.
22   Q    Were you married?
23   A    I was not married at that time, but I was living
24   with my girlfriend.
25   Q    Were you burglarizing homes at that time?
26   A    I was not burglarizing homes at that time.  I was
27   working Monday through Saturday.
```

```
 1      Q   Who arrested you?

 2      A   Detective Ocif.

 3      Q   Had you had some prior dealings with Detective Ocif?

 4      A   I had many dealings with Detective Ocif.

 5      Q   So you -- you were ultimately tried in April of

 6  1989, right?

 7      A   Yes, sir.

 8      Q   You were tried as an adult?

 9      A   Yes, I was.

10      Q   Were you able to afford your own lawyer?

11      A   I was not.

12      Q   So you had Carl Eisenmann appointed?

13      A   Yes, I did.  I had Carl Eisenmann as -- was my

14  attorney.

15      Q   So as -- while you were tried as an adult, in your

16  interactions with Mr. Eisenmann, did you feel that you were

17  being treated like an adult?

18      A   I did not.

19              ATTY. PROSCINO:  Objection, Your Honor.

20              THE COURT:  Yes?

21              ATTY. RAABE:  I'm -- I'm going to -- I'm going

22          to explore, Your Honor.

23              THE COURT:  Okay, go ahead.

24      A   I did not.

25      Q   Why not?

26      A   I wasn't asked.  I wasn't consulted on any of the

27  things he was doing.  I was not told what to expect from
```

1    witnesses.  I wasn't -- he was one man handling a murder

2    case, and when I asked him questions he would tell me not

3    now.

4        Q    So when --

5        A    He couldn't listen and -- and -- and talk to me at

6    the same time.  That's what he said.

7        Q    When was the first time that you recall meeting with

8    Attorney Eisenmann in relation to your trial for the Everett

9    Carr homicide?

10       A    I don't recall what the first time was.

11       Q    Do you recall meeting with an inspector by the name

12    of Tim Casey?

13       A    I do.

14       Q    Do you recall when that was?

15       A    Tim Casey was the only one that came to see me in

16    regards to the Carr homicide, and he told me to write my

17    confession on a pad of paper.

18       Q    What did you tell him?

19       A    I didn't do that.  I would not be writing a pad -- a

20    confession on a pad, and I pushed the pad of paper back at

21    him across the table.

22       Q    So let's talk about whatever pretrial preparation

23    you did with either Mr. Casey or Attorney Eisenmann.  Prior

24    to going to trial, did you have any discussion with either

25    of them about who the witnesses were and what they were

26    expected to testify about?

27       A    I do not recall doing that with any of the witnesses

1    in my case.  We did have discussions with Douglas Stanley,

2    my grandmother and Tim, but some of these other people I

3    never even heard of before.

4        Q    So you recall discussing Douglas Stanley, Mildred

5    Henning and Tim Saathoff with either Mr. Eisenmann or Mr.

6    Casey?

7        A    Yes, sir.

8        Q    Prior to trial, have you ever heard of a person by

9    the name of Gary Smith?

10       A    I did not.  Prior to trial, I did not.

11       Q    We'll come back to your -- your grandmother and Mr.

12   Saathoff.  What do you recall about your discussions with

13   either Mr. Casey or Mr. Eisenmann about Douglas Stanley?

14       A    I told both of them to interview Douglas Stanley

15   because everything that we learned about the Carr crime came

16   from Douglas Stanley.  I told Tim Casey to go question

17   Douglas Stanley.  That's what I told him.

18       Q    Do you know whether he did?

19       A    He came to me and said that he slept in front of

20   Douglas Stanley's apartment and that he could not reach him.

21   I told him to keep trying -- to keep trying.

22       Q    And you said that everything that you knew about the

23   Carr homicide came from Douglas Stanley?

24       A    Yes, sir.  That's true.

25       Q    Do you have any firsthand knowledge about the Carr

26   homicide?

27       A    I do not.

 1      Q    What did Douglas Stanley tell you about the

 2   homicide?

 3                   ATTY. PROSCINO:   Objection, Your Honor.

 4                   ATTY. RAABE:   I'm not offering it for the

 5           truth, Your Honor.

 6                   THE COURT:   I'll allow it.

 7      A    And your question --

 8                   THE COURT:   As for what was spoken, what was

 9           told to the witnesss.

10      Q    What was told to you by Douglas Stanley about the

11   Carr homicide?

12      A    That an old man had been killed in New Milford, that

13   he was stabbed and beaten, that anyone doing burglaries in

14   the area would be called in for questioning about the crime,

15   to expect to be called in if we were doing burglaries.  He

16   told all of us that, everyone who was present at Douglas'

17   kitchen in his apartment that day.

18      Q    Who was present?

19      A    A whole bunch of people.  Douglas' next door

20   neighbor, burglars from Connecticut, anyone who was doing

21   burglaries.  Douglas was fencing items for a lot of people.

22      Q    And do you recall when this conversation was?

23      A    That was at nighttime at Douglas' house.  I remember

24   it being nighttime.

25      Q    Do you recall in relation to the Carr homicide when

26   it was?

27      A    It was the next day, Monday or the day thereafter.

1   Monday or Tuesday night.  I'm pretty sure it was Monday.

2       Q   So December 2nd or December 3rd?

3       A   Yes, sir.

4       Q   Did he mention anything about a dog?

5       A   He said in the course of the crime a man and a dog

6   had been killed.

7       Q   And did you essentially repeat the information that

8   you got from Douglas Stanley to the New -- New Milford and

9   Connecticut State Police?

10      A   Yes, I did.  And to my grandmother and Tim (sic)

11  Saathoff.

12      Q   Okay, we'll come back to that.  So other than

13  Douglas Stanley, Mildred Henning and Tim Saathoff, do you

14  recall having any other discussion about the State's

15  potential witnesses or actual witnesses and what they were

16  expected to testify about?

17      A   By Eisenmann during my trial?  No, sir, they didn't

18  know.  No, sir.

19      Q   They just discuss -- withdrawn.  Did you have

20  conversations with Attorney Eisenmann either before or

21  during the trial about the possibility of engaging or

22  calling experts to testify on your behalf?

23      A   I don't remember any discussion about us calling

24  experts.  We didn't call any at trial.  In fact, I begged

25  him to get an expert --

26          ATTY. PROSCINO:  Objection, Your Honor.

27      There's no --

```
 1              THE COURT:  Yes.

 2              ATTY. PROSCINO:  -- question pending.

 3              ATTY. RAABE:  I'll -- I'll ask some

 4         questions --

 5              THE COURT:  You wait until a question comes up.

 6              ATTY. RAABE:  Sir, I have a series of exhibits.

 7         They are copy- -- photocopies of notes that are

 8         coming from Exhibit 183, Mr. Eisenmann's file, so

 9         they're already in evidence.  I pre-marked them.

10              THE COURT:  Mm hmm.

11              ATTY. RAABE:  I've given copies to the State.

12              THE COURT:  Okay.

13              ATTY. RAABE:  To the Respondent, I should say.

14         The first one is Exhibit 167.

15    Q    So Mr. Henning, Exhibit 167.  Is that your

16    handwriting?

17    A    Yes, it is.

18    Q    During the course of your trial -- your criminal

19    trial, did you -- did you write out and hand Mr. Eisenmann

20    notes?

21    A    All throughout my trial, yes, I did.

22    Q    Is this two page document some of those notes?

23    A    Yes, it is.  Some of them, yes.

24    Q    If you go down to the bottom of the first page of

25    Exhibit 167, the second to last entry begins with the word

26    get.  It says get someone quote privately employed unquote

27    to do tests dash on underlined everything.
```

1    A    Yes, I did write that.

2    Q    Can you tell the Court why you wrote that?

3    A    Because I knew that the evidence in this case would

4    prove me innocent.

5    Q    And so what were you asking Mr. Eisenmann to do?

6    A    Test everything.

7         ATTY. PROSCINO:  Sorry, I didn't hear the

8         answer.

9    A    Test everything.

10         ATTY. RAABE:  Next, your -- your hon- -- next,

11         Your Honor, is Exhibit 168.  It's some notes up in

12         the right hand corner.  It begins with Peter Barrett

13         (phonetic).

14    Q    Is Exhibit 168 more notes from the trial that you

15    gave to Attorney Eisenmann?

16    A    Are you asking me if this is what I wrote to

17    Attorney Eisenmann?

18    Q    Yes.

19    A    Yes, this is.

20    Q    During the trial?

21    A    Yes, sir, this is my handwriting.

22    Q    If you look on the second page of Exhibit 168,

23    there's some starred bullet points there.  You see the third

24    one?

25    A    Yes, sir, I do.

26    Q    It said no hair, blood or anything else found off of

27    us in house.  Couldn't be.  Think about that.

```
 1      A   Yes, sir, I wrote that.

 2      Q   Did you have conversations with Attorney Eisenmann

 3  about that?

 4      A   I had many conversations with Attorney Eisenmann

 5  regarding that subject.

 6      Q   And what did you tell him?

 7      A   To test everything.  Have everything tested.

 8  Everything that they took from me, have it tested.

 9  Everything.  The car, everything.

10      Q   And again, because you believed that that would

11  prove your innocence?

12      A   That's absolutely right.

13      Q   And to your knowledge, did Attorney Eisenmann have

14  any of those materials tested by a forensic expert?

15      A   We did not call any experts to my trial, no.

16      Q   If you go back to the first exhibit, Exhibit 167, on

17  the second page down towards the bottom about seven lines

18  up, does that say what size boots did the markings show?

19      A   Yes, it does.  Yes, I see it.

20      Q   Did you have particular conversations with Attorney

21  Eisenmann about the foot impressions and your footwear in

22  relation to the Carr homicide?

23      A   Yes, I did.

24      Q   Can you tell the Court what you said to Attorney

25  Eisenmann?

26      A   To match them.  To try to match them to my own

27  because they would not match me.
```

```
1        Q   And is this one of the areas where you were hoping

2   that someone would come to trial and testify that your shoes

3   did not match the imprints at the trial?

4        A   Yes, sir.  I was hoping that Henry Lee would do

5   that.  Henry Lee was the forensic.

6        Q   So let's take a look at Exhibit 169.  Is Exhibit 169

7   questions that you wrote to Attorney Eisenmann while Dr. Lee

8   was testifying?

9        A   Yes, they are questions that I wrote to Eisenmann

10  during my trial.  I put a star next to the ones I thought

11  would be the most important to prove my innocence.

12       Q   And the second one with 169 is what size shoe

13  imprints question mark?

14       A   Yes, sir.

15       Q   You were asking Attorney Eisenmann to ask questions

16  like that of Dr. Lee?

17       A   Yes.  Size, shape, everything.  Yes.

18       Q   Or some other expert witness?

19       A   Yes, sir.  Yes, I did.  I begged him to have that

20  done.

21       Q   What did he say to you?

22       A   What did Eisenmann say to me?

23       Q   Yes.

24            ATTY. PROSCINO:  Objection, Your Honor.

25            ATTY. RAABE:  I'll withdraw the question, Your

26       Honor.

27            THE COURT:  It's withdrawn.
```

1    Q    To your knowledge, did Attorney Eisenmann ever hire

2    anyone with regard to the shoe imprints as they might've

3    related or not related to your feet and your shoes?

4    A    Eisenmann did not, as far as I know, hire anyone to

5    do anything like this with the physical evidence in my case.

6              ATTY. RAABE: Your Honor, I don't -- I don't

7         think I have moved as full exhibits 168 and 169.

8         Again, I -- I moved them.  They're part of 183.

9              ATTY. PROSCINO:  We have no objection just as I

10        understand these are from the full exhibit --

11             THE COURT:  Yes.

12             ATTY. PROSCINO:  -- of Mr. Eisenmann's files,

13        so no objection.

14             ATTY. RAABE:  The same with Exhibit --

15             THE COURT:  They're admitted as full exhibits.

16             ATTY. RAABE:  Thank you.  And the same with

17        Exhibit 170, which I'll now offer in full.

18             THE COURT:  Okay.

19             ATTY. PROSCINO:  No objection.

20             THE COURT:  Thank you.

21    Q    The top bullet point on Exhibit 170 again relates to

22    sneakers, boots or shoeprints found question mark?

23    A    Yes, sir, I see that.

24    Q    It's another instance where you're asking Attorney

25    Eisenmann to offer evidence at trial that connected or

26    disconnected your feet, your shoes from the footprints at

27    the crime scene?

```
1        A    Yes, sir.  The same thing I told the police
2   detectives I told Eisenmann a million times.  Test the
3   evidence.  Test the physical evidence.  I said this
4   repeatedly throughout the investigation, throughout my
5   trial.
6        Q    Was it your sense that he was listening to you?
7        A    That he did not listen to me, obviously, because
8   none of that was done in this case -- until now.
9              ATTY. RAABE:  Your Honor, offer is full Exhibit
10             171, more notes from Exhibit 183.
11             THE COURT:  Okay.
12             ATTY. PROSCINO:  No objection, Your Honor.
13             THE COURT:  Full exhibit 171.
14       Q    So all -- all of these notes that we've gone
15   through, these -- this is your handwriting, right, sir?
16       A    Yes, sir, it is.
17       Q    Here's Exhibit 171.  It's entitled defense and
18   offenses, right?
19       A    Yes, sir.
20       Q    Why did you write these notes out?
21       A    Defense were the things that I thought would defend
22   my innocence.
23       Q    And what was offense?
24       A    The things that I thought would prove my innocence.
25       Q    And the second bullet point, did you tell Mr.
26   Eisenmann you weren't wearing boots on the night of the Carr
27   homicide?
```

```
 1      A    Yes, that's true.  I wrote that.  Yes, I did.

 2      Q    So all of these things that you're writing,

 3 you're -- you're trying to raise issues for Attorney

 4 Eisenmann to examine witnesses or present witnesses on your

 5 behalf?

 6      A    Yes, sir.  His witnesses were on the stand, and I

 7 was writing to Attorney Eisenmann these notes as fast as I

 8 could.  I was pulling on his jacket, and I was telling him

 9 to listen to me.  I needed him to address these things.  He

10 couldn't do two things at once.

11      Q    And was it your sense -- withdrawn.  How much

12 interaction did you have with Attorney Eisenmann either

13 before the trial day or after the trial day?

14      A    I don't understand what you mean by interaction.

15 Like, I don't --

16      Q    Did -- were you meeting with Attorney Eisenmann

17 either before court or after court during the murder trial?

18      A    I don't remember meeting with Attorney Eisenmann too

19 muff -- too often at the County Jail if that's what you're

20 asking me.  Excuse me.

21      Q    During the trial when you raised notes or asked

22 questions of him, what kind of response did you get?

23      A    The same response.  You know, I'm -- I'm --

24 Eisenmann was doing the trial by himself.  You know, it's

25 not like the team we have now.

26      Q    So did you have a sense that he was listening to

27 what you were saying?
```

1    A    At times, he could not listen to what I was saying

2    because he was trying to listen to the people testifying on

3    the stand.

4    Q    And -- so my question before was when you got done

5    with court, would you talk with him about what had happened

6    that day or what was going to happen the next day?

7    A    Shortly in the bullpen down at the bottom of

8    Litchfield Country Jail holding bin, where they hold us at

9    before the sheriffs took us out, similar to what we do now

10    in the courtroom here --

11    Q    Before --

12    A    -- at the habeas trial.

13    Q    Sure.  Before trial, did you sit down with Attorney

14    Eisenmann to discuss overall defense strategy for the trial?

15    A    I do not remember doing that with Attorney Eisenmann

16    ever.  Not like you and I have done for this trial, never.

17    Q    Do you recall police coming at your trial to testify

18    about the stolen car and its location?

19    A    Do I -- I don't understand the question.

20    Q    At -- at your trial, there was testimony about the

21    car that you, Mr. Birch and Miss Yablonski had stolen,

22    right?

23    A    The Buick, yes.

24    Q    And during -- during the course of the

25    investigation, did you tell the police where that car had

26    been hidden?

27    A    I'm the one who showed them where the stolen car

1    was, yes.

2        Q    And it was by a reservoir?

3        A    Yes, sir, wooded area, picnic thing -- where picnic

4    tables were at.  I believe they call it a reservoir, yes.

5                ATTY. RAABE:  Your Honor, I'll offer as a full

6            exhibit Exhibit 172, which is more notes from

7            Exhibit 183.

8                ATTY. PROSCINO:  No objection.

9                THE COURT:  It will be admitted as full Exhibit

10           172.  Thank you.

11       Q    This again is your handwriting and your sketch?

12       A    Yes, sir, it is.  I wrote this for Eisenmann during

13   my trial.

14       Q    And why did you write it?

15       A    Because someone was testifying about where I had

16   hidden the car, and I was trying to illustrate for Eisenmann

17   in a hurried sketch as to what I did, as to where I put the

18   car.

19       Q    And you write down the bottom wasn't the pond

20   searched by divers for stolen goods.  It was, but I want you

21   to ask -- do you know what that cut off word was?

22       A    Him.  I want you to ask him.

23       Q    You wanted him to ask the law enforcement officers

24   that --

25       A    I wanted Eisenmann, yes, to ask the -- the officer

26   which I believed to be McCafferty or maybe Samoska -- either

27   one of -- it could've been either one of those that this

1    line of questioning was targeted because those are the two

2    officers that were present when I showed them where the

3    stolen car was.

4              ATTY. RAABE:  Your Honor, at this point, I'm

5         going to offer as full exhibits 161, 162 and 163

6         which are police reports with no imbedded hearsay in

7         them.

8              THE COURT:  Any objection?

9              ATTY. PROSCINO:  No objection, Your Honor.

10             THE COURT:  All right, may be admitted as full

11        exhibits.  Thank you.

12             ATTY. RAABE:  And just for expediency purposes,

13        Your Honor, those are about -- those are about

14        searches up at the reservoir.

15             THE COURT:  Okay.  You gave me the actual

16        exhibits.  Did you mean to do that?

17             ATTY. RAABE:  They can go back to the clerk.

18             THE COURT:  Okay.

19    Q    Did you gain information that there had been a

20    search up at the pond?

21    A    I did, but I don't recall as to which detective it

22    was that told me that the pond would be searched.

23    Q    So --

24    A    It was one of the detectives, I believe.

25    Q    One of the detectives told you that they were going

26    to search the pond?

27    A    I believe so, yes.

1    Q    As you sit here now, do you know whether any stolen

2    goods were found there?

3    A    There was not.

4    Q    During the course of your preparation for trial,

5    were you ever told about a thousand dollars in cash being

6    found at the crime scene?

7    A    I was not.

8    Q    When did you first learn about that?

9    A    I believe that was a member of the Connecticut

10   Innocence Project that told me that.  Pete Palmer, Mike

11   LeFebvre maybe.

12   Q    You testified at your trial, right?

13   A    Yes, I did.

14   Q    Do you recall how much time you spent with Attorney

15   Eisenmann before you testified at -- in your trial?

16   A    It was not much.

17   Q    Did you feel prepared before you testified?

18   A    I was not.

19          ATTY. RAABE:  Your Honor, I'd offer as a full

20          exhibit 173, more notes from Exhibit 183.

21          THE COURT:  Okay.

22          ATTY. PROSCINO:  Your Honor, just an objection

23          just as to -- there's a lot of information contained

24          on Exhibit 173.  We have no objection to it being

25          offered just for the limited purpose of the note

26          that's on the bottom left hand corner.

27          THE COURT:  Okay.  Is it -- is it being offered

```
1              for other purposes?

2                   ATTY. RAABE:  No, Your Honor.  I'm only

3              claiming for evidentiary purposes today the -- the

4              bottom left hand note that says --

5                   THE COURT:  Okay.

6                   ATTY. RAABE:  -- do not call me to the stand

7              before we talk more.

8                   THE COURT:  All right, so it's admitted for

9              that purpose.

10        Q    You have Exhibit 173 in front of you, Mr. Henning?

11        A    Yes, sir, I do.

12        Q    And that part that I just read, is that a note that

13   you were passing to Attorney Eisenmann during the trial?

14        A    That's one of them, yes.

15        Q    And what were you conveying to Attorney Eisenmann?

16        A    To not call me to the stand before we talked more

17   about what was going on.

18        Q    Because you didn't feel prepared?

19        A    I was scared out of my mind.

20        Q    Did you meet with Attorney Eisenmann to your

21   satisfaction before you were called to the stand to testify?

22        A    I did not, and that's why I wrote what I wrote on

23   this piece of paper.

24        Q    All right, I want to turn your attention to December

25   1st and December 2nd of 1985.  You heard Mr. Birch's

26   testimony about that Thanksgiving weekend and leading up to

27   that timeframe today, right?
```

```
1      A    Yes, I did.

2      Q    To your knowledge, is that -- was that a fair

3   summary of the events of those couple of days?

4      A    He has a better memory than I do.  When I told you

5   that, I wrote it down.

6      Q    Do you recall whether after you left -- oh,

7   withdrawn.  At some point on the evening of December 1st,

8   you left Douglas Stanley's, right?

9      A    Yes, sir, when we came back from New Hampshire.

10     Q    And -- and to your knowledge, after you left Douglas

11  Stanley's, did you go siphon gas?  I'm sorry, after you left

12  Douglas Stanley's, where'd you go?

13     A    We went and did the Danbury burglary.

14     Q    That Mr. Birch testified to.

15     A    Yes, sir.

16     Q    So then you went back to Mr. Stanley's, fenced some

17  items, and then left again, right?

18     A    Yes, sir.

19     Q    And where did you go?

20     A    We went the back roads down Brookfield Lake so we

21  stayed off of Route 7 'cause we had a loud car, and we went

22  to Tina's house -- my girlfriend, Tina.

23     Q    It's fair to say that the stolen car that you had

24  did not have a muffler and was very loud, right?

25     A    Yes, sir.

26     Q    And as a result of that, you drove on back roads so

27  as not to draw attention to the stolen car?
```

```
 1    A   Yes, sir.  When you drove the car up hill, it was

 2  very loud.

 3    Q   And do you recall whether after you dropped off Miss

 4  Yablonski you siphoned gas?

 5    A   I recall that originally when the CO -- excuse me,

 6  when -- when the officer -- the detectives asked me what we

 7  did, because we normally siphoned gas at nighttime, that was

 8  normal what we did, so I just -- yes, I said that.

 9    Q   And then after you had siphoned gas, did you go to

10  your dad's house?

11    A   Yes, we did.

12    Q   Where did you park the car at your father's house?

13    A   Behind a shed on the left side of the driveway that

14  wrapped around the back side of my father's house.  The

15  driveway wrapped around like a candy cane around the back of

16  the house to where my father parked.

17    Q   So as you went up the candy cane, the candy cane

18  turned to the right?

19    A   Yes, sir.

20    Q   And you parked the car off to the left behind a

21  shed?

22    A   Yes, sir, that's correct.

23    Q   Why did you park it there?

24    A   Because I did not want my father to know that I was

25  in his house.

26    Q   Why?

27    A   And because the car was stolen.
```

1      Q    Why didn't you want your father to know that you

2  were in his house?

3      A    Because me and him had had the argument about me

4  leaving his house, and I was no longer welcome there.

5      Q    And did you take some of his food?

6      A    I did.

7      Q    Just as Mr. Birch had described?

8      A    Yes, sir, that's true.

9      Q    Did you believe that you had permission to take his

10  food?

11      A    I did not have permission to take his food, but I

12  didn't care.

13      Q    Did you sleep at your father's house on the night of

14  December 1st going into December 2, 1985?

15      A    Yes, we did.

16      Q    Can you describe for Judge Sferrazza as you go into

17  the house what you did, where you went, where you slept?

18      A    We went to the kitchen.  We stole pork and beans,

19  and then we went to my bedroom.

20      Q    Okay, so the kitchen's on the first floor, I assume?

21      A    Yes, sir.  When you go into the house, there's a

22  pantry that had a washer and dryer, which is where I left my

23  sneakers.  The kitchen is off the pantry.  You walk through

24  a dining room, then a living room, then up the stairs to the

25  upper level of the house.

26      Q    And your bedroom was on the upper level?

27      A    Yes, sir.  My bedroom was the first door to the left

1   at the top of the landing at the top of the stairs.

2      Q    Your father's bedroom was also up there?

3      A    My father's bedroom was the next door down on that

4   same wall.

5      Q    When you got home that night, was your dad there?

6      A    No, he was not.  His car was not present when me and

7   Ricky walked into the pantry.

8      Q    So you and Mr. Birch went into your bedroom, right?

9      A    Yes, sir.

10     Q    Can you describe for the Court once you went into

11  the bedroom where each of you went and what, if anything you

12  did with the door?

13     A    I slept in my bed that was to the far left of the

14  bedroom, and Ricky slept behind the door where the door

15  swings open.  If you'd open the door, you would've busted

16  Ricky right in the forehead.

17     Q    So with the way you left the door, if someone were

18  in the hallway looking into the room, would they have seen

19  your -- either of you there?

20     A    They would've seen the -- maybe the foot of the

21  bedpost, and maybe out the window of my bedroom.

22     Q    Would they have seen you on -- with the way you left

23  the door, would they have seen you on the bed?

24     A    You would've had to have pushed the door open more

25  than it was in order to see that.

26     Q    And if you pushed the door, what would have

27  happened?

1    A   It would've made no sense for my father on that

2  night --

3    Q   I'm not asking about what would make sense for your

4  father.  If you pushed the door, what would happen?

5    A   He would've hit Ricky right on top of the head.

6    Q   From the way you had positioned the door, if you

7  stood in the hallway could you see Mr. Birch?

8    A   He was behind the door.  No, sir.  No, you could not

9  see Mr. -- Ricky Birch.

10    Q   The next day, December 2nd, Mr. Birch testified that

11  you were awakened by a Laurie Brooks, right?

12    A   Laurie Brook- -- yes, Laurie Brooks was the woman

13  who lived with me and my father with her boyfriend.  She

14  woke us up, ten thirty or eleven o'clock I believe, that

15  next morning.

16    Q   Did you stick around?  Did you leave?  What did you

17  do?

18    A   Best of my relection- -- my -- my recollection is we

19  got out of there --

20    Q   Okay.

21    A   -- before my father got home.

22    Q   So at any time from the time that you arrived in the

23  nighttime until you left in the morning, did you change your

24  clothes or take a shower?

25    A   The last time I remember cleaning up was at Ricky's

26  mother's house in New Hampshire.  We did not shower at my

27  father's house.

```
1        Q    Did you change your clothes at your father's house?

2        A    I didn't want my father to know that I was there.

3        Q    Did you change your clothes at your father's house?

4        A    I don't recall.  I don't believe so.  I don't -- I

5   don't recall.

6        Q    Where -- where were the clothes that you were living

7   in in this time period -- this weekend?

8        A    Where were my clothes?

9        Q    Where did you keep your clothes dur- -- during

10  Thanksgiving weekend into December 1st and 2nd of 1985?

11       A    Almost everything I owned was in either the stolen

12  car, Tina's bedroom, or my bedroom.  That's pretty much it.

13       Q    And to your knowledge, did the police seize the

14  clothes in the stolen car and your bedroom and at Tina's

15  house?

16       A    The police told me they were going to seize

17  everything.  They took the filter out of the washer and

18  dryer in the pantry of our house.  They went down to Douglas

19  Stanley's.  They went everywhere.  They went to the pond,

20  and they searched everywhere.

21       Q    So later in that day, December 2, 1985, did you go

22  back to Douglas Stanley's?

23       A    Later on the second?

24       Q    On the second.

25       A    Yes, sir.  We went to Douglas Stanley's almost every

26  day.

27       Q    And is it your best recollection that that's when he
```

1    told you about the Carr homicide?

2        A    Yes, sir.

3        Q    Before you heard it from Douglas Stanley, did you

4    know that Mr. Carr had been murdered?

5        A    Douglas Stanley is the person -- that's what I've

6    been telling people since start.  He is the person who told

7    us everything we know about that crime scene.  Everything.

8        Q    So the question is, before learning about the Carr

9    homicide from Douglas Stanley, did you have any knowledge of

10   that homicide?

11       A    I did not.

12       Q    So you mentioned before that Mr. Stanley had told

13   you you're a burglar, you should be getting ready to be

14   questioned by the police, right?

15       A    He told all of us that.  He told the next door

16   neighbor that used to hang out in his house that he was

17   there to snake Chris whatever his name was.

18       Q    And in fact, did the police reach out to you?

19       A    Yes.  They called me to the police station December

20   3rd or 4th.  Yes -- yes, they did.

21       Q    So describe to the judge --

22       A    Just as Douglas said they would.

23       Q    So describe to the judge how they reached out to you

24   and what you did.

25       A    I believe it was Detective Samoska or McCafferty,

26   one of the two called me down to the New Milford Police

27   Station, said they wanted to talk to me, and I went.

```
1        Q    How'd they call you?

2        A    They called my father's house.  I believe Laurie

3    Brooks took -- Laurie Brooks took the first phone call, and

4    then -- I wasn't there.  She's the one, I believe, that gave

5    me the message that they wanted to talk to me.

6        Q    Okay.  And -- and you went down voluntarily?

7        A    Yes, I did.

8        Q    When you initially talked to the police, were you

9    honest and forthcoming about where you had been on the night

10   of December 1st and December 2nd?

11       A    No, I wasn't.

12       Q    Why not?

13       A    Because I did not want to be arrested for the stolen

14   car and for the burglaries that we did do.

15       Q    Did you then become more forthcoming and truthful

16   with the police?

17       A    After I showed them where the stolen car was, yes.

18       Q    So describe how that played out - from the time that

19   you were initially called down to the police department to

20   the time that you're showing them where the stolen car is.

21   Just walk the judge through that.

22       A    You'll have to be more specific than that.

23       Q    So you get called down to the police station, right?

24       A    Yes, sir.

25       Q    Were you interviewed inside the police station,

26   outside the police station?  What's your recollection?

27       A    I was questioned by the New Milford Police,
```

1    Detective Samoska and McCafferty, I believe, five times

2    probably that week saying that, you know, they're looking

3    for who killed the man up on the hill or -- you know,

4    little -- little things like that.  I was being questioned

5    by people in town.

6        Q    Did you tell the police in the course of these

7    interviews that you had stolen -- stolen a car?

8        A    Had I told the police --

9        Q    Did you admit in the course of the interviews in the

10   week of December 2, 1985, did you admit to the police that

11   you had stolen a car?

12       A    Yes, sir, I admitted that to Samoska and McCafferty

13   when they -- when I -- when I ditched the car.  When I was

14   walking back toward the police station from ditching the

15   car, Ricky said you can tell them everything 'cause I told

16   them everything.

17       Q    So Ricky was in a police car, right?

18       A    Yes, sir, he was with Detective Samoska and

19   McCafferty.

20       Q    The police car pulls up next to you on the street?

21       A    An unmarked police car, yes.

22       Q    And Ricky says I told them everything?

23       A    Yes, sir.

24       Q    And then what did you do?

25       A    I showed them where the -- the stolen Buick was, and

26   that's when we started to tell them everything we knew.

27       Q    From early on in -- in these interviews, after

1    December 2, 1985, did the police start accusing you of

2    committing the Carr homicide?

3        A    Yes, they did.

4        Q    At any point, did they threaten you with the death

5    penalty?

6        A    The New Milford police -- police officers said that,

7    yes, they did during the original interrogation.

8        Q    And again, you were 17 at the time?

9        A    Yes, sir, I was.  I just turned 17.

10       Q    What was your emotional state?

11       A    I was very scared.

12       Q    Once the police had told you that they were

13   investigating you for the Carr homicide, were you fully

14   forthcoming with them?

15       A    Yes.  To the best of my knowledge, everything I knew

16   I told them, yes.

17       Q    I'm going to show you on Exhibit 5 the evidence

18   report, item 189.  This describes a cassette tape of an

19   interview with you on December 6, 1985 with the Chief of

20   Police of New Milford, Mr. Olmsted and his Captain, Norbert

21   Lillis.  Do you see that?

22       A    Yes, I do see that.  I remember that.

23       Q    Do you recall being interviewed by the Chief of

24   Police and -- and one of his captains?

25       A    I did not know that they were the Chief of Police

26   and a Captain at that time.  I don't remember that part, but

27   yes, I do remember that interview.

1          ATTY. RAABE:  Your Honor, at this point, I'm

2     going to offer as a full exhibit Exhibit 165, which

3     is an evidence flow sheet that relates to that same

4     item, the cassette tape of the interview of Mr.

5     Henning.

6          ATTY. PROSCINO:  Your Honor, I'm -- I'm going

7     to object.  Mr. Henning can't authenticate this

8     document.  And also, we'd object on relevance and

9     hearsay grounds as well, but primarily

10    authentication.

11         ATTY. RAABE:  Your Honor, this is extremely

12    frustrating.  We have a stipulation with the

13    Respondent's Counsel that we would not have to

14    authenticate these kinds of business records.

15         ATTY. PROSCINO:  Well -- Your Honor, if I may

16    have one moment?

17         THE COURT:  I'll tell you what we'll do.  We'll

18    take our afternoon break and you can discuss it

19    further, and we'll resume in about --

20         ATTY. PROSCINO:  Thank you.

21         THE COURT:  -- ten or fifteen minutes.

22                    (Recess)

23         THE COURT:  You may be seated.  All right, you

24    may continue direct examination.

25         ATTY. RAABE:  Just, Your Honor, initially a

26    couple of house cleaning matters.  We've talked with

27    the court clerk.  Exhibit 149 was Dr. Turvey's CD.

```
 1                THE COURT:  Yes.

 2                ATTY. RAABE:  Amongst of all -- all of us, we

 3      seem to have misplaced it.  He was my witness.  I'll

 4      take the blame, but we have a substitute Exhibit 149

 5      that -- that is Brent Turvey's CD.

 6                THE COURT:  Yes.

 7                ATTY. PROSCINO:  And no objection to that, Your

 8      Honor.

 9                THE COURT:  Okay.

10                ATTY. CARLUCCI:  And I'm sorry, Judge, one

11      other housekeeping matter.  Exhibit G --

12      Respondent's Exhibit G.  Counsel and I agreed, full

13      exhibit.

14                THE COURT:  All right.  And what is that?

15                ATTY. CARLUCCI:  It's a 2011 statement by Mr.

16      Birch -- I'm sorry, Judge -- with Mr. Birch,

17      Attorney Goodrow, and Len Boyle of the Chief State's

18      Attorney's Office.

19                THE COURT:  Okay.

20                ATTY. RAABE:  Next, Your Honor, I -- I think I

21      failed to move as full Exhibit 167, which again are

22      some of Mr. Henning's notes that we examined

23      earlier.

24                THE COURT:  All right.  If not previously

25      admitted as a full exhibit, they can be admitted as

26      full exhibit -- I think I have that as a full

27      exhibit, but okay.
```

1        ATTY. RAABE:  And finally, Your Honor, we

2     reached agreement.  Exhibit 165, I believe, can come

3     in as full.

4        ATTY. PROSCINO:  That's correct, Your Honor.

5        THE COURT:  Okay, so that's admitted as a full

6     exhibit.  Yes?

7        ATTY. O'SHEA:  I just want to clarify.  So is

8     Exhibit G a statement of -- of Ralph Birch or Shawn

9     Henning?

10        ATTY. PROSCINO:  I -- May I, Your Honor?

11        THE COURT:  Yes.

12        ATTY. PROSCINO:  It's as to Ralph Birch.

13        ATTY. O'SHEA:  I was not aware that this was

14     being put in as a full exhibit, Your Honor.  May I

15     have a moment with opposing counsel?

16        THE COURT:  Yes.

17        ATTY. O'SHEA:  Thank you.

18        ATTY. CARLUCCI:  Judge, I'm sorry -- Counsel

19     and I were -- there was a misunderstanding, so may

20     it remain a -- an ID exhibit?

21        THE COURT:  It'll remain ID Exhibit G.

22        ATTY. CARLUCCI:  G.  Yes, Judge -- Respondent's

23     G.

24        THE COURT:  Yes?

25        ATTY. RAABE:  Thank you, Judge.

26  DIRECT EXAMINATION CONTINUED BY ATTY. RAABE:

27     Q   So in front of you, Mr. Henning, is Exhibit 165

1    which is the evidence flow sheet for item 189 from Exhibit 5

2    which you previously had recognized as the tape of the

3    interview between you, Chief Olmsted and Captain Lillis.  Do

4    you recall them interviewing you, sir?

5        A   Yes, I do.

6        Q   On December 6, 1985, just a few days after the Carr

7    homicide?

8        A   Yes, that's correct.

9        Q   Let me show you -- let me show you what's been

10   marked Exhibit 166 for identification.  In preparation for

11   your testimony here today, did I have you review the

12   contents of Exhibit 166?  That's the document I just put in

13   front of you.

14       A   Yes.

15       Q   And that's a partial transcript of the interview

16   between you, Chief Olmsted and Captain Lillis?

17       A   Yes, sir.

18       Q   And to the best of your recollection, is that an

19   accurate transcription of your conversation with those two

20   officers from December 6, 1985?

21       A   To the best of my ability, yes, that's what I

22   remember.

23           ATTY. RAABE:  Your Honor, I'm going to offer

24       Exhibit 166 as a full exhibit.  It's a -- make it a

25       partial transcript of this recorded conversation.  I

26       don't have the tape of the actual recording, and I

27       have a few -- a few bases to offer it if the

1     Respondent objects.

2          ATTY. PROSCINO:  Your Honor, we have an

3     objection to this document being introduced.  First

4     off, it's not authenticated.  It does contain

5     hearsay, and as it indicates on the last page of

6     this document, it's not a full transcript.  It's

7     certainly not a certified copy, so we would object

8     on those grounds.

9          THE COURT:  Where did it come from?

10          ATTY. RAABE:  We got it in preparation for the

11     case.  We believe that someone from the State had

12     transcribed it.  Regardless of whether it came from

13     the State, Your Honor, I think these --

14          THE COURT:  Well, I was talking about the

15     actual tape recording.  Wasn't that by the State?

16          ATTY. RAABE:  Yes, Your Honor.

17          ATTY. PROSCINO:  Your Honor, we have no copy of

18     that tape.  We weren't aware of this.  Yeah.  I

19     mean, again, we would also object that there hasn't

20     been a proper foundation laid for this to be

21     introduced.  I mean, it certainly can be used to

22     refresh his recollection if he reviewed it, but just

23     for that limited purpose.

24          THE COURT:  Well, if it was a tape recording on

25     December 6th of 1985, then it would have to have been

26     provided to the defense counsel by the State.

27          ATTY. RAABE:  Yes, Your Honor.

1  THE COURT:  As a statement of the Defendant

2  through the discovery rules.  Am I reciting

3  procedural law correctly?

4  ATTY. PROSCINO:  Absolutely, and Your Honor,

5  we're not disputing that that would've occurred.

6  THE COURT:  Okay.

7  ATTY. PROSCINO:  However, as to this actual

8  document, we're arguing that it's -- there's no way

9  to prove that it's an accurate and full --

10  THE COURT:  I don't --

11  ATTY. PROSCINO:  -- transcription of that --

12  that -- that tape recording.

13  THE COURT:  I don't think there's a claim that

14  it's full.

15  ATTY. RAABE:  Correct, Your Honor.

16  THE COURT:  Okay?  What are you offering it

17  for?  Let me get that on the record.

18  ATTY. RAABE:  Yes, Your Honor.  So there's a

19  couple of different purposes.  One, I think it would

20  be much easier for the Court to digest this than

21  having to listen to the tape, so it's an aide to the

22  Court.  Secondly, the statements of the officers

23  within it set up the context for Mr. Henning's

24  responses.  And third, we contend it would be a

25  treasure-trove for defense counsel had you reviewed

26  it to cross-examine the chief, the captain, or any

27  other officer.

```
 1              THE COURT:  Okay.  Well, again, I go back to
 2         the -- I thought -- you have the actual tape --
 3         cassette.
 4              ATTY. RAABE:  I don't have it here, Your Honor.
 5         If --
 6              THE COURT:  No, but I mean you have it in
 7         existence in your possession.
 8              ATTY. RAABE:  Not in our possession.  It's in
 9         the Respondent's possession or the State's
10         possession.  It's on the evidence log.  We have the
11         flow sheet for it.
12              THE COURT:  Okay.
13              ATTY. RAABE:  That's why I put --
14              THE COURT:  But you said that it would be
15         better than having me listen to the tape.  I assumed
16         that you -- you meant you had the tape available to
17         play.
18              ATTY. RAABE:  Yes.  If we need to put the tape
19         in, we'll put the tape in.  It's a whole lot easier
20         to use this.
21              THE COURT:  Well, I got the impression from the
22         Respondent that they don't know where the tape is.
23         Is that a mistake?
24              ATTY. PROSCINO:  It's not a mistake, Your
25         Honor.  We certainly don't have it in our
26         possession.
27              ATTY. RAABE:  That's why I put the flow sheet
```

```
 1        in, Your Honor.  It's -- it's in the State's

 2        possession, according to the flow sheet.

 3            THE COURT:  Okay, but as far as Counsel know,

 4        no one knows where that tape is, so I can't listen

 5        to it.

 6            ATTY. RAABE:  I am assuming that it's with the

 7        State Police, according to the flow sheet.  It was

 8        most recently move- --

 9            THE COURT:  Okay, but it's not -- you don't

10        have access to it.

11            ATTY. RAABE:  I don't have access to it.

12            THE COURT:  And the Respondents are saying they

13        don't have access to it.

14            ATTY. PROSCINO:  Correct, Your Honor.

15            THE COURT:  Okay.  All right, so again, the

16        objection is -- well, wait a min- -- were you going

17        to respond?

18            ATTY. COUSINS:  No.

19            THE COURT:  Do you want to talk to Counsel?

20        Only one Counsel can address from --

21            ATTY. COUSINS:  Yes, if I could.

22            ATTY. RAABE:  I -- I'm waiting for Your Honor.

23            THE COURT:  Oh, oh, I thought you were going

24        to -- I thought it was like a Perry Mason moment,

25        and he was going to resolve all the issues with that

26        one revelation.

27            ATTY. RAABE:  What I'll -- what I guess I can
```

```
 1              offer, Your Honor, if you go back to Exhibit 165 --
 2                   ATTY. PROSCINO:  Mm hmm.
 3                   ATTY. RAABE:  -- the first page which is the
 4              flow sheet --
 5                   THE COURT:  Yes.
 6                   ATTY. RAABE:  -- it says at the second to last
 7              entry that there was a transcript prepared of the
 8              tape, assuming that that's what I have here.  I
 9              didn't take the transcript.
10                   THE COURT:  And this witness testified to the
11              best of his recollection it appears to be what
12              happened there.  We don't have it in front of us, so
13              we don't have a -- a best evidence.  I would guess
14              it's a loss if that's the correct state, so I'm
15              going to allow it in for what it's worth.
16                   ATTY. RAABE:  Yes, Your Honor.
17                   ATTY. PROSCINO:  Thank you, Your Honor.
18                   THE COURT:  And again, it would've been
19              possibly available to Defense Counsel if Defense
20              Counsel had sought it.
21         DIRECT EXAMINATION CONTINUED BY ATTY. RAABE:
22           Q   Fair to say, Mr. Henning, this interview with the
23         chief of police and his captain was an extremely emotional
24         experience for you?
25           A   Yes, it was.
26           Q   You were 17 years old, right?
27           A   Yes, I was.  I was scared out of my mind.
```

1      Q    And at the beginning of the interview, they advised

2   you of your constitution rights?

3      A    Throughout this interview, yes, I believe they did

4   do that.

5      Q    And to your recollection, was that the first time

6   you were advised of your constitutional rights?

7      A    Yes, to the best of my recollection, yes.

8      Q    So if we go to the second page, you'll see on the

9   bottom right hand corner there are what we call base labels.

10  It says 15831.

11     A    Yes, sir, I see that.

12     Q    And if -- if you read up top there, they talk about

13  your friend from Gaylordsval- -- Gaylordsville.  You say

14  Ricky, and then Captain Lewis said he told us a few things,

15  he finally told the truth about some things you were

16  involved in, some heavy things.  Do you recall that?

17     A    I remember him saying that, yes, I do.

18     Q    Is it your understanding through the course of this

19  interview and from the very -- very beginning that they were

20  accusing you of participating in the Carr homicide?

21     A    Yes, sir.

22     Q    If we go to page 15833 --

23     A    Yes, sir.

24     Q    Three lines down, Captain Lewis again talking about

25  heavy things and he says all the evidence points towards

26  you, right?

27     A    That's what not just Lillis, but a lot of officers

```
1    were saying things like that to me.
2        Q   And is that an accurate reflection of your
3    response -- oh, my God, I didn't murder no one?
4        A   Yes.  I said that many times to many officers.
5        Q   And further down on that same page, the big
6    paragraph in the middle, four lines down to the right -- a
7    lot of the evidence points to who's ever involved would have
8    some blood on their person, may have some cut on their
9    hands, right?
10       A   I don't see what you're referring to.  My fault.
11               THE COURT:  Right in the middle of the page.
12               THE WITNESS:  Oh, yes, sir -- yes, sir.  I see
13           it.  In the middle of the paragraph, I see it.
14       Q   Did you have cuts on your hands at that point?
15       A   I had cuts on my fingers, yes.
16       Q   Can you tell Judge Sferrazza where the cuts came
17   from?
18       A   When we had stolen the car we had stolen New Jersey
19   license plates, and when Ricky put those New Jersey license
20   plates on the vehicle he twisted them on with a heavy-gauge
21   electrical wire.  I didn't know that the gauge was that
22   heavy, so when I went to take the license plates and rip
23   them off of the car, the license plates didn't come free and
24   I cut my hands doing so.
25       Q   And when you cut your hands, where did you wipe
26   them?
27       A   When I cut my hands -- what?
```

1    Q    When you cut your hands pulling the license plates

2    off, did you wipe your hands off -- your bloody hands on

3    something?

4    A    I stuck my hands in my coat, yes -- my blue corduroy

5    coat.

6    Q    Okay.  We'll come back to that.  So was it your

7    sense they -- they were saying here there's going to be

8    evidence connecting you to this crime.  You should confess

9    right now.  Right?

10   A    Yes, a lot of officers were saying things like that,

11   yes.

12   Q    And then you essentially told them take the

13   evidence, run it -- quote run it through the processor.

14   Right?

15   A    That is what I said.

16   Q    What did you mean by that?

17   A    Do the evidence.  Test it.  Test everything.  I

18   begged them all.  Test everything and prove my innocence,

19   right then and there.  There'd be no more discussion, no

20   more needed to be said about anything.  Do the tests.  Test

21   everything.  That's what I said to all of them.

22   Q    If you go to the page two pages down, bottom right

23   hand corner, the number is 15839.  You see the last entry by

24   Chief Olmsted?  The second sentence -- 'cause this crime

25   scene that we've got up there is what we call a rich crime

26   scene.  There's a lot of evidence up there, an awful lot of

27   evidence.  Right?

```
1      A   Yes, many officers said that.
2      Q   And when they were telling you that there was a rich
3   crime scene, what did you continually tell them?
4      A   To test the evidence across the board.  Test
5   everything.
6      Q   During the course of this interview, were they --
7   were the police threatening to drag Tina into the
8   investigation?
9      A   Yes, they were.
10     Q   And what was your response to that?
11     A   It pissed me off.
12     Q   To your knowledge, did Tina Yoblonski have anything
13  to do with the murder of Everett Carr?
14     A   Absolutely not.
15     Q   Top of page 15841.  Again, this is Chief Olmsted.
16  If you had nothing to do with that that's fine, but what I'm
17  saying is that if you guys had anything to do with it, that
18  evidence that we got from you and from the scene is going to
19  put you there, but it's going to take two weeks.  Do you see
20  that?
21     A   Yes, I do see that.
22     Q   And then they started talking about Tina, or you
23  started talking about Tina?
24     A   Yes, sir.
25     Q   And once again, did you tell them test the evidence,
26  it will prove that I was not at Mr. Carr's house?
27     A   Yes, I did.
```

```
 1      Q    If you go to page 15845, the third to last Lillis

 2   entry that says, among other things, be a man.  Right?  Do

 3   you remember them saying that to you?

 4      A    Yes, I do, very, very vividly.

 5      Q    What did you understand them to be telling you?

 6      A    That if I did a crime to speak up -- to own up to

 7   it.

 8      Q    And then he said a little bit farther down, how come

 9   your story doesn't match up with Birch's?  Right?

10      A    Yes, sir.

11      Q    And your response was oh, my God.

12      A    Yes, sir.

13      Q    To your knowledge, did Ricky Birch have anything to

14   do with the Carr homicide?

15      A    Ricky Birch had absolutely nothing to do with the

16   Carr homicide, as far as I know.

17      Q    Was Ricky Birch with you on the night of December 1,

18   1985 into December 2, 1985?

19      A    Yes, he was.

20      Q    And page 15849, about halfway down there's a big

21   entry from Captain Lillis talking about Ricky here.  He's

22   gonna put it all on you, man -- everything on you, and

23   you're gonna sit there and you're gonna say I don't give a

24   damn about Tina, I don't give a damn about anything, and

25   Birch is going to walk out of this thing and guess who's

26   gonna be left sitting holding the bag - Shawn Henning.

27   Right?
```

1    A    Yes, he said that to me.  Yes, he did.

2    Q    If you go down two pages after that dialogue

3    continues to 15851, second to last entry.  This is you

4    talking again.  Send it off now just so I can prove you guys

5    I didn't -- that's not my blood.  I didn't -- that's my

6    blood.  I didn't F with no old man.  Send it off now, all

7    right?  Just save me problems.  What did you mean?

8    A    To do the testing.  I begged them to do the testing

9    over and over and over.

10    Q    And finally, if you go to 15- -- back two pages,

11    15849 into 50.  Your statement actually -- they're telling

12    you you're in big trouble.  You said I told you the truth.

13    I did not f-ing -- I didn't touch no old man.  I didn't

14    touch his house.  Right?

15    A    That is true.

16    Q    Is that in fact true?

17    A    Yes, it is.  Yes, that's true.  I did say that.

18    They asked me that, and I did say that.  That is my answer.

19    Q    So at this point, was it your mindset they were

20    telling you that Ricky Birch had turned on you, that the

21    evidence was all going to be against you forensically, and

22    that you could potentially face the death penalty?

23    A    Yes.

24          ATTY. PROSCINO:  Objection, Your Honor.

25          THE COURT:  (Indiscernible)

26          ATTY. RAABE:  His mindset.

27          THE COURT:  All right.  He's already testified

1           to that.

2       A   I said yes in case you didn't hear me.

3       Q   During the course of your meetings, interrogations

4   with the police, you did truthfully admit to all of the

5   burglaries that you committed, right?

6       A   Yes, sir, I did.

7       Q   You admitted the stolen car?

8       A   Yes, I did.  I showed them where the stolen car was.

9   I did that.

10      Q   You admitted to drug use?

11      A   Yes, I did.

12      Q   And part of that was cocaine use, right?

13      A   Yes, it was.

14      Q   Can you tell Judge Sferrazza how you first got

15  introduced to cocaine?

16      A   Through a friend of Tina's.

17      Q   And were you a cocaine addict at the time in

18  December of 1985?

19      A   I have never in my life been a cocaine addict.  I

20  was experimenting with cocaine.  My thing was marijuana and

21  hasheesh, things of that nature.  I liked to laugh.

22      Q   As a result of ingesting cocaine or marijuana in

23  this timeframe, December of 1985, did you ever lose control

24  of your faculties?

25      A   Absolutely not.

26      Q   When did you first meet Ricky Birch?

27      A   I believe I met Ricky Birch in the baseball fields

1    down by the river in New Milford in September or October of

2    '85, I believe.

3        Q    Is that about the time that you came to New Milford

4    from Illinois?

5        A    Yes, sir.  Within them months, yes, sir.  A month

6    and a half after I came to New Milford from Groton where I

7    was living, yes.

8        Q    At the time that Chief Olmsted and Captain Lillis

9    were telling you that Ricky had turned on you, did you feel

10   any loyalty to Ricky?

11       A    Absolutely not.  I barely knew Ricky.  I mean, we

12   were living together in a stolen car, but that's only

13   because of Tina.

14       Q    At some point --

15       A    If it hadn't been for Tina, then I would not have

16   been involved with Ricky.

17       Q    At some point when the police were questioning you

18   about Ricky Birch, did you say words to the effect of if you

19   want to know about what Ricky did, go ask Ricky?

20       A    Yes, I did say that.

21       Q    Can you tell the judge why you said that?

22       A    Because the police kept asking me questions like

23   what'd Ricky do?  What'd Ricky do?  You know, Ricky's saying

24   this and Ricky's saying that.  Well, if you want to know

25   what Ricky's saying about anything, go ask Ricky.

26       Q    Were they telling --

27       A    That's what I said, but I said that many times to

1    many, you know, many questions.

2        Q    Did the police tell you that Ricky Birch had killed

3    Everett Carr and that they wanted you to cooperate against

4    him?

5        A    Yes, they did.

6        Q    Is that one of the reasons you said if you want to

7    know about Ricky, go ask Ricky?

8        A    Yes, it is.

9        Q    You talked before about the fact that you had

10    interactions with Detective Ocif.  Did you ever tell

11    Detective Ocif that you killed Everett Carr?

12        A    Never have I told anyone that I killed Everett Carr.

13    Never.

14        Q    Did you ever tell Detective Ocif that you had any

15    information about -- withdrawn.  Did you ever tell Detective

16    Ocif that you were present when Everett Carr was killed?

17        A    Never.

18        Q    You were here when he testified in this court,

19    right?

20        A    Yes, I was.

21        Q    Did he at some point come down and pick you up down

22    in the Waterford area on a violation of probation warrant?

23        A    Yes.  Detective Ocif drove all the way from

24    Litchfield County to where I was working in Waterford,

25    Connecticut, and he arrested me for a violation of probation

26    charge.

27        Q    This is when you were working building houses?

```
1      A   Yes, sir.  I was building houses in Waterford,

2   Connecticut.  I lived in Mystic, Connecticut at the time.

3      Q   And in the course of driving you to Litchfield, did

4   he show you a dummy warrant for the -- for your arrest in

5   relation to the Carr homicide?

6               ATTY. PROSCINO:  Objection, Your Honor.

7      A   Yes, he did.

8               THE COURT:  What -- what's the objection?

9               ATTY. PROSCINO:  How is this relevant to --

10          with the claims in the petition?

11              THE COURT:  We've already had testimony on it.

12          I think it's cumulative.

13              ATTY. RAABE:  I was just asking what his

14          reaction to it was, Your Honor.

15              THE COURT:  I -- I don't know that that's

16          relevant.  I'll sustain the objection.

17     Q   In the course of the ride and then your

18   interrogation in the Litchfield barracks, did Detective Ocif

19   say that you should give up Ricky?

20     A   Yes.  Yes, he did.

21     Q   What'd you tell him?

22     A   I told him there was nothing to say.  Not going to

23   give up a man that I know is not guilty of a murder.  Who

24   would do that?

25     Q   At -- at some point, was there talk between you,

26   Miss Yablonski and Ricky about quote getting your story

27   straight unquote?
```

1      A    Yes.  Yes, there was.

2      Q    And was that in -- well, withdrawn.  What did that

3   relate to?

4      A    That related to the night that Mr. Carr was killed

5   in his -- in his house.

6      Q    And what was getting the story straight all about?

7      A    Us not being arrested for the stolen car and for the

8   burglaries that we'd done.

9      Q    So when you first were not truthful with the police,

10   was that in relation to getting your story straight about

11   the stolen car and the burglaries?

12      A    Could you rephrase that, please?  Could you ask --

13      Q    When you first -- you said before you weren't

14   initially truthful with the police, right?

15      A    Yes, that's true.

16      Q    And when you weren't being truthful, was that part

17   of the getting the story straight about the stolen car and

18   the burglaries?

19      A    Yes.  I didn't want Tina going to prison.  I didn't,

20   you know -- she was my woman.

21      Q    And then after that initial deception to the police,

22   once they started accusing you of the Carr murder, were you

23   forthcoming and honest with them?

24      A    Yes.

25      Q    You talked before about the -- the blue coat.

26      A    Yes, sir.

27      Q    Going back to Exhibit 5, Item 63, it describes a

1    blue corduroy, quilted jacket, brand name Skidaddle quote

2    Pack Ten unquote having an apparent blood-like -- blood-like

3    substance on it that was seized from you.  Is that the coat

4    you're referring to?

5        A    Yes, sir.  That's the coat that they seized from me

6    the day that I showed them where the stolen car was when I

7    ripped my hands open on the license plate, yes, sir.

8        Q    Was that the only winter coat that you had at the

9    time?

10       A    That was the only coat that I had that entire time.

11   Yes, sir.  Yes, it was.

12       Q    Did it have blood on it?

13       A    Yes, it did.

14       Q    Whose blood?

15       A    My blood.

16       Q    All right, let's switch gears to calls with Mildred

17   Henning, your grandmother, and Tim Saathoff.

18       A    Yes, sir.

19       Q    You called both of them on a particular day?

20       A    At nighttime, yes, after the interrogations were

21   over with the New Milford and the State Police Departments,

22   yes.

23       Q    Can you tell the judge why you called them and what

24   you said to them, starting with your grandmother?

25       A    I called my grandmother first from the collect phone

26   in the jail.  I told her I was in jail.  I told her that I

27   was in jail because I had stolen a car and that we had done

1    some burglaries, and because of those burglaries I was a

2    suspect for a murder where the -- where the police think a

3    man and a dog were killed.

4        Q   Did you tell your grandmother that you were present

5    at that murder?

6        A   I told my grandmother that I didn't do the murder.

7        Q   Did you tell your --

8        A   That's what I told her, but she doesn't know who

9    Ricky and Tina are.  There's no sense in saying we didn't --

10       Q   Listen to my question.  Did you tell your

11   grandmother that you were present at the murder?

12       A   Never did I say that.

13       Q   How long after you talked to your grandmother did

14   you call Tim Saathoff?

15       A   Right afterwards.

16       Q   Who is Tim Saathoff?

17       A   He was a childhood friend of mine that I knew from

18   Herscher, Illinois at various points in my life.  I moved to

19   Herscher and from Herscher at various times in my life.

20       Q   What did you tell Mr. Saathoff?

21       A   Almost the same thing as I told my grandmother.

22       Q   Did you tell either of them that you had

23   participated in the Carr homicide?

24       A   Absolutely not.  I never said that.

25       Q   Did you tell either of them that you were present

26   for the Carr homicide?

27       A   No, I did not.

```
 1      Q   Did you tell either of them that Mr. Birch committed

 2  the Carr homicide?

 3      A   No, I did not.  That was Ocif's version of what I

 4  said.

 5      Q   I didn't ask a question, sir.  So they're -- they're

 6  testifying -- they testified against you at trial, right?

 7      A   Yes.

 8      Q   And they said that you did say that you were there,

 9  right?

10      A   Yes.

11      Q   In the course of that testimony, did you provide

12  more notes to Attorney Eisenmann?

13      A   Yes, I did.

14      Q   So do you still have Exhibit 168 in front of you?

15      A   Yes, sir, I do have it.

16      Q   If you look on the page that says (indiscernible) up

17  top --

18      A   Yes, sir.

19      A   About five bullets down -- let's make sure I'm

20  reading this right.  Grandmother told her about me be

21  suspect.  Did not say I was involved.  Wish they had tape

22  recording.

23      A   Yes, sir, I wrote that.

24      Q   Did -- did you write that note to Attorney

25  Eisenmann?

26      A   Yes, I did.

27      Q   Why?
```

1    A   Because I begged him to get the audio tape of the

2   telephone calls between me and my grandmother and me and Tim

3   Saathoff.  That's why I wrote that.  I begged him to get the

4   audio tape so that I could prove what I said -- so I could

5   prove how I said what I said.

6    Q   If you go to Exhibit 171, the defense and offense --

7    A   Yes, sir.

8    Q   About halfway down that first page it says phone

9   recording of my calls to Timmy and my grandmother.  Is that

10  another instance where you were asking to see if there were

11  phone call recordings?

12   A   Yes, sir.

13   Q   Because you believed that those would bear out your

14  conversation that you just accounted to this Court?

15   A   Yes, I did believe that.  I told him that a hundred

16  times over and over and over.

17           ATTY. RAABE:  Your Honor, I'd offer as a full

18           exhibit 175, which is again more notes from Exhibit

19           183.

20           ATTY. PROSCINO:  No objection, Your Honor.

21           THE COURT:  Okay.  It will be admitted as

22           Exhibit 175.  Thank you.

23   Q   Again, these are more notes that you were giving to

24  Attorney Eisenmann?

25   A   Yes, sir.

26   Q   The second one said I did call Timmy about this

27  murder, but when I told him a man was killed, I also told

 1  him that the police detectives thought I was there.

 2      A   Yes, I wrote that.

 3      Q   Why were you sending that note to Attorney

 4  Eisenmann?

 5      A   Because it's the truth.

 6              ATTY. RAABE:  I'd offer Exhibit 174 as full,

 7          Your Honor.  Again, more notes from Exhibit 183.

 8              ATTY. PROSCINO:  No objection, Your Honor.

 9              THE COURT:  Okay.

10      Q   Is this another note that you gave to Attorney

11  Eisenmann during the trial?

12      A   Yes, sir, while Tim Saathoff was testifying.

13      Q   And here you were suggesting how Attorney Eisenmann

14  might deal with Mr. Saathoff's testimony during your

15  criminal trial?

16      A   Yes, sir.

17      Q   When your grandmother and Attorney Saathoff were

18  done testifying, did you say anything to Attorney Eisenmann?

19  Or -- let me withdraw the question.  After your grandmother

20  and Attorney -- and Mr. Saathoff had testified, were you

21  concerned about their testimony?

22      A   Yes.  He made -- he left it in the courtroom like if

23  I was guilty, and I was pulling on his jacket saying you

24  can't leave this like this.  I didn't understand how he

25  could leave that like that, like after I told him a million

26  times to, you know -- I just didn't understand it.  I still

27  don't understand how he could do that as a lawyer.

1    Q   With your grandmother, do you recall she testified

2   that you had told her that a man and a dog was killed?

3    A   Yes, that's what she said.

4    Q   Why -- did you in fact tell your grandmother in the

5   phone call that a dog had been killed?

6    A   Yes, that's what I said.  That's what I was told.

7    Q   Why'd you tell your grandmother a dog had been

8   killed?

9    A   Because that's the story how I heard it.

10    Q   Did you ever try to convince your grandmother that

11   the conversation that you had with her just before you

12   called Mr. Saathoff didn't in fact occur?

13    A   I never --

14         ATTY. PROSCINO:  Objection, Your Honor.

15    A   -- said that it didn't occur.

16         ATTY. PROSCINO:  I'm just going to argue it's

17         not relevant.

18         ATTY. RAABE:  It's part of the trial evidence,

19         Your Honor.

20         THE COURT:  As to whether he tried to -- to

21         convince his grandma --

22         ATTY. RAABE:  There was some -- there was --

23         excuse me.  There was some trial testimony that --

24         THE COURT:  I'll allow it.

25    Q   Did you ever try to convince your grandmother that

26   the first conversation, before you had spoken with Mr.

27   Saathoff, didn't in fact occur?

1    A    I never tried to convince her that that conversation

2    did not occur.

3    Q    Did you have a conversation with your grandmother

4    about whether she was recalling that early December

5    conversation correctly?

6    A    Yes.  That is what -- yes.

7    Q    What did you say to your grandmother in that regard?

8    A    That she didn't get the conversation right.  She

9    didn't listen.  She wasn't -- she was distraught when I

10   called her and told her about the murder and then the

11   burglaries and that I was a suspect in the murder.

12   Q    And that when she was recalling it, she would said

13   (sic) that you had participated in the murder, that you were

14   not there in fact?

15   A    Say that again?

16   Q    So, you were concerned that she had some

17   recollection that you had said to her that you somehow

18   participated in the murder, right?  Is that right?

19   A    Yes, sir.

20   Q    And when you had this follow up conversation with

21   her, what did you say to her?

22   A    Repeat the question, please.

23   Q    So when you had the follow up conversation with her

24   about her recollection of the first phone call, what did you

25   say to her?

26   A    I don't recall.  I don't recall.

27   Q    Let me back you up.  You -- you had heard that she

1   was saying that you had said that you were involved in the

2   Carr homicide, right?

3           ATTY. PROSCINO:  Objection, Your Honor.

4           ATTY. RAABE:  I'm just trying to get back in

5       the frame --

6           THE COURT:  Well, he said he doesn't recall.

7           THE WITNESS:  I'm lost.

8   Q   Do you recall having -- you talked with your

9   grandmother and then you called Tim Saathoff, right?

10  A   Yes, sir.

11  Q   Do you recall being concerned about how your

12  grandmother recalled that first conversation?

13  A   Of course.

14  Q   And did you have a subsequent conversation with your

15  grandmother?

16  A   Yes.

17  Q   Do you remember what you said to your grandmother in

18  that conversation?

19  A   That she was wrong.

20  Q   About what?

21  A   About how the phone call went, about what I said to

22  her.

23  Q   How was she wrong?

24  A   'Cause I never said that I was at the Carr crime.  I

25  never once said that.

26  Q   Did you ever say to Mr. Saathoff that you were at

27  the Carr crime scene?

1    A    Never.

2    Q    You ultimately were convicted of felony murder,

3  right?

4    A    Yes, sir, we were.

5    Q    And you took an appeal?

6    A    Yes, sir.

7    Q    Did you at any point have any conversations with --

8  well, withdrawn.  Who was your counsel for the appeal?

9    A    Eisenmann -- Carl Eisenmann.

10    Q    Did you ever at any point have any conversations

11  with Attorney Eisenmann about what issues would be raised

12  or the strategy for the appeal?

13    A    I did not.  I didn't even know he was putting an

14  appeal in like that.

15    Q    Ultimately, your appeal was denied, right?

16    A    Yes, sir.

17    Q    And you filed a habeas petition?

18    A    Yes, I did.

19    Q    Did Attorney Michael Merati, M E R A T I, represent

20  you in that habeas?

21    A    Yes, he did.

22    Q    Let me show you what's been marked for

23  identification as Exhibit 176.  That's a letter dated April

24  one, 2003 from Attorney Merati?

25    A    Yes, sir.

26    Q    Did you receive this while you were incarcerated in

27  Virginia?

```
 1      A   When the DOC had us in Virginia, yes.  I was an
 2   inmate in Virginia at the time.
 3      Q   So -- so the question is, did you receive this when
 4   you were an inmate in Virginia?
 5      A   Yes, sir.
 6              ATTY. RAABE:  Your Honor, I offer it not for
 7           the truth, but simply for the subsequent actions in
 8           relation to the habeas.
 9              ATTY. PROSCINO:  Just for that limited purpose,
10           Your Honor, we have no objection.
11              THE COURT:  All right, it may be admitted.
12           What's the number again?
13              ATTY. RAABE:  One seven six, Your Honor.
14              THE COURT:  Okay.
15              ATTY. PROSCINO:  Craig, if you want to just
16           expedite, are you entering 177 and 178 under the
17           same?
18              ATTY. RAABE:  Yes.
19              ATTY. PROSCINO:  Do you want to just enter
20           those as full right now?
21              ATTY. RAABE:  Your Honor, on Respondent
22           Counsel's suggestion to expedite things, we have
23           Exhibits 177 and 178 which are also letters to Mr.
24           Henning from Attorney Merati.  I'd offer those as
25           full.
26              THE COURT:  Okay.
27              ATTY. PROSCINO:  179 I think, Craig, right?
```

```
 1              ATTY. RAABE:  I'm sorry.  177 and 179.

 2              ATTY. PROSCINO:  And for the same limited

 3         basis, Your Honor, we have no objection.

 4              THE COURT:  All right.  They may be admitted as

 5         full exhibits on that basis.

 6    Q   So if you look at Exhibit 176, Mr. Henning, down on

 7    the bottom of the first -- down on the bottom of the bottom

 8    paragraph on the first page, Mr. Merati is talking to you

 9    about your habeas.  Is it fair to say as you were dealing

10    with Attorney Merati he didn't seem to have a lot of

11    enthusiasm for your habeas petition?

12              ATTY. PROSCINO:  Objection, Your Honor.

13              THE COURT:  Yes, you're asking him to speculate

14         on someone else's enthusiasm.

15    Q   What was your belief as to your lawyer's enthusiasm

16    for your habeas petition?

17    A   He acted like he didn't want to do my habeas, and I

18    told him that the DNA would prove my innocence.

19    Q   Okay.  So down the bottom of the first page, I was

20    going to go through this quickly, it talks about your shoe

21    size being a ten and a half.  Do you see that?

22    A   Yes, sir.

23    Q   Is that accurate?

24    A   That's wrong.

25    Q   What is your shoe size.

26    A   My shoe size is eleven and a half, twelve.

27    Q   Here's Exhibit 177, Mr. Henning.
```

```
 1              ATTY. RAABE:  I apologize, Your Honor.  I don't
 2         have another copy of this one.
 3     Q    Do you recall having -- or receiving this letter
 4   from Attorney Merati?
 5     A    Yes, sir.  Yes, sir, I do.
 6     Q    And just to expedite things, he was writing you
 7   before your upcoming habeas hearing in January of 2004?
 8     A    Yes, sir.
 9     Q    And did you have some communication with him about
10   whether you needed to be present for that hearing?
11     A    Yes, that's what's in the letter.
12     Q    So did you have any understanding as to whether you
13   needed to be -- needed to be present for your habeas hearing
14   in January of 2004?
15     A    He said I didn't need to be there.
16     Q    And did he talk about your petition being withdrawn
17   without prejudice?
18     A    Yes.  That was in the letter that he wrote, yes.
19     Q    And what did you understand that to mean?
20     A    That means that I wouldn't be penalized, that I
21   could do the -- wait for the DNA testing to be done in this
22   case to prove my innocence before I had to recla- -- refile
23   the habeas.
24     Q    And is some of your understanding on this issue
25   encapsulated in Exhibit 177?
26     A    Yes.  Yes, sir, in the letter.  I was still in
27   Virginia when I got this.
```

1          ATTY. PROSCINO:  Objection, Your Honor.  No

2       question pending.

3          ATTY. RAABE:  Your Honor, I'd offer as a full

4       exhibit Exhibit 178 which is the hearing transcript

5       from Mr. Henning's January five, 2004 habeas

6       dismissal.

7          ATTY. PROSCINO:  No objection to that.

8          THE COURT:  It may be admitted.

9    Q   You didn't come back to Connecticut for the January

10   five, 2004 hearing, right?

11   A   I did not.  He said I didn't need to.

12   Q   If you were told that you had to be there, would you

13   have gone?

14   A   Absolutely.

15   Q   In the hearing on page three, the Court asked your

16   lawyer, Counsel, is it true that your client refused to come

17   here, and your lawyer answered yes.  Is that true?

18          ATTY. PROSCINO:  Objection, Your Honor.  The

19       transcript speaks for itself at this point.

20          THE WITNESS:  I-- I don't have that document.

21          THE COURT:  I think he's not asking him what

22       the transcript says, but whether that actually

23       happened.

24          ATTY. RAABE:  That's correct, Your Honor.

25   Q   So the Court asked your counsel, Counsel, is it true

26   that your client, meaning you, refused to come here, and

27   your lawyer said yes.

```
1      A    Yes.

2      Q    Had you in fact refused to go to your habeas

3  hearing?

4      A    Absolutely not.

5      Q    Did you authorize your lawyer to have your habeas

6  dismissed with prejudice?

7      A    No, I most certainly did not.

8      Q    Why not?

9      A    I never authorized that.  I was never asked to

10  authorize anything by Merati.

11     Q    Was it your understanding that you were going to

12  withdraw without prejudice, have some DNA testing --

13     A    Yes.

14     Q    -- and then bring the --

15     A    Yes, sir.

16     Q    -- DNA claims and all of the other habeas claims all

17  at once?

18     A    Yes, sir.

19     Q    In this proceeding that we're here today at?

20     A    Yes, sir.  That was my understanding.

21     Q    You've seen pictures of the Carr-Colombo residence

22  in the course of your underlying trial in this case, right?

23     A    Yes, sir.

24     Q    Did you ever burglarize that home?

25     A    I did not.

26     Q    Have you ever set foot on that property?

27     A    I have never stepped foot on that property in my
```

```
 1   life.

 2       Q   Did you kill Everett Carr?

 3       A   I did not.

 4       Q   Were you present when Everett Carr was killed?

 5       A   I was not present.

 6       Q   Do you know who killed Everett Carr?

 7       A   I do not know who killed Everett Carr.

 8              ATTY. RAABE:  One moment, please, Your Honor?

 9              THE COURT:  Yes.

10              ATTY. RAABE:  Thank you, Your Honor.  Nothing

11          further.

12              THE COURT:  Counsel for Mr. Birch?

13              ATTY. O'SHEA:  No questions, Your Honor.

14              ATTY. PROSCINO:  Just briefly, Your Honor.

15              THE COURT:  Yes.

16              ATTY. PROSCINO:  Thank you.

17              THE WITNESS:  Your Honor, do I give these to

18          you?

19              THE COURT:  Sure.

20              ATTY. PROSCINO:  Your Honor, may I be permitted

21          to question the witness from counsel table?

22              THE COURT:  Sure, as long as you're in front of

23          the microphone.

24              ATTY. PROSCINO:  I'll allow Attorney Raabe to

25          collect his --

26              THE COURT:  Yes.

27              ATTY. PROSCINO:  -- items.
```

1     CROSS-EXAMINATION BY ATTY. PROSCINO:

2       Q    Good afternoon, Mr. Henning.

3       A    Good afternoon.

4       Q    Just a few questions for you.  And if I just ask you

5     just to keep your voice up a little louder.  We just had

6     some trouble hearing you earlier.

7       A    Yes, ma'am.

8       Q    Thank you.  So you testified on direct examination

9     about the notes that you wrote your attorney, Carl

10    Eisenmann.  Is that correct?

11       A    Yes.

12       Q    And it's true that you wrote quite a bit -- quite a

13    lot of notes to Attorney Eisenmann.  Is that correct?

14       A    I wrote them throughout my trial just as I do for

15    this trial.

16       Q    But you wrote a lot of them, correct?

17       A    Yes.

18       Q    And you indicated that you wrote them throughout

19    your trial --

20       A    Yes, ma'am.

21       Q    -- to Attorney Eisenmann?

22       A    Yes, ma'am.

23       Q    Did you write them at any other time during your

24    trial to him?  Well, let me rephrase that.

25       A    Yeah, I don't understand your question.

26       Q    Were you only writing the notes to him while you

27    were in court?

1       A    I believe so.

2       Q    Okay.

3       A    I don't remember writing them anywhere else.

4       Q    Okay, so it's safe to say that the notes that you

5  were giving Attorney Eisenmann were being written while you

6  were sitting next to him in court, correct?

7       A    The best that I can recall, yes.

8       Q    Okay.

9       A    Those are Eisenmann -- those were the notes --

10      Q    There's no question pending, Mr. Henning.  Now, you

11 wouldn't have written all those notes if you thought that

12 Mr. Eisenmann wasn't paying attention to them, correct?

13      A    I was writing those notes because Eisenmann was not

14 paying attention to me while the witnesses were on the

15 stand.  I was writing them for various reasons.

16      Q    Well, if you thought that he wasn't paying attention

17 to you, then why did you continue to write them?

18      A    Because I needed him to pay attention to what I was

19 writing.  I was telling him to have the testing done, and he

20 was not paying attention to what I was writing.  That's why

21 I wrote it repeatedly.  I was trying to --

22      Q    So --

23      A    -- defend myself.

24      Q    But your testimony earlier on direct examination was

25 that Attorney Eisenmann was paying attention to the

26 witnesses.  Wasn't that correct?

27      A    Yes, ma'am, that's true.

1    Q    And isn't that what you would want your attorney

2    who's defending you in a murder case to be doing?

3    A    I want him to pay attention to both what I'm saying

4    to him and was being said on the witness stand so I can

5    defend myself.

6    Q    But didn't you testify that Attorney Eisenmann told

7    you that it was difficult for him to pay attention to what

8    the witnesses were stating on -- while they were on the

9    stand and listen to you, correct?

10    A    This is true.

11    Q    And you wouldn't want your attorney to get confused

12    by what he's listening to you say and what he's listening to

13    the witnesses who could possibly provide some information

14    that could render you innocent, correct?

15    A    I don't know how to answer that.  I would want my

16    attorney to defend me to the best of his ability, and if

17    that's what you're asking me, that's my answer.

18    Q    Okay.  Now -- just one moment.  Now you testified

19    also on direct examination that you brought the police to

20    where the stolen Buick was located, correct?

21    A    Yes, I did.

22    Q    Now that was days after the Carr murder, correct?

23    A    That was, I believe, December 5th.  Yes, four days

24    after the Carr murder, yes.

25    Q    Okay, and it's -- it's a --

26    A    Five days after, yes.

27    Q    Okay, excellent.  Thank you.

1          ATTY. PROSCINO:   Just one moment, Your Honor.

2          THE COURT:   Yes.

3          ATTY. PROSCINO:   Thank you.

4     Q    Now, you also talked about on direct examination the

5     letters that Attorney Merati, your habeas counsel, sent to

6     you while you were incarcerated, correct?

7     A    Yes.

8     Q    And you read those letters, correct?

9     A    Yes, I did.

10    Q    And you indicated on direct examination that you had

11    some disagreements with the information in those letters,

12    correct?

13    A    I don't understand what you mean by disagreement.

14    Q    I'll withdraw that.  If you didn't agree with some

15    of the statements that Attorney Merati had made in those

16    letters, would you -- wouldn't you have contacted him to

17    correct his understanding?

18    A    We were in contact.  That's why he sent me the

19    letters that he sent me.

20    Q    So you didn't tell him that there were any issues

21    that you had with some of the things that he said

22    specifically like you testified on direct that he had your

23    shoe size wrong, correct?

24    A    The shoe size wasn't necessary for me to correct him

25    on in that letter.  I'm waiting for the DNA across the

26    board.

27    Q    But --

```
 1      A   I wanted all of the testing to be done.

 2      Q   But you testified, though, that you did communicate

 3  with him, correct?

 4      A   Yes, of course.  That's what -- what -- that's the

 5  reason I got three or four letters from him.

 6      Q   Okay.  Now isn't it true that during your habeas

 7  trial, the one that took place on January 5, 2004, the

 8  reason why you didn't want to come up to Connecticut is

 9  because you were happy in Virginia, right?

10      A   That's not true.  My mother was dying of cancer.

11  She lived in North Carolina.  That was the reason why.  It

12  wasn't because I was happy.

13      Q   But Attorney Merati --

14      A   I've been in prison 28 years.  I'm not happy.

15      Q   There's no question pending, Mr. Henning.  So it was

16  incorrect that -- withdrawn.

17              ATTY. PROSCINO:  One moment, Your Honor.

18              THE COURT:  Yes.

19              ATTY. PROSCINO:  Nothing further, Your Honor.

20              THE COURT:  Any redirect based on cross-

21          examination?

22  REDIRECT BY ATTY. RAABE:

23      Q   You said your mother was dying of cancer in North

24  Carolina?

25      A   Yes, sir.  An hour -- she lived an hour or something

26  away from where I was.  I hadn't seen her in 20 years.

27      Q   So is that one of the reasons you were down in
```

 1   Virginia?

 2       A    I was down in Virginia because Connecticut had too

 3   many inmates in their system, and they sent us down there.

 4       Q    As a result of your mother being sick, did you

 5   refuse to come back to Connecticut?

 6       A    I don't know if it was as a result of that, but that

 7   was one of the reasons why I did not want to come back to

 8   Connecticut, yes.

 9       Q    And you had a conversation with your habeas lawyer

10   about whether you had to come back, right?

11       A    Yes, sir.

12       Q    And what did he tell you?

13       A    That I didn't have to come back, 'cause the judge

14   already -- he was already straight with the judge.

15       Q    And as a result, you stayed in Virginia.

16       A    I was in -- I was in the state -- I was housed in

17   Virginia, yes.

18       Q    Now, with regard to the notes that you were

19   preparing and that you gave to Attorney Eisenmann, were you

20   going over those notes with him at the lunch break, after

21   court, at any time?

22       A    Yes.  I was trying to, you know -- as it happens

23   here, I don't get much time with you guys to discuss those

24   things.  You know, the sheriffs bring us out after a couple

25   of minutes.  That's the same thing that happened in my

26   trial.

27       Q    But you -- you were raising issues because you were

1    concerned with the way that Attorney Eisenmann was dealing

2    with them and you wanted to --

3        A    Yes, sir.  Obviously, yes, sir.

4        Q    Yup.  Let me finish the question.  You were

5    concerned about the way that the trial was going, and you

6    wanted to raise issues for Attorney Eisenmann to address?

7        A    Yes, sir.

8        Q    And at the end of the day, did you feel that they

9    were properly addressed?

10       A    I did not -- a lot of times, I did not.

11               ATTY. RAABE:  Thank you, Your Honor.

12               ATTY. O'SHEA:   No questions, Your Honor.

13               ATTY. PROSCINO:  Just briefly, Your Honor.

14               THE COURT:  Yes.

15   RECROSS BY ATTY. PROSCINO:

16       Q    While you were in Virginia, Mr. Henning, you weren't

17   able to see your mother anyway because you were

18   incarcerated, correct?

19       A    My mother came to visit me multiple times when I was

20   down in Virginia.

21       Q    So she was able to travel?

22       A    My mother traveled with my stepfather, brought her

23   there, yes.

24       Q    So she would've been able to travel to Connecticut,

25   correct, to see you?

26       A    My mother was poor.

27       Q    Yes or no, Mr. Henning.

```
1    A    I suppose.

2              ATTY. PROSCINO:  Nothing further, Your Honor.

3              ATTY. RAABE:  Nothing, Your Honor.

4              THE COURT:  All right, you may step down and

5         resume your seat.

6              THE WITNESS:  Thank you, sir.

7              THE COURT:  Do you have any other exhibits --

8         you're all set.

9              ATTY. RAABE:  In terms of the balance of the

10        day, Your Honor, if the Court pleases, we've had a

11        conversation with Respondent's Counsel and our

12        thought jointly is rather than start a new witness,

13        we'd just commence tomorrow -- Wednesday morning at

14        ten?

15             THE COURT:  Okay, Wednesday morning at ten

16        o'clock.  Let me just ask -- do we know if this

17        courtroom is going to be used tomorrow or can we

18        leave materials and --

19             THE CLERK:  Let me just check real quick.

20             THE COURT:  Okay.

21             THE CLERK:  According to Edison, it's not being

22        used tomorrow.

23             THE COURT:  Okay, so apparently this courtroom

24        is free tomorrow, so if you want to leave your

25        things here --

26             ATTY. PROSCINO:  Thank you, Your Honor.

27             THE COURT:  -- you can do that.
```

1              ATTY. RAABE:  Thank you, Judge.

2              THE COURT:  So we are adjourned until Wednesday

3         at ten o'clock.

4                        (End of day)

```
 1
 2   NO.:  TSR-CV01-0817907-S        :  SUPERIOR COURT
 3
 4   RALPH BIRCH v. WARDEN            :  JUDICIAL DISTRICT
 5                                       OF TOLLAND
 6   NO.:  TSR-CV12-4004924-S        :  AT ROCKVILLE, CONNECTICUT
 7
 8   SHAWN HENNING v. WARDEN          :  NOVEMBER 16, 2015
 9
10   NO.:  TTD-CV15-6009683-S
11
12   SHAWN HENNING v. STATE OF CONNECTICUT
13
14   NO.:  TTD-CV15-6009781-S
15
16   RALPH BIRCH v. STATE OF CONNECTICUT
17
18
19
20
21
22
23                C E R T I F I C A T I O N
24
25
26
27        I hereby certify the foregoing pages are a true and
28   correct electronic/transcription of the audio recording of the
29   above-referenced case, heard in Superior Court, Judicial District
30   of Tolland, at Rockville, Connecticut, before the Honorable
31   Samuel J. Sferrazza, Judge, on the $16^{th}$ day of November, 2014.
32
33
34        Dated this 3rd day of February, 2016 in Rockville,
35   Connecticut.
36
37
38
39
40
41
42                    _____
43                    Pamela Clemens
44                    Court Recording Monitor
45
```