## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RALTH BIRCH AND SHAWN HENNING,
*Plaintiffs*,

v.

TOWN OF NEW MILFORD et al.,
*Defendants*.

No. 3:20-cv-1790 (VAB)
[*rel.* No. 3:20-cv-1792 (VAB)]

### RULING AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Ralph Birch has sued the Town of New Milford, David Shortt, Steven Jordan, and Robert Santoro (collectively the "Town Defendants"), as well as Andrew Ocif, Scott O'Mara, John Mucherino, Joseph Quartiero, Michael Graham, Brian Acker, and Dr. Henry Lee under 42 U.S.C. § 1983 and state common law torts for alleged fabrication of evidence, malicious prosecution, and suppression of material exculpatory evidence, which allegedly resulted in Mr. Birch's wrongful conviction for felony murder and burglary and subsequent incarceration for more than thirty years. *See* First Am. Compl., No. 3:20-CV-1790, ECF No. 54 (Apr. 16, 2021) ("Am. Compl.").

Shawn Henning, a co-defendant with Mr. Birch in the state criminal proceeding, likewise has sued Andrew Ocif, Scott O'Mara, John Mucherino, Joseph Quartiero, Michael Graham, Brian Acker, H. Patrick McCafferty, and Dr. Henry Lee (collectively the "State Defendants") and Town Defendants, alleging virtually the same claims. *See* Compl., No. 3:20-CV-1792, ECF No. 1 (Dec. 2, 2020) ("Compl.").[1]

---

[1] To simplify matters, and to avoid any confusion between and among the State and local police entities, as well as the law enforcement officials who were involved in the relevant events, the Court will consistently refer to any of the Defendants by their title during the time period relevant to this case, regardless of any subsequent titles they may have held since then.

Andrew Ocif, Scott O'Mara, Joseph Quartiero, Michael Graham, and H. Patrick McCafferty were, at all relevant times, Detectives in the Connecticut State Police. Am. Compl. ¶¶ 40–41, 44–45; Compl. ¶ 38. John Mucherino and Brian Acker were, at all relevant times, Sergeants in the Connecticut State Police. State Police Sergeant Acker was the highest-ranking police official assigned to the Carr murder investigation and he retained supervisory authority over the investigation as a whole. Am. Compl. ¶¶ 42, 46. Dr. Henry Lee ("Dr. Lee") was, at all relevant times, the Director of the Connecticut State Forensic Laboratory. *Id.* ¶ 47.

David Shortt was, at all relevant times, a Detective in the New Milford Police Department, *see id.* ¶ 48, and Steven Jordan was, at all relevant times, a Police Officer in the New Milford Police Department, *id.* ¶ 43. The Town of New Milford is a municipal corporation organized under the laws of the State of Connecticut. *Id.* ¶ 39.

Mr. Birch and Mr. Henning (collectively "Plaintiffs") filed a joint motion to consolidate their cases on February 3, 2021, and the Court granted that motion, thereby consolidating *Birch v. Town of New Milford et al.*, No. 3:20-cv-01790, with *Henning v. Town of New Milford et al.*, No. 3:20-cv-01792. *See* Order, ECF No. 27.

All of the Defendants moved to dismiss some of Plaintiffs' claims, and the Court denied those motions.[2] *See* Orders, ECF Nos. 70, 71 (Sep. 24, 2021). Following discovery, certain State Defendants and all of the Town Defendants have now moved for summary judgment on Plaintiffs' claims. More specifically:

- Dr. Lee has moved for summary judgment as to all claims against him brought by Mr. Birch and Mr. Henning, *see* Dr. Lee's Mot. for Summ. J, ECF No. 127 ("Dr. Lee's

---

[2] The Court granted the Town Defendants' motion to dismiss as to Mr. Henning's § 1983 civil rights conspiracy (Count Four) and failure to intervene (Count Five) claims.

MSJ"), and has filed a motion to amend his Answer to include the affirmative defense of absolute testimonial immunity, a defense which he relies on in moving for summary judgment, *see* Dr. Lee's Mot. to Am. State Defs.' Answer and Special Defenses, ECF No. 143 ("Dr. Lee's Mot. to Am.").

- The remaining state Defendants have moved for partial summary judgment. *See* State Police Defs.' Mot. for Summ. J., ECF No. 128 ("State Defs.' MSJ"). State Police Sergeant Acker has moved for summary judgment as to all claims against him. *See* State Defs.' MSJ at 1. The remaining State Defendants have moved for summary judgment as to all claims against them, except for Plaintiffs' fabrication of evidence claims. *See id.*

- The Town Defendants have moved for summary judgment on all claims against them. *See* Town of New Milford and David Shortt's Mot. for Summ. J., ECF No. 116 ("Shortt's MSJ"); Steve Jordan's Mot. for Summ. J., ECF No. 117 ("Jordan's MSJ").

In addition to opposing the various motions, Plaintiffs have moved for summary judgment against Dr. Lee as to liability. *See* Pls.' Joint Mot. for Partial Summ. J. against Dr. Lee, ECF No. 124; Mem. in Supp. of Pls.' Mot. for Summ. J., ECF No. 125 ("Pls.' MSJ").

For the following reasons, Dr. Lee's motion to amend his Answer is **DENIED.** His motion for summary judgment also is **DENIED**.

Plaintiffs' partial motion for summary judgment against Dr. Lee as to liability is **GRANTED**.

The State Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**. Specifically, State Police Sergeant Acker's motion for summary judgment as to Plaintiffs' fabrication claim, with respect to his knowledge of a fabricated supplemental police report, is **GRANTED**. In all other respects, including the remaining claims of fabrication of

evidence, State Police Sergeant Acker's motion for summary judgment is **DENIED**. The remaining State Defendants' motion for summary judgment is **DENIED** as to all other claims raised in it.

The Town Defendants' motions for summary judgment are **DENIED**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

#### 1.   The Underlying Criminal Cases[3]

Sometime either on the evening of December 1, or the morning of December 2, 1985, someone killed Everett Carr, a New Milford resident, in his home. State Defs.' Local Rule 56(a)(1) Statement of Material Facts ¶ 1, ECF No 128-2 (State Defs.' SMF"). The assailant or assailants stabbed Mr. Carr twenty-seven times, struck him in his head multiple times, and severed his jugular vein. Pls.' Local Rule 56(a)(1) Statement of Material Facts ¶ 2, ECF No 126 (Pls.' SMF"). When members of the New Milford Police Department and State Police Western District Major Crime Squad responded to the Carr residence on December 2, 1985, State Defs.' SMF ¶ 2, they found Mr. Carr's blood pooled on the floor and splattered from the floor nearly to the ceilings, *id.* ¶ 3.

#### 2.   The Initial Investigation of the Underlying Criminal Case

In the early morning of December 2, 1985, members of the New Milford Police Department and State Police Western District Major Crime Squad responded to investigate the murder of Mr. Carr. State Defs.' SMF ¶ 2. State Police Sergeant Acker coordinated the early days of the investigation. *Id.* ¶ 3. He supervised evidence collection, prepared lead sheets, attended meetings with investigators and assigned tasks to officers who were assigned to the

---

[3] Unless otherwise noted, page numbers cited in this Ruling and Order refer to the ECF-generated page numbers rather than a document's internal page numbers.

investigation. *Id.* ¶ 4. State Police Detectives Ocif, O'Mara, Quartiero, Graham, and H. Patrick McCafferty as well as State Police Sergeant Mucherino, also assisted with the investigation. *Id.* ¶ 6.

When police processed the crime scene, they photographed a bathroom upstairs in which two towels were hanging next to the sink. One of the towels appeared to have a red-colored stain of some kind on it. Am. Compl. ¶ 308; State Defs.' Answer ¶ 308.

As Director of the Connecticut State Forensic Laboratory, Dr. Lee worked on the Carr murder investigation, Dr. Lee's SMF ¶¶ 1–2, and took pictures in the bathroom of the Carr home, which were developed into slides, including one picture of a white towel hanging on a bar in Mr. Carr's bathroom, *id.* ¶ 3. Dr. Lee did not create any written documents memorializing any testing or analysis that he either did or did not perform on the white towel. *Id.* ¶ 4. Dr. Lee did not take "any notes" regarding his test. Dr. Lee's Resp. to Pls.' SMF ¶ 25.

Dr. Lee later told the prosecutor, then-Assistant State Attorney David Shepack, that he had tested the bathroom towel and that the test was positive for blood. Pls.' SMF ¶ 15; Dr. Lee's Resp to Pls.' SMF ¶ 15.

The lead investigator, State Police Detective Ocif, noted that he had "never seen that kind of violence in a burglary." *Id.* ¶ 6. He and some of his colleagues focused on Mr. Henning and Mr. Birch, who were seventeen and eighteen years old at the time, respectively, as suspects in the Carr homicide because Mr. Birch and Mr. Henning had admitted to conducting daytime burglaries in the area. *Id.* ¶ 10.

On December 5, 1985, New Milford Detective Samoska and State Police Detective McCafferty questioned Mr. Birch about his activities with Mr. Henning and Tina Yablonski in

connection with the theft of a car and the commission of multiple burglaries in New Milford, and Mr. Birch provided them a sworn statement. Pls.' Resp. to State Defs.' SMF ¶ 7.

On December 6, 1985, New Milford Police Patrolman Lynch interviewed Mr. Henning about his activities with Mr. Birch and Tina Yablonski in connection with the theft of a car and the commission of multiple burglaries in New Milford. *Id.* ¶ 8.

Mr. Birch and Mr. Henning "confessed to using the car in connection with the commission of several burglaries," unrelated to the alleged robbery of the Carr residence. *Henning v. Comm'r of Corr.*, 334 Conn. 1, 8 (2019). Mr. Birch and Mr. Henning later were arrested and charged in connection with the stolen car.[4] While in custody pending trial on those charges, Mr. Birch and Mr. Henning were again interviewed regarding the Carr murder. *Id.*

One investigator, Captain Nobert Lillis of the New Milford Police Department, who interviewed Mr. Henning and Mr. Birch shortly after the homicide, immediately expressed his opinion during the investigation that the focus on Mr. Henning and Mr. Birch was misguided and that they were not involved. Dr. Lee's Resp. to Pls.' SMF ¶ 8. After he expressed his opinion, Captain Lillis allegedly was removed from the investigation. *Id.* ¶ 9.[5]

---

[4] The Connecticut Supreme Court noted that "[w]hen the police recovered the Buick, it was evident that it had not been cleaned." *Henning*, 334 Conn. at 9. The Court further noted

> [a]ccording to several police reports and photographic exhibits, the vehicle was covered in dirt and filled with sand, sneakers, toiletries, food, blankets, pillows, various items of clothing, and what the police believed to be stolen electronics. Despite a thorough examination of the vehicle and the surrounding area, which involved draining two reservoirs and the use of specially trained dogs, the police found no evidence linking the petitioner or Birch to the murder. A search of the victim's neighborhood, including the surrounding roadways and fields adjacent to those roadways, also produced no incriminating evidence.

*Id.*

[5] State Defendants admit that Captain Lillis was removed from the investigation, but they deny that there is evidence to support the assertion that Captain Lillis was removed because of the opinion he expressed. Dr. Lee's Resp. to Pls.' SMF ¶ 9.

On December 9, 1985, a week after the murder, State Police Detective O'Mara and State Police Sergeant Mucherino interviewed Mr. Birch. State Defs.' SMF ¶ 9. In the police report memorializing the interview, they noted that when Mr. Birch was shown "a photograph of the victim at the scene," he "asked if the victim was laying in the bathroom." Ex. D to State Defs.' SMF at 4, ECF No. 128-6 ("Initial Report").

The murder of Mr. Carr, a senior citizen killed in a brutal fashion, attracted significant public attention in the western part of Connecticut. The police allegedly were under significant pressure to solve it. Am. Compl. ¶ 96. Some of that pressure allegedly came from the victim's family. *Id.* ¶ 197. For example, on May 11, 1986, Mr. Carr's widow, Evelyn, wrote to Acker to express her displeasure that no one had been arrested yet. *Id.* Evelyn Carr, who by then lived in New Jersey, asked the police to tell her if they were still "at first base." *Id.* She wrote: "I still have many friends in New Milford, and I feel obliged to let them know by advising these friends and doing so through the public media, i.e., press conferences, TV, interviews, etc." *Id.* ¶ 198.

On October 9, 1986, State Police Lieutenant James Hiltz, the Commander of the Western District Major Crime Squad, encouraged the State's Attorney's Office to seek authorization from the Governor to issue a monetary reward for information that would aid in the Carr investigation. *Id.* ¶ 200. He wrote: "[A]ll conventional investigative leads and processes have been exhausted. All known associates, friends, possible witnesses and/or suspects have been interviewed. Evidence has been collected and forensically examined and analyzed. Simply stated, there is ***not enough Probable Cause for an arrest or prosecution***." *Id.* ¶ 201.

On October 23, 1986, Connecticut's then-Governor authorized a $20,000 award. *Id.* ¶ 203.

On May 5, 1987, about a year and half after filing his initial report and several months after the issuance of a reward, State Police Detective O'Mara filed a supplemental report. *See* Ex. C to State Defs.' SMF, ECF No. 128-5 ("Suppl. Report"). In the supplemental report, he noted an additional statement not previously included in the initial report. Specifically, he noted that State Police Detective Ocif "had advised him that he specifically recalled Birch saying, 'That's the bathroom there' when Birch was shown a polaroid photograph of the victim's body" during the December 9, 1985 interview. Suppl. Report at 1. State Police Detective O'Mara further noted the "bathroom was not visible in the photograph," and that "prior to showing B[?]birch the photograph, there had been no conversation to the orientation of any room or even the location of the victim in the house." *Id.*

### i.   Witness Testimonies of Mr. Birch's Purported Confessions

In the fall of 1987, while incarcerated at the John R. Manson Youth Institution ("Manson Youth Institution") in the town of Cheshire, Mr. Birch met an eighteen year old fellow inmate, Robert Perugini, while working in the laundry room. *Birch v. Comm'r of Corr.*, 334 Conn. 37, 47 (2019). On December 7, 1987, State Police Detective Ocif interviewed Mr. Perugini at Manson Youth Institution about Mr. Birch's involvement in the Carr murder. State Defs.' SMF ¶ 18. Approximately two weeks later, on December 23, 1987, he interviewed Mr. Perugini again in the presence of State Police Sergeant Acker, Mr. Perugini's uncle, and Mr. Perugini's lawyer. *Id.* ¶ 20. During the December 23, 1987 interview, State Police Detective Ocif "asked Perugini about the additional information [Perugini] had about the Carr murder," and Mr. Perugini "[s]tated that Birch had told him (Perugini) that he (Birch) had used a knife to kill the old man." Ex. F to State Defs.' SMF at 2, ECF No. 128-8 ("Ocif Police Report – Perugini"). When pressed for "other specifics," Mr. "Perugini stated that he had nothing else." *Id.*

While incarcerated at the Manson Youth Institution, Mr. Birch also befriended another fellow inmate, Todd Cocchia. *Birch*, 334 Conn. at 48. After their release from custody in 1988, Mr. Birch and Mr. Cocchia lived together in Danbury for approximately two months before moving together to Norfolk, Virginia. *Id.* On June 22, 1988, Mr. Cocchia was arrested and subsequently detained in a Norfolk jail. *Id.*

On July 12, 1988, State Police Detective Ocif interviewed Mr. Cocchia at the Norfolk, Virginia, Police Department in the presence of Detective Charles Squires of the Norfolk, Virginia, Police Department. State Defs.' SMF ¶ 21. At the start of the interview, Mr. Cocchia "indicated that he wanted assurances that he would not serve any time in the state of Connecticut if he provided this information about the murder." Ex. M to State Defs.' MSJ at 2, ECF No. 128-15 ("Ocif Police Report – Cocchia"). During the interview, Mr. Cocchia claimed that Mr. Birch "spontaneously confessed his participation in a murder while the two were on the bus to Virginia together." Am. Compl. ¶ 258; State Defs.' Answer ¶ 258.

In exchange for his cooperation, the State of Connecticut entered into an agreement with Mr. Cocchia under which it agreed, first, not to seek any prison time for Mr. Cocchia's probation violation and, second, to notify the Office of the State's Attorney for the judicial district of Danbury, where Mr. Cocchia had a pending criminal matter, of his cooperation in Mr. Birch's case. Additionally, because of his cooperation with state authorities in Connecticut, prosecutors in Virginia agreed that Mr. Cocchia would receive a sentence of time served on the charges that were pending against him there. *Birch*, 334 Conn. at 48–49.[6]

---

[6] On May 5, 1986, State Police Detective Ocif also interviewed arrestee Stanley Bryson, who had been detained with the Plaintiffs at the Litchfield County Jail in December 1985 shortly after the homicide. Ex. L to State Defs.' MSJ, ECF No. 128-14. Mr. Bryson claimed that Mr. Henning had told him in Mr. Birch's presence that Mr. Birch killed an old man during a burglary. *Id.* Mr. Bryson signed a statement to this effect. *Id.* Mr. Bryson also claimed that Mr. Henning admitted to stabbing a dog during the crime to stop the dog from barking. *See id.* at 4 ("Sean also said that

**ii.  Witness Testimonies of Mr. Henning's Purported Confessions**

During the course of the investigation, the police discovered that Mr. Henning had called

his grandmother, Mildred Henning and his close childhood friend, Timothy Saathoff, from jail

shortly after his arrest in 1985. *Henning*, 334 Conn. at 11. On September 16, 1988, Ms. Henning,

who resided in Herscher, Illinois, spoke with State Police Detective Ocif and Detective Karl

Seidel at the Herscher, Illinois, police department. State Defs.' SMF ¶ 24, 25. Mildred Henning

provided a signed sworn statement, in which she stated that "sometime around the Christmas

holidays in 1985," Mr. Birch called her and "began telling [her] about a crime," in which "an old

man with a dog had been killed, and that he was there, saw the man get killed but that [Mr.

Birch] didn't do it." Ex. K to State Defs.' SMF at 3, ECF No. 128-13. Mildred Henning's

statement was obtained after State Police Detective Ocif twice tried unsuccessfully to secure her

statement nearly a year before. Ocif Dep. Tr. at 304:23–25, ECF No. 137-10 ("Ocif. Tr.")

Timothy Saathoff "had been a friend of [Mr. Henning] when [Mr. Henning] lived in

Herscher." Ex. N to State Defs.' SMF at 3, ECF No. 128-16. Saathoff's sister, Lisa Pombert, was

a notary public and Ms. Pombert notarized Mildred Henning's statement. State Defs.' SMF ¶ 26.

After notarizing the statement, Ms. Pombert allegedly told the Herscher police chief that her

brother also informed her that Mr. Henning had called him around the same time that he called

Mildred Henning and stated something similar. *Id.* ¶ 27. After several attempts, on October 12,

1988, Herscher, Illinois, Police Chief Bruce Larson interviewed Timothy Saathoff who reported

that Mr. Henning, allegedly told him that "he, Henning, had been at the scene of a murder while

---

a dog was barking at them so he (Sean) stabbed the dog so the barking would not attract attention."). The
Connecticut Supreme Court noted that "[it] is undisputed that no dog was killed or otherwise harmed in the
commission of the victim's murder." *Henning*, 334 Conn. at 8 n.7. Mr. Bryson died on October 4, 1988, however,
before State Police Detective Ocif sought either Plaintiff's arrest. Ex. P to State Defs.' MSJ ¶ 21, ECF No. 128-18.

burglarizing a house," but "that Henning stated that he had not committed the murder." Ex. N to State Defs.' MSJ at 4, ECF No. 128-16 (Larson Police Report – Saathoff).[7]

### 3. The Trials and Convictions of Mr. Birch and Mr. Henning

On November 18, 1988, Shawn Henning was arrested and charged with the murder of Everett Carr. Henning's Compl. ¶ 287. Two months later, on January 28, 1989, Mr. Birch was arrested and similarly charged. Am. Compl. ¶ 319. Mr. Henning and Mr. Birch each pleaded not guilty and proceeded to have separate trials. State Defs.' SMF ¶ 41.

During each trial, Dr. Lee testified on direct examination that he tested the towel and that the result was positive for blood. Dr. Lee's SMF ¶¶ 6, 7. Specifically—pointing to slides of the photographs he took at the murder scene—Dr. Lee testified:

> The last slide shows a portion of the view of upstairs (sic) bathroom. On this towel have (sic) reddish color smear. That smear, I did a few tests, show that it positive (sic) consistent with blood smear. Those are the slides I wanted to present to you today.

EX. E to Dr. Lee's MSJ at 2, ECF No. 127-7.[8]

The state presented no forensic evidence connecting Mr. Birch and Mr. Henning to the murder. Dr. Lee's Resp. to Pls.' SMF ¶ 18.

During the State's closing arguments, the prosecutor noted to the jury that it was significant that Dr. Lee testified about the upstairs bathroom and the towel and the blood on it. Ex. F to Dr. Lee's MSJ at 4. The prosecutor then urged the jury to "[r]emember the bloody towel in the upstairs bathroom. It gave [Mr. Birch and Mr. Henning] an opportunity to wash or have some access to that sink." *Id.*

---

[7] Timothy Saathoff resided in Bonfield, Illinois, and Mr. Henning "had been a friend of Timothy when [Mr. Henning] lived in Herscher." Larson Police Report – Saathoff at 3.

[8] The Connecticut Supreme Court noted that in connection with the habeas proceedings, "a test of the substance" on the towel "proved negative for blood." *Henning*, 334 Conn. at *4.

Mr. Birch and Mr. Henning were each convicted at the close of trial. Mr. Birch was

sentenced to 55 years while Mr. Henning was sentenced to 50 years. *Birch*, 334 Conn. at 54;

*Henning*, 334 Conn. at 16.

### 4. The Legal Proceedings Following Plaintiffs' Convictions

In 1991, the Connecticut Supreme Court rejected Mr. Birch and Mr. Henning' direct

appeals and confirmed their convictions. *See State v. Birch*, 219 Conn. 743, 751 (1991); *State v.

Henning*, 220 Conn. 417, 431 (1991). Thereafter, Mr. Birch and Mr. Henning each filed their

first habeas petition in state court, which were denied. *See Birch v. Warden*, No. TSR-CV-92-

1567-S, 1998 WL 376345, *11 (Conn. Super. Ct. June 25, 1998).

Mr. Birch and Mr. Henning each filed a second habeas petition in state court. In their

second petitions, they alleged, among other things, that the state deprived them of a fair trial in

violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *See Henning*, 334 Conn. at 3; *Birch*, 334

Conn. at 39. More specifically, Mr. Birch and Mr. Henning argued that:

> [their] right to due process was violated because the assistant state's
> attorney (prosecutor) failed to correct certain testimony of the then
> director of the state police forensic laboratory, Henry C. Lee,
> concerning a red substance on a towel found in the victim's home
> that, according to Lee, had tested positive for blood. In fact, no such
> test had been conducted, and, moreover, a test of the substance that
> was performed for purposes of the present case proved negative for
> blood.

*Birch* at 39. That habeas court denied the second petitions, and Mr. Birch and Mr. Henning

appealed. In 2019, after Mr. Birch and Mr. Henning had served more than thirty years of their

imposed sentences, the Connecticut Supreme Court reversed that habeas court's decision and

granted Mr. Birch and Mr. Henning's second habeas petitions. The Connecticut Supreme Court

concluded that Mr. Birch and Mr. Henning were "entitled to a new trial due to the state's failure

to alert the trial court and the petitioner[s] that Lee's testimony was incorrect. . . ." *Id.* at 40.

In vacating Mr. Henning and Mr. Birch's convictions, the Connecticut Supreme Court concluded that "Dr. Lee's false testimony was the state's 'sole evidentiary basis' to explain the 'dearth of forensic evidence,' which was the prosecutor's 'greatest challenge at trial.'" Pls.' SMF ¶ 21 (first quoting *Henning*, 334 Conn. at 32; and then quoting *Birch*, 334 Conn. at 68); Dr. Lee's Resp. to Pls.' SMF ¶ 21. The Connecticut Supreme Court vacated Mr. Henning and Mr. Birch's convictions based, *inter alia*, on the state's concession during the habeas proceedings that Dr. Lee had not performed a positive blood test on the towel. Pls.' SMF ¶ 22; Dr. Lee's Resp. to Pls.' SMF ¶ 22.

Following the vacaturs of Mr. Birch's and Mr. Henning's convictions, on July 20, 2020, the state concluded that it did not have evidence to prove guilt beyond a reasonable doubt, and the court dismissed the charges against Mr. Birch and Mr. Henning. *See* Ex. N to Pls. MSJ at 4–5, ECF No. 125-14; Ex. M to Pls.' MSJ at 4–5, ECF No. 125-13.

### B.  Procedural History

On December 2, 2020, Mr. Birch and Mr. Henning filed their respective Complaints in this Court. *See Birch v. New Milford et al.*, No. 3:20-cv-01790-VAB, ECF No. 1 (D. Conn. Dec. 2, 2020); *Henning v. New Milford et al.*, No. 3:20-cv-01792-VAB, ECF No. 1 (D. Conn. Dec. 2, 2020).

On February 4, 2021, the Court granted Mr. Birch's and Mr. Henning's joint motion to consolidate the two cases. Order, ECF No. 27.

On February 15, 2021, the Town of New Milford and Steven Jordan filed a motion to dismiss Counts Three, Four, Five, Six, and Seven of Mr. Birch's Complaint with supporting materials. Mot. to Dismiss Pl. Birch's Compl., ECF No. 32.

The same day, Brian Acker, Michael Graham, Andrew Ocif, Scott O'Mara, John Mucherino, Joseph Quartiero, and Dr. Henry Lee filed a motion to dismiss Counts Three, Four, and Five of Mr. Birch's Complaint with supporting materials. State Defs.' Mot. to Dismiss Pl. Ralph Birch's Compl., ECF No. 34.

On March 22, 2021, Mr. Birch and Mr. Henning filed a joint memorandum in opposition to the State Defendants' motion to dismiss. Pls.' Joint Mem. in Opp'n to State Defs.' Partial Mot. to Dismiss, ECF No. 40. Mr. Birch and Mr. Henning also filed a joint opposition to the Town Defendants' motion to dismiss. Pls.' Joint Mem. in Opp'n to Town Defs.' Mot. to Dismiss, ECF No. 41.

The same day, Mr. Birch voluntarily dismissed without prejudice Counts Four and Five of the Complaint against the State Defendants. Joint Notice of Partial Voluntary Dismissal of State-Law Causes of Action Against State Defs.' Only, ECF No. 42. Mr. Birch did not dismiss any causes of action against the Town Defendants. *Id.*

On March 25, 2021, the Court issued an Order dismissing Counts Four and Five of Mr. Birch's Complaint against the State Defendants. Order, ECF No. 43.

On April 5, 2021, the State Defendants filed a consolidated reply to Mr. Birch's opposition to their motion to dismiss. Reply Mem. in Supp. of Mot. to Dismiss, ECF No. 46.

On April 9, 2021, the Town Defendants filed a consolidated reply to Mr. Birch's opposition to their motion to dismiss. Reply to Pls.' Joint Mem. of Law in Opp'n to the Town Defs.' Mot. to Dismiss, ECF. No. 49.

On April 12, 2021, Mr. Birch and Mr. Henning moved to strike the Town Defendants' reply as untimely. Mot. to Strike Reply Mem., ECF No. 50.

On April 13, 2021, the Town Defendants filed a motion for leave to file a reply to Mr.

Birch's opposition to their motion to dismiss out of time *nunc pro tunc*. Mot. for Leave to File

Reply to Pls.' Joint Mem. of Law in Opp'n to the Town Defs.' Mot. to Dismiss Out of Time

Nunc Pro Tunc, ECF No. 51. The next day, the Court issued an Order denying that motion.

Order, ECF No. 52.

On April 16, 2021, the parties filed a stipulation of consent to amend Mr. Birch's

Complaint. Stip. of Consent to Amend Compl., ECF No. 53. According to the stipulation, the

parties

> agree that the amendment of the Complaint is without prejudice to
> the pending motions to dismiss and that Defendants' consent to the
> filing of the Amended Complaint does not waive any defenses raised
> in those motions. All parties rest on the briefs previously filed in
> support of and opposition to Defendants' pending motions to
> dismiss and agree that those motions are not rendered moot by the
> filing of the Amended Complaint.

*Id.* ¶ 3.

The same day, Mr. Birch filed an Amended Complaint. Am. Compl. The Amended

Complaint adds Robert Santoro, administrator of the estate of David Shortt, as a Defendant with

respect to Counts One, Three, Four, and Five and omits the negligence claims against the State

Defendants that were voluntarily dismissed on March 22, 2021. Stip. ¶ 2.

On September 17, 2021, State Defendants filed a Suggestion of Death notice as to

Defendant H. Patrick McCafferty. Suggestion of Death Notice, ECF No. 68.

On September 19, 2021, the Court ordered substitution of the proper party in light of the

suggestion of death notice as to H. Patrick McCafferty. ECF No. 69.

On September 24, 2021, the Court denied the State and Town Defendants partial motion

to dismiss for failure to state a claim as to Mr. Birch. Order, ECF No. 70.

The same day, the Court denied the State Defendants' motion to dismiss Mr. Henning's § 1983 suppression of material favorable evidence (Count Three) and intentional infliction of emotional distress (Count Eight) claims.

The Court granted in part and denied in part the Town Defendants' motion to dismiss. Specifically, the Court granted the Town Defendants' motion to dismiss as to Mr. Henning's § 1983 civil rights conspiracy (Count Four) and failure to intervene (Count Five) claims but denied it as to Mr. Henning's § 1983 suppression of material favorable evidence claim (Count Three); common law negligence (Count Six), negligent infliction of emotional distress (Count Seven), and intentional infliction of emotional distress (Count Eight) claims; and statutory indemnification (Count Nine) and municipal liability (Count Ten) claims. Order, ECF No. 71.

On October 26, 2021, the Town Defendants filed their Answers. Answer, ECF Nos. 81, 82, and on December 1, 2021, the State Defendants filed their Answers. Answer, ECF Nos. 83, 84.

On January 20, 2022, the Court held a discovery conference. Minute Entry, ECF No. 93.

On January 27, 2022, Mr. Henning filed a motion to substitute a party for deceased defendant H. Patrick McCafferty. Mot. to Substitute Party, ECF No. 99. The Court granted that motion on the next day. Order, ECF No. 100.

On October 4, 2022, the Town Defendants filed a motion for summary judgment as to Robert Santoro, *see* Shortt's MSJ., and a separate motion for summary judgment as to Steven Jordan, *see* Jordan's MSJ.

On November 7, 2022, Plaintiffs filed a joint partial motion for summary judgment as to Dr. Henry Lee. Pls.' Joint Mot. for Partial Summ. J. against Dr. Henry Lee, ECF No. 124; Pls.' MSJ.

Also on November 7, 2022, Dr. Henry Lee and State Defendants each filed a motion for summary judgment. State Defs.' MSJ.

On December 19, 2022, Pls.' filed: a joint opposition to Dr. Henry Lee's motion for summary judgment, *See* Pls. Joint Opp'n to Dr. Lee's MSJ, ECF No. 138 ("Pls. Opp'n to Dr. Lee's MSJ"); a joint opposition to Steven Jordan's motion for summary judgment, *see* Pls.' Opp'n to Jordan's MSJ, ECF No. 139 ("Pls.' Opp'n to Jordan's MSJ"); an opposition to the and David Shortt's motion. *See* Pl.' Opp'n to Shortt's MSJ, ECF No. 140 ("Birch's Opp'n to Shortt MSJ"); and joint opposition to the State Defendants' motion for summary judgment, *see* Pls.' Joint Opp'n to State Defs.' MSJ, ECF No. 141 ("Pls.' Opp'n to State Defs.' MSJ").

Also on December 19, 2022, Dr. Henry Lee filed an opposition to Plaintiffs' partial motion for summary judgment. Dr. Lee's Opp'n to Pls.' Mot. for Summ. J., ECF No. 142 ("Dr. Lee's Opp'n").

On January 12, 2023, Dr. Henry Lee filed a reply in further support of his motion for summary judgment. Dr. Henry Lee's Reply, ECF No. 144 ("Dr. Lee's Reply")

On January 13, 2023, Steven Jordan filed a reply in further support of his motion for summary judgment. Steven Jordan's Reply, ECF No. 145; Robert Santoro filed his reply, *see* Robert Santoro' Reply, ECF No. 146, and the State Defendants filed their reply, *see* State Defendants' Reply, ECF No. 147.

Also on January 13, 2023, Plantiffs filed a joint reply in support their motion for summary judgment as to Dr. Henry Lee. Pls.' Joint Reply, ECF No. 148.

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal

quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." (internal quotation marks omitted)). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III.    DISCUSSION

Dr. Lee has moved for summary judgment as to all claims against him brought by Mr. Birch and Mr. Henning. *See* Dr. Lee's MSJ. In response to Plaintiffs' opposition to his motion for summary judgment, Dr. Lee has also filed a motion to amend his Answer to include the affirmative defense of absolute testimonial immunity that he relied on in moving for summary judgment. *See* Dr. Lee's Mot. to Am. Plaintiffs have cross moved for summary judgment as to liability against Dr. Lee. *See* Pls.' MSJ. The remaining state Defendants have moved for partial summary judgments. *See* State Defs.' MSJ. Finally, Town Defendants have moved for summary judgment on all claims against them. *See* Shortt's MSJ; Jordan's MSJ.

The Court will first address Plaintiffs' and Dr. Lee's cross-motions for summary judgment. Then, the Court will address the remaining Sate Defendants' motion for summary judgment. Finally, the Court will address the Town Defendants' motion for summary judgment.

### A. Dr. Lee's and Plaintiffs' Motions for Summary Judgment

Dr. Lee moves for summary judgment as to all claims against him. Plaintiffs move for summary judgment against Dr. Lee as to liability. In considering cases involving cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017) (citation omitted).

The Court therefore will consider each motion in turn.

### 1. Dr. Lee's Motion

Dr. Lee moves for summary judgment on all claims against him, specifically the First Cause of Action in Mr. Birch's First Amended Complaint, and on the First, Fourth, Sixth, Seventh and Eighth causes of action in Mr. Henning's Complaint. *See* Dr. Lee's Mot. at 1. Although Plaintiffs allege various distinct causes of action against Dr. Lee—*e.g.*, fabrication of evidence, negligence, negligent infliction of emotional distress—he seeks summary judgment on the basis of the affirmative defense of absolute testimonial immunity.

Dr. Lee, however, did not plead this affirmative defense in his Answer. Nor did Dr. Lee move to amend his Answer to include that defense before filing his motion for summary judgment. In assessing Dr. Lee's motion for summary judgment, the Court therefore will also determine whether Dr. Lee may, at this stage of the litigation, raise the affirmative defense of absolute testimonial immunity.

20

In "responding to a pleading, a party must affirmatively state" any affirmative defense it intends to raise in the case. Fed. R. Civ. P. 8(c)(1). "Failure to plead an affirmative defense ordinarily results in forfeiture of that defense." *Foster v. Lee*, 93 F. Supp. 3d 223, 229 (S.D.N.Y. 2015); *see also Wood v. Milyard*, 566 U.S. 463, 470 (2012) ("An affirmative defense, once forfeited, is excluded from the case." (internal quotation marks and alterations omitted)); 5 Charles A. Wright, Arthur R. Miller et al., Federal Practice & Procedure § 1278 (4th ed.) ("It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule 8(c) results in the waiver of that defense and its exclusion from the case."). "[A]bsolute immunity is an affirmative defense whose availability" could be ascertained from "the face of the complaint." *Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005). Because "the existence of absolute immunity protects an official not only from liability but also from suit, the validity of the defense should be determined at an early stage." *Id.*

Dr. Lee nonetheless urges this Court to permit him to amend his Answer to add his affirmative defense of absolute testimonial immunity and grant his motion for summary judgment on that basis. He argues that "all of" the alleged misconduct giving rise to Plaintiffs' claims against him "occurred while he was testifying in court during their trials." Dr. Lee's MSJ. at 3. His alleged misconduct, according to Dr. Lee, is limited to the allegation that he "fabricated evidence that a towel in the victim's bathroom had tested positive for blood when, in fact, the towel had never been tested and [he] knew that the towel had never been tested when he told the prosecution it had been tested and then testified to that fact at the Plaintiffs' trials." *Id.* at 7. In his view, because he testified as a witness during trial, "[a]s to all claims, [he] is shielded by absolute testimonial immunity." *Id.* at 1.

21

Plaintiffs respond that because Dr. Lee did not plead absolute immunity in his Answers to their Complaints, he may not rely on that affirmative defense at this late stage of the litigation. Pls.' Opp'n to Dr. Lee's MSJ at 7. *See id.* ("Failure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case." (cleaned up) (quoting *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir. 1984))). Here, Plaintiffs argue that not only did Dr. Lee not plead the testimonial immunity affirmative defense in his Answer, he also failed to move to amend his Answer before filing a motion for summary judgment which relied exclusively on that defense. Pls.' Opp'n to Dr. Lee's Mot. to Am. at 5. To permit an untimely amendment of Dr. Lee's affirmative defense, especially because discovery closed many months ago, would result in undue prejudice against them, Plaintiffs argue. *Id.* at 7.

In reply, Dr. Lee argues that permitting him "to invoke the defense of testimonial immunity does not prejudice the Plaintiffs in any way because," in his view, "the Plaintiffs had the opportunity to investigate and query all of the facts and legal concepts underlying and related to testimonial immunity throughout the discovery process and actively took advantage of that opportunity." Dr. Lee's Reply at 2. According to Dr. Lee, "Plaintiffs have had significant notice, opportunity and motive to overturn every stone in connection with this Defendant's involvement with the Carr murder investigation." *Id.* at 3.

Plaintiffs argue, however, that "absolute immunity 'require[s] a fact intensive inquiry'" and because fact discovery has closed, they are unable to "test the required 'sufficient facts' for [this] defense." Pls.' Opp'n to Dr. Lee's MSJ at 5 (first quoting *Abrahams v. Conn. Dep't of Soc. Servs.*, No. 3:16-CV-00552 (CSH), 2018 WL 995106, at *8 n.6 (D. Conn. Feb. 21, 2018); and then quoting *Godson v. Eltman, Eltman & Cooper, P.C.*, 285 F.R.D. 255, 259 (W.D.N.Y. 2012)). For example, Plaintiffs note that because they were not on notice of the absolute immunity

defense, they "did not conduct any discovery on who else might have been present at any [pre-trial] preparation session, the availability of any third party's notes or subsequent communications with others on the prosecution team," which are all facts that refute the validity of an absolute testimonial immunity. *Id.* This, Plaintiffs argue, constitutes prejudice, and "the court should deny any attempt to amend Dr. Lee's affirmative defenses—and his motion for summary judgment." *Id.*

The Court agrees.

"One of the core purposes of Rule 8(c) is to place the opposing parties on notice that a particular defense will be pursued so as to prevent surprise or unfair prejudice." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003); *see also Doubleday & Co. v. Curtis*, 763 F.2d 495, 503 (2d Cir. 1985) (recognizing that the purpose of requiring affirmative defenses to be pleaded in the answer is "to notify a party of the existence of certain issues"); *Walker v. Schult*, 463 F. Supp. 3d 323, 341 (N.D.N.Y. 2020) ("Providing notice of an affirmative defense provides a plaintiff with 'the opportunity to rebut it.'" (quoting *Carnley v. Aid to Hosps., Inc.*, 975 F. Supp. 252, 254 (W.D.N.Y. 1997))); *LPD New York, LLC v. Adidas Am., Inc.*, No. 15-CV-6360 (MKB), 2022 WL 4450999, at *19 (E.D.N.Y. Sept. 24, 2022). Because Dr. Lee raised his absolute immunity defense for the first time in a dispositive motion, he failed to provide Plaintiffs a fair notice to "conduct discovery on the unpled absolute immunity issue to test the required 'sufficient facts' for the supposed defense." Pls.' Opp'n to Dr. Lee's MSJ at 9 (citing *Godson*, 285 F.R.D. at 259).

Although "a district court may entertain unpleaded affirmative defenses at the summary judgment stage," *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 176 (2d Cir. 2014) (quoting *Rose v. AmSouth Bank of Fla.*, 391 F.3d 63, 65 (2d Cir. 2004)), courts "will be

most hesitant" to use this discretionary authority "where doing so unfairly surprises the non-movant and impedes the fair prosecution of the claim," *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000). "The longer the period of unexplained delay, the lesser the showing of prejudice required of the nonmoving party." *Mabry v. N.Y.C. Dep't of Corr.*, No. 05 CIV 8133 JSR JCF, 2008 WL 619003, at *10 (S.D.N.Y. Mar. 7, 2008) (citing *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir. 1983)).

Here, Dr. Lee argues that his counsel "unintentionally neglected to move more quickly to amend when it became clear to counsel that testimonial immunity was a viable, and in fact, meritorious defense for the Defendant." Dr. Lee's Mot. to Am. at 5.[9] But as the Second Circuit has explained, the affirmative defense of absolute immunity "is often clear from face of the complaint." *Shmueli*, 424 F.3d at 236. In other words, upon review of the claims contained in the Complaint, it should have been fairly obvious that absolute testimonial immunity may have been a defense to the claims against Dr. Lee. Indeed, as Dr. Lee himself noted, "[i]t is well settled that under 42 U.S.C. § 1983, 'a trial witness has absolute immunity with respect to *any* claim based on the witness' testimony.'" Dr. Lee's Opp'n at 4 (quoting *Rehberg v. Paulk*, 566 U.S. 356, 367 (2012)).

Moreover, the Connecticut Supreme Court's decisions—which made possible for Plaintiffs pursue their claims in this case—made clear that Dr. Lee's testimony was the basis for vacating Plaintiffs' convictions. *See Birch*, 334 Conn. at 68 (concluding that Mr. Birch "is entitled to a new trial due to the state's failure to alert the trial court and the petitioner that Lee's testimony was incorrect"); *Henning*, 334 Conn. at 33 (same).

---

[9] In his Reply, Dr. Lee moved to "incorporate[] by reference . . . his full argument outlined in his motion to amend and accompanying memorandum of law." Dr. Lee's Reply at 2 n.1. For the purposes of this Ruling, the Court will therefore consider Dr. Lee's arguments from his motion to amend.

Dr. Lee therefore had ample opportunity to raise this defense. Yet, he did not raise it until after he filed his motion for summary judgment, nearly two years after the Complaint was filed. To further illustrate the various opportunities that Dr. Lee had to raise his affirmative defense, the following is worth noting: Dr. Lee filed a motion to dismiss in this case, but he did not seek to dismiss the Complaint on that basis, *see* Mot. to Dismiss; a full year lapsed between when Plaintiffs filed their respective Complaints and when Dr. Lee filed his Answer, meaning Dr. Lee had a year to identify this affirmative defense and plead it in his Answer; having failed to raise his affirmative defense in his Answer, Dr. Lee had an additional six months—until the close of discovery on July 1, 2022—to seek leave to amend his Answer and provide Plaintiffs fair notice before the close of discovery and give them the opportunity to explore this issue. Yet, Dr. Lee only moved to cure his failure to comply with Rule 8(c) after Plaintiffs raised this issue in their opposition to his motion for summary judgment.

In fact, throughout this litigation, as Plaintiffs correctly noted, "Dr. Lee alleged no supporting facts" to suggest to Plaintiffs that he intends to raise an absolute immunity defense. Pls.' Opp'n to Dr. Lee's MSJ at 9. And because Plaintiffs were not on notice that Dr. Lee intends to raise a testimonial immunity defense, they "did not conduct discovery" on the issue of absolute testimonial immunity. *Id*. To "[s]pring this defense on [Plaintiffs] at summary judgment" therefore "unfairly prejudices [them] because [they are] deprived of an opportunity to pursue the necessary discovery to rebut it." *Rood v. R&R Express, Inc.*, No. 2:17-CV-1223-NR, 2022 WL 1082481, at *1 (W.D. Pa. Apr. 11, 2022); *see also Pereira v. Cogan*, No. 00 CIV. 619 (RWS), 2002 WL 1822928, at *4 (S.D.N.Y. Aug. 7, 2002) (explaining that "parties are required to act promptly to assert affirmative defenses rather than 'lie behind a log' and ambush a plaintiff with an unexpected defense" (quoting *Venters v. City of Delphi,* 123 F.3d 956, 967–68 (7th Cir.

1997))); *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 482 (7th Cir. 2019) ("Without a

credible excuse for the delay, [a defendant's] late invocation of [a] defense looks like a straight

ambush of the plaintiff when it [would be] too late for [plaintiff] to put together a comprehensive

rebuttal."). In light of this background, the Court "cannot overlook [Dr. Lee's] failure to comply

with Rule 8(c)," because "[i]ntentionally or not," Plaintiffs were "bushwacked." *Id.*[10]

 At this late stage of the litigation, the Court will decline to exercise its discretion to

permit Dr. Lee to assert the unpled affirmative defense of absolute testimonial immunity. *See*

*Godson*, 285 F.R.D. at 259 (emphasizing "the importance . . . of providing the plaintiff with fair

notice, buttressed by sufficient facts, of the affirmative defenses that the defendant intends to

assert; thus allowing the plaintiff an opportunity to knowledgeably respond"); *Unicorn*

*Crowdfunding, Inc. v. New St. Enter., Inc.*, 507 F. Supp. 3d 547, 577 (S.D.N.Y. 2020) (declining

to "entertain unpled affirmative defenses at summary judgment"); *Kozak v. CSX Transp., Inc.*,

No. 20-CV-184S, 2023 WL 2955851, at *4 (W.D.N.Y. Apr. 14, 2023) (explaining that "[a]

proposed amendment is especially prejudicial when discovery has been completed and the non-

movant has already filed a motion for summary judgment" (citing *Ansam Assocs. v. Cola*

*Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985))); *cf. Reed*, 915 F.3d at 482 (concluding that

"the district court abused its discretion" in allowing a defendant to raise an affirmative defense

for the first time on summary judgment).

 In any event, as further discussed below, even if applicable, the testimonial immunity

defense does not defeat Plaintiffs' fabrication of evidence claim against Dr. Lee, at least on this

---

[10] Counsel for Dr. Lee urged this Court not to attribute counsel's "neglect[ful]," albeit "unintentional," conduct to
Dr. Lee. Mot. to Am. at 5. *See id.* ("This is not a situation where the Defendant Lee's actions led to the delay in
moving to amend."). Dr. Lee, however, is bound by the acts of his counsel. *See Harris v. United States*, 367 F.3d 74,
81 (2d Cir. 2004) (explaining that in "our system of representative litigation . . . each party is deemed bound by the
acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the
attorney (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962))).

record. The United States Supreme Court has made clear that testimonial immunity does not "extend[] to *all* activity that a witness conducts outside" of the witness's in-court testimony. *Rehberg*, 566 U.S. at 370 n.1. And the Second Circuit has clarified that when an official claims absolute immunity for his testimony under *Rehberg*, this Court must "determine whether the plaintiff can make out the elements of his § 1983 claim without resorting to the . . . testimony. If the claim exists independently of the . . . testimony, it is not 'based on' that testimony, as that term is used in *Rehberg*." *Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015); *see Nnodimele v. Derienzo*, No. 13CV3461ARRRLM, 2016 WL 337751, at *14 (E.D.N.Y. Jan. 27, 2016) (concluding that "defendants' claim to absolute immunity clearly fails . . . [because] Plaintiff can establish misconduct by defendants without reference to their allegedly perjurious testimony").

As a result, if the Plaintiffs can "make out" the elements of their fabrication of evidence claim without resorting to Dr. Lee's testimony, then the testimonial immunity defense is no bar to their claim, and it does not provide a basis for granting summary judgment in Dr. Lee's favor, or denying Plaintiffs' motion for summary judgment, a matter discussed below.

In resolving this issue, consistent with denying Dr. Lee leave to amend his Answer to add this defense, long after the close of discovery and only in the context of a motion for summary judgment, the Court will do so based on the record before it.[11]

---

[11] If the Court granted Dr. Lee's motion to amend over Plaintiffs' objection, the Court would have to reopen discovery to allow Plaintiffs to further probe the validity of the absolute immunity defense. The resulting further delay would "impede[] the fair prosecution" of Plaintiffs' claims, *Monahan*, 214 F.3d at 284, a delay which cannot be understated, and should not, even if appropriate, inure to Dr. Lee's behalf, at least given the history of this case. As alleged by Plaintiffs, it is because of Dr. Lee's fabrication of evidence and his subsequent testimony to that effect during their trials, that they each "spent decades in prison for a crime they did not commit." Am. Compl. ¶ 341. Indeed, in vacating their convictions in 2019, the Connecticut Supreme Court specifically noted that Dr. "Lee's [false] testimony provided the sole evidentiary basis for both of the state's theories regarding the dearth of forensic evidence." *Birch*, 334 Conn. at 68. And soon after their convictions were vacated, Plaintiffs filed their respective Complaints in this case. Given this procedural history, even the alleged "unintentional[] neglect," Mot. to Am. at 6, by counsel for Dr. Lee does not provide a sufficient basis to further delay the resolution of the Plaintiffs' civil case and allow further discovery—not only after the close of discovery, but after extensive briefing on motions for summary judgment.

27

On this record, drawing "all reasonable inferences from the existing factual record in favor" of Plaintiffs, *Vasquez v. Maloney*, 990 F.3d 232, 237 (2d Cir. 2021), Plaintiffs can "make out" a fabrication of evidence claim, separate and apart from any testimony provided by Dr. Lee at trial. *See* Pls. Opp'n to Dr. Lee's MSJ at 9–10 (asserting that Plaintiffs' fabrication of evidence claim against Dr. Lee is as follows: "Dr. Lee fabricated the blood test on the towel and communicated it to the state's attorney's office, which then used fabricated evidence to meet a significant challenge at trial: the complete lack of forensic evidence connecting Messrs. Henning and Birch to the gruesome crime scene") (internal quotation marks omitted).[12]

Accordingly, Dr. Lee's motion to amend his Answer will be denied, and Dr. Lee's motion for summary judgment on the basis of absolute testimonial immunity will likewise be denied. *See McCalla v. City of New York*, No. 15CIV8002LAKAJP, 2017 WL 3601182, at *73 (S.D.N.Y. Aug. 14, 2017) (denying summary judgment where defendants "fail[ed] to present any alternative argument for summary judgment" and "rel[ied] entirely on" an affirmative defense that the Court rejected), *report and recommendation adopted*, 2017 WL 4277182 (S.D.N.Y. Sept. 22, 2017).

### 2. Plaintiffs' Motion for Summary Judgment

Plaintiffs move for summary judgment as to liability against Dr. Lee on Count One of their respective Complaints—namely the claim that Dr. Lee fabricated evidence which, in part, led to their convictions and subsequent thirty years of imprisonment. Specifically, Plaintiffs argue that "[t]here can be no genuine dispute that Dr. Henry Lee fabricated a 'positive' blood test

---

[12] Indeed, Plaintiffs' allegations in their Complaint—clarified by the evidence obtained during their discovery—focus on Dr. Lee having "tested the bathroom towels and that one of the towels had tested positive for blood," Am. Compl. ¶ 309, and Dr. Lee having communicated his purported towel test with prosecutors during the investigative phase, including, "to former Litchfield State's Attorney Dennis Santore . . . who retired during the investigatory phase—before Plaintiffs' arrests and well before the criminal trials," Pls.' Reply at 7 (citing Dr. Lee Dep. Tr. at 320:3–10, ECF No. 137-56) ("Dr. Lee Dep. Tr. II")). The record, therefore, establishes that Plaintiffs' fabrication of evidence claim against Dr. Lee is not limited to his trial testimony.

on bathroom towel" found at the scene of the murder of Everett Carr in 1985. Pls.' MSJ at 5. Dr.

Lee concedes that there are no "genuine issues of material fact in dispute relevant to [Dr. Lee's]

liability for fabrication of evidence." Dr. Lee's Opp'n at 1. But, because he is entitled to absolute

testimonial immunity, he argues that it is he, not Plaintiffs, who is entitled to summary judgment.

*Id.*

The Court, however, has rejected Dr. Lee's unpled absolute testimonial immunity defense

as untimely and, even if timely, it does not provide a basis for relief for Dr. Lee on this record.

*See supra* Part III.A.1. Thus, the Court's review of Plaintiffs' motion for summary judgement

will focus on whether Plaintiffs' motion is sufficiently supported by the evidence in the record.

*See Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[F]ailure to

oppose a motion for summary judgment alone does not justify the granting of summary

judgment. Instead, the district court must still assess whether the moving party has fulfilled its

burden of demonstrating that there is no genuine issue of material fact and its entitlement to

judgment as a matter of law."); *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001). To the extent

that arguments contained in Dr. Lee's motion for summary judgment are responsive to Plaintiffs'

motion, the Court will consider those arguments in deciding this motion.

Our Constitution guarantees the accused the right to a fair trial. *See Holbrook v. Flynn*,

475 U.S. 560, 567 (1986) (recognizing that the Sixth and Fourteenth Amendments secure the

constitutional right to a fair trial); *United States v. Ruiz*, 536 U.S. 622, 628 (2002) (recognizing

that the Fifth and Sixth Amendments form "part of [the Constitution's] basic 'fair trial'

guarantee"); *Smalls v. Collins*, 10 F.4th 117, 132 (2d Cir. 2021). In a criminal case, when an

investigating official "fabricat[es] and forward[s] to prosecutors . . . known false evidence," that

official not only violates the accused's right to a fair trial, but the official "works an unacceptable

29

'corruption of the truth-seeking function of the trial process.'" *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (quoting *United States v. Agurs,* 427 U.S. 97, 104 (1976)). "The Second Circuit, frequently required to confront this aberrational behavior, has for at least [twenty-five] years consistently condemned it in strong and uncompromising terms." *Harasz v. Katz*, 239 F. Supp. 3d 461, 489 (D. Conn. 2017).

Separate and apart from the remedies available in the underlying criminal case where the right to a fair trial is violated, alleged victims of such violations may additionally seek recourse in civil suit under 42 U.S.C. § 1983. *See Garnett v. Undercover Officer C0039*, 838 F.3d 265, 278 (2d Cir. 2016) (declaring that "claims alleging the denial of a right to a fair trial based on fabricated information are redressable under the Constitution, regardless of which constitutional provision provides the basis for the claim"); *Bailey v. City of New York*, 79 F. Supp. 3d 424, 445 (E.D.N.Y. 2015) ("A section 1983 claim for the denial of a fair trial is, in essence, a claim for damages attributable to an unconstitutional conviction.").

 "On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense." *Cohen Lans LLP v. Naseman*, No. 14 Civ. 4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp.*, 477 U.S. at 322–23). To maintain a claim of fabrication of evidence under § 1983, a plaintiff must show that "an (1) investigating official (2) fabricate[d] evidence (3) that is likely to influence a jury's decision, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of liberty as a result." *Harasz*, 239 F. Supp. 3d at 491.

Plaintiffs argue that they have met each element required to establish their claim of fabrication of evidence against Dr. Lee. As to the first element, they argue that "as the head of the Connecticut Forensic Laboratory and an on-the-scene investigator," Dr. Lee was indisputably

an "investigating official" in the Carr criminal matter. Pls.' MSJ at 18. As to the second element,

Plaintiffs argue that, not only did the Connecticut Supreme Court conclude "Dr. Lee had not

performed a positive blood test on the towel," when he testified that he did, Pls.' MSJ at 7, Dr.

Lee's own deposition testimony—and the deposition testimony of his own experts—reveal that

"[t]here is no credible evidence that he performed" any blood test on the towel, *id.* at 17, when

he testified that he did. As to the third and fourth elements, according to Plaintiffs, "there can be

no dispute that Dr. Lee (1) told Assistant State's Attorney Shepack that he had tested the towel,

(2) that the test revealed a positive result for blood and (3) that Attorney Shepack . . . used the

information to influence the jury." Pls.' MSJ. at 18; *see also* Pls.' SMF ¶¶ 15–19; Dr. Lee's

Response SMF ¶ 15–19. Finally, as to the fifth element, deprivation of liberty, Plaintiffs claim

that they "were incarcerated for more than thirty years based on trials that the Connecticut

Supreme Court determined were unfair due to Dr. Lee's 'false or misleading' testimony." Pls.'

MSJ at 18–19 (quoting *Henning*, 334 Conn. at 4 n.3, 33; *Birch*, 334 Conn. at 40 n.4, 69).

More specifically as to the second element, the actual fabrication of evidence, according

to Plaintiffs, "the State [of Connecticut]—represented by one of Dr. Lee's attorneys in this

case—conceded at every level of the Connecticut judicial system that Dr. Lee never performed

the blood test on the towel." Pls.' MSJ at 5. Notwithstanding this concession, according to

Plaintiffs, Dr. Lee claims "to have photographic proof that he performed a presumptive

tetramethylbenzidine ("TMB") test on the towel at the murder scene." *Id.*[13] Plaintiffs argue,

however, that this proof "was facially false and not credible." *Id.* at 6. And when confronted with

this fact, Plaintiffs argue, Dr. Lee claims to have "better quality" photographic proof of his test

---

[13] "TMB, when exposed to the 'heme' in the hemoglobin of blood, turns the 'heme' blue, and Dr. Lee testified that a test on the towel yielded a positive, blue result." Pls.' Mem. at 5.

that he "considered his 'personal' property and that he had kept at his home—and had never previously disclosed to Plaintiffs at any time in the 37-year history of this case." *Id.* at 6.

This additional proof, likewise, according to Plaintiffs, failed to support Dr. Lee's claim that he performed a blood test on the towel. *Id.* In fact, according to Plaintiffs, Dr. Lee's own expert, after viewing "Dr. Lee's ***original*** 'much better quality' slide," concluded that there was no evidence to support the claim that Dr. Lee performed a blood test on the towel. *Id.* at 17. Plaintiffs therefore conclude that the evidence establishes that they have also met their burden as to the second element of their fabrication of evidence claim. Dr. Lee's "only evidence" in opposition, they argue, "is his unsubstantiated testimony that is inconsistent with the physical evidence that he cites as support." *Id.* at 19. As a result, Plaintiffs argue, they are entitled to summary judgment as to liability on their claims against Dr. Lee.

The Court agrees.

Nothing in the record suggests that the first, third, fourth and fifth elements of Plaintiffs' fabrication of evidence claim are contested. *See, e.g.*, Dr. Lee's SMF ¶ 1 (stating in his Local Rule 56(a)(1) statement in support of his motion for summary judgment that in 1985 he "served as the Director of the Connecticut State Forensic Laboratory"); *id.* ¶ 5 (stating that he "met with State's Attorney Shepack to go over the content of his upcoming testimony"); Dr. Lee's Resp to Pls.' SMF ¶¶ 16–17 (admitting that State's Attorney Shepack "elicited [his] statement" regarding the towel that "positively tested" for blood); *id.* ¶ 18 (admitting that during the closing arguments in each Plaintiff's trial, attorney Shepack stated to the jury: "Remember also the bloody towel in the upstairs bathroom. It gave them an opportunity to wash or have some access to that sink. . . . There was testimony that there was blood by the sink in the bathroom upstairs"); Dr. Lee's Opp'n at 5 (conceding that evidence in the record supports Plaintiffs contention that Dr. Lee

"testified at their respective trials that he tested the white bathroom towel at the scene and it tested positive for the presence of blood," notwithstanding the fact that "there is no documentary evidence memorializing any pretrial testing of the towel by the Defendant"). The evidence in this record therefore establishes that Plaintiffs' have met their burden as to the first, third, fourth and fifth elements of their fabrication of evidence claim.[14]

On this record, therefore, the second element—actual fabrication of evidence—is the only element that appears to be contested.

Dr. Lee, however, does not meaningfully challenge Plaintiffs' assertion that the evidence in this record establishes that they have met the second element—namely that he fabricated evidence in their respective underlying criminal cases. *See, e.g.*, Dr. Lee's Opp'n to Pls.' MSJ at 5 ("In short, the parties agree that the sole issue driving summary judgment is whether absolute testimonial immunity shields Defendant Lee from suit and judgment."); *id.* (arguing that the Court must deny summary judgment even if "[Dr. Lee] were to admit that his testimony at each Plaintiff's trial was knowingly false (which he does not)"). Dr. Lee's bare assertion that "he [did] not" fabricate evidence, *id.*, without pointing to admissible evidence in the record, is insufficient to defeat Plaintiffs' well-supported motion for summary judgment. *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("At the summary judgment stage, a nonmoving party

---

[14] Moreover, the record does not show that Dr. Lee contests the first, third, fourth and fifth elements of Plaintiffs' fabrication of evidence claim against him. The Court therefore concludes that Dr. Lee has abandoned any opposition to those elements. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *Dixon v. Metro. Dist. Comm'n*, No. 3:14-cv-01468 (VAB), 2017 WL 4247051, at *4 (D. Conn. Sept. 25, 2017) ("If no reasonable jury could find in favor of the opposing party because 'the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.'" (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)); *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."); *accord Douglas v. Victor Cap. Grp.*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (citing cases).

'must offer some hard evidence showing that its version of the events is not wholly fanciful.'"

(quoting *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998))); *Adilovic v. County of Westchester*, No. 08 CIV. 10971 PGG, 2011 WL 2893101, at *7 (S.D.N.Y. July 14, 2011)

("[U]ncorroborated claims . . . not supported by any evidence . . . cannot alone defeat summary judgment."). In other words, in his submission, Dr. Lee all but concedes that, at least for the purpose of this motion for summary judgment against him, the evidence in this case support Plaintiffs' assertion that he fabricated evidence.

Dr. Lee instead argues that "[t]he accuracy of [his] trial testimony, standing alone, does not support a fabrication of evidence claim under 42 U.S.C. § 1983." Dr. Lee's Opp'n to Pls.' MSJ at 2.[15] But Plaintiffs have not limited their fabrication of evidence claim against Dr. Lee to his trial testimony. Instead, Plaintiffs allege that there is no evidence that Dr. Lee performed a

---

[15] Although it is an accurate statement of the law that, even a witness who knowingly testifies falsely, is immune from suit under the absolute testimonial immunity doctrine, *see Briscoe v. LaHue*, 460 U.S. 325, 345 (1983), the Supreme Court, in so holding, did not take lightly our judicial system's reliance on truthful testimony from witnesses placed under oath. *See Agurs*, 427 U.S. at 104 (noting that "perjured testimony" "corrupt[s] . . . the truth-seeking function of the trial process"). Nor did the Court suggest a diminished concern for the safeguards that our Constitution affords to the accused. *See Rehberg*, 566 U.S. at 367 (reiterating that although "civil liability was not needed to deter false testimony at trial," other sanctions—chiefly prosecution for perjury—provided a sufficient deterrent" against perjured testimony).

The Second Circuit likewise has been emphatic on the dangers that false testimony poses to our judicial system. *See Ricciuti*, 124 F.3d at 130 ("No arrest, no matter how lawful or objectively reasonable, gives [law enforcement officials] license to deliberately manufacture [a false confession] against an arrestee."); *id.* ("To hold that [investigating officers] . . . are . . . free to fabricate false [testimonies] at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice.").

Thus, when a witness, under oath, knowingly testifies falsely, the harm to our justice system—and most immediately the harm to the parties before the Court—cannot be understated. This is all the more concerning in a criminal prosecution where liberty is at stake. *See Harasz*, 239 F. Supp. 3d at 489 ("It is distressing to discover, during the course of legal research, the significant number of cases demonstrating that law enforcement officers fabricated evidence in connection with criminal charges against individuals.").

In any event, as discussed above, and further below, to the extent that Plaintiffs' fabrication of evidence claim relies on evidence, other than Dr. Lee's allegedly false testimony, *i.e.*, the allegedly fabricated evidence, even if such evidence was discussed during Dr. Lee's trial testimony, Plaintiffs' fabrication of evidence can move forward, even with an absolute testimonial immunity defense. *See Coggins*, 776 F.3d at 113 (requiring the court to "determine whether the plaintiff can make out the elements of his § 1983 claim without resorting to the . . . testimony. If the claim exists independently of the . . . testimony, it is not 'based on' that testimony, as that term is used in *Rehberg*.").

critical blood test on a towel, evidence relied on at trial by the prosecution, regardless of whether Dr. Lee later testified at trial that such a blood test had been conducted.[16]

Because Plaintiffs have "come forward with evidence . . . illustrating" that Dr. Lee did not perform the blood test, *Clopay Plastic Prod. Co. v. Excelsior Packaging Grp., Inc.*, No. 12-CV-5262 JPO, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014), Dr. Lee must "identify specific facts demonstrating a genuine issue for trial," *id.*, as to whether he, in fact, performed the test. Other than stating that he performed the test, however, the record contains no evidence that any such test was performed. In fact, as Plaintiffs noted, Dr. Lee's own experts concluded that there is no "'written documentation or photographic' evidence that Dr. Lee performed the TMB blood test." Pls.' MSJ at 16 (quoting Kammrath Dep. at 26:15–27:7, ECF No. 125-15). And there is evidence in this record that the tests actually conducted did not indicate the presence of blood. *See Henning*, 334 Conn. at 4 ("[A] test of the [red] substance conducted in connection with the [habeas proceedings] proved negative for blood."). Dr. Lee therefore cannot "defeat [Plaintiffs'] properly supported motion for summary judgment," *Anderson*, 477 U.S. at 257, simply by proffering testimony that is "largely unsubstantiated by any other direct evidence," *Jeffreys*, 426 F.3d at 555.[17]

---

[16] *See supra* Part III.A.1.

[17] Because the very testimony at issue here—as to whether Dr. Lee had performed the blood test on the towel—has been characterized as at best, "incorrect," *see Birch*, 334 Conn. at 40 n.4 (characterizing Dr. Lee's testimony "as incorrect rather than false or misleading because the latter terms might be understood as connoting a dishonest or untruthful intent, an implication that would be incompatible with the habeas court's determination"), or, at worst, "false or misleading," *see id.* ("[T]he respondent, the Commissioner of Correction, concedes that the testimony of Lee at issue in this case was false or misleading – terms commonly used in cases, like the present one, that involve due process claims predicated on the state's improper use of testimony in a criminal trial – in the sense that it was factually wrong or incorrect."), it is not clear how counsel for Dr. Lee would have a good-faith basis for having him testify at trial in this case that such a test had been performed. *See* Connecticut Rules of Professional Conduct 1.2(d) ("A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may (1) discuss the legal consequences of any proposed course of conduct with a client; (2) counsel or assist a client to make a good-faith effort to determine the validity, scope, meaning or application of the law; or (3) counsel or assist a client regarding conduct expressly permitted by Connecticut law, provided that the lawyer consults the client about the legal consequences, under other applicable law, of the client's proposed course

Accordingly, the Court will grant Plaintiffs' motion for summary judgment against Dr. Lee as to liability. *See Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (affirming the district court's order granting summary judgment where a "party's inconsistent and contradictory statements transcend credibility concerns"); *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 194 (2d Cir. 2013) (explaining that "a sham issue of fact exists . . . when the contradictions in an expert witness's testimony are inescapable and unequivocal in nature" (citation omitted)).

### B.  The State Defendants

State Defendants move for summary judgment as follows: with respect to the claims brought by Mr. Birch, State Police Sergeant Acker moves for judgment on the First Count (Fabrication of Evidence), and all State Police Defendants move for judgment on the Second (Malicious Prosecution) and Third Counts (Suppression of Material Favorable Evidence/*Brady* Violation).

As for the claims brought by Shawn Henning, State Defendants move for judgment as to the Second (Malicious Prosecution), Third (Suppression of Material Favorable Evidence/*Brady* Violation), and Eighth Counts (Intentional or Reckless Infliction of Emotional Distress).

The Court will address each claim for summary judgment in turn.

---

of conduct."). In other words, given all of the evidence in the record that no blood test on the towel had been performed by Dr. Lee, a more than adequate basis for granting summary judgment against Dr. Lee, as discussed above, it is speculative that any admissible testimony would be offered by counsel for Dr. Lee at trial, or that Dr. Lee would seek to offer any such testimony at trial against the advice of counsel. *See Chapman Lumber, Inc. v. Tager*, 288 Conn. 69, 95 (2008) ("However far the duty of an attorney to zealously represent his client extends, it necessarily falls short of the point at which the representation constitutes a fraud on a third party or the assistance in the perpetration of such a fraud, whether by affirmative misrepresentations or knowing nondisclosures." (citing Rules of Professional Conduct 1.2(d) and 4.1)).

### 1.  Mr. Birch's Count I: Fabrication of Evidence Against State Police Sergeant Acker

State Police Sergeant Acker moves for summary judgment on Count One—fabrication of evidence—of Mr. Birch's Amended Complaint. *See* AC ¶¶ 380–88; State Defs.' MSJ at 4–16. Mr. Birch's fabrication of evidence claims against him center around his alleged failure to intervene during the alleged fabrication of two pieces of evidence.

First, Mr. Birch alleges that State Police Sergeant Acker failed to intervene when State Police Detectives Ocif and O'Mara and State Police Sergeant Mucherino attributed an allegedly false inculpatory statement to him in a supplemental police report. More specifically, Mr. Birch asserts that in an initial report filed immediately after his custodial interview, on December 9, 1985, they stated that when Mr. Birch was shown a photograph of Mr. Carr from the crime scene, Mr. Birch "asked if the victim was laying in the bathroom." Ex. D to State Defs.' MSJ, ECF No. 128-6 ("Initial Report"). State Police Detective O'Mara filed a supplemental report nearly a year and half after the initial report was filed. In the supplemental report, he stated that he, State Police Detective Ocif, and State Police Sergeant Mucherino now remember that, during the December 9, 1985 custodial interview, Mr. Birch affirmatively stated, "[t]hat's the bathroom there" when he was shown a photograph of the victim from the crime scene. Ex. C to State Defs.' MSJ at 1, ECF No. 128-5 ("Supplemental Report"). As the coordinating law enforcement official for the Carr investigation, State Police Sergeant Acker—who was not present during the December 9, 1985 interview—reviewed the supplemental report which contained the alleged fabrication. Ex. A to State Defs.' MSJ ¶ 13, ECF No. 128-3 ("Acker Aff.").

Second, Mr. Birch alleges that State Police Sergeant Acker failed to intervene when State Police Detective Ocif knowingly elicited false testimony from Robert Perugini and Todd Cocchia which inculpated Mr. Birch in the murder of Mr. Carr. Mr. Birch asserts that State

Police Detective Ocif followed improper police procedures during the interviews, and that he improperly provided details about the Carr murder to Perugini and Cocchia. Specifically, Mr. Birch alleges that State Police Detective Ocif acted improperly when he began his interview by telling these witnesses that Mr. Birch "committed the homicide and invited them to parrot that information back to him." Pls.' Opp'n to State Defs.' MSJ at 26. As the coordinating law enforcement official for the Carr investigation, State Police Sergeant Acker was present during one of the interviews of Perugini and he reviewed the police report summarizing the content of the Cocchia interview. Acker Aff. ¶¶ 17, 19.

State Police Sergeant Acker argues that he is entitled to summary judgment on Mr. Birch's fabrication of evidence claim as to both the Supplemental Report and the Perugini and Cocchia interviews.

The Court will address each claim in turn.

### i.    Fabrication of Evidence and Duty to Intervene

As the Court previously noted above, our Constitution guarantees the accused the right to a fair trial. *See supra* Part IV.A.2. When an investigating official "fabricat[es] and forward[s] to prosecutors of known false evidence," that official not only violates the accused's right to a fair trial, but the official "works an unacceptable 'corruption of the truth-seeking function of the trial process.'" *Ricciuti*, 124 F.3d at 130 (quoting *Agurs*, 427 U.S. at 104). In addition, it is well settled that "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens"—including the right to a fair trial—"from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 552 (2d Cir. 1994); *see also Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) ("An officer who fails to

intercede in [a] . . . constitutional violation is liable for the preventable harm caused by the actions of other officers." (citation omitted)).

To maintain a claim of fabrication of evidence under § 1983, a plaintiff must show that "an (1) investigating official (2) fabricate[d] evidence (3) that is likely to influence a jury's decision, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of liberty as a result." *Harasz*, 239 F. Supp. 3d at 491; *Garnett*, 838 F.3d at 279.

The affirmative duty to intervene in a constitutional violation is triggered when the observing officer knows or "has reason to know" that a constitutional violation is afoot, and the officer has a "realistic opportunity to intervene" but fails to do so. *Anderson*, 17 F.3d at 557. Whether "an officer had a 'realistic opportunity' to intervene . . . is normally a question for the jury unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" *Terebesi*, 764 F.3d at 244 (quoting *Anderson*, 17 F.3d at 557).

### ii.  The Supplemental Police Report

In his motion for summary judgment, State Police Sergeant Acker does not argue that O'Mara's supplemental report was not fabricated, at least at this stage of the case. *Cf.* State Defs.' MSJ at 5 n.3 (noting that although State Defendants "categorically deny that they fabricated any evidence but cannot, consistent with Rule 56, move for summary judgment on these claims at this time"). Instead, he argues that he had no duty to intervene in the alleged fabrication contained in the supplemental report because "there is no evidence to show that [he] knew, or should have known, that the 'bathroom statement' was (allegedly) fabricated in the first place." State Defs.' MSJ at 8.

First, he argues that he "was not present for the 1985 interview with Birch," nor was he present during the "conversation between O'Mara, Ocif and Mucherino," which led to the

revised supplemental report. *Id.* at 10. Second, he argues that there was no "evidence uncovered prior to trial indicating that the statement in the 1987 report was fabricated." *Id.* Thus, according to State Police Sergeant Acker, it was "objectively reasonable for [him] . . . to conclude that the 1987 report, which was similar to the 1985 report, was honestly generated by his fellow investigating officers." *Id.* When viewed in this context, he argues that he cannot "be held responsible for failure to intervene in the alleged fabrication of the bathroom statement," and that any attempt to do so "is pure speculation on the part of Birch." *Id.* at 11 (internal quotation marks omitted).

In response, Mr. Birch argues that a "rational jury could find that Acker knew, or had reason to know, that the 'bathroom' statement was fabricated." Pls.' Opp'n to State Defs.' MSJ at 22. First, Mr. Birch argues that the supplemental report "on [its] face . . . reek[s] of fabrication." *Id.* at 22. Second, according to Mr. Birch, a "rational jury could . . . infer that, when [O'Mara and Mucherino] met up with their supervisor [Acker] after interrogating the primary suspect, O'Mara and Mucherino told Acker what they had just learned." *Id.* at 23. Therefore, in Mr. Birch's view, a jury could further infer from this record that "that O'Mara and Mucherino, with Acker's acquiescence, fabricated evidence to the maximum extent feasible." *Id.* at 24.

The Court disagrees.

When deciding a summary judgment motion a court must draw all inferences in favor of the non-moving party. *Jeffreys*, 426 F.3d at 555. But "[t]he nonmoving party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Harasz v. Katz*, 327 F. Supp. 3d 418, 427 (D. Conn. 2018) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). Here, it is true, as Mr. Birch argues, that on this record, a jury could infer that "when [O'Mara and Mucherino] met up with their supervisor

[Acker] after interrogating the primary suspect, O'Mara and Mucherino told Acker what they had just learned." *Id.* at 23. But, without additional evidence, a rational jury would have to speculate as to the exact content of that conversation. *See Saeli v. Chautauqua County*, 36 F.4th 445, 454 (2d Cir. 2022) ("[S]peculation alone is insufficient to defeat a motion for summary judgment." (quoting *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006))).

In effect, Mr. Birch invites a rational jury not only to determine what was said during this inferred conversation between State Police Sergeant Acker and State Police Detective O'Mara and State Police Sergeant Mucherino, but also to determine what was left out of the conversation—meaning that they did not mention to him that Mr. Birch identified the victim's bathroom. More is required of Plaintiffs to defeat summary judgment. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) ("[U]nsupported allegations do not create a material issue of fact."); *see also Eyuboglu v. Gravity Media, LLC*, No. 16 CV 6362-LTS, 2018 WL 4680986, at *6 (S.D.N.Y. Sept. 28, 2018) (concluding that "in light of Defendant's specific denials of knowledge" of plaintiff's telephone conversation," for summary judgment purposes, it was "unreasonable and speculative" to then infer that a defendant "learned of the content of Plaintiff's phone call through" other means), *aff'd*, 804 F. App'x 55 (2d Cir. 2020)

Accordingly, the Court will grant summary judgment to State Police Sergeant Acker as to the claim that he failed to intervene in the alleged fabrication of evidence with respect to the Supplemental Report.[18]

---

[18] To be clear, as State Police Sergeant Acker correctly notes, in granting summary judgment as to his role in the alleged fabrication of evidence with regard to the Supplemental Report, the Court need not and does not reach, much less decide, whether State Police Detectives Ocif, and O'Mara, as well as State Police Sergeant Mucherino did, in fact, fabricate evidence in their supplemental report. *See* State Defs.' MSJ at 10 ("Whether the 1987 report was factual or not, does not create a material issue of fact with respect to Acker's liability. The question is whether Acker knew, or could have known, that the 1987 report was (allegedly) fabricated."). Thus, nothing in this Order should be construed as addressing Mr. Birch's fabrication of evidence claim against them.

### iii. Fabrication as to the Perugini and Cocchia Statements

State Police Sergeant Acker also argues that he is entitled to summary judgment on Mr. Birch's fabrication of evidence claim relating to witness statements from Mr. Perugini and Mr. Cocchia because State Police Detective Ocif did not fabricate the statements from them, and as result, he did not have an obligation to intervene. *See* State Defs.' MSJ at 12 ("The evidence about which he complains is not evidence of fabrication, consequently, Acker's failure to act on the evidence cannot support a claim for failure to intervene in such misconduct."). According to him, to the extent that Mr. Birch relies on the "facts surrounding" State Police Detective Ocif's interviews with Mr. Perugini and Mr. Cocchia—namely that State Police Detective Ocif "affirmatively [sought] the witnesses"; that "Ocif offered to help [Perugini and Cocchia] in exchange for information about [Mr. Birch]"—those facts may suggest that "both men had credibility problems," and not evidence that he fabricated their statements. State Defs.' MSJ at 13, 14. In his view, merely "[o]ffering to assist individuals with their own pending charges, in exchange for testimony against another, is not evidence of illegal coercion." *Id.* at 14. Rather, he argues, it "is simply a fact that goes to the witness' credibility and the weight of the testimony at a future trial." *Id.*

In response, Mr. Birch argues that "Acker candidly acknowledged at his deposition" that State Police Detective Ocif's approach to the interviews of Mr. Perugini and Mr. Cocchia was improper. Pls.' Opp'n to State Defs.' MSJ at 25. More specifically, Mr. Birch argues that State Police Sergeant Acker acknowledged that "it was 'wrong' for State Police Detective Ocif to begin his interview by telling Mr. Perugini that he was investigating a murder that Mr. Birch was involved in." *Id.* (quoting Acker Dep. Tr. at 113:1–11, ECF No. 137-3 ("Acker Dep. Tr.")). Mr. Birch argues that State Police Sergeant Acker likewise acknowledged that it was improper for

State Police Detective Ocif to provide details about the crime to Mr. Cocchia during the interview. *See* Pls.' Opp'n to State Defs.' MSJ at 24 (noting that during his deposition Acker "testified that he 'wouldn't' do what Ocif had done . . . '[b]ecause it's providing them information, the whole idea is for you to get information from them'"). According to Mr. Birch, "the evidence viewed in the light most favorable [to him] shows that . . . a rational jury could . . . find that Acker knew or had reason to know" that State Police Detective Ocif fabricated evidence and therefore had a duty to intervene. *Id.* at 27.

The Court agrees, in part.

As an initial matter, in order to maintain a fabrication of evidence claim against State Police Sergeant Acker, because Mr. Birch does not allege that he himself fabricated evidence with respect to the Perugini and Cocchia interviews, he must first establish that State Police Detective Ocif, in fact, fabricated evidence with respect to these interviews, and then that State Police Sergeant Acker knew or should have known that State Police Detective Ocif fabricated the evidence.

The Court will address the former before turning to the latter.

### a) *Actual Fabrication of Evidence*

"When false testimony is knowingly elicited by an investigating official, that act can be viewed as the creation of false evidence . . . ." *Lopez v. City of New York*, 105 F. Supp. 3d 242, 248 (E.D.N.Y. 2015). In the context of a "section 1983 action for using fabricated evidence to deprive a plaintiff of his constitutional rights," the Second Circuit has explained that there is no reason to distinguish "between misleading statements or omissions and affirmative falsehoods." *Morse v. Fusto*, 804 F.3d 538, 548, 549 (2d Cir. 2015) (citation and quotation marks omitted). Here, when viewed in the light most favorable to Mr. Birch, a reasonable jury could conclude

that State Police Detective Ocif fabricated evidence by "knowingly elicit[ing]" "false testimony," *Lopez*, 105 F. Supp. 3d at 248, during his interview with Mr. Cocchia. More specifically, a reasonable jury could find that State Police Detective Ocif fabricated key details of the Carr murder during his interview.

For example, although Mr. Cocchia did not indicate that Mr. Birch told him that Mr. Carr was "an old man," State Police Detective Ocif repeatedly attempted to inject that description in Mr. Cocchia's retelling of his purported conversation with Mr. Birch. The following exchange from the Cocchia interview is illustrative:

> **OCIF**: Alright, getting back to the burglary where the old man was killed. What, is there anything that you can recall specifically, that he told you? Other than he killed him. Did he say he knifed him?
>
> **COCCHIA**: Yes, he said he stabbed him.

Cocchia Tr. at 6. A few questions later, State Police Detective Ocif stated that:

> **OCIF**: Well think about what else he told you, other than he said, he stabbed an old man during a burglary.
>
> **COCCHIA**: Um hmm.

*Id.* at 7. Although Mr. Cocchia is yet to say the words "old man," later in the interview, State Police Detective Ocif yet again returns to the subject after repeating a few of the points that Cocchia made during the interview:

> **OCIF:** Yeah so basically, he said he stabbed an old man during a burglary?
>
> **COCCHIA:** Uh huh.
>
> **OCIF:** It occurred a long time ago?
>
> **COCCHIA**: Uh huh.
>
> **OCIF**: You think it happened in New Milford?
>
> **COCCHIA**: Uh huh.
>
> **OCIF**: And you went to the Port Authority bus terminal, you were in New York for a while, and he told you this on the bus?
>
> **COCCHIA**: Uh huh.

**OCIF**: And he also said he grabbed a knife and stabbed him. It was not his knife right?

**COCCHIA**: No, I know that. It wasn't his knife. It, he, it sounded like it was right on the counter.

**OCIF**: Well, we'll just leave it like, like you remember, it was not his wife [sic], his knife ok?

**COCCHIA**: Alright.

**OCIF**: He didn't know anybody was in the house?

**COCCHIA**: Nope. Positive of that.

**OCIF**: Did he say the guy, the old, the old man's name that you can recall?

**COCCHIA**: I'm positive he didn't say the old man's name.

**OCIF**: But he said it was an old man?

**COCCHIA**: Yes. I don't even know, I got the impression the guy was, you know, my father's age. I didn't get the impression that he was real old. I don't remember if he said old but I figured.

**OCIF**: You said a man, an old man.

**COCCHIA**: Yeah I figured he, that, Rich you know what he looks like, he's a young stocky kid.

**OCIF**: Yeah.

Cocchia Tr. at 10–11.

Mr. Cocchia did not identify Mr. Carr as an "old man" until after the fourth time Ocif repeated the phrase. Later in the interview, State Police Detective Ocif clarifies to Mr. Cocchia that "the guy was old, he was 65." *Id.* at 15. Yet, in his police report summarizing the content of the interview, State Police Detective Ocif writes: "Cocchia then told us . . . Birch told him that he was involved in a Burglary sometime ago and that he (Birch) had stabbed an old man who later died." Ocif Police Report – Cocchia Interview at 1.[19]

---

[19] Earlier in their interview, State Police Detective Ocif stated the following to Mr. Cocchia:

> There's something in your mind that you're not aware of that [Birch] told you, that would be very important, ok? That's what I'm trying to get out of you without telling you, and I can't tell you. What I want, I want you to keep thinking about it. That would make it very important to us, and it would get you what you're

Also, State Police Detective Ocif corrected several errors made by Cocchia during the

interview:

> **OCIF:** You know the old expression, half a loaf of bread is better than none? You got some information that's very interesting, and some that isn't, ok? It's worth something, depending if you're willing to testify on a murder end of it.
>
> **COCCHIA:** [explaining that he "sympathizes" with the victim; expressing fear of retribution if he testifies against Mr. Birch; and asking that Ocif "offer [him] something" in return of his testimony such as another place to live]
>
> **OCIF:** Um hmm. I know, I know what you're saying Todd. But like I said, like I said half the information and I'll be truthful with you, he wasn't alone.
>
> **COCCHIA:** He was with someone else.
>
> **OCIF:** Yeah.
>
> **COCCHIA:** Did that person go in the house is the question? I don't think so.
>
> **OCIF:** Yeah. Uh, the information about getting the knife from somewhere, that's true.
>
> **COCCHIA:** He didn't have it on him.
>
> **OCIF:** No.
>
> **COCCHIA:** And he –
>
> **OCIF:** He got the knife from within the house, so that's true. Uh, it was night time, it wasn't day time.
>
> **COCCHIA:** It wasn't day time?
>
> **OCIF:** No. He woke an old man up, you know. The guy was old, he was 65, and he got murdered.
>
> **COCCHIA:** [Birch] deserves whatever he gets regardless.

Cocchia Tr. at 13–14. After correcting these errors, Ocif then invites Cocchia to testify:

> **OCIF:** So, I can help you in Connecticut, as long as you're willing to testify. I'm sure I can get you a base on balls in Connecticut, as long as I relate this to the

---

looking for. Ok, I'll try to give you a hint. What did he say, did he say anything about what they took out of the house, or that he took out of the house?"

Cocchia Tr. at 5.

probation department and the state's attorney, you will be brought back when, the conclusion of this, on a violation of probation warning.

**COCCHIA:** Um hmm, I know that.

*Id.* at 14.

On this record, at best, there is a genuine dispute as to whether State Police Detective Ocif sought to elicit false testimony from Cocchia. There is also a genuine dispute as to whether, after correcting Mr. Cocchia's errors—key details, such as the age of the victim and time of the murder—and thereafter inviting him to testify against Mr. Birch at trial, he knowingly sought to elicit false testimony for Cocchia during Mr. Birch's trial.[20]

In sum, on this record, drawing all inferences in Mr. Birch's favor, a reasonable jury could conclude that State Police Detective Ocif knowingly elicited false testimony.[21] *See Vazquez v. City of New York*, No. 10 Civ. 6277 (JMF), 2014 WL 4388497, at *4, *8 (S.D.N.Y. Sept. 5, 2014) (denying summary judgment on fabrication claim where a defendant "fabricated all (or most) of [the witness's] testimony").

---

[20] At the time of the Cocchia interview, State Police Sergeant Acker concedes that there was no probable cause to charge Mr. Birch with the Carr murder. *See* Acker Dep. Tr. at 114:14–15 (conceding that they "didn't have sufficient probable cause" to arrest and charge Mr. Birch); *cf.* State Defs.' Reply at 3 n.2 ("Acker was no longer working on the Carr murder investigation at the time that the Plaintiffs were arrested."). Yet, during the interview, State Police Detective Ocif all but expressed to Cocchia that Mr. Birch was responsible for the murder. *See* Cocchia Tr. at 15 ("When we pinch him for the murder, he ain't gonna get out on no bond. Nobody's gonna post the bond we're gonna have on him."). Again, on this record, at best, there is a dispute as to whether State Police Detective Ocif fabricated evidence of Mr. Birch's purported responsibility in the Carr murder when, in fact, he was aware that no probable cause existed to charge Mr. Birch of the murder. Probable cause, of course, is not required to sustain "[a] fair trial claim based on fabricated evidence." *Hincapie v. City of New York*, 434 F. Supp. 3d 61, 75 (S.D.N.Y. 2020).

[21] To be clear, "[t]he manufacture of false evidence, in and of itself . . . does not impair anyone's liberty, and therefore does not impair anyone's constitutional right." *Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000). A plaintiff still "must establish a causal connection between the fabricated evidence and a deprivation of liberty." *Lopez*, 105 F. Supp. 3d at 247. Here, State Police Sergeant Acker does not contest the causal connection and the Court therefore assumes, for the purposes of this motion, that the causation element has been satisfied.

The Court will next analyze whether State Police Sergeant Acker knew or should have known of Ocif's alleged fabrication.[22]

### b)  *State Police Sergeant Acker's Knowledge*

Turing next to whether State Police Sergeant Acker knew or should have known of State Police Detective Ocif's fabrication, State Police Sergeant Acker argues that he "had little firsthand contact or involvement in each of the scenarios that Plaintiff Birch identifies as giving rise to fabricated evidence." State Defs.' Reply at 2. Notably, State Police Sergeant Acker does not assert he had no firsthand contact of involvement. Rather argues that he "he little firsthand contact." *Id.* In any event, his obligation to intervene is not limited solely to scenarios in which he had firsthand contact or involvement. *See Tangreti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020) (explaining in § 1983 deliberate indifference claim that a plaintiff can establish liability against a supervisor if the plaintiff can establish that the supervisor "personally knew of and disregarded an excessive risk" to the plaintiff); *Terebesi*, 764 F.3d at 234 ("In this Circuit, a 'direct participant' includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally."); *Dunham v. City of New York*, 295 F. Supp. 3d 319, 331 (S.D.N.Y. 2018) ("The personal involvement of a supervisor can be shown" through, *inter alia*, the supervisor's "failure to take corrective action after learning of a subordinate's unlawful conduct . . . ." (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003))); *Wyler v. Conn. State Univ. Sys.*, 100 F. Supp. 3d 182, 196 (D. Conn. 2015) (explaining that "personal involvement" in a constitutional violation under § 1983 "is not limited

---

[22] To be clear, it is not "false" that Mr. Carr was indeed "an old man" or that the alleged robbery occurred at night instead of during the day. Rather, the alleged false statements are whether (1) Mr. Birch told Cocchia anything at all about his purported role in the Carr murder; and (2) Mr. Birch revealed anything about the age of Mr. Carr and the time of the alleged burglary. As to those statements, a jury reasonably could find that Ocif knowingly elicited false testimony.

to direct participation by the supervisor in the challenged conduct, but may also be established by evidence [that] an official . . . fail[ed] to take corrective action after learning of a subordinate's unlawful conduct" (citation omitted)); *see also Israel v. City of New York*, No. 16 CIV. 6809 (PGG), 2018 WL 11219076, at *9 (S.D.N.Y. Sept. 29, 2018) (explaining that "[p]ersonal involvement may arise through . . . a failure to intervene" (quoting *Patterson v. City of New York*, No. 14-CV-5330 (PKC), 2015 WL 8362702, at *2 (S.D.N.Y. Dec. 8, 2015))).

Here, when viewed in the light most favorable to Mr. Birch, the record contains evidence suggesting that State Police Sergeant Acker should have known that State Police Detective Ocif engaged in "improper police procedures" which could result in "giving a witness an opportunity to fabricate a story." Acker Dep. Tr. at 113:12–19. For example, although he was not present during the December 7, 1987, Perugini interview, Acker Aff. ¶ 18, a reasonable jury could conclude that State Police Sergeant Acker, as the law enforcement official coordinating the Carr investigation, read State Police Detective Ocif's police report of the interview. Such a conclusion—that he read the December 8, 1987 police report—is bolstered by the fact that State Police Sergeant Acker participated in a follow-up interview which he described as a "critical interview." Acker Dep. Tr. at 118:21–23. In other words, viewing the evidence in the light most favorable to Mr. Birch, a reasonable jury could conclude that State Police Sergeant Acker, in preparation for a "critical interview," *id.*, would have read State Police Detective Ocif's police report documenting his previous interview with this witness.

Critically, State Police Sergeant Acker acknowledged that it would be "improper police procedure" for State Police Detective Ocif to begin his interview by informing Mr. Perugini that he is "investigating a murder that Ricky Birch was involved in." *Id.* at 113:6–12. In his own words, State Police Detective Ocif's conduct "put[] an idea in" Mr. Perugini's head, which he

concedes gives a "witness an opportunity to fabricate a story to serve his own purposes." *Id.* at 113:17–20. Thus, from this evidence, a reasonable jury could find that State Police Sergeant Acker knew or should have known that State Police Detective Ocif knowingly elicited false testimony from Mr. Perugini.[23]

Similarly, although State Police Sergeant Acker was not present during the July 12, 1988, interview of Mr. Cocchia, Acker Aff. ¶ 16, he "did review Andrew Ocif's police report dated July 14, 1988, summarizing the content of his July 12, 1988, interview with Todd Cocchia," *id.* ¶ 17. Further, State Police Sergeant Acker "either listened to the recording[] . . . or read [the] transcript" of State Police Detective Ocif's interview with Mr. Cocchia. State Defs.' MSJ at 15 n.5. He acknowledges that it was improper for State Police Detective Ocif to provide certain details about the Carr murder to Mr. Cocchia during the interview. *Id.* 148:1-2. He explained that he "would not" provide information to a witness because the "whole idea [of the witness interview] is for you to get information from them." *Id.* 147:23–148:1-2. Again, viewing the evidence in the light most favorable to Mr. Birch, a reasonable jury could conclude that State Police Sergeant Acker knew or should have known that State Police Detective Ocif engaged in conduct that would lead a witness to fabricate evidence.

Accordingly, because a reasonable jury, viewing the evidence in the light most favorable to Mr. Birch, could conclude that State Police Detective Ocif knowingly elicited false statements from Mr. Perugini and Mr. Cocchia, and that State Police Sergeant Acker knew or should have known that he did so, the Court will deny State Police Detective Acker's motion for summary

---

[23] To the extent that State Police Sergeant Acker argues that merely "because the interviews were conducted and designed to produce fabricated statements" does not mean that the interviews "did, in fact, produce fabricated statements," State Defs.' MSJ at 12, that is a factual determination to be made by a jury, not this Court on a motion for summary judgment, as the Court noted above, *supra* Part IV.B.1(iii)(a). *See Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010))).

judgment on Mr. Birch's fabrication of evidence claim. *See United States v. Cromitie*, 727 F.3d

194, 224 (2d Cir. 2013) (imputing knowledge of false testimony where the "testimony . . . was . .

. clear enough to show its falsity," and "no reasonable person could fail to recognize its falsity");

*Blake v. Race*, 487 F. Supp. 2d 187, 207–08 (E.D.N.Y. 2007) (concluding that "even if not

directly involved," where "there is . . . sufficient evidence to create an issue of fact as to whether

[a defendant] failed to intercede in such a constitutional violation," summary judgment is

precluded as to that defendant).

### iv. Qualified Immunity

State Police Sergeant Acker argues he is entitled to qualified immunity because, in his

view, "it was objectively reasonable for him" to believe that his conduct complied with the law.

State Defs.' MSJ at 15 (citing *Pearson v. Callahan*, 555 U.S. 223, 244 (2009)). In his view, he

"did not possess any information that would suggest the constitutional rights of [Mr. Birch] had

been violated by anyone," and he "reasonably relied upon the information his fellow officers

shared with him." *Id.* at 15. But as Mr. Birch correctly notes, "Acker does not dispute that the

right not to be deprived of liberty based on fabricated evidence and the obligation of police

officers to intervene (when realistic) to prevent fellow officers' constitutional violations were

clearly established at the time." Pls.' Opp'n to State Defs.' MSJ at 28. In other words, State

Police Sergeant Acker simply argues that he was not—and that it was reasonable for him to not

be—aware that State Police Detective Ocif engaged in a constitutional violation. The Court,

however, has concluded that a reasonable jury could find that State Police Sergeant Acker knew

or should have known that Ocif engaged in a constitutional violation, *see supra* Part

IV.B.1(iii)(b).

Accordingly, the Court also will deny summary judgment on the basis of qualified immunity. *See Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 255 (2d Cir. 2020) ("[S]ummary judgment based . . . on qualified immunity requires that no dispute about material factual issues remain . . . ." (alteration in original) (quoting *Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998))).

### 2. Count II: Malicious Prosecution Claim as to State Police Detectives Ocif, McCafferty, and O'Mara, and State Police Sergeants Acker and Mucherino

Under Connecticut law, to state a claim for malicious prosecution, a plaintiff must establish that "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *Spak v. Phillips*, 857 F.3d 458, 462 (2d Cir. 2017) (quoting *Brooks v. Sweeney*, 299 Conn. 196, 210–11 (2010)). "The existence of probable cause will defeat a claim of malicious prosecution . . . ." *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012); *see also Turner v. Boyle*, 116 F. Supp. 3d 58, 86 (D. Conn. 2015) ("The existence of probable cause is a complete defense to a claim of malicious prosecution.").

Probable cause is "evaluated on the totality of the circumstances," *Jenkins v. City of New York*, 478 F.3d 76, 90 (2d Cir. 2007) (citation omitted), and "[a] court 'must consider [only] those facts available to the officer at the time of the arrest and immediately before it,'" *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). And a "[r]eview for probable cause should encompass plainly exculpatory evidence alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." *Stansbury*, 721 F.3d at 93 (quotation marks and citation omitted).

The Second Circuit has explained that the "probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Id.* at 95. In the malicious prosecution context, "[p]robable cause . . . has been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Id.* In other words, to establish probable cause sufficient to entitle a defendant to qualified immunity from civil suit, the "defendant must show he had probable cause to believe that the charged individual could be successfully prosecuted." *Rodriguez v. City of New York*, 291 F. Supp. 3d 396, 413 (S.D.N.Y. 2018).

Finally, "[a] lack of probable cause generally creates an inference of malice." *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003); *see also Falls Church Grp., Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 94 (2007) ("Malice may be inferred from lack of probable cause."); *Stonick v. Delvecchio*, 438 F. Supp. 3d 154, 168 (D. Conn. 2020) ("Want of probable cause and malice, combined, are essential. If the evidence supports the former, we need not consider the latter, since it may be inferred." (quoting *Mulligan v. Rioux*, 229 Conn. 716, 746 (1994))).

State Police Detectives Ocif, McCafferty and O'Mara and State Police Sergeants Acker and Mucherino move for summary judgment on Plaintiffs' malicious prosecution claims. They do not contest satisfaction of the first two elements of Plaintiffs' malicious prosecution claim. *See* State Defs.' MSJ at 19 ("The parties agree that prosecutions were initiated against the Plaintiffs and those prosecutions terminated in the Plaintiffs' favor some thirty years later when the convictions were vacated and then dismissed."). At issue on summary judgment, therefore, is whether the "prosecutions were initiated without probable cause and with malice." *Id.* And

because "[m]alice may be inferred from lack of probable cause," *Falls Church Grp.*, 281 Conn. at 94, the Court therefore need only decide the probable cause element.

The State Defendants claim that there was probable cause to arrest and prosecute Plaintiffs, but even if the Court found that probable cause did not exist, they are "still entitled to qualified immunity for a suit for damages because there was '*arguable* probable cause" to arrest. State Defs.' MSJ at 21. They assert that at the time of Plaintiffs' arrests, the basis for arguable probable cause consisted of "five highly inculpatory statements" by Stanley Bryson, Robert Perugini, Todd Cocchia, Mildred Henning, and Timothy Saathoff. *Id.* (footnote omitted). These statements, they argue, "coupled with Plaintiffs' possession" of a noisy vehicle believed to have been outside of the Carr residence at the time of the murder, Plaintiffs' admitted local burglaries in the area, and Plaintiffs' "consciousness of guilt," were sufficient to support probable cause. *Id.* at 22. Although Plaintiffs' have raised questions as to the validity of the Perugini, Cocchia, Mildred Henning and Saathoff statements in light of Ocif's alleged misconduct in securing those statements, the State Defendants argue that those allegations are without merit. *Id.*

As to the Perugini and Cocchia interview, they reiterate that "there was nothing objectively improper about" those interviews and that "[a]ny credibility problems associated with the circumstances under which the statements were taken, was fodder for cross examination at trial and an issue of credibility for the jury." *Id.* at 23. Similarly, as to the Mildred Henning and Saathoff interviews, they argue that "[t]here is no legal basis for disqualifying the statements" because "Ms. Henning was interviewed at home in Illinois by local police, with Ocif present, and Saathoff was initially interviewed exclusively by Illinois police." *Id.*

Thus, in the State Defendants' view, because Saathoff and Mildred Henning statements "were secured . . . through the neutral assistance of the Illinois police . . . there is no basis for

suggesting that either statement be excluded from a backward-looking probable cause analysis based on misconduct by the State Defendants." *Id.* at 24. But, "even if this Court were to conclude that one or more of the statements was sufficiently tainted to warrant its exclusion from the probable cause consideration," the State Defendants maintain that "the inclusion of even one of the four statements, coupled with the additional inculpatory evidence known to police, would have been sufficient to lead a reasonable officer to conclude that probable cause existed to arrest the Plaintiffs in connection with the crimes that occurred at the Carr residence." *Id.* 24.

Finally, the State Defendants argue that contrary to Plaintiffs' assertion, the inclusion of certain exculpatory evidence—the discovery of $1,000 in cash at the crime scene; a witness's conflicting statements about the timing of the Plaintiffs' whereabouts and the fact that that the same witness was offered a deal in exchange for testimony—in the warrant affidavit or during the probable cause hearing would not have undermined or "voided probable cause." *Id.* at 27.

In response, Plaintiffs argue that State Defendants "unquestionably knew that they did not have probable cause to arrest Mr. Henning or Mr. Birch through at least the first 16 months of their investigation." Pls.' Opp'n to State Defs.' MSJ at 29. Plaintiffs point to a letter from the Major Crime Squad Commander in charge of the Carr investigation asking that the Assistant Attorney General request that the Governor approve a monetary award of $20,000 for any individual who comes forward "with information that would aid in the [Carr] investigation." Ex. 17 to Pls. Opp'n to State Defs.' MSJ. at 1, ECF No. 137-17 ("Hitlz letter"). In the letter, the Commander explained that as of October 9, 1986, "all conventional investigative leads and processes have been exhausted. . . . Evidence has been collected and forensically examined and analyzed. Simply stated, there is not enough Probable Cause for an arrest or prosecution." *Id.*

In light of this admission—that there was not "enough probable cause for an arrest or prosecution," *id.*—Plaintiffs argue that the evidence in support of the probable cause was therefore obtained after October 9, 1986. *See also* Pls.' Opp'n to State Defs.' MSJ at 34 ("Ocif testified, 'we didn't have enough probable cause' to seek Mr. Birch's arrest without a written statement from Cocchia." (citing Ocif Dep. Tr. at 127:9–13)); *id.* at 33 (explaining that Ocif only sought Mr. Henning's arrest "[a]fter obtaining" Mildred and Saathoff's written statements). But this evidence—"Mr. Birch's purported secondary confessions to Perugini and Cocchia, and Mr. Henning's purported secondary confessions to Saathoff and Mildred Henning"— Plaintiffs argue, was fabricated. Pls. Opp'n to State Defs.' MSJ at 29. The State Defendants cannot therefore rely on it to show that they had arguable probable cause at the time of the arrest, Plaintiffs conclude. *Id.*

In support of excluding this evidence from the arguable probable cause analysis, Plaintiffs argue that, as an initial matter, the State Defendants did not move for summary judgment on fabrication claims as to State Police Detective Ocif, who secured these statements. Thus, any arguments contesting the fabrication claim, they argue, is waived for the purposes of the motion for summary judgment on the malicious prosecution claim. *Id.* at 34. Next, they argue that, even if the argument is not waived, on this record, "[a] rational jury could find that [Ocif], in bad faith, participated in creating false evidence [statements of Perugini, Cocchia, Saathoff, and Mildred Henning] that he subjectively knew was false." *Id.* at 34–35.

Finally, Plaintiffs argue that the remaining statement from Bryson should likewise be excluded because Bryson died before the State Defendants sought either Plaintiff's arrest. *See Id.* at 32 (explaining that because using "a dead man's signed statement in a criminal prosecution would . . . violate the accused's Sixth Amendment right to confront the witnesses against him, . .

56

. Bryson's written statement . . . cannot contribute to 'probable cause to believe the prosecution could succeed.'" (first citing *California v. Green*, 399 U.S. 149, 157 (1970); and then quoting *Boyd*, 336 F.3d at 77)).

Absent "these fabrications," Plaintiffs conclude, State Defendants cannot show they had probable cause or arguable probable cause and are therefore not entitled to summary judgment. *Id.* at 4.

The Court agrees.

Plaintiffs can only defeat the presumption that probable cause existed for their arrest and prosecution if they can show that Defendants used fabricated evidence to obtain a warrant for their arrests. *Boyd*, 336 F.3d at 74. "To succeed in this challenge," Plaintiffs "must demonstrate that the [fabricated statements] and omissions were 'necessary to the finding of probable cause.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). In assessing the merit of such a challenge, courts in this Circuit rely on "what has come to be known as the 'corrected affidavits doctrine.'" *Id.* Under this doctrine, courts "look to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law." *Id.* at 743–44.

Here, Plaintiffs have brought fabrication of evidence claims as to the Perugini, Cocchia, Mildred Henning, and Saathoff statements. *See* Am. Compl. ¶¶ 380–87; Compl. ¶¶ 330–38. Except as to State Police Sergeant Acker and Dr. Lee, the State Defendants did not move for summary judgment on those claims, meaning that the State Defendants recognize that a jury would need to resolve whether State Police Detective Ocif fabricated evidence with respect to

these statements. *Cf.* State Defs.' MSJ at 1 ("With respect to the claims brought by Ralph Birch,
Defendant Acker moves for judgment on the First Count, and all State Police defendants move
for judgment on the Second and Third Counts. As for the claims brought by Shawn Henning,
these defendants move for judgment as to the Second, Third, Fourth, Fifth and Eighth Counts.").
In other words, the State Defendants have conceded that a genuine dispute of material facts
exists as to the propriety of those statements. *Cf.* State Defs.' MSJ at 5 n.3 ("These defendants
categorically deny that they fabricated any evidence but cannot, consistent with Rule 56, move
for summary judgment on these claims at this time.").

The Court, therefore, on that basis alone, must exclude these statements from its
corrected affidavit analysis. *See Ganek v. Leibowitz*, 874 F.3d 73, 82 (2d Cir. 2017) ("To
determine whether a false statement was necessary to a finding of probable cause, we consider a
hypothetical corrected affidavit, produced by deleting any alleged misstatements from the
original warrant affidavit and adding to it any relevant omitted information."); *Vazquez*, 2014
WL 4388497, at *8 (excluding allegedly fabricated evidence from the arguable probable cause
analysis because "there are plainly disputes of facts").

The State Defendants suggest that this Court should include at least some of the
statements in its analysis but provides no legal basis for this Court do so. They argue in reply that
although they did not move for summary judgment on the fabrication of evidence claims against
State Police Detective Ocif who secured these statements, they nevertheless "contest[ed]
fabrication in the context of their probable cause arguments." State Defs.' Reply at 4. But as the
party with the burden at summary judgment, it is not enough for State Defendants to simply
"contest fabrication." *Id.* Rather, they must show that there is no genuine dispute that these
statements were not a result of fabrication. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101,

105 (2d Cir. 2002) (explaining that the moving party satisfies its burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case") (*per curiam*) (quotation marks omitted)).

Here, as the Court noted above in Part IV.B.1(iii)(a), a rational jury could find that State Police Detective Ocif knowingly solicited false information from Mr. Cocchia and Mr. Perugini. As to the Mildred Henning and Saathoff statements, at best, a genuine issue of material fact remains at to whether those statements were properly obtained.[24] To include these statements in the analysis, the Court would have to, in effect, conclude that State Police Detective Ocif did not improperly obtain these statements. But it is well settled that in "deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

Therefore, because the State Defendants all but concede that a jury must determine whether State Police Detective Ocif improperly obtained the statements of Cocchia, Perugini, Mildred, and Saathoff—meaning that there are genuine issues of material facts as to whether these statements are a result of a fabrication—these statements cannot form the basis of probable cause for the Plaintiffs' arrest and must therefore be excluded from the corrected affidavit analysis.[25]

---

[24] *See* Pls.' Opp'n to State Defs.' MSJ at 37 (asserting that "Ocif had twice tried unsuccessfully to convince Mrs. Henning to provide a statement" first in August of 1987, then again in October 1987. Mrs. Henning refused to give Ocif the statement he wanted" until "a year later, in September 1988, [when] Ocif and Siedel interviewed Mildred again in Herscher" (first citing Ocif Dep. Tr. at 304:23–25; and then citing Initial Disclosures at 001212)); *id.* at 36 (asserting that Saathoff's statement "cannot create arguable probable cause" in part because Saathoff was "reluctant to participate" and that police official in Herscher made several attempts to interview him and that when they were finally to interview him, "before taking his 'statement' they 'briefed [him] on the situation concerning Henning" (citing Ex. N to State Defs.' MSJ at 2-3)).

[25] Plaintiffs are correct, and State Defendants do not argue otherwise, that the Bryson statement "cannot contribute to probable cause to believe the prosecution could succeed" because he died before the either Plaintiff was arrested. Pls.' Opp'n to State Defs.' MSJ at 32 (citation and quotation marks omitted). Accordingly, the Court also will not consider this statement in the corrected affidavit analysis.

Having excluded these statements from the corrected affidavit analysis, the State Defendants must start from October 9, 1986, when the Major Crimes Squad Commander declared that "simply stated, there is not enough Probable Cause for an arrest or prosecution" in the Carr investigation. Hitlz letter; *cf.* State Defs.' MSJ at 24 ("[E]ven if this Court were to conclude that one or more of the statements was sufficiently tainted to warrant its exclusion from the probable cause consideration, the inclusion of even one of the four statements, coupled with the additional inculpatory evidence known to police, would have been sufficient to lead a reasonable officer to conclude that probable cause existed to arrest the Plaintiffs in connection with the crimes that occurred at the Carr residence."). Put differently, the State Defendants concede that these statements were "necessary to secure issuance of the warrant." *Ganek*, 874 F.3d at 82 (internal quotation marks omitted).

The corrected affidavit analysis, however, does not end there. In addition to "deleting any alleged [fabrication] from the original warrant," the Court must also add to it "any relevant omitted information," that was available at the time the warrant was obtained. *Id.* Here, Plaintiffs claim, and Defendants do not contest, that the warrants omitted that (1) a $1,000 in cash was discovered at the crime scene; (2) one of the witnesses relied on offered conflicting statements about the timing of the Plaintiffs' whereabouts; and (3) that same witness was offered a deal in exchange for that witness' testimony. State Defendants argue that the addition of these omissions would not undermine probable cause. *See* State Defs.' MSJ at 26.

But these omissions are relevant to the arguable probable cause analysis. *See Martel v. Town of S. Windsor*, 562 F. Supp. 2d 353, 358 (D. Conn. 2008) ("In seeking an arrest warrant, a police officer may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause . . . ." (cleaned up)), *aff'd*, 345 F. App'x 663 (2d Cir. 2009).

The discovery of $1,000 in cash at the scene of an alleged robbery in and of itself does not entirely suggest that a robbery did not occur, but when viewed in the light most favorable to Plaintiffs, a reasonable jury could conclude that this evidence may have been exculpatory. Similarly, a witness's inconsistent statements about key details regarding Plaintiffs' whereabout at the time of the murder, and the fact that that witness was offered a deal in exchange their testimony, when viewed in the light most favorable to Plaintiffs, is relevant in determining that witness's credibility and assessing the overall evidence in support of the probable cause. On this record, a reasonable jury could conclude that these omitted facts are exculpatory and therefore relevant to the probable cause determination.

In the absence of the alleged fabricated statements and with the addition of the omitted exculpatory evidence, there is a genuine issue of material fact as to whether the State Defendants had probable cause or arguable probable cause to arrest and charge Mr. Birch and Mr. Henning with felony murder in the Carr case. *See Stonick*, 438 F. Supp. 3d at 168 (denying summary judgment where questions of fact remain as to whether defendants had probable cause or arguable probable cuase); *Golino*, 761 F. Supp. 968–69 (same); *see also Acevedo v. Sklarz*, 553 F. Supp. 2d 164, 169 (D. Conn. 2008) (upholding denial of summary judgment on reconsideration).[26]

Accordingly, the Court will deny State Defendants motion for summary judgment as to Plaintiffs' malicious prosecution claims.

---

[26] As to the malice element, "[a] lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78. Thus, "[o]nce [a court] find[s] an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well." *Id.* (citation omitted); *see also Mulligan v. Rioux*, 229 Conn. 716, 746 (1994) ("If the evidence supports [lack of probable cause], we need not consider [malice], since it may be inferred."). The Court therefore also will deny summary judgment as to the malice element.

### 3.  Count III: The Alleged *Brady* Violations

*Brady*-based § 1983 claims have three components: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Fernandez v. Capra*, 916 F.3d 215, 221 (2d Cir. 2019) (alteration in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)); *Jabar v. U.S. Dep't of Just.*, 62 F.4th 44, 49 (2d Cir. 2023). "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 467 (S.D.N.Y. 2009) (quoting *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001)). "To establish prejudice, a plaintiff must show materiality," *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014), meaning "a reasonable probability of a different result," *id.* (quoting *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001)).

The prejudice inquiry "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* (quoting *Leka*, 257 F.3d at 104) (emphasis removed); *see also Poventud*, 750 F.3d at 133 ("While *Brady* ensures a fair trial, a defendant's right to pre-trial disclosure under *Brady* is not conditioned on his ability to demonstrate that he *would* or even *probably would* prevail at trial if the evidence were disclosed, much less that he is in fact innocent." (internal quotation marks omitted)).

"Police officers can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors." *Bermudez v. City of New York*, 790 F.3d 368, 376 n.4 (2d Cir. 2015) (citation omitted); *see also Horn v. City of New Haven*, No. 3:18-CV-

1502 (JAM), 2019 WL 3006540, at *3 (D. Conn. July 9, 2019) ("[B]ecause the police are just as much an arm of the state as the prosecutor, the police inflict the same constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory information." (quoting *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009))), *aff'd sub nom. Horn v. Stephenson*, 11 F.4th 163 (2d Cir. 2021). Police officers, however, "satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors." *Horn v. Stephenson*, 11 F.4th at 171 (quoting *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992)).

Plaintiffs assert that four pieces of evidence from their underlying criminal proceedings were suppressed: (i) $1,000 cash found at the crime scene; (ii) Tina Yablonski's March 4, 1986 pre-polygraph interview; (iii) the fact that Todd Cocchia reviewed the Connecticut State Police file during his interview; and (iv) Officer Quartiero's notes. *See* Pls. Opp'n to State Defs.' MSJ at 40–49.[27]

State Police Detectives Graham, Quartiero, and Ocif, as well as State Police Sergeant Acker move for summary judgment on Plaintiffs' Suppression of Material Favorable Evidence/*Brady* violations claims. *See* State Defs.' MSJ at 31–52. They argue that the evidence that Plaintiffs allege they suppressed was known and available to Plaintiffs' respective criminal defense counsel before trial. But even if the Court disagrees, they argue that they are nevertheless entitled to summary judgment on qualified immunity grounds. *Id.* at 48–52.

The Court will discuss each piece of evidence in turn.

### i.   The $1,000 Cash

The State Defendants argue that "the record evidence undisputedly establishes that [they] did not suppress" the $1,000 in cash discovered at the crime scene. *Id.* at 34. To support this

---

[27] Plaintiffs "withd[rew] their *Brady* claims solely to the extent they pertain to the video of the crime scene and a letter offering Tina Yablonski immunity from prosecution in New Hampshire." *Id.* at 40 n.16.

claim, they point to testimony from Mr. Birch and Mr. Henning's respective criminal defense counsel during their consolidated habeas corpus trial in State Court.

But that evidence, as Plaintiffs correctly argue, "says exactly the opposite." Pls. Opp'n to State Defs.' MSJ at 43. During the habeas trial, when asked whether he has "any recollection" of seeing evidence regarding the $1,000, counsel for Mr. Henning responded "Yes, but I don't – I don't know when." *Id.* at 35. Similarly, when counsel for Mr. Birch was asked, he responded "I don't have any present recollection and I don't remember—and truthfully I don't remember—these documents." *Id.*

When viewed in the light most to Plaintiffs, these testimonies do not "undisputedly establish[] that [they] did not suppress" the $1,000 in cash. State Defs.' MSJ at 34. Notably, the State Defendants do not assert this evidence—the discovery of $1,000 in cash—was "turn[ed] . . . over to the prosecutors." *Walker*, 974 F.2d at 299. *See* Pls.' Opp'n to State Defs.' MSJ at 40 ("The totality of information that the State's Attorney's Office received from the police about the Carr investigation was a two-volume 'casebook' prepared by CSP Sergeant Brian Acker. That casebook does not contain any information about the evidence upon which Plaintiffs' Brady claims are based." (citing Acker Dep. Tr. at 57:11–59:22; Grabner Dep. Tr. at 62:23–63:17, ECF No. 137-48)). Thus, at best, a genuine issue of material fact remains as to whether State Defendants suppressed this evidence.

The State Defendants next argue that, even if suppressed, the discovery of $1,000 in cash was not material. State Defs.' MSJ at 43. To make this point, they again rely on the habeas trial testimony of Mr. Birch's defense counsel, *see id.* ("Attorney Mencuccini was doubtful if the $1,000 in cash that was found after the murder of Everett Carr was material."), and the testimony of trial prosecutor at the same habeas trial, *see id.* at 44 ("I don't know if [the discovery of

$1,000 in cash] could be used to argue it wasn't a burglary. It could be used to argue that it wasn't an efficient burglary.").

But Plaintiffs respond that, when viewed in the light most favorable to them, evidence of cash left behind during a robbery undermines the State's "robbery-gone-wrong theory" of the case against them. Pls.' Opp'n to State Defs.' MSJ at 52. Again, the parties' disagreement over how to weigh the significance of this evidence "necessitates the conclusion that this is one of those 'doubtful cases' in which 'summary judgment is inappropriate." *Stonick*, 438 F. Supp. 3d at 166 (quoting *McColley v. County of Rensselaer*, 740 F.3d 817, 826 (2d Cir. 2014)).

### ii.  Todd Cocchia's Review of the Connecticut State Police file

Mr. Birch alleges that Todd Cocchia—the witness who testified that Mr. Birch allegedly confessed to him his role in the Carr murder—"was given an opportunity to review Ocif's file to fill in the missing information in his story while giving a statement to the police." Am. Compl. ¶ 399(d). In moving for summary judgment, the State Defendants argue that "there is absolutely no evidence to support [Mr. Birch's] theory that State defendant Ocif permitted Todd Cocchia to review his file to allegedly fill in missing information." State Defs.' MSJ at 38 (internal quotation marks omitted). In response, Mr. Birch points to Mr. Cocchia's testimony at the habeas trial. *See* Pls. Opp'n at 46 (noting that "Cocchia testif[ied] that "[t]he file was right there in front of me opened" as he spoke with Ocif and that he was permitted to review it (second alternation in original) (citing Nov. 9, 2015 Habeas Tr. at 63:16–64:4, 65:14–21, ECF No, 137-39)). Again, viewed in the light most favorable to Plaintiffs, at best, a genuine factual dispute remains as to whether State Police Detective Ocif permitted Cocchia to review his file.

The State Defendants next argue that, even if the Court assumes that "Ocif *actually* permitted Cocchia to review his file to fill in the gaps in his story – and this information was not disclosed to the prosecution," the Court should nonetheless grant summary judgment on this

claim because Mr. Birch's counsel had an opportunity "to cross-examine Cocchia at length," during the trial, "specifically as to the basis of his knowledge, his criminal record and as to any promises he may have been made or anything he expected as a result of his testimony." State Defs.' MSJ at 39.

The Court disagrees.

Mr. Birch, of course, had no duty to uncover the State's alleged suppressed evidence through cross examination of witnesses against him at trial. Rather, it is the State Defendants who had "an affirmative duty to disclose favorable evidence known to [him], even if no specific disclosure request is made by the defense." *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995); *see also United States v. Hunter*, 32 F.4th 22, 30 (2d Cir. 2022) ("It is well-established by *Brady* and related authorities that in a criminal prosecution, the government has an affirmative duty under the Due Process Clause to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense." (citation and internal quotation marks omitted)). A reasonable jury could find that the State Defendants suppressed this evidence.

Next, the State Defendants argue that this allegation of State Police Detective Ocif sharing the police file with Mr. Cocchia during the interview is not material, because even if that information had it been known at the time of the trial, it "would not have led to a different result in Plaintiff Birch's trial." State Defs.' MSJ at 45. In their view, "the impeachment value of the suppressed information"—State Police Detective Ocif permitting Mr. Cocchia to use the police file to fil in gaps in his statement—"was minimal--cumulative at best." *Id.* at 46. *See id.* ("Cocchia did not provide the only evidence against plaintiff Birch. His criminal history was disclosed to the jury. His credibility was attacked at trial.").

66

Leaving aside State Police Detective Ocif's own admission that State Defendants "'didn't have enough probable cause' to seek Mr. Birch's arrest without a written statement from Cocchia," Pls.' Opp'n to State Defs.' MSJ at 34, (quoting Ocif Dep. Tr. at 127:9–13), the Court disagrees.

In contrast to the cases cited by the State Defendants, *see* State Defs.' MSJ at 45 (citing *Cantone v. Superintendent, N.Y. Corr. Facility at Green Haven*, 759 F.2d 207 (2d Cir. 1985); *United States v. Wong*, 78 F.3d 73 (2d Cir. 1996)), the alleged impeachment evidence is that Mr. Cocchia's testimony was fabricated, and State Police Detective Ocif allegedly allowed him to review police records to bolster the credibility of his fabrication. *See* Pls.' Opp'n at 46.

On this record, viewing the evidence in the light most favorable to Mr. Birch, a reasonable jury could find "in [the] absence" of the impeachment evidence at issue here—namely that allegation Mr. Cocchia reviewed State Police Detective Ocif's file during his interview—Mr. Birch did not "receive[] a fair trial . . . a trial resulting in a verdict worthy of confidence." *Leka*, 257 F.3d at 104; *see also Bermudez*, 790 F.3d at 376 n.4 (explaining that "the same disputed issues of material fact" that foreclose summary judgment as to a fabrication claim also preclude summary judgment on the corresponding *Brady* claim).

As a result, the Court will deny summary judgment on Mr. Birch's claim that Todd Cocchia was allowed to review Ocif's file.

### iii.  Tina Yablonski's March 4, 1986 Pre-Polygraph Interview

The State Defendants claim that Plaintiffs' respective criminal defense attorneys were aware of the immunity deal granted to Tina Yablonski in exchange for her testimony. State Defs.' MSJ at 39. This evidence, they argue, was in the prosecutor's file, "and it was made available for review and disclosure to defense counsel." *Id.* at 40. Plaintiffs do not dispute that this information was contained in the prosecutor's file. Instead, they assert that additional

material evidence regarding Ms. Yablonski, namely "the pre-polygraph interview from March 1986," was not provided by the prosecutors. Pls.' Opp'n to State Defs.' MSJ at 45. This evidence, Plaintiffs argue, includes "exculpatory statements that [Ms. Yablonski] made" which they only learned about "when the Connecticut Innocence Project obtained a copy of the audio-recorded interview during the course of its reinvestigation." *Id.* The State Defendants offer no rejoinder on this argument in reply.

Because State Defendants do not dispute that additional exculpatory evidence in their possession regarding Ms. Yablonski was not provided by the prosecutor, the Court concludes that a reasonable jury could find that that evidence was suppressed, and that it was material. *See Gaither v. Stop & Shop Supermarket Co.*, 84 F. Supp. 3d 113, 123 n. 8 (D. Conn. 2015) ("The freedom to use summary judgment procedure to address particular issues or elements of a claim is an important feature of Rule 56, making it a much more useful case management device." (quoting 11–56 Moore's Federal Practice–Civil § 56.122)).

### iv.  State Police Detective Quartiero's Notes

The State Defendants argue that although State Police Detective Quartiero did not turn over his field notes to prosecutors, his failure to do so does not rise to a *Brady* violation. State Defs.' MSJ at 40. That is because, they argue that State Police Detective Quartiero's practice was to "memorialize the information from his field notes into a police report . . . and . . . turn over those police reports to the State's Attorney's Office." *Id.* (internal quotation marks omitted). They argue that State Police Detective Quartiero "would not turn over his notes, not because of any intentionally misleading or dishonest animus, but rather because there's things in there that may not pertain to the investigation." *Id.*

Plaintiffs respond that various exculpatory evidence was contained in State Police Detective Quartiero's notes, which were not included in any of his police reports. Pls.' Opp'n to

State Defs.' MSJ at 41. In fact, Plaintiffs argue that "Quartiero's notes contain several pieces of key exculpatory information unavailable from any other source." *Id.* For example, Plaintiffs point to a phrase contained in State Police Detective Quartiero's notes that read "$1,000 found" yet that information was not contained in his typewritten reports provided to prosecutors. *Id.* at 48. Plaintiffs list various additional notations in his notes which they claim are exculpatory in nature but were not shared with prosecutors. *See generally id.* at 47–48. Because State Police Detective Quartiero failed to turn over his field notes to prosecutors, Plaintiffs argue "that information was suppressed within the meaning of *Brady*." *Id.* at 46.

The Court agrees.

"Evidence that is not disclosed is suppressed for *Brady* purposes . . . when it is 'known only to police investigators and not to the prosecutor.'" *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 161 (2d Cir. 2008). Here, the State Defendants do not dispute that the field notes contain information known to State Police Detective Quartiero but not the prosecutor in Plaintiffs' criminal trial, information a reasonable jury could infer was exculpatory, *e.g.*, discovery of $1,000 in cash and discussion of $10,000 worth of jewelry left behind, *see* Shepack Dep. Tr. at 133:22–134:14, ECF No. 137-29.

A reasonable jury could further infer that this information undermined State Defendants' contention that State Police Detective Quartiero did not turn over his notes because "there's things in there that may not pertain to the investigation." State Defs.' MSJ at 40. As the Second Circuit has explained, a police officer's obligation under *Brady* is not to make "separate, often difficult, and perhaps conflicting, disclosure decisions." *Horn*, 11 F.4th at 171. Rather it is to simply "turn exculpatory evidence over to the prosecutors," who possess "the requisite legal acumen to determine whether materials constitute Brady evidence." *Id.* (quotation marks

omitted). Viewing the evidence in the record in the light most favorable to Plaintiffs, a

reasonable jury could conclude that State Police Detective Quartiero failed to meet his *Brady*

obligation.

In sum, when viewed in the light most favorable to Plaintiffs, a genuine dispute of

materials remains as to whether the State Defendants suppressed evidence with respect to the

discovery of $1,000 in cash at the crime scene, Ms. Yablonski's statements, State Police

Detective Ocif allegedly permitting Cocchia to review police files, and State Police Detective

Quartiero's field notes. In addition, there remains genuine factual disputes over the materiality of

this evidence.

Finally, the parties disagree as to whether Plaintiffs must establish that the State

Defendants acted in bad faith. *Compare* State Defs.' MSJ at 47 ("[P]laintiffs cannot satisfy the

elevated intent requirement necessary for a *Brady*, damages claim against State defendants . . .

There is no evidence that these defendants intentionally suppressed materials or that they acted in

bad faith."), *with* Pls.' Opp'n to State Defs.' MSJ at 56 ("Defendants' suppression of materially

favorable evidence was unconstitutional regardless of whether they had the specific intent to

deprive Plaintiffs of their constitutional rights.").

Absent biding precedent from the Second Circuit on this issue, *see Bellamy v. City of*

*New York*, 914 F.3d 727, 751 n.23 (2d Cir. 2019) ("We have suggested, though without so

concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional."

(citation omitted)), district courts in this Circuit confronted with this issue have reached different

conclusions. *Compare, e.g.*, *Valentin v. City of Rochester*, No. 11-CV-6238 CJS, 2018 WL

5281799, at *13 (W.D.N.Y. Oct. 24, 2018) ("To establish liability against a police officer for a

Brady due process violation, the plaintiff must show that the officer intentionally withheld

information from prosecutors."), *aff'd*, 783 F. App'x 97 (2d Cir. 2019), *with Nnodimele v. Derienzo*, No. 13 Civ. 3461, 2016 WL 3561708, at *5 (E.D.N.Y. June 27, 2016) (holding that "bad faith is not a required element of a Brady claim under § 1983," but rather "deliberate indifference to or reckless disregard for an accused's rights can sustain such a claim").

Assuming, without deciding, that Plaintiffs must show "bad faith" or intentionality, on this record, the Court concludes that a reasonable jury could infer that requisite intent, based on the cumulative evidence in this record. *See Ellinger v. Napier*, No. 6:22-CV-19, 2023 WL 2873393, at *3 (W.D. Va. Apr. 10, 2023) ("Bad faith can be inferred from the conduct of the officer failing to provide clearly exculpatory information to the defendant."); *Johnson v. Balt. Police Dep't*, No. CV ELH-19-00698, 2020 WL 1169739, at *24 (D. Md. Mar. 10, 2020) ("[B]ad faith can be inferred when police officers fabricate evidence and fail to disclose especially pertinent exculpatory evidence."); *McPherson v. Balt. Police Dep't*, 494 F. Supp. 3d 269, 282 (D. Md. 2020) ("When, as alleged here, police officers fail to disclose exculpatory evidence, the court can infer bad faith.").

Accordingly, the Court will deny the State Defendant's motion for summary judgment as to Plaintiffs' Suppression of Material Favorable Evidence/*Brady* claims.

### v.  The State Defendants' Qualified Immunity Claim

Qualified immunity protects a government official sued in the official's individual capacity from claims for money damages unless a plaintiff can show that "(1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct." *Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). The focus of the analysis

is on the "'*particular* conduct' and the 'specific context' at issue." *Mara*, 921 F.3d at 68. Thus, "[b]y its very nature, qualified immunity hinges on a snapshot of the factual and legal circumstances at the time of the alleged violation." *Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir. 2014); *see also id.* at 205 (explaining that when determining whether a right is clearly established "courts must calibrate, on a case-by-case basis, how generally or specifically to define the right at issue").

The State Defendants argue that, even if Plaintiffs' can establish a *Brady* violation, they are nevertheless entitled to summary judgment because they are protected by qualified immunity. *See* State Defs.' MSJ at 50. They argue that it was reasonable for them to "to believe that the practices that they had followed time and again were in compliance with any *Brady* requirement." *Id.* at 51.

Plaintiffs respond that this Court has already rejected the applicability of qualified immunity to their *Brady* claims in denying State Defendants' motions to dismiss. *See* Pls. Opp'n to State Defs.' MSJ at 55 (citing *Birch v. Town of New Milford*, No. 3:20-CV-1790 (VAB), 2021 WL 4932405, at *13 (D. Conn. Sept. 24, 2021). This ruling, they argue, "remains law of the case and forecloses Defendants from seeking summary judgment on qualified immunity grounds." *Id.*

In reply, in addition to denying that the withheld "any material, exculpatory evidence," State Defs.' Reply at 5, the State Defendants reiterate their claim that it was objectively reasonable for them to believe that the investigatory practices they engaged in at the time complied with any affirmative duty they had under *Brady. Id.*

The Court disagrees.

Here, Plaintiffs have alleged—and produced admissible evidence in support of these allegations—specific instances of *Brady* violations pertaining to at least four different officers,

over at least two years and in varying contexts. *See generally* Pls. Opp'n to State Defs.' MSJ at

40–49 (identifying four separate instances of alleged *Brady* violations). In support of their

qualified immunity defense, the State Defendants assert in conclusory fashion that it was

objectively reasonable for them "to believe that the investigatory practices they engaged in were

in compliance with any affirmative *Brady* requirement." State Defs.' Reply at 5.[28] But State

Defendants, for example, do not specify whether the "investigative practices," they identified

refer to State Police Detective Quartiero withholding his fields notes, or State Police Detective

Ocif permitting a witness to review police files about suspect. Nor do they specify whether it was

their investigative practices at the time to lead witness during interviews as Plaintiffs have

alleged, or to withhold certain information about evidence found at the crime scene.[29]

---

[28] It is true that the State Defendants separately challenged the factual basis of these claims. To the extent that the State Defendants incorporate those merits arguments in their qualified immunity argument, their motion for summary judgment on the basis of qualified immunity must fail because, as the Court has noted above, there are genuine issues of material fact as to the merits of those claims. *See Stonick*, 438 F. Supp. 3d at 168 (holding that genuine factual disputes preclude summary judgment on the basis of qualified immunity).

[29] The State Defendants cite *Horn* for the proposition that because they subjectively "believe that the practices that they had followed time and again were in compliance with any *Brady* requirement," they are protected by qualified immunity. State Defs.' MSJ at 51; *see id.* ("In fact, the Second Circuit emphasized that its rulings for extending Brady obligations past prosecutors and attaching to police officials 'makes good sense, we['ve] reasoned, because the police may lack 'the requisite legal acumen' to determine whether materials constitute Brady evidence, and therefore they should not be charged with 'mak[ing] separate, often difficult, and perhaps conflicting, disclosure decisions.'" (quoting *Horn*, 11 F.4th at 171)). In *Horn*, the Second Circuit, however, did not announce a new protection for police officers or further shield them from liability for any alleged *Brady* violation. Rather, the Court simply provided its reasoning behind requiring police officers to turn over all exculpatory evidence to prosecutor. The full quote from that opinion make this clear:

> Applying the teachings of *Brady*, in 1992, we recognized in *Walker v. City of New York* that the government's disclosure obligation applied to the police when we held that the police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors. That rule makes good sense, we reasoned, because the police may lack the requisite legal acumen to determine whether materials constitute *Brady* evidence, and therefore they should not be charged with mak[ing] separate, often difficult, and perhaps conflicting, disclosure decisions.

*Horn,* 11 F.4th at 171 (quotation marks omitted). Here the allegations against State Defendants are that they failed to turn over evidence to prosecutors. They cannot therefore be shielded from liability simply because they "may lack 'the requisite legal acumen,'" to determine whether the evidence they failed to turn over was *Brady* evidence. *Horn,* 11 F.4th at 171 (quoting *Walker*, 974 F.2d at 299).

Thus, on this record, State Defendants fail to meet their burden for summary judgment as factual disputes remaining over whether the conducts of the officers were reasonable such that they are entitled to qualified immunity. *See Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir. 1994) (holding that summary judgment on the basis of qualified immunity is precluded where "disputed issue[s]" exist as to whether the conduct of the officer was proper).

Accordingly, State Defendants motion for summary judgment on the basis of qualified immunity will also be denied.

### 4. Mr. Henning's Failure to Intervene Claim[30]

In his Complaint, Mr. Henning alleges that State Police Detectives O'Mara, McCafferty, Quartiero, and Graham, and State Police Sergeant Acker had "opportunities to intervene on [his] behalf . . . to prevent his malicious prosecution, lack of a fair trial and deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so." Compl. ¶ 359. These State Defendants argue that they are entitled to summary judgment on this claim because, not only has Mr. Henning "failed to establish that State defendants violated his constitutional rights," he "cannot meet his burden to show that any of the defendants observed or had knowledge of any other defendants' actions that would amount to a constitutional violation." State Defs.' MSJ at 56.

In response, Mr. Henning argue that, as an initial matter, the State Defendants failed to "adequately brief this issue" and have instead "offer[ed] only conclusions and no analysis." Pls. Opp'n to State Defs.' MSJ at 59. On that basis alone, Mr. Henning argues that the Court should decline to consider the State Defendants' motion as to Mr. Henning's failure to intervene claim.

---

[30] Mr. Henning withdrew "his civil conspiracy [Count Four] claim against all State Police Defendants." Pls. Opp'n to State Defs.' MSJ at 63 n.21. Accordingly, State Defendants' motion for summary judgment on that claim is denied at moot.

*Id.* But even if the Court considers the motion, they argue that Mr. Henning has plausibly alleged that his constitutional rights were violated and that "Aker and Ocif failed to fulfill their duty to interne, and at the very least, genuine issue of material facts exist with respect to those failure." *Id.* at 60.

The Court agrees, in part.

As these State Defendants concede, "the question of whether an officer had a 'realistic opportunity' to intervene is normally a question for the jury." State Defs.' MSJ at 56. Here, the State Defendants have not challenged, at summary judgment, Mr. Henning's fabrication of evidence claim. *See* State Defs.' MSJ at 1 (moving for summary judgment on all of Mr. Henning's claims except for Court One-fabrication of evidence claim). Thus, at the very least, material questions of fact remain as to whether the State Defendants fabricated evidence used to secure a warrant to Mr. Henning's arrest and that same fabricated evidence was subsequently used in his prosecution. *See Cooper v. City of New York*, No. 14-cv-1761 (RJD) (RML), 2018 WL 5115565, at *11 (E.D.N.Y. Oct. 11, 2018) (denying summary judgment as to failure to intervene claim because "a material question of fact remains as to whether Defendants fabricated evidence . . . and used it to initiate and continue [the plaintiff's] prosecution").

Accordingly, because genuine issues of material fact remain as to Mr. Henning's fabrication of evidence claim with respect to these State Defendants, the Court will deny the State Defendants' motion for summary judgment as to Mr. Henning's failure to intervene claim.

### 5.  Mr. Henning's State Law Claim as to State Defendants

Finally, the State Defendants ask this Court not to exercise supplemental jurisdiction over Mr. Henning's remaining state law claim of intentional infliction of emotional distress. *See* State Defs.' MSJ at 56 ("Because plaintiff Henning has failed to establish any plausible federal law

claims, the Court should decline to exercise supplemental jurisdiction over his state law claim.").
But, as discussed above, State Defendants did not move for summary judgment as to Mr.
Henning's federal fabrication of evidence claim. *Cf. Chapco, Inc. v. Woodway USA, Inc.*, No.
3:15-CV-1665 (JCH), 2018 WL 3581694, at *5 (D. Conn. July 24, 2018) (explaining that where
a party does not "affirmatively move for summary judgment on an argument," that argument is
"preserved . . . for trial, as long as the claim is adequately pled and disclosed").

These State Defendants have not affirmatively moved for summary judgment on Mr.
Henning's fabrication of evidence claim. That claim therefore is preserved for trial. Thus, at the
very least, the Court retains jurisdiction over Mr. Henning's fabrication of evidence claim,
providing a basis for supplemental jurisdiction over his state law claim against State
Defendants.[31] *See Connelly v. Komm*, No. 3:20-CV-1060 (JCH), 2022 WL 13679562, at *9 (D.
Conn. Oct. 21, 2022) ("A district court has supplemental jurisdiction over state law claims 'that
are so related to claims in the action within such original jurisdiction' that they amount to the
same constitutional case or controversy." (quoting 28 U.S.C. § 1367(a))).

Accordingly, the Court will decline the State Defendants' request to dismiss Mr.
Henning's state law claim for lack of supplemental jurisdiction.

### C.  The Town Defendants

David Shortt, Steven Jordan, and the Town of New Milford have filed two motions for
summary judgement: *See* Shortt's MSJ; Jordan's MSJ.

The Court will address each motion in turn.

---

[31] The Court has also concluded that the State Defendants are not entitled to summary judgment on Mr. Henning's
remaining federal causes of action, namely his Malicious Prosecution and Suppression of Material Favorable
Evidence/*Brady* Violation claims. *See supra* Part IV.B.2–3. This is an alternative basis for exercising supplemental
jurisdiction over Mr. Henning's state law claim against State Defendants.

1. **New Milford Police Detective Shortt's Motion for Summary Judgment**

New Milford Police Detective Shortt argues that he is entitled to summary judgment as to Mr. Birch's claim that he failed to intervene during State Police Detective Ocif's interview of Todd Cocchia when he knowingly elicited false testimony inculpating Mr. Birch in the Carr murder. *See* Shortt's MSJ at 1. He argues that the interview was "not coercive" and that Mr. Cocchia, "without prompting by any specific question, volunteered that Birch admitted committing a murder by stabbing a man during a burglary." *Id.* In his view, the transcript of the interview reveals that "Ocif was not suggesting or encouraging Cocchia to state false claims." *Id.* at 14. Because, in his view, there was not a constitutional violation during the interview, he argues that he had no duty to intervene.

In response, Mr. Birch argues that the record plainly contradicts New Milford Police Detective Shortt's assertions. First, Mr. Birch points out that State Police Detective Ocif has not sought summary judgment on Mr. Birch's fabrication of evidence claim as it relates to his interview of Cocchia. *See* Birch's Opp'n to Jordan's MSJ at 3. Thus, according to Mr. Birch, whether he committed a constitutional violation therefore remains unresolved in this case. *Id.* Next, Mr. Birch argues that, when viewed in the light most favorable to him, the record, at the very least, shows that genuine dispute of material facts remains as to whether State Police Detective Ocif knowingly elicited false testimony from Cocchia. *Id.* at 13–14. And because New Milford Police Detective Shortt was present and failed to intervene during that alleged constitutional violation, Mr. Birch argues he can be held liable. As a result, Mr. Birch argues that Shortt's motion for summary judgment should be denied.

The Court agrees.

The Court has previously provided a detailed analysis of the Cocchia interview, *see supra* Part IV.B.1(iii)(a), and a reasonable jury could find that State Police Detective Ocif knowingly elicited false information in violation of Mr. Birch's constitutional right to a fair trial. Consequently, the Court will deny New Milford Police Detective Shortt's motion for summary judgment on the basis that Mr. Birch did not suffer a constitutional violation. *See Zahrey v. City of New York*, No. 98 Civ. 4546 (DCP), 2009 WL 54495, at *10–12 (S.D.N.Y. Jan. 7, 2009) (denying defense motion for summary judgment on fabrication claims arising from inculpatory statements of unreliable jailhouse informant that were elicited in bad faith). As to his assertions that he is entitled to qualified immunity, that argument also fails for the same reason the Court rejected it as to State Police Sergeant Acker. *See supra* Part IV.B.1(iv).

Accordingly, the Court will deny New Milford Police Detective Shortt's motion for summary judgment as to Mr. Birch's fabrication of evidence claim.[32]

### 2. New Milford Police Officer Jordan's Motion for Summary Judgment

New Milford Police Officer Jordan moves for summary judgment on Plaintiffs' suppression of material favorable evidence/*Brady* violations claims. He claims that Plaintiffs' allegations against him are that he failed to report the discovery of $1,000 in cash found at the crime scene. *See* Jordan's MSJ at 1. He argues that there is no evidence in the record to suggest that he took action to conceal the fact that this money was discovered. Moreover, he argues that

---

[32] Mr. Birch also alleged state law claims of negligence and negligent infliction of emotional distress against Town Defendants. *See* Am. Compl. ¶¶ 405–08; 409–12. As Mr. Birch points out, the Town Defendants' arguments as to these claims are entirely derivative of their failure to intervene in the fabrication of evidence claims. *See* Jordan's MSJ at 33 (stating that "Plaintiff's Fourth cause of action alleges negligence, Fifth cause of action alleging negligent infliction of emotional distress" "fails as there is no duty to stop a constitutional interview and no foreseeability that the interview would subject an identifiable person to imminent harm." (capitalization altered in second quote)). The Court, however, has concluded that a reasonable jury could find that a constitutional violation has occurred. As to the foreseeability of the harm to Mr. Birch, State Police Detective Ocif himself conceded there was not enough probable cause to arrest Mr. Birch without the Cocchia interview. *See* Ocif Dep. Tr. at 127:9–13. Viewed in the light most favorable to Mr. Birch, a reasonable jury could conclude that the harm to Mr. Birch was foreseeable.

his alleged failure to affirmatively provide this information to the prosecutor does not give rise to a *Brady* violation because the discovery of the money was not material evidence. *Id.* at 5.

Plaintiffs object largely on the same ground that they opposed State Defendants' motion for summary judgment on this same claim.

For the reasons stated above in Part IV.B.3(i), the Court will deny New Milford Police Officer Jordan's motion as to the discovery of the $1,000 not being material. Here, New Milford Police Officer Jordan concedes that precisely where the $1,000 was discovered would determine the validity of Plaintiffs' *Brady* violation claim. *See* Jordan's MSJ at 7 ("For [Plaintiffs' materiality argument] to have any validity, the cash would have had to have been found in a location a burglar could have found it, which is an essential fact missing here."). He contends that the "passing of thirty-five years" since this event occurred have made it impossible for Plaintiffs "to present evidence to clear up this mystery." *Id.*

This "mystery," however, is for a jury, not this Court, to resolve. Plaintiffs have argued that "the fact that a significant amount of cash in large bills was left undisturbed at the scene would have undermined the prosecution's theory that Plaintiffs killed Everett Carr while trying to rob him." Pls.' Opp'n to Jordan's MSJ at 8. The parties' competing views of this evidence are genuine issues of material facts.[33]

Jordan next contends that, even if the $1,000 could be found to be material under *Brady*, he did not have a duty to disclose it. *See* Jordan's MSJ at 10. He argues that the investigation was

---

[33] The remainder of New Milford Police Officer Jordan's materiality arguments are not different in kind from arguments that the State Defendants raised, arguments which the Court has rejected. *Compare, e.g.*, Jordan's MSJ at 9 ("Even Attorney Mencuccini, who represented Birch at his criminal trial, was doubtful if the found cash was material."), *with* State Defs.' MSJ at 43 ("Attorney Mencuccini was doubtful if the $1,000 in cash that was found after the murder of Everett Carr was material."). Plaintiffs also point to Jordan's deposition testimony where, in response to a question on whether he would consider it significant to the investigation that money was left behind, Jordan stated "I have never seen it, in all my years, them leaving money behind." Jordan Dep. Tr. at 185:10–14, ECF No. 137-50. In sum, when viewed in the light most favorable to Mr. Birch, genuine factual disputes—such as precisely where the money was found—remain, with respect to the materiality of the discovery of $1,000.

being handled by the Connecticut State Police, who instructed him to return the money to the

victim's daughter. *Id.* at 11. In his view, he had no reason to know that this information was not

disclosed to the prosecutor. *Id.* Although he admits that he does not remember many of the

details about how he processed the discovery of the $1,000, *id.* at 12, he nevertheless concludes

that ultimately, his "understanding was that he did not have a personal responsibility to turn over

a file to the Court in this case." *Id.* at 13. For these reasons, he claims that "he cannot be faulted

for failing to inform the State's Attorney about the cash." *Id.*

Again, New Milford Police Officer Jordan is asking this Court to make credibility

determinations which are specifically reserved for a jury. Under *Brady,* his obligation is to turn

over exculpatory documents to the prosecutors—which he concedes he did not do in this case.

New Milford Police Officer Jordan's reasons for not doing so, and whether they justify his

failure to do so, are for the jury to decide. *See Proctor*, 846 F.3d at 607–08 ("Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge." (quotation marks omitted)).

Finally, New Milford Police Officer Jordan argues that he is entitled to qualified

immunity because, in 1989, when Plaintiffs were tried, "a reasonable officer in [his] position

could have thought it was not constitutional violation to fail to contact" the prosecuting attorney

to ensure that they were aware of the "possessed property receipt or return of the cash because

there was no factually similar case to put him on notice that he had such a responsibility in a

situation where another department was investigating the crime and it documented the cash being

found." Jordan's MSJ at 15.

"It is well settled," however, "that the absence of precedent involving fundamentally

similar facts" does not entitle an officer to qualified immunity. *Horn*, 11 F.4th at 171 (internal

quotation marks omitted). Instead, "the salient question is whether the state of the law gave the defendant fair warning that his alleged treatment of the plaintiff was unconstitutional." *Id.* (cleaned up).

There are genuine issues of material fact with respect to whether Jordan knew that the information in his possession was shared with the prosecutor, and therefore summary judgment on the basis of qualified immunity is precluded. *See Walker v. Schult*, 45 F.4th 598, 618 (2d Cir. 2022) ("Once the jury has resolved any disputed facts that are material to the qualified immunity issue . . . the court then may make the ultimate legal determination of whether qualified immunity attaches *on those facts*." (internal quotation marks omitted) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007))); *Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir. 1994) (holding that summary judgment on the basis of qualified immunity is precluded where "disputed issue[s]" exist (alteration in original)); *Stonick*, 438 F. Supp. 3d at 167 (concluding that defendant "is not, by way of summary judgment, entitled to qualified immunity" where there remain genuine issues of material facts).[34]

Accordingly, the Court will deny New Milford Police Officer Jordan's motion for summary judgment.[35]

---

[34] As the Court previously noted with respect to State Defendants' qualified immunity defense, a reasonable jury could infer bad faith from Jordan's failure to turn over exculpatory evidence. *See Ellinger*, 2023 WL 2873393, at *3 ("Bad faith can be inferred from the conduct of the officer failing to provide clearly exculpatory information to the defendant.").

[35] As with New Milford Police Detective Shortt, New Milford Police Officer Jordan's arguments for summary judgment on Plaintiffs' state law claims are likewise largely derivative of their *Brady* arguments. *See* Jordan's MSJ at 23 ("[O]bviously if the found cash was not exculpatory, or if Jordan did not know it was exculpatory, he could not intend emotional distress."). The Court has concluded otherwise. As to his claim that "it is not extreme or outrageous for him to rely on the investigating department, who documented the cash in their paperwork, to notify the State's Attorney of its existence," *id.*, on this record, a reasonable jury could infer that he knew his conduct could posed a risk of severe emotion distress to Plaintiffs. *See Pines v. Bailey*, No. 10-cv-866 (MRK), 2012 WL 2958213, at *5 (D. Conn. July 19, 2012) (upholding NIED claim based upon possibility of facing 14 years in prison), *rev'd on other grounds*, 563 F. App'x 814 (2d Cir. 2014).

### 3.   The Town of New Milford's Liability

Plaintiffs allege that, under Connecticut General Statute § 7-465, the Town of New Milford is liable for the alleged misconduct of New Milford Police Detective Shortt and New Milford Police Officer Jordan and. *See* Conn. Gen. Stat. § 7-465 ("Any town, city or borough, . . . shall pay on behalf of any employee of such municipality, . . . all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights . . . ."). They argue that they were police officers acting in the performance of their duties within the scope of their employment with the Town of New Milford. The Town of Milford argues that Conn. Gen. Stat. "Section 7-465 is an indemnity statute; it does not create liability." Jordan's MSJ at 27 (quoting *Myers v. City of Hartford*, 84 Conn. App. 395, 401 (2004)).

Nevertheless, the Town of New Milford does not contest its obligation to pay damages if Plaintiffs' claims against New Milford Police Detective Shortt, or New Milford Police Officer Jordan or succeed. *Cf.* Jordan's MSJ at 27 ("If the claims against Jordan are eliminated, the Town has no obligation to pay."). Because the Court has denied their motions for summary judgment, Town of New Milford will remain a party in this case.

The Town of New Milford separately argues that it is immune from liability on the ground of governmental immunity. *See* Shortt's MSJ at 34 ("Plaintiffs' negligence claims against the Defendants are barred by the common law doctrine of governmental immunity, and the statutory discretionary act immunity codified in Conn. Gen. Stat. § 52-227n(a)(2)(B)."). In its view, interviewing a witness "is part of an investigation and conducting an investigation is a discretionary act." *Id.* at 35. Thus, New Milford Police Detective Shortt's mere presence at the

interview of Mr. Cocchia, according to Town of New Milford, is a discretionary act for which it cannot be liable. *Id.*

Mr. Birch responds that, at issue is whether New Milford Police Detective Shortt failed to intervene in a constitutional violation against him, not his decision to participate in the interview. Pls.' Opp'n to Shortt's MSJ at 26. Relying on *Cole v. City of New Haven*, 337 Conn. 326 (2020), Plaintiffs argue that while State Police Detective Ocif and New Milford Police Detective Shortt may have had discretion over how, when, and where to interview Cocchia, New Milford Police Detective Shortt "had discrete mandatory duties not to fabricate evidence and to intervene to prevent the fabrication of evidence." *Id.* at 27.

The Court agrees.

Connecticut courts "consistently have held that to demonstrate the existence of a ministerial duty on the part of a municipality and its agents, a plaintiff ordinarily must point to some statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, by its clear language, compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion." *Doe v. Town of Madison*, 340 Conn. 1, 31–32 (2021) (emphasis omitted). "Whether the acts complained of . . . were governmental or ministerial is a factual question which depends upon the nature of the act complained of." *Gauvin v. City of New Haven*, 187 Conn. 180, 186 (1982).

Here, the acts complained of are New Milford Police Detective Shortt's failure to intervene in the fabrication of evidence and New Milford Police Officer Jordan's failure to turn over exculpatory evidence to the prosecutor. Because the Court has concluded that there are genuine issues of material fact as to these acts, these issues are for a jury to decide. *See Ventura v. Town of E. Haven*, 330 Conn. 613, 636 n.11 (2019) ("[A]lthough the ultimate determination of

whether governmental immunity applies is typically a question of law for the court, there may well be disputed factual issues material to the applicability of the defense, the resolution of which are properly left to the trier of fact.").

Accordingly, summary judgment as to the Town of Milford's liability under Connecticut General Statute § 52-557n will be denied.

## IV.   CONCLUSION

For the foregoing reasons, Dr. Lee's motion to amend his Answer is **DENIED.** His motion for summary judgment also is **DENIED**.

Plaintiffs' partial motion for summary judgment against Dr. Lee as to liability is **GRANTED**.

The State Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**. Specifically, State Police Sergeant Acker's motion for summary judgment as to Plaintiffs' fabrication claim with respect to his knowledge of a fabricated supplemental police report is **GRANTED**. In all other respects, including the remaining claims of fabrication of evidence, State Police Sergeant Acker's motion for summary judgment is **DENIED**. The remaining state Defendants' motion for summary judgment is **DENIED** as to all other claims raised in it.

The Town Defendants' motions for summary judgment are **DENIED.**

**SO ORDERED** at Bridgeport, Connecticut, this 21st day of July, 2023.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE