# Exhibit A

```
UNITED STATES DISTRICT COURT
CONNECTICUT DISTRICT
-------------------------------------X
RALPH BIRCH,

                          PLAINTIFF,

     -against-        Case No.:
                      3:20:CV-1790(VAB)


TOWN OF NEW MILFORD, ET AL.,

                          DEFENDANTS.
-------------------------------------X

          DATE: December 14, 2021

          TIME: 10:10 a.m.
```

DEPOSITION of NORBERT LILLIS, taken by the Plaintiff, pursuant to a Subpoena and to the Federal Rules of Civil Procedure, held at the offices of New Milford Town Hall, 10 Main Street, New Milford, Connecticut 06776, before ToniAnn Lucatorto, a Notary Public of the State of New York.

Page 46

1　　　　　　N. LILLIS
2　on one of the clothing, one of the pieces
3　of clothing.  And they were going to send
4　it down to the FBI lab and have them see if
5　they could match it between Everett Carr,
6　the victim, and Henning or Birch or
7　whoever's clothes it was on.  That was the
8　-- that's what the plan would be.
9　　　Q.　Do you know what the results of
10　those tests were?
11　　　A.　According to what I heard, it
12　was done.
13　　　Q.　It was done?
14　　　A.　Correct.
15　　　Q.　And it was not them?
16　　　A.　There was no blood spatter on
17　that piece or the clothing that they
18　checked in the car.  That's a correct
19　statement.
20　　　Q.　As far as you're aware, there
21　was no forensic evidence at all that tied
22　either Mr. Birch or Mr. Henning to that
23　crime scene; is that right?
24　　　A.　Can I qualify that?
25　　　Q.　You may.

Page 47

1　　　　　　N. LILLIS
2　　　A.　Yes.  There was no -- there was
3　no chemical evidence or physical evidence
4　to tie them to the crime scene, that would
5　be accurate.  This was days later, though.
6　This wasn't that day.
7　　　Q.　I understand.
8　　　A.　Okay.
9　　　Q.　But at some point you became
10　aware there was no forensic evidence --
11　　　A.　I've was aware of that.
12　　　Q.　At some point, Mr. Lillis, did
13　you develop a belief based on your
14　experience that you've described here today
15　as an investigator, as a very experienced
16　investigator, the evidence as to whether
17　Ricky Birch and Sean Henning were the
18　actual perpetrators of this crime?
19　　　A.　You want to know the dead
20　honest truth?  This is right from my heart.
21　When I finished that interview, they
22　weren't involved.
23　　　Q.　That was your opinion?
24　　　A.　That is right.
25　　　Q.　Did you express that opinion to

Page 48

1　　　　　　N. LILLIS
2　anybody else?
3　　　A.　Yeah.  I'm sure I said it that
4　night.  I said it to Olmstead, I said it to
5　some of the people from major crime that
6　was there.  I don't know who else, but I
7　said I don't think these guys are involved.
8　I remember saying that.  I mean, they --
9　we're talking about Birch.  No, we're
10　talking about Henning here.  Henning came
11　through this thing with flying colors.  In
12　my mind, and I've done -- at that point I
13　had done many, many interviews with people.
14　When I got through interrogating him, I was
15　convinced in my mind that he wasn't
16　involved.  That's me.  And I said that.
17　　　Q.　You said that to chief
18　Olmstead?
19　　　A.　I said it to Olmstead and I
20　said it to probably some other people that
21　were there.
22　　　Q.　Do you remember who they may
23　be?
24　　　A.　Some guys from the major crime
25　squad.  You know, major crime squad was

Page 49

1　　　　　　N. LILLIS
2　collecting the evidence.  One piece.  Then
3　there was the investigative unit that was
4　there also.  I said I don't think either of
5　these guys are involved.  That's correct.
6　That's what I said.
7　　　Q.　Did that opinion ever change
8　throughout the course of the investigation
9　of this homicide?
10　　　A.　They were -- you're asking
11　another question that just keeps going on
12　because that was my opinion that night and
13　it stayed in my mind.  I wasn't going to
14　change that.  But I heard different
15　versions.  Yeah, it's going to come back
16　and it's going to show they were there.
17　And I was like I don't think they were
18　involved.  I just don't think they're
19　involved.  If anybody goes through an
20　interview like that and comes out the way
21　they did, in my opinion, in my experience
22　they weren't involved.  That's me,
23　personally.
24　　　Q.　That opinion never has changed?
25　　　A.　Hasn't changed.

Page 50

1              N. LILLIS
2      Q.   As you sit here today, has that
3  opinion not changed?
4      A.   100 percent.
5      Q.   When the forensic evidence was
6  tested and the results came back, that
7  basically confirmed what you thought?
8      A.   I said that right along
9  consistently to some of the people from the
10 major crime and our guys, too.  I don't
11 think they're involved.  But I was ordered
12 that night after that thing, after I said I
13 don't think they're involved, Olmstead said
14 you're off the case.  I don't want you
15 involved.
16     Q.   Did he say why?
17     A.   Because I guess I didn't come
18 up with the right answers that he wanted.
19 You know, these people were involved.  They
20 aren't involved.  I determined that from
21 this interrogation.  Anybody comes through
22 that at that age, they pretty convinced me
23 they weren't involved.
24     Q.   When you voiced that opinion,
25 Chief Olmstead, as a result, took you off

Page 51

1              N. LILLIS
2  of the case?
3      A.   That is right.  He said you're
4  ordered off of the case.
5      Q.   Did you participate in the case
6  in any capacity thereafter?
7      A.   Not really.  I stayed away from
8  it, but some of the guys from major crime,
9  the investigators would talk to me and I
10 said I can't be involved.  There would be
11 talk about this, that, and the other
12 because there were a lot of pieces of this
13 case that went on from there.  My opinion
14 never changed.
15     Q.   At some point, did you become
16 aware of the Connecticut Supreme Court
17 opinion that vacated the convictions of Mr.
18 Birch and Mr. Henning?
19     A.   Somewhere, you know.  Time went
20 on, and over the years, I did hear that the
21 Supreme Court had done whatever they did.
22 I would say to Andy Ocif, who was one of
23 the SP involved.  I said Andy, it doesn't
24 strike me as unusual.  This is the way I
25 felt that night.

Page 52

1              N. LILLIS
2      Q.   When did you have that
3  conversation with Ocif?
4      A.   When did I have it?
5      Q.   Yes.
6      A.   Or how did I have it?
7      Q.   Why don't we start with when?
8      A.   I don't remember.  Sometime
9  thereafter.
10     Q.   After the Supreme Court
11 decision?
12     A.   No.  I don't remember that.
13 You know, Supreme Court decision and when I
14 was talking, I can't correlate those two
15 things.  But I remember saying to him,
16 Andy, I don't think these guys are
17 involved.  They're not involved.  Not I
18 don't think.  They're not involved.  I
19 remember one time he said to me well,
20 there's a murder involved and people don't
21 like to admit to murders, and that's why
22 they're just keeping it.  And I said Andy,
23 it's not going to happen.  So these are the
24 things that stick in my mind.
25     Q.   Mr. Ocif didn't have the

Page 53

1              N. LILLIS
2  interrogation skills that you did, did he?
3      A.   I don't know that.  I can't
4  tell you that.  I never saw him interview
5  anybody.  But I know how I interview people
6  and when I got through, I could tell one
7  way or the other.  I'm not a polygraph.  I
8  used to say to these kids that night, we're
9  going to take a polygraph when this thing
10 is over.  He said I don't -- pardon my use
11 of language.  I don't give a, you know
12 what, I didn't do it.  I'll take your
13 polygraph right now.  That's how.  Boom.
14 Straight forward they were.
15     Q.   Do you recall speaking with
16 anybody and expressing this opinion after
17 the Supreme Court opinion was released?
18     A.   There was some guy that came to
19 my house.  And I don't remember the whole
20 thing, but he came to my house.  I don't
21 know if this is the guy you're referring to
22 or what, and I said I don't want to talk
23 about the case with anybody and I didn't
24 say much to him.  And in my mind I still
25 had the same thing.  And I said it to Andy

Page 82
1                N. LILLIS
2        Do you recall working with an
3   officer named Steve Jordan in the New
4   Milford Police Department?
5        A.   He was a detective.
6        Q.   What's your overall impression
7   of him?
8        A.   My overall?  Sharp guy.  Sharp
9   guy.  He was a good detective.
10       Q.   He testified as you did that
11  you told him that he believed Mr. Birch and
12  Mr. Henning was innocent.  Do you recall
13  discussing that with him?
14       A.   I said that.
15       Q.   Do you recall telling that to
16  Mr. Jordan?
17       A.   It's very possible I could
18  have.  Because he was a good officer.
19  Believe me.
20       Q.   He --
21       A.   Detective.
22       Q.   Mr. Jordan thought that you
23  expressed that view to him around the time
24  that the state police sought arrest
25  warrants for Mr. Henning or Mr. Birch.

Page 83
1                N. LILLIS
2   Does that timing sound right to you?
3        A.   First of all, as I said, I have
4   a problem hearing you.  I just want to make
5   sure I have exact -- I can't hear.
6        Q.   Mr. Jordan testified in this
7   case that he recalled you telling him that
8   you believed Mr. Birch and Mr. Henning were
9   innocent around the time that the state
10  police sought arrest warrants for them.
11  Does that timing sound right to you?
12       A.   It sounds right to me, but
13  you've heard me say from the beginning I
14  don't think these guys were involved.  I'm
15  not going to be bashful about it, I said
16  that.  And I -- he probably was talking in
17  general to me.  I'm just guessing, I don't
18  know the specific thing.  But I said
19  they're not involved.  I didn't say I don't
20  think so.  I said they're not involved,
21  period.
22       Q.   You testified that you
23  expressed that view to Andrew Ocif; is that
24  right?
25       A.   That is right.

Page 84
1                N. LILLIS
2        Q.   And did you say that to Mr.
3   Ocif before Mr. Birch and Mr. Henning were
4   arrested?
5        A.   I don't recall that.  I can't
6   tell you the specific timing, but I wasn't
7   bashful about saying I don't think those
8   guys were involved.  You're talking cop to
9   cop.
10       Q.   Fair to say you told Mr. Ocif
11  that at least at some point before they
12  were tried and convicted?
13       A.   I don't know that.  I mean, I'm
14  sure I did.  Because I'm not bashful about
15  saying these guys -- after I got through
16  that night, I said this to you 2 or 3
17  times.  I made -- after interviewing them,
18  I was pretty damn sure they weren't
19  involved and I never heard a word any other
20  way that convinced me they were involved.
21       Q.   Do you have any recollection of
22  sharing that view with a state police
23  Sergeant named Brian Acker?
24       A.   I know Brian Acker.  Let me
25  think about this.  Brian Acker.  I'm just

Page 85
1                N. LILLIS
2   trying to think how I talked to him.  Let's
3   see.  Was he a trooper, right?  I just know
4   the name.  Where he was, troop L?
5        Q.   Yes.
6        A.   I don't recall that at all, but
7   it's very possible.  Do you understand what
8   I'm saying?
9        Q.   I do.
10       A.   I'm not the least bit bashful
11  about saying I didn't think they were
12  involved.  And that's from a lot of years
13  of experience and I wasn't bashful about
14  saying that to other cops.
15       Q.   At the time?
16       A.   At the time.
17       Q.   There was a mention earlier of
18  a current New Milford police lieutenant
19  named Lee Grabner.  Mr. Grabner testified
20  in this case that he had spoken to you
21  about the Town of New Milford's law
22  enforcement liability insurance and that
23  you told him you thought that the New
24  Milford insurance agency may have written a
25  liability policy for the town at some point

Page 86

1 N. LILLIS
2 in the 1980s. Is that something that you
3 have any knowledge about?
4     A. I don't know what you're
5 talking about. You mean, I told Grabner
6 that the New Milford Police Department had
7 a policy to protect the police? I don't
8 know what you're talking about.
9     Q. Do you have any recollection of
10 town official having a connection to an
11 insurance company or insurance agent that
12 resulted in a liability policy being
13 purchased from that insurance agency in the
14 1980?
15     A. I have no recollection of that.
16 But Lee Grabner was a lieutenant then. He
17 was he a patrolman, I think. So you're
18 stepping way ahead.
19     Q. No, this is a conversation that
20 he recalled having with you very recently.
21     A. Recently? I don't recall
22 talking to him recently. I talked to the
23 other guy that was there, whatever his name
24 is. Earling. He's like a lieutenant too.
25 I mean, how are you doing, how is the

Page 87

1 N. LILLIS
2 department going, that's my conversation.
3 I don't recall any conversation with him
4 about that. I can just say that clearly.
5     Q. Do you have any recollection of
6 anything to do with the town buying
7 insurance from the New Milford insurance
8 agency?
9     A. The combine insurance?
10     Q. New Milford insurance agency.
11 Did the Town of New Milford buy insurance
12 from the New Milford insurance agency; that
13 you know of?
14     A. I don't know that. I have no
15 idea about that. You're asking me about
16 marbles.
17     MR. LEBOWITZ: I believe that's
18   all I have. Let me just take a quick
19   break and confer. That's all I have.
20     MR. SPECTOR: I have no
21   questions.
22     MR. O'NEILL: I have a couple.
23     Q. My name is Terry O'Neill. I'm
24 also stubborn, hard-headed Irishman. Can
25 you hear me?

Page 88

1 N. LILLIS
2     A. I hear you if you're talking to
3 me.
4     Q. I am talking to you.
5     A. Go ahead.
6     Q. I'm an attorney with the
7 Connecticut Attorney Generals Office. I
8 represent the Connecticut State Police
9 officers who have been sued in this case,
10 and I have a few questions for you, okay?
11 If you can't hear me, let me know.
12     A. You're coming through pretty
13 clear.
14     Q. Great.
15 You told us earlier today that
16 you came to the decision or to the opinion
17 that Mr. Birch and Mr. Henning didn't
18 commit the Carr murder based on an
19 interview that you did of one of them; is
20 that right?
21     A. That's basically it. I formed
22 that opinion that night and I still have it
23 today. But that's me doing the interview.
24     Q. I understand. Did you base
25 your opinion on anything else other than

Page 89

1 N. LILLIS
2 that interview?
3     A. I based my opinion on talking
4 to these individuals -- you know. As a
5 veteran police officer, I saw a lot of
6 people over team and I interviewed a lot of
7 people. When I got through interviewing
8 those two that night, especially the young
9 man, Henning, I was convinced that he was
10 talking -- this is just me, my
11 interpretation of it. I said they're not
12 involved. That's exactly where I stand
13 today.
14     Q. Okay. I'm going to ask you to
15 answer the question that I've asked you
16 though.
17     My question is: Did you base
18   that opinion on anything other than
19   your interview?
20     A. That was basically it. Other
21 than my experience as a policeman and that
22 kind of thing. That's what I based it on.
23     Q. Based on your experience as a
24 police officer --
25     A. And my --

Page 90

N. LILLIS

Q. No, no, no. Let me finish. We're in this artificial conversation, right, because we're on the record with the court reporter so we're not talking formally.

Did you base your opinion on anything other than your interview of the individual that evening?

A. That's what I based it on that night. That's correct. After that interview.

Q. And I think you just told us that you had a conversation about your opinion with Andy Ocif. Are you able to tell us whether that was before or after these fellows were convicted of the murder?

A. I don't know. Before or after. How do I say it?

Q. I don't know is fine.

A. I'm trying to --

Q. If you don't know, you don't know.

A. I'm trying to search my mind. Hold on. At some point I talked to Andy

Page 91

N. LILLIS

about that because Andy was being the lead officer and investigations and the thing, and he would talk to me from time to time. And I told him what I thought. So I can't tell you if it was before or after they were convicted. I think it was before is what I think.

Q. Did you ever write your opinion -- well when you say you think, is that a guess? Is that your best guess?

A. That was my -- after interviewing these individuals, that's what I felt happened here.

Q. I understand, but your conversation with Mr. Ocif, you're saying you think that happened before they were convicted. Is that a guess?

A. That's a guess. I don't remember.

Q. Did you ever discuss your opinions with anyone at the state's attorney's office?

A. I can't recall that. Maybe at some point -- I just can't recall. I'm

Page 92

N. LILLIS

trying to think who was at the state's attorney's office then. I don't recall talking to anybody there, but I could have. I don't recall it.

Q. Did you reduce or --

MR. O'NEIL: Withdrawn.

Q. Did you write your thoughts down, your opinion, that they didn't do it in any kind of a report?

A. I don't recall that. I just remember when I got through interviewing them that night, I told Olmstead and I think Olmstead told everyone else that was around at that time. That's where this came from. And that was the feeling I had that night and I still have that feeling today. So it hasn't changed.

MR. O'NEIL: I have no further questions for you. Thank you, sir.

MR. COUSINS: No further questions.

(Continued on next page to include jurat.)

Page 93

N. LILLIS

(Time Noted: 12:02 p.m.)

NORBERT LILLIS

Subscribed and sworn to before me this      day of           2021.

Notary Public

I N D E X