Exhibit C

## Legislative History for Connecticut Act

### PA 24-106

#### SB 439

*AN ACT CONCERNING COMPENSATION FOR PERSONS WHO ARE WRONGFULLY INCARCERATED.*

| | | |
|---|---|---|
| <u>House</u> | 6733-6736 | <u>4</u> |
| <u>Senate</u> | 2145-2150 | <u>6</u> |
| <u>Judiciary Committee</u> | 2165-2167, 2170-2171, 2184-2207, 2210-2221, 2234, 2249-2256, 2273-2275, 2277-2278, 2293-2294, 2342-2343, 2405-2465 | <u>120</u> |

<u>130 Pages</u>

Transcripts from the Joint Standing Committee Public Hearing(s) and/or
Senate and House of Representatives Proceedings

**Connecticut State Library**
Compiled 2024

# CONNECTICUT GENERAL ASSEMBLY

## 2024

## House Proceedings

**Connecticut State Library**

**Hartford, CT 06106**

ak/rr                                                              767

HOUSE OF REPRESENTATIVES                            May 8, 2024


     The bill passes in concurrence to the Senate. (Gavel). Let's
do 490.


CLERK:

     On page 34, calendar 490, substitute for Senate Bill number
439 as amended by Senate Amendment Schedule A, LCO 4882, AN ACT
CONCERNING   COMPENSATION   FOR   PERSONS   WHO   ARE   WRONGFULLY
INCARCERATED, Favorable Report of Judiciary.


SPEAKER RITTER (1ST):

     Representative Stafstrom, the chairman.


REP. STAFSTROM (129TH):

     I move acceptance and passage in concurrence as amended by
LCO 4882.


SPEAKER RITTER (1ST):

     You may proceed.

ak/rr                                                                768

HOUSE OF REPRESENTATIVES                              May 8, 2024

REP. STAFSTROM (129TH):

    Clarifies the process.

SPEAKER RITTER (1ST):

    Representative Fishbein.

REP. FISHBEIN (90TH):

    Thank you, Mr. Speaker. Mr. Speaker, this bill went through
various iterations. Certainly when the government incarcerates
someone wrongfully and it is determined that it was wrongful, there
should be compensation that is provided as a result thereof. The
original language that passed the committee though would have been
quite broad in compensation. We've been able to strip that down.
Well, reasonably bring it down to a place that's more comfortable
as reflected by the amendment. I do rise in support and ask my
colleagues to support. Thank you.

SPEAKER RITTER (1ST):

HOUSE OF REPRESENTATIVES                              May 8, 2024


Thank you, representative. Staff and guests, come to the well of the House, members take your seats, the machine will be open.


CLERK:

House is voting by roll, members to the chamber. House is voting by roll, members to the chamber.


SPEAKER RITTER (1ST):

Have all the members voted? The machine will be locked and the Clerk will please take and announce the tally for the General Assembly.


CLERK:

Senate Bill 439 as amended by Senate A:

Total Number Voting                          146

Necessary for Passage                        74

Those voting Yea                             146

Those voting Nay                             0

ak/rr                                                              770

HOUSE OF REPRESENTATIVES                           May 8, 2024

    Those absent and not voting            5


SPEAKER RITTER (1ST):

    The bill passed as amended in concurrence with the Senate.
Let's do 470.


CLERK:

    On page 31, Calendar 470, Senate Bill number 339, AN ACT
REQUIRING RESTITUTION WHEN A POLICE ANIMAL OR DOG IN A VOLUNTEER
CANINE SEARCH AND RESCUE TEAM IS INJURED OR KILLED, Favorable
Report of Public and Safety.


SPEAKER RITTER (1ST):

    Representative Boyd.


REP. BOYD (50TH):

    I move for acceptance of the joint committee's Favorable
Report and passage of the bill in concurrence with the Senate.

# CONNECTICUT GENERAL ASSEMBLY

## 2024

## Senate Proceedings

**Connecticut State Library**

**Hartford, CT 06106**

mg/mm/rp                                             349

Senate                                      May 3, 2024

Thank you. With that, will you remark further? If
not, I will open the voting machine. Mr. Clerk,
would you announce the vote?

CLERK:

An immediate roll call has been ordered in the
Senate. An immediate roll call has been ordered in
the Senate. We're voting on Senate Bill 333 as
amended. An immediate roll call has been called in
the Senate.

THE CHAIR:

Have all the senators voted? The machine is locked.
Mr. Clerk, please announce the tally.

CLERK:

Senate Bill 333 as amended:

| | |
|---|---|
| Total Number Voting | 36 |
| Necessary for Adoption | 19 |
| Those voting Yea | 36 |
| Those voting Nay | 0 |
| Those absent and not voting | 0 |

THE CHAIR:

(gavel) Legislation is adopted. Senator Duff.

SENATOR DUFF (25TH):

Thank you, Madam President. Will the Clerk now
please call Counter Page 26, Calendar 305, Senate
Bill 439.

THE CHAIR:

Mr. Clerk.

CLERK:

mg/mm/rp                                                      350

Senate                                           May 3, 2024

Counter Page 26, Senate Calendar 305, substitute
Senate Bill 439, An Act Concerning Compensation For
Persons Who Are Wrongfully Incarcerated. Clerk has
one amendment.

THE CHAIR:

Senator Winfield, good morning.

SENATOR WINFIELD (10TH):

Good morning, Madam President. I move acceptance the
joint committee's favorable report and passage of
the bill.

THE CHAIR:

The question is on passage. Will you remark?

SENATOR WINFIELD (10TH):

Yes, Madam President, I will. Madam President, the
bill that comes to us through the Judiciary
Committee. It deals with the issue of wrongful
incarceration. This bill expands eligibility by
allowing the compensation or the claimant
information that was dismissed on grounds of
innocence. It calculates the word based on median
family income, versus the median household income.
It increases the point at which a legislative review
happens from $20,000 to $35,000.

It also specifies a two-year filing deadline that
applies from the date of the information that was
dismissed. It requires the claims commissioner to
determine whether a claimant met eligibility within
90 days after the hearing. Also, Madam President,
there is an amendment that clarifies some of the
language. It's LCO 4882. I'd ask the Clerk call it.
I'd be glad to leave the chamber to summarize

THE CHAIR:

mg/mm/rp                                                351

Senate                                        May 3, 2024


Mr. Clerk.

CLERK:

LCO 4882, Senate Schedule Amendment A.

THE CHAIR:

Senator Winfield.

SENATOR WINFIELD (10TH):

Yes, Madam President. This is a joint amendment that
clarifies language on the grounds of consistent with
innocence and I will just, for the information of
the chamber, read that small section. So for the
purposes of the section affected the grounds
consistent with innocent include, but not limited to
a, situation in which a conviction was vacated or
reversed and there's substantial evidence of
innocence, whether such evidence was available at
the time or not. Madam President, I urge adoption.


THE CHAIR:

Thank you. Senator Kissel, will you remark on the
amendment?

SENATOR KISSEL (7TH):

Good morning, Madam President. Great to see you on
this lovely Saturday spring day. I'm going to
comment on the amendment and also the underlying
bill so we can expedite this entire process and I
don't think that we need a roll call on the
amendment. We can just do that by voice vote.

The amendment makes some clarifications as to what
would constitute the grounds for the ability of an
inmate. They were either wrongfully convicted or
again, they can muster enough information that it's
substantially similar grounds to being wrongfully

mg/mm/rp                                                    352

Senate                                          May 3, 2024

convicted, and that's along with the public policy
purpose of this.

During the public hearing, it was quite amazing to
know that you would like to think that this never
happens in Connecticut, but occasionally wrongful
convictions do happen. We already have a statutory
formula as far as what the compensation would be
depending on the length of time an individual was
incarcerated as to based on a wrongful conviction.

But the underlying bill in conjunction with the
amendment also makes it very clear that if there's
both a state claim and a local claim that they would
offset one another for so that it would not be
overly compensated and yet at the same time, the
individual could pursue one avenue or another and it
wouldn't necessarily harm the individual if they
chose to proceed against the town and then later the
state or vice versa.

We rely on our claims commissioner and his
incredible staff to pursue these matters. There also
is some time limitations that are now definitively
spelled out. So the bill as amended will not extend
anybody's rights. They're already in statute as far
as what the compensation terms should be. But it
makes the process much clearer and defines it so
that everybody's expectations should be on same
page.

It also makes the limit a little bit higher so that
there will not be as many claims coming to the
legislature that we'll have to review, and
hopefully, there will be no further wrongful
incarcerations in Connecticut, but we'll be good to
go when that happens.

I would urge adoption of the amendment as well as
passage of the underlying bill and I commend Senator
Winfield for shepherding this through the process as
well as our colleagues in the House. Thank you,
Madam President.

Senate                                      May 3, 2024

THE CHAIR:

Thank you. Will you remark on the amendment? If not,
let me try your minds. All in favor of the
amendment, please signify by saying aye.

MEMBERS:

Aye.

THE CHAIR:

Opposed? The ayes have it. The amendment is adopted.
Will you remark further on the bill as amended? Will
you remark further? If not, the machine is open. Mr.
Clerk, if you would call the vote.

CLERK:

An immediate roll call has been ordered in the
Senate. An immediate roll call has been ordered in
the Senate. We're voting on Senate Bill 439 as
amended. An immediate roll call has been ordered in
the Senate. We're voting on Senate Bill 439.

THE CHAIR:

Have all the senators voted? The machine is locked.
Mr. Clerk, would you give us the tally, please?

CLERK:

Senate Bill 439 as amended:

| | |
|---|---|
| Total Number Voting | 36 |
| Necessary for Adoption | 19 |
| Those voting Yea | 36 |
| Those voting Nay | 0 |
| Those absent and not voting | 0 |

THE CHAIR:

mg/mm/rp                                         354

Senate                              May 3, 2024

(gavel) Legislation passes. Mr. Clerk.

CLERK:

Just going down. Okay. Page 22, Senate Calendar 259,
substitute Senate Bill 432, An Act Concerning State
Contracts With Nonprofit Human Services Providers.

THE CHAIR:

Good morning, Senator Flexer.

SENATOR FLEXER (29TH):

Sorry, Madam President. I still don't know how to
respond to that. Good morning, Madam President.
Madam President, I move for acceptance of the joint
committee's favorable report and passage of the
bill.

THE CHAIR:

And the question is on passage. Will you remark?

SENATOR FLEXER (29TH):

Yes. Thank you, Madam President. Madam President,
the bill before us today attempts to address an
issue that I know almost every one of us in the
circle has heard about in recent years and perhaps
for a very long period of time.

The bill seeks to improve the process by which the
State of Connecticut fulfills commitment to our
nonprofit providers who do critical work in so many
arenas throughout our state to deliver important and
vital services to our friends, neighbors, and all of
our constituents. Madam President, the Clerk is in
possession of Amendment, LCO Number 5531. I would
ask that the Clerk please call the amendment and I
be granted leave of the chamber to summarize.

THE CHAIR:

**CONNECTICUT GENERAL ASSEMBLY**

**2024**

**PUBLIC HEARINGS**

**ON**

**JUDICIARY**

**Connecticut State Library**
**Hartford, Connecticut  06106**

STEPHANIE THOMAS:  Thank you.

SENATOR WINFIELD (10TH):  Thank you, Representative.
Comment or question from Members of the committee?
Comment or question from Members of the committee?
Seeing none.  Thank you very much, Madam Secretary
for joining us today. .

STEPHANIE THOMAS:  Thank you, sir.

SENATOR WINFIELD (10TH):  Robert Shea, Claims
Commissioner.

ROBERT SHEA:  Hello again.

SENATOR WINFIELD (10TH):  Good morning.

ROBERT SHEA:  I'm Robert Shea from the Claims          SB 439
Commissioner's Office.  First of all, I'd like to
thank this committee for all of your hard work on
all of the claims that are pending this session.
I'd like to thank Kirsten and Nathan and your whole
staff for hard work.  So thanks to everyone.

And I'm also very grateful that you raised House
Bill 5487, an Act Concerning the Operation
Administration of the Claims Commissioner's Office.
It's a good bill, I hope it passes.  And I've
respectfully submitted a JFS Proposal to the
committee.  And what that is intended to do is to
maybe take another look at how we deal with the
claims that are more than two years old.

So right now, currently before this committee, there
are about 293 claims that are more than two years
old.  They were on a public hearing Agenda on March
1st.  Those are claims that our office can't work on
right now.  We're waiting to hear from you folks
about what you're going to do with those claims.

I respectfully would like to work on those claims,
work on the older claims.  So the proposal that

we've submitted as JFS still would keep the Claims
Commissioner's Office feet to the fire, now that we
still have to report to the Judiciary Committee on
claims that are two years old or older.

And we have to provide a plan as to how we're going
to get these claims resolved within a year.  So, I
understand that 4-159 a, I think the purpose is to
make sure that the Claims Commissioner's Office is
really moving claims.  And I think this will be a
helpful change.

We'll tell you how many claims are more than two
years old, we'll give you a plan as to how we're
going to get these claims resolved, but in the
meantime, we can continue to work on them.  So we
wouldn't be asking the Judiciary Committee to give
us an extension of time, but for those claims, if
you wanted to, you could still release them to
Superior Court, or deny them, or make an award, I
believe so.

That's what our JFS Proposal is.  I'm certainly
willing to kick this around, but I think it would be
helpful if we can continue to work on the older
claims throughout the year at the Claims
Commissioner's Office.  So I look forward to talking
with you about that JFS Proposal.

And I'd also like to just quickly say on Senate Bill
439, wrongful incarceration.  The one comment that
the Claims Commissioner's Office has would be in
Line 10 and 11, where the Proposal states that a
person could be eligible for wrongful incarceration
damages if his or her conviction was vacated or
reversed on the basis of grounds of innocence or
grounds consistent with innocence.

I'd respectfully request the interested parties to
come up with maybe an agreement about what that
means, because that would be something that would be
heavily litigated at the Claims Commissioner's
Office, what precisely that means.  So we can, I

think, make quicker decisions for-- oh, I'm sorry, I
just heard the bell.

SENATOR WINFIELD (10TH):  Yeah.  No, I would let it-
-

ROBERT SHEA:  Okay.

SENATOR WINFIELD (10TH):  We will pass.

ROBERT SHEA:  So, that's it.  That was it.  Just to
have the interested parties work on a, what that
means, grounds of innocence or grounds consistent
with it.  Thank you, everyone.

SENATOR WINFIELD (10TH):  Okay.  Representative
Fishbein.

REP. FISHBEIN (90TH):  Thank you, Mr. Chairman.
Bob, nice to see you again.  Long day on Friday.
Anyway the JFS language, I guess my concern is the
open jurisdiction.  You have been in the office for
a short period of time, and I have faith in you, but
there's been other individuals in that office that--
well, we sort of know how we got where we are.

So, is there a way that your office can sort of
triage those to at least clean up that without
having this open-ended jurisdictional thing?
Because the last time we got a report before you got
appointed, we had changed the statute required all
this reporting, and the report basically said, "I'm
not in this job anymore, figure it out."

I don't want to be there and I don't want to have to
rely upon a report and micromanaging what's going on
in that office.  So is there a way that you can sort
of prioritize those old claims?

ROBERT SHEA:  That's what I have been doing, but
there are a lot of them.  So, respectfully, I'd like
to continue to work on these old claims during the
session.  So if there's a way that we can come up

22                                        March 18, 2024
vs/pg              JUDICIARY COMMITTEE       10:00 A.M.

ROBERT SHEA:  Yeah, thank you for understanding that
issue.  And I think we can come up with something
that makes sense.  Again, we don't want the
claimants and the State employees who are part of
these claims waiting any longer than we have to on
these older claims.

REP. FISHBEIN (90TH):  So to perhaps help you, at
least with the ones that are before us, if we're not
comfortable with open-ended jurisdiction, it would
meet your needs if this extension was at least to
the end of the next legislative session, right?

ROBERT SHEA:  That'd be awesome.  Yeah.

REP. FISHBEIN (90TH):  Okay.  Okay.  Thank you.
Thank you, Mr. Chairman.

ROBERT SHEA:  Yeah.  Thanks, Representative
Fishbein.  Thank you, everyone.

SB 439    SENATOR WINFIELD (10TH):  Thank you, Representative.
Comment or question from other Members of the
committee?  Representative Quinn.

REP. QUINN (82ND):  Thank you, Mr. Chairman.  Good
morning, Bob.  Good to see you.  Sorry I missed you
on Friday.  Going back to Lines 10 and 11, does your
JFS language have a proposed definition?

ROBERT SHEA:  Oh, that's a different bill.  I'm
sorry, Rep. Quinn.  So my JFS language is on House
Bill 5487, the Claims Commissioner's bill.

REP. QUINN (82ND):  Okay.

ROBERT SHEA:  I kind of quickly jumped over to the
wrongful incarceration bill, which is Senate Bill
439.

REP. QUINN (82ND):  Okay.

23                                          March 18, 2024
vs/pg                   JUDICIARY COMMITTEE        10:00 A.M.


ROBERT SHEA:  And I don't have a definition, I'm not
sure what the right answer is, but I'd like to be
part of discussions with this committee and all the
interested parties about if there's a way that we
can get at a definition that makes sense for
everyone there.

REP. QUINN (82ND):  Okay.  All right.  Thank you.

ROBERT SHEA:  It's 10 and 11 in Senate Bill 439.
Right.

REP. QUINN (82ND):  Okay.  Thank you.

SENATOR WINFIELD (10TH):  Thank you, Representative.
Comment or question from Members of the committee?
Comment or question?  Seeing none.  Thank you very
much for joining us today.

ROBERT SHEA:  Thank you, Senator.  Thanks again,
everyone.

SENATOR WINFIELD (10TH):  All right.  Kyle Probst?

KYLE PROBST:  Yes.  Thank you.  My name is Kyle
Probst.  I am Deputy General Counsel and Director of
Government Relations for Datavant Group based in
Atlanta, Georgia, but operating nationally.  We are
the country's largest provider of release of medical
information to those who are requesting medical
records around the country.

So thank you to the Chairs and the committee for
allowing me to testify on House Bill 5411.  I'm here
to present testimony regarding 5411.  And while I am
opposed, and while Datavant is opposed to the bill
as it reads right now, I'd like to make clear that
having the fees for medical records regulated by the
State Legislature or a government entity, one of the
departments or agencies is something that our
industry actually commends and likes to have set in
code so that we have guidance as to what can be

SHAWNA WORTZ:  I'm not really sure.  I have been
here for two years, and I have not been involved in
anything regarding the transcripts.  The only time
that I've been invited to do something like this was
this today.  I'm assuming that the stuff about
transcripts being non-billable and stuff occurred
before I got hired, so I don't think I can really
speak to that.

REP. QUINN (82ND):  Okay.  And are you here just on
your own behalf?  Are you representing some sort of
group?

SHAWNA WORTZ:  No, just myself.

REP. QUINN (82ND):  Okay.  Well I appreciate you
taking the time.  Thank you, Mr. Chair.

SHAWNA WORTZ:  Thank you.

SENATOR WINFIELD (10TH):  Thank you.  Comment or
question from Members of the committee?  Comment or
question from Members of the committee?  If not,
thank you very much for joining us this morning.

SHAWNA WORTZ:  Thank you.

SENATOR WINFIELD (10TH):  Adam Carmon.  Make sure
you turn the microphone on with the red button.
There you go.  Now it's on.

ADAM CARMON:  Good morning, Chairman.  My name is
Adam Carmon.  I'm an Exoneree from New Haven,
Connecticut.  I was in prison for the last 29 years
of my life for a crime I didn't commit.  My
conviction was overturned in November, 2022 because
of a Brady violation, meaning that exploratory
evidence was withheld at trial.

I was released on bond in December, 2022.  The
charges was dismissed in June, 2023.  I'm here today
to speak in support of bill Senate Bill 439, but

also to ask you to change it that it applies so that
it applies to the claims that are pending when it
passes.  Coming back to society as an exoneree is
hard.  It's also expensive.

To get decent housing, you need at least two months'
rent, a security, deposit.  And quite often these
things are out of reach as quick as possible as it
really needs to be in our hands.  When I came out of
prison, I had, excuse me, severe dental disease.  I
didn't get any dental care inside.

I only had a few healthy teeth left for medical
reasons.  I needed implants, and Medicaid didn't
cover that.  I got a good job, but I needed a car to
get there.  I borrowed money against my case to meet
these needs.  There was no other way to do it.  This
bill should be passed because it will help exonerees
get on their feet more quickly.  We shouldn't have
to give up our rights to pursue civil right lawsuits
in order to be compensated by the State.

But the bill as written wouldn't help people like me
who are exonerated in the past several years and
have pending claims.  Passing this bill is the right
thing to do.  If you agree, it should also apply to
me and my fellow exonerees who are waiting for
compensation right now.  Thank you.

SENATOR WINFIELD (10TH):  Thank you.  Comment or
question from Members of the committee?  Comment or
question from Members of the committee?
Representative Porter first, then Representative
Fishbein.

REP. PORTER (94TH):  Thank you, Mr. Chair, and thank
you for coming in today.

ADAM CARMON:  Thank you.

REP. PORTER (94TH):  And for your testimony.  You're
asking that we consider amending the bill to include
exonerees such as yourself?

ADAM CARMON:  Yes.

REP. PORTER (94TH):  Is there any timeline on the limitations that you think would be applicable if we considered that?

ADAM CARMON:  I feel as though it should be speedy as quick as possible because truthfully, we're drowning and nobody's there to help.  We work hard and come out here to be a productive part of society, and we should be treated as such.

REP. PORTER (94TH):  Okay.  And I haven't in full disclosure actually read the bill, but I will take a look at it and I will definitely take into consideration what you're asking.

ADAM CARMON:  All right.

REP. PORTER (94TH):  And I do want to apologize. I'm sorry that you had to endure whatever time it was you served as someone who hadn't committed a crime.

ADAM CARMON:  Right.

REP. PORTER (94TH):  And I think that this bill should absolutely look at and take all of those things into consideration--

ADAM CARMON:  Thank you.

REP. PORTER (94TH):  --when we put it forward.  So thank you again for being here today, Mr. Carmon.

ADAM CARMON:  Thank you for that.

REP. PORTER (94TH):  And thank you, Mr. Chair.

SENATOR WINFIELD (10TH):  Thank you.  Representative Fishbein.

39                                          March 18, 2024
vs/pg                JUDICIARY COMMITTEE        10:00 A.M.


REP. FISHBEIN (90TH):  Thank you, Mr. Chairman.
Good morning, Adam.  Thank you for coming here
today.

ADAM CARMON:  Good morning.

REP. FISHBEIN (90TH):  Adam, can you just tell me a
little bit more about your story?  How old were you
when you got incarcerated?

ADAM CARMON:  I was 21 years old.

REP. FISHBEIN (90TH):  And you said that you got
incarcerated because there was a Brady violation.

ADAM CARMON:  Right.

REP. FISHBEIN (90TH):  And a lot of people don't
know what that is, so can you just tell us a little
bit more about that?

ADAM CARMON:  A Brady violation consists of the
State, the actors, which is the police withholding
vital evidence, which could exonerate a person
immediately.  But we must win by any means
necessary, they withheld such evidence, vital
evidence.

REP. FISHBEIN (90TH):  Okay.  And who found that
Brady violation?

ADAM CARMON:  My attorneys, Doug Lieb and Attorney
David Keenan, and the rest my own instincts.

REP. FISHBEIN (90TH):  Oh, for Innocence, Innocence
Project?

ADAM CARMON:  No, private attorneys.

REP. FISHBEIN (90TH):  Private attorneys.  And what
did you get convicted of?

ADAM CARMON:  Murder.

REP. FISHBEIN (90TH):  Okay.  And what was your
sentence?

ADAM CARMON:  85 years.

REP. FISHBEIN (90TH):  Okay.  And you served 25?

ADAM CARMON:  Right.

REP. FISHBEIN (90TH):  When did you get out?

ADAM CARMON:  No, I served 28 and a half years on my
life.

REP. FISHBEIN (90TH):  Okay.  Sorry about that.

ADAM CARMON:  Yes.

REP. FISHBEIN (90TH):  28 and a half.  So when did
you get out?

ADAM CARMON:  I got out December 5th of 2022.

REP. FISHBEIN (90TH):  Okay.  So you went in at 21,
and did you graduate from high school?

ADAM CARMON:  No, not at the time.  No.

REP. FISHBEIN (90TH):  Okay.  Did you get your GED
while you were in?

ADAM CARMON:  Yes.

REP. FISHBEIN (90TH):  Okay.  What are you doing for
work now?

ADAM CARMON:  I'm at Hartford Hospital.

REP. FISHBEIN (90TH):  Okay, good, good.  I guess
the portion that you're here on, I think, is Section
1.  And I think the problem that you have presently,

perhaps, is it requires that the conviction was
vacated or dismissed on the grounds of innocence.

ADAM CARMON:  Yes.

REP. FISHBEIN (90TH):  Is that the problem?  Because
you being let out, the Brady violation says there
was misconduct in the court process.

ADAM CARMON:  The files were claimed and not pending
as the case was going on.

REP. FISHBEIN (90TH):  Okay.  What does that mean?
The files were--

ADAM CARMON:  He can better tell you.

DOUGLAS LIEB:  Yeah.

SENATOR WINFIELD (10TH):  Yeah.  I'm going to assume
you're his attorney, right?

DOUGLAS LIEB:  That's a correct assumption.

SENATOR WINFIELD (10TH):  Identify yourself for the
purposes of answering whatever questions,
Representative Fishbein.

DOUGLAS LIEB:  Of course.  Attorney Douglas Lieb,
I'm one of the attorneys that Mr. Carmon referred to
in his Statement a few moments ago represented him
in his habeas proceedings and I now represent him in
pending civil matters.  And so, Representative, the
issue that Mr. Carmon was referring to is actually
when the bill takes effect.

As written, it says that should this bill be passed,
the bill applies to claims filed on or after this
date.  As written, it would not apply to claims that
have that are pending with the Claims Commissioner,
but have not yet been heard.  Or at least that's the
way I and my colleagues and many of the others who

are here to speak on this issue today understand
that language.

And so, were this bill to only apply to claims filed
on or after the date of its passage, it wouldn't
help folks like Mr. Carmon who have already been
exonerated and have pending claims before the
Commissioner that have not been heard.  And so
that's the issue that as a technical point, Mr.
Carmen was speaking to when he spoke.

REP. FISHBEIN (90TH):  Yeah.  No, I appreciate that.
That was part of my concern.  What I don't want to
see happen is that everyone-- So a portion of this
has to do with, it says, provided such person's
claim was presented to the Claims Commissioner
prior-- Well, that's a different portion.

What I don't want to see happen just for the system
is that everyone who gets incarcerated puts in a
claim.  Right?  So then the claim is the wrongful
incarceration is not determined until years after
the claim is perhaps disposed of.  And that opens up
floodgates.  Right?  Okay.  So I understand why
you're here trying to work through this language,
but okay.  Thank you, Adam.  Thank you, and good
luck to you.

ADAM CARMON:  All right.  Thank you.

SENATOR WINFIELD (10TH):  Thank you, Representative.
Comment or question from other Members of the
committee?  Comment or question from other Members
of the committee?  Seeing none.  Thank you very much
for joining us this morning.  David Keenan.

DAVID KEENAN:  Thank you, Senator Winfield and
Members of the committee.  My name is David Keenan.
I am a Wrongful Convictions Lawyer who has helped
exonerate all Connecticut men who collectively have
served nearly 100 years.  Mr. Carmon is one of them.
Mr. Horn, Vernon Horn, who will speak after me is
another, and Marquis Jackson's also here.

43                                              March 18, 2024
vs/pg                   JUDICIARY COMMITTEE      10:00 A.M.

And just to briefly respond to Representative
Fishbein.  An important thing to note about Adam's
case is there was another individual that actually
confessed.  And the Prosecutor withheld 50 items of
exculpatory evidence.  It wasn't just a single piece
of evidence, 50 pieces of exculpatory evidence, many
of which corroborated that alternative suspect's
confession.

And I was able to find that evidence through a very
exhaustive investigation over four years.  I
actually live in Queens with my wife and kids, but I
went to Law School in Connecticut.  I worked as an
Assistant Federal Defender there.  And I've happened
to base the majority of my practice there now
representing exonerees in Connecticut.

What I'm here to testify about is Senate Bill 439.
And to in support of that bill, but to propose a
very modest change, which is to just make clear that
it applies not only to future claimants, but also
pending claimants.  In terms of your concerns about
it expanding the State's liability, it actually
provides for an offset against future damages in
subsection G of the bill, I think.  But also the
change we're proposing would have a very modest
effect.

I checked with the Claims Commissioner whose work on
these cases, I appreciate it, and his dedication to
getting them decided quickly.  And there's only 22
pending 102uu claims.  But that really overstates
matters because it includes claims from Ralph Birch
and Shawn Henning, who, as you know, their claims
have settled and will be dismissed shortly.

It also concerns, frankly, claims that I think the
Commissioner agrees have been misclassified.  So
we're really only talking about a handful of people
with substantial periods of incarceration.  I think
there's eight individuals that I can think of who

44                                      March 18, 2024
vs/pg                JUDICIARY COMMITTEE        10:00 A.M.


have substantial periods of incarceration that we're
asking that this would apply to.

Mr. Horn was my first innocent client.  I just want
to give you briefly, if I can, very, some insight
into why it's so important to provide that this bill
applies to current exonerees with pending claims.
Vernon Horn was my first innocent client.  He
actually wrote to the Federal Judge that was
overseeing his case, indicating he was on a hunger
strike.  This is when he was incarcerated.

And he wanted to know whether his daughter, who had
been born in this brief two year period where he had
been released on bond, whether she would learn if he
died, that he was in fact innocent, would his case
continued so she would know that he was in fact
innocent.

And when I first went to visit him, he was very
gaunt in a wheelchair, and his commitment to his
innocence was really overwhelming.  I never
represented an innocent person before, and it was an
overwhelming obligation to me.

SENATOR WINFIELD (10TH):  Attorney Keenan.

DAVID KEENAN:  Yes.  Thank you.

SENATOR WINFIELD (10TH):  Yes.  Thank you.  Your
time has elapsed.  Representative Fishbein.

REP. FISHBEIN (90TH):  Thank you, Attorney Keenan.
Do you have the bill in front of you?

DAVID KEENAN:  I do.  I can pull it up.  It's one of
my window panes here.

REP. FISHBEIN (90TH):  And while you're doing that--

DAVID KEENAN:  Got it.

45                                          March 18, 2024
vs/pg                    JUDICIARY COMMITTEE        10:00 A.M.


REP. FISHBEIN (90TH):  Okay.  Can you just point me
to the lines of this bill that are problematic for
you and your clients?

DAVID KEENAN:  It's just one.  It's Line 3, and you
see it says, applicable to claims filed on or after
the effective date.  We would just propose changing
the word filed to pending, and that way it would
encompass the claims that are currently pending, as
well as all future claims.

REP. FISHBEIN (90TH):  Okay.  I thank you for that.
Thank you, Mr. Chairman.

SENATOR WINFIELD (10TH):  Thank you, Representative.
Comments or question from Members of the committee?
Comment or question from Members of the committee?
Seeing none.  Attorney Keenan, thank you very much
for joining us today.

DAVID KEENAN:  Thank you.

SENATOR WINFIELD (10TH):  Vernon Horn.  Good
morning, Mr. Horn.  Press the red button.  There you
go.  Good to see you.

VERNON HORN:  Good morning, Chairman and committee.
My name is Vernon Horn.  Thank you for having me.  I
was incarcerated for a crime I didn't commit.  I got
incarcerated when I was 17 years of age.  I spent 18
years, and then I was exonerated through FBI
analysts proving that there's no way I could have
committed this crime.  I would've had to be
Superman.

Since I've been home, I have not gotten any help.  I
have not been compensated in any kind of way.  I'm
here to support bill 439.  I think it's essential.
I think it's vital that you guys pay attention to
this.  Like I said, I've been home five years, and I
haven't gotten any help.  No mental health
treatment, no job help, anything.

And I'm a transparent person.  I know I'm not
supposed to say this, but I'm going to say it.  I
took advances, which is highway robbery just to
survive.  Like I said, I went in when I was 17, I
don't have no skills.  I came out, no one helped me,
and I think the system owed me.

I know you folks are very busy, and you don't get to
know what's really going on.  So, like I said, I
thank you guys for this.  I appreciate you for
having me.  But I think it's very sensual, and I'm
going to reiterate what my attorney said, David
Keenan, that you guys should have this for pending
cases, as well as future claims.

And I can't go to the Claims Commission because if I
do, I forfeit my rights for 1983.  So I'm caught
between a rock and a hard place.  And I'm sure you
guys read Terence Ward report, who represented me,
not the Innocence Project, the Federal Defender's
Office, and David Keenan.  And I just ask you guys
with faith to please take this serious because it's
real.  I'm still suffering today.  So thank you.
And that's it.

SENATOR WINFIELD (10TH):  Thank you.  Comment or
question from Members of the committee?  Comment or
question?  Senator Kissel.

SENATOR KISSEL (7TH):  Thank you very much, Chairman
Winfield.  Thank you for coming and testifying.  I'm
just a little confused.  I think you said you took
advances.  What did you mean by that?

VERNON HORN:  I took loans.  So as my Attorney,
David Keenan, say, I was one of the first ones who
he got exonerated.  When I came home, I had no help.
I didn't have no support system.  Like I told you, I
went in when I was 17, no Innocence Project, no one
came to help me.  I was just thrown in the street
and go make it.

So what I had to do was myself, I had to figure out how I was going to make it.  I found a company that give loans.  Lawyers are familiar with it, they know about it, and I took advances to survive.  If not, my daughter wouldn't be able to eat, nor will I.

SENATOR KISSEL (7TH):  But like what kind of company?  Like a lot of times, like people will give you money in anticipation of you having a job and you getting paid.

VERNON HORN:  Right?

SENATOR KISSEL (7TH):  Is there a collateral?  Are they banking on the fact that you're going to get a successful judgement?

VERNON HORN:  Right.  I don't mean to interject, to be transparent.  Yes.  That's what they are.  Yes.

SENATOR KISSEL (7TH):  They are what?

VERNON HORN:  They're banking on you to get compensated for you being incarcerated.

SENATOR KISSEL (7TH):  Okay, thank you.

VERNON HORN:  You are welcome.

SENATOR KISSEL (7TH):  Thank you, Mr. Chair.

SENATOR WINFIELD (10TH):  Thank you.  Vernon.

VERNON HORN:  Yes.

SENATOR WINFIELD (10TH):  Just a little bit on that, because you and I have had plenty of conversation.

VERNON HORN:  Yes.

SENATOR WINFIELD (10TH):  Can you talk a little bit about what that meant?

VERNON HORN:  And thank you for conversating with
me.  I appreciate you.

SENATOR WINFIELD (10TH):  Absolutely.  But can you
talk a little bit about what that looks like?  What
the repayment is?  What kind of money you get
advanced?  And what the impact for some folks who
maybe never spent much time in the adult world not
knowing what having that kind of money could do to
them.  I think that would be useful as well.

VERNON HORN:  Well, first and foremost, anyone that
was a kid or who have been in prison for decades
don't know about funds.  So there's no way you can
learn how to manage them.  That's number one.  If
someone tell you that, they're a liar.  So number
two, it's 30% interest rate.  So it is highway
robbery.  However, I have no choice what else I'm
going to do.  The State ain't giving me a job, the
State ain't training me.

There's no disrespect to lawyers, but their job is
to get you compensated, not to be directly in your
life.  Some of them may do it for some people, some
they don't.  So that's the most I can say about
that.  I'm not going to tell you the amount I owe
because I've been advised not to even touch this
subject, but I'm very transparent, and I'm
passionate about this, and I'm emotionally--

SENATOR WINFIELD (10TH):  And I get that.  Would you
be willing-- I just think it's a-- I know the number
on these things--

VERNON HORN:  Yes, yes, you do.

SENATOR WINFIELD (10TH):  --from probably half the
people who've been loaning the money because I'm
talking to them.  But would you say that the money
that you get loan is well in excess of the money you
would need to live, even though you may not have
known that at the time?

VERNON HORN:  100%.  You're correct.  Yes.

SENATOR WINFIELD (10TH):  Yeah.  And so with that
interest rate, it really has impact on your life.

VERNON HORN:  Absolutely.

SENATOR WINFIELD (10TH):  Yeah.  Comment or question
from other Members of the committee?  Representative
Porter, followed by Representative Quinn.

REP. PORTER (94TH):  Thank you, Mr. Chair.  And good
to see you, Vernon.

VERNON HORN:  Good to see you, too--

REP. PORTER (94TH):  It's been a long time.

VERNON HORN:  --Robyn.  Rep. Robyn.  Sorry.

REP. PORTER (94TH):  Very shocked--

VERNON HORN:  Sorry.

REP. PORTER (94TH):  --to see you today.

VERNON HORN:  Good to see you as well.

REP. PORTER (94TH):  But I'm very happy to see you--

VERNON HORN:  Likewise.

REP. PORTER (94TH):  --and to know that you're doing
as well as you can be.

VERNON HORN:  Thank you.

REP. PORTER (94TH):  Just a little bit more
information around you were incarcerated at the age
of 17.  How much time did you serve before being
released?

50                                          March 18, 2024
vs/pg                JUDICIARY COMMITTEE        10:00 A.M.


VERNON HORN:  I served 16 years, and then I was
released on a claim of ineffective.  Then they put
me back in jail because of technicality.

REP. PORTER (94TH):  Stop right there.  Can you
please tell us what a claim of ineffectiveness is?

VERNON HORN:  Ineffective is when your attorney
don't represent you adequately.

REP. PORTER (94TH):  Okay.  And then you were re-
jailed, sent back to prison?

VERNON HORN:  Correct.

REP. PORTER (94TH):  Okay.

VERNON HORN:  And then I was exonerated when the
Federal Defender's Office got involved, and the FBI
got involved as well.  And that's when they found
out, they did an investigation, and they said there
was no way I could have committed this crime.  And
they released me.

I went to federal court first in front of Judge
Meyers, the Honorable Judge Meyers, and then I went
into Superior Court, and then I was released.

REP. PORTER (94TH):  Okay.  And you were released
when?

VERNON HORN:  2018.

REP. PORTER (94TH):  What date?

VERNON HORN:  I don't know the exact date.  Sorry.

REP. PORTER (94TH):  Okay.  End of year?  Middle of
the year?

VERNON HORN:  I believe it was-- Do you know the
exact date?  I'm sorry, I apologize.

51                                           March 18, 2024
vs/pg                   JUDICIARY COMMITTEE        10:00 A.M.


REP. PORTER (94TH):  No, no need to apologize.  I
just want to document this, and I would like for it
to be on the record as well.

VERNON HORN:  April 22nd.

REP. PORTER (94TH):  April 22nd, 2018 was your
release date?

VERNON HORN:  Correct.

REP. PORTER (94TH):  Okay.  And I think that you've
explained why this is important that you are
considered because of your pending case.  Is that
correct?

VERNON HORN:  That's correct.

REP. PORTER (94TH):  All right.  Thank you so much,
and good to see you again.

VERNON HORN:  Thank you.  Good to see you, too.
Thank you.

REP. PORTER (94TH):  Thank you, Mr. Chair.

SENATOR WINFIELD (10TH):  Thank you, Representative
Porter.  Representative Quinn.

REP. QUINN (82ND):  Thank you, Mr. Chairman.  And
echoing the sentiments of my colleagues, I'm very
sorry that this has happened to you.  A question
that might be more appropriate for your attorney,
from the point where someone is deemed to have not
committed the crime and is released based on that,
you obviously are then filing a claim with the
Claims Commissioner.  What's the average amount of
time between when a claim is filed and when a
decision is made and money is awarded?

DOUGLAS LIEB:  So, thank you for your question,
Representative.  If I may answer that question.  In
practice, people who have been in Mr. Horn's

situation under the currently pending version of
Section 54-102uu, don't file a claim with the Claims
Commissioner right away, because under the current
version of the statute, which the proposed bill
correctly changes, in order to recover from the
Claims Commissioner under the current version of the
statute, one would need to release all of one's
remaining civil claims, including potential civil
rights claims against the municipality or the police
officers responsible for one's wrongful conviction,
which in Mr. Horn's case is a pending civil action
against the City of New Haven, and certain retired
New Haven detectives, and one State Firearms
Examiner.

And so, as a practical matter, the answer to your
question is that the Claims Commissioner operates as
something as a failsafe because one can't obtain
that compensation without giving up what is
potentially a more valuable source of compensation,
and also one that comes with a form of
accountability, which is a finding that someone
violated one's civil rights.

And so in practice, folks in Mr. Horn's position
file with the Claims Commissioner under the statute
toward the end of, or just before the end of the
applicable limitation period, which is two years.
And then really neither side has any particular
interest in that claim moving forward, while the
civil rights claim works its way through the federal
courts, which in Mr. Horn's case has taken an
unconscionably long time for reasons that are beyond
his or our control, and sort of not directly
relevant to the committee here today, other than to
say it's taken a very long time.

And so it's really not a question of time from
filing to decision, Representative.  It's really
just that people delay filing because it's not
advisable to rush through that process before the
civil rights claim has had an opportunity to be
heard.  And so it's really a file and sit kind of

53                                          March 18, 2024
vs/pg                JUDICIARY COMMITTEE        10:00 A.M.


situation.  Does that answer the question?  Even
though it doesn't answer the question.

REP. QUINN (82ND):  Yeah, no, it does, it does.  And
I have familiarity with the types of loan that I
think you probably have gotten.  I see it in the
context of personal injury cases and workers'
compensation cases.  And so I assume that it
functions the same way that the company makes a
determination on a potential future value of your
claim and then loaned you a portion of that.

Are these loans set up the same way where it's
escalating interest, meaning if you're able to pay
it back within six months, it's X percent, and then
it just keeps snowballing from there?

DOUGLAS LIEB:  They are non-recourse advances
against future proceeds of litigation.  And the
interest, or I guess not technically interest, but
it's steps on a schedule, and then it's capped at a
certain amount.

REP. QUINN (82ND):  In your practice, have you dealt
with repaying those loans?

DOUGLAS LIEB:  Yes, I have.

REP. QUINN (82ND):  Okay.  I've seen it on the
workers' comp and the personal injury side where,
because so much of it is interest that there's some
willingness to negotiate on the part of the loan
people, but not sure if that applies in this type of
case either.

DOUGLAS LIEB:  Yeah.  I mean, speaking generalities
for reasons of client confidentiality, there are
times when it's an all-party's interest in a
settlement process.  A settlement is a settlement
for everyone involved, including the plaintiff and
the defendants, and anyone else who may have a
financial interest in the case.

And sometimes there's a reason to compromise.  And
so in general, that happens, but not necessarily in
a way that makes a huge difference to the overall
calculus as you may be aware of.

REP. QUINN (82ND):  And this may be difficult to
quantify, but perhaps thinking down the road with
the changes to this particular statute, it may make
sense for the State to come up with some sort of a
way to advance the person something and deduct it
off of any future award rather than the current
system of you've got to wait and you may get a
larger payday somewhere down the road, but that
obviously doesn't get you a place to live, or feed
you, or get your car to get to work, and that sort
of thing.  All right.  Thank you.

SENATOR WINFIELD (10TH):  Thank you, Representative.
Comment or question from other Members of the
committee?  Comment or question?  Representative
Fishbein.

REP. FISHBEIN (90TH):  Thank you, Mr. Chairman.
Thank you, Vernon, for coming here today and sharing
portions of your story with us.  Just when did you
put in a claim?

VERNON HORN:  I put in a 1983 in 2018.

REP. FISHBEIN (90TH):  Okay.  So you brought a Civil
Action 1983.  It's a constitutional violation.  So
you brought that, but you have not put a claim in
with the Claims Commissioner?

VERNON HORN:  I have.  I was actually persistent in
doing that, but like my lawyers, I guess they was
protecting me.  Yeah, protecting me because the law
say if I do go forward, I got to forfeit my rights.

REP. FISHBEIN (90TH):  Yeah, we're going to talk
about that.

VERNON HORN:  Yeah.  I do have a claim.  Yes.

REP. FISHBEIN (90TH):  When did you put in that
claim with the claims Commissioner?

VERNON HORN:  Would you be able to answer that?

DOUGLAS LIEB:  Yes.  That would've been
approximately the spring of 2020.  So it would've
been toward the end of the two-year statute of
limitations that would've arisen-- I don't know the
exact date, but--

REP. FISHBEIN (90TH):  Okay.  So about three and a
half, four years ago?

DOUGLAS LIEB:  And consistent, if I may, with my
remarks in response to Representative Quinn's
question, that claim has been not moved forward, not
necessarily through any fault of the Commissioner,
but because were it to be moved forward to its final
conclusion under the current statute, Mr. Horn would
have a very, very, very hard decision to make as to
whether to accept that award and waive any other
right to compensation.  And so it's been pending
essentially by agreement of the parties.

REP. FISHBEIN (90TH):  Yeah.  And that's where I
wanted to get there, because I think the problem is,
is that-- and we saw this in the Henning case,
right?  There's claims against the Municipality, New
Milford.  And in Mr. Horn's case, there may be
claims against the Municipality, but the statute, as
it presently exists, requires him to sign off on and
release those potential claims.

And I don't know, as a State Representative, that I
am comfortable saying the State is on the hook for
bad acts by a town.  So I would be more inclined to
you release the claims against the State, right?  So
I heard like the State Firearms Examiner, right?  He
would come under the State liability, but if a
Municipal police officer did something wrong,
there's no subrogation here.  There's no way for the

State to then get compensated by the town for bad
act by the town.

So I'm just throwing it out there, would it be
acceptable if we sort of carved that up and said,
you released the claims, but they're only against
the State?  And that way you could have collateral
actions.  I guess it's a question for the lawyer.

VERNON HORN:  I'm just going to add on to that.  If
you asking me personally, I would not do that.  Just
being, I mean, I don't think it's fair.  And maybe
he could speak more because he went to school to be
a lawyer, but it was a few entities that did me
wrong, it wasn't just one entity.

So I don't think one should be able to say, well,
hey, Mr. Horn can get a limit of $3 million when he
spent 18 years in prison, and when I can go and put
in a 1953 and a jury could award me $50 million if
they wanted to.  So it's like, to me, it doesn't add
up.  But maybe he could explain to you --

REP. FISHBEIN (90TH):  Well, one of the scenario
that I'm suggesting, it would potentially result in
more money for you.  So I'm looking to expand your
ability to get compensated, but I sit here as a
State Representative, and I think the lawyer
understand-- So I'm not looking to cap you or
anything like that, okay?

VERNON HORN:  Okay.

REP. FISHBEIN (90TH):  So if I could just hear from
your lawyer--

VERNON HORN:  Sure.

REP. FISHBEIN (90TH):  --in his position.

DOUGLAS LIEB:  If I may, Representative, and for the
record, by the way, again, I'm Douglas Lieb.  I am
one of Mr. Horn's attorneys.  I think the answer is

on the one hand, that would be a significant
improvement over the status quo.  On the other hand,
as I think the Commissioner recognized in the award
in the Scott Lewis matter, which was under not the
current statute, but the old version of the statute,
which contained no, as we call it, election of
remedies language at all.

This statute exists to address distinct harms and
distinct conditions from Section 1983 or other
claims against people who have committed torts,
right?  So, you can go to court and sue people for
tortious acts, but part of what this statute
recognizes, first of all, is that you don't have to
prove that someone did you wrong, right?

There's an ability to be compensated regardless of
whether you prove anyone was at fault.  But second
of all, this statute is really the one and only
vehicle where to the extent prosecutorial misconduct
played a role in causing someone's wrongful
conviction as opposed to police misconduct or other
investigative misconduct by investigating officials,
Prosecutors are basically immune from suit in nearly
every circumstance.

And so one thing that the statute does that tort
claims don't do is that it offers a path to
compensation for people who have been wronged by the
otherwise unactionable misconduct or wrongdoing of a
Prosecutor's Office or the State's Attorney's
Office, right?  And so to answer your question, that
suggestion is better than what's in the statute now.
And obviously, I understand the interest that you're
referencing that sort of motivated as an idea.

On the other hand, I think there's an argument to be
made that, as in many States, New York, for example,
they're just two separate processes, right?  One is
if you didn't do it and you can show that you didn't
do it, or that your conviction was caused by some
form of State misconduct, you can be compensated.

And the other is a federal statute that provides
remedies for the victims of civil rights violations.
And it's heard by generally in Federal Court, and
there are two pathways, and one can, in many
jurisdictions, pursue both.

REP. FISHBEIN (90TH):  Well, I guess that's part of
the problem.  I think the calculation was put into
place to try and prevent that burden of the
incarcerated proving bad act, right?  It's just, you
are wrongfully incarcerated, here's the calculation,
here's a check, because we already, I think, we've
heard, and you generally hear apprehension,
criticism of lawyers in general.

So I want people like Vernon to be able to flourish
outside of bars, right?  And if you have to or you
choose to go--

VERNON HORN:  Thank you for that.

REP. FISHBEIN (90TH):  Oh, no problem at all.  I'll
share with you, I've got two relatives, one got
sentenced to 24 years because of vehicular homicide
where they--

VERNON HORN:  Sorry to hear that.

REP. FISHBEIN (90TH):  --rear-ended a car, and he
got 24 years over that.  And I got another relative
who did 10.  And so it isn't like I sit up here
without-- Anyway.  In the scenario that one chooses
to go to court, these federal court cases take a
long time, right?  We're talking three, four years.
You go to the second circuit, another year or so.

And then I've got the wrongfully incarcerated
individual who's trying to survive, and they got no
money.  So they're being forced to survive, whether
that be getting that 30% loan, or unfortunately,
maybe engaging in bad acts.  So that's the lawsuit
path, right?  The other path is, here's the
calculation, you were in jail, here's a check, I'm

sorry.  And I'm leaning towards this path, quite
frankly.  But anyway, I appreciate the exchange.
And thank you, Mr. Chairman.

VERNON HORN:  Thank you.

SENATOR WINFIELD (10TH):  Thank you, Representative.
Comment or question from other Members of the
committee?  Comment or question?  Seeing none.  Mr.
Horn, thank you for joining us today.

VERNON HORN:  Thank you, Senator Winfield.

DOUGLAS LIEB:  Thank you for allowing me to be
heard.

SENATOR WINFIELD (10TH):  Absolutely.  Christine
Sladyk.  Christine Sladyk.  Okay.  Timothy Costello.
Timothy Costello.

TIMOTHY COSTELLO:  Here.  Can you hear me?

SENATOR WINFIELD (10TH):  Yes, we can.

TIMOTHY COSTELLO:  Good morning, Senator Winfield,
Representative Stafstrom, Senator Flexer,
Representative Quinn, and Ranking Members, Kissel
and Representative Fishbein.  I'm testifying today
on behalf of the Division of Criminal Justice, in
support of House Bill 5500.

I'm a Supervisory Assistant State's Attorney in the
Appellate Bureau with the Office of the Chief
State's Attorney.  And I'm testifying in particular
in support of Section 5 of the bill.  The bill
itself will resolve a jurisdictional and venue issue
that may arise in the future based upon an omission
in certain older statutes regarding where the
location of a crime committed by electronic means is
committed.

More recent statutes, for example, Public Act 23-
123, have specified that a crime committed by

SENATOR WINFIELD (10TH):  Kenneth Sladyk.  Kenneth
Sladyk.  Marquis Jackson.

MARQUIS JACKSON:  Good morning.  My name is--

SENATOR WINFIELD (10TH):  Pull the mic a little
closer.  There you go.

SB 439

MARQUIS JACKSON:  How are you doing?  My name is
Marquis Jackson, and I'm an exoneree.  I'm 19 years
old.  I was incarcerated with Vernon Horn, that's my
co-defendant, and I spent 19 years in prison for a
crime I didn't commit.  I've been going through the
reintegration into society.  And it hasn't been
easy.

And it definitely wasn't easy due to the fact that I
was let out back to the community, just vomited back
out to the community with no assistance from the
State of Connecticut.  And that's an issue that I
feel that we have to acknowledge.  That's why I came
here today.

I couldn't sleep knowing that I had to be here.  And
I wanted to put a face on this because it seems like
there's always something.  I filed several
different-- while incarcerated, I appealed, it was
denied, I did a habeas, denied, I did a
certification, denied.  And everything that I said
from the day one has come true, records was
discovered, and I was exonerated a little bit after
Mr. Horn.

And after that, nothing, you're just here, you're
out here, swim or sink.  So I'm here today in
support of Senate Bill, I believe, 439, other than a
word or two, that I feel that if a word is replaced
as concerning filed and pending, I believe the bill
will really help other exonerees that are coming
home and don't have to go through the same thing I
had to go through.

My attorneys and I filed our claim, I believe, for
five years ago.  And the reason why we couldn't get
to an understanding or get so many compensation is
because of Subsection G, where it states that we
have to give up our rights for future lawsuits, and
wasn't really comfortable doing that.

So, as I'm here, it's been lingering off.  In fact,
it's almost six years.  It was July of 2018 is when
we filed it.  So I'm still here.  And now that I'm
seeing in this proposed bill that they would like to
say filed on or after, I believe that's kind of the
same.  If you filed it on the day or the day after,
it's kind of the same.

So what happens to us?  What happens to the pending
cases?  What happens to the cases that's been on the
docket that's been trying to get some justice, which
I haven't received from anyone anywhere?  I haven't
received anything from the State of Connecticut.
But once again, I'm here to just state that I'm
asking this committee to just change one word in the
bill, and I believe that'd be sufficient.

SENATOR WINFIELD (10TH):  Thank you.  Thank you, Mr.
Jackson.  Comment or question from Members of the
committee?  Representative Fishbein.

REP. FISHBEIN (90TH):  Thank you, Mr. Jackson, for
coming here today.

MARQUIS JACKSON:  Thank you.

REP. FISHBEIN (90TH):  You told us a little bit
about your story.

MARQUIS JACKSON:  Yes.

REP. FISHBEIN (90TH):  Part of what I wanted to ask
you about is, when you got out, what was your
housing situation like?

MARQUIS JACKSON:  When I first got out, I moved in with my ailing mother, who I might have drove her-- I believe my wrongful incarceration was part of her decline in health.  Her only son sentenced to 45 years in prison for a crime he didn't commit.

And my mother was my backbone.  She was the one who encouraged me to keep going, just believe a little bit longer that you will be exonerated, you will come home.  Unfortunately, she passed away after 18 months after I was released.

So we was just reconnecting with each other, just getting to know each other, because when I left, I was 19, when I come home, it was five days before my 39th birthday.  I went in 19, I got out 38, and with three days, four days into my birthday, which was, I believe, I got out on May 2nd of 2018.

REP. FISHBEIN (90TH):  So in your particular case about 18 months after you're out, mom passes?

MARQUIS JACKSON:  Yes.

REP. FISHBEIN (90TH):  Did she own the house?  Were you renting?

MARQUIS JACKSON:  No, she was renting.

REP. FISHBEIN (90TH):  Okay.  So what did you do?

MARQUIS JACKSON:  I stayed in the back room, and then I moved in with my younger sister.

REP. FISHBEIN (90TH):  Okay.  Because a portion of this bill actually, and nobody's highlighted this yet, gives some sort of prioritization for a Housing Choice Voucher program.

MARQUIS JACKSON:  I've seen that.

REP. FISHBEIN (90TH):  Yeah.

MARQUIS JACKSON:  And I could have used that.  I
could have absolutely used that, but at the time, my
claim was pending.  So was I able to use those
resources, even though my claim is pending?  Has it
been proven that I was innocent or incarcerated
falsely?  So I was in limbo, which leads us back to
cash loans.

I'm also a person that received cash loans because
Connecticut didn't give me anything.  So Predatorial
lenders came and they, Hey, I can give you
something, what a 30% interest rate?  Of course.
And I took loans to survive, but those loans really
did help me.  I purchased a home that I lived in.
I'm a homeowner, I'm a business owner, I'm engaged.
I'm just trying to move on with my life.

REP. FISHBEIN (90TH):  Good for you.

MARQUIS JACKSON:  It seems like every time, there's
always something when it comes to compensating.  One
word here before was Subsection G, we had to give up
something.  Now it's filed on or effect.  It's
something.  So I'm here to speak on that.  I don't
want to be here, I didn't want to come back into
this type of, I just want to go on with my life and
live, but I still have to keep coming up to reasons
on why I should be compensated.

REP. FISHBEIN (90TH):  Well, I appreciate you being
here, because putting a face on--

MARQUIS JACKSON:  Yes.

REP. FISHBEIN (90TH):  --these cases is very
important.  And that's why I just want to discuss
the language before us.  It says, in addition to
compensation paid under Subsection D.

MARQUIS JACKSON:  Okay.

REP. FISHBEIN (90TH):  And that has to do with the
claims process that you get this prioritization for

2214

housing.  But if we're hearing these claims aren't
being processed for about four years, by that time,
I don't know.  I mean, prioritization of housing is
sort of like out the window, right?

MARQUIS JACKSON:  Yeah.

REP. FISHBEIN (90TH):  It's four years later.  So,
do you think if we maybe move that somewhere else so
you got it quicker, it would be helpful?

MARQUIS JACKSON:  It would've been helpful.  It'd
really help me out.  And then it would stop me from
going for loans.  Just give exoneree something,
don't just vomit them back out to the community that
they just came from.  I was around the corner from
the same area that I was convicted of robbing the
store.  I'm around the corner.

REP. FISHBEIN (90TH):  So when you got out, did you
know you were getting out that day?

MARQUIS JACKSON:  Sort of.  Sort of my attorney came
and told me that because Vernon Horn was released
maybe a couple weeks before.  But Vernon Horn was
released two years previously, and I'm still in
prison waiting for the Connecticut Supreme Court to
confirm that his habeas is successful win.

But the Connecticut Supreme Court didn't agree with
the Habeas Court and re-incarcerated Mr. Horn,
which, once again, my issue was also denied.  I
still sit back and think that if Mr. Horn didn't do
the hunger strike, I'll still be in prison because
no one cared.

REP. FISHBEIN (90TH):  So, we're talking about
reintegration, right?

MARQUIS JACKSON:  Yes.

REP. FISHBEIN (90TH):  And I'm just trying to get a
picture.  So a lot of times, when you're let out,

67                                            March 18, 2024
vs/pg              JUDICIARY COMMITTEE        10:00 A.M.


it's really early in the morning.  And did you know,
like when you went to bed the night before that you
were going to get out the next day?

MARQUIS JACKSON:  I know I had a court, I had to go
to court the next day.  At 4: 00 in the morning, I
had to go to court from prison--

REP. FISHBEIN (90TH):  Yeah.

MARQUIS JACKSON:  --with my jail uniform and
everything.

REP. FISHBEIN (90TH):  So did you know when you were
going to court?

MARQUIS JACKSON:  I don't know nothing in the
system.  When it happens, that's when it happens.

REP. FISHBEIN (90TH):  So in your particular
situation, you left prison early in the morning, and
then you went to court, and then you walked out of
the court?

MARQUIS JACKSON:  Walked out of the courthouse.

REP. FISHBEIN (90TH):  A free man.

MARQUIS JACKSON:  A free man.  Yes.

REP. FISHBEIN (90TH):  Okay.  Well, thank you.
Thank you.  Thank you for being here once again.

MARQUIS JACKSON:  Thank you.  Thank you.

SENATOR WINFIELD (10TH):  Comment or question from
Members of the committee?  Representative Porter.

REP. PORTER (94TH):  Thank you, Mr. Chair.  And
thank you for being here today.  And like the ones
that came before you, I do apologize for this
atrocity.

2216
Case 3:20-cv-01790-VAB    Document 318-4    Filed 04/15/25    Page 51 of 135
68                                          March 18, 2024
vs/pg              JUDICIARY COMMITTEE        10:00 A.M.

MARQUIS JACKSON:  Thank you.

REP. PORTER (94TH):  This is definitely a case or
cases where the system failed miserably.  And just
for those, myself, Members on the committee, people
watching help us understand this process because you
were released.

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  We're talking claims, we're
talking suits, we're talking about this bill and how
it can positively impact you or negatively impact
you.

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  Can you just kind of unpack for
us, you came home, right?

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  You're looking for
compensation.  What steps do you take?  How does
this hinder you?  When we talk about changing file
to pending, right?

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  Just kind of break it down a
little bit because I don't know if everybody is
following the process that occurs when someone who
has been wrongfully convicted and in prison for
decades comes home.  What are the options to
compensation?  What does that look like?  And what
do you have to do to get there, to start to make
something happen for you?  So just kind of walk us
through that, please.

MARQUIS JACKSON:  After being released to a world
that looked totally different, everything looked
different from when I went in as a 19-year-old,
coming home as technically a 39-year-old.  I spent

20 years more-- In fact, I've been in prison more
than I've been free.  So, it just looked different,

I definitely didn't want to move back in with my
mother or my sister because I just was in a cell
with a guy, with people for 20 years.  Can I be
alone at least once?  But that never happened.  As
far as the process, the process is you come home and
then you get an attorney, then an attorney files
with the Claim Commissioner, file the case, and then
it waits there.

The reason, in that situation, why I wasn't-- I
don't know if the case lingered on, but there was a
Subsection G, which say, to get something, you have
to give up something.  And with the advice of my
attorneys, that wasn't feasible for us to do that.
Give up our 1983 claim to get something from the
Claims Commissioner.  So now I'm in limbo.  This is
where we in limbo again, you get nothing.

REP. PORTER (94TH):  So you filed with the Claims
Commissioner?

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  Right?

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  Then there was discussion
around this Subsection G.

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  And you decided it wasn't worth
forfeiting your 1983 claim--

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  --right, the wrongful
conviction claim--

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  --in order to receive something
from the State of Connecticut through the Claims
Commissioner.

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  So, does that cancel out your
Claims Commissioner claim?

MARQUIS JACKSON:  Well, this is where it lingered
because there was going to be legal wrangling,
because technically, I'm under the 1999.  Right?
Because for that whole time, the injustice was
consistently going.  Now, if they create a new law
under 2016, they changed the law on that.

That shouldn't affect me, right, because my
injustice is still going from 1999.  Now, they're
changing it again.  Once again, it's affected me
again because they got filed on or after.  Now, how
about the pending cases?  Nothing?

REP. PORTER (94TH):  Okay.

MARQUIS JACKSON:  So I'm like, okay, it's always
something.

REP. PORTER (94TH):  So have you filed a claim in
court as well?

MARQUIS JACKSON:  1983?

REP. PORTER (94TH):  Yes.

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  You have?

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  Okay.  And when did you file
the claim with the Claims Commissioner's Office?

MARQUIS JACKSON:  The Claims Commissioner Office?

REP. PORTER (94TH):  What's that?

MARQUIS JACKSON:  July, 24th, 2018, I believe.

REP. PORTER (94TH):  Okay.  July, 2018.  All right.
I was just trying to get some clarity around the
sacrifices that you're being asked to make versus
what you have options to do.

MARQUIS JACKSON:  Yeah.

REP. PORTER (94TH):  And it doesn't seem, like you
said, in between a rock and a hard places, my
grandmother would say.

MARQUIS JACKSON:  But there was a savior, the loans.
Now, that floats you, but when at the end of the
day, whatever you possibly get from the State, you
have to turn it over because it's a 30% interest.
So it's like, if I would've got help, I would've
received all of the money that I needed to create my
life.  But instead, I was put out, gave nothing, and
put in limbo to wait.

I heard one of the members from the panel say, what
about if you would be able to borrow against what
you would get from the Claims Commissioner?  Well,
that would've been an excellent proposition.

REP. PORTER (94TH):  Option.

MARQUIS JACKSON:  Absolutely.  Why wouldn't I?

REP. PORTER (94TH):  Right.

MARQUIS JACKSON:  And keep it in house.  Let's take
it outside now, and it's basically, if you borrow,

let's say, $300,000, by the time those cases come
around, you might owe $700,000.

REP. PORTER (94TH):  Right.  With the interest, the
30% interest.

MARQUIS JACKSON:  With the interest.

REP. PORTER (94TH):  Okay.

MARQUIS JACKSON:  And they're predatory.  They're
looking for that.  They're coming and calling and--

REP. PORTER (94TH):  Absolutely.

MARQUIS JACKSON:  Yeah.  And you want some more
money.

REP. PORTER (94TH):  We do need to provide another
option.  I really think that that is scandalous,
that that is allowed to happen.

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  But it's business, right?

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  All right.  And somebody's
making a profit off of your injustice.  And I think
that's really scandalous.

MARQUIS JACKSON:  Yes.

REP. PORTER (94TH):  Thank you for breaking it down.

MARQUIS JACKSON:  Thanks.

REP. PORTER (94TH):  I appreciate your time, and I
hope and pray that we get this right.  Right?

MARQUIS JACKSON:  Thank you.

REP. PORTER (94TH):  I don't want it to just be
better than what you had, but I want it to be what's
right.

MARQUIS JACKSON:  Yeah.

REP. PORTER (94TH):  Right?  We want it to be right,
and we want it to be just.  So I will do my due
diligence as I play my part in that role.

MARQUIS JACKSON:  Yeah, we've been through enough.

REP. PORTER (94TH):  Amen.  I agree.  Thank you so
much.

MARQUIS JACKSON:  Thank you.

REP. PORTER (94TH):  Thank you, Mr. Chair.

SENATOR WINFIELD (10TH):  Thank you, Rep. Porter.
Comment or question from other Members of the
committee?  Comment or question?  Seeing none, Mr.
Jackson, thank you very much for joining us today.

MARQUIS JACKSON:  Thank you.

SENATOR WINFIELD (10TH):  Rick Silver.  You need--
Yeah.

RICHARD SILVER:  Oh, thank you.  I'm Richard Silver.
I was on the committee.  I'm a past President of the
Connecticut Trial Lawyers.  I've been on the
Chairman or Co-Chairman of the Medical Malpractice
committee for about 25 years.  And I'm here to
support the bill 5411.

Let me give you just a slight background.  We had
eight sessions that were two hours, and all parties
were present, and they were two hours.  And this was
over five months.  We had a total of eight sessions.
We could not come to an agreement.  So that Chairman
Quinn and Chairman Conley and Representative O'Dea

MARISA BELLAIR:  Thank you all.

SENATOR WINFIELD (10TH):  Deborah Del Prete
Sullivan.

DEBORAH DEL PRETE SULLIVAN:  Good afternoon.  And
with the Co-Chairs permission, Renee Cimino is here
with me today.

SENATOR WINFIELD (10TH):  She's next, so that's
fine.

DEBORAH DEL PRETE SULLIVAN:  Thank you.  Good
afternoon, Senator Winfield, Representative Quinn,
Senator Kissel, and Representative Fishbein, and
other Members of the committee.  My name is Deborah
Del Prete Sullivan.  I'm Legal Counsel to the Chief
Public Defender's Office here on its behalf.

And I just wanted to make sure that you all know
that we have testimony we submitted on bill 360,
also 429, 5486, and 439.  We're here mostly though
on 5500, which is a Joint bill between the DCJ,
Division of Criminal Justice and our office.

There are a couple of sections that were put in
there from the Sentencing Commission, and we'd like
to concentrate today on Section 8, which we do
oppose in regard to competency to stand trial.  We
have written testimony, but we do have concerns in
the way that it's drafted because Subsection D of
the 5456d statute is specifically about examinations
prior to even thinking about what the least
restrictive setting might be for treatment.

So I've brought along Renee Cimino, who is a former
GA Attorney, down in New Haven, as well as the
Interim Supervisor down there in New Haven.  And now
she's our Director of Child Protection and Juvenile
Delinquency here at the Chief Public Defender's
Office, in case there are questions about our
testimony.

101                                    March 18, 2024
vs/pg               JUDICIARY COMMITTEE        10:00 A.M.


REP. STAFSTROM (129TH):  Further questions or
comments?

REP. PORTER (94TH):  Thank you, Mr. Chair.

REP. STAFSTROM (129TH):  Further questions or
comments?  Seeing none.  Thank you for both, for
being with us.

RENEE CIMINO:  Thank you.

DEBORAH DEL PRETE SULLIVAN:  Thank you.

REP. STAFSTROM (129TH):  Paul Casteleiro.

PAUL CASTELEIRO:  Good afternoon.  My name is Paul
Casteleiro.  I'm the Legal Director of Centurion
Ministries, which is commonly known as Centurion.
And I thank you for giving me the opportunity to
appear before you today.  I'm here to support bill
439, and to request you make it applicable to
pending claims.

Centurion was formed in 1983, and is the first
Innocence Organization in the United States.  In
2000, the year 2000, we began representing Richard
Lapointe.  Richard suffered from Dandy Walker
Syndrome and was cognitively impaired.  Richard was
convicted in a capital murder trial of killing his
wife's 88-year-old grandmother.

He was arrested on July the 5th, 1989, after the
police coerced him into falsely confessing to the
murder by threatening to take away his 6-year-old
son, Sean, and arrest his wife, who was also
disabled.  Part of his confession was if you said I
did it, I guess I did, but I don't remember doing
it.

It took until April, 2015 to free Richard, when the
Connecticut Supreme Court vacated his conviction
based upon the State's suppression of exculpatory
evidence, Brady material, which was referred to

before, which had it been disclosed, proved it was
impossible for him to have committed the offense.

The claim that the State suppressed evidence proving
Richard's innocence was first made when we began
representing him 15 years earlier.  But it took that
amount of time, we went up and down the court system
three times for the claim to be finally ruled on.

In March, 2016, we filed the claim with the Claims
Commissioner for his 26 years of imprisonment, and
it has been eight years that we have been waiting
for a hearing.  In the meantime, in August, 2020,
Richard died, leaving his son, Sean, as his sole
heir.  When he died, we substituted in his estate as
the claimant.

His estate consists only of the claim for his 26
years of lawful imprisonment.  The State did not
object to the substitution of the estate as the
claimant.  Three years later in 2023, the State, for
the first time, began saying that his claim died
with him, and that his son from whom he was taken in
1989 will get nothing.

The State, in essence, is saying, we can do horrible
things to you, try to put you to death in a capital
murder trial, suppress evidence proving your
innocence, and if you die before the claim is heard,
your State and heirs are out of luck.  You can't get
any more cynical than that.

We don't think that is the law of the State of
Connecticut, but bill 439 in its current form can be
interpreted as creating, for the first time, a right
survivorship on a wrongful imprisonment claim that
previously did not exist.  I urge you to make the
bill applicable to any and all claims that were
pending at the time of the passage to eliminate any
possibility for the State to argue Mr. Lapointe's
claim for 26 years--

REP. STAFSTROM (129TH):  Thank you, sir.

103                                        March 18, 2024
vs/pg                  JUDICIARY COMMITTEE        10:00 A.M.


PAUL CASTELEIRO:  --of incarceration, despite his
innocence died with him.

REP. STAFSTROM (129TH):  Thank you.  Thank you.

PAUL CASTELEIRO:  Thank you.

REP. STAFSTROM (129TH):  Senator Kissel.

SENATOR KISSEL (7TH):  Thank you very much, Chairman
Stafstrom.  Just one quick question.  So the State
did not object in what I would consider a timely
fashion when the estate was substituted in, and you
said that it was three years when the State actually
did argue that.  Is that being fought over in the
Claims Commission?  Or did you respond to that?

PAUL CASTELEIRO:  Well, the claims in an email,
they've raised this claim for the first time.  They
haven't filed a formal motion to that effect, but
they've raised it now as an issue that this claim is
extinguished because Richard died, and that his
State has no right to make the claim.

Our claim also is one of the claims that's pending
to be sent back because it's been so long and it
hasn't been decided.  It's been well over two years.
It's one of the 200 or so--

SENATOR KISSEL (7TH):  Right.

PAUL CASTELEIRO:  --that Commissioner Shea
referenced earlier.

SENATOR KISSEL (7TH):  Okay.  Well, thank you.
Thank you, Chairman.

REP. STAFSTROM (129TH):  Further questions or
comments?  Seeing none.  Thanks for being with us.

PAUL CASTELEIRO:  Thank you.

REP. STAFSTROM (129TH):  Timothy Fisher.

TIMOTHY FISHER:  Good afternoon.  My name is Timothy
Fisher.  I am Dean Emeritus at the UConn Law School.
The following comments are my own opinions.  I'm
here in support of bill 439 on compensation to
wrongfully convicted individuals.  I share in the
comments made by all others who have spoken to you
already, so I won't repeat those.

But I'd like to address a couple of points that have
been brought up in colloquy with some of you.  And
first, Representative Fishbein, you elicited
dramatic point from both Mr. Horn and Mr. Jackson of
the triple dilemma of a newly released person at
really the maximum point of their vulnerability
after years in prison of choosing between a
ridiculous loan, being destitute, or releasing their
rights.

And this bill really does address that problem in an
excellent way.  You also pointed out its effective
subsidy in the previous and current legislation to a
wrongful party who gets a free release of this at
the cost of the State taxpayers.  You question
whether that should apply when a State actor is the
target of a private claim.

And I would say that while that's true, that that
subsidy is not present in that situation of a State
defendant, the same triple dilemma still applies in
that case.  And so really, there should not be a
requirement of a release and return for State
compensation.  The other point is related to that,
and that has to do with interim relief, which I
think you asked about, Representative Quin.

This bill does something important, which is a 90-
day deadline from hearing for a decision on
eligibility.  Past experience, and this goes back to
2009 when Kenneth Ireland and Miguel Roman were
released, the Commissioner said that, at that time,
he could not give interim relief without a decision

on eligibility, which was a basically the liability
case, which could be lengthy.

In that regard, I'll mention the Connecticut
Innocence Fund, which was informed at that time for
that reason, which is a joint venture of the
Connecticut Bar Foundation and the Community's
Partners in Action, which makes interest-free non-
recourse loans to exonerees to be repaid out of
their comp awards or private actions. That's the
good news.

The bad news is it's only got $100,000 in assets,
and all that is basically loaned out right now.
They've made loans to 12 different men, over
$200,000 has been loaned, 100% repayment history.
So it's worked really well, but that is not State
money, and so it's not constrained by the statute.

It's a committee that makes decisions on their own
as to the likelihood of compensation. And so if the
State put $500,000 into that, that could solve a lot
of problems. But that's another matter.

REP. STAFSTROM (129TH): Questions or comments?
Rep. Fishbein.

REP. FISHBEIN (90TH): Thank you, sir, for--

TIMOTHY FISHER: Sure.

REP. FISHBEIN (90TH): --being here today. I think
that the calculation that is in place that's
referenced in this language in Lines 59 through 71
was, and thank you for bringing a copy, providing
that there's compensation for each year of
wrongfully being incarcerated. I think the public
policy that was created at that time was to not
delay. You would agree with me there?

TIMOTHY FISHER: Certainly.

So, I guess a portion of this that I have a problem
with is this expands greatly, even though that
calculation was done, a check was written, and then
we have all these other things that are added into
this on top of that, many of which would not be
present at the time of the claim.

For instance, vocational training, that's post-
incarceration.  The way this system is supposed to
work is, I was wrongfully incarcerated, here's the
calculation, you get a check within six months at
the most, right?  The vocational training
transportation mental, physical, dental care, all of
that, I thought when we passed this calculation, was
part of that compensation.  So did you want to speak
to that, or?  Because this is a significant
expansion of the calculation.

TIMOTHY FISHER:  Well, I'll just make two points on
that, which may not go to the heart of your concern.
One is that there's a blend here of fairness to the
individual for what happened to them, which none of
us would ever want to bear, coupled with it's really
in the State's interest to help get this person back
on their feet.

And so that targeted money for this, money for that,
that's what we all want to have happen because we
want to restore somebody as a productive member of
the society.  A related thought, and this is not
part of the current bill, there was a mention
earlier of workers' comp liens.

You could do something different, which is to make
the compensation award like a workers' comp lien, so
that if then there's a 1983 or a tort claim, instead
of the exonerate getting a set-off, they don't
recover the portion they already got from the Claims
Commissioner.  Instead, they do recover that, but
then they reimburse the Claims Commissioner's fund
as it would a workers' comp lien net, of course, of
the attorney's fees.

It's a wash to the exoneree.  What it does is it
restores the compensation, the fund that the Claims
Commissioner draws upon.  And so in that case, it
would resolve the concerns you have on this issue.

REP. FISHBEIN (90TH):  But then at the end of the
day, also, if one risks, we'll say, the process of
the court system, and they cannot prove their case
for whatever reason, the State is having to defend,
expend all these resources.  I thought that was the
intent of having the calculation.

I'm having a little difficulty dealing with what's
totally before us.  And I have to say, in Lines 89
through 92, having to do with child support, I
believe it's already law in this State that if
somebody gets incarcerated, they don't have to pay
child support.  So I don't know who put that in
here.

But I've been involved in cases that people get
incarcerated, and there's a presumption that the
person cannot pay their child support because
they're incarcerated, and therefore, it's not held
against those individuals.

I am in favor and we really haven't touched on it
with the other people that have been here today, but
if somebody had a claim that is not processed and
then they pass away, I think that should be
legitimate to the estate.  The problem, though, in
Line 116, it doesn't require that that claim be
pending at the time of such person's death.

TIMOTHY FISHER:  Correct.

REP. FISHBEIN (90TH):  And my concern there is, as I
said before, that everybody will just put in a claim
and then-- I mean, most people don't intend they're
going to die.  Right?  But it just happens to
happen.  And I think that that would meet the intent
of what we're talking about.

You had a pending claim, for whatever reason, it
didn't get disposed of that the estate should be
able to get that.  But once again, I think it has to
be based upon the calculation.  So I think this is a
work in progress at this point.  But thank you for
coming here today.

TIMOTHY FISHER:  Certainly.  Thank you.

REP. STAFSTROM (129TH):  Further questions or
comments?  If not, thanks for coming.

TIMOTHY FISHER:  Thank you.

REP. STAFSTROM (129TH):  Steve Kennedy.

STEVE KENNEDY:  Thank you.  Thanks for having me.
I'll try and keep this brief because I know we've
talked about this a little bit already.  But I am
Steve Kennedy.  I'm the Organizing and Network
Director of the People's Parity Project.  We have
been doing some work around trying to increase the
professional diversity of Connecticut's State
courts.

So one of the issues that we've run into, we found
that our courts, like courts kind of across the
country have basically an overrepresentation of
Corporate Lawyers, of Prosecutors,
underrepresentation of people who lawyers who've
worked for people.  So, your Public Defenders, your
Legal Aid Attorneys, Plaintiff's Attorneys, folks
like that.

And one of the things we've really run into that's
been difficult is trying to get a sense of who's
actually applying for these positions.  So we are
here in support of HB 5380, which does a few things.
I want to speak specifically just to the
modifications to Section 51-44a, Subsections F and
M.

SENATOR KISSEL (7TH):  Well, again, it strikes me as
this is a bit complicated, so I'm going to look to
Vice Chair, Quinn, for his wisdom.  But I think
you're right, we'll have to have one policy.  But
thank you again for your willingness to serve.

MICHAEL D'AMICO:  Thank you.

REP. STAFSTROM (129TH):  Further questions?
Representative Quinn.

REP. QUINN (82ND):  Thank you, Mr. Chair.  And Mike,
I just wanted to take the opportunity to thank you
for your service on the committee.  Your insight was
invaluable in helping us get to a proposal.  It's a
work in progress, I think, that both sides have some
excellent points, and I'm sure we're ultimately
going to come out of this with something that will
work for everyone.  But again, thank you very much
for your time and effort on the committee.

MICHAEL D'AMICO:  And thank you for your work.  And
it's always difficult to come up with a compromise,
but it was a good compromise, and we support it.

REP. STAFSTROM (129TH):  Thanks, Mike.  Amanda
Wallwin.

AMANDA WALLWIN:  Thank you to the Chair, and the
Members of the committee for raising bill SB 439,
and holding today's hearing.  And I'd also like to
thank the exonerees who are able to testify today,
Mr. Horn, Mr. Carmon, Mr. Jackson, and coming up
should be Mr. Morant.

My name is Amanda Wallwin, and I'm a State Policy
Advocate with the Innocence Project.  The Innocence
Project is a national organization that represents
wrongfully convicted clients across the country.  We
also work to enact State-level policy reforms that
prevent and reveal wrongful convictions, and

126                                    March 18, 2024
vs/pg              JUDICIARY COMMITTEE      10:00 A.M.


compensate people who have been wrongfully
convicted.

The Innocence Project supports SB 439, which
improves Connecticut's statute to compensate
wrongfully convicted people in several important
ways.  The bill has five major provisions, and I've
detailed our support for these provisions in my
written testimony, but today I'll focus on two of
them.

Firstly, the bill restores the grounds consistent
with innocence language.  Many innocent people have
strong constitutional claims for exoneration.  They
may have had exculpatory evidence hidden from them,
or been subject to misconduct by law enforcement or
forensic analysts.

Often a court is more willing to exonerate someone
on a constitutional claim if that is an option,
rather than on the basis of actual innocence.  Those
people should not be excluded from compensation
simply because they were exonerated based on their
constitutional claim.

In effect, without this language, people who have
been subject to intentional violations of their
constitutional rights in the course of their
wrongful conviction are less likely to be
compensated than those whose wrongful convictions
were the result of incompetence or error.

Alabama, Minnesota, and Missouri, all include this
provision in their compensation statutes.  Secondly,
the bill lifts the civil litigation bar.
Compensation through the Claims Commission process
is intended to allow exonerees to become whole and
to be able to rebuild their lives as quickly as
possible after their wrongful conviction and
incarceration.

However, the civil litigation process permits
exonerees to receive damages from bad actors who

contributed to their wrongful conviction.  Federal
civil rights lawsuits can hold those actors
accountable and incentivize agencies to make changes
to prevent future wrongful convictions.

A civil offset provision allows the State to recover
money if an exonerate wins an award or settlement
from the entities that are actually responsible for
the wrongful conviction.  The offset provision is a
more fiscally responsible option than barring civil
lawsuits altogether.

Alabama, California, Colorado, Washington DC, Idaho,
Illinois, Iowa, Kansas, Louisiana, Maine, Maryland,
Massachusetts, Michigan, Minnesota, Nevada, New
Hampshire, New Jersey, New York, North Carolina,
Ohio, Oklahoma, Oregon, Tennessee, West Virginia,
and Wisconsin, all permit exonerees to file civil
lawsuits in addition to collecting State
compensation.  Thank you for taking the time to
consider this legislation and for the opportunity to
testify today.

REP. STAFSTROM (129TH):  Questions or comments?
Seeing none.  Thanks for being with us.

AMANDA WALLWIN:  Thank you.

REP. STAFSTROM (129TH):  Adrienne Morrell.

ADRIENNE MORRELL:  Hi, good afternoon, Members of
the committee.  My name is Adrienne Morrell, and I'm
the Vice President of Government Affairs at MRO.
And I'm here to testify in opposition to HB 5411, AN
ACT CONCERNING REQUESTS FOR HEALTH RECORDS AND THE
FEES CHARGED FOR ACCESS TO SUCH RECORDS.

MRO, by way of background, is a provider of release
of information, ROI, and we provide solutions to
hospitals, health systems, physician practices, and
other healthcare providers in Connecticut and other
States across the country to provide secure,

Services, AHIOS, who is testifying later this
afternoon.  But it is our hope to continue working
with you and your colleagues on workable solutions
to ensure medical records are fulfilled and safe in
a cost-effective manner.  Thank you for the
opportunity to testify.

REP. STAFSTROM (129TH):  Thank you.  Questions or
comments from the committee?  If not, thanks for
zooming in.  Terra Volpe.  Kathy Flaherty.  Kathy
Flaherty.  Kenneth Rosenthal.

KENNETH ROSENTHAL:  Yes.  Hello, Members of the
committee, and thank you.  I'm going to be very
brief.  I'm an attorney who has-- but I'm speaking
on Senate Bill 439.  I have been involved with
claims that have been brought by exonerees under the
original statute, under the current statute.

And I currently represent two of the four people
you've heard from, or we'll hear from today about
the one change that I, at least, am seeking to 439.
And that's to change one word on Line 3 of the bill
so that there's handful of currently pending claims,
the six to eight claimants who are involved, four of
whom you're hearing from today, will be included in
the benefits that this new bill provides as soon as
that happens if it applies to pending claims.

To answer Representative Porter's question earlier,
the gentleman you've heard from today, including my
client, Mr. Jackson, and my client, Mr. Morant, you
will shortly hear from, would be able to have a
hearing before the Commissioner to obtain
compensation if he finds that they are entitled to
it, to obtain the benefits of Subsection E with
respect to support services, and under the 90 day
provision, get that money soon so they don't have to
continue taking loans out from the companies that
they have had to deal with.

So it would answer all of the other problems.  The
other sections accomplish what we think should be

accomplished in terms of not requiring him to have
the Hobson's choice they presently have.  And I
would encourage you to make that one change to the
bill on Line 3 from filing to replacing the word
"filing" with the word "pending." And I think you
would have gone a long way toward addressing some of
the concerns that you've heard today.  Thank you
very much.

REP. STAFSTROM (129TH):  Thank you.  Further
questions or comments on this topic?  Seeing none.
Thanks for being with us.  Jim Cousins.  Okay,
Rebecca Hernandez.  Oh, Jim Cousins.  I'm sorry.
Jim Cousins is there.

JIM COUSINS:  Good afternoon.  My name's Jim
Cousins.  I'm a Connecticut Attorney, employed by
Centurion, which you heard earlier is an
organization dedicated to freeing the wrongly
incarcerated.  I respectfully refer the committee to
the points I made in my written testimony, which I
submitted to the committee on Friday.

We support the Senate Bill 439 with one suggested
modification, and that is that be applied to
presently pending claims.  I believe the points I
intended to highlight by my testimony today have
been fully addressed by previous witnesses,
including my colleague, Paul Casteleiro.  So unless
there are any questions, I have nothing further to
add.  Thank you.

REP. STAFSTROM (129TH):  We appreciate that.  Seeing
no questions, appreciate sticking with us.  Rebecca
Hernandez.

REBECCA HERNANDEZ:  Good afternoon.  Can everyone
hear me?

REP. STAFSTROM (129TH):  Yeah.  Go ahead, Ma'am.

SB 360      REBECCA HERNANDEZ:  Okay, great.  Good afternoon.
My name is Rebecca Hernandez, and I'm a Court

REP. STAFSTROM (129TH):  Further questions or
comments from the committee?  If not, Louis, thanks
again for taking the time today.  I appreciate it.

LOUIS ROMAN:  Thank you for giving me the
opportunity.

REP. STAFSTROM (129TH):  Jim Williams will be next.

JAMES WILLIAMS:  Good afternoon, committee.

REP. STAFSTROM (129TH):  Go ahead, sir.

JAMES WILLIAMS:  Yes.  How are you doing?  Good
afternoon, committee.  Thank you for your blessing
for allowing me to testify today.  My name is James
Williams.  I'm a proud member of the Republican Town
committee of West Haven, Connecticut.

I'm here to support Senate Bill 439, An Act
Concerning Compensation for Individuals Wrongfully
Convicted and Imprisoned.  In Connecticut, when the
judicial system gets it wrong and imprisons an
innocent man or woman, it's their constitutional
right to be made whole and to be in a position even
better than they were before in the form of
compensation and other services because of the
mental, emotional, and financial stress that
individuals go through while being incarcerated,
especially if they know they're innocent.

Because we got residents in the State of Connecticut
who likes to weaponize law enforcement for their own
personal gain or other devious reasons, and have had
people arrested under false and fabricated
statements, as I have witnessed, because the most
arrests these days, are made by emotions and not
facts, you have residents who will use false
allegations as a way to show power over another
person's life.

Then what leads to an individual, especially in the
poor community, getting arrested, getting a Public
Defender who don't work hard for them, and a
Prosecutor who manipulates the system and, in some
cases, hide evidence just to get a conviction?

What leaves an individual of being coerced to plead
guilty or being found guilty of a crime they didn't
commit?  I would ask the Legislation Body to pass
this bill to help and compensate those who have had
their life and liberty stolen from them for no fault
of their own, and pass more laws that will require
hard facts and evidence before arrest and
conviction.  Thank you so much.  I'm willing to
answer any questions.

REP. STAFSTROM (129TH):  Questions from the
committee?  Seeing none, thanks for being with us.

JAMES WILLIAMS:  Thank you.

REP. STAFSTROM (129TH):  Stefon Morant will be next.
Stefon Morant.  Okay.  One more time, Stefon Morant.
If not, Elizabeth McElhiney.  Lisa Freeman.  Lisa
Freeman.  All right, that concludes our list then.
Thank you all for being here.  That concludes our
public hearing for today.  We'll see you all again
on Wednesday.  Have a good day, everybody.



ATTORNEY GENERAL WILLIAM TONG
STATE OF CONNECTICUT

**Testimony Regarding:**

**Senate Bill No. 428,** *An Act Concerning Business Registrations Filed with the Secretary of the State.*
**Senate Bill No. 439,** *An Act Concerning Compensation for Persons Who Are Wrongfully Incarcerated*; and
**House Bill No. 5487,** *An Act Concerning the Operation and Administration of the*
*Office of the Claims Commissioner*

**Judiciary Committee**
**Monday, March 18, 2024**

Thank you for the opportunity to comment on the above-referenced bills.

**Senate Bill No. 428,** *An Act Concerning Business Registrations Filed with the Secretary of the State*

S.B 428 provides the Secretary of the State with new tools designed to address business filing fraud, for example, when someone registers a business using the address or business name of an unsuspecting third party, commits some fraud, and the resulting legal notices or demands related to the alleged fraud are sent to the third party. Sections 50, 52, 53 and 54 would permit the SOTS to make referrals of business fraud to the Office of the Attorney General for investigation and prosecution of violations under the Connecticut Unfair Trade Practices Act (CUTPA) before the Department of Consumer Protection. The AG does not typically appear before State agencies in administrative proceedings but instead, defends agencies' administrative decisions if they are appealed and brings enforcement actions in Superior Court. We look forward to working with the Committee and the proponents to better understand the new enforcement responsibilities contemplated by this bill.

**Senate Bill No. 439,** *An Act Concerning Compensation for Persons Who Are Wrongfully Incarcerated*

S.B. 439 would make a variety of changes to Conn. Gen. Stat. Sec. 54-102uu, the statute governing compensation for wrongful incarceration, aimed at creating a system of awarding compensation to certain claimants who served time in prison, but later had their convictions vacated or reversed or received a pardon based on their innocence. As the Committee is aware, the Office of the Attorney General represents the State of Connecticut in wrongful incarceration and other matters brought before the Claims Commissioner. The bill would expand eligibility for compensation to include convictions vacated or reversed on grounds consistent with innocence; shorten the timeframe within which the Claims Commissioner must decide wrongful incarceration claims; make changes to the formula for determining compensation; increase compensation awards to include time claimants were required to participate in state services aimed at facilitating reintegration; and permit an award of compensation to the estate of a claimant who died after filing a claim. Notably, S.B. 439 would replace the statutory requirement that claimants release any future claims arising out of the wrongful conviction and incarceration with a provision that would permit the claimant to seek future damages, for example from a municipality, which would be offset by the damages awarded by the claim's commissioner.

165 Capitol Avenue
Hartford, Connecticut 06106
*An Affirmative Action/Equal Opportunity Employer*



ATTORNEY GENERAL WILLIAM TONG
STATE OF CONNECTICUT

We look forward to working with the proponents as this proposal makes its way through the legislative process.

**House Bill No. 5487,** *An Act Concerning the Operation and Administration of the Office of the Claims Commissioner*

H.B. 5487 makes several changes to the statute governing the Office of the Claims Commissioner (OCC). Representing state agencies in claims brought at the OCC and, when the Claims Commissioner grants permission to sue—at the Superior Court, goes to the core of our mission at the Office of the Attorney General. The Office is currently defending hundreds of claims against the state pending at the OCC, including claims brought by parties alleging injuries at state facilities or while receiving services from state agencies. They reflect the wide, varied and unique activities and programs in which the state is involved: administering technical high schools and colleges; running prisons and corrections facilities; providing care and assistance to persons with mental illness, substance abuse disorders, and intellectual or developmental disabilities; maintaining recreational parks and swimming areas; owning buildings and land; protecting abused or neglected children; and employing workers to provide numerous other government services.

For almost a year, Claims Commissioner Robert Shea has worked diligently to move business through the Office of the Claims Commissioner. Our Office supports Commissioner Shea's efforts to make the claims process more efficient and streamline and standardize workflow. Commissioner Shea takes his mandate from this Committee very seriously and he has made significant progress.

In that vein, we support Commissioner Shea's request for substitute language aimed at improving the OCC's ability to render fair and efficient decisions and give claimants and the state closure. Delays in bringing cases to resolution are detrimental both to claimants seeking damages or closure, and the state's efforts to defend claims as witnesses retire, leave state service or are otherwise hard to locate.

We also support the language in Section 2 making the role of Claims Commissioner full time. We would respectfully request that the legislature also fund additional staff to support the Commissioner's efforts to review and decide claims expeditiously.

Section 4 of the bill references "the claimant's representative," but the OCC statutes do not explicitly authorize claimants to name non-attorney designees to represent them before the OCC, as required by Connecticut Practice Book Sec. 22A(b). Under the practice book provision, the statute or agency rule must expressly permit lay representation. If the Committee would like to permit claimants to designate non-attorneys to represent them at the OCC it should specify this in the OCC statute.

Finally, we would respectfully request that the Committee clarify its intent in section 8 (c). The existing language in this provision permits claimants seeking permission to sue the state, who have been waiting longer than 18 months, to file notice with the Governor and the Judiciary Committee. The provision then requires the Claims Commissioner to issue a decision on such claim not later than ninety days after the filing of such notice or, if the Claims Commissioner does not act within



Connecticut Criminal Defense Lawyers Association
P.O. Box 1766
Waterbury, Connecticut 06721
CCDLA.org

**Testimony of Connecticut Criminal Defense Lawyers Association**
**Molly H. Arabolos, President**

**Judiciary Committee – March 18, 2024**

**<u>Raised Bill No. 439</u>**
**An Act Concerning Compensation for Persons who are wrongfully Incarcerated.**

The Connecticut Criminal Defense Lawyers Association <u>supports</u> ***<u>Raised Bill No. 439</u>, An Act Concerning Compensation for Persons who are Wrongfully Incarcerated***.  Since 1986, 36 people have been found to be wrongfully incarcerated. Their lives and the lives of their loved ones have been permanently and negatively impacted. We support the changes to this bill. We also support the Office of the Chief Public Defender's position that this bill should be retroactively applied.

**W. James Cousins**
**Attorney at Law**
**54 Danbury Road, Suite 413**
**Ridgefield, CT 06877**
TEL (203) 205-0622
Cell (203) 417-9679
Email: jcousins@wjcousinslaw.com

**Admitted in Connecticut and New York**

March 15, 2024

Senator Gary A. Winfield, Co-Chair Representative
Steven J. Stafstrom, Co-Chair
Joint Committee on Judiciary
Connecticut General Assembly
Legislative Office Building, Room 2500
Hartford, CT 06106

**Re: Raised <u>Senate Bill No. 439</u>**

Dear Senator Winfield, Representative Stafstrom, and Members of the Committee:

Please consider this letter to be my written testimony with repect to <u>Raised Senate Bill No. 439</u>.

I.  Introduction and purpose of testimony.

I am a Connecticut attorney employed by Centurion Ministries, an innocence organization dedicated to freeing the wrongly incarcerated. I, along with my colleagues Paul Casteleiro and David Keenan, represent the estate of Richard Lapointe in a pending wrongful incarceration claim pursuant to Conn. Gen. Stat. § 54-102uu. Centurion represented Richard Lapointe in successfully vacating his wrongful conviction in Connecticut after he spent 26 years in prison. We subsequently brought a claim before the Claims Commissioner in 2016 seeking compensation for his years of wrongful incarceration. Unfortunately, four years after filing the claim Mr. Lapointe died in 2020. The claim is still pending but it is now 8 years since it was filed and four years since he died. The State is now arguing before the Claims Commissioner, for the first time three years after his death, that his death extinguished his claim and that his estate has no right to pursue the claim.

We write today to urge that the proposed amendments to Conn. Gen. Stat. § 54-102uu, and in particular subsection (h), which provides that a claim survives the death of the claimant, be applied to pending claims such as that of Mr. Lapointe's estate so that the State cannot  argue that the amendment creates a new right and that Lapointe's claim, as preexisting the amendment

W. James Cousins
Page 2 of 2

is, therefore extinguished. We urge that best means of accomplishing this is by specifying that the survival provision applies to pending claims.

## II. Background of the Lapointe case of wrongful incarceration

Paul Casteleiro and I began our representation of Mr. Lapointe nearly 25 years ago.  Mr. Casteleiro will provide more details in his oral testimony on Monday of the tortured odyssey that eventually resulted in Mr. Lapointe's exoneration. But suffice it to say that Mr. Lapointe was the victim of a profound miscarriage of justice. Mr. Lapointe, an intellectually disabled man, was falsely accused of sexually assaulting and murdering his wife's 88-year-old grandmother in 1987. He was wrongly convicted of that crime in 1989.

After many years of litigation and delay, in 2015 the Connecticut Supreme Court finally vacated Mr. Lapointe's conviction, finding that the State had suppressed material exculpatory evidence that would have allowed Mr. Lapointe a "complete and potentially compelling alibi." *Lapointe v. Comm'r of Corr.*, 316 Conn. 225, 349 (2015). In addition to his alibi, DNA testing conducted by the Connecticut state forensic laboratory after the Supreme Court vacated the conviction *eliminated Mr. Lapointe as the source of all DNA* extracted from the many items left at the crime scene, including DNA extracted from the gloves worn by the perpetrator, the ligatures he used to bind the victim, a male pubic hair found on the victim's bed, and a semen stain located on her bedspread.

On October 2, 2015, the Superior Court (Alexander, J.), without objection from the State, granted a complete dismissal of all claims against Mr. Lapointe.

Mr. Lapointe thereafter filed a claim in March 2016 with the Claims Commissioner which has been pending without a hearing for nearly eight years. Tragically, in August 2020, *more than four years after filing his claim*, Mr. Lapointe died after contracting COVID-19. Three years later, the State for the first time, claimed that Mr. Lapointe's death extinguished the claim.

## III. The existing law provides that the claim survives Mr. Lapointe's death.

The existing law provides that a claim for monetary damages, such as that made by Mr. Lapointe, survives his death, and inures to the benefit of his estate. There is authority directly on point:  Connecticut General Statutes § 52-599 provides in pertinent part: "A cause or right of action shall not be lost or destroyed by the death of any person but shall survive in favor of or against the executor or administrator of the deceased person." A more comprehensive discussion of the various further legal authorities that support this principle, please see Mr. Keenan's attached letter to the Claims Commissioner (Exhibit A), Accordingly, in our view proposed Senate Bill 439 merely codifies an existing right of survival. While we welcome such codification, if the General Assembly wishes to make the right of survival clear, it should likewise make clear that such a right encompasses pending claims like Mr. Lapointe's so as to avoid any further ambiguity.

The sole beneficiary of Mr. Lapointe's estate is his son, who for nearly three decades was deprived of his father's love, companionship, and physical presence. He should not be made to suffer further because the State unreasonably and negligently failed to hold a hearing or decide his father's claim in a timely manner.

2408

W. James Cousins
Page 2 of 2

IV. The proposed amendment should be made clear that it applies to pending claims.

The proposed language in Bill No.439 subsection (h) makes it clear that the legislature intends that a claim under Conn. Gen. Stat. §54-102uu survives the death of the claimant. As such it is simply codifying the existing law. One interpretation, however, could be that the legislature is amending the law to include subsection (h) because such a right of survival did not previously exist and it is needed to protect claimants going forward. Such an interpretation could then be used by the State to argue that Mr. Lapointe's claim is in fact extinguished by his death since his claim was filed prior to the enactment of the amendment.  We suggest that such a result would be grossly unfair and contrary to the overall intent of § 54-102uu's remedial purpose.

Accordingly, we respectfully urge you to make the amendments to Conn. Gen. Stat. § 54-102uu applicable to not only future wrongful incarceration claims, but also claims pending as of the date of its enactment.

Respectfully submitted,

Jim Cousins
Paul Casteleiro
David Keenan

EXHIBIT A

# Law Office of David Keenan

*Admitted in NY and CT

152 West 57th Street, 8th Floor, New York, NY 10019 | Tel. (347) 460-4857 | dkeenan@davidkeenanlaw.com

February 6, 2024

**BY EMAIL**

Claims Commissioner, Robert F. Shea, Jr.
Office of the Claims Commissioner
450 Columbus Boulevard – Suite 203
Hartford, CT 06103
(860) 713-5501
Robert.Shea@ct.gov

Re:    Estate of Richard Lapointe (Claim No. 24537)

Dear Commissioner Shea:

As you know, I recently appeared on behalf of the estate of Richard Lapointe in this matter. Last week I wrote to you and Assistant Attorney General Beizer to indicate that we would consent to an extension of the two-year statutory deadline so that you could hold a hearing and render a decision on this claim, which as of this coming March will have been pending for eight years. Unfortunately, AAG Beizer informed you today that his office will not consent to an extension, without providing any reasoning.

Given the significance of this claim and how long it has been pending, I believe it would be in everyone's interest to resolve it as soon as possible, whether through mediation or a hearing. However, since the State has not consented to an extension and the deadline for doing so is tomorrow, I want to ensure that the Senate Judiciary Committee has a complete understanding of the claim's history and the legal issues that are currently pending should you be required to transmit the claim. Accordingly, I am submitting this letter for inclusion in your file and ask that it be made available to Senator Winfield and the other members of the Committee as necessary. Part I provides a brief factual background, Part II explains why Mr. Lapointe is eligible under the statute's plain terms, and Part III explains why the State's jurisdictional challenge is legally meritless, misguided as a matter of policy, and contrary to the dictates of justice.

I look forward to working the Attorney General's Office to resolve this matter promptly or, alternatively, to promptly return this matter to you to allow for a hearing and decision on the merits.

**Background**

This is a claim for wrongful incarceration on behalf of the estate of Richard Lapointe

1

("Claimant") pursuant to Conn. Gen. Stat. § 54-102uu. As detailed at length in the Connecticut Supreme Court's decision overturning his conviction, Mr. Lapointe was the victim of a profound miscarriage of justice. Mr. Lapointe, an intellectually disabled man, was falsely accused at the age of 42 of sexually assaulting and murdering his wife's 88-year-old grandmother more than two years after the crime had occurred. "Until then, [Mr. Lapointe] was not a suspect: he had no criminal record or history of violence of any kind, and he seemed physically, mentally and temperamentally incapable of the brutal crime." *Lapointe v. Comm'r of Corr.*, 316 Conn. 225, 229-30 (2015). Only after a nine-hour station house interrogation that lasted until the early morning hours, *id.*, did Mr. Lapointe—who psychologists and psychiatrists described as "slow-witted; childlike; compliant; genial; guileless; talkative; and very concrete and inflexible in his reasoning," *id.* at 329—give "three written statements in which he purported to take responsibility for the victim's murder," *id.* at 230. Mr. Lapointe "repeatedly told the police, however, that he had no recollection of killing the victim and that he was confessing only because they wanted him to do so." *Id.* at 230.

In 2015, the Connecticut Supreme Court vacated Mr. Lapointe's conviction, finding that the State had suppressed material exculpatory evidence that would have allowed Mr. Lapointe a "complete and potentially compelling alibi." Such evidence, if credited by the jury, would have meant "not just a reasonable probability of a different result," but "a near certainty of one" in light of the State's exceedingly "weak" case. *Lapointe v. Comm'r of Corr.*, 316 Conn. 225, 349 (2015). A copy of the decision is attached hereto as Exhibit A.

In addition to his alibi, DNA testing *eliminated* Mr. Lapointe as the source of *all* DNA extracted from the many items left at the crime scene, including DNA extracted from the gloves worn by the perpetrator, the ligatures he used to bind the victim, a male pubic hair found on the victim's bed, and a semen stain located on her bedspread.

After more than 26 years of wrongful incarceration, the State's Attorney's Office sought to nolle the charges against Mr. Lapointe on October 2, 2015. Mr. Lapointe's attorneys thereafter moved for a complete dismissal on grounds of innocence, which the Superior Court (Alexander, J.) granted without objection. A copy of the dismissal transcript is attached as Exhibit B.

Mr. Lapointe thereafter filed this claim in March 2016, which has been pending without a hearing for nearly eight years. Tragically, in August 2020, *more than four years after filing his claim*, Mr. Lapointe died. Following his death, the probate court appointed George Ducharme to serve as the administrator to Mr. Lapointe's estate, the sole asset of which is his pending claim. Mr. Ducharme, who championed Mr. Lapointe's innocence for years and helped found an organization whose purpose was to free him, had served in a similar capacity as Mr. Lapointe's conservator following his release. On November 23, 2020, Mr. Lapointe's counsel notified the former Commissioner and AAG Beizer of his death and the requested substitution of his estate. AAG Beizer did not object at that time. Ex. C (Nov. 23, 2020 Email and attached Ltr.).

AAG Beizer initially filed a statement of position in this matter indicating it would leave Mr. Lapointe to his proof. *See* Ex. D, Respondent's Position (Aug. 24, 2016). It was not until February 2019, nearly three years after the claim was filed, that AAG Beizer first contested his eligibility by asserting that the information against him had not been dismissed on grounds of actual innocence or consistent with innocence. See Exhibit E. (Respondent's Feb. 6, 2019 Opposition to

Summary Judgment). The State likewise waited until June 2023, nearly three years after Mr. Lapointe's death, to assert for the first time that the Commissioner lacks jurisdiction because § 54-102uu does not provide for a right of survival.

As explained below, the challenges belatedly raised by AAG Beizer are legally meritless, misguided as a matter of policy, and contrary to the dictates of justice.

### Mr. Lapointe Is Eligible

Section 54-102uu as enacted in 2008 requires a claimant to satisfy six criteria to be eligible for compensation, *i.e.*, that he (1) was convicted of a crime, (2) is innocent of that crime, (3) was sentenced to prison, (4) served a part of that sentence, (5) had the conviction vacated, and (6) that the charges were dismissed "on the grounds of innocence or a ground consistent with innocence."

AAG Beizer has now belatedly taken the position that Mr. Lapointe is ineligible for relief because, he argues, his conviction was not vacated "on the grounds of innocence or a ground consistent with innocence." In so doing, the State has disregarded the statute's plain meaning, mischaracterized and overlooked applicable precedent, and irrationally relied on the subjective views of a former prosecutor who blatantly misrepresented material facts to the court and public prior to the court's dismissal of Mr. Lapointe's case.

### Mr. Lapointe's Conviction Was Vacated and the Charges Dismissed on Grounds of Innocence or Consistent With Innocence

### It is More Probable than Not that the Charges Were Dismissed on Grounds of Innocence or Consistent with Innocence

To establish his eligibility, Mr. Lapointe must show that it is more likely than not that the charges against him were dismissed on grounds of actual innocence or consistent with innocence. He can easily do so.

First, the Connecticut Supreme Court vacated Mr. Lapointe's conviction based on the State's suppression of material exculpatory evidence that would have given Mr. Lapointe a "complete alibi," *Lapointe*, 316 Conn. at 349– evidence that is not only "consistent with innocence"[1] but constitutes "*affirmative* evidence of innocence." *Gould v. Comm'r of Corr.*, 301 Conn. 544, 563 (2011) (emphasis added) (citing alibi evidence as that "which might tend to establish that the petitioner *could not* have committed the crime even though it is unknown who committed the crime . . . .").

---

[1] The Massachusetts Supreme Court has noted that "[p]ropositions are 'consistent with' each other if they are compatible and can coexist harmoniously," such that under the language of Massachusetts wrongful incarceration statute as originally passed, "it is possible to envision many potential claimants whose convictions are reversed because of procedural or evidentiary errors or structural deficiencies at their trials that could well be 'consistent' with innocence without any tendency to establish it." *Guzman v. Com.*, 458 Mass. 354, 358 (Mass. 2010). Here, by contrast, Mr. Lapointe easily satisfies the higher burden of demonstrating dismissal on grounds which "tend to establish" his actual innocence. *See id.* (finding that the Massachusetts' legislature's use of the term "grounds which tend to establish" actual innocence means "grounds resting on facts and circumstances probative of the proposition that the claimant did not commit the crime").

3

Second, the Connecticut Supreme Court's decision was indisputably the "but for" or proximate cause of both (a) the State's decision to nolle the charges and (b) the Court's subsequent dismissal. The State prosecutor himself acknowledged as much on remand. *See, e.g.*, Tr. 3 (noting the Supreme Court's decision is "binding and the state is now called upon to consider the remainder of the evidence as it exists today"); *id.* 6 (noting the Supreme Court's ruling "casts doubts and concerns upon . . . the reliability or trustworthiness" of Mr. Lapointe's statements and concluding that they "would have a diminished effect on the trier of fact").

Third, following remand but prior to the dismissal, the State's Attorney's Office sought DNA testing of the semen stain found on the victim's bed, presumably with the hope that such testing would inculpate Mr. Lapointe. In fact, the testing not only identified DNA that did not match Mr. Lapointe, it affirmatively excluded him. Mr. Lapointe had already been eliminated as the source of DNA found on several other crime scene items presumably belonging to or used by the perpetrator, including his gloves, the ligatures used to bind the victim, and a male pubic hair. *Gould*, 301 Conn. at 568 (DNA is "one form of irrefutable exculpatory evidence"). Even the State itself, while attempting to downplay the significance of the DNA evidence, begrudgingly acknowledged that "[t]he bottom line is that none of the additional analysis conducted by the state laboratory identified Richard Lapointe as a contributor."

Fourth, as noted, while the State's argument rests entirely on the prosecutor's comments in seeking to nolle the charges, the Court in fact *dismissed* the charges upon motion by Mr. Lapointe's attorneys, which the State did not object to. It is the State's objective act, not the subjective and erroneous statement of a prosecutor, that ought to govern this determination. *See, e.g.*, *Thompson v. Clark*, 212 S. Ct. 1332 (2022) (plaintiff need not show "affirmative indication of innocence" to satisfy "favorable termination" element of malicious prosecution claim."). Moreover, the transcript makes clear that the basis for the motion was Mr. Lapointe's innocence. Indeed, in seeking dismissal Attorney Casteleiro explained at length at the hearing, *see* Tr. 7-11, why the evidence "is overwhelming as to Mr. Lapointe's innocence," including the fact that "[a]ll the DNA evidence excludes him." Only after hearing from Mr. Casteleiro did the Court dismiss the charges, yet the State simply ignores Mr. Casteleiro's remarks as if they did not occur.

Based on the foregoing, how could any reasonable person plausibly argue that Mr. Lapointe's charges were not dismissed on grounds of innocence or at least "consistent with" innocence?

### The State's Reliance on the Prosecutor's Subjective Views at Mr. Lapointe's Dismissal Hearing is Misplaced

It would be unfortunate if the State continued to rely on the legally irrelevant subjective opinions of the former prosecutor who moved to nolle the charges, an individual's whose bias is clear and whose credibility is suspect at best. The former prosecutor made material false statements on the record at the dismissal hearing, copy of which on information and belief he provided to a newspaper reporter for public dissemination, both in violation of his ethical duties. Most gallingly, while moving to nolle the charges and acknowledging that there was insufficient evidence, he (1) stated his office believed that Mr. Lapointe was guilty notwithstanding the nolle motion, Tr. 2, and

(2) told the Court that "there never was, nor has been, any allegation that the police investigation [o]r the prosecution of the defendant involved misconduct on anyone's part," Tr. 2.

It is not appropriate for a prosecutor to publicly label someone a murderer without sufficient proof, much less one whose conviction was overturned based on the suppression of evidence that would have provided him with a "complete alibi" and who was eliminated as the source of all crime scene DNA. Moreover, the prosecutor well knew at the time of his statements that (a) *the reason Mr. Lapointe's conviction had been vacated was because the State suppressed material exculpatory evidence*, and (b) Mr. Lapointe had argued on direct appeal that his confessions were the product of coercion and therefore improperly admitted at his trial, a position two Connecticut Supreme Court justices had agreed with.

If the former prosecutor is called to testify at a hearing, counsel for Claimant will be placed in the awkward position of having to question as sitting Superior Court judge as to why he made materially misleading statements and saw fit to disseminate them to the public where, regardless of his personal opinions, Mr. Lapointe was entitled to the presumption of innocence.

**Claims Commissioner Precedents Support Mr. Lapointe's Eligibility**

The written decisions of both prior Claims Commissioners make clear that a claimant's eligibility is *not* predicated on a prosecutor's subjective views of a claimant's innocence. Indeed, the State's Attorney's Office does not, as a matter of course, indicate that an exoneree is innocent nor affirmatively move to dismiss their case. Rather, the State's Attorney's Office always moves to nolle the charges citing legal insufficiency or some other defect that makes a retrial possible. Yet numerous prior claimants, if not all, have been awarded money under these circumstances.

To take but one example, Alfred Swinton, who received over $4 million in 2018, was required to prove under the 2016 amendments to Conn. Gen. Stat. 54-102uu that his conviction was vacated "on grounds of actual innocence," not merely "consistent with innocence." But the prosecutor in his case did not move to dismiss the charges against him on that basis. To the contrary, as happened here, the prosecutor moved to nolle the charges for lack of sufficient evidence. The Commissioner nevertheless found Swinton eligible, noting the presence of exculpatory DNA as well as the prosecutor's lack of objection to Swinton's motion for dismissal on innocence grounds – both of which are factors present here. *See* Claim of Alfred Swinton, No. 25253, Memorandum of Decision (Dec. 14, 2020).

Moreover, the State's position on Mr. Lapointe's eligibility is inconsistent with the position it has taken in other claims, including claims where, unlike here, no affirmative evidence of actual innocence was cited as the basis for vacatur or dismissal or presented to the Commissioner. For example, the New Haven State's Attorney's Office never conceded that Scott Lewis was innocent— to the contrary, it fought Mr. Lewis's claim for years, only eventually dismissing the charges based on legal sufficiency. Even *after* Mr. Lewis's conviction was vacated, the State's Attorney's Office refused to vacate the conviction of his co-defendant, Stefon Morant, forcing him to accept a sentence modification. Moreover, unlike here, the dismissal of Mr. Lewis's charges did not rest upon affirmative evidence of actual innocence; rather, Mr. Lewis's conviction was vacated and charges dismissed because the State failed to disclose evidence that could have been used to

5

impeach a witness. Nevertheless, the Attorney General's Office did not contest Mr. Lewis's actual innocence.

Likewise, undersigned counsel recently settled the claim of Leroy Harris, a New Haven man who spent nearly 30 years in prison for a sexual assault he did not commit. In 2017, the New Haven State's Attorney's Office *refused* to dismiss the charges against Mr. Harris, requiring that he accept an *Alford* plea in exchange for his immediate release. Mr. Harris was subsequently pardoned despite the State's Attorney's Office's prior position, and although the Pardon Board did not issue an explicit statement of reasons, the Attorney General's Office rightly conceded Mr. Harris's eligibility.

For related reasons, the Commissioner's decision in the Claim of Murray Colton does not support the State's position here. Mr. Colton's conviction was vacated because "the trial court violated [his] constitutional rights when it precluded evidence relating to [a witness's] bias and motive," *not* based on the State's suppression of affirmative evidence of innocence. Claim of Murray Colton, File No. 22401, Memorandum of Decision (Aug. 8, 2018). Nor did Mr. Colton point to any affirmative evidence tending to establish his innocence, whereas Mr. Lapointe has. Rather, Mr. Lapointe argued that the primary witness against him was not credible and that he could have further impeached her had the State proceeded to retry him. However, the Commissioner found that evidence was "so similar to the types of information" about the witness that had been presented at the previous trial that "it did not seem likely that its existence would have prompted the state to abandon a case which they otherwise thought to be prosecutable." *Id*. at 6. Here, the State cannot plausibly claim that its case against Mr. Lapointe would have been prosecutable in light of the Connecticut Supreme Court's decision and DNA evidence. *Colton* is simply inapposite to the present claim.

### Mr. Lapointe is Actually Innocent

At a hearing, we will establish that it is more likely than not that Mr. Lapointe is actually innocent and therefore entitled to damages. In addition to the total lack of any reliable evidence of his guilt, we will rely primarily on (1) Mr. Lapointe's complete alibi, (2) DNA test results excluding him as the source of all crime scene DNA, and (3) evidence that another man, convicted of a nearby sexual assault with striking similarities, may have committed the crime.

Given the Connecticut Supreme Court's decision, we do not understand the State to be arguing that Mr. Lapointe committed the crimes for which he was wrongly convicted, nor do we understand the State to be relying on Mr. Lapointe's false "confessions" as reliable evidence of his guilt.

### The Substitution of Mr. Lapointe's Estate is Proper

In a letter dated July 11, 2023, the Attorney General's Office argues that Conn. Gen. Stat. § 54-102uu does not provide for a right of survival, such that an exoneree's wrongful incarceration claim does not survive his death. To hold otherwise, the State argues, would amount to an impermissible expansion of the State's limited waiver of sovereign immunity.

Although Mr. Lapointe is the only claimant to date who has died while awaiting a hearing

6

and award, the State's effort to recast his death as creating an issue of "first impression" is equal parts misguided and meritless. Nothing about Mr. Lapointe's death or the substitution of his duly appointed personal representative serves to divest the Officer of the Commissioner of its jurisdiction over this claim. To hold otherwise would run afoul of the statute's plain text, require an extremely dim view of the legislature's intentions, and reward the State for improperly delaying both Mr. Lapointe's exoneration and his right to compensation.

### The Statute's Text, Structure, and Purpose Support Substitution of a Decedent's Executor or Administrator

Section § 54-102uu, as enacted in 2008, provides for a statutory benefit, *i.e.*, compensation for wrongful incarceration, to claimants meeting certain eligibility requirements. The statute directs the Commissioner to issue "immediate payment" to claimants who meet the eligibility requirements. The statute further makes clear that its purpose is remedial in nature – the Commissioner is required to consider "the damages suffered by the person," including, *inter alia*, "loss of liberty and enjoyment of life," "loss of earnings capacity," "loss of familial relationships," "loss of reputation," "physical pain and suffering, "mental pain and suffering," and "attorney's fees and other expenses." The statute also recognizes the State's "negligence or misconduct" as a factor in determining the appropriate amount of compensation."

Where, as here, an exoneree dies during the pendency of his claim, substitution of his estate is entirely proper.

First, the statute expressly provides that an eligible claimant "may present a claim against the state for such compensation with the Claims Commissioner *in accordance with the provisions of chapter 53*." That chapter, in turn, requires that the Commissioner prioritize three categories of claims, one of which is "claims by executors or administrators of estates." Conn. Gen. Stat. § 4-151. The legislature is presumed to know what other statutes say, and that presumption is materially strengthened where, as here, the statute in question includes an explicit cross-reference.

Second, the statute's express purpose is to compensate the innocent for the damages incurred because of their past injury, *i.e.*, their wrongful conviction. The categories of damages are those typically considered in all personal injury actions and nothing about the claimant's death serves to extinguish either the injury inflicted by the State or the damages suffered by the claimant as a result.

Third, this reading accords with Connecticut courts' recognition that the legislature has, for more than a century, expressed a broad policy "preference for the survival of actions over the common-law rule of abatement per se," which "provides for the timely substitution of a party holding an interest in the litigation that is sufficiently equivalent in nature to the decedent to permit the action to be tried to a final resolution." *In re David B.*, 167 Conn. App. 428, 446 (Conn. App. Ct. 2016) (citing *Craig v. Wagner*, 88 Conn. 100, 103 (1914)). This preference makes no distinction between common law and statutory rights of action. Indeed, this century-long preference applies beyond traditional "civil actions," having been cited even in cases where, unlike here, the relief sought is non-monetary. *See id*. (permitting substitution of a decedent's estate in a petition to terminate parental rights under 45a-75(a), a statute which "is silent regarding the substitution of

parties once a petition has been brought").

Fourth, § 54-102uu must be read in concert with other statutes. Section 52-599, which provides for a right of survival in any civil action or "proceeding." Contrary to the State's assertion, § 52-599 applies here. A claim under 54-102uu, which requires a determination of eligibility and a hearing, is undoubtedly a "proceeding" within the meaning of that statute – *see, e.g.*, Conn. Gen. Stat. § 4-152 (governing "[m]isbehavior at proceedings" before the Claims Commissioner), § 4-157 (requiring the Commissioner to adopt rules of procedures "governing the proceedings of the Office of the Claims Commissioner"). And the Connecticut Supreme Court has applied § 52-599 in an administrative context like this one in deciding that a claim for monetary damages survived the claimant's death. *Commission on Human Rights and Opportunities v Greenwich Catholic Elementary School*, 202 Conn. 609, 614 (1987) (relying on §52-599 held that "the claim of the deceased complainant before the CHRO for monetary losses . . . was not 'defeated or rendered useless' by her death because a recovery upon such a claim would enhance the value of her estate." It is equally clear that the exceptions in § 52-599(b) are inapplicable here. Those exceptions only apply where, for example, the claimant's death defeats the purpose of relief, *e.g.*, where a plaintiff seeks injunctive relief such as the restoration of his or her job, not where the claim is for monetary damages such as lost wages.

### Substitution of an Estate Does Not Alter the Nature of the Claim or Defeat the Statute's Purpose

The substitution of Mr. Lapointe's estate does nothing to change the nature of the claim or defeat § 54-102uu's purpose. In arguing otherwise, the State both ignores the legislature's stated intent and misunderstands basic legal principles of estate law.

First, nothing about the administrator's substitution as Mr. Lapointe's duly appointed *personal representative* renders this action no longer "personal" to Mr. Lapointe. *See, e.g.*, *St. George v. Gordon*, 264 Conn. 538, 546-47 (Conn. 2003) ("The language expressly vests any right provided by § 5-141d in the state officer or employee against whom the claim is made or suit is brought. In this case, the statutory rights were vested in Mak as the high sheriff, and now are vested in Gordon in his representative capacity of Mak's estate."). Mr. Lapointe's § 54-102uu claim is a personal asset for damages caused by his wrongful incarceration that now simply belongs to his estate by virtue of his death. Personal assets are indeed personal, which is precisely why the law provides a process for distributing them to a decedent's *beneficiaries* and why many people pay to have wills drafted explaining, sometimes in great detail, precisely what their intentions are with respect to who gets their personal assets after their death. Mr. Ducharme's role as administrator is simply that of a fiduciary, *i.e.*, to protect the interests of the estate and eventually distribute its assets in accordance with the law. The claim does not belong to him **<u>or</u>** the beneficiaries, it belongs to the estate.

Second, the State appears to suggest that Mr. Ducharme, as Mr. Lapointe's lawfully appointed personal representative, does not bear a sufficiently close relationship to Mr. Lapointe to continue this claim. As an initial matter, the Claims Commissioner cannot look behind a valid probate order. Nor would it be wise as a matter of policy for the Commissioner to have "mini trials" on collateral issues that are already settled. But even if the Commissioner could, there is nothing improper or mysterious about Mr. Ducharme's appointment. As Mr. Lapointe's conservator prior to

his death and the man who championed his innocence for over a decade, Mr. Ducharme is the logical choice to continue to prosecute this claim. Unfortunately, Mr. Lapointe was estranged from his son during his wrongful incarceration. After being informed by Attorney Cousins of the probate application and its purpose, *i.e.*, continuing this claim, thereby protecting the estate's sole asset, as well as Mr. Ducharme's proposed appointment as administrator, Mr. Lapointe's son elected to waive notice. There is no requirement in Connecticut law that a family member serve as an estate's administrator or executor – to the contrary, it does not even need to be a human being as opposed to a corporation like a bank or law firm. If Mr. Lapointe's estate does receive an award, his son will be the beneficiary – sadly, the only thing that Mr. Lapointe is now able to provide to his sole heir.

### Substitution of an Estate Does Not Broaden the Legislature's Limited Waiver of Sovereign Immunity

Contrary to the State's assertion, the substitution of an estate does not broaden the legislature's limited waiver of sovereign immunity in any way. This is not a new action, like an action for wrongful death brought by the deceased person's family, or a derivative action brought on behalf of a spouse or a child. Rather, it is the continuation of a preexisting claim brought by Mr. Lapointe during his lifetime for the personal injuries he suffered and that is now being continued on his behalf by his legally appointed personal representative. If anything, Mr. Lapointe's death has unfairly reduced the State's financial exposure because, among other things, he is no longer able to receive vocational and related services, a consequence of the former Claims Commissioner's failure to hold a hearing and issue a decision for more than four years, which, to put it diplomatically, is regrettable. It is perverse to argue, as the State does, that Mr. Lapointe's inability to access services that could have helped him in the four years preceding his death now serves to divest the Office of Claims Commissioner of its jurisdiction.

### Not Permitting Substitution Would Violate Basic Principles of Fairness and Justice and Lead to Absurd Results

In addition to misunderstanding the nature of an administrator and its limited effect on this proceeding, the State's position blithely disregards § 54-102uu's remedial purpose, *i.e.*, to compensate individuals for the damages they suffered because of their wrongful conviction and the State's own role as a contributing party to it. As the current Commissioner has noted in awarding Scott Lewis $5.5 million, in addition to the $9.5 million he received from the City of New Haven in a federal civil rights settlement, where the State should "also provide compensation" to an exoneree where it is "also a contributing party to the harm" he suffered. Claim of Scott Lewis, No. 24509, Final Decision at 2 (July 28, 2023).

First, as a matter of statutory interpretation, one would have to possess an extremely dismal view of the legislature and its commitment to justice to conclude that, in creating a right to "immediate payment" for wrongful incarceration, the legislature somehow intended to extinguish such claims where the exoneree, through no fault of his own, died before he could be paid. This claim is a case in point – it languished for four years before Mr. Lapointe finally died, after he needlessly spent 26 years in prison because, as the Connecticut Supreme Court found, the State deprived him of a fair trial by suppressing material exculpatory evidence.

Second, the logic of the State's position would extend even to claimants who the State and

the Commissioner have agreed are eligible and entitled to substantial damages. For example, the State recently agreed to settle the claim of Leroy Harris for $7.5 million and the Commissioner approved such an award. However, the award must be approved by the legislature before the Comptroller can issue payment. Under the State's reasoning, Mr. Harris's claim would be extinguished, and his estate would receive no money, if he died the day before the legislature approved the award. That would mean, among other things, that he would be unable to provide for the wife who supported him through thirty years of wrongful incarceration and the daughter who was deprived of a parent from age 3 to 33.

Third, as a matter of policy, such a result would be drastically at odds with the legislature's intent. In providing for a statutory right of compensation, thereby waiving its sovereign immunity, the legislature both recognized the immense suffering of the wrongly convicted and the State's moral responsibility to remedy it. To endorse the State's position would be to increase the trauma and suffering inflicted on exonerees by orders of magnitude and to absolve the State of its own wrongdoing. The Commissioner is required by statute to pay or authorize suit for just claims – defined as "a claim which in equity and justice the state should pay, provided the state had caused damage or injury." Conn. Gen. Stat. 4-141. There is nothing just about absolving the State of that responsibility because a claimant dies while his proceeding is ongoing, especially where the State deprived him of the prime years of his life and where studies have found that each year of incarceration reduces life expectancy by two years.

Fourth, to accept the State's position would be to reward the State for its delay and further incentive the State to delay the exoneration of innocent individuals and their wrongful incarceration claim. Sadly, the State's history is replete with examples of the State doing both – from compelling innocent individuals to take *Alford* pleas (Leroy Harris) and sentence modifications (Stefon Morant), to defending their convictions against meritorious *Brady* claims (Scott Lewis, Richard Lapointe), to taking years to decide their compensation claims, even where those claims were not contested (Alfred Swinton).

Fifth, if the State's argument succeeds, it will lead to additional absurd consequences that the legislature could not possibly have intended. Among other things, it will mean that state employees will lose their right of indemnification upon their death, as the indemnification statute, like almost every other statute, does not explicitly state a right of survival. In other words, if you spill water in the office while carrying out your official duties as a state employee and, god forbid, someone slips and is injured, your right to indemnification for the costs of defending the suit and any judgment will cease upon your death. Since the Connecticut Supreme Court has decided that state employees have no statutory right to bring an indemnification action, and must instead seek permission of the Claims Commissioner, *St. George v. Gordon*, 264 Conn. 538, 546-47 (Conn. 2003), that means your ability to hold the state to its statutory commitment would be entirely dependent on the fortuity of your continued survival and the diligence of the Assistant Attorney General handling your claim.

*       *       *

Thank you for your attention to this matter. We look forward to resolving this matter in consultation with the Attorney General's Office or, alternatively, scheduling a hearing on the merits as soon as practicable.

10

Sincerely,

<u>David Keenan</u>
Attorney for Claimant

Cc (by email):

Attorney General William Tong (william.tong@ct.gov)
Solicitor General Joshua Perry (joshua.perry@ct.gov)
Deputy Associate Attorney General Terence O'Neill (terrence.oneill@ct.gov)
Assistant Attorney General Matthew B. Beizer (matthew.beizer@ct.gov)
W. James Cousins (jcousins@wjamescousinslaw.com)
Paul Casteliero (paul@casteleirolaw.com)

11

**Marquis Jackson, Exoneree**
**235 W. Ivy St.**
**New Haven, CT 06511**

To: Judiciary Committee

Re: Raised Bill SB No. 439

Written testimony of Marquis Jackson

Dear Senator Winfield, Representative Stafstrom and Members of the Committee,

My name is Marquis Jackson, and I am an exoneree. I served 19 years of a 45-year sentence for felony murder and a host of other crimes I had nothing to do with. Technically I'm not supposed to be here. I'm supposed to be languishing away somewhere in a Connecticut maximum security prison. Fortunately, that is not the case. Thanks to God, my faith and my lawyer, that was not my fate.

I can go on and tell this Committee how difficult it was serving 19 years in prison, but I won't. I can also go on and express the nights I spent in my prison cell contemplating suicide, but I won't. I believe my time will be best served talking about what I am here for; and that is to speak about the proposed amendment to Conn. Gen. Stat. 54-102uu, S.B. # 439.

S.B. # 439 will significantly improve Connecticut's system for compensating the wrongfully convicted. However, it falls short for the exonerees whose claims are already pending, of which I am one. This would only add to the injustice I already suffered, and I cannot let that stand without saying something ("The only way an injustice will stand, is if the just do nothing"). So I humbly ask this Committee not to forget about us, the Pending 6, whose claims are already filed.

If SB # 439 is ratified in its current form, pending claims would be denied the benefits of the changes the bill would provide to all new claims. I am asking that the Committee change the wording to include pending claims. Doing so makes good sense and there is no reason the legislation should not apply to include those small number of claims as well. Respectfully, it is the right thing to do.

In conclusion, I welcome the proposed amendment to Conn. Gen. Stat. 54-102uu with the modification of one word from filed to pending on line 3 of SB # 439, so that these changes apply to all of us.

Thank you.

*Marquis Jackson*

# Law Office of David Keenan

*Admitted in NY and CT

152 West 57th Street, 8th Floor, New York, NY 10019 | Tel. (347) 460-4857 | dkeenan@davidkeenanlaw.com

March 16, 2024

**BY WRITTEN SUBMISSION**

Senator Gary A. Winfield, Co-Chair
Representative Steven J. Stafstrom, Co-Chair
Joint Committee on Judiciary
Connecticut General Assembly
Legislative Office Building, Room 2500
Hartford, CT 06106

**Re: <u>Raised Senate Bill No. 439</u>**

Dear Senator Winfield, Representative Stafstrom, and Members of the Committee:

My name is David Keenan. I am wrongful convictions lawyer who has helped exonerate four Connecticut men who collectively served nearly 100 years of wrongful incarceration: Leroy Harris (30 years), Adam Carmon (29 years), Marquis Jackson (19 years), and Vernon Horn (17 years). I currently represent three exonerees with pending wrongful incarceration claims pursuant to Conn. Gen. Stat. § 54-102uu: Mr. Harris, Mr. Carmon, and the estate of Richard Lapointe (26 years).

The amendments to Conn. Gen. Stat. § 54-102uu in <u>Proposed Senate Bill No. 439</u> would significantly improve Connecticut's system for compensating the wrongly convicted. However, the proposed bill suffers from one significant but easily correctible flaw: in its current form, the amendments would only apply to claims "filed" on or after its effective date. I write to urge you to modify the proposed bill so that the amendments apply to all § 54-102uu claims "pending" on or after the bill's effective date. This can be accomplished simply by deleting the world "filed" in Section 1 of the bill and replacing it with the word "pending," *i.e.* "Effective from passage and applicable to claims [filed] <u>pending</u> on or after the effective date of this section."

There is no legal reason why the legislature could not apply the amendments to encompass exonerees with pending claims, and every moral consideration favors doing so. More than anyone, exonerees with existing claims—many of which have been pending for years—should be fairly and promptly compensated for the damages they have suffered and deserve the assurance that their families will not suffer further should they die before their claims can be paid. To help the Committee understand why, I would like to share with you a personal story that exemplifies both the unfathomable suffering of what these exonerees have been forced to endure and the heroic resilience and determination they have demonstrated in facing it.

In 2017, while working as a thirty-five-year-old Assistant Federal Defender only a few years removed from law school, I was assigned to handle Mr. Horn's federal habeas. After serving 15 years, Mr. Horn had been released on bond in 2014 after a Superior Court judge found that his lawyer had been ineffective, only to be sent back to prison two years later when the Connecticut Supreme Court reinstated his conviction in a unanimous decision. To prevail in a

federal habeas, a petitioner is generally bound by the record in state court and must prove that no reasonable jurist could have agreed with the highest state court's decision. From my perspective, the legal odds were daunting and the situation seemed hopeless.

Three months after my appointment, Mr. Horn wrote to the federal judge overseeing his case to inform him that he was on a hunger strike to protest his wrongful incarceration and that no one from my office had spoken with him. During his brief release, Mr. Horn married and had a daughter. In his letter he asked the judge whether his case would continue in the event of his death so that his daughter would one day learn the truth—her daddy was not a murderer. Having recently become a father for the first time, I could not help but be moved. The following week I went to see him at MacDougall-Walker prison with my boss Terry Ward.

I will never forget that first meeting. Mr. Horn, gaunt and in a wheelchair, was understandably angry. But it was the conviction with which he spoke of his innocence and his dedication to proving it – even if meant dying – that left me shaken. While I didn't know yet whether Vernon was innocent, I left prison that day determined to undertake an investigation that would leave no stone unturned. Less than eight months later, with the assistance of the FBI's cellular phone expert, we were able establish that it was factually impossible for Vernon to have committed the crime. Far from a mistake, our investigation also revealed serious misconduct by both New Haven Police detectives and the State's firearms examiner, without which Vernon never would have been convicted. After presenting our evidence, in 2018 the State's Attorney's Office agreed to voluntarily vacate the convictions of Mr. Horn and his co-defendant, Marquis Jackson.

There is an adage in medicine that I think is equally applicable to the law: "When you hear hoofbeats, think horses not zebras." As criminal defense lawyers, judges, and prosecutors, we are conditioned to the reality that most defendants are in fact guilty. But then there are zebras like Vernon who, unfortunately, the legal system treats like horses.

Vernon often refers to me as his guardian angel. But I think he has it backwards. Shortly after I was appointed to represent Vernon, I visited a world-renowned hospital emergency room after noticing blood in my urine and was sent home with antibiotics and a diagnosis of a urinary tract infection. Later, when a mass was discovered on my kidney during an ultrasound, I was told that it was most certainly benign and that I did not need a biopsy. Having no medical knowledge or doctors in my family who I could consult, I was inclined to defer to my physician, one of the leading urologists in the country.

The experience of witnessing the legal system fail Vernon, however, prompted me to take a more active role in my own medical care. To that end, four months after his exoneration, I insisted on having the tumor on my kidney biopsied. The diagnosis was devastating—renal cell carcinoma, a silent but aggressive type of renal cancer. Healthy thirty-five-year-olds are not supposed to get renal cancer. I was a zebra. But because of my experience representing Vernon and my ability to access and afford quality medical care, my cancer was fortunately caught early enough that it could be successfully treated with surgery. In that way, Vernon not only changed the trajectory of my life, he may well have saved it.

Law Office of David Keenan
Page 3 of 3

I do not represent Mr. Horn in his civil cases and have no financial interest in their outcome. But as his former counsel, I am distraught that nearly six years after his exoneration, Vernon has not received a single cent from the State of Connecticut or the City of New Haven. That is a travesty that we should all be ashamed of. Vernon's federal civil rights action continues to drag on despite the best efforts of his lawyers and through no fault of his own. He cannot proceed with his § 54-102uu claim at this time because, under current law, he would be unfairly compelled to sign a release of his federal civil rights action, thus forfeiting not only a significant sum of money to which I believe he is entitled but the opportunity to hold responsible the individuals whose unconstitutional actions caused his wrongful conviction and incarceration. With no resources provided to him by the State upon his release, he must currently rely on "advances" with extremely high interest rates.

While I welcome the proposed amendments to § 54-102uu, it would be confounding and distressing if those amendments are not made applicable to Mr. Horn and other exonerees with pending claims. Current wrongful incarceration claimants, many of whose claims have been pending for years, deserve to be compensated promptly no less than future claimants. Prison has deprived them not just of their freedom but also their mental and physical health. They should not be further deprived of what the State is morally obligated to provide them. And they should not be made to suffer the anguish of worrying that their families will receive nothing if they die before a decision is rendered.

I respectfully ask you to modify the proposed bill by substituting the word "pending" for "filed" so that all § 54-102uu claimants are treated equally. Thank you for your careful consideration of this issue and I look forward to asking any questions you may have at the hearing.


Respectfully submitted,

David Keenan



# State of Connecticut

### DIVISION OF PUBLIC DEFENDER SERVICES

**Office of Chief Public Defender**
55 Farmington Avenue, 8th Floor
Hartford, Connecticut 06105
(860) 509-6405 Telephone
(860) 509-6495 Fax

**Deborah Del Prete Sullivan**
Legal Counsel, Director
deborah.d.sullivan@pds.ct.gov

### Testimony of the Office of Chief Public Defender
### Robert Meredith, Director of CT Innocence Project / Post Conviction Unit

### JUDICIARY COMMITTEE – MARCH 18, 2024

### Raised Bill No. 439
## AN ACT CONCERNING COMPENSATION FOR PERSONS WHO ARE WRONGFULLY INCARCERATED

The Office of Chief Public Defender <u>supports</u> **_Raised Bill No. 439, An Act Concerning Compensation For Persons Who Are Wrongfully Incarcerated_**.

The Connecticut Innocence Project (CTIP), first formed in the summer of 2005, is an office within the Office of Chief Public Defender in the Connecticut Division of Public Defender Services. In 2007, the Connecticut legislature granted funding for the Connecticut Innocence Project. CTIP is now combined with the Post Conviction Unit within the Office of Chief Public Defender. As a member of the Innocence Network, a coalition of Innocence Projects in fifty states and abroad, CTIP investigates cases of wrongfully convicted individuals and seeks their exoneration. Since 1989, there have been thirty-six (36) exonerations in the state of Connecticut, resulting in 486 years of lost life. The years of wrongful incarceration and lost life has had an obviously devastating impact on each exoneree. This office fully supports the proposed changes in this bill regarding compensation for individuals who have been wrongfully incarcerated in the past, the present, and the future.

This office notes, however, that the bill is effective from passage and applicable only to claims filed on or after the effective date of the bill. In _fairness,_ this office believes that this proposal, if adopted by the Committee, **should be applied retroactively** so that persons with pending claims are compensated similarly. Therefore, this office respectfully requests that the Committee vote that the bill be applied "retroactivity" and vote favorably on the remainder of the bill. Thank you for your consideration.

March 18, 2024

## Written testimony of Stefon Morant – SB No. 439

Dear Senator Winfield, Representative Stafstrom and Members of the Committee,

Mr. Morant was standing by to testify at this morning's hearing on SB No. 439, but for some reason was never successfully connected through to the panel link (which he had accepted per instructions) at the time you called on him to speak. Because Mr. Morant works two jobs, and was required to be present at his job with Hartford Healthcare all day, he had arranged to participate via Zoon, but through no fault of his own was unable to do so.

Mr. Morant was imprisoned for more than 21 years, from age 23 until his release in June 2015 at age 44, for a murder that neither he nor his co-defendant, Scott Lewis, had anything to do with. Despite a number of post-conviction proceedings, including the presentation of a 187-page FBI report released in 1997, and the testimony of a supervising detective as early as 1999, documenting the corruption and evidence fabrication used to convict Mr. Morant and Mr. Lewis, it took another 15 years for the criminal justice system to finally exonerate them. In Stefon's case, his eligibility for compensation was further delayed by the fact that his initial release from prison was based on a sentence modification, not a full erasure of charges, which did not happen until 2021.

His 54-102uu claim was filed in November 2021 and remains pending. As with the other exonerees who testified this morning (Adam Carmon, Vernon Horn and Marquis Jackson), Stefon has yet to receive any compensation or other from of reparations for his more than two decades of wrongful incarceration, and, as noted above, works multiple jobs (as he has done since the very first month of his release) in order to support himself and his family. He is a remarkable, deserving and contributing member of the community in many other ways as well, as attested by the attached documents.

In lieu of the testimony he was planning and ready to present at today's hearing, but could not do so through no fault of his own, he has provided the following written remarks that he asked me to submit for the record (see next page):

*Good morning.  Thank you for allowing me to speak. For over 21 years, no one would listen.  Again, thank you.*

*I would ask that you please consider including coverage of <u>pending</u> claims, such as mine, in the changes you are making to the statute for compensating the wrongfully incarcerated.  As of now, we are forced to sign away our rights in order to obtain compensation.*

*I don't know if you are aware that if you are released after showing you were unjustly imprisoned, you are not given any funds or other support. You literally have nothing coming out of prison, unlike the transition support services given to a guilty person finishing up their sentence (as I know first-hand because I have worked as a counselor at the Renaissance Center halfway house in Waterbury). There should be timely help for an exonerated person – we've already suffered and now the State leaves you to figure it out for yourself, forcing us to take out these high interest loans.*

*There has to be a better way.  I appreciate the changes under <u>bill # 439</u>, which does away with releasing all other rights, but it needs to cover us with presently pending claims as well.*

> *Stefon Morant*
> *Hamden, Connecticut*

(Uploaded by Attorney K. Rosenthal, 3/18/2024)



CONNECTICUT
*Renaissance*
*Helping people change the direction of their lives*

**President**
Marly J. LeBeau

**Chief Executive Officer**
Kathleen Deschenes

My name is Carol Pace, Director of Community Release Programs for CT Renaissance. I direct and supervise our Department of Corrections Halfway Houses in Waterbury and Bridgeport. Stefon Morant was an employee at our East Halfway House in Waterbury, CT. I have been employed by CT Renaissance for 20 years. I am writing in support of Stefon's pardon application.

Before I begin, I would like to explain how I met Stefon and what my first impressions were. My Assistant Director interviewed and hired Stefon as a per diem employee about a year and a half ago. This meant that I did not have the opportunity to meet Mr. Morant. During his first week on shift I noticed Stefon diligently moving around our main hub. My impression of Stefon was that his presence would certainly be known. I based that impression on his physical statute. I introduced myself to Stefon and was pleasantly surprised to find that he was soft spoken. CT Renaissance has a philosophy of meeting our clients where they are at and to treat all clients with respect and dignity. I was certain that Stefon would adhere to that philosophy.

I had the opportunity to observe Stefon interact with our clients. He was firm but fair. His demeanor was approachable. H e enforced boundaries and made ethical decisions. He worked well with the team. He covered all shifts when asked. He was prompt and always on time. Not a bad hire!

Shortly after Stefon started his per diem position, a full time position became available. Stefon was encouraged to apply. He did and was awarded the position. This is when I became aware of Stefons story. But before I address that, let me explain the environment that Stefon chose to work in. Halfway Houses are transitional living for people coming out of prison. Most are aware that they have been awarded the opportunity to change their lives, but unfortunately some are not. We have clients who deviate, escape, use illegal substances and try to manipulate the system. With that being said, the staff that we hire need to have an understanding of the population we serve, are willing to work for little compensation and use all of their skills to fulfill agency and contractual obligations. Staff needs to recognize someone that is under the influence of drugs and/or alcohol. We have had many clients that have been under the influence of synthetic marijuana that have exhibited psychotic behaviors. We have clients that have mental health issues that need staff that understand their specific needs and limited abilities. We have clients that have significant medical issues. Our staff needs to be aware of medical procedures to ensure client safety. All of this is what Stefon has chosen to work with after living with for 21 years. After hearing Stefons story, I questioned why he chose this field, why this environment and most of all why isn't he mad as hell?? I listened to his story in disbelief. How did Stefon live 21 years incarcerated for a crime he did not commit? How did he wake up each morning and watch those precious years go by? I was amazed by Stefons drive to speak on behalf of the Innocence Project and his commitment to our clients. Let me give you an example, Stefon and I had a conversation regarding drug use in the house. I remember Stefon shaking his head and saying "I'm trying to talk to R (client), but he doesn't want to listen. I try to talk to the younger guys to try to set them straight". I remember the look on his face and the disappointment he displayed. He kept shaking his head. This is just one of many moments that Stefon has gone above and beyond to reach clients that are struggling. He has invested his time, spirit and genuine commitment to the population. His sense of loyalty to serving this population has meaning to him. He knows, he just

knows. Stefon does not divulge his past, but our clients know when someone can truly relate. Stefon can truly relate.

As a Director, I look for people to work at CTR that have loyalty, ethics, morals and commitment to the people we serve. I have found that in Stefon. He is a valuable part of the Renaissance team. He offers good advice to his team and works in collaboration with the Department of Corrections. I am truly lucky to have Stefon working for me. He is a diligent worker but an even better person. I admire his strength and commitment to his family and friends.

Like I said, NOT A BAD HIRE!

Administrative Offices ● 350 Fairfield Avenue ● Suite 701 ● Bridgeport, CT 06604
Tel: (203) 336-5225 ● Fax: (203) 336-2851
www.ctrenaissance.com

2429

Karen Wolff
1306 Talbot Ave.
Berkeley, CA 94702
karenwolff9@gmail.com

October 30, 2020

Board of Pardons and Paroles
55 West Main Street
Waterbury, CT 06702

Re: Stefon Morant Pardon Application

Dear Board:

I am writing this letter in support of Stefon Morant's Pardon Application. As a Social Worker at the Innocence Project ("IP") for 14 years, I worked with between 150-200 men and women who were wrongfully incarcerated.[1] My job entailed helping them transition back to free society after having been in prison for years, sometimes decades, for crimes they did not commit. I am aware of only a handful of other social workers in the country who work with this population, and because of my length of service and the IP's national client base, I do not believe anyone has worked on life transition issues with more "exonerees"[2] than I.

Without exception, my former clients suffered immeasurable trauma, loss, physical and emotional abuse and humiliation both during and after their wrongful incarceration. Without exception, they are survivors of horrible injustice perpetrated by individuals and/or a deeply flawed criminal justice system, and without exception, these men and women have had to fight for every scrap of legal and/or financial compensation they receive. Even though all of the exonerees I have worked with over the years have survived trauma I cannot even begin to fathom, there is not a single one who has shown the strength of character, resolve, commitment to justice and generosity of spirit that I have seen in Stefon Morant.

I met Stefon in 2016 at the Innocence Network Conference in Atlanta, Georgia. In my role at this annual conference I facilitated exoneree attendance, helped organize the exoneree-related sessions and then spent the entire three days with exonerees. Stefon impressed all of us that weekend - which launched collaborations between him and various IP departments (Social Work, Development, Legal and Communications) that continue to this day. Since that conference, Stefon has attended numerous IP events - most of which were geared towards raising funds for the organization that never represented him in his own legal struggle and because of that, was unable to provide him the financial assistance it offers

---

[1] I just recently moved to another State and no longer work at the IP.

[2] The IP uses this term for Stefon because everyone there considers him to be an exoneree even though he has been cruelly denied the relief granted his former co-defendant, Scott Lewis. Everyone at the IP knows Stefon is innocent and that he should be in the same position right now as Scott: completely exonerated and financially compensated for his years of wrongful incarceration. At every IP event he attends, he will always be introduced as an exoneree, and everyone there hopes that one day his legal status will catch up to the nomenclature.

*MemoAppdx-041-Morant*

1

to its own clients after they are released. Stefon has responded positively to every single IP invitation he has received merely because he believes in the innocence movement and wants to be of assistance in any way he can. He never asks "what is in this for me?", or "how do I personally benefit from attending this event?"

Some of my more personal interactions with Stefon occurred during his attendance at the monthly meetings the IP social workers convene (pre-COVID) for New York/Tri-State-area exonerees. Tellingly, Stefon travelled all the way from Connecticut - further than any other regular attendee - for the meetings, which lasted only 1.5 hours. He was one of the most consistent and vocal attendees; in fact, I specifically scheduled the meetings when it was convenient for Stefon to attend because he was both so valuable to the group and so enthusiastic about coming. We generally had an informational speaker at the meetings, and whether it was a financial consultant or a medical doctor, Stefon was on time, participated actively and interacted comfortably with everyone. He was a vital asset to the functionality and success of that group.

Despite the fact that his own situation is complicated, painful and totally unfair, Stefon always has time for others. He told me numerous times when discussing his legal struggle that "I'll be alright; I am made for this", i.e., he is strong and able to continue waging his fight for justice. This "made for it" attitude has enabled him to be the kind of person others count on, lean on and need, in order to make their own situations better, and he never says no. I sometimes called upon him to help others and saw him offer help without being asked. In one example of this generosity, in September, 2017, an attorney from another Innocence Network project called me to ask for advice about a client who had taken a plea and therefore not been formally exonerated. This client was angry about how his case was resolved, which was apparently preventing him from moving forward in his life and causing friction with his wife who did not understand his feelings. I thought Stefon and his wife, Kim, might be able to offer some counsel to this other couple, so I asked Stefon if they would call and talk to the client and his wife. He immediately agreed to give this other person (a total stranger - who like him, was innocent but had been denied a just resolution to his case) the benefit of his experience and positive attitude. It is my understanding that the men had several conversations, and that the other client found some solace after hearing Stefon's perspective on moving forward in spite of the lack of an appropriate and restorative legal remedy in his case.

In another example, in November, 2017, we found out Leroy Harris, an IP client who had been wrongfully incarcerated in Connecticut for nearly 30 years, would be released from prison as a result of taking a plea. Prior to his release, we discovered that Stefon knew Leroy quite well from prison, so we called Stefon to tell him when Leroy would be getting out. I drove to the prison with Leroy and his IP attorney, but when we arrived at the prison, I saw that Stefon was already there, waiting in his car. I got into his car and we drove around to the side of the prison where he knew Leroy would be exiting. At the first sight of Leroy walking out of the gate, Stefon jumped out of the car and ran to him, giving him a giant bear hug. He was the first person to welcome Leroy home - even before Leroy's wife, who was in a car that took longer to find the right gate. That moment - the first moment of freedom for Leroy after three decades of being locked up for a crime he did not commit - was intensely moving. Witnessing Stefon's pride in welcoming his friend home - even though neither of them had actually received adequate justice in court - was amazing. While Stefon could have been bitter and unable to celebrate with his friend

2

2431

because of his own legal quagmire, he was able to rise to the occasion with no sign of personal regret or selfishness. The sight of his emotional generosity and pure joy in that moment will stay with me forever.

The IP invited Stefon to its annual gala for the past five years, along with about two dozen other NYC-area exonerees who are in the IP orbit. This event is the IP's biggest fundraiser of the year, and in May 2018, Stefon showed up with his wife, and also a new Connecticut exoneree with whom the IP had no previous contact. Stefon was unaware of proper protocol for these highly choreographed, fancy benefits; the facts that each seat cost the IP several hundred dollars and all tables were intricately arranged with great care by IP staff and event organizers had escaped him. All Stefon knew was that he wanted this new exoneree to experience the festivities and be introduced to the 1,000 guests as an innocent person recently freed - in essence, to be honored just as he would be later in the evening. Stefon cannot help reaching out to others he views as less fortunate, and even though this other exoneree had received the full exoneration that he, himself, had not, Stefon slipped effortlessly into the roles of mentor and giver, trying to bring "the new guy" into the IP fold, with all the important contacts and celebrations that entails.

Whenever I had the opportunity to speak with anyone about exonerees, I always emphasized that there is no way to generalize about them as a group; they are all individuals with their own family backgrounds, personalities, strengths and weaknesses. Each exoneree copes with his or her wrongful incarceration and subsequent release from prison differently because of all these differences. Although I tried very, very hard to avoid making comparisons between clients or general statements about them, in this particular situation I must compare and generalize: Stefon Morant is one of the most amazing people I have ever met, including exonerees, staff at the IP and anyone else. In my 14 years there, I met one or two other exonerees with the positive energy, leadership potential and capacity to mentor others I have seen in Stefon. He is a person of uncommon and infectious goodness, and it pains me greatly to see him struggle so hard to get some semblance of justice in this truly unfair and inequitable situation. I urge you to grant his Pardon Application.

Please let me know if you have questions about anything in this letter or need any additional information. Thank you for your attention to this matter.

Yours truly,

Karen Wolff, LMSW, J.D.
Former Social Worker at the Innocence Project



# Rock Tabernacle Ministries
## Everybody is Somebody in the Rock

94 Webster Street
New Haven, CT 06511
Phone: (203) 777-8263
Email: info roctab.org



January 11, 2021

To: Board of Pardon and Paroles

Ref: Stefon Morant

I am writing to you on behalf of Stefon Morant. As the Senior Pastor of Rock Tabernacle Ministries, located at 94 Webster Street, in the City of New Haven, CT, I would like to share some important and noticeable things about Stefon. Stefon came to Rock Tabernacle Ministries one week after his release. He met with me and shared his life story and why he came to Rock Tabernacle. He outlined his desires and plans for a going forward life. He was seeking spiritual guidance and direction that would restore him in society and make him a productive individual.

Stefon has kept his word and followed the plan of action that has been beneficial and productive at Rock Tabernacle Ministries. Stefon became engaged and active in several ministries at the church. He has made sound decisions involving ministries assignments. He is a man that Rock Tabernacle has grown to admire and respect. He is always making himself available for assignments and is supportive of others in their assignments. His attitude of caring and compassion for the people has made him an asset to all.

Stefon is now seen as a pillar in the church. He demonstrated a great desire to learn by attending and actively participating in Bible Study every Wednesday night. He is a faithful prayer warrior that is found Sunday after Sunday leading the congregation in prayer,

On a personal note, I have been a member of Rock Tabernacle Ministries (formally Little Rock Church of Christ) for the past forty-eight years and the Senior Pastor for the past twenty years. I have seen many people come and say they changed, but it was not sincere. Stefon has been faithful and sincere about his spiritual life. He has demonstrated his desire to fulfill his life with happiness and not only for himself but for others.

You probably hear and read letters about individuals that stand before you day after day saying that they have changed. I want to let you know this is not just another letter trying to impress you about his character.

Email: Rock Tabernacle Ministries: info@roctab.org; Rev. Willis Miller, Jr: pastorm@roctab.org

**MemoAppdx-019-Morant**

As a married man, Stefon is always with his wife when attending church. I cannot remember ever seeing him without his wife with him in church.

Stefon and I have had several discussions about employment. He was always looking for a better job opportunity to provide for his family. Over the past years, he has continued to excel in the work place because his desire is for the better.

As you ponder the material that is presented, I ask that you give great consideration to all the facts and grant Stefon Morant a full pardon. I believe this will release him to become a greater asset to the community and society.

I am available to provide any additional information that will assist the Board in making a favorable decision on behalf of Stefon Morant.

Thank you for taking the time to consider my thoughts.


*Rev. Dr. Willis Miller*
Rev. Dr. Willis Miller, Jr
Senior Pastor Rock Tabernacle Ministries



To the Pardon Board,

My name Kimberly Morant, I am the wife of Stefon Morant, I am also a mother, daughter, and a sister to many family members. I am employed by the Special Ed dept of education for the City of NewHaven. I grew up in the city of NewHaven, to which I reside in the present.

I am grateful for the opportunity to tell you about my husband Stefon Morant. Stefon and I first met in elementary school (5th grade) "1979" I was the new girl, and he introduced himself, and in the same breath he asked me to be his girlfriend. We've been friends ever since ... He has always had a special place in my heart.

I Knew he was innocent of the crime he was accused of from day one, Stefon as I Knew in his early years of life had challenges. but he was an individual who had a heart of compassion. And what I mean by challenges, there was challenging choices of most inner city youth growing up in the 80's and 90's. He is the 2nd oldest of four brothers. I'd always admired how he cared and cares for his younger siblings. til this very day. He

i's a son, brother, father, grandfather and husband.

I fell in love with Stefon because he was a man grounded in his faith. I have three children of my own and Stefon has four, together we have 7 (4 grandchildren). As a man of faith he believed we had to be married so we could be a family. He fights very hard to bring unity of the challenges of missing out on so many years of not being able to be apart of his family. Family is everthing to Stefon as well as his friends...

Stefon is a very loyal man, for which I'am very proud to call him my best friend. He calls me his "ANGel" and treats me like his "QUEEN". Stefon is a provider, protector and peace keeper, He never likes to see me Sad. He works 2nd shift and Sometimes 3rd, and he always makes phone calls to Check on me to make sure I'm ok. Never there is a time he doesn't let me know his whereabouts. He is a husband who always believes as his wife I should wear a smile, even in a mist of a disagreement he'll sing a song to remind us of how

much this love matters or he'll instanly announce it's time to pray. Stefon loves Church and it's mandatory that we attend, And for that I love him so much more.

He loves our children and all children with such an open heart, for example he makes sure he makes a way to attend our youngest son football games, even when he is very tired or have other things to do, its always important that he let's our son know he's in the stand as his biggest fan. He always tries to be the example of what a good man should be so he can be the man our sons can look up too, and also so our daughters will make the right decisions on choosing a good man. It is so important to him to leave a great legacy for our grandchildren.

He is the one who gives to the WORLD all he has to give eventhough so much was taken from him, I know the man that he is today has so much more to CONTINUE to offer the world.

To know Stefon is to love him, to love him is know him. It's so much I could share about him, but it would

2437

take written book to do it, which Some day I do plan on doing. I Just hope this letter can give you some type of insight of Stefon Morant the husband, a man I believe and pray that would be so deserving of this pardon.

Thank you for the opportunity to share who Stefon Morant is to me. —For all these reasons, and many more, I support Stefon Morant's pardon application and hope you will grant it. —

Sincerly,

—KIMBERLY Morant —

K. Mont

Mia Smokes- Boyd

89 William Street

West Haven, CT. 06516

203-606-7744

December 22, 2020

Dear Board of Pardons and Paroles,

My name is Mia Smokes- Boyd and I am writing on the behalf of Stefon Morant, in support of his pardon application to the Board. I am the daughter of Kimberly Morant, whom is his wife. I would not consider Stefon a stepfather because that title is not good enough. He is my bonus dad. Not only to me but to my siblings and my boyfriend as well. I have known Stefon over the phone since 2008 and formally in person as of 2015. Since then Stefon has been very involved in my life productively and positively.

Anytime you need a helping hand, no job is too big or too small for Stefon. I have never met a person who will help anybody at any time and never complain. If he is busy he will make time, if you need him he will be there. I remember back in 2017 I was working a lot and needed to be moved out of my apartment by the 10th of the month. Of course I had waited to the last minute and called Stefon the night before and told him I needed to move my entire 3rd floor apartment into storage before the morning. He didn't chastise me about not being prepared and being irresponsible for not taking time off from work to move. Like a super dad he just showed up in the middle of the dark winter with a truck and we moved that entire apartment. He used that as a teaching moment for me. Make time for what is important so I won't complicate my own life and make a situation worse than it has to be. And I respect him for that. And that's what makes him a better person than me because I know if the situation was the other way around I would have said see you in the morning. But Stefon reliability and selfness is one to admire.

He is always teaching my family to be kind and think of other's. Whenever my boyfriend and I fight we go to him and my mother for encouragement. Us being young and raising a child, Stefon plays an important role in support when we need it most. My boyfriend and I argue and call Stefon to mediate for us all the time. Stefon never picks a side and always plays the voice of reasoning. His calm demeanor, wisdom, actively listening and easy going spirit is what we always need in that moment to bring us back to our happy home. If Stefon wasn't my bonus dad he would defiantly be my marriage counselor.

Every Sunday Stefon comes over to visit my boyfriend and I to see how we are doing. Well one Sunday he came over and my boyfriend and I were in the middle of a heated argument. He made us sit and talk and hug he had us pray with each other. And that right there was a life changing moment that we carry with us to this day in our relationship. When we have disagreements, we don't yell at each other. We used what Stefon taught us. We stop, listen to each other and we pray together.

But all of this stuff that I have previously talked about is minor for what I really want to get into describing the type of person Stefon is. Since my boyfriend and I have been together we always joke

how him and Stefon are long lost father and son. They somehow just clicked and created a strong bond where they talk and hangout every day. Which at first I thought was funny but now I realize that their relationship was a blessing sent from God. Stefon probably doesn't even know how much my boyfriend looks up to him and admires him. And the fact that my boyfriend actually has a father whom he has a relationship with but still is drawn to Stefon is very remarkable.

My boyfriend has a criminal history and did 3 years in jail when he was younger. He has since got his life together started his own trucking business and became focused on going in the right direction in life. He always calls Stefon and their always talking about life. They ride motorcycles together go on day trips together and Stefon has become a great mentor and father like figure to my boyfriend. As things seem to be going right for my boyfriend with his business and family, his life took a turn for the worse when his mom was murdered on October 17th of this year. My boyfriend became depressed and started to lose focus. I remembering him crying and saying he needed to talk to God because he doesn't want to go back to his old life. He called Stefon and asked him to teach him to pray by himself. He called Stefon to help him not lose focus and lose all that he has worked hard for.

One day after his mom had died he was in his truck crying and Stefon called him just to check on him. My boyfriend told me that if Stefon had not called him and talked to him he probably would not still be here. My boyfriend who had never tied a tie a day in his life had to go buy a tuxedo to bury his 46 year old mother. And you know how he called to help him pick put his suit, Stefon! When they came back from the store my boyfriend was so emotional and said that Stefon had paid for his suit with no questions asked. My boyfriend had to pay for his mother's funeral out of his pocket and just out of the kindness of his heart Stefon had lifted some burden off of him by getting his suit.

So to me that's why I can't just call him a step dad. Stefon is more than that. If he has done nothing else he has saved my boyfriend's life. He is someone that my boyfriend needed in life to see that there are people out here that care about others and you can be cool and still do all the right things. Stefon has brought us closer to our faith. He has given us the encouragement to do whatever we set our minds to. He has taught me to be kind and to not be selfish. And as long as you are on this earth and able you should be helping people anyway you can. I guess the best way to describe Stefon is angel on earth.

Sincerely,

Mia Smokes- Boyd

**MemoAppdx-030-Morant**



# City of New Haven
## Department of Parks, Recreation & Trees
720 Edgewood Avenue, New Haven, CT 06515, Phone 946-8020, Fax 946-8024

Toni N. Harp, Mayor                    Rebecca Bombero, Director

DAVID R. BELOWSKY, PRESIDENT, BOARD OF PARK COMMISSIONERS



New Haven
All-America City
2008

September 30, 2016

To Whom I May Concern:

Stefon Morant worked as a seasonal caretaker for the Department of Parks, Recreation and Trees. His effort these past months have contributes to our ability to maintain and improve our park and recreation system during our most demanding season. His service has been consistent and competent; his attendance is exemplary. As a worker, there is no job that Mr. Morant will not tackle and complete to the best of his ability. Additionally, Mr. Morant gets along well with a very diverse workforce and has a pleasing personality on the job.

His reliability and conscientious work ethic makes him an asset to any department. Mr. Morant is eligible for rehire as budget and positions become available.

If I can be of any further assistance, or provide you with further information, please do not hesitate to contact me at (203) 946-8004.

Thank you,

Gary. M. Dickinson
Assistant Superintendent
New Haven Parks & Recreation

Transcript of Video statement of Stefon Morant (December 2016)

My name is Stefon Morant born in Georgetown South Carolina, moved to New Haven Connecticut around a year to 18 months.  My mother and father moved to New Haven so they could get a better way of living and take care of me and my older brother whose name is Frank Morant.  Later on in life two more brothers came, Julien and Leander.  Julien is no longer with us.  He died of lupus in 2013.

We grew up in the City of New Haven.  My father worked for the Housing Authority and my mother started off working at Blue Cross Blue Shield, for approximately a year, and then she went on to work at United Technologies which is known as Pratt and Whitney.

My father early on in our lives took us to Farnam House, which introduced us to basketball.  We used to play there on Saturday.  My father was a happy go lucky guy when he wasn't drinking.  When he did drink he was verbally abusive, sometimes he could be physically abusive.  But when he was not drinking, he was the best father in the world.  He made sure he was at all of our basketball games. I remember a point in time when I did something in school.  My mother worked day shifts so she couldn't be there.  He also worked the day shift but he worked for the Housing Authority so he was able to come and pick me up; like I said, he was there for us.

But there came a time when he wasn't, because my mother and father -- it just got too rocky and they separated.  I think I was in the fifth or sixth grade, age probably was 11 or 12.  That was the change in my life.  Frank at one point in time, I think it was in his freshman year in high school, I guess he just couldn't take it here no more, he just moved south.  I actually never knew why he left.  I just remember me and my mother and my two brothers taking him down I think it was to the Trailways on State Street, and  hearing him saying, "See you later."  I mean we don't use "bye" because we think "bye" means forever.  Of course I seen him again, but it was just like wow.  I was put in a position that my father left, now my big brother is gone, now I have got to take care of my younger brothers. It

1

wasn't rough, it wasn't easy, at the same time it was something that I don't know if I was ready for, but I had to take on that role because nobody else did.

When I became of age I went to get a job. I started working at the 95 Steak House in North Haven. I was a dishwasher. That was my first job I think if I am not mistaken. And every year since, before being thrown into a cage, I worked.

In 1994, here it is. A young man, never had a crime committed in his life, well disorderly conduct, whatever you might say had no prison record, gets hauled off to prison. I can remember the first day actually when I was on trial. I made bond and they said not guilty and they told me to stand up and say "Not guilty" and I said yeah and then they said guilty and my body rocked and they said guilty and my body rocked again. And the judge said, "remand", and I went downstairs and I was in the cell by myself. It was after five. Everybody had left the courtroom and I took my tie and I shook it to the side and I am a man of faith I mean I believe in a higher power, I am a Christian man and an angel, a voice, spoke and told me that "You are going to be all right." I started crying, I'm a grown man but I am crying. And then all of a sudden my tears just backed up.

I remember going back to Whalley Avenue and sitting in that bullpen and my tie was over to the side. I was coming in from being free. They actually called me as soon as I got back to, got processed, they called me and said so you made bond. I was happy, the NBA finals were going on. Wow, I'm got bond, I'm out on bond. Is it possible, my mother paying another quarter million dollars to get me out of jail, I don't believe it.

It was a visit from my big brother Frank , you know it's like, whew. Oh man it was just a visit man. Wow. It's like how do you just take somebody's life. 21 years. It was like I was nothing man. Wow. 21 years. I lose my father. I lose my brother. My grandfather, cousin. And it's like it's all right. It's like you just don't care.

**MemoAppdx-070-Morant**

I'm not with the slogan "Black Lives Matter," because my thing is every life matters, and you know it is what it is.  Like I said I'm not a... color means nothing to me.

I have four children, actually seven, but four biological children, twin boys, a daughter and a son.  My daughter and son, they live in South Carolina.  My twin boys live here.  I try to talk to them as often as possible, but it is hard for me to even build a relationship with them because it was taken from us.  You know and it's like, my son, I just got an article from Yale [Journal], and I didn't even know how he felt.  I had to read it in the paper.  He said, "My dad, my dad is here but I don't even know him."  My sons were two years old when they just took me out of their lives.

I'm not saying I was the best person in the world.  I did sell drugs.  I wouldn't have had a problem you taking me to jail for selling drugs, but without a doubt that is what I did.  It was wrong.  I don't ever believe that I was righteous.  I was wrong for that, but you put me in prison for a double homicide I didn't commit and that was wrong.  Where is the justice?  There is no justice in that.

I live in a household my wife and I, . . .  I don't even know my wife.  Sometimes I'm there, sometimes I'm not, because of the situation, because when you become incarcerated or when you become a felon, you can't live in certain areas.  You can't live in certain households when it is like a project complex.  You know and it's like when is it going to stop?  I mean it's like you took everything from me.  Once again, I am not saying that I was the best person in the world.

As far as jobs is concerned, it's just temporary job here, temporary job there.  I have bills to pay.  My motto is, if I don't work, I don't eat.  So it gets rough.  Sometimes, like I would say two days ago I just broke down.  I'm a man.  I'm supposed to be providing.  I never want to see someone going through something that they don't have to go through.  Especially with the experience that I just went through.  I don't believe anybody should ever have to go through nothing like that.

I don't think that my thing is just the prosecutor or a lawyer or a judge, whomever it may be, it doesn't matter who it is, ... I'm just using this as an example of a person should never not give a person

3

the benefit of the doubt to know that a person has done something wrong. I believe wholeheartedly myself, if the prosecution would have checked into my background of how I was living or did I have a job, they didn't ask me if I had a job, they didn't ask me about my schooling, they didn't ask me about do I have parents, they didn't ask me do I have any children. They didn't ask me any of these things.  They just wanted somebody to be arrested for a crime.  And no shape or form that should be a policy, that should be right.  Things should be investigated.  It shouldn't take a United States court to say okay something is wrong here.

Twenty-one years.  Now what do I do?  Now when I go fill out an application and they ask me well there is a void in your life.  You go from job to job, trying to get a job, trying to get a stable job.  I went to a place, actually I had my attorney draft me up a letter, because the man was like,  "Give us some more information" in regards of your situation. Because I was telling him I was unjustly incarcerated.

I wanted to go work for the Children's Center in in Hamden.  And we drafted a letter. I did this, I did that, and he was like "But it's got to be more.  You got convicted."  So I am faced with this every day.  I went to NAPA.  I tried to get a job.  The lady seen that I wrote down everything on the application and she went, "We're going to give you a chance."  That was three months ago.  I guess the chance is never going to come.

I was working at another job delivering.  I went and got my CDL since I have come home, and I was driving trucks for like two weeks, and next thing you know, the guy is like, I was doing well, good job, so it's not because of my work ethics, because I got good work ethics.  So he's like, "I'm going to give you your last check."  I mean this is what I have been going through. This is what I have been going through.  Last week I was on a truck, mind you I am almost 49 years old jumping off the back of a garbage truck. Don't take away from garbage workers, it's a good paying job.  But wow, you're telling me that I going to retire at 70 what 72 years old.  I think you got to have 30 years, so I got to be 80 years

4

old before you are going to retire me.  I don't think I'll be 80 years old and jumping off the back of a garbage truck.

I want to definitely start a mentoring program.  This is something I want to do.  I know I will make a difference because I am capable and I am able.  Even when I was running the game room, even when I was at Camp Farnam, it started off as counselor.  At the end of the summer, and this is no joke, at the end of the summer, every kid within the age group that I had, wanted me as their counselor.

I go to another job.  I fill out an application and you got to go through a pallet test.  Now I'm the oldest gentleman there. This guy works out at the gym with me, younger than me.  So I'm the fastest with the pallet test.  Now I go to the second interview.  They tell me how much they are going to pay me.  So they sent out the background check.  You know what happens then.  They say, "we found another candidate for this job."

I thank God for change.  I think it's something that going through that experience I'm going to call it, because I never gave up hope, I never gave up faith.  I continued to strive.  I continued to fight and say one day I'll be home.  I'm here today to tell my story.

It's really hard, it's really hard. Sometimes sleeping.  I could sleep but sometimes I wake up in the middle of the night.  I remember I just wonder was it a dream that I was actually here, that I was actually home.  I got to pinch myself every now and then.  Sometimes it is rockier than other times.  It's rockier because at times I could be driving down the road, right, on the highway and just start crying because there is so much pain.

*MemoAppdx-073-Morant*

In Re: Stefon Morant                              Pardon Memorandum

# EXHIBIT E-2

## *Letter from prison (Stefon) to lawyer*
## *Spring 2015*

Mr. ■■■  I am writing to
is order to Clarify A Pretious
letter that I wrote to you in
which I relayed to you that
I am currently incarcerated
for being in the wrong place at
The wrong time. What I
was referring to was the
New Haven Police Dept not
the Crime Scene. Please let
Me explain. At no time on
Or around october 10th 11th
1990 was I anywhere near
Howard Ave. I was in Fay-
etteville NC on my way to
Summerville SC with Christin
Sabia and Esnico Pickett.
What I Experienced at the New
Haven Police Dept. was on every
account highly illegal. I was
intoxicated and under the influence
of marijuana at the time of my

KKB 002220

A-01071

**MemoAppdx-075-Morant**

interview. To be honest at
that point in my life I was
Always intoxicated I was an
alcoholic (and had I not been
an alcoholic I wouldn't be in
prision) while intoxicated and
high the cops, over a period
of several hours threatened me
with the Electric chair, and
A bond so high that my family
wouldn't be able to post it
they also brought the statement
they wanted me to say. And a
newspaper Article written about
the Crime at hand I begged
them to let me leave. time
and time again, but all they
kept saying is I could go
once I said what they wanted
me to say. they had been
drilling in my head for hours
I had never been in a

KKB 002221

**MemoAppdx-076-Morant**

2449

Situation like that + didn't
even Know a Situation like
that existed! Not in real life
not that late in the 20th
Century. My impaired judgment
was taken Avantage of and
I never thought I would be
Fighting for my freedom 2oyrs
later, Fighting to Clear my
name. MR ███████ if you liste
to the interview tape you'll
hear how they Start And
stop the tape So I Can do
it over and over again
until they got the testimony
they wanted. I Trust that
you will do your Job, I Am
not writing to Check up on
you, or question you, + Am
writing because Im Innocent,
And For years it has been
Like Screaming in a Sand

KKB 002222

A-01073

**MemoAppdx-077-Morant**

Proof room, no one outside
these walls seemed to be hearing
At this Junction, when it seem
like I'm finally getting through
the last thing I want to
happen is for you to be Skep-
tical of Anything, And have
A misunderstanding of what
I'm trying to relay I've
been able to aquire some
Material on false Confessions, I
am in no way inferring that
you don't have the Cases or
Know of these Cases, my
experiences has taught me,
however to be safe rather
than sorry. If possible Can
you send me a copy back of
these Cases, these are my only
ones, and the Copier here is broken
last but not least MR. ▮▮▮▮
Detective Reuer, - as I am Sure

KKB 002223

**MemoAppdx-078-Morant**

you will discover is a Corrupt
Cop, And the State is protecting
him, I pray at your hearts
this truth Comes to light
God Bless

Respectfully

Stefon Morant

Ps

Cited Cases
Peter Reilly CT
The memphis 3
Barry Beach Mout
Damon Thibodeaux Louisiana
God Bless

KKB 002224

A-01075

**MemoAppdx-079-Morant**

# the thing about winter

## *After twenty years in prison, can you rebuild a family?*

**Scott Lewis: Framed by a crooked cop?**

by Caroline Wray

"THE THING ABOUT WINTER is, when you're not in it, you have a perception of how cold it is. But then, when you actually get in the cold, and you're freezing your butt off, you don't even remember what that perception was. For a second, you're like, 'take me back.'"

At 5:30 a.m. on February 24, 2014, Scott Lewis took his first step as a civilian in more than twenty years. Ejected from a bus on the side of the road next to the New Haven Correctional Center on Whalley Avenue, he had only one set of clothes, which he was wearing, and a box of legal papers. He'd spent the majority of his time in prison toiling to get out: teaching himself the law, representing himself for nineteen years, methodically plodding though appeal after rejected appeal in order to shed his inmate number (137682) and escape from the 120-year sentence he'd been handed down for a crime he never committed.

When Scott took that first breath outside after the bus doors puffed open and he stepped onto the sidewalk, the air rushed hard at him. Most of his fellow citizens were asleep, including his sister Marlo, scheduled to pick him up in three hours. He had no cell phone, no access to a phone booth—or the coins needed to activate it—and no coat.

The bus chugged away. The sun would rise in an hour. His arms, carrying the box of legal papers, started to tremble.

HOMECOMING

Twenty-four years earlier, on October 11, 1990, former New Haven alderman Ricardo Turner and his lover were murdered in bed following a cocaine-related heist. At the time, neighborhood dealers Scott Lewis and Stefon Morant owed ten thousand dollars to a local kingpin whose business depended on his partnership with a dirty cop, Detective Vincent Raucci. By 1995, Raucci had gathered several witness statements implicating Scott and Stefon in the double murder, and the men were sentenced to 120 and seventy years, respectively. An FBI investigation into the corrupt cop soon revealed that he'd blackmailed the witnesses into falsely placing them at the scene of the crime. The complete FBI file is dated January 24, 1997—less than two years after the men were incarcerated—but it would take eighteen years before both men were released for the crimes they didn't commit.

Some of the events that occurred during that time: Scott and Stefon turned twenty-five, then thirty, then forty-five. Scott's younger daughter Jesilinett learned to write her name in cursive, dropped out of high school, and became a certified medical assistant. Stefon's twin sons, Christian and Julian, learned how to toss a baseball back and forth, then how to drive. Scott's youngest son, Tamaje, started kindergarten and eventually served a three-year drug possession sentence after being arrested and tried as an adult at the age of fifteen. Scott and Stefon became grandparents. Stefon's father died, then his brother. His elementary school girlfriend wrote

## "Everyone was happy, everyone was celebrating, but I was isolated in my own mind, strategizing. What's my next move?"

him a letter, and they got married. Scott taught himself to write appeals, which seven state judges rejected.

In 2009, then-Yale Law School professor Brett Dignam learned about the case through a judge with whom Scott had filed for writ of habeas corpus. Aided by a small team of her law students, she began working to secure his release. Finally, in 2014, a federal judge granted Scott habeas corpus, ruling that Connecticut had withheld evidence of his innocence and thereby violated his constitutional rights. (According to the National Registry of Exonerations, 160 wrongfully convicted people were exonerated in both 2015 and 2016.) When Scott stepped off the bus into the February air, he was a free but not-yet-exonerated man with only the clothes on his back and the GPS device strapped to his ankle.

When someone is wrongfully imprisoned, all their resources go towards one thing: getting out. But reentry into society is not the same as reintegration. What happens after getting out? Besides arduous logistics (Do you have a bed to sleep in? How do you get an ID?), navigating the emotional saga of release is a colossal task. The Federal Bureau of Prisons has published a twenty-two-page handbook for released prisoners. It concludes with a "Rebuilding Your Relationships" section, which advises prisoners to "begin by appreciating the small things," and bear in mind that loved ones have aged in their absence. But what is that supposed to look like? Where on earth do you start?

Scott's first goal as a returning civilian was to avoid freezing to death on the sidewalk. He followed a line of people into the jail, saw a counselor he knew, and managed to borrow his phone. His call woke his sister Marlo, who rushed out of bed to pick him up. "Turn left," her GPS said as they pulled out of the parking lot. Scott was floored. While he knew technology had changed since the nineteen-nineties, he hadn't accounted for his sister's talking car.

Even during those first hours—his reunion with Marlo, his mother, and then his children—Scott tried to figure out how he was going to move out of Marlo's house. Without independence, he still felt imprisoned.

"Everyone was happy, everyone was celebrating, but I was isolated in my own mind, strategizing. What's my next move? How am I going to get up in the morning? What am I going to wear?" he remembered.

Those first sixty days were excruciating. Even with a loving family and a place to stay, Scott felt trapped, reliant on others for food, cash, and transportation. He had one pair of shoes (work boots), and his only clothes smelled like the cobwebbed basement where they'd been stored during his twenty-year absence. He and his two twenty-something sons, Scottie Jr. and Tamaje, spent weeks driving around in the same little car, applying for the same jobs. Eventually, Scottie Jr. was hired, rendering Scott immobile once again.

"I really understood how people could come out of prison, have family support, and still break down and go back to what they were doing before," Scott said. That's exactly what happened to his son Tamaje, who had been released from prison a week before his father, and ended up back in jail for a few months in 2016.

---

**22**                                                      THE NEW JOURNAL

### LOVE

Stefon Morant, Scott's co-defendant, was released from prison in August 2015, a year and a half after Scott, after serving for over two decades. Since his release, he's bounced around from seasonal work to unemployment to a brief stint as a warehouse dockworker, which he had to quit because of his knees. When his job sweeping floors for the city came to a close in October, he felt nervous about being unemployed again.

Unlike Scott, who was officially exonerated in August, Stefon still has the murder felony on his record. (Rather than getting off on an early release, his sentence was cut to the shortest possible time, which he'd already served, minus a couple of years for good behavior. Also unlike Scott, Stefon had not aggressively represented himself or caught the attention of the Yale Law School clinic.) Still, he's in good spirits. A large man who often smiles so big that his eyes disappear, Stefon says it's tough to stay depressed for long, thanks largely to the Christian faith he discovered in prison. Remembering his homecoming, he gazes at the ceiling.

"The first day was joy, of course," he said. "It couldn't have been any other feeling. It was an answered prayer from God."

When the judge ruled that he'd get out, the courtroom was full of Morants—his mother, siblings, and cousins—who erupted in celebratory tears. His wife Kimberly said that, aside from the births of her three children, it was the happiest day of her life. At the moment of his release, she met him on the corner outside the New Haven Correctional Center, where Scott stood the previous winter, and asked where he wanted to go.

"All I wanted was to be able to put on a belt," remembers Stefon. "Think about it: twenty-one years, not being able to wear a belt with your pants."

So straight to Marshalls they went, where they bought a belt, a pair of pants, and some slippers. Eighty minutes of freedom, and one goal already accomplished.

His wife helped mitigate the struggles he faced coming home. Kimberly had a house, a steady income, and a life with space carved out for him. It was easy to slip into. While Scott was worried about how long he'd have to live at his sister's, Stefon moved right into his wife's house.

When Kimberly and Stefon first dated, they were in elementary school. After breaking up as preteens, they remained friends. When Stefon went to prison, social circles they shared always maintained his innocence. She sometimes wondered how he was doing, as she grew up, got married and had three children. After her



Scott Lewis and his youngest daughter Renee Ross, soon after his release (photo courtesy of Scott Lewis)

Stefon Morant and his wife Kimberly, a few weeks after Stefon's release from prison in late 2015 (photo courtesy of Kimberly Morant)

first husband's death in 2007, she reached out to the still-incarcerated Stefon as a penpal. By 2008 they'd started a romance and by 2009 they were married. His faith in the face of a seemingly insurmountable sentence attracted her. Devotion like that, she said, was what she sought in a partner. She always hoped but

MemoAppdx-083-Morant



*Stefon Morant and his children, sent as a gift to him while incarcerated. (drawing by Jason Peterson)*

*Stefon Morant's twin sons, Jahan & Christian, at their high school graduation. Stefon, still behind bars, missed the ceremony. (photo courtesy of Stefon Morant)*

never fully imagined they'd be able to live as a co on the outside. Then, last July, they celebrated t marriage with both of their families and a traditi wedding party. Stefon was dressed in black and wl It was the happiest day of his life.

A committed romantic relationship eventually b somed in Scott's new life, too. A few years into incarceration, Scott's mother told him offhande that a young woman had come into her hair salon. T woman knew Scott and believed that he was innoce and the case had inspired her to go to law school to him out. This was years before Dignam's legal te; had picked up Scott's case. He needed all the help could get, and he couldn't believe his mother did remember the woman's name. Without knowing w she was, Scott thought of her often while sloggi through legal work behind bars. He wondered wheth she'd ever come back to the salon, whether his moth would ever remember her name, whether a you woman would ever appear with the key to his freedor

About a month after he came home, Scott reache out to an old friend, Rachel Bidon, with whom "there always been an unspoken attraction" during his form marriage. She was with someone at the time, but the went for lunch anyway. Scott wore parachute pants an a sparkling gold shirt, the only "going-out" outfit h still had from the nineteen-nineties.

As they aired old feelings, she mentioned that sh once wanted to be a lawyer, and in the midst of studying for the LSATs visited his mother's salon to tell her tha Scott had inspired her studies. Scott was dumbstruck "When does that happen?" he said, shaking his head. "I looked at her and said, 'You're the one I'm looking for.' They were married five months later. Their daughter, Harper-Rose, is now eleven months old.

Scott has been out for three years. He's practicing real estate with Pike International, and he's just a couple of steps away from obtaining his broker's license. He loves talking about the clients that he has made homeowners. He wears a crisp white button-down and shiny black loafers to work. His wedding ring gleams on his left hand. He gestures like a politician while he talks, as if he is building something for you in the air.

"Who knows?" he says. "Maybe someday I'll be mayor of New Haven."

LOST LETTERS

Scott Lewis' twenty-six-year-old daughter, Jesilinett Vasquez, can't remember interacting with her father before he went to prison. But, save for a short break when she was seventeen, they exchanged letters nearly

MemoAppdx-084-Morant

twice a week throughout his entire incarceration. She knew what he looked like from photos, but she never visited and they rarely spoke on the phone. He existed primarily within the words he wrote to her. The notes ran long—usually several lined pages, front and back. This was their medium, which rendered Scott not so different from a diary that wrote back. Jesilinett says she's always felt comfortable telling her dad almost anything: aspirations, school stresses, relationship woes. Stuff she'd never tell her mom.

## "All I wanted was to be able to put on a belt...think about it: twenty-one years, not being able to wear a belt with your pants."

She grew up fantasizing about an old-fashioned father-daughter relationship. She wished he'd helped her with math homework she struggled with, given her boyfriend a hard time, or seen her off to prom. She wished he'd been there when she dropped out of high school because she was pregnant, and when her children Lanie and Xavier were born. She wondered if he'd ever dance with her at her wedding.

Then, all of a sudden, he wasn't in prison anymore. She had plans to meet him at her grandmother's house. But, unsure of how it would go, she almost bailed on the meet-up altogether. She couldn't remember ever touching him before. What should she expect? Would it be better to keep their relationship encapsulated in its past state, without real-time verbal confusion to muddle it? But shortly after Scott opened the door to embrace her, Jesilinett realized she had nothing to fear. She and her father embraced and talked, and it felt natural. Their on-paper rapport carried into conversation. She left brimming with optimism and gratitude. Her father was home. Really home. A couple of weeks later, she brought her kids to a family birthday party, and they met their grandfather. Again, it felt as though things were cohering well, if a little surreally.

Her boyfriend had met her father before she did, because they were in prison together. He told her Scott talked a big game about "becoming a father" after getting out. But despite the first few happy reunions, Jesilinett began to feel like he wasn't making good on his word. She rarely heard from him, and she wanted

him to take greater initiative to be a part her life. She couldn't get rid of the fear that maybe he wasn't the father she'd been waiting for, that maybe he wasn't much of a father at all.

The first thing one notices about Scott Lewis are his high cheekbones and soft, brown eyes. These are also the first things one notices about Jesilinett (who, although twenty-six, looks like she might be sixteen). Her four-year-old, Xavier, has them, too.

Jesilinett and her kids live in West Haven in a single-family home. She said she couldn't bring much in the move, so she got rid of the collection of letters she'd gotten from her dad while he was in prison.

Sitting in her kitchen, Jesilinett described how she's felt since her dad came home. "It hurts," she said.

Lanie, tugging at her mother's jeans to show her a drawing, floated away, then returned with a paper towel roll. She wordlessly handed it to Jesilinett, who took a sheet to wipe her eyes. "I just wish he was more like a father. I wish he knew them," she said, pointing towards the kids.

"I know him," said Lanie, crossing her arms. "He picked me up. We played a game."

"Yeah? What do you call him? What's his name?" Jesilinett asked.

Lanie pursed her lips. She looked at her feet.

"Exactly."

—

Fifteen-minute phone calls once a week or less constituted Scott's relationship with his sons, beginning when they were in preschool. Early on, he said, he stopped allowing his kids to visit. The humiliation of getting stripped, searched, and bossed around—and watching his kids go through metal detectors, get reprimanded for moving the wrong way or attempting to do anything other than hold his hand across a table—"triggered [him] psychologically." And, unlike Jesilinett, Scott's sons didn't strike up a written correspondence.

Before he came home, Scott took his reunion with his children for granted. He thought it "would be a given; that it was natural, biological," but he found that his kids had grown up without him in their lives and didn't need him.

A few months after Scott's release, Scottie Jr. told his father as much. He didn't feel any particular emotional connection to his father, and as a then-twenty-six-year-old man with two kids of his own, he wasn't seeking guidance from a stranger who'd been removed from society since 1995.

"We're biologically father and son, but in terms of everyday living, you really don't know me," Scott recalled his son saying. "You don't know who I am."

Five months after his release, Jesilinett learned her dad was engaged to Rachel when an acquaintance mentioned it offhandedly in a Stop & Shop. She had no idea her father had been seeing someone.

Incensed, she texted her sister Liz, who didn't know either. They agreed: How did their father have the time to meet someone and get to know her, but not the time to mend and foster relationships with the family he already had? In his hurry to make up for lost time—reconnect with a lost love, assemble a life, and participate in a linear, traditional fatherhood—he had left them behind.

"He wasn't only moving on. The whole thing felt like he was rubbing it in our faces," Jesilinett said.

Jesilinett "went off on him" over text. She told her father that she worried about the marriage. It seemed naïve not to acknowledge that Scott, who'd been wrong-

> ## "Part of me was like, why does he have to join this new family? Why couldn't he make things work with a family he already had?"

fully imprisoned for twenty years, stood to gain a great deal of money as compensation from the state. Was he sure that this woman's motives were pure?

Rachel, Scott's fiancée, saw the messages and grew angry. When Harper-Rose was born about a year ago, Jesilinett decided to go see the family, but her relationship with Rachel remained sour. Jesilinett left the hospital in tears. Her dad had a new daughter and a new life with a woman who couldn't stand her.

"He says he knew her before, that she helps him, gives him a house, that she loves him…" Jesilinett trailed off, waving her hand above her kitchen table.

"Blah, blah, blah," her daughter Lanie finished.

### HOW TO BE A FATHER

Scott and Stefon attribute most of their post-prison successes to the new relationships they've forged, but both have struggled to connect with their now-adult children. Like Jesilinett, Stefon's son Julian Sobin questioned his dad's new relationship with Kimberly, and he considered skipping last year's wedding party. He cried at the ceremony because it was an emotional

day: wonderful, sure, but also difficult. He didn't know Kimberly and, frankly, he hardly knew Stefon. He resented that his dad wasn't trying harder to make things work with what he already had.

"It's not like my mom wanted him back or anything," Julian said. "But he has four kids with two women. Part of me was like, why does he have to join this new family? Why couldn't he make things work with a family he already had?"

To her three kids, now all high school–aged or older, Kimberly said Stefon's been a fantastic stepfather. Julian, however, thinks his dad doesn't really know how to be a parent. When Julian becomes a parent, he says he hopes to emulate his mother: someone who was always there, who "would give the shirt off her back" and worked tirelessly for him and his twin brother Christian.

Even though Julian knows his father didn't commit the murders for which he went to prison, he's always harbored resentment.

"If he'd been a good parent at the time—focusing on his kids or helping my mom, and not on getting involved in sketchy stuff—he would never have ended up in prison to begin with," he explained.

For a while, Julian thought about joining his local police force. During the preliminary stages at the training academy, they asked if he was related to anyone who'd been convicted of a crime, and he knew he'd have to bring up Stefon. He did, but also mentioned that he barely knew and almost never thought about his father, having been raised by his mother and grandparents. By any emotional measure, they were his parents.

Christian feels that distance even more strongly—which is ironic, Julian said, since Christian has so much in common with Stefon. They look alike, laugh alike, and exhibit the same rebellious streak. Growing up, Julian occasionally worried about Christian; he didn't want him to end up like their dad.

The twins talked on the phone with Stefon occasionally and visited every so often, but they didn't like going to the prison. There were so many rules about how you could interact, and they were never sure how to make conversation. When they got older and had more control over their schedules, they went less regularly. Sometimes, if peers asked why his dad was never around, Julian would lie, saying he was away on business or always working. He was embarrassed. His friends' parents weren't in prison.

But when on a road trip with friends, Julian got the call that his dad would be free and began to sob. "The tears just started coming. I didn't even know it was happening," he said. "I just started imagining all the things he could be there for—if I ever get married, have kids."

MemoAppdx-086-Morant



Scott Lewis and Stefon Morant shortly after Morant's release in 2015 (photo courtesy of Scott Lewis)

Julian didn't know what to expect from their relationship after the release. The first time they met, he mostly felt shock, and that didn't go away for a while. Now, he told me, they're more like friends than father and son. He is reluctant to schedule time with his dad, who rarely takes the initiative. Sometimes, they go to the gym together, where they make small talk about girls or sports and work out alongside each other.

In December, after Julian graduated from Southern Connecticut State University, Stefon took him out for a drink. On the drive over, Julian told his dad that he didn't feel like they knew each other, that he was angry, and that he wished his dad felt more like a father. Stefon listened sympathetically, and Julian thought things might change. But after a few months, he said, they haven't.

"They all come back from prison having found Jesus, which is cool, fine," Julian added. "So I get a lot of Bible verse texts. But not a lot of 'Hey, how are you? How's your life?' texts."

### IN SEARCH OF LOST TIME

Unlike his half-sister Jesilinett, Tamaje—Scott's youngest child from before prison—has a single early memory of his dad. He must have been around four, which puts Scottie Jr. around six. They were at Toys

"R" Us, and Scott told them they could each pick out one thing. Tamaje impulsively grabbed a piece of candy, but later wished he'd followed Scottie's lead and picked out a Hot Wheels car.

A week after his most recent prison release, he sat at the kitchen table with his fiancée. Tamaje, like his father and Stefon, credits her, who visited him in prison every day for the last year, with helping him get straight and giving him a place to come home.

To an extent, he thinks having his father around might have kept him out of trouble—he went to prison for the first time for drug possession when he was fifteen—but he also doesn't care to linger on hypotheticals.

Now, Tamaje is feeling more optimistic about the future. Before, it seemed impossible to get a job and easy to go back to the street. But this time, his dad's around and has a steady income, and he's offered Tamaje a part-time position at Pike. He says he never felt his relationship with Scott was strained, because he never knew what he was missing. Now, he's looking forward to building a personal and professional bond.

"Maybe it's because I've been in myself," he said. "But I get it. I don't hold anything against him. He lost a lot of his life."

—

Last March, Jesilinett turned twenty-six. Scott took her to IHOP in the morning.

"Just to have breakfast together, for the first time ever," she said, her voice cracking a little, "that was so special to me."

Like Tamaje, she sometimes wonders whether things would have gone more smoothly if Scott had been around while she was growing up. He motivates her unlike anyone else, she says. After several starts and stops over seven years, she finally got her GED this summer, partially as a result of his prodding. Maybe that would have happened sooner had he been home.

So, there at IHOP, they talked about her study schedule, her aspirations for a medical career, her life as a mother. They discovered that neither of them even likes breakfast food. It's something they share, along with their high cheekbones, youthful brown eyes, and a tendency to get cold, both indoors and out.

"Like, all the time," said Jesilinett, reaching for her jacket over their unfinished pancakes.

"Me too," said Scott. "Have I told you about my first day out of prison?"

*— Caroline Wray is a senior in Jonathan Edwards College.*

**INNOCENCE PROJECT**

**Executive Director**
Christina Swarns

**Co-Founders & Special Counsel**
Barry C. Scheck, Esq.
Peter J. Neufeld, Esq.

**Amanda Wallwin, Innocence Project**
**Testimony to the Judiciary Committee of the Connecticut Legislature**
**On S.B. No. 439**
**18 March 2024**

My name is Amanda Wallwin and I'm a State Policy Advocate with the Innocence Project. The Innocence Project is a national organization that represents wrongfully convicted clients across the country. We also work to enact state-level policy reforms that prevent and reveal wrongful convictions and compensate people who have been wrongfully convicted.

The Innocence Project supports **S.B. 439**, which improves Connecticut's statute to compensate wrongfully convicted people in several important ways.

Most wrongfully convicted people spend years behind bars fighting to prove their innocence and the effects of wrongful conviction are profound. The average prison stay of individuals exonerated through DNA testing is 14 years.  While wrongfully imprisoned, exonerees miss out on opportunities to build work experience and further their careers, making it difficult to immediately re-enter the workforce. Incarcerated in the prime of their lives, they often miss out on critical economic benchmarks such as attending college, investing earnings, buying a home, creating retirement accounts, and contributing to social security. Upon release, exonerees can face a number of immediate challenges financially, such as finding housing, transportation, health care, and other basic needs.

S.B. 439 would make a real difference for Connecticut exonerees. The bill has five major provisions:
- Restores "grounds consistent with innocence language"
- Provides survivors benefits
- Sets a timeline for determination
- Repeals the civil litigation bar
- Details examples of services that the Commissioner can order

T 212 364 5340    F 212 364 5341    innocenceproject.org    40 Worth Street, Suite 701, New York, NY 10013

Affiliated with Benjamin N. Cardozo School of Law, Yeshiva University


**Restores "grounds consistent with innocence" language**

Many innocent people have strong constitutional claims for exoneration. They may have had exculpatory evidence hidden from them, or been subject to misconduct by law enforcement or forensic analysts. Often, a court is more willing to exonerate someone on a constitutional claim, if that is an option, rather than on the basis of actual innocence. Those people should not be excluded from compensation simply because they were exonerated based on their constitutional claim, if their exoneration is consistent with innocence. In effect, without this language, people who have been subject to intentional violations of their constitutional rights in the course of their wrongful conviction are less likely to be compensated than those whose wrongful convictions were the result of incompetence or error. Alabama, Minnesota and Missouri all include this provision in their compensation statutes.

**Survivors' benefits**

Exonerees often fight for years to prove their innocence, and may pass away before they are able to collect compensation for their wrongful convictions. In these cases, their families and estates should receive the compensation owed, just as they would for any other debt owed to their loved one. Alabama, Colorado, Tennessee and Texas all provide benefits to the surviving family members of exonerees

**Timeline**

When exonerees are released, they often have a variety of immediate support needs. It's critical to ensure that they are compensated quickly so that they can begin to rebuild their lives, find housing and employment, and begin to heal from their wrongful incarceration. California, Colorado, Florida, Hawaii, Louisiana and Utah all include a timeline in their compensation statutes.

**Services**

While awaiting a cash award, many exonerees have needs that are best met with services from the state. Physical and mental health care, as well as dental and vision care, can be more affordably provided through the state employees' insurance plan, instead of direct reimbursement. Similarly, inclusion in already-existing housing programs is often a more effective way to ensure exonerees have access to housing than directly paying housing costs. Exonerees also often have needs for education, vocational training, transportation, and a variety of re-integrative services. This bill specifies that the Claims Commissioner can immediately order these services, as well

as anything else the Commissioner believes would be appropriate for an exoneree.

**Lift the civil litigation bar**
Compensation through the Claims Commission process is intended to allow exonerees to become whole and be able to rebuild their lives after their wrongful conviction and incarceration. However, the civil litigation process permits exonerees to receive damages from bad actors who contributed to their wrongful conviction. Federal civil rights lawsuits hold bad actors accountable and incentivize agencies to make changes to prevent future wrongful convictions. A civil offset provision allows the state to recover money if an exoneree wins an award or settlement from the entities that are actually responsible for the wrongful convictions. The offset provision is a more fiscally responsible option than barring civil lawsuits.

Alabama, California, Colorado, Washington D.C., Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Tennessee, West Virginia and Wisconsin all permit exonerees to file civil lawsuits in addition to collecting state compensation.

We are aware that attorneys who represent exonerated people have recommended a change in the language of the effective date, to ensure that those who have currently pending claims are not carved out of this legislation, and we support that change.

Thank you for considering this legislation, and for the opportunity to submit testimony. Please feel free to contact me with any questions at awallwin@innocenceproject.org.

**Terence S. Ward**
**42 Montclair Drive**
**West Hartford, CT 06107**
**860 977-2208**


**BY WRITTEN SUBMISSION**

Senator Gary A. Winfield, Co-Chair
Representative Steven J. Stafstrom, Co-Chair
Joint Committee on Judiciary
Connecticut General Assembly
Legislative Office Building, Room 2500
Hartford, CT 06106

**Re:  Raised Senate Bill No. 439**

Dear Senator Winfield, Representative Stafstrom, and Members of the Joint Committee,

     I am the Federal Defender for Connecticut, but I do not write in that capacity.  I write as a citizen and life-long resident of Connecticut to support the passage of Raised Senate Bill No. 439, but I hope you will make one modification to the Raised Senate Bill.  The proposed law will do much to redress the harms that the wrongfully convicted suffer, but it does not go far enough in that it applies, in its current form, only to those whose claims arise after the effective date of the legislation.  Respectfully, I think the Raised Senate Bill should be modified to apply to all who have claims pending, and not just those who are wrongfully convicted after the legislation's effective date.

     As a society, we have a moral and ethical duty to help those who lost their liberty when our system of justice failed them.  I was one of the lawyers who represented Vernon Horn in his federal habeas petition challenging his State of Connecticut conviction.  *See  Horn v. Commissioner of Correction,* 3:17cv1064 (JAM).  Mr. Horn spent 17 years in state custody for a crime he did not commit.  He faces tremendous challenges now that he has been released after the state vacated his conviction and set him free.  He went to jail as a teenager and now finds himself in a world that is largely foreign to him, especially in terms of technology.  You can imagine the difficulties of applying for jobs when you have little, if any, relevant work experience and a 17 year hole in your resume.

     In the current version of Raised Senate Bill 439, Mr. Horn would not quality for relief, and that is not right.  I have no stake in any claim Mr. Horn may have.  As Federal Defender, I cannot engage in the private practice of law, and I have no financial interest whatsoever in Raised Senate Bill 439 being passed.  You should pass it because it is the right thing to do.  When the state wrongfully deprives people of their liberty, it is incumbent on the citizens of the state, through its General Assembly, to help those it has harmed.

Thank you for considering my written testimony.  I would be happy to respond to any questions you may have.


Very truly yours,


Terence S. Ward



Legislative Testimony
765 Asylum Avenue, 2nd Floor
Hartford, CT 06105
860-523-9146
www.acluct.org

**Written Testimony Supporting <u>Senate Bill 439</u>, An Act Concerning Compensation for Persons Who Are Wrongfully Incarcerated**

Senator Winfield, Representative Stafstrom, Ranking Members Kissel and Fishbein, and members of the Judiciary Committee:

My name is Jess Zaccagnino, and I am the policy counsel of the American Civil Liberties Union of Connecticut (ACLU-CT). I am writing to testify in support of <u>Senate Bill 439,</u> An Act Concerning Compensation for Persons Who Are Wrongfully Incarcerated.

The ACLU-CT is committed to ending police violence and racism in policing in all forms. Accountability measures alone are not enough. Connecticut must also divest from policing and reinvest in programs that build strong and safe communities. To build an equitable future for all people in Connecticut, policymakers must reduce policing's responsibilities, scale, and tools. When people are wrongfully incarcerated by our criminal legal system, they deserve their day in court.

To date, the Connecticut has exonerated 36 people whose sentences total 486 years of life lost to the system. For comparison, the state of Connecticut was joined the United States as a state merely 236 years ago. <u>Senate Bill 439</u> would allow people who are wrongfully incarcerated to file federal lawsuits against local municipalities and police in addition to receiving a claim from the state. Under current law, a person forfeits their right to sue in federal court if they receive a claim from the state. We support this bill with one recommended amendment: that this law should be retroactively applied so that people whose claims are currently pending are included.

As such, the ACLU-CT supports Senate Bill 439, and encourages this Committee to do the same.