## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RALPH BIRCH,

               Plaintiff,

-against-

TOWN OF NEW MILFORD et al.,

            Defendants.

No. 3:20-CV-1790 (VAB)

May 1, 2025

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR AN OFFSET

Plaintiff Ralph Birch submits this memorandum of law in opposition to the motion for judgment as a matter of law and for an offset of the jury's verdict filed by Defendants Town of New Milford and Robert Santoro as Administrator of the Estate of David Shortt (ECF No. 318).

## I.    DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW SHOULD BE DENIED

After listening to a tape recording of a detective providing the star witness in a bogus murder case with details about the crime that the witness did not otherwise know, could a reasonable jury find that the detective fabricated evidence and that his partner was negligent in failing to intercede? To ask the question is to answer it. As the Court has already repeatedly held, the evidence in this case more than suffices to support a verdict in Plaintiff's favor.

A motion for judgment as a matter of law under Rule 50(b) "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons

could not arrive at a verdict against it." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008) (internal quotation marks and alterations omitted). Judgment as a matter of law is available only where "a reasonable juror would have been compelled to accept the view of the moving party. The court cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 112-13 (2d Cir. 2015) (internal quotation marks omitted). "The standard is a high one, met only in rare occasions." *Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018) (internal quotation marks omitted). Because Defendants' motion for judgment as a matter of law comes nowhere close to satisfying this demanding standard, the Court should deny it.

### A.    The Jury Reasonably Found that Detective Shortt Negligently Failed to Intervene in the Fabrication of Evidence

Defendants' motion for judgment as a matter of law on the merits of the negligence claim, *see* Defs.' Br. 13-19, fails for two independent reasons. First, it is contrary to the Second Circuit's appellate mandate and the law of the case. Second, the evidence amply supports the jury's finding that Shortt breached a duty to intervene to prevent Mr. Birch from being deprived of liberty based upon fabricated evidence.

### 1.    The Second Circuit's Mandate and the Law of the Case Foreclose Defendants' Argument

In dismissing Defendants' interlocutory appeal, the Second Circuit concluded that "a reasonable jury could find that Ocif improperly coached Cocchia to make false statements inculpating Birch, and that Shortt witnessed this coaching," such that Shortt was not entitled to judgment as a matter of law. *Birch v. Town of New Milford*, No. 231153, 2024 WL 3083385, at *2 (2d Cir. June 21, 2024). "[W]hen the court of appeals has remanded a case for trial after ruling that summary judgment in favor of a given

party was inappropriate because the evidence indicated the existence of genuine issues of material fact to be resolved by the jury, the district court cannot properly, on remand, grant judgment as a matter of law to that party on the basis of trial evidence that is not substantially different." *Kerman v. City of New York*, 374 F.3d 93, 110 (2d Cir. 2004) The principal evidence on which the Second Circuit's based its conclusion—*i.e.*, the transcribed and recorded interview of Todd Cocchia—was not "substantially different" from the evidence presented to the jury at trial. Based on that evidence, the jury found that Shortt was negligent in failing to intervene to remedy Detective Ocif's fabrication. Because the Second Circuit has already found that evidence sufficient to support Plaintiff's claims against Shortt, Defendants' motion is barred by the appellate mandate.

Even if the Second Circuit's mandate did not constrain this Court's consideration of Defendants' motion, the Court's prior summary judgment rulings would still foreclose the relief they seek. Relying on the same recorded and transcribed interview of Todd Cocchia that was before the jury at trial, the Court denied Shortt's motion for summary judgment because "a reasonable jury could find that State Police Detective Ocif knowingly elicited false information in violation of Mr. Birch's constitutional right to a fair trial." *Birch v. Town of New Milford*, No. 3:20-CV-1790 (VAB), 2023 WL 4684720, at *41 (D. Conn. July 21, 2023), *appeal dismissed,* No. 23-1153, 2024 WL 3083385 (2d Cir. June 21, 2024). Under the law-of-the-case doctrine, a district court's substantive pretrial rulings "may not usually be changed unless there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." *Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (internal quotation marks omitted). None of those circumstances exist here. The Court should therefore adhere to

its ruling at summary judgment that the recorded Cocchia interview provides a sufficient basis for a reasonable jury to find that Detective Ocif fabricated evidence in Detective Shortt's presence.

## 2.    The Evidence Supports the Jury's Verdict

Law of the case aside, the trial record amply supports the jury's negligence verdict. Because there was more than a sufficient evidentiary basis for the jury to find that Detective Shortt failed "to use reasonable care under the circumstances" when he witnessed Detective Ocif feed information to Todd Cocchia and failed to intervene, *see* ECF No. 303 (Jury Charge) at 23, there is no basis to grant judgment as a matter of law.[1]

Defendants' continued insistence that Detective Ocif did nothing improper during the Cocchia interview ignores and contradicts vast swaths of the evidence presented at trial. Most importantly, the jury had before it both the transcript and the audio recording of the interview, which unmistakably show Ocif feeding Cocchia information that he could use to inculpate Mr. Birch.

Defendants make no real effort to dispute that Ocif intentionally provided Cocchia with information about the Carr murder that Cocchia did not previously know. Early in the recorded portion of the interview, Ocif told Cocchia that the victim was old and that the murder weapon was a knife. PX73 at 3. Even with the benefit of this somewhat subtle coaching, however, Cocchia remained unable to provide an accurate or coherent statement that could be used effectively against Mr. Birch. Even after Ocif told Cocchia that he would "try to give [him] a hint" and sought to prompt Cocchia to claim that Mr. Birch had stolen specific items from the Carr residence, Cocchia continued to

---

[1]    Although Defendants erroneously rely on the Court's jury instructions concerning Mr. Birch's § 1983 claim for fabrication of evidence, *see* Defs.' Br. 13 (quoting ECF No. 303 at 18-19), that claim was not the basis for the judgment in Plaintiff's favor, and those instructions have no relevance here.

provide responses Ocif knew were inaccurate. *Id.* at 5. Finally, after informing Cocchia that "half the information" he had purported to provide during the interview was wrong, Ocif announced: "I'll be truthful with you," and began directly feeding information about the crime to Cocchia. PX73 at 12. Ocif told Cocchia that Mr. Birch "wasn't alone" during the murder"; that "it was night time, it wasn't day time"; and that that Mr. Birch "woke an old man up . . . he was old, he was 65, and he got murdered." *Id.*

Ocif admitted in front of the jury that he provided this information to Cocchia during the interview. Ocif Tr. 49:17-50:11.[2] It was hardly unreasonable for the jury to conclude that he did so for the purpose of bolstering Cocchia's false claim that Mr. Birch had confessed involvement in the murder; indeed, Defendants barely attempted to offer the jury an alternative explanation. Accordingly, this evidence would more than suffice to support a jury finding that Ocif fabricated evidence in Shortt's presence. *Birch*, 2023 WL 4684720, at *41 (finding evidence sufficient at summary judgment stage to support Mr. Birch's claims against Defendant Shortt).

Defendants' contrary arguments have no force. Their assertion that only Cocchia's initial, generic claim that Mr. Birch confessed to killing a man during a burglary was materially inculpatory and Ocif was thus free to feed him any information he wished after that, *see* Defs.' Br. 16-17, defies both the law and common sense. Defendants cite no authority for the proposition that evidence fabrication is only improper if it happens immediately, and none exists. To the contrary, it is unlawful for investigators to feed investigative information to witnesses precisely *because* doing so allows them to artificially burnish the credibility of otherwise vague and unconvincing

---

[2]    Citations to "Ocif Tr." are to the certified transcript of the trial testimony of Andrew Ocif on March 13, 2025, annexed as Exhibit 1 to the Declaration of Douglas E. Lieb accompanying this brief. Citations to "Acker Tr." and "Shepack Tr." are to the relevant pages of those witnesses' deposition transcripts read into evidence.

statements. *See, e.g.*, *Vazquez v. City of New York*, No. 10 Civ. 6277 (JMF), 2014 WL

4388497, at *4, *8 (S.D.N.Y. Sept. 5, 2014); *Zahrey v. City of New York*, No. 98 Civ.

4546 (DCP), 2009 WL 54495, at *10-12 (S.D.N.Y. Jan. 7, 2009); *Blake v. Race*, 487 F.

Supp. 2d 187, 207-08, 213 (E.D.N.Y. 2007). And that is exactly what occurred in this

case: after learning details from Ocif about the Carr murder that he previously did not

know, Cocchia testified at Mr. Birch's probable cause hearing and attributed those

details to Mr. Birch's supposed confession, paving the way for Mr. Birch's prosecution

and wrongful conviction. PX 220 at 139.

     If that were somehow not enough, the jury also learned that a portion of the

interview with Cocchia in Norfolk occurred before the tape recorder was turned on. Ocif

Tr. 41:2-21. Ocif "do[es]n't know" the length of this unrecorded portion. *Id.* at 62:2-4.

The jury was reasonably entitled to infer that additional coaching and fabrication

occurred during this unrecorded portion of the interview. The facts supporting this

inference include: (i) Ocif's demonstrated willingness to feed Cocchia information even

when he *was* being recorded; (ii) Cocchia's subsequent recantation, Ocif Tr. 85:24-86:4;

(iii) Ocif's admission that he *began* a prior interview with another jailhouse informant,

Robert Perugini, by improperly informing Perugini that he was "investigating a murder

that Ricky Birch was involved in," PX96, which Ocif's own supervisor acknowledged was

contrary to standard practice and created an opportunity to fabricate, *see* Acker Tr.

105:15-106:18; and (iv) Ocif's incredible insistence that he brought only blank paper and

extra tapes and batteries with him on an interstate journey to interview a crucial witness

in a murder investigation—even though he did not know in advance whether Cocchia

might have had firsthand knowledge of the crime, *see* PX119; Ocif Tr. 83:14-18—which

supports an inference that he was lying about his possession of case-related materials to

conceal the fact that he showed them to Cocchia, *see id.* at 63:24-64:2; *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952) (Hand, J.) (observing that "the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denied").

The trial record similarly supports the finding that Shortt knew or should have known that Ocif's conduct was improper, triggering his legal duty to intervene. *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that any constitutional violation has been committed by a law enforcement official.").

To begin with, the jury had ample basis to find that Shortt knew even before the Norfolk trip that Detective Ocif was resolutely convinced of Mr. Birch's guilt—irrespective of the evidence—and would do whatever it took to secure a conviction. The week before their trip to Virginia, Shortt sat with Ocif during an interview with Mr. Birch in which Mr. Birch attempted to provide the detectives with information he had heard about the Carr murder. PX216; Ocif Tr. 35:10-36:3. In front of Detective Shortt, Ocif mocked Mr. Birch's protestations of innocence, opined that Mr. Birch's statements were "a pack of lies," and insisted that Mr. Birch and Shawn Henning were the true perpetrators. Ocif Tr. 36:6-13. The jury was entitled to find that a reasonable officer in Shortt's position would have approached the Norfolk interview with heightened caution, given Detective Ocif's fixation on proving Mr. Birch's guilt by any means necessary—not to mention Shortt's supervisors' protestations that Mr. Birch was innocent, *see generally* Testimony of Norbert Lillis and John Roma.

The jury also heard extensive evidence that Ocif's approach to the interview was obviously and unambiguously improper, and thus reasonably found that Shortt knew or should have known that Ocif was acting unlawfully. Ocif himself conceded that supplying witnesses with information during interviews allows them to tailor their statements to investigatory objectives; the tactic is so self-evidently impermissible that Ocif (falsely) claimed that he "never did that." Ocif Tr. 33:8-24. The jury likewise heard the testimony of State Police Sergeant Brian Acker, the Carr investigation's overall supervisor, who explained that providing witnesses with information and leading them to conform their statements to police knowledge creates "an opportunity [for] fabrication." Acker Tr. 106:4-17; *accord id.* at 111:20-112:11. Assistant State's Attorney Shepack, the trial prosecutor, similarly testified by deposition—*as a defense witness*—that feeding facts to witnesses is "problematic." Shepack Tr. 99:23-100:18. Yet according to Shepack's notes on the interview transcript, Ocif repeatedly did just that. *See generally* PX74 (noting repeated insistences of Ocif "interject[ing]," "leading," and "coaching"). The jury thus heard from Shortt's partner, the supervisor of the investigation, and the assigned prosecutor that they all readily recognized the kind of coaching in which Ocif engaged as a form of improper evidence fabrication. It was more than reasonable for the jury to find that Shortt reached or reasonably should have reached the same conclusion as he observed Ocif's conduct, triggering a duty to intervene.

Finally, the jury could reasonably have found that the falsity of Cocchia's claims was or reasonably should have been apparent to Shortt. Ocif's admission that Cocchia "lied a lot"—which Ocif initially denied and was then forced to concede after being impeached with his own video-recorded deposition testimony, Ocif Tr.

50:23-51:16—alone provides a sufficient basis to support this finding.[3] Defendants'
contention to the contrary rests on the faulty premise that Plaintiffs somehow bore the
burden to specifically prove that Ocif communicated his distrust of Cocchia to Shortt in
real time. *See* Defs.' Br. 17-18. But regardless of what Ocif may have *told* Shortt about his
"personal belief" that Cocchia was a liar, *id.* at 18, the jury could infer from *Ocif's*
contemporaneous recognition of Cocchia's untruthfulness that *Shortt* reached the same
conclusion after sitting through the same interview—just as the jury (and everyone else
in the courtroom, with the possible exception of defense counsel) did after listening to it.

The jury could also have reasonably found that Shortt *knew* Cocchia was lying
about the crime having been perpetrated during the daytime by one person because
Shortt personally responded to the crime scene no later than 4:55 am and observed the
two prominent sets of bloody shoeprints in the house. PX2; PX179-59 through -63. The
jury could reasonably have found that Shortt was or should have been aware of
Cocchia's untruthfulness in general from his demonstrable lies about these subjects. Nor
would it have been unreasonable for the jury to infer that Ocif and Cocchia likely
discussed their respective impressions of Cocchia's veracity during their overnight stay
in Virginia and their eight-hour drive back to Connecticut, during which Ocif testified
that they discussed the investigation and Shortt expressed approval of Ocif's conduct.
*See* Ocif Tr. 51:20-52:12.

Drawing all permissible inferences from the trial evidence in Plaintiff's favor, no
basis exists to disturb the jury's well-supported finding that Detective Shortt acted
negligently in failing to intervene when Ocif coached and led Cocchia to falsely inculpate

---

[3]    As the Court is aware, this videoed testimony appears to have been important to the jury's
deliberations, as it was the subject of the jury's only substantive note.

Mr. Birch in the murder of Everett Carr, and that Shortt knew or reasonably should have known Ocif's conduct was out of bounds. The Court should deny Defendants' motion.

### B. The Jury Reasonably Found that the Harm to Mr. Birch Was Imminent and Foreseeable

Defendants are equally wrong in contending that no reasonable jury could find that the "identifiable victim, imminent harm" exception to governmental immunity applied. *See* Defs.' Br. 20-27. Under Connecticut law, "liability may be imposed" notwithstanding this immunity "when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm." *Doe v. Petersen*, 279 Conn. 607, 616 (2006) (internal quotation marks and ellipsis omitted). Defendants do not contest that Mr. Birch was an identifiable victim, but contend—without reference or citation to any particular evidence adduced at trial—that the harm caused by the fabrication of Cocchia's story was not imminent from Shortt's perspective at the relevant time.[4] The facts found by the jury rationally demonstrate otherwise.

At the time of the July 1988 Cocchia interview, Shortt surely knew that Mr. Birch was the primary suspect in the Carr murder investigation. He had just participated in an interview with Mr. Birch less than a week earlier in which Ocif had vehemently expressed his view that Mr. Birch was guilty and that his protestations of innocence were "a pack of lies." PX216. He then drove eight hours with Ocif to Virginia for the purpose of seeking evidence that would incriminate Mr. Birch. If that were not enough,

---

[4] Defendants at times appear to suggest that to find in Mr. Birch's favor on his negligence claim against Shortt, the jury must somehow have believed that the police were obligated to conceal Cocchia's statement from the prosecutor. *See, e.g.*, Defs.' Br. 22 (characterizing the notion "that Ocif should not have given Cocchia's statement to the prosecutor" as a fact that "must have been proven to support the negligence verdict against David Shortt"). Of course, Plaintiff never presented any such theory to the jury; Mr. Birch's contention is that Ocif should not have helped Cocchia fabricate inculpatory evidence and that Shortt should have taken reasonable steps to ensure that fabricated evidence would not be used to deprive Mr. Birch of liberty, not that they should have suppressed the evidence after helping to fabricate it.

as the interview was concluding, Ocif stated in Shortt's presence, with respect to Mr. Birch: "*When we pinch him for the murder*, he ain't gonna get out on no bond. Nobody's gonna post the bond we're gonna have on him." PX73 at 13 (emphasis added). In this context, it was not unreasonable for the jury to find that the fabrication of evidence Shortt had just witnessed "was so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to prevent the harm"—which the Connecticut Supreme Court has made clear is "the proper standard for determining whether a harm was imminent." *Haynes v. City of Middletown*, 314 Conn. 303, 323-23 (2014).

Defendants' contrary contention is largely based on the amount of time that elapsed between the Norfolk interview and Mr. Birch's arrest. *See* Defs.' Br. 26. But as the Court previously recognized, the proper "inquiry focuses not on the '*duration* of the alleged dangerous condition, but on the *magnitude of risk* that the condition created.'" *Birch v. Town of New Milford*, 2021 WL 4932405, at *23 (D. Conn. Sept. 24, 2021) (quoting *Haynes*, 314 Conn. at 323). In any event, even if Shortt's observations as of July 1988 were somehow insufficient to support the jury's finding, Shortt's negligence did not end when the detectives left Norfolk.[5] To the contrary, Shortt remained involved in encouraging Cocchia to testify against Mr. Birch on the basis of Ocif's fabrication.

---

[5]     Although the gravamen of the argument is unclear, Defendants appear to suggest that Shortt is somehow entitled to discretionary act immunity because other people also failed to stop Cocchia's statement from being used to deprive Mr. Birch of liberty. *See, e.g.*, Defs.' Br. 27 ("No evidence was presented proving that Det. Shortt had any more material information than those participating in the criminal litigation to better enable him to judge Cocchia's credibility."). But the culpable conduct of third persons has nothing to do with the discretionary act immunity analysis. Regardless, as the Court correctly instructed the jury, "negligent conduct can be a proximate cause of an injury if it is not the only cause, or even the most significant cause of the injury, provided it contributes materially to the production of the injury, and thus is a substantial factor in bringing it about." ECF No. 303 at 25. To the extent Defendants mean to suggest that the subsequent acts or omissions of other persons amounted to a superseding cause that insulates Shortt from negligence liability, Defendants never made such an argument at trial, nor did they request that the Court charge the jury on superseding cause. *See* Conn. Jud. Branch, Civil Jury Instr. 3.1-5.

In January 1989, Shortt personally traveled *back* to Virginia to obtain a sworn, written statement from Cocchia implicating Mr. Birch in the murder. PX215. Shortt then *personally participated in arresting* Mr. Birch in January 1989, even as Mr. Birch once again insisted on his innocence. PX214. By that point, Shortt had also personally participated in arresting Shawn Henning in November 1988 and had listened to him refuse to falsely implicate Mr. Birch to help himself while being driven across the state back to Litchfield. PX225.

Even if Shortt somehow could not have foreseen that Mr. Birch would be the victim of Ocif's fabrications in July 1988, he certainly knew as much when he took Cocchia's formal statement and accompanied Ocif to arrest Mr. Birch in January 1989. Yet Shortt still did not act to prevent the imminently foreseeable deprivation of Mr. Birch's liberty at that time. *See Fleming v. City of Bridgeport*, 284 Conn. 502, 532 (2007) (observing that "[f]oreseeability is the touchstone of our analysis in determining whether a public officer can be liable for his discretionary acts" under the identifiable person, imminent harm exception). It was thus more than reasonable for the jury to determine that the harm to Mr. Birch was imminent, and that finding of fact is entitled to the Court's deference. *See Brooks v. Powers*, 328 Conn. 256, 275 (2018) ("whether harm in any particular case was imminent necessarily is a fact bound question").

The non-precedential authorities upon which Defendants rely do not involve the highly deferential Rule 50 standard for disturbing a jury's verdict and provide no basis for doing so here. *Alexander v. Vernon*, for example, held that the murder of a domestic violence victim at the hands of her abusive husband was not imminent from the perspective of police officers who failed to arrest the husband two days before the murder. No. X07CV020078935S, 2004 WL 1098773, at *7 (Conn. Super. Ct. May 3,

2004). In so concluding, the court noted that the police "were confronted with conflicting versions of events and ambiguous physical evidence" about prior interactions between the couple, *id.* at *6, and that the officers had not observed any threatening behavior by the perpetrator during their brief investigation, *id.* at *7. The scenario presented in *Alexander* bears scant resemblance to the facts here, where Defendant Shortt (1) directly witnessed Detective Ocif improperly obtain a fabricated witness statement; (2) watched as Ocif proclaimed that the fabricated statement would be used to "pinch" Mr. Birch; and then (3) personally participating in arresting Mr. Birch based on the fabricated statement. Unlike in *Alexander*, where the risk of domestic violence "might be realized, if at all, at some future unknown time and place," *id.* at *7, the temporal sequence here was both specific and known to Detective Shortt in real time.

*Brooks v. Sweeney*, No. CV065005224S, 2008 WL 5481203 (Conn. Super. Ct. Nov. 28, 2008), is similarly inapposite. *Brooks* found the imminent harm exception inapplicable to claims that a Health District employee negligently supervised his subordinate by failing to halt the submission of an allegedly groundless arrest warrant application. *See id.* at *1, *8. In finding that the plaintiff's arrest was not imminent from the perspective of the supervisor, *Brooks* relied on the fact that the supervisor could not have known when the warrant application would be acted upon by police or prosecutors. *Id.* at *8. Even assuming that the rationale of *Brooks* survives the Connecticut Supreme Court's later decision in *Haynes*, *see* 314 Conn. at 321 (abrogating prior rule that improperly suggested "that a harm is imminent if it *can only* occur in the near future"), it would have no application here. Unlike the health inspectors in *Brooks*, who could not have known when the police might effectuate the plaintiff's arrest, Detective Shortt *personally carried out* the arrest of Mr. Birch and his co-defendant. At the very least, it

certainly was not unreasonable as a matter of law for the jury to find that the harm to Mr. Birch became imminent *at some point* during the course of Shortt's months-long, ongoing breach of his duty to intervene, which is all that is necessary to sustain the jury's verdict.[6]

Where conflicting evidence creates a question of fact as to the availability of discretionary act immunity, that "factual inquiry . . . should be left for jury determination," and only in an "exceptional case" should the court grant judgment as a matter of law. *Sestito v. City of Groton*, 178 Conn. 520, 528 (1979) (reversing directed verdict in favor of police officer who allegedly failed to intervene to prevent harm caused by third party). This case does not come close to crossing that threshold. The jury was properly instructed on the elements of the "identifiable victim, imminent harm" exception to governmental immunity and rationally found those elements satisfied based on the evidence of Shortt's involvement in this homicide investigation. There is no proper basis to disturb the verdict, and Defendants' motion should be denied.

## II.    DEFENDANTS ARE NOT ENTITLED TO AN OFFSET UNDER GENERAL STATUTE § 54-102UU(H)

Defendants' brand-new argument that they are entitled to reduce the jury's verdict to $0 based upon Mr. Birch's prior settlement with the State Defendants (Noirot Decl. Ex. B, the "State Settlement") is wholly meritless. *See* Defs.' Br. 28-37. First, Defendants have waived any claim for an offset. Second and more important,

---

[6]     The additional examples on which Defendants rely, *see* Defs.' Br. 25-26, cannot help them because those cases hinged on the "identifiable person" prong of the immunity exception, not the imminency of the harm. *See Evon v. Andrews*, 211 Conn. 501, 508 (1989) (exception did not apply to negligent failure to enforce residential fire codes because "[t]he class of possible victims of an unspecified fire that may occur at some unspecified time in the future is by no means a group of 'identifiable persons'"); *Shore v. Town of Stonington*, 187 Conn. 147, 153-54 (1982) (exception did not apply to officer's failure to arrest drunk driver because officer's duty of care in enforcing traffic laws was not specific to plaintiff's decedent). Here, Defendants do not dispute that Mr. Birch was a readily identifiable victim, nor could they.

Defendants' argument ignores the statutory text and context of General Statute § 54-102uu, which authorizes the Connecticut Claims Commissioner to award compensation to exonerees. The municipal offset provision of § 54-102uu(h), on which Defendants rely, applies only where there has been an "award" of compensation by the Claims Commissioner. The State Settlement is not such an "award." It is a voluntary compromise of Mr. Birch's federal civil rights claims pursuant to General Statute § 3-125a, to which the provisions of § 54-102uu expressly do *not* apply. Finally, even if the offset provision could ever apply to such a settlement, Defendants would not be entitled to benefit from it here because it was enacted into law after the State Settlement took effect and is not retroactive.

> **A.    The History of the State Settlement and the 2024 Amendments to the State's Wrongful Incarceration Compensation Scheme**

Before proceeding further, it is important to set forth the procedural history of the State Settlement and the 2024 amendments to § 54-102uu.

Mr. Birch and the State Defendants executed the State Settlement in September 2023. *See* State Settlement at 4-5 (signature dates). The purpose of the State Settlement was to "compromise and settle claims that exist among and between them as a result of the Suits"—a defined term referring to this case and Shawn Henning's related federal lawsuit. *Id.* at 1. The State Settlement was expressly a "compromise of disputed claims" that included no admission of liability. *Id.* at 2. Indeed, it provided that "[t]he existence of this Agreement or any payment made hereunder shall not be construed as an admission of liability, or the correctness of any judicial decision or opinion, or the truth of the allegations, claims, or contentions of any party." *Id.*

The State Settlement contained a general release of claims against the State of Connecticut, its officers, and its employees, pursuant to which Mr. Birch and Shawn Henning released "all . . . present and former officers and employees of the State of Connecticut, their heirs, successors and assigns, from all actions, causes of action, suits, claims, controversies, damages and demands of every nature and kind, . . . which the plaintiffs, their heirs, successors and assigns ever had, now have or hereafter can, shall or may have for, upon, or by reason of any matter, cause of thing whatsoever from the beginning of the world to the date of this Release." *Id*. Consistent with this broad general release, the State Settlement required Mr. Birch to dismiss this action with prejudice against the State Defendants. *Id*. at 1. It also required him to withdraw with prejudice his claim for wrongful incarceration under § 54-102uu, *see id*. at 1, which had been filed but never heard on the merits or otherwise acted upon by the Claims Commissioner.

There was a reason Mr. Birch had never tried to advance his compensation claim before the Claims Commissioner to a ruling on the merits. Under the version of § 54-102uu that existed at the time, receiving an award would have required Mr. Birch to "relinquish[] any right to pursue any other action or remedy . . . arising out of such wrongful conviction and incarceration." Conn. Gen. Stat. Ann. § 54-102uu(g) (June 29, 2016) ("Old Statute," Lieb Decl. Ex. 2). In other words, to receive compensation from the Claims Commissioner under the Old Statute, Mr. Birch would have had to release his civil rights claims against the State Defendants *and* the Town Defendants. *See id*. Like most Connecticut exonerees, Mr. Birch had no interest in doing so except as a fallback option. Compensation from the Claims Commissioner was governed by a statutory formula presumptively limiting annual recovery to 100%-200% of

16

inflation-adjusted median household income. *See* Old Statute § 54-102uu(d)(2). As a result, Mr. Birch's federal civil rights claims were much more valuable, so he filed a claim protectively with the Claims Commissioner but did not seek to move those proceedings forward. *See generally* Legislative History (Noirot Decl. Ex. C) at 36-37, 93, 131 (materials in legislative record describing exonerees' incentive under the Old Statute to file protectively with the Claims Commissioner and let claims sit as they pursued more remunerative federal civil rights cases).

The State Settlement required the Attorney General to submit it to the General Assembly for approval under General Statute § 3-125a, and the parties' obligations were contingent upon legislative approval. *See* State Settlement at 3. Section 3-125a is a general procedure pursuant to which the General Assembly must approve settlements that involve a payment in excess of $2.5 million from the State's General Fund. *See* Conn. Gen. Stat. § 3-125a. The General Assembly was not in session during the second half of 2023. When the General Assembly was in session in the first half of 2024, the Joint Committee on Judiciary considered Senate Resolution No. 5, a joint resolution to approve the State Settlement. *See* Lieb Decl. Exhibit 3 (S.R. No. 5 (2024)). The resolution provided in its entirety:

> That the provisions of the stipulation of settlement in the actions Ralph Birch v. Town of New Milford, Et Al., No. 3:20CV1790 (VAB) and Shawn Henning v. Town of New Milford, Et Al., No. 3:20CV1792 (VAB) United States District Court, Consolidated Civil Action No. 3:20CV1790 (VAB), dated September 19, 2023, requiring an expenditure from the General Fund budget in excess of two million five hundred thousand dollars and submitted by the Attorney General to this Assembly in accordance with section 3-125a of the general statutes, are approved.

*Id.* On March 1, 2024, the Joint Committee on Judiciary unanimously reported in favor of the resolution. *See* Lieb Decl. Ex. 4 (vote tally). The full General Assembly did not act

on the resolution. As a result, the State Settlement was approved by operation of law, as § 3-125a provides that settlements shall be deemed approved unless rejected by a three-fifths vote of each house within 30 days of submission. *See* Conn. Gen. Stat. § 3-125a(a).

In the 2024 legislative session, the General Assembly also considered amendments to the separate exoneree compensation scheme set forth in § 54-102uu. Those amendments were passed by the General Assembly in the waning hours of the legislative session and signed into law by the Governor on June 4, 2024. The relevant legislative enactment, Public Act No. 24-106 (Lieb Decl. Ex. 5), does several things.[7] First, it expands eligibility by making persons whose convictions were overturned on "grounds consistent with innocence" eligible for compensation. *See id.* § 1(a)(2). Second, it increases the amount of compensation by making the presumptive compensation amount 200% of inflation-adjusted median family income, as opposed to a range of 100%-200%, while preserving the Claims Commissioner's ability to adjust the award by 25%. *See id.* § 1(d)(2)(A). Third, and relevant here, it replaces the Old Statute's requirement that a compensated exoneree relinquish *all* civil claims with new provisions requiring a release of civil claims only against the State and providing for an offset of any future recovery against a municipality. *See id.* §§ 1(g), 1(h).

Public Act No. 24-106 provides that it is "[e]ffective from passage and applicable to claims pending before the Claims Commissioner on the effective date of this section or filed with the Claims Commissioner on or after the effective date of this section." *Id.* § 1. Mr. Birch's protective claim under § 54-102uu had already been withdrawn without any award of compensation at the time the Act was passed.

---

[7]     When reading the Public Act, note that bracketed language is removed from the statute by passage of the Act and underlined language is added to the statute by passage of the Act.

### B.    Defendants Waived Any Argument for an Offset

As an initial matter, Defendants waived any claim for an offset by failing to plead it, assert it in the Joint Trial Memorandum, or mention or pursue it in any way whatsoever until this post-trial motion.

To the extent they believed they were entitled to an offset against Mr. Birch, Defendants were required to plead as much as a counterclaim. *See, e.g.*, *Valley Disposal Inc. v. Central Vt. Solid Waste Mgmt. Dist.*, 113 F.3d 357, 365 (2d Cir. 1997) ("Under the Federal Rules of Civil Procedure, a defendant's claim of setoff against a plaintiff is to be made by means of counterclaim in its answer to the complaint."); *Middletown Plaza Assocs. v. Dora Dale of Middletown, Inc.*, 621 F. Supp. 1163, 1164-64 (D. Conn. 1985) (discussing whether offset is properly pleaded as an affirmative defense or a counterclaim and construing pleaded affirmative defense as a counterclaim). Defendants did not plead offset in any form. *See* Town Defendants' Answer to First Amended Complaint, ECF No. 81 (no mention of offset).

While the statutory provision on which Defendants rely did not exist at the time they originally filed their Answer, almost a year has passed since the General Assembly enacted the relevant amendment on May 8, 2024. *See* Legislative History at 4. Defendants made no effort to amend their Answer—let alone a prompt and diligent effort—to assert any claim for offset. As the Court has already held in this case under analogous circumstances, Defendants have therefore waived any claim for offset under the applicable good cause standard for amendments to the pleadings under Federal Rule of Civil Procedure 16. *See Birch v. Town of New Milford*, No. 3:20-CV-1790, 2023 WL 4684720, at *11-14 (D. Conn. July 21, 2023) (holding that Henry Lee waived affirmative

defense of absolute testimonial immunity by failing to plead it in his answer or diligently seek to amend his answer).

Defendants's failure to assert any entitlement to an offset in the parties' Joint Trial Memorandum further confirms their voluntary waiver of any such claim. *See* Second Revised Joint Trial Memo., ECF No. 283 (no mention of offset); *Short v. Westport Nat'l Bank*, No. 3:09-CV-1055, 2014 WL 1316098, at *4-5 (D. Conn. Mar. 31, 2014) (contentions not raised in joint trial memorandum waived).

### C.    The Offset Provision of § 54-102uu Only Applies to Compensation Awarded by the Claims Commissioner, Not the Voluntary Settlement of a Civil Rights Action

More important, Defendants are not entitled to an offset because the statutory provision on which they rely simply does not apply here. Even if the offset provision were somehow retroactive, which it is not, *see infra* § II(D), only an "award" to Mr. Birch under General Statute § 54-102uu would entitle Defendants to the relief they seek. But the State Settlement is manifestly not an award under § 54-102uu. To the contrary, it is a settlement under General Statute § 3-125a, to which the provisions of § 54-102uu, including the municipal offset provision in subsection (h), "*shall not apply*." New Statute § 54-102uu(k) (emphasis added).[8]

### 1.    The Settlement with the State Is Not an "Award" Under the Compensation Statute

The new municipal offset provision of § 54-102uu enacted in 2024 states: "Any damages awarded after *an award pursuant to this section* to the claimant resulting from an action by the claimant against any other unit of government within this state by reason of the same subject of the claim shall be offset by the amount of the

---

[8]    For clarity, we cite to the current version of General Statute § 54-102uu as the "New Statute."

*compensation award received under this section*." New Statute § 54-102uu(h)
(emphasis added). Thus, by its plain terms, the offset provision operates to reduce a
later recovery against a municipality only where the claimant has previously received
an "*award*" under § 54-102uu.

For a few independent reasons, the State Settlement is not an "award" pursuant
to § 54-102uu and does not trigger the offset provision.

First, based on the plain text of § 54-102uu, the State Settlement is not an
"award." Section 54-102uu uses the term "award" to refer exclusively to compensation
*ordered by the Claims Commissioner*. The statute provides that "[i]n determining the
amount of such compensation, the *Claims Commissioner shall award* an amount that
is two hundred per cent of the median family income for the state for each year the
claimant was incarcerated, . . . adjusted for inflation." New Statute § 54-102uu(d)(2)(A)
(emphasis added). If "such compensation award" exceeds $35,000, "the Claims
Commissioner shall submit any such compensation *award*" to the General Assembly
for its review. *Id.* § 54-102uu(d)(1) (emphasis added).

Understanding the term "award" to mean an order on the merits issued by the
relevant tribunal, as opposed to a voluntary settlement of a completely separate action
between different parties, is consistent with the usual legal meaning of an "award." *See,
e.g.*, *Mahon v. B.V. Unitron Mfg*., 284 Conn. 645, 662-64 (2007) (discussing the
principle that a "jury award" can be reduced by the amount of a prior "settlement
payment" only if the total amount exceeds what is fair and reasonable).Because the
State Settlement is not a merits decision by the Claims Commissioner, it is not an
"award" under § 54-102uu that triggers the statute's offset provision.[9]

---

[9]      Of course, it is true that the State Settlement *releases* Mr. Birch's claim for statutory
compensation under § 54-102uu. *See* Defs.' Br. 31-32. But that does not mean the State Settlement is an

Second, the behavior of all parties, including Defendants, reflects their shared contemporaneous understanding that the State Settlement was not an "award" under § 54-102uu. As explained above and as Defendants briefly acknowledge, *see* Defs.' Br. 36, at the time the State Settlement was executed, the then-existing version of § 54-102uu required an exoneree to release *all* claims *against anyone* arising from his wrongful conviction in order to receive compensation. *See* Old Statute § 54-102uu(g) ("Any person who is compensated pursuant to this section shall sign a release providing that such person voluntarily relinquishes any right to pursue any other action or remedy at law or in equity that such person may have arising out of such wrongful conviction and incarceration."). If Defendants really believed what they are now belatedly claiming, they should and would have insisted in 2023-24 that Mr. Birch had to *release* his claims against them in order to receive $12.6 million from the State.

But Mr. Birch did not execute—and would not have agreed to execute—any such release. The Attorney General's Office did not ask that he execute such a release. The Joint Committee on Judiciary did not care that there was no such release when it unanimously approved the State Settlement. And, perhaps most important, *Defendants did not argue* at the time that the State Settlement terminated this action or released Mr. Birch's claims against them based on the then-applicable release provision of the Old Statute. Nor did they urge the General Assembly to reject the State Settlement on the basis that Mr. Birch had failed to execute the general release of all claims that the Old Statute required in order to receive a compensation award.

---

*award* of compensation under § 54-102uu, any more than a conventional settlement that releases a defendant's heirs, agents, or employees somehow constitutes a verdict or award against those absent persons. Settlements routinely release a broad range of asserted and unasserted claims against present and absent parties all the time without constituting an "award" on such claims.

Why did no one, including Defendants, believe at the time that the State Settlement released Mr. Birch's claims against Defendants? The answer is obvious: Because everyone understood that it was not an "award" of compensation under § 54-102uu to which the Old Statute's release provision would have applied. For the same reasons, it is not today an "award" of compensation under § 54-102uu to which the New Statute's municipal offset provision would apply.

Third, the State Settlement cannot be an "award" of compensation under § 54-102uu because it far exceeds the amount that could lawfully have been awarded under that statute. Under the New Statute, the amount awarded by the Claims Commissioner as compensation cannot exceed 250% of the median family income (MFI) for the State of Connecticut, adjusted for inflation, for each year of the claimant's incarceration. *See* New Statute § 54-102uu(d)(2)(A). Annexed as Exhibit 6 to the Declaration of Douglas E. Lieb are charts prepared by an expert economist in another proceeding before the Claims Commissioner, the accuracy of which was stipulated to by the Attorney General's Office on behalf of the State, showing the relevant MFI figures for approximately 28.8 years of incarceration between February 1994 and December 2022, adjusted for inflation as of October 2024. *See* Lieb Decl. 7. The maximum statutory award under § 54-102uu for that period of time—250% of MFI, adjusted for inflation—was $8,768,708. *See* Ex. 6. There is a slight difference here in the effective date of the State Settlement (March 2024) and the dates of Mr. Birch's incarceration (approximately 30.5 years from January 1989 to June 2019). Nonetheless, these inflation-adjusted MFI figures make abundantly clear that the maximum award Mr. Birch could have received under § 54-102uu would have been closer to $9 million. Given the statutory limit of 250% of inflation-adjusted MFI, the Claims Commissioner

could not under any circumstances have "awarded" Mr. Birch under § 54-102uu the

$12.6 million that he received from the State Settlement.

> ### 2. The State Settlement Is an Agreement Under General Statute § 3-125a, to Which the Offset Provision Does Not Apply

If the State Settlement is not an "award" under General Statute § 54-102uu, what

is it? That question has an equally obvious answer: It is a settlement agreement of

disputed claims to be paid from the General Fund under General Statute § 3-125a. And

the General Assembly made unmistakably clear that the provisions of the New Statute,

including the municipal offset provision invoked by Defendants, "shall not apply" to a

settlement agreement under § 3-125a. New Statute § 54-102uu(k).

The State Settlement provides on its face that it is a settlement agreement under

§ 3-125a:

> Legislative Approval. The parties acknowledge that, except where another
> provision of this Agreement provides for performance within a specified
> timeframe, this Agreement is not effective unless and until approved by
> the legislature and must be *submitted to the legislature for approval
> pursuant to Conn. Gen. Stat § 3-125a by the Attorney General* no later
> than February 21, 2024.

State Settlement at 3 (emphasis added). Were there any lingering doubt, the resolution

unanimously approved by the Joint Committee on Judiciary confirms that the General

Assembly acted pursuant to § 3-125a when it approved the State Settlement. *See* Ex. 3

(S.R. No. 5 (2024)) (citing § 3-125a as the operative provision for legislative approval of

the State Settlement, and not mentioning § 54-102uu).

Section 54-102uu could not be clearer that none of its provisions, including the

municipal offset provision, apply to settlements under § 3-125a: "The provisions of this

section *shall not apply* to any agreement or stipulation pursuant to the provisions of

section 3-125a." New Statute § 54-102uu(k) (emphasis added). Once again, then, the statute's plain terms foreclose Defendants' argument. Their disturbingly uncandid failure to even mention § 3-125a or § 54-102uu(k)—let alone persuasively explain how those provisions do not compel their motion's denial—should tell the Court all it needs to know about the merits of their position.

### D.    The Municipal Offset Provision Does Not Apply Retroactively to Claims Resolved Prior to Its Effective Date

*Even if* the State Settlement were somehow an "award" under § 54-102uu—which it manifestly is not—Defendants would still not be entitled to an offset because the new municipal offset provision does not apply retroactively to past awards.

Mr. Birch entered into the State Settlement in 2023, *see* State Settlement at 4-5, and it was approved by the General Assembly and became legally binding in March 2024, *see* Exs. 3-4. The New Statute with the relevant municipal offset provision was not enacted into law until June 2024. *See* Ex. 5. Thus, at the time Mr. Birch entered into the State Settlement, no provision of law existed that would have entitled Defendants to reduce a future recovery against them in this case in the manner they now seek. Defendants are therefore attempting to reduce Mr. Birch's recovery for their wrongdoing through the retroactive application of a statutory provision that did not exist at the time he chose to enter into the State Settlement.

Under Connecticut law, whether a statute applies retroactively or prospectively is a matter of legislative intent. *See Rice v. Vermilyn Brown, Inc.*, 232 Conn. 780, 786 (1995). Absent a statement of legislative intent to the contrary, procedural statutes are presumed to apply retroactively, while statutes that affect substantive rights are presumed to apply only prospectively. *See id.* at 786-87; *see* Conn. Gen. Stat. § 55-3

(setting forth default rule of legislative intent that statutes "impos[ing] any new obligation on any person or corporation" apply only prospectively).

Here, the offset provision newly enacted by the General Assembly in 2024 is substantive in nature because it affects Mr. Birch's substantive ability to recover compensation for wrongs he suffered. "Legislation which limits or increases statutory liability has generally been held to be substantive in nature." *Lavieri v. Ulysses*, 149 Conn. 396, 402 (1962). Thus, in *Lavieri*, the Connecticut Supreme Court held that a statutory amendment capping damages under the Dram Shop Act affected substantive rights and did not apply retroactively. *See id.* at 400-02; *accord Magfour v. City of Waterbury*, 340 Conn. 41, 48-49 (2021) (statute granting self-insured municipality the right to assert lien to recover medical expenses paid to employee plaintiff from third-party tortfeasor was not retroactive); *Little v. Ives*, 158 Conn. 452, 457 (1969) (statute providing additional compensation for property taken for highway construction where highway commissioner unreasonably delayed in filing certificate of taking was not retroactive). Just as in *Magfour*, applying the offset provision to the State Settlement here would "attach new legal consequences to events completed before the act's effective date" and thereby impair Mr. Birch's right to obtain compensation for personal injuries. 340 Conn. at 51.

Regardless of whether § 54-102uu(h) of the New Statute is substantive or procedural, moreover, we *know* it does not apply to claims already resolved as of its enactment date because the General Assembly said so. *See* Ex. 5. When it amended § 54-102uu in 2024, the General Assembly expressly provided that Public Act No. 24-106 was "[e]ffective from passage and *applicable to claims pending before the*

*Claims Commissioner* on the effective date of this section *or filed with the Claims Commissioner on or after the effective date of this section.*" *Id.* § 1 (emphasis added).

Mr. Birch's claim under § 54-102uu was not pending before the Claims Commissioner on the effective date of Public Act No. 24-106, or filed on or after the effective date, because it was released by the State Settlement months earlier. The 2024 amendments to § 54-102uu therefore do not apply to it, and Defendants are not entitled an offset under the New State's municipal release provision *even if* the State Settlement could somehow constitute an "award."

## CONCLUSION

The Court should promptly deny Defendants' meritless request to overturn or reduce the jury's verdict.

Dated:       May 1, 2025                                    THE PLAINTIFF,
                                                            RALPH BIRCH

                                                            By:  ___/s/ Douglas E. Lieb___
                                                            KAUFMAN LIEB LEBOWITZ
                                                                & FRICK LLP
                                                            David A. Lebowitz, *pro hac vice*
                                                            Douglas E. Lieb (ct31164)
                                                            Alyssa Isidoridy, *pro hac vice*
                                                            18 E. 48th Street, Suite 802
                                                            New York, NY 10017
                                                            (212) 660-2332

                                                            KIRSCHBAUM LAW GROUP,
                                                                LLC
                                                            Damon A. R. Kirschbaum (ct21216)
                                                            935 Main Street, Level A
                                                            Manchester, CT 06040
                                                            (860) 522-7000