# Exhibit 1

Certified Transcript of Trial Testimony of Andrew Ocif
March 13, 2025

1       **UNITED STATES DISTRICT COURT**

2       **DISTRICT OF CONNECTICUT**

3       ------------------------------------------------x

4       RALPH BIRCH                    :  CASE NO.

5       v.                             :  20CV1790

6       NEW MILFORD                    :  MARCH 13, 2025

7       ------------------------------------------------x

8       TRANSCRIPT OF JURY TRIAL DAY 4 ANDREW OCIF

9       TESTIMONY BEFORE THE HONORABLE VICTOR A. BOLDEN, U.S.D.J.

10                      **APPEARANCES**

11      FOR THE PLAINTIFF:             DAVID LEBOWITZ, ESQ.
                                       DOUGLAS E. LIEB, ESQ.
12                                     ALYSSA DIANE ISIDORIDY, ESQ.
                                       Kaufman, Lieb, Lebowitz & Frick LLP
13                                     18 E. 48th Street
                                       Suite 802
14                                     New York, NY 10017
                                       571-643-5706
15                                     aisidoridy@kllflaw.com
                                       dlieb@kllflaw.com
16      also present:                  dlebowitz@kllflaw.com
                                       LUKE FORAN, IT SPECIALIST
17

18      FOR THE DEFENDANT:             JEFFREY O. MCDONALD, ESQ.
                                       FORREST ALAN NOIROT, ESQ.
19                                     ELLIOT B. SPECTOR, ESQ.
                                       Hassett & George, PC
20                                     915 Hopmeadow St.
                                       Simsbury, CT 06070
21                                     860-651-1333
                                       jmcdonald@hgesq.com
22                                     fnoirot@hgesq.com
                                       ebspector87@gmail.com
23

24              Heather A. Ireland, Official Court Reporter, RPR, CRR

25

1                          <u>ANDREW OCIF</u>

2     <u>DIRECT</u>    <u>CROSS</u>              <u>REDIRECT</u>  <u>RECROSS</u>

3     3          55                82

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:    All right.  Everyone please be seated.  Sir, do

2    you want to just hang your coat up?  You want us to hang your

3    coat up while you are there?

4          THE WITNESS:    Andrew C. Ocif, O-C-I-F.

5          THE COURT:    All right.

6          THE CLERK:    Mr. Ocif, please raise your right hand.

7          (Witness sworn)

8          THE CLERK:    Thank you.

9    **DIRECT EXAMINATION BY MR. LIEB:**

10   Q.    Good morning, sir.

11   A.    Good morning.

12   Q.    Can you just do me two favors; Number 1, speak into that

13   microphone, please.

14   A.    Okay.

15   Q.    And Number 2, if you can't hear me, let me know, okay?

16   A.    Yes, I will.

17   Q.    Thank you.  You were the lead investigator for the

18   Connecticut State Police in the Everett Carr homicide, correct?

19   A.    I was -- yes, yes.

20   Q.    That's also called the case officer?

21   A.    That's right.

22   Q.    At that point in time, you were assigned to the Western

23   District Major Crime squad, right?

24   A.    Yes.

25   Q.    You worked out of the Litchfield barracks?

4

1    A.    Well, at the time, it was down in Waterbury.  It was on a

2    college down there, but we worked out of Litchfield and Canaan.

3    You know, we had investigators assigned to each place out of

4    Canaan barracks and Litchfield barracks.

5    Q.    Am I correct, sir, that there were three districts of the

6    State Police, Western, Central, and Eastern?

7    A.    Yes, there was three, yeah, there was three, yes?

8    Q.    And the Western was based in Waterbury?

9    A.    Yes.

10    Q.    And was the Central in Meriden?

11    A.    Yes.

12    Q.    In 1985, you held the rank of detective?

13    A.    Yes.

14    Q.    And you became the lead investigator a few weeks into this

15    investigation, yes?

16    A.    Yes.

17    Q.    So let's talk about how you became the lead investigator.

18    A.    How?

19    Q.    Yes, I will you a question in a second.

20    A.    Okay.

21    Q.    The State Police got involved in this investigation at the

22    request of the New Milford Police Department, correct?

23    A.    Yes.

24    Q.    Captain Norbert Lillis was in charge of the detectives in New

25    Milford, correct?

1    A.    Yes.

2    Q.    Sergeant Brian Acker was your supervisor at the state police?

3    A.    Yes.

4    Q.    There was friction between Lillis and Acker about this

5    investigation, correct?

6    A.    Yes.

7    Q.    That friction was obvious to you, correct?

8    A.    Yes.

9    Q.    You knew that Captain Lillis thought that Ricky Birch and

10    Shawn Henning were innocent, right?

11    A.    Well, I assumed that's what he indicated, yes, that they were

12    innocent, yes.

13    Q.    You knew that was his belief, correct?

14    A.    Say that?

15    Q.    It is okay.  I will move on.  A couple of weeks after Captain

16    Lillis expressed that view is when you became the lead

17    investigator, right?

18    A.    Yes, couple weeks later, I was the case officer.

19    Q.    You understood that you became the case officer because of

20    this friction between the New Milford Police and the state

21    police, right?

22    A.    No, that was not the problem.

23    Q.    You know who Dawn Gallo is?

24    A.    Say that again, please.

25    Q.    Do you know who attorney Dawn Gallo is?

1    A.    I still don't get it.  You will have to repeat it.

2    Q.    Sure.  You are familiar with a person, Attorney Dawn Gallo?

3    A.    Yes, I know who she is, yes.

4    Q.    You met with -- without telling anything we discussed, you

5    met with her about this case around 2019, right?

6    A.    Yes, after she became State's Attorney.

7    Q.    Okay.  And you told her that you became the case officer

8    because of friction between the New Milford Police and the State

9    Police, right?

10   A.    I said friction between Captain Lillis and Sergeant Acker.

11   Q.    Fair enough.  At the time you got involved in this

12   investigation, you believed it was a burglary gone wrong,

13   correct?

14   A.    Yes.

15   Q.    Okay.  So let's talk about why you believed that.  The

16   victim's daughter had reported some items missing from her home,

17   correct?

18   A.    Well, I found out later, yes, but I didn't know at the time.

19   Q.    You learned at some point that the victim's daughter had

20   claimed items were missing from her home, correct?

21   A.    You're going to have to say that again.  I wear hearing aids.

22   Q.    No problem.  It is important to get your testimony right.  So

23   just let me know, and I will be happy to say it again.

24         You learned at some point that the victim's daughter claimed

25   items were missing from her home, correct?

1    A.    Yes.

2    Q.    Her name was Diana Columbo, right?

3    A.    Yes.

4    Q.    Diana Columbo claimed some quarters were missing, correct?

5    A.    Yes, I understood that, later.

6    Q.    And she claimed a VCR was missing, correct?

7    A.    What?  Say that again?

8    Q.    Diana claimed that a VCR was missing, correct?

9    A.    Yes.

10   Q.    You tried hard to find that VCR, right?

11   A.    Yes.

12   Q.    At one point you finally tracked down a VCR that you thought

13   was taken from the victim's home, right?

14   A.    Yes, yes.

15   Q.    Let's pull up, let's pull up Plaintiff's Exhibit 116 in

16   evidence, please.  Can you call out the signature at the bottom,

17   please.  You see your signature on this police report, sir?

18   A.    Yes.

19   Q.    Okay.  Can you call out the sort of big middle paragraph, "it

20   was felt"?

21   A.    Well, I think -- I would like to read the whole thing.

22   Q.    Okay.  Why don't we take the signature down and give the

23   gentleman an opportunity to read the document.

24   A.    Yes.

25   Q.    So you see here how it says, it was felt that this VCR had

1    been the one that was stolen from the victim's residence.  Do you

2    see that language?

3    A.    Yes.

4    Q.    When it says "it was felt," that means you felt that, right?

5    A.    You're going to have to say that again.

6    Q.    You felt that the VCR had been the one stolen from the house,

7    right?

8    A.    It was not the stolen one.

9    Q.    That's what you thought it was going to be, right?

10   A.    Yes.

11   Q.    And then it wasn't?

12   A.    Wasn't.

13   Q.    Okay.  And you were disappointed about that, right?  You were

14   disappointed about that, right?

15   A.    No, no.

16   Q.    No?  Do you remember that you had a deposition in this case?

17   A.    I had a what?

18   Q.    A deposition, when we went to a hotel conference room in

19   Danbury and I asked you a lot of questions?

20   A.    Yes.

21   Q.    Okay.  You remember you were under oath at that deposition?

22   A.    Yes.

23   Q.    Did you do -- did you tell the truth at that deposition?

24   A.    Yes.

25   Q.    Okay.  Page 53 lines 8 thru 10, do you remember being asked

1    the following question and giving the following answer at your

2    deposition.

3          Question, "Were you disappointed when this ended up not being

4    the VCR that you were after?"

5          Answer, "Probably."

6          Do you remember that testimony?

7    A.    Probably.  That's probably right.

8    Q.    Yeah, you were disappointed when this turned out to be --

9    A.    I wasn't disappointed, I said probably.

10   Q.    You were probably disappointed when this turned out not to be

11   the VCR, right?

12   A.    What was that again?  You will have to repeat it.

13   Q.    Withdrawn.  It is okay.

14         You never found any item that was allegedly stolen from this

15   house, right?

16   A.    That's right.

17   Q.    In the course of your investigation, you saw photos of the

18   victim's body, correct?

19   A.    Yeah, I saw a Polaroid.

20   Q.    Lying dead on the floor, right?

21   A.    Yes.

22   Q.    It was a gruesome crime scene, correct?

23   A.    Yes.

24   Q.    You've never seen this kind of violence in another burglary,

25   have you?

1    A.    I'm not sure about that, but not where it was a murder, no.

2    Q.    The brutality of this crime surpassed that you had seen in

3    any other botched burglary, right?

4    A.    Yes.

5    Q.    Sometimes with a burglary there is a broken window, right?

6    A.    There is what?

7    Q.    A broken window, right.

8    A.    Not all the time.

9    Q.    Sometimes, with the burglary, there is a broken window,

10    correct?

11    A.    I have no idea.  I can't answer that.

12    Q.    Okay.  Sometimes when you investigate a burglary, there is a

13    sign of forced entry into the home, correct?

14    A.    Yes.

15    Q.    Not in this case, correct?

16    A.    What was that again?

17    Q.    There was no sign of forced entry in this case, correct?

18    A.    That's true.

19    Q.    You never found the murder weapon used to kill Mr. Carr,

20    correct?

21    A.    Yes.

22    Q.    There was no forensic trace of Ricky Birch at the crime

23    scene, correct?

24    A.    Yes.  There was evidence that he was at the scene.

25    Q.    There was no forensic evidence?

1   A.   Okay.

2   Q.   Of Ricky Birch's presence at the crime scene?

3   A.   You will have to speak clearer, sir.

4   Q.   Okay.  I will do my best.  I'm sorry?

5   A.   I don't want to give a wrong answer.

6   Q.   There was no forensic evidence of Ricky Birch at the scene,

7   correct?

8   A.   Yes.

9   Q.   There was no forensic evidence of Shawn Henning at the scene,

10   correct?

11   A.   Yes.

12   Q.   No fingerprints, correct?

13   A.   Yes.

14   Q.   No blood, correct?  No blood, correct?

15   A.   You are still going to have to ask it gain.

16   Q.   I will move on.  There were bloody foot prints -- withdrawn.

17        There were bloody shoe prints left at the crime scene,

18   correct?

19   A.   Yes.

20   Q.   Shoes were seized from Ricky Birch and Shawn Henning,

21   correct?

22   A.   Yes.

23   Q.   The shoe prints at the scene did not match those shoes,

24   correct?

25   A.   Yes.

1    Q.    Your investigation showed that Ricky Birch and Shawn Henning

2    were driving around in a loud stolen car, correct?

3    A.    Yes.

4    Q.    Your theory was that they drove that loud stolen car to the

5    scene, right?

6    A.    To what scene are you talking about?

7    Q.    To the murder scene.

8    A.    Okay, yes.

9    Q.    And then, after the murder, your theory was that they left in

10   that same car, correct?

11   A.    You're going to have to repeat that again, sir.

12   Q.    Your theory was that they left the murder scene in that same

13   loud stolen car, correct?

14   A.    Yes, yes.

15   Q.    Ricky Birch and Shawn Henning took the police to that car in

16   the woods, correct?

17   A.    Yes.

18   Q.    That car was searched, correct?

19   A.    Yes.

20   Q.    Every item was taken out of it and examined, correct?

21   A.    Yes, I think so.

22   Q.    There was no forensic link to the murder scene in that car,

23   correct?

24   A.    Yes.

25   Q.    You believe that they -- withdrawn.

1       You believed that they cleaned up after the crime, right?

2    A.    You are going to have to --

3    Q.    I'm sorry.  I wasn't looking at you.  You believed that they

4    cleaned up after the crime, right?

5    A.    I just assumed so.  I can't answer that.

6    Q.    Well, specifically, you thought that they took a shower at

7    Shawn Henning's father's house, right?

8    A.    Yes.

9    Q.    Shawn Henning's father's house was searched, correct?

10   A.    Yes.

11   Q.    You were there for that search, right?

12   A.    Yes, yes.

13   Q.    Let's pull up Plaintiff's Exhibit 227 in evidence.  This is a

14   picture of Shawn Henning's room.  Mr. Ocif, when you saw this,

15   did it look to you like the place where two teenagers had just

16   carefully cleaned up every trace of a bloody murder?  Did this

17   look to you like a place where the murderers cleaned up?

18   A.    This was probably the room.  I don't know for sure.

19   Q.    You can take that down.  During the search of Shawn's

20   father's house, clothing was taken, right?

21   A.    Beg pardon?

22   Q.    Clothing was seized during the search of Shawn's father's

23   house?

24   A.    Yes.

25   Q.    Lint from the dryer was taken during this search of Shawn's

1    father's house, correct?

2    A.    I'm not sure of that because I don't remember that.

3    Q.    Would it refresh your memory to look at your previous

4    testimony?

5    A.    Sure.

6    Q.    Mr. Foran, could you please pull up just for the witness,

7    just page 191, lines 13 to 18 of the deposition, please.  It is

8    tab 1.  Okay.  So, just look at that on your screen, and don't --

9    don't read it aloud, please.

10   A.    Okay.

11   Q.    Does that refresh your memory that lint was taken from the

12   dryer of Shawn's father's house?

13   A.    Yes, there was.

14   Q.    And nothing from Shawn's father's house revealed any forensic

15   link to the homicide, right?

16   A.    Well, the way I want to answer that I don't think you're

17   going to like it, but we had a blood dog there, German shepherd

18   that reacted to the blood, and I could even smell the blood,

19   myself.  There is an odor to blood, when there is a lot of it, so

20   --

21   Q.    So your testimony is that when you went to Shawn Henning's

22   father's house you smelled blood?

23   A.    Well, I thought it was blood, but the dogs reacted to it.

24   Q.    Okay.  And your testimony is that some dogs reacted to the

25   blood, to this smell while you were there, right?

1   A.   That's the way they're trained.

2   Q.   Yeah.  And you alerted your colleagues to that, right?

3   A.   Probably, yes.

4   Q.   Yeah.  And they tested whatever it is that the dogs were

5   smelling, right?

6   A.   I have no idea what they did there.

7   Q.   Okay.  Well, you know that there was none of the victim's

8   blood found at Mr. Henning's father's house, right?

9   A.   That's true, yes.

10  Q.   So regardless of what you smelled, there was no forensic link

11  from Shawn's father's house to the crime, right?

12  A.   Yes.

13  Q.   Shawn Henning's jacket was of particular interest to you,

14  correct?

15  A.   You will have to repeat that question.

16  Q.   No problem.  Shawn Henning's jacket was of particular

17  interest to you, right?

18  A.   Through the whole investigation, not just me.

19  Q.   Because that jacket had blood on it when Shawn was taken into

20  custody in December of 1985, right.

21  A.   Yes.

22  Q.   You took Shawn's jacket to the FBI crime lab, right?

23  A.   Yes.

24  Q.   You personally took the jacket on a plane, right?

25  A.   On a state police plane.

1    Q.    To Washington, right?

2    A.    Beg pardon?

3    Q.    To Washington?

4    A.    Yes.

5    Q.    So the FBI could test that blood, right?

6    A.    Yes.

7    Q.    The FBI found it was not the victim's blood, right?

8    A.    Yes.

9    Q.    So you concluded that Shawn Henning, intentionally put his

10    own blood on his own jacket?

11    A.    Yes, I did.

12    Q.    To get you to think it was the victim's blood, right, to get

13    you to think it was the victim's blood, right?

14    A.    Well, I assumed it was at the time, but that's -- that was

15    conclusive because the FBI checked it.

16    Q.    Right.  But you thought this was a trick on his part, right?

17    A.    I wouldn't call it a trick.  Covering up the crime scene,

18    that's what I thought.

19    Q.    There was no eyewitness identification in this case, correct?

20    A.    There was no eyewitness?

21    Q.    No eyewitness identification of the perpetrator, correct?

22    A.    You're going to have to go slower.

23    Q.    It is okay.  I will do my best.  I'm sorry.  There was no

24    eyewitness identification in this case, correct?

25    A.    Yes.

1   Q.   No one ever told the police that they saw Ricky Birch at the

2   crime scene, correct?

3   A.   Yes.

4   Q.   No one ever told the police that they saw Shawn Henning at

5   the crime scene, correct?

6   A.   You can mention that again?

7   Q.   No one ever told police that they saw Shawn Henning at the

8   crime scene, correct?

9   A.   Yes.

10  Q.   Diana Columbo, the victim's daughter.  Her employer was a man

11  named Richard Burkhart, correct?

12  A.   Yes.

13  Q.   They also had some kind of romantic relationship, correct?

14  A.   I'm not sure about that, but probably.

15  Q.   During the investigation you learned that Diana had given

16  different accounts of where she was that night, correct?

17  A.   Yes.

18  Q.   You never considered Diana Columbo a suspect, correct?

19  A.   That's right.

20  Q.   That VCR that she claimed was stolen, that was a gift from

21  Richard Burkhart to Diana Columbo, correct?

22  A.   Yes.

23  Q.   You learned during the investigation that Richard Burkhart

24  sent his son, George, over to the crime scene that morning,

25  right?

1    A.   You're going to have to go again.

2    Q.   Let's pull up Plaintiff's Exhibit 103 in evidence.  Can you

3    just enlarge the paragraph of text, please.  Actually, I

4    apologize, can you just start at approximately 5:00 a.m., his

5    father Richard Burkhart?

6    A.   Can you make it bigger?

7    Q.   Yes, we are working on it.  So do you see here that this

8    police report indicates Richard Burkhart called his son on the

9    morning the body was found?

10    A.   That's what it says, yes.

11    Q.   Okay.  And told him to go over to the house to clean up the

12    blood, right?

13    A.   I understood that, yes.

14    Q.   You can take that down.  You were aware of this during your

15    investigation, correct?

16    A.   No, not at the time.  I learned later.

17    Q.   You remember learning something about this during your

18    investigation, correct?

19    A.   Yes, later.

20    Q.   When you say later, you mean in the later stages of the

21    investigation, right?

22    A.   Well, when there is an initial investigation, it is many

23    people, as you can get to work on the case.  And you do what they

24    call inductive reasoning to get, it is somebody that's in charge

25    of the investigation.  If something comes in, whoever is there,

1    gets the assignment.  I did a lot of the work on a lot of other

2    avenues at the time.  I was not on -- other than fingerprinting

3    everyone that was in the house and, you know, that kind of thing,

4    checking out their shoes, that was what I did initially.  So, I

5    was never part of the initial investigation.  I was never at the

6    crime scene.

7    Q.    I just wanted to clarify what you meant by "later."

8          When you said "later," you meant later during the

9    investigation, not after the investigation, right?

10   A.    That's right.

11   Q.    Okay.  You interviewed Richard Burkhart, correct?

12   A.    Yes.

13   Q.    That interview did not go well, did it?

14   A.    I was ordered to do that.

15   Q.    The interview did not go well, correct?

16   A.    That's true.

17   Q.    You asked him to take a polygraph, correct?

18   A.    Yes.

19   Q.    And he said no fucking way, right?

20   A.    Yes.

21   Q.    And you tried to explain yourself, right?

22   A.    Yeah, I did.

23   Q.    Yeah.  And then he walked towards you and kicked a trash can,

24   right?

25   A.    Yes.

1    Q.    And then Diana Columbo came in the room, right?

2    A.    I don't remember that.

3    Q.    Let's pull up Plaintiff's Exhibit 10 for identification,

4    please, for identification.  Can you see this document on your

5    screen?

6    A.    Okay.  I see what you are talking about.

7    Q.    Do you see the document on the screen?

8    A.    I warned Mr. Burkhart.

9    Q.    Stop, stop.  Do you see the document on the screen?

10   A.    Yes, I do.

11   Q.    Okay.  Do you see your signature at the bottom?

12   A.    Yes.

13         MR. LIEB:    I offer Plaintiff's Exhibit 10.

14         THE COURT:    Any objection?

15         MR. SPECTOR:    No objection.

16         THE COURT:    All right.  Exhibit 10 is admitted into

17   evidence.

18         (Exhibit Admitted).

19         MR. LIEB:    Let's publish that, please.

20   Q.    (Mr. Lieb) Can you call out at this point paragraph,

21   please, Mr. Foran?

22   A.    You're going to have to say that again.

23   Q.    I was talking to him.  (Indicating)

24   A.    Oh, okay.

25   Q.    So you see here that after Mr. Burkhart kicked a trash can at

1    you, Diana Columbo came into -- sorry, I apologize.

2        Miss Columbo came into the room during this interview, right?

3    A.    Yes.

4    Q.    And she tried to calm him down, right?

5    A.    Yes.

6    Q.    Okay.  Can you call out the next paragraph, please.  All

7    right.  So after he kicked a trash can at you, you warned him

8    that you would not tolerate being assaulted, right?

9    A.    Yes.

10   Q.    And then Richard Burkhart said, "Get the hell out of here and

11   never come back," right?

12   A.    Yeah, and I left.

13   Q.    Yeah, you got the hell out of there and never came back,

14   right?

15   A.    What is that again?

16   Q.    You got the hell out of there and never came back?

17   A.    That's what I said in the report, yes.

18   Q.    Well, that's what he said to you, right?

19   A.    Yes.

20   Q.    And that's what you did?

21   A.    Yes.

22   Q.    You can take that down.  This was a long investigation,

23   right?

24   A.    Yes.

25   Q.    It lasted years, right?

1    A.    Yes.

2    Q.    The state police asked the Governor of Connecticut to issue a

3    reward, right?

4    A.    Yes.

5    Q.    Which the Governor did, right?

6    A.    Yes.

7    Q.    A $20,000 reward, right?

8    A.    Something like that.

9    Q.    This was the only case you ever worked on where the Governor

10    issued a reward, right?

11    A.    No.  I had other cases I worked on, major fraud cases and

12    another homicide up in Salisbury, Connecticut, where a witness

13    was killed.  I worked on that, and that was after Henning and

14    Birch went to jail.

15    Q.    Okay.

16    A.    For burglaries.

17    Q.    Do you remember being asked the following question and giving

18    the following answer at your deposition, page 77, lines 2 thru 7.

19         Question, "Have you worked on other cases in which the

20    Governor has issued a reward in the course of your career?"

21         Answer, "No."

22         Question, "This is the only one, right?"

23         Answer, "Yes."

24         Was that your testimony at your deposition?

25    A.    You're saying that is the only case that I ever worked on

1    where a reward -- yes.

2    Q.    Okay.  It is an -- the reward, the reward is an extraordinary

3    measure, right?

4    A.    No, not if it is unsolved it is not.  I have seen other

5    investigations where there is a reward offered.  I have no idea

6    the outcome of any of them.

7    Q.    Well, let's go back to your deposition, same page, next

8    question.  Do you recall being asked this question and giving

9    this answer.

10        "It is an extraordinary measure, right?"

11        Answer, "Yes."

12        Was that your deposition testimony?

13   A.    Yes.

14   Q.    Let's show the witness only Plaintiff's Exhibit 3 for

15   identification.  Please do not read this aloud.  Let me ask you a

16   question, okay.  Do you see the name and signature of the person

17   who sent this letter?

18   A.    Lieutenant James Hiltz.

19   Q.    You indicated before that Sergeant Brian Acker was your

20   supervisor, right?

21   A.    He was my supervisor, yes.

22   Q.    And Lieutenant James Hiltz was his supervisor, right?

23   A.    Yes.

24   Q.    Again, please do not -- do not read this aloud.  Can you

25   please enlarge for the witness the second paragraph beginning

1    "Since."

2          Can you please read this to yourself?

3    A.    Just that there was no probable cause.

4    Q.    Do you see what is written there?

5    A.    You better repeat that again.

6    Q.    Do you see what is written there?  I will ask a different

7    question.

8          What Lieutenant Hiltz wrote there accurately reflects your

9    view of the state of this investigation at the time of this

10   letter, correct?

11   A.    The only thing that I can say, there was no probable cause.

12   I'm not Lieutenant Hiltz.  I did not write that letter.

13   Q.    Fair enough.  You can take that down.

14         As of October 9th of 1986, there was no probable cause in

15   this investigation, right?

16   A.    Yes.

17   Q.    Let's pull up Plaintiff's Exhibit 12 which is in evidence.

18   Can you call up the signature and name, please.  Do you see there

19   Major John Watson?

20   A.    Yes.

21   Q.    Okay.  That's Watson is Hiltz's boss, right?

22   A.    Yes.

23   Q.    He is your boss's boss's boss, right?  It is okay, sorry

24   don't answer that.

25         Do you see -- can you call out at the top the person to whom

1  the letter is addressed.  Do you see there Mrs. Evelyn Carr?

2  A.    Yes.

3  Q.    That was the victim's widow, correct?

4  A.    Yes.

5  Q.    Okay.  Can you call out the last paragraph of the letter.

6  You see here, "Major Watson says, I do understand your

7  frustrations regarding this tragic occurrence in your life.  We

8  share some of that frustration with you."  Do you see that?

9  A.    Yes.

10  Q.    Was it fair to say that you shared that frustration that the

11  investigation had not been completed at this time?

12  A.    I wasn't frustrated.  I never wrote that letter.

13  Q.    You see the next sentence says, "I can assure you that

14  everything that could be done, has been done."  You see that?

15  A.    Yes.

16  Q.    You agree with that?

17  A.    Yes, I agree.

18  Q.    You were trying your best, right?

19  A.    And I will answer it again, I did not see that letter, okay.

20  Q.    And you see the next sentence that says, "Suspects have been

21  identified but sufficient probable cause does not exist at this

22  time to proceed against them."  You see that?

23  A.    Yes, I agree with that, yes.

24  Q.    That is true, right?

25  A.    That is from my own knowledge.

1    Q.    Okay.  You can take that down.  Mr. Foran, I want to take a

2    quick detour to Plaintiff's Exhibit 34, please.  Can you call out

3    the signature, please, this is in evidence, sorry.

4          Mr. Ocif, you see your signature on this police report?

5    A.    I can't read it.

6    Q.    I'm just asking if you see your signature.

7    A.    Yes, I see my signature.

8    Q.    Now let's call out the text.  Do you see that your report

9    indicates that on February 20th of 1987 Patrolman David Shortt

10   returned $67 to the victim's wife.  Do you see that?

11   A.    Yes.

12   Q.    And then do you see it says, "New Milford's possessed

13   property receipt is attached."

14         You see that?

15   A.    Yes, I see it.

16   Q.    Okay.  Let's go the next page, right.  This would be the

17   possessed property receipt that's attached, right?

18   A.    Yes.

19   Q.    Okay.  So, you wrote -- you go back to the previous page?

20   You wrote up a report about there because that receipt was a New

21   Milford document, right?

22   A.    Just remove that part?  Okay.

23   Q.    So there was a New Milford receipt, correct?

24   A.    Yes.

25   Q.    And you wrote up a state police report about it, correct?

1   A.   Repeat that again, please.

2   Q.   You wrote up a state police report about it, correct?

3   A.   Well, my signature is on there, but I don't remember it.

4   Q.   Fair enough.  You can take that down.  Let's talk about how

5   you eventually made a case against Ricky Birch.

6        Ricky Birch and Shawn Henning had admitted to committing

7   burglaries, correct?

8   A.   Yes.

9   Q.   And they were in jail, correct?

10  A.   Yes.

11  Q.   You went around speaking with people who had been locked up

12  with them, correct?

13  A.   Yes.

14  Q.   You wanted to see if those people had any useful information,

15  correct?

16  A.   Partly.

17  Q.   Okay.  You did not have a particular reason to believe they

18  had useful information, did you?

19  A.   You better ask that again, the question again.

20  Q.   The people you spoke to, you did not have a particular reason

21  to believe that they had useful information?

22  A.   I was not the one that found all these people that came

23  forward.  Some of the New Milford cops did, okay.

24  Q.   Sorry.  I didn't mean to interrupt you.  Some of the New

25  Milford cops found who?

1    A.    There is a couple of the New Milford cops that found me and

2    said such and such was incarcerated with Birch and Henning, and

3    then I went to interview them.

4    Q.    You were just going around talking to people who were in jail

5    with Ricky and Shawn to see if one of them might give you

6    something useful, right?

7    A.    Not at all times.

8    Q.    At times, you were going around talking to people who were in

9    jail with Shawn and Ricky to see if one of them might give you

10   something useful, correct?

11   A.    I only did it on one occasion, not of all the other witness,

12   no.

13   Q.    Well, let's -- let's talk about that.  Can you pull up

14   Plaintiff's Exhibit 93 in evidence.  Call out the signature,

15   please.  Do you see your signature?

16   A.    I see my signature, yes.

17   Q.    Okay.  Can you call out the interview subject in the text,

18   please.  Yeah, just all the stuff, whatever.

19        You see this is your report of an interview with Mark

20   Kulesza, right?

21   A.    I see that now, yes.

22   Q.    Okay.  And you see that he was someone that was incarcerated

23   at the Litchfield Correctional Center with Ricky Birch and Shawn

24   Henning, right?

25   A.    Yes.

1  Q.   He was actually just there the day they came in, right?

2  A.   Well, that's what it says in my report.

3  Q.   That's what your report says, right?

4  A.   Yes.

5  Q.   Yeah.  And you asked him if they said anything to him about

6  the murder in New Milford, right?

7  A.   I don't know.  I don't remember that, but probably.

8  Q.   Yeah, I mean, the report says that Kulesza says they did not

9  do it, right?

10  A.   Yes.

11  Q.   Okay.  So, presumably, you asked him, did they tell you

12  anything about it, right?

13  A.   Say that again?

14  Q.   Withdrawn.  This is just some random guy who was in jail with

15  them, right?

16  A.   Yes.

17  Q.   Let's go to Plaintiff's Exhibit 94.  Call out the signature

18  please.  Do you see your signature?

19  A.   Yes.

20  Q.   Let's call out the stuff.  Can we get the date on there, too?

21  You see this is an interview with an Edward Chaffee, right?

22  A.   I don't remember it, but apparently I did interview him.

23  Q.   Right.  This just another random guy who was in jail with

24  them, right?

25  A.   Yes.

1    Q.    Who you went to and said, hey, did they tell you anything

2    about that murder?

3    A.    You're going to have to say that again.

4    Q.    You went to him and you said hey, did Ricky and Shawn tell

5    you anything about that murder in New Milford?

6    A.    Yes, they had some conversation that they played cards with

7    them, etc., and they didn't make any statement they were

8    involved.

9    Q.    You can take that down.  You're familiar with the term

10   "jailhouse informant," right?

11   A.    I have heard it, yes.

12   Q.    That's when an incarcerated person claims that the suspect

13   confessed to him, right?

14   A.    Well, something to that effect, yes.

15   Q.    You knew that you needed to be unusually cautious about the

16   accuracy of what jailhouse informants told you, right?

17   A.    You're going to have to repeat that again.

18   Q.    You knew you needed to be cautious about the accuracy of what

19   jailhouse informants told you, correct?

20   A.    Probably, yes.

21   Q.    Can we please pull up for identification only Plaintiff's

22   Exhibit 96.  Signature, please.  Do you see your signature?

23   A.    Yes.

24   Q.    Call out just the subject and the first line, please.  Do you

25   see that this is a report of an interview you conducted with

1     Robert Perugini?

2     A.    Yes.

3     Q.    Do you see that this interview took place in December of

4     1987?

5     A.    Yes.

6           MR. LIEB:    I offer Plaintiff's Exhibit 96.

7           THE COURT:    Any objection?

8           MR. SPECTOR:    I would like to read the exhibit, please.

9           THE COURT:    Yeah, yeah, take your time.

10          MR. SPECTOR:    No objection.

11          THE COURT:    Plaintiff's Exhibit 96 is admitted into

12    evidence.

13          (Exhibit Admitted)

14    Q.    (Mr. Lieb)  Can you call out the paragraph "after

15    identifying myself" so your report says.

16    A.    Which one?

17    Q.    Justs look at your screen?

18    A.    You want me to read it.

19    Q.    No, I will read it.  You wrote, "After identifying myself,

20    this officer" -- this officer, that is you, right?

21    A.    Yes.

22    Q.    You advised Perugini that you were investigating a murder

23    that Ricky Birch was involved in.  You see that?

24    A.    Yes.

25    Q.    You just walked in and met some random guy in jail and said,

1    hey, I'm investigating a murder that Ricky Birch was involved in.

2    You know anything about that?  That's what you did, right?

3    A.    I remember interviewing Perugini, but I don't remember

4    everything in my report other than I did interview him.

5    Q.    And he was just another random guy in jail who knew Ricky in

6    jail, right?

7    A.    This is the first one I remembered going to a place when I

8    answered the question before, I only did it once.  This is the

9    one that I remember.  That's it.

10    Q.    My question is:  Robert Perugini was another random guy in

11    jail who knew Ricky, correct?

12    A.    Yes.

13    Q.    And according to your report, you identified yourself and

14    then said, I'm investigating a murder that Ricky Birch was

15    involved in, right?

16    A.    Yes.

17    Q.    Can you call out the paragraph above.  So you wrote here, "it

18    should be noted that during this interview no facts or

19    circumstances re: the Carr murder were divulged to Perugini by

20    this officer."

21        You see that?

22    A.    At the time, that's what I understood.  I did not indulge any

23    information.

24    Q.    Holding back details is an investigative technique that you

25    used, right?

1    A.    I can't answer that.

2    Q.    You wrote that no facts or circumstances were divulged to try

3    and show that you were not giving Perugini information, right?

4    A.    I wrote that report, and that's what I said.

5    Q.    If you give a subject of an interview details that you know,

6    they can tailor their statement to what you tell them, correct?

7    A.    I did not tell them that.

8    Q.    Let's take the exhibit down.  I'm asking you a general

9    question.  If you give someone details, they can tailor their

10    statement to what you told them, correct?

11    A.    Yes.

12    Q.    Giving someone details gives them an opportunity to

13    fabricate, right?

14    A.    No.  I never did that.  I never gave them information before

15    I interviewed.

16        MR. LIEB:    Page 89, line 6 thru 23 of the deposition.  Your

17    Honor, I'm intending to play the video portion of this, of

18    Mr. Ocif's prior testimony at this time.  Clip 7.

19        (Video played)

20    Q.    (Mr. Lieb)  You agree your job as a police officer is to

21    hear what the witness knows, correct?

22    A.    Yes.

23    Q.    Not to give the witness information that you know, correct?

24    A.    I already answered that, I never did that.

25    Q.    You remember traveling to Virginia in this case, correct?

1    A.    Yes.

2    Q.    You went to see Todd Cocchia, correct?

3    A.    Yes.

4    Q.    He was another guy who had been in jail with Ricky Birch,

5    right?

6    A.    Yes.

7    Q.    You went to Virginia with Detective David Shortt?

8    A.    Yes.

9    Q.    Of the New Milford Police Department, right?

10    A.    Yes.

11    Q.    It was Shortt who contacted you about Todd Cocchia, correct?

12    A.    Yes.

13    Q.    Shortt told you that he had become aware that Cocchia might

14    have some information, right?

15    A.    It came to Detective Shortt from a detective from down in

16    Norfolk, Virginia.

17    Q.    Okay.  So, you and Shortt went down to Virginia, correct?

18    A.    Yes.

19    Q.    You drove, correct?

20    A.    Well, what was that again?

21    Q.    You drove to Virginia?

22    A.    Yes.

23    Q.    From Litchfield County to Norfolk, Virginia, right?

24    A.    Yes.

25    Q.    That's like eight hours?

1    A.    Something like that.

2    Q.    Let's pull up Plaintiff's Exhibit 119 in evidence.  I just

3    want to show you the interview subject and the first paragraph,

4    just for now.  Okay.  Do you see that this report shows that your

5    interview with Todd Cocchia was on July 12th, of 1988?

6    A.    Yes.

7    Q.    Okay.  Let's go to Plaintiff's Exhibit 216 in evidence.  Can

8    you call out the signature, please.  You see your signature?

9    A.    Yes.

10    Q.    Okay.  Let's go up to the date and time the interview of the

11    first paragraph.  Do you see here the date of July 6th, 1988?

12    A.    Yes.

13    Q.    Six days before you went to Virginia, yes?

14    A.    Yes.

15    Q.    All right.  So, on July 6th, Detective Shortt contacts you

16    indicating that he had gotten a call from Ricky Birch?  You see

17    that?

18    A.    Yes.

19    Q.    All right.  Can we show the next two paragraphs, please.  All

20    right.  So, you and Detective Shortt went to go speak with Ricky,

21    right?

22    A.    Say that again?

23    Q.    On this date, you and Detective Shortt went to speak with

24    Ricky?

25    A.    Yes.

1   Q.   And Ricky told you something that Craig Battista had told him

2   about some guy named Eddie, right?

3   A.   Yes.

4   Q.   And you informed Ricky that this was a pack of lies, right?

5   A.   Say that again?

6   Q.   You told Ricky that this was a pack of lies, correct?

7   A.   Yes.

8   Q.   And you told Ricky that he and Shawn were guilty, right?

9   A.   Yes.

10   Q.   And Ricky told you that he was innocent, right?

11   A.   Yes.

12   Q.   And Detective Shortt was there, right?

13   A.   Yes.

14   Q.   You can take that down.  So let's talk about your eight-hour

15   trip to Virginia.  Were you and Detective Shortt personal friends

16   at that point?

17   A.   Say that again about Detective Shortt?

18   Q.   Sure.  At the time you and Detective Shortt drove to

19   Virginia?

20   A.   Yes.

21   Q.   Were you -- the two of you personal friends?

22   A.   I never knew much about Detective Shortt.  He was newly

23   assigned.

24   Q.   You were two detectives, right?

25   A.   Yes.

1    Q.    On a case, right?

2    A.    Yes.

3    Q.    There was a business trip, right?

4    A.    It wasn't a business trip.

5    Q.    It was a work trip, it was a police trip, right?

6    A.    Yes.

7    Q.    And it was a long road trip, right?

8    A.    Yes.

9    Q.    Naturally, you talked about the case on your eight-hour drive

10    there, right?

11         MR. SPECTOR:    Objection.

12         THE COURT:    Overruled.

13    Q.    (Mr. Lieb)  You talked about the case on your eight-hour

14    drive there, correct?

15    A.    Yes.

16    Q.    You told Detective Shortt about your investigation, correct?

17    A.    Yes, I did.

18    Q.    Because you and he were going to interview someone together,

19    correct?

20    A.    Yes.

21    Q.    So you wanted him to know what was going on, right?

22    A.    He did not know the whole investigation from day one.  I did.

23    Q.    Right.  And so you wanted to fill him in, right?

24    A.    I filled him in a little bit, yes.

25    Q.    And you told him about those other guys in jail that you went

1    to talk to, right?

2    A.    No, I did not.

3    Q.    You didn't tell him about Robert Perugini?

4    A.    No, I didn't, no.

5    Q.    So at that point, Robert Perugini had told you that Ricky

6    Birch confessed to him, right?

7    A.    I don't remember telling Dave Shortt too much at all, just

8    the beginning of the investigation, because I was involved in it

9    from day one.  He was not.  He was a newly appointed detective.

10   So I did not know he was with me when we went to interview Ricky

11   Birch.

12   Q.    Let's go back to Plaintiff's Exhibit 96.  So Plaintiff's

13   Exhibit 96, this is your report of when you went down to Robert

14   Perugini, right?

15   A.    Yes.

16   Q.    Okay.  And then you told him, "I'm investigating a murder

17   that Ricky Birch was involved in," right?

18   A.    Yes.

19   Q.    Okay.  Call up the paragraph that says "Perugini then

20   stated," right?

21   A.    Yes.

22   Q.    So after you told Perugini, "I'm investigating a murder that

23   Ricky Birch was involved in," Perugini says, "Oh, yeah, yeah,

24   Birch told me about that," right?

25   A.    He said he Birch and Shawn Henning had been robbing a house,

1    yes.

2    Q.    Okay.  And that happened in December of 1987, correct?

3    A.    The date of the report?  It was on December 7th, 1987.

4    Q.    When you went to Virginia in July of 1988, wouldn't this be

5    pertinent information for Detective Shortt to know?

6    A.    I don't know if he knew it or not.  I can't answer that.

7    Q.    It certainly would have made sense for you to tell him on the

8    way, right?

9    A.    I don't remember from 1988 much of what we talked about when

10   we went to Norfolk, Virginia.

11   Q.    During your interview with Mr. Cocchia, Detective Shortt was

12   there, right?

13   A.    Yes.

14   Q.    He was there the whole time, right?

15   A.    Yes.

16   Q.    As far as you know, he was listening, right?

17   A.    He was what?

18   Q.    Listening?

19   A.    Yes.

20        MR. LIEB:    I am about to get into a new area.  I'm happy to

21   proceed?

22        THE COURT:    You think it might be a good time to take a

23   lunch break?

24        MR. LIEB:    It is a good time.

25        THE COURT:    All right.  We will be back at 1:00 p.m.

1    Don't discuss the case or learn anything and discuss your

2    activities as a juror or use social media or TikTok or anything.

3    Don't talk about being a juror or make a Facebook.  See you after

4    lunch.  Thanks so much.

5            (Jury excused)

6            THE COURT:    All right.  Please be seated.  Anything to take

7    up before I leave for lunch?

8            MR. LIEB:    Not from me.

9            MR. McDONALD:    No, Your Honor.

10           THE COURT:    All right.  See you all in a little bit.

11           THE CLERK:    All rise.  The Court stands in recess.

12           (A recess was taken)

13           THE CLERK:    All rise.  The United States District Court is

14   now open after recess.  The Honorable Victor A. Bolden presiding.

15           THE COURT:    Please be seated, although I was halfway in the

16   door.

17           (Jury present)

18           THE COURT:    All right.  Welcome back, everyone, are you

19   ready, Mr. Lieb?

20           MR. LIEB:    Yes, thank you.

21   Q.    (Mr. Lieb) Good afternoon.  Let's discuss what happened in

22   the interview with Todd Cocchia.  You tape recorded that

23   interview, correct?

24   A.    Yes.

25   Q.    The recording was then transcribed, correct?

1    A.    Yes.

2    Q.    There is a portion of the interview that is not captured in

3    the recording or the transcript, correct?

4    A.    Yes.

5    Q.    During that unrecorded portion, Mr. Cocchia said he did not

6    want to talk to you, correct?

7    A.    We did not have the tape recorder on at the beginning of the

8    interview with him, and that was outside the interview room.  And

9    he basically said that he did not want to record it.  He did not

10   want to make a statement.  We identified ourselves.  He knew

11   Detective Squires.  He did not know either myself or Detective

12   Shortt, so he was adamant that he was not going to -- well, I

13   said to him, okay, we are getting up and we are leaving.  So we

14   got up to leave, and then he says hold it, I want to talk to you.

15   So then we went into the interview room, and he sat across from

16   me and Detective Shortt and then he consented and we turned the

17   recorder on so there's -- that is why that missing part is in

18   there.

19   Q.    So there is a portion of your interview with Mr. Cocchia that

20   occurred before the recorder turned on, correct?

21   A.    Yes, that's correct.

22   Q.    And during that portion he indicated he did not really want

23   to talk to you, correct?

24   A.    Well, just because we said we were leaving, that's why.

25   Q.    Right.  You said you were leaving because he said he didn't

1   want to talk, right?

2   A.   Initially, yes.  It is just what I explained.

3   Q.   Right.  And you and Detective Shortt got up, right?

4   A.   We got up out of our seats and/or wherever we were, and we

5   were ready to leave.

6   Q.   And you said you were going back to New Milford, right?

7   A.   Going back to Connecticut.

8   Q.   Right, back to Connecticut.  And then he said he would talk,

9   right?

10  A.   He said wait.

11  Q.   And then you turned on the recording?

12  A.   Yes.

13  Q.   Correct?

14  A.   Yes, in the interview room.

15       MR. LIEB:    So I'm going to show a portion of Plaintiff's

16  Exhibit 73, the transcript, and play the accompanying portion of

17  Defendant's Exhibit A, the audio, both in evidence.  Mr. Foran,

18  let's play the first clip of the interview.

19       THE WITNESS:    You're asking me too many questions.

20       MR. LIEB:    I was talking to him.

21       THE WITNESS:    Okay.

22       (Video played)

23  Q.   (Mr. Lieb)  Okay.  So during this portion of the interview

24  from page 2 of the transcript, going on to page 3, Cocchia gives

25  this initial story of hearing this confession on the bus down to

1    Virginia, right?

2    A.    That's what he said, on a bus, coming from Connecticut.

3    Q.    Okay.  And you ask him if he knew who Ricky -- you asked him

4    if Ricky said who he was with, correct?

5    A.    What?

6    Q.    You asked Cocchia -- can we pull the -- sorry, the visual

7    back up, please?  You asked him if Ricky said who he was with,

8    right?

9    A.    Yes, I did.

10    Q.    And Cocchia says, "I got the impression he was alone,"

11    correct?

12    A.    That's -- initially, yes.

13    Q.    Yes.  And you knew there were multiple perpetrators, correct?

14    A.    What was that?

15    Q.    You knew there were multiple perpetrators, correct, more than

16    one killer, correct?

17    A.    I just told him there was a burglary, an old man was in the

18    house, and just basically he expounded on that as I kept

19    questioning him.  He kept giving more information.  And initially

20    he did not say anything about that was not Birch's knife, that

21    kind of thing.  He said he got it from the kitchen.  That is part

22    of this interview, and also on tape.

23    Q.    My question is:  Your investigation revealed there was more

24    than one killer in the house, right?

25    A.    Yes, I said that to him, yes.

1    Q.    I'm not asking what you told him.  I'm asking what your

2    investigation revealed.  Your investigation revealed that there

3    was more than one killer in the house, correct?

4    A.    Yes.

5    Q.    And Cocchia said, "I think Ricky was alone," correct?

6    A.    Yes.

7    Q.    That information was wrong, correct?

8    A.    Yes.

9    Q.    During this portion of the interview you said, "All right.

10   Getting back to the burglary, where the old man was killed."

11   A.    Yes.

12   Q.    You heard yourself say that?

13   A.    Yes.

14   Q.    Okay.  Up until that point, he had not mentioned the victim's

15   age, correct?

16   A.    I'm not sure about that.  He said old man somewhere in that

17   statement.

18   Q.    You were the one who introduced to Cocchia that it was an old

19   man who was killed, correct?

20   A.    Yes, that was correct, but it was on -- in all the

21   newspapers, it was, how he was stabbed, everything within a

22   couple days after the homicide.

23            MR. LIEB:    We're going to play another clip from DX A and

24   show more of the transcript from page 5 of Plaintiff's

25   Exhibit 73, next, please.

1       (Video played)

2    Q.   (Mr. Lieb)  During this portion of the interview, did you

3    tell Mr. Cocchia that you're trying to get something important

4    out of him, right?

5    A.   You got to -- do that again?

6    Q.   That's okay.  I'm happy to do it again during this portion of

7    the interview.  You told Todd that you're trying to get something

8    important from him, right?

9    A.   That's the way the interview -- I wanted more information

10    that I knew -- I thought he had more information than he did.

11    Q.   Right.  You were trying to get something out of him, right?

12    A.   I wanted to get what he called us down for.

13    Q.   Right.  And you knew you couldn't tell him, right?

14    A.   I'd like you to repeat that question.

15    Q.   You knew you couldn't tell him -- you see you say, "That's

16    what I'm trying to get out of you, without telling you, and I

17    can't tell you."  You see that?

18    A.   He told a little more information as we went along, you know.

19    Initially, he didn't say too much.

20    Q.   My question is:  Do you see the words, "That's what I'm

21    trying to get out of you without telling you, and I can't tell

22    you."

23        Do you see those words?

24    A.   I can't answer that.

25    Q.   You can't answer whether you see those words on the screen?

1    A.    What are you talking about now?  Okay, because I don't hear

2    that well.  I want you to point it out, and I can't listen to

3    these tapes and get anything out of them.  I only have what I'm

4    reading right now.

5    Q.    Mr. Foran, do you have the ability to highlight the sentence

6    I just mentioned?

7    A.    Point it out again to me?

8    Q.    The gentleman is working on it, okay.  One moment, please.

9    Okay.  Do you see the yellow?

10   A.    Yes, I do.

11   Q.    Okay.  Do you see it says, "That's what I'm trying to get out

12   of you without telling you"?

13   A.    Yes, I did say that.

14   Q.    What were you trying to get out of him without telling him?

15   A.    More information, because he was very evasive about

16   everything at first.  He just kept remembering -- kept

17   remembering more and more information --

18   Q.    Mr. Cocchia --

19   A.    -- as the interview went along.

20   Q.    Mr. Cocchia was very evasive you said?

21   A.    What was that again?

22   Q.    Todd was very evasive you said?

23   A.    Initially, yes, but then he wanted assurances because we

24   could -- I said I couldn't give you any assurance.  He didn't

25   want to go back to Connecticut.  He didn't want to go down to

1    jail down there.  He would have got five years, and that is why

2    he called.

3    Q.    Do you see a couple of lines down from the yellow you say,

4    "Okay.  I'll try to give you a hint."

5         Do you see that?

6    A.    Yes.

7    Q.    And you were trying to get information about what was

8    supposedly stolen from this house, right?

9    A.    Yes.

10   Q.    And Todd says, "He took a color T.V.," right?

11   A.    "Took a color T.V. and pointed out a house in New Milford."

12   I don't see how he did that and a VCR.

13   Q.    There was no color T.V. reported missing from this house, was

14   there?

15   A.    You're going to -- I just can't get what you're saying a lot

16   of times, okay.

17   Q.    There was no color T.V. --

18   A.    That's true.

19   Q.    -- reported missing from this house, correct?

20   A.    Okay.  That was true, yes.

21   Q.    Okay.  And there was a VCR supposedly missing, right?

22   A.    Supposedly, no.  It was stolen out of -- the VCR was stolen

23   out of the house.

24   Q.    Well, Diana told you it was stolen, right?  Diana told you it

25   was stolen?

1   A.    He didn't tell me until I read it later in somebody else's

2   report, because --

3   Q.    Diana told the police it was stolen.

4   A.    Well, that's what they put down was stolen from the house,

5   okay.

6   Q.    But you tried really hard to find it, and you never did,

7   right?

8   A.    The VCR, no.

9   Q.    Okay.

10  A.    Never found it.

11  Q.    Okay.  Let's go to the next portion, which will be from the

12  bottom of page 6, going on to page 7 of Plaintiff's Exhibit 73,

13  with accompanying audio from Defendant's A.

14        (Audio clip played)

15  Q.    (Mr. Lieb)  Here you asked Todd if it was daytime or

16  nighttime, right?

17  A.    What's that?  On this tape is what he said.  He said it was

18  -- I know it was daytime, I guess he told me.

19  Q.    Yeah, Todd said it was supposedly daytime, right?

20  A.    In the morning, yes.

21  Q.    You knew Everett Carr died in the middle of the night, right?

22  A.    Repeat that again?

23  Q.    You knew that Everett Carr died in the middle of the night,

24  correct?

25  A.    Yes.  I knew it was at night, yes.

1    Q.    You again ask Todd, "You got the impression he was alone."

2    You see that here?

3    A.    Yeah, that's what he said.

4    Q.    And Todd again says, "He was alone," right?

5    A.    You got to repeat that again.

6    Q.    Todd says a second time "He was alone," correct?

7    A.    Yeah, he said -- he didn't tell me anyone else was with him.

8    Q.    Wrong again, correct?

9    A.    That's true.  That is true.  He had an accomplice that was

10   with him, yes, Henning.

11   Q.    Okay.  Let's go to the final clip from page 12 of the

12   transcript.

13        (Audio clip played)

14   Q.    (Mr. Lieb)  Here you told Todd that Ricky was supposedly

15   not alone, correct?

16   A.    Yes.

17   Q.    That's information that you thought you had, right?

18   A.    Yes.

19   Q.    That Todd did not have, correct?

20   A.    You got to ask that one again.

21   Q.    You gave Todd that information, right?

22   A.    About getting -- no.

23   Q.    Do you see --

24   A.    That's true.  He already said he got the knife, that Birch

25   got the knife from somewhere else and within the house.

1    Q.    You gave Todd the information that there was more than one

2    perpetrator, correct?

3    A.    Partially, yes.

4    Q.    But even after you did that, Todd still thought the second

5    person didn't go in the house.  Do you see that?

6    A.    Whereabouts you talking?

7    Q.    It is okay.  We will let it speak for itself.  You told Todd

8    that it was nighttime, correct?

9    A.    Yes, I did.

10    Q.    That was information you gave him, correct?

11    A.    Yes, I did, yes, I did.

12    Q.    Can we pull up page 11 of Plaintiff's Exhibit 73, please,

13    Mr. Foran.  Can you call out the last Ocif chunk at the bottom of

14    the page.  You see this says, "You know the old expression, half

15    a loaf of bread is better than none?"  You see that?

16    A.    Yes, I do.

17    Q.    The other half that he didn't give you, you gave him, right?

18    A.    I was trying to get enough information and I thought he

19    already gave enough to us, a little repetitious if I continued

20    the interview, because I felt that we had enough with his

21    statements that we had already, and he was -- he would just

22    repeat the same thing again and again.

23    Q.    You knew that Todd lied a lot during this interview, right?

24    A.    Well, I don't know if he lied a lot.  I thought he was

25    telling the truth on this.  In fact, I was positive, because he

1    wanted to get out of jail down in Norfolk, Virginia, period.

2    Q.    So it is your testimony that you thought he was telling the

3    truth?  You thought he was telling truth?  That's what you are

4    saying?

5    A.    Repeat that again, please.

6    Q.    Did you know Cocchia was lying during this interview?

7    A.    No.

8    Q.    Did you question the veracity of what he was saying?  Did you

9    question the truth of what he was saying?

10   A.    Not everything, but I knew enough from the investigation and

11   being the case officer what occurred.  That's what I'm reporting.

12        MR. LIEB:    Let's play deposition clip 9.  This is from

13   page 129 lines 24 to page 130 line 11 of the deposition.

14        (Video played)

15        THE WITNESS:    That's my statement when I was under

16   deposition, yes.

17   Q.    (Mr. Lieb)  Did you drive back that night, or did you and

18   Detective Shortt stay over in Virginia?

19   A.    You got to ask that again.

20   Q.    Did you drive back that night, or did you and Shortt stay the

21   night in Virginia?

22   A.    I think we did, yes.

23   Q.    You think you stayed the night?

24   A.    Yes, I think so.

25   Q.    Yeah.  Go to dinner?

1   A.   Beg pardon?

2   Q.   Did you have dinner?

3   A.   I don't know.

4   Q.   Presumably you talked about what had just happened, right?

5   A.   Talked about, to who?

6   Q.   With Shortt, about the interview you just did?

7   A.   Yes.

8   Q.   You don't recall Shortt ever expressing any disagreement with

9   the way you handled that interview, correct?

10  A.   No, he didn't disagree with it at all.

11  Q.   He didn't object at all, did he?

12  A.   No, no.

13  Q.   Can we pull up Plaintiff's Exhibit 35 in evidence, please.

14  Let's go the legible third page.  Do you see this on your screen?

15  A.   I can't read it.

16  Q.   Sure.  Can you tell that it is an inventory form?

17  A.   Can I tell what?

18  Q.   That is it an inventory form.  Pull up the top left?

19  A.   Yes.

20  Q.   Okay.  Take that down, please.  Now I'm going to show you

21  Plaintiff's Exhibit 36 in evidence.  You see Plaintiff's

22  Exhibit 36 concerns money being given to Diana Columbo, yes?

23  A.   Uh-hmm.

24  Q.   You see that?

25  A.   Yes.

1    Q.    Okay.  You can take that down.  The first time you ever saw

2    those documents in your life was in 2021 at your deposition,

3    correct?

4    A.    Don't remember.

5    Q.    Okay.  Can you pull up for the witness, Mr. Foran, page 236

6    lines 9 thru 17 of the deposition just for the witness.  No, no,

7    no.  Not the video, just the text.  Okay.  Just read that to

8    yourself for a moment, please.

9    A.    So I must have saw them three years ago.

10    Q.    Right.  Does that refresh your memory that the first time you

11    saw them was at your deposition?

12    A.    Yes.

13    Q.    Okay.  You have no idea where those documents came from,

14    correct?

15    A.    I think New Milford Police.

16    Q.    You delayed your retirement from the state police until Shawn

17    and Ricky had been convicted, right?

18    A.    Not exactly.  I was burned out, was ready to retire.

19    Q.    Page 285, lines 14 to 22, we don't have a video of this one.

20    Do you remember being asked the following question, and giving

21    the following answer at your deposition.

22        The fourth paragraph in this article says, "Ocif, 49, delayed

23    his retirement until Ralph Birch and Shawn Henning were convicted

24    of stabbing a New Milford man in a botched burglary four years

25    ago.  Do you see that?"

1          Answer, "Yes."

2          Question, "Is that true?"

3          Answer, "Yes."

4          Was that your sworn testimony?

5     A.   Okay.  I must have said it.

6     Q.   And it is true, right?  You delayed --

7     A.   Probably, probably yes.

8     Q.   You delayed your retirement to put that man away, right?

9     A.   Beg pardon?

10    Q.   You delayed your retirement?

11    A.   Not really, not really, just because you read it in a

12    newspaper article?

13    Q.   You attended Mr. Birch's trial?

14    A.   No, I didn't.  I was sequestered.

15    Q.   The jury convicted Ricky Birch on Friday afternoon.  You

16    remember that?

17    A.   No.

18    Q.   And you put in your retirement papers on Monday, right?

19    A.   Yes.  Well, I learned that he was -- it was done.

20    Q.   So you learned he had been convicted on Friday, right?

21    A.   Well, if you are telling me it was a Friday, yes, okay.

22    Q.   And you retired on Monday, right?

23    A.   Well, probably.

24    Q.   You were personally invested in the outcome of this case,

25    right?

1    A.    I wanted the defendants to be brought to justice, and I did

2    my job.

3    Q.    Even today, you think it's good that Ricky Birch spent 30

4    years in prison, right?

5    A.    Probably.

6    Q.    There is nothing that could ever convince you that Ricky and

7    Shawn didn't do this, is there?

8    A.    No.

9         MR. LIEB:    No further questions.

10   **CROSS-EXAMINATION BY MR. SPECTOR:**

11   Q.    Good afternoon, Mr. Ocif.

12   A.    Good afternoon.

13   Q.    I would like to clarify a couple of points.  You were asked

14   about the unrecorded portion of the interview with Mr. Cocchia?

15   A.    Yes.

16   Q.    You were asked whether or not he wanted or did not want to

17   talk to you, and I believe --

18   A.    Can you repeat that?

19   Q.    Sure.  It was proposed that at the beginning of the interview

20   he did not want to talk to you, and I believe you responded he

21   didn't want to give a recorded or a written statement.  And then

22   you were asked again that he did not want to talk to you?

23   A.    Yes.

24   Q.    And I'm confused as to whether or not he didn't want to talk

25   to you, or he just didn't want to give a recorded or a written

1    statement.  Would you clarify that?

2    A.    He wanted to make some assurances first from the State of

3    Connecticut and to get him out of jail down in Norfolk, Virginia

4    and that is why he was reluctant until we said we were going to

5    leave, and then he changed his mind.

6    Q.    So are you now saying that he did not want to give a

7    statement or talk to you unless he received assurances?

8    A.    Yes.

9    Q.    Okay.  Now, you were shown Plaintiff's Exhibit 96, correct?

10    We will put it up on the screen.  All right.  If we go to the

11    bottom of the screen, okay.  The second-to-last paragraph,

12    "Perugini then stated that Birch had told him about four months

13    ago while both of them were in G cottage that he, Birch, and

14    Shawn Henning had been robbing a house when an old man surprised

15    them.  Birch then told him that he and Shawn Henning then killed

16    the old man."

17          Is that information that you received directly from

18    Mr. Perugini?

19    A.    Yes.

20    Q.    Now, further up, for the top paragraph, you informed

21    Mr. Perugini in paragraph number 3 that you were investigating a

22    murder that Ricky Birch was involved in, correct?

23    A.    Yes.

24    Q.    And I believe you said that you have never introduced

25    yourself in that manner before; is that correct?

1  A.    Yes.

2  Q.    You were previously questioned about interviews with two

3  other people in correctional facilities; one was Mr. Kulesza, and

4  the other was Mr. Chaffee.  And while being questioned, you were

5  asked whether or not you just randomly selected these people.

6        Do you recall that?

7  A.    No, sir.

8  Q.    All right.  Why did you happen to speak to these two

9  individuals?

10  A.    If I saw the reports, I really don't remember those.  One was

11  a guy named McKinley, was that it?

12        MR. LIEB:    Objection, Your Honor.  Nonresponsive and going

13  elsewhere.

14        MR. SPECTOR:    I don't know if it is not responsive.

15        THE COURT:    I will overrule it.

16  Q.    (Mr. Spector) All right.  Can you explain why you went to

17  speak to these two particular individuals?

18  A.    Well, the one at -- with regards to Perugini, I went

19  personally and talked to one of the corrections officers, and

20  they are the one that came up with the information about

21  Perugini.

22  Q.    Okay.  We're speaking now of Kulesza and Chaffee, did you

23  have any information that led you to speak to them?

24  A.    I don't really remember much information about those.

25  Q.    Okay.

1    A.    One I know I went to court on one of them, and I don't

2    remember his name, where the attorney says don't talk to him, he

3    will confess to anything.  I don't know which one that was, if

4    that's what you're talking about.

5    Q.    No, I'm just trying to find out, of all the people in the

6    correctional facilities, why you spoke to these two people?

7    A.    Yeah.

8    Q.    And you are saying you do not remember?

9    A.    I don't remember, but somebody gave it to me.  I don't know

10   who.

11   Q.    Now, early on in your testimony you were asked about a

12   theory, a theory that was a loud car that arrived in the

13   neighborhood where the crime occurred and then left the

14   neighborhood?

15   A.    Yes.

16   Q.    What was the factual information that you had that resulted

17   in that theory?

18   A.    At the time, a woman across the street named Alice Kennel,

19   heard the car come in with a loud muffler, and five or ten

20   minutes later she heard the dogs barking and the car turned

21   around in her driveway.  She said it was very loud, and she --

22   she specifically came up to time, about 5 -- 12:15 in the morning

23   on December 2nd, and took off.

24   Q.    And that was approximately the time or within the time that

25   you believed the crime may have been committed?

1   A.   Yes.

2   Q.   Did there come a time when you learned that an individual

3   named Todd Cocchia had information about a burglary murder that

4   Birch was involved in?  Did there come a time --

5   A.   Yes.  That was a couple years later.

6   Q.   All right.  And how did you learn that information?

7   A.   Well, Detective Shortt from New Milford Police Department got

8   a call from Detective Squires down in Norfolk, Virginia, says

9   there is an inmate there and he knows about a murder in New

10  Milford.  And that -- I didn't get the information, it was about

11  Birch, but I think it was.

12  Q.   Can we put up Defendant's Exhibit C, please.  All right.  Do

13  you recognize this report?

14  A.   Yes, it's up there now.

15  Q.   Can we go to the bottom, please, with the signature line.  Do

16  you recognize the signature at the very bottom of the report?

17  A.   I got my signature there, yes.

18  Q.   Okay.  And the date of the report is July 14th, 1988?

19  A.   Yes.

20  Q.   Correct?

21  A.   Yes.

22  Q.   And now up to the second paragraph.  Do you see the second

23  paragraph starts with "Note"?

24  A.   Yes.

25  Q.   Todd Cocchia was interviewed on July 6th, 1988, by Detective

1   Charles Squires and informed him that he had information about a

2   murder that Ralph Birch was involved in.  You wrote that in your

3   report?

4   A.    Yes.

5   Q.    Okay.  Prior to going to Virginia, did you have a phone

6   conversation with Detective Charles Squires?

7   A.    Detective Shortt, yes.

8   Q.    Did you have, prior to going to Virginia, a conversation with

9   Detective Charles Squires of the Norfolk Police Department?

10  A.    I did on the telephone, before we went down.

11  Q.    Before this time, where you heard the name of Todd Cocchia,

12  had you ever communicated with Mr. Cocchia?

13  A.    No, never.

14  Q.    Had you ever met him?

15  A.    No, never met him.

16  Q.    Did you know that he existed?

17  A.    No.

18  Q.    Did you have any knowledge with regard to any specific

19  information that he might give you about Mr. Birch?

20  A.    No.

21  Q.    So the only thing you knew going to Virginia is that he had

22  some information about a murder that Mr. Birch was involved in;

23  is that correct?

24  A.    Yes.

25  Q.    The interview took place on July 12th, 1988, correct?

1   A.   Yes.

2   Q.   What do you recall happening when you arrived in Norfolk?

3   A.   We spoke with Todd Cocchia before the interview was taped.

4   At first he didn't want any part of it, of, you know, cooperating

5   to the -- giving a statement, or even recording it, but when we

6   got ready to leave, we said well that's it.  We're not -- we're

7   going back to Connecticut, because he didn't want to be, give a

8   statement.  He said that somehow Birch would be after him.  He

9   would get this information.  It's just what I wrote in the

10  report.

11  Q.   Okay.

12  A.   And then, when we started again with the interview, now we

13  recorded it.  He wanted assurances that he wouldn't serve any

14  time in Connecticut if he provided this information about the

15  murder, and I told him that I had spoken with court officials in

16  Connecticut who indicated they would not give any assurances

17  until the information was evaluated as to its validity, and they

18  could go down a little bit, so I can see this.

19  Q.   That is fine for now, thank you.

20  A.   Okay.

21  Q.   Did the conversation about him wanting assurances occur in

22  the hallway outside of the interview room?

23  A.   No.

24  Q.   Where did it occur?

25  A.   No, all -- all that was about when we recorded it.  That was

1    it, and get a statement from him, and he refused.

2    Q.    Can you approximate how much time you were speaking to

3    Mr. Cocchia before you turned on the tape recorder?

4    A.    I have no idea, five, ten minutes maybe.  I don't know.

5    Q.    Did you ask him any specific questions before you turned on

6    the tape recorder?

7    A.    None whatsoever.

8    Q.    Did you provide him any facts related to the case before you

9    turned on the tape recorder?

10   A.    No.

11   Q.    Have you ever listened to the tape?

12   A.    Probably 35 years ago or something, and just partial part

13   today, but that was from the, I never -- I don't remember

14   listening to the tape, okay.  It went into evidence and probably

15   was at the trial.  I don't know.

16        MR. SPECTOR:    At this point, I would like to play the tape,

17   which is Defendant's Exhibit A.

18        THE COURT:    There is no objection?  That's in, right.

19        MR. LIEB:    It's in.  We are going to play the entirety of

20   the tape with a witness on the stand?

21        MR. SPECTOR:    Yes.  It is extremely --

22        THE COURT:    Come over here.

23        (Sidebar conference)

24        THE COURT:    First, how long is this thing?

25        MR. SPECTOR:    I believe it is about 30-something minutes.

1          THE COURT:    All right.  And this is agreed or stipulated it

2    is in evidence?

3          MR. LIEB:    It is in evidence.

4          THE COURT:    Okay.  Fine.  We will play it.

5          (Sidebar conference concluded)

6          (Audio clip played)

7    Q.    (Mr. Spector)  Could you hear that?

8    A.    Yes.

9    Q.    Okay.  There seems to be some rustling that is going on.

10    Were you inside or outside the interview room at this moment?

11    A.    I think it was probably inside the interview room.

12    Q.    Okay.  Had you just entered the interview room?

13    A.    Yes.

14    Q.    Okay.  Had you actually sat down at this point?

15    A.    Yes, I sat down, and Cocchia was across from us.

16    Q.    Okay.

17    A.    Dave Shortt was there, too.

18    Q.    All right.  I know you sat down at some point.  What I'm

19    trying to get to is: We hear this rustling noise.  Had you sat

20    down at that point?

21    A.    I opened up my briefcase probably.

22    Q.    Okay.  So the noise we hear is you opening up your briefcase?

23    A.    Yes.

24    Q.    All right.  Are you opening up your briefcase to take some

25    papers out?

1    A.    I had statement paper in there and some -- some tape recorder

2    batteries in the case and some tapes.

3    Q.    Okay.  Well, we are going to now play the rest of the tape in

4    context, okay?

5    A.    Okay.

6    Q.    Just going to run through the entire tape.

7    A.    Okay.

8    Q.    Thank you.

9          (Audio clip played)

10   Q.    (Mr. Spector)  Mr. Ocif, did we just listen to the entire

11   interview that took place within the interview room?

12   A.    I think so, yes.

13   Q.    Are you able to describe the interview room, the size of it?

14   A.    Well, I noticed one thing when I came in.  There was bars on

15   the windows.  You know, I mean, definitely people tried to escape

16   once in a while, but I don't think that was the case.  It was

17   well put out, and there was a big table, I can remember that.

18   And I sat on one side with Detective Shortt, and I think

19   Detective Squires was there, I'm not positive, and Cocchia was

20   sitting across from us.

21   Q.    When you say there was a big table, was it bigger than the

22   table here in the courtroom?  (Indicating)

23   A.    Yeah, it was typical size, something like that, could have

24   been longer.  I don't remember exactly.

25   Q.    Okay.  And Mr. Cocchia was sitting directly across from you?

1    A.    Yes.

2    Q.    Did you bring the Carr investigative file with you?

3    A.    No.

4    Q.    Did you have any of the investigative documents with you?

5    A.    No.

6    Q.    Did you bring anything with you?

7    A.    Just the briefcase and statement paper and, like I said

8    before, the batteries for the tape recorder and also some empty

9    cartridges.

10    Q.    What we're going to do now is we're going to pull up

11    Defendant's Exhibit B.  This is the transcript.  So when you

12    start an interview, do you start the interview with the date and

13    time interview begins?

14    A.    Yes.

15    Q.    Okay.  And it appears as though you did that before you went

16    into the interrogation room?

17    A.    Before I went where, sir?

18    Q.    It says -- let's look on the left where it says "unknown,"

19    you see on the left-hand side of the page.  Six lines down.  It

20    says "unknown"?

21    A.    Okay.

22    Q.    So they don't know who the speaker is?

23    A.    Yes, that's right.

24    Q.    All right.

25    A.    I think that was probably Detective Squires.

1  Q.    Okay.  So the unknown where we see it is probably Detective

2  Squires?

3  A.    Uh-hmm.

4  Q.    That's fine.  And the first page, essentially, is you talking

5  about assurances that Todd Cocchia wanted?

6  A.    Yes.

7  Q.    And then we can go to page 2.  And by the way, did you give

8  Todd Cocchia any assurances?

9  A.    No, because I couldn't, you know.  It wasn't my authority to

10  do that.  I said probably, maybe, yes, but that's what I said.

11  Q.    So probably he could receive some benefits, depending upon

12  what he said?

13  A.    Yes.

14  Q.    On the top of page 2, you see Todd Cocchia and the first few

15  lines indicating that, "If I made a statement, I don't want to

16  see Connecticut jails.  You put me in Connecticut jails, Rich is

17  going to know.  His attorney's going to know right off the bat

18  that I'm a snitch, and you're -- you're going to label me as a

19  pin cushion, and I'm going to" -- you know, he is expressing some

20  concerns about giving a statement with regard to Mr. Birch's

21  involvement --

22  A.    Yes.

23  Q.    -- for the crime.

24       And you thereafter say, "I can't give that -- I can't give

25  you that kind of guarantee."

1          What kind of guarantee are you talking about?

2    A.    He wanted assurances that -- from the State of Connecticut

3    and from down in Norfolk, Virginia, and I couldn't give him that.

4    Q.    Okay.  So at that point you're not addressing his concern

5    that he might be a pin cushion?

6    A.    Probably, I -- just going by what he was saying at the time

7    and then he -- he emphasized that a little more later that Birch

8    would get him, that kind of thing, if he gave a statement.

9    Q.    Okay.  In fact, looking at the top of the page where it says

10   "Cocchia"?

11   A.    Yeah.

12   Q.    Go down to the -- on the left-hand side, where it again says

13   "Cocchia"?

14   A.    Yes.

15   Q.    "Your word could get me killed"?

16   A.    That's what he said.

17   Q.    Did you believe at the time that he feared Mr. Birch?

18          MR. LIEB:    Objection.

19          THE COURT:    Overruled.

20          THE WITNESS:    Just what he said, your word could get me

21   killed, and he indicated that -- my response would be, yes, he

22   was -- he was scared about giving me a statement.

23   Q.    (Mr. Spector)  So the first question that you asked him,

24   going down half the page, after he says, "All's I got is we were

25   on the way here and" -- and you're clarifying, who is "we"?

1   A.   Yes.

2   Q.   Because you wanted to know whether or not he was talking

3   about himself --

4   A.   Yes.

5   Q.   -- and Ricky Birch?

6   A.   Yes.

7   Q.   And at that point, had you related to him any facts about the

8   case?

9   A.   He said me and Ricky Birch.

10  Q.   No, had you --

11  A.   Oh.

12  Q.   -- told him about any facts related to the case?

13  A.   No.

14  Q.   Had you asked him any specific questions about what he knew?

15  A.   Eventually, yes, after he consented to the tape recorder.

16  Q.   I'm not talking about eventually, I'm talking about at this

17  point in the interview.

18  A.   I couldn't give him anything.  I didn't know it.

19  Q.   And you didn't ask him any specific questions, substantive

20  questions about what he knew?

21  A.   Yes.

22  Q.   At that point you had not?

23  A.   Yes.

24  Q.   Now, going about seven lines down, it says --

25       THE COURT:   Mr. Spector, I think you need to be close to the

1    microphone.

2         MR. SPECTOR:    Okay.

3    Q.    (Mr. Spector)  It states, and I want you to do this

4    carefully, go down 1, 2, 3, 4, 5, 6, 7 lines.  The first word in

5    the line is "he" there?

6    A.    What did you say?

7    Q.    First line is "he"?

8         "He told me about way back" --

9    A.    Yeah, yes.

10   Q.    -- "did a burglary, and there was a man in the house and he

11   killed him."

12   A.    Yes.

13   Q.    And he said that again before you asked him any substantive

14   question about what he knew?

15   A.    I agree.

16   Q.    And he says four lines down that he thinks it was in New

17   Milford?

18   A.    Yes.

19   Q.    And the last two lines in that paragraph are, "He told me

20   that there was a man in the house and he stabbed him, and he said

21   the man died."

22   A.    Yes.

23   Q.    You asked him in the very next line, "did he say who he was

24   with?"  And he responds, "I got the impression that he was

25   alone."

1          Now, you knew, or believed at least that he was not alone

2     when he committed the crime, correct?

3     A.    Yes.

4     Q.    But you didn't correct him?  You didn't say that's not true,

5     did you?

6     A.    No.

7     Q.    And why not?

8     A.    Because he was -- I knew that what was going on.  I knew that

9     they were doing burglaries together.

10    Q.    Would it have been appropriate for you to correct him to tell

11    him what the true facts were, as far as you knew?

12    A.    I wasn't going to tell him.  I already knew it.

13    Q.    Going to page 3, you ask, "Did he say he knifed him?"  Was

14    that in reference to his prior comment that he stabbed the man?

15    A.    Yes.

16    Q.    And he confirms "Yes, he stabbed him."  Going down in that

17    paragraph, that's the third comment by Mr. Cocchia going on the

18    left-hand side of the page, going down six lines, "I started

19    thinking, oh my God, he's getting me involved in this, too."

20          Do you know why he said that?

21          MR. LIEB:    Objection.

22          THE COURT:    Sustained.  Actually, this might be right at the

23    time for the afternoon break.  Is this an okay time and place?

24          MR. SPECTOR:    Sure.

25          THE COURT:    All right.  Great.  We will take the break and

1    be back at 2:45.  Gentlemen of the jury, we will be back.  Don't

2    learn anything about the case.  Don't try to do anything during

3    your duties as juror.  Everything will be right here.  See you in

4    a little bit.

5         (Jury excused)

6         THE COURT:    You can be seated.  Can I actually just see

7    Mr. Spector and Mr. Lebowitz just come over for a quick sidebar?

8         (Sidebar conference)

9         THE COURT:    Hi, I see Mr. Lieb, I don't know he is having a

10   bloody nose, do we need to take break?

11        MR. LEBOWITZ:    I think he is now okay.  But obviously, I

12   will confirm now with him.

13        THE COURT:    It is fine.  If he needs a break, just let me

14   know.  You are focused on this.  I don't know.

15        MR. SPECTOR:    I noticed that.

16        THE COURT:    There he is.  Okay.

17        MR. LIEB:    I apologize, Your Honor.

18        THE COURT:    No, no, we are actually talking about you.  Your

19   timing is impeccable.  I wanted to make sure, do you need a break

20   or something?

21        MR. LIEB:    I think I will be okay.

22        THE COURT:    Just let us know.

23        MR. LIEB:    I will use the 15 minutes to ascertain as much.

24        THE COURT:    All right.  Thank you so much.  All right.

25        (Sidebar conference concluded)

1          THE CLERK:    All rise.  The Court stands in recess.

2          (A recess was taken)

3          THE CLERK:    All rise.  The United States District Court is

4     now open after recess.  The Honorable Victor A. Bolden presiding.

5          THE COURT:    All right.  Are we ready?

6          MR. SPECTOR:    Yes.

7          THE COURT:    Okay.

8          MR. LIEB:    Your Honor, I'm okay to proceed, but I may have

9     to get this checked out.  Let's try and finish the witness.

10          THE COURT:    Okay.  All right.  You know, I will do whatever

11     you need.  Just let me know.  Thank you.  How much longer do you

12     have, Mr. Spector?

13          MR. SPECTOR:    20 to 30 minutes.

14          THE COURT:    Okay.  Do you want me to take a longer break?

15          MR. LIEB:    No.

16          THE COURT:    Just keep going?  All right.

17          (Jury present)

18          THE COURT:    All right.  Welcome back.

19          Mr. Spector?

20          MR. SPECTOR:    Thank you, Your Honor.

21     Q.    (Mr. Spector) Going back to the transcript now, and I'm

22     bringing you, coming from the bottom of the page on page 3, nine

23     lines up from the bottom of the page.  Cocchia asks you, "When

24     did it occur?"

25          So, he was saying it occurred in the prior sentence, a long

1    time ago?

2    A.    Uh-hmm.

3    Q.    And then he asked you at the bottom of the paragraph when did

4    it occur.  And you respond, "Let's just see what you have on

5    first, okay, I'll tell you that later."

6         Why did you not want to tell him what time -- when it

7    occurred?

8    A.    I don't know.  I can't answer that.  I don't remember.

9    Q.    Well, shouldn't you give him information about the real facts

10   in the crime?  Or is that inappropriate?

11   A.    Can you ask me that question again?

12   Q.    Sure.  I will simplify it.  As an investigator, when you're

13   conducting an interview of an individual, you do not want to

14   provide them with facts, correct?

15   A.    Yes.

16   Q.    And you did not provide him with the true fact about what had

17   occurred?

18   A.    No, I never told him that.

19   Q.    I'm going to skip to page 5.  Halfway down the page, under

20   the long paragraph Cocchia said, "I don't think it was his knife.

21   It was not his knife, as a matter of fact."

22        And three lines down from that, he states, "I remember him

23   saying I just picked up the knife and stabbed him."

24        About five lines down from that you say, "It's all coming out

25   of you."

1          What do you mean by that?

2     A.    I was just trying to get more information.

3     Q.    And, again, he says at the bottom of the page, he said, "I

4     just grabbed knife and stabbed him, or I saw the knife, I grabbed

5     it and stabbed him."

6          Skipping to page 7, at the very top of the page, you ask him,

7     "Was this daytime?  Nighttime?"

8          And he states, "It was daytime."

9          And you repeat that.

10         "It was daytime?  How do you know it was daytime?  He told

11    you?"

12         "Yeah."

13         And, once again, you did not correct him, did you not correct

14    him, because it would be inappropriate to correct him?

15    A.    I didn't correct him.

16    Q.    And you, in fact, repeat with regard to him being alone, you

17    got the impression he was alone.  You are not refuting his

18    information that you knew was wrong, correct?

19    A.    Right.

20    Q.    Now, on page 8, you essentially summarize what he has already

21    told you.  "Yeah, so basically, he said he stabbed an old man

22    during a burglary."

23         But, he didn't tell you it was an old man, did he?  You said

24    it was an old man, correct?

25    A.    Yes, yes.

1    Q.    "And that it occurred a long time ago," and he thinks it

2    happened in New Milford?

3    A.    Yes.

4    Q.    "And he told you this on a bus?"

5    A.    Yes.

6    Q.    "And he grabbed a knife and stabbed him?"

7    A.    Yes.

8    Q.    You are providing a summary of what he has told you, and then

9    at the bottom of the page, five lines from the bottom, you ask,

10   "But he said it was an old man."  And he says, "Yes, I don't even

11   know."  So he didn't accept your comments that it was an old man?

12            MR. LIEB:    Objection.

13            THE COURT:    Overruled.

14            THE WITNESS:    Yes.

15   Q.    (Mr. Spector)  Do you recall why you said it was an old

16   man?

17   A.    Because everybody knew it already around New Milford.  I

18   mean, it was in the news.  It was on television within a couple

19   days after the homicide.  There was articles and papers where his

20   throat -- the victim's throat was slashed and, you know, lot of

21   people knew this and had his age and, you know, he was in the

22   Second World War.  He was a veteran, so that was in the papers,

23   in the newspapers.

24   Q.    I'm going to go to page 10.  And in the large paragraph,

25   toward the top, where Cocchia is speaking.  Four lines down in

1    that paragraph he is talking about a situation where the police

2    came to a motel that they were staying at, and that was the Beach

3    Comber Hotel?

4    A.    Right, it was called -- I forgot the name of it.

5    Q.    And he says five lines down, "When they came to the hotel

6    that night, he started freaking out on me, you know.  Oh my God,

7    what if they're here for us?  Because they walked into the hotel.

8    You know what, because I used my ID, I'm kind of, 14 months is

9    all I got hanging."

10           He says at the bottom of that paragraph, "He was like, you

11   don't have a murder to worry about" and then toward the bottom of

12   the page --

13           MR. LIEB:    Objection.  Is there a question here?

14           MR. SPECTOR:    There is.  It is the same thing, so it runs

15   off of this.

16           THE COURT:    I will overrule it.

17           MR. SPECTOR:    At the bottom of the page Cocchia says, "I

18   said the police are here, and he said, don't worry.  I said, they

19   just walked into the office?  And I said, what do you mean, don't

20   worry?  He said you don't have a murder to worry about, you know.

21   He said you just got a little bit of time to do."

22   Q.    (Mr. Spector) Did you have any information about the motel

23   incident?

24   A.    It was just a Beach Comber.  I just read it here.  I didn't

25   remember the name of it.  They broke into a restaurant, because

1    they were hungry, and Birch got away.

2    Q.    So before Mr. Cocchia made this comment, about the police

3    coming to the motel --

4    A.    Yes.

5    Q.    -- did you have any idea that an incident like that had

6    occurred?

7    A.    I didn't really follow-up on that.  I think Detective Squires

8    did.

9    Q.    But my question is:  Before he made these statements --

10    A.    Okay.

11    Q.    -- indicating fear, because the police officers were there,

12    and he had a murder to worry about?

13    A.    Yes.

14    Q.    Did you know that this had occurred, or is this the first

15    time you heard about this statement?

16        MR. LIEB:    Objection to form.  What is "this"?

17        THE WITNESS:    This is the first time.

18        THE COURT:    Okay.  I will overrule it.

19    Q.    (Mr. Spector)  On page 11, going up from the bottom, on the

20    left-hand side, where it says "Ocif," you start off with "you

21    know, the old expression, half a loaf of bread is better than

22    none"?

23    A.    Yes, I said that.

24    Q.    At that point in the interview, did you believe you were

25    going to get any more information from Mr. Cocchia?

1    A.    If I would have kept going I would have got the same thing

2    over and over repeated.

3    Q.    So, in your mind, this investigation, this investigative

4    interview was essentially over?

5    A.    Yes.

6    Q.    And after that point, you corrected some of the information

7    that you had not corrected earlier, right?

8    A.    Yes, yes.

9    Q.    And why did you do that?

10   A.    Why did I do that?  Because I thought we had enough, and to

11   just keep talking to him was useless.

12   Q.    Okay.  On page 13, Mr. Cocchia expresses concern about

13   signing a statement, and that's at the top of the page.  You tell

14   him at the top of the page, rather, don't you have to sign a

15   statement but you indicate four lines down from that that you

16   might have to when you come to Connecticut.

17         So when you came down there, you were prepared to take a

18   written statement from him, correct?

19   A.    Yes.

20   Q.    But you didn't press the issue?

21   A.    Yes.

22   Q.    Did you talk to Mr. Cocchia at any time after this interview?

23   A.    I think I did in the interview just before he was brought,

24   after he was brought back to Connecticut and I went to see him, I

25   think to see if he was going to testify or something, and there

1    is a report on it, but I don't remember it.

2    Q.    Okay.  And did he indicate that he would testify?

3    A.    He said he would.  I thought -- at first he didn't want to,

4    but he indicated that he would.

5    Q.    Did you ever talk to Detective Squires after you left

6    Norfolk?

7    A.    No.

8    Q.    When you came back to Connecticut, describe the process by

9    which you had the tape transcribed.

10   A.    I tagged it as evidence, went to the lab down in Bethany, not

11   Bethany, but in Meriden, had copies made.  I don't know how many

12   copies we made.  And I sat down with Dave Shepack, the Assistant

13   State's Attorney, who I remember, we went over it, and I don't

14   know who else, probably the Lieutenant and Sergeant Acker

15   probably saw it, but I wasn't there when they looked at it or

16   reviewed it.

17   Q.    Okay.  Did you arrange for the tape to be transcribed, or how

18   does that work?

19   A.    All I know is it was put into evidence.  That's the last

20   time, and I don't know who took it.

21   Q.    Do you believe that Todd Cocchia was telling the truth with

22   regard to Mr. Birch's involvement in the murder?

23   A.    Yes.

24   Q.    Now, did you prepare a warrant for Mr. Birch's arrest?

25   A.    Yes.

1    Q.    How was it determined that a warrant should be submitted, a

2    warrant application should be submitted?

3            MR. LIEB:    Objection, Your Honor.  May we be heard?

4            THE COURT:    Sure.  Come on over.

5            (Sidebar conference)

6            THE COURT:    What do we got?

7            MR. LIEB:    So the warrant itself has Mildred.  It has say to

8    have -- it has the statement from other people.

9            MR. SPECTOR:    I'm not going to ask that.

10           MR. LIEB:    I know, but I just want to make sure that he

11   limits himself to the question, because I -- if you are saying --

12           MR. SPECTOR:    I just want the process.

13           MR. LIEB:    Can you ask him more clearly, like, in general

14   describe the process for submitting a warrant, because I don't

15   want him detouring into the contents of that.

16           MR. SPECTOR:    I will remember those words and do it that

17   way.

18           THE COURT:    All right.  Just so everyone gets along.

19           (Sidebar conference concluded)

20           THE COURT:    Do you want to rephrase the question or state it

21   again?

22           MR. SPECTOR:    I will state it again.

23   Q.    (Mr. Spector)  In general, what is the process for

24   determining whether a warrant application should be submitted?

25   A.    I went through probably Sergeant Acker and my direct

1    supervisor, but then, I think I went right to Assistant State's

2    Attorney Dave Shepack.  I had been dealing with David about the

3    case quite a bit, so I went to him.

4    Q.    So are you saying that the three of you decided that an

5    application should be submitted?

6    A.    Yes, I thought so, yes.

7    Q.    And who drafted the search warrant application?

8    A.    I did the first draft, and gave it to Dave Shepack, and he

9    made a couple changes and I -- I can't remember what the changes

10   were, but then it was submitted, my new sergeant, he was -- Acker

11   wasn't there anymore, but he notarized it, and then I gave it to

12   Dave Shepack, and he got it, went to the judge, and the judge

13   signed the warrant.

14   Q.    Were Steven Jordan or David Shortt involved in any way in a

15   determination that a warrant application should be applied for?

16   A.    I don't think so.  There was a rush to do it or something.  I

17   don't remember the rush, but I was keeping Captain Lillis

18   apprised of everything that was going on, so he knew it.  And

19   Dave Shortt, I don't know if Dave Shortt knew about the warrant.

20   He may have.  I don't really remember.

21   Q.    Okay.  But are you certain that Steven Jordan played no role

22   in the application for the search warrant?

23   A.    I'm positive he didn't know.

24   Q.    And Dave Shortt did not participate in the preparation of the

25   warrant application?

1    A.    Oh, no, he was not.

2         MR. SPECTOR:    That's everything.

3         THE COURT:    All right.  Thank you.

4    **REDIRECT EXAMINATION BY MR. LIEB:**

5    Q.    Your testimony in response to Mr. Spector's questions was

6    that you brought your briefcase to the interview, correct?

7    A.    Yes.

8    Q.    And you said you had some statement paper in your briefcase?

9    A.    Yes.

10   Q.    And you had your recorder in your briefcase?

11   A.    Yes.

12   Q.    Is it your testimony that you had nothing else with you?

13   A.    Just some blank tape, I think, for the tape recorder.

14   Q.    Can we go to Plaintiff's Exhibit 119 in evidence, Mr. Foran,

15   please.  Can you call out the note paragraph, second paragraph,

16   please.  Mr. Spector asked you about this paragraph during his

17   examination.  Do you recall that?

18   A.    Didn't I just reply to this a little while ago?

19   Q.    That is my point.  Do you recall being asked about this

20   paragraph?

21   A.    Yes, I did, but I don't remember.

22   Q.    Okay.  Here I have another question.  You were -- you got

23   some information that Todd Cocchia had said something to Charles

24   Squires, right?

25   A.    Yes.

1    Q.    Okay.  You did not know what Todd had said to Charles

2    Squires, correct?

3    A.    That's not correct.  I think I did.  I can't answer that one

4    way or the other.

5    Q.    Well, this report just says "information about a murder that

6    Ralph Birch was involved in," correct?

7    A.    Yes.

8    Q.    It does not say whether the information was some type of

9    confession, right?

10    A.    This information came out from Detective Squires, and he gave

11    it to Dave Shortt, and then I called him about it on the phone,

12    and that's when I learned that it was about Ralph Birch being

13    involved.

14    Q.    Right.  You knew it was about Ralph Birch, but you didn't

15    know whether this was going to be some kind of confession or

16    something Todd Cocchia supposedly saw, right?

17    A.    All I knew is it was about a murder that happened in New

18    Milford.

19    Q.    Right.  So it might have been when you left for Virginia for

20    all you know, about something Todd Cocchia supposedly saw, right?

21    A.    No, that's not true.  I knew it was about Birch.

22    Q.    You knew it was about Birch, but you didn't know the kind of

23    information, right?

24    A.    I did not know Cocchia, didn't even know who the guy was, but

25    if he knew information but --

1    Q.    But here is my question:  If Todd Cocchia might have been

2    some kind of eyewitness, wouldn't you need more than just some

3    blank paper?  Wouldn't you need photos and other crime

4    scene-related materials to show him in case he knew something

5    firsthand?

6    A.    No.

7    Q.    So you had one shot to go down to Norfolk?

8    A.    All I knew was it is about Ralph Birch and this Cocchia guy

9    wanted to talk about it.

10   Q.    But in case Todd Cocchia claimed to have had firsthand

11   knowledge, wouldn't you have needed to bring photos and other

12   materials to show him?

13   A.    No.

14   Q.    Why not?

15   A.    He wasn't there.

16   Q.    How did you know that?

17   A.    That's not the way you start an interview, Counselor.  You

18   start an interview from day one, so you start using your

19   deductive reasoning, so you come up with a -- with some

20   information.  You know, I don't tell the guy anything about the

21   case initially.  I did not.

22   Q.    Let me try this one more time.  Before you packed for

23   Virginia, you did not know what Todd Cocchia was going to say,

24   correct?

25   A.    That's correct.  I didn't know a thing he was going to say,

1    just that it was about a murder.

2    Q.    You didn't know if Todd Cocchia was going to say he committed

3    the crime with Mr. Birch?

4    A.    Didn't know that.

5    Q.    Right.  So wouldn't you want to have case-related materials

6    to show Todd Cocchia in case they became relevant?

7    A.    I already knew that Birch and Henning had, were involved, not

8    Cocchia.  I never heard of Cocchia.  Didn't know who he was.

9    Nothing.

10    Q.    You testified in response to Mr. Spector about what was in

11    the news.  Do you recall that?

12    A.    Yes.

13    Q.    Did the news articles say that this was a daytime burglary?

14    A.    Say that again?

15    Q.    Did the news articles inaccurately report that this was a

16    daytime murder?

17    A.    I don't remember.

18    Q.    Did the news articles inaccurately state that there was one

19    perpetrator?

20    A.    No, but in the newspaper articles they said they -- they woke

21    this guy up, and within a couple days it was out, every where in

22    the news, even had the autopsy report on the victim.  They had

23    his neck slashed from ear-to-ear.

24    Q.    You testified in response to Mr. Spector's question that you

25    currently believe Todd Cocchia was telling the truth; is that

1    correct?

2    A.    Yes.

3    Q.    You are aware he has recanted, correct?

4    A.    Yes, I heard that.

5    Q.    But you don't care?

6    A.    Beg pardon?

7    Q.    You don't care, do you?

8    A.    He was a witness, and if he recanted, he should get arrested

9    for perjury then.  That's my opinion.

10          MR. LIEB:    Nothing further.

11          THE COURT:    All right.  Anything further?

12          MR. SPECTOR:    No questions you Your Honor.

13          THE COURT:    All right.  Thank you, you may step down, sir,

14    thank you very much.

15          (Witness excused)

16          THE COURT:    Next witness.

17          MR. LIEB:    Your Honor, I think I may need a moment.

18          THE COURT:    Yes, we will take a short break, we will see how

19    long it is.  All right.  We will be back.  As always don't

20    discuss the case and don't learn anything about it.  I know I

21    didn't give you all the things.  No TikToks, all right.  No

22    Facebook posts about being a juror.

23          (Jury excused)

24          THE COURT:    All right.  Please be seated.  Just let

25    Miss Murphy know when you're ready.

1          THE CLERK:    All rise.  The Court stands in recess.

2          (A recess was taken)

3          THE CLERK:    All rise.  This District Court is open after

4    recess.  Honorable Victor A. Bolden presiding.

5          MR. LIEB:    I was going to respectfully ask if the Court

6    would consider adjourning for the afternoon.

7          THE COURT:    That's fine.  Let's get you healthy.  And just,

8    you can have someone else answer you don't have to be responsible

9    for this, so your next witness is Mr. Cocchia, Mr. Birch?

10          MR. LIEB:    I think we will go to Mr. Birch.

11          THE COURT:    Go to Mr. Birch, all right.  And then, after

12    that, you will have one more?

13          MR. LEBOWITZ:    I think most likely after that we will rest,

14    yeah.

15          THE COURT:    All right.  And are you all set up to have --

16    you are thinking about it?

17          MR. McDONALD:    The one item, Your Honor, would be --

18          THE COURT:    Shepack?

19          MR. McDONALD:    Yes.

20          THE COURT:    I will be smarter the first thing in the

21    morning.

22          MR. McDONALD:    There is not a ton of sections on that.

23          THE COURT:    Yeah.  I mean, yeah, I will be smarter first

24    thing in the morning.

25          MR. McDONALD:    Yeah.

1          THE COURT:    That is fine.  Okay.

2          MR. LIEB:    I, well --

3          THE COURT:    You don't think I will be smarter first thing in

4    the morning?

5          MR. LIEB:    I was going to raise another issue, but I should

6    just leave.

7          THE COURT:    All right.  Go.  All right.  Thank you very

8    much.  We will adjourn, and I will have Miss Murphy let the jury

9    go.  I don't feel like I need to bring them back and send them

10   out.  Thank you very much.  Have a good evening.  Get well.

11         (Court adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              <u>CERTIFICATE</u>

2                               20CV1790

3                     RALPH BIRCH  v. NEW MILFORD

4          I, HEATHER A. IRELAND, CSR, CRR, RPR, do hereby certify that

5     the foregoing is an **<u>uncertified rough draft copy</u>** of my

6     stenographic notes to the best of my knowledge and ability.

7

8

9

10         Heather A. Ireland, RPR, CRR
           Official Court Reporter
11         United States District Court
           141 Church Street, Room 147
12         New Haven, Connecticut 06510
           (413) 427-0344
13

14

15

16    Dated:  3/16/25

17

18

19

20

21

22

23

24

25